**22-2110**

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
### *for the*
## 𝔉𝔬𝔲𝔯𝔱𝔥 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

COURTHOUSE NEWS SERVICE,

*Plaintiff/Appellant*,

– v. –

JACQUELINE C. SMITH, in her official capacity as Clerk
of the Circuit Court for Prince William County, Virginia,

*Defendant/Appellee*,

and

COMMONWEALTH OF VIRGINIA,

*Intervenor/Defendant – Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT RICHMOND

## BRIEF OF APPELLANT

DABNEY J. CARR, IV
TROUTMAN PEPPER
HAMILTON SANDERS LLP
Post Office Box 1122
Richmond, Virginia 23218
(804) 697-1238

*Counsel for Appellant*

JONATHAN E. GINSBERG
BRYAN CAVE
LEIGHTON PAISNER LLP
1290 Avenue of the Americas
36th Floor
New York, New York 10104
(212) 541-2000

*Counsel for Appellant*

ROGER MYERS
RACHEL MATTEO-BOEHM
BRYAN CAVE
LEIGHTON PAISNER LLP
Three Embarcadero Center
7th Floor
San Francisco, California 94111
(415) 675 3400

*Counsel for Appellant*

 COUNSEL PRESS • VA – (804) 648-3664

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and Local Rule 26.1, Appellant Courthouse News Service discloses that it is a privately held corporation with no parent company.  No publicly held corporation owns more than 10 percent of its stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT

JURISDICTIONAL STATEMENT ........................................................ 1

STATEMENT OF ISSUES ................................................................. 2

STATEMENT OF THE CASE.............................................................. 6

   A. Virginia's Preferential Remote Access to Court Records System ............. 7

   B. CNS' Coverage of Virginia's Circuit Courts Without Access To OCRA ... 12

   C. This Lawsuit ......................................................................... 14

     1. Motions to Dismiss................................................................ 14

     2. Change in Defendants; Cross-Motions for Summary Judgment............. 16

SUMMARY OF ARGUMENT ............................................................ 19

ARGUMENT ................................................................................ 21

I.  THIS IS A FREE EXPRESSION CASE SUBJECT TO DE NOVO
    REVIEW, AND THE RESTRICTIONS ON EXPRESSION ARE NOT
    "SMALL" ................................................................................ 21

II.  THE DISTRICT COURT MISUNDERSTOOD THE FUNDAMENTAL
    FIRST AMENDMENT RIGHT AT ISSUE AND THUS MISAPPLIED
    LOWER LEVELS OF SCRUTINY TO CNS' CLAIMS THAN
    REQUIRED ............................................................................. 31

   A. The Court Erred In Refusing To Apply Strict Scrutiny To CNS'
     Equal Protection Claim Because The Non-Attorney Access
     Restriction Clearly Impinges On The Fundamental First Amendment
     Right Of Access ...................................................................... 32

B. CNS' First Amendment Challenge To The Non-Attorney Access Restriction Is Subject To Some Form Of Strict Or "Rigorous" Scrutiny Because It Is Content-Based And Because It Denies The Right Of "Contemporaneous" Access ...................................................... 37

   1. The Non-Attorney Access Restriction Is Not Content-Neutral, And Therefore Must Be Subjected To Strict Scrutiny ............................ 37

   2. By Denying Contemporaneous Access, The Non-Attorney Access Restriction Must At Least Survive *Press-Enterprise II* Scrutiny............ 41

C. The Dissemination Restriction Is A Prior Restraint, And The Court Erred In Refusing To Apply The "Most Rigorous Form Of Review" ......... 44

III. THE EVIDENCE IN THE RECORD FAILS TO SATISFY EVEN THE TPM SCRUTINY THE DISTRICT COURT APPLIED, LET ALONE THE HIGHER STANDARDS IT SHOULD HAVE APPLIED ...................... 49

A. The Strict (Or Rigorous) Scrutiny The District Court Should Have Applied Poses High Evidentiary Hurdles That Appellees Did Not Meet .... 49

B. Even TPM Scrutiny Is Not Easily Met ........................................................ 51

C. Appellees Did Not Provide Evidence To Satisfy TPM Scrutiny, Let Alone Strict Or Rigorous Scrutiny .......................................................... 52

   1. Even Under TPM Scrutiny, The District Court Erred In Accepting Appellees' Conclusory Assertions Of Harm ............................................53

   2. Even Under TPM Scrutiny, There Is No Evidence To Support The Rejection Of Less Speech Restrictive Alternatives................................. 58

   3. Even If TPM Applies, Appellees' Policies Do Not Leave Ample Alternative Channels For Contemporaneous Access .............................. 65

CONCLUSION .................................................................................................... 65

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alexander v. United States*,
509 U.S. 544 (1993)........................................................45

*Americans for Prosperity Found v. Bonta*,
141 S. Ct. 2373 (2021).....................................................63

*Anderson v. Liberty Lobby*,
477 U.S. 242 (1986)........................................................62

*In re Associated Press*,
172 F. App'x 1 (4th Cir. 2006) ........................................43

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963).........................................................46

*Bauer v. Kincaid*,
759 F. Supp. 575 (W.D. Mo. 1991) ................................36

*Baughman v. Freienmuth*,
478 F.2d 1345 (4th Cir. 1973) ........................................46

*Bernstein v. Bernstein Litowitz Berger & Grossman LLP*,
814 F.3d 132 (2d Cir. 2016) ...........................................29

*Billups v. City of Charleston*,
961 F.3d 673 (4th Cir. 2020) ...................................*passim*

*Bostic v. Schaefer*,
760 F.3d 352 (4th Cir. 2014) .................................... 22-23

*Boyer v. City of Simi Valley*,
978 F.3d 618 (9th Cir. 2020) ..........................................41

*Burdick v. Takushi*,
504 U.S. 428 (1992).......................................................35

*Butigan v. Al-Malki*,
2017 WL 3097772 (E.D. Va. July 20, 2017)....................50

iii

*Cahaly v. Larosa*,
    796 F.3d 399 (4th Cir. 2015) .................................................................37

*CBS v. Young*,
    522 F.2d 234 (6th Cir. 1975) .................................................................46

*Cent. Radio Co. v. City of Norfolk*,
    811 F.3d 625 (4th Cir. 2016) .................................................................49

*In re Charlotte Observer*,
    882 F.2d 850 (4th Cir. 1989) ...................................................21, 22, 43

*In re Charlotte Observer*,
    921 F.2d 47 (4th Cir. 1990) .....................................................29, 31, 47

*City of Clebrune b. Cleburne Living Ctr.*,
    47 U.S. 432 (1985)..................................................................................32

*Citizens United v. Fed. Election Comm'n*,
    558 U.S. 310 (2010).................................................................................38

*Courthouse News Serv. v. Cozine*,
    2022 WL 593603 (D. Or. Feb. 14, 2002) .............................................33

*Courthouse News Serv. v. Gabel*,
    2021 WL 5416650 (D. Vt. Nov. 19, 2021)...............................37, 56, 62

*Courthouse News Serv. v. Jackson*,
    2009 WL 2163609 (S.D. Tex. July 20, 2009) .....................................43

*Courthouse News Serv. v. Planet*,
    750 F.3d 776 (9th Cir. 2014) .......................................................*passim*

*Courthouse News Serv. v. Planet*,
    947 F.3d 581 (9th Cir. 2020) .......................................................*passim*

*Courthouse News Serv. v. Quinlan*,
    32 F.4th 15 (1st Cir. 2022)................................................................32, 33

*Courthouse News Serv. v. Schaefer*,
    2 F.4th 318 (4th Cir. 2021) ..........................................................*passim*

*Courthouse News Serv. v. Schaefer*,
    440 F. Supp. 3d 532 (E.D. Va. 2020) ...................................................3, 28, 41, 43

*Cox Broad. Corp. v. Cohn*,
    420 U.S. 469 (1975).............................................................................30, 39, 47

*State ex rel. Dispatch Printing Co. v. Loudon*,
    741 N.E.2d 517 (Ohio 2001) ................................................................29

*Doe v. Cooper*,
    842 F.3d 833 (4th Cir. 2016) ...............................................................22, 52

*Doe v. Public Citizen*,
    749 F.3d 246 (4th Cir. 2014) ...............................................................*passim*

*Donrey Media Group v. Ikeda*,
    959 F. Supp. 1280 (D. Haw. 1996)........................................................35, 36

*Fusaro v. Cogan*,
    930 F.3d 241 (4th Cir. 2019) ...............................................................*passim*

*Globe Newspaper Co. v. Pokaski*,
    868 F.2d 497 (1st Cir. 1989)................................................................27, 44

*Globe Newspaper Co. v. Superior Court*,
    457 U.S. 596 (1982).......................................................6, 22, 23, 43, 63

*Harte-Hanks Commc's, Inc. v. Connaughton*,
    491 U.S. 657 (1989).............................................................................25

*Int'l Refugee Assistance Project v. Trump*,
    857 F.3d 554 (4th Cir.), *judgment vacated*, 138 S. Ct. 353 (2017)...................21

*Leigh v. Salazar*,
    677 F.3d 892 (9th Cir. 2012) ...............................................................50

*Lucero v. Early*,
    873 F.3d 466 (4th Cir. 2017) ...............................................................37

*Lugosch v. Pyramid Co.*,
    435 F.3d 110 (2d Cir. 2006) ................................................................25

*McCullen v. Coakley*,
    573 U.S. 464 (2014)......................................................................*passim*

*Morrison v. Garraghty*,
    239 F.3d 648 (4th Cir. 2001) ...............................................31

*In re Murphy-Brown, LLC*,
    907 F.3d 788 (4th Cir. 2018) ......................................................*passim*

*National Press Photographers Ass'n v. McCraw*,
    594 F. Supp. 3d 789 (W.D. Tex. 2022) ............................................38

*Nebraska Press Ass'n. v. Stuart,*
    427 U.S. 537 (1976).................................................................34, 47

*News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*,
    612 F.3d 301 (4th Cir. 2010) ......................................................50, 66

*Police Dep't of City of Chicago v. Mosley*,
    408 U.S. 92 (1972).....................................................................36

*Press-Enterprise Co. v. Superior Court*,
    478 U.S. 1 (1986).......................................................................3

*Press-Enterprise Co. v. Superior Court*,
    464 U.S. 501 (1984)...............................................................*passim*

*Quad-City Cmty. News Serv. v. Jebens*,
    334 F. Supp. 8 (S.D. Iowa 1971) ................................................36

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015)......................................................3, 20, 37, 40

*In re Reporter's Committee for Freedom of the Press*,
    357 F. Supp. 3d 528 (E.D. Va. 2019) ..........................................23, 32

*Reynolds v. Middleton*,
    779 F.3d 222 (4th Cir. 2015) ...................................................*passim*

*Richmond Newspapers, Inc. v. Virginia*,
    448 U.S. 555 (1980)................................................................24, 39

*Ridenour v. Schwartz*,
    875 P.2d 1306 (Ariz. 1994) ................................................................29

*Ross v. Early*,
    746 F.3d 546 (4th Cir. 2014) ...........................................51, 53, 58

*Rushford v. New Yorker Magazine, Inc.*,
    846 F.2d 249 (4th Cir. 1988) ............................19, 22, 23, 63

*Smith v. Daily Mail Publ'g. Co.*,
    433 U.S. 97 (1979)...............................................................44

*Soderberg v. Carrion*,
    999 F.3d 962 (4th Cir. 2021) .........................................22, 47

*Sorrell v. IMS Health*,
    564 U.S. 552 (2011).........................................25, 37, 40

*South Carolina State Conf. of the NAACP v. Kohn*,
    2023 WL 144447 (D.S.C. Jan. 10, 2023) ....................23, 32

*Stone v. Univ. of Md. Med. Sys. Corp.*,
    855 F.2d 178 (4th Cir. 1988) ................................................23

*United States v. Antar*,
    38 F.3d 1348 (3d Cir. 1994) ...............................................23

*United States v. Lawson*,
    677 F.3d 629 (4th Cir. 2012) ...........................2, 20, 32, 49

*Virginia Dep't of State Police v. Washington Post*,
    386 F.3d 567 (4th Cir. 2004) ..........................................25, 50

*In re Wall Street Journal*,
    601 F. App'x 215 (4th Cir. 2015) .................................45, 46

**Statutes**

42 U.S.C. § 1983 ..................................................................*passim*

Va. Code § 8.01-217(G)..................................................12, 60

Va. Code § 8.01-420.8 ...............................11, 39, 56, 59, 60

Va. Code § 16.1-305 ...........................................................................59

Va. Code § 16.1-305.01 ......................................................................59

Va. Code § 16.1-307 ...........................................................................59

Va. Code § 17.1-293(B) ................................................................*passim*

Va. Code § 17.1-293(E)(5) .................................................................38

Va. Code § 17.1-293(E)(7) ..............................................................9, 10

Va. Code § 17.1-293(H)................................................................*passim*

Va. Code § 20-124 ..............................................................................12

Va. Code § 20-146.20……………………………………………………12, 60

Va. Code § 63.2-1246 .........................................................................59

## Rules

FRCP 5.2(a) .........................................................................................59

FRCP 5.2(c) .........................................................................................59

## Other Authorities

D. Victoria Baranetsky, *Data Journalism and the Law,* Columbia
   Journalism Review, at 3-4 (Nov. 29, 2018) (available at
   https://www.cjr.org/tow_center_reports/data-journalism-and-the-
   law.php#newsgathering) .........................................................................57

David S. Aradia & Anne Kleinfelter, *Privacy and Court Records: An
   Empirical Study*, 30 Berkeley Tech. L.J. 1807 (2015) .......................................56

Washington D.C. Elizabeth Greico, *10 charts about America's
   newsrooms;* Pew Research Center, April 28, 2020 (available at
   https://www.pewresearch.org/fact-tank/2020/04/28/10-charts-
   about-americas-newsrooms/). ................................................................12

## **JURISDICTIONAL STATEMENT**

Appellant Courthouse News Service's ("CNS") claims arise under the First and Fourteenth Amendments to the U.S. Constitution and the Civil Rights Act, 42 U.S.C. § 1983. The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights), and 2201 (declaratory relief).

Upon the filing of CNS' notice of appeal on October 25, 2022, from the final order of the district court dated September 27, 2022, disposing of all parties' claims, this Court obtained jurisdiction under 28 U.S.C. § 1291.

**STATEMENT OF ISSUES**

1.    Whether denying remote access to non-confidential civil court records denies the press and public their fundamental First Amendment right of contemporaneous access to such records recognized by this Circuit in *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 328 (4th Cir. 2021), where Appellees allow Virginia-barred attorneys and governmental employees to have remote access in all civil cases, but deny it to the press and general public (the "Non-Attorney Access Restriction"), who must instead incur the time and expense of traveling from courthouse to courthouse across the Commonwealth to review the same records?

2.    Whether the district court erred in applying rational basis review to dismiss CNS' claim for violation of the Equal Protection Clause under Rule 12(b)(6), even though this Circuit has emphasized that restrictions which "impinge upon a fundamental right protected by the Constitution … [are] subject to strict scrutiny review," *United States v. Lawson*, 677 F.3d 629, 637 (4th Cir. 2012), and, as the district court recognized, CNS alleged in its Amended Complaint the Non-Attorney Access Restriction "limit[s] an already established fundamental right, the right of access to civil court records, in an unconstitutional manner," JA70?

3.    Whether the district court erred in finding that the Non-Attorney Access Restriction is content-neutral, and subject to intermediate time, place, and manner ("TPM") scrutiny, where Appellees' enforcement of that restriction reflects a

2

preference for speech by attorneys and the government regarding civil court records, and such a speaker preference requires strict scrutiny where, as here, it reflects a content preference, *Reed v. Town of Gilbert*, 576 U.S. 155, 170 (2015); *Fusaro v. Cogan*, 930 F.3d 241, 252 (4th Cir. 2019)?

4.     Even if the Non-Attorney Access Restriction is content-neutral, whether the district court erred in applying TPM scrutiny instead of the scrutiny mandated by the Supreme Court in *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986) ("*Press-Enterprise II*"), to test restrictions limiting the press and public's access to civil court records, described in this Circuit as "strict," *Courthouse News Serv. v. Schaefer*, 440 F. Supp. 3d 532, 559 (E.D. Va. 2020), *aff'd*, 2 F.4th 318 (4th Cir. 2021), and in the Ninth Circuit as "rigorous," *Courthouse News Serv. v. Planet*, 947 F.3d 581, 596 (9th Cir. 2020) ("*Planet III*")?

5.     Whether the Non-Attorney Access Restriction survives the scrutiny mandated by *Press-Enterprise II*, which requires Appellees to prove the restriction "'is essential to preserve higher values and is narrowly tailored to serve those interests,'" *Planet III*, 947 F.3d at 595 (quoting *Press-Enterprise II*, 478 U.S. at 13-14) (quoting *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 510 (1984) ("*Press-Enterprise I*") ("'necessitated by a compelling government interest'")?

6.     Whether the district court erred in applying TPM scrutiny to CNS' First Amendment challenge to Appellees' prohibition on disseminating information

3

contained in non-confidential civil court records accessed remotely (the "Dissemination Restriction"), which, like a gag order, is a content-based prior restraint on speech about information about pending cases that "bear[s] 'a heavy presumption against [its] constitutional validity'" and "must survive strict scrutiny," *In re Murphy-Brown, LLC*, 907 F.3d 788, 797 (4th Cir. 2018)?

7.    Whether the Non-Attorney Access and Dissemination Restrictions survive the requisite heightened scrutiny, where Appellees presented no evidence showing either that remote access to non-confidential civil court records (and related speech) would harm their purported interest in preventing misuse of personal identifiers, or that the "less restrictive alternatives" used by all federal courts, and courts in more than three-fourths of states, to protect that interest while allowing remote access would not work in Virginia?

8.    Whether the district court erred in finding Appellees' enforcement of the Non-Attorney Access and Dissemination Restrictions even passes TPM scrutiny, which also requires that Appellees "present actual evidence," not mere argument, showing that the restrictions "further[ ] [their] asserted interests," *Reynolds v. Middleton*, 779 F.3d 222, 228-29 (4th Cir. 2015), and that they are "'narrowly tailored to serve'" those interests, which in turn requires that the restrictions do "not burden substantially more speech than necessary" as well as "leave open ample alternative channels of communication," *id* at 225-26, 229, where the record

4

indicates the real reason for the restrictions is to protect Appellees' OCRA-related revenue stream and the experience in the vast majority of courts providing remote access shows that "readily available, less-speech-restrictive alternatives" indisputably exist to protect personal identifiers, *Billups v. City of Charleston*, 961 F.3d 673, 688 (4th Cir. 2020)?

## STATEMENT OF THE CASE

All federal district courts and courts in 38 states provide the press and public with remote electronic access to non-confidential civil court records. JA79 ¶¶ 10-11; *see also* JA149 ¶¶ 26-28. Appellees – Jacqueline Smith ("Smith"), in her official capacity as Clerk of the Circuit Court for Prince William County, along with Intervenor the Commonwealth of Virginia (the "Commonwealth") – also provide remote access. But they restrict that access only to Virginia-barred attorneys and governmental employees, while denying it to the press and general public. JA82 ¶¶ 27-28, JA86 ¶ 44, JA88 ¶ 53. As a further access restriction, Appellees prohibit the dissemination of information contained in the non-confidential civil court records obtained through their remote access system. JA107, JA296-297; *see also* Va. Code § 17.1-293(H).

The record shows the effect of Appellees' restrictions is to create an unconstitutional two-tier access system that "'stifles the "free discussion of governmental affairs" that the First Amendment exists to protect,'" *Planet III*, 947 F.3d at 587-88 (quoting *Courthouse News Serv. v. Planet*, 750 F.3d 776, 787 (9th Cir. 2014) ("*Planet I*")) (quoting *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604 (1982)), implicating both Equal Protection and First Amendment interests, and therefore must survive heightened scrutiny. *Id*. at 595-96. But the evidence needed to satisfy heightened scrutiny – or even the TPM scrutiny the district court

applied to the First Amendment claims – is absent, requiring reversal under controlling Fourth Circuit and Supreme Court precedent.

## A.    <u>Virginia's Preferential Remote Access To Court Records System</u>

Remote access to court records is becoming the rule rather than the exception. The undisputed evidence established that all federal district courts and courts in 38 states – including the Alexandria Circuit Court in Virginia – provide remote access to the press and public without exclusion.  JA79 ¶¶ 10-11, JA80 ¶ 15.  Federal courts do so via PACER, which is available to anyone who registers for an account, and state courts do so via various systems, some of which require user registration (paid or unpaid) and some of which do not.  JA79 ¶¶ 10-11, JA382-383 ¶¶ 9-10.[1]

By contrast, in 105 circuit courts in Virginia other than Alexandria, online access to court records is limited to judicial insiders: Virginia-barred attorneys and government employees via Virginia's Officer of the Court Remote Access system ("OCRA").[2]  Virginia stands alone among the 50 states in defending its system of

---

[1] *See, e.g.,* https://iapps.courts.state.ny.us/nyscef/CaseSearch (no registration required); https://www.masscourts.org/ (no registration required); https://prothonotary.co.westmoreland.pa.us/ijems/#/main (paid user registration).

[2] Alexandria does not use the OCRA system.  CNS currently covers Alexandria remotely on a daily basis by accessing new civil filings through the Internet via the Alexandria Justice Information System (https://secure.alexandriava.gov/ajis/).  JA80 ¶ 15, JA159 ¶ 12.  The filings available remotely in Alexandria are the same records available at the courthouse and are accessible to any subscribing member of the press or public.  JA161 ¶¶ 16-17.  The district court ignored this evidence.  JA537-538.

discriminatory access.  Other than Virginia, only two states (Missouri and Illinois) maintain an attorney preference system, but Missouri is eliminating it, while Illinois has been given authority to eliminate it by that state's Supreme Court.  JA142 ¶ 5.[3] OCRA, which is supported and maintained by Virginia's Office of the Executive Secretary of the Supreme Court of Virginia ("OES"), enables circuit clerks who opt in to make non-confidential court records available for remote viewing by Virginia lawyers and government employees in return for a monthly fee that provides a revenue source for the clerks and OES.  OES, which created, provides, supports and maintains OCRA for Virginia circuit court clerks, JA84 ¶¶ 35, 38, JA85 ¶ 40, and "hosts the online records viewable through OCRA," JA45, bills $1.2 million to clerks annually for maintenance fees.  JA134 ¶ 6.  Clerks, in turn, collect annual subscriber fees: Appellee Smith alone collects $54,800 in annual subscriber fees, despite paying an annual maintenance fee of only $9,500.  JA84 ¶¶ 38-39, JA209 No. 12.

Lawyers and government employees who use OCRA have access to non-confidential records in all civil cases, not just cases in which they are attorneys of record or otherwise involved.  JA86-87 ¶ 45.  Through OCRA, they can view these records remotely at any time, on any day of the week, from any location in the world.

---

[3] *See also* https://ilcourtsaudio.blob.core.windows.net/antilles-resources/resources/506df08f-0f59-4cd3-9a62-fb6e3d555657/121919_2.pdf (Order entered on December 19, 2019 by the Supreme Court of Illinois).

JA86. To view these same records, non-attorney members of the public, including the press, must spend significant time and money to travel to individual courthouses, particularly in Virginia's rural areas.  JA86 ¶ 44.  And these records are available only when courts are open, during business hours.  JA86 ¶ 44; *see also* JA81-82 ¶¶ 24-26.

Appellees insist that two provisions of Va. Code § 17.1-293 mandate this discriminatory two-tier system of access.[4]  The first, § 17.1-293(B), prohibits clerks from posting on the Internet any document that contains: (i) an actual signature, (ii) social security number, (iii) date of birth, (iv) "the maiden name of a person's parent so as to be identified with a particular person," (v) financial account numbers, or (vi) names or ages of children.  Va. Code § 17.1-293(B).[5]  The second, § 17.1-293(E)(7), qualifies the first prohibition by stating it "shall not apply to:"

> Providing secure remote access to nonconfidential court records, subject to any fees charged by the clerk, to members in good standing with the Virginia State Bar and their authorized agents, pro hac vice attorneys authorized by the court for purposes of the practice of law, and such governmental agencies as authorized by the clerk.

---

[4] In 2019, the Virginia General Assembly rejected an attempt to amend the Virginia Code to require clerks to provide OCRA access to non-attorneys.  JA289-293.

[5] CNS is not aware of any other state that prohibits posting signatures, and is only aware of four other states that require the redaction of maiden names.  JA162 ¶ 20.

Va. Code § 17.1-293(E)(7). Appellees rely on this statutory framework to enforce their Non-Attorney Access Prohibition regardless of whether a court record contains any of the personal identifiers listed in § 17.1-293(B).

Appellees also rely on § 17.1-293 to justify the Dissemination Restriction. Section 17.1-293(H) provides:

> Nothing in this section shall be construed to permit any data accessed by secure remote access to be sold or posted on any other website or in any way redistributed to a third party, and the clerk, in his discretion, may deny secure remote access to ensure compliance with these provisions. However, the data accessed by secure remote access may be included in products or services provided to a third party of the subscriber provided that (i) such data is not made available to the general public and (ii) the subscriber maintains administrative, technical, and security safeguards to protect the confidentiality, integrity, and limited availability of the data.

Under this provision, Virginia lawyers and government employees can discuss the contents of online case records with staff, clients, and any other "third party" as long as it is "not made available to the general public," nor "sold or posted on any other website." Appellees contend this provision is needed to prevent the "abuse" of any personal identifiers contained in non-confidential documents. But it also creates a monopoly on publishing online court records, from which both the Commonwealth and Smith earn income. JA134 ¶ 6, JA86 ¶ 43, JA209 No. 12.

OCRA requires a paid subscription for each circuit court. JA84 ¶ 37, JA86 ¶¶ 43-44. The Prince William County Circuit Court, where Appellee Smith is the clerk, requires a detailed application, which must be notarized with the applicant's

10

name, address, phone number, and email address.  JA200-206.  A subscriber must also pay an annual fee of $200, which covers one attorney plus one employee.  JA86 ¶ 43; JA200 ¶ 5.  On approval by the clerk and payment of the fee, the subscriber is provided a username and password.  JA85 ¶¶ 40-41.  Pursuant to the subscriber agreement, an OCRA user "shall not use automated tools to navigate [OCRA] and must "manually enter any requests using the queries provided on the website."  In addition, the user is responsible for "proper" use of the remote access system in a "legal manner."  JA201 ¶ 7.

The records available on OCRA are also available at the courthouse through public access terminals for those who can afford the time and expense to make an in-person visit during non-holiday business hours.  JA86 ¶44, JA87 ¶¶ 48-49.  Once a record is available for viewing on a courthouse terminal, it is available on OCRA within five minutes, where lawyers and government employees can review online records from all 105 OCRA courts in a single sitting.  JA86 ¶ 44, JA87 ¶ 47.

In Virginia, pursuant to Va. Code § 8.01-420.8, a filing party is required to redact social security and financial account numbers.  JA88 ¶ 51.  In addition, Smith and her staff review new civil filings to ensure that any social security or other identification number, such as bank account numbers, are redacted before making records available at the courthouse and via OCRA.  JA88 ¶ 51.  Social security and financial account numbers are the only personal identifiers deemed confidential by

the General Assembly, but a filing party may redact minor or maiden names where disclosure of the name in an otherwise non-confidential filing would pose a health or safety threat.  Va. Code §§ 8.01-217(G), 20-124, 20-146.20; JA256, JA258.

**B.    CNS' Coverage of Virginia's Circuit Courts Without Access To OCRA**

CNS is a nationwide news service specializing in reporting on civil litigation that covers federal and state courts in all 50 states, including courts across Virginia. JA77 ¶ 1.  At the time of the cross-motions for summary judgment ("MSJ"), CNS had two full-time Virginia-based reporters covering Virginia's courts.  They reported on civil litigation for CNS' web site, www.courthousenews.com, which is freely available to all, as well as for reports published for and distributed to paid subscribers, which include other press; higher education, academic and non-profit institutions; government entities; and law firms and lawyers.  JA77-78 ¶¶ 2-7, JA157 ¶ 4; *see also* JA150-152 ¶¶ 30-34.[6]  Even with two or three Virginia reporters – significant single-state resources for a national news institution[7] – CNS is able to send its reporters to only five of Virginia's 120 circuit courts on a daily basis, JA80

---

[6] CNS had three reporters when the Amended Complaint was filed, but only two during the MSJ proceedings.  JA157 ¶ 4 n.1.  It is now back up to three.

[7] The Pew Research Center reported that newsroom employment in the U.S. dropped 23% between 2008 and 2019, and about one-fifth of newsroom employees live in New York, Los Angeles or Washington D.C.  Elizabeth Greico, *10 charts about America's newsrooms*, Pew Research Center, April 28, 2020 (available at https://www.pewresearch.org/fact-tank/2020/04/28/10-charts-about-americas-newsrooms/).

¶ 14, and 12 on a less than daily basis.  JA80 ¶ 16.  CNS can cover only Alexandria remotely.  As for the remaining 102 Virginia courts, CNS' lack of access to OCRA means its coverage is limited to reviewing docket information online (*i.e.*, party names, case type, and court name).  JA80 ¶ 17, JA149-151 ¶¶ 29, 32.

The 105 Virginia circuit courts that utilize OCRA cover an area of over ***30,000 square miles***.  JA149-150 ¶ 29.  Whereas Virginia lawyers and government employees can view records from all of these courts at any time of the day or night from the comfort of their home or office (or even while traveling anywhere in the world), it is a practical impossibility for a news organization like CNS to cover the distance between these courts to view these same records within a week, let alone in a single day.  JA80 ¶ 17, JA142-143 ¶¶ 6-7, JA149-151 ¶¶ 29, 32; *see also* Request for Judicial Notice ("RJN"), Req. Nos. 2 & 3.  As CNS put it in a news report published on its web site that chronicled, in travel diary style, "what it would take to cover the public record of the Virginia Courts by visiting each courthouse in person," even when reporters started each day "when one clerk's office opened" and ended "as the last clerk's office closed," it took five days just to visit 25 of the 105 Virginia courts that utilize OCRA.  RJN, Req. No. 3.

CNS is willing to pay the subscriber fees for access to court records on OCRA but has been told it cannot have OCRA access.  JA86 ¶ 43, JA88-90 ¶¶ 53-54, 57-59, JA152-153 ¶¶ 38-39.  Prior to commencing suit, CNS requested OCRA access

from 46 Virginia circuit court clerks. JA88 ¶ 53. Those who responded either denied OCRA access or offered it if CNS employed a Virginia-barred attorney, which it does not. JA88 ¶ 53. In May 2021, Smith offered to provide OCRA access to CNS at an annual fee of $1,200 for one non-attorney, JA191-192, JA281-282 ¶ 5, even though the annual subscription fee for lawyers is $200. JA86 ¶ 43; JA200 ¶ 5. CNS did not agree to pay the inflated fee, but it is willing to pay the fee Smith and other circuit court clerks currently charge to Virginia lawyers and government employees. JA86 ¶ 43, JA152-153 ¶¶ 38-39, JA163 ¶ 26.

## C.     **This Lawsuit**

CNS' Amended Complaint, JA11, filed in September 2021, asserts three claims pursuant to 42 U.S.C. § 1983. Counts One and Two allege that the Non-Attorney Access Restriction and the Dissemination Restriction violate the First Amendment. Count Three alleges the Non-Attorney Access Restriction violates the Equal Protection Clause. CNS sought declaratory relief and a permanent injunction. JA32-38. The named defendants were Smith, along with Karl Hade, in his official capacity as OES Executive Secretary.

### 1.     **Motions to Dismiss**

In October 2021, Smith and Hade moved to dismiss pursuant to Fed. R. Civ.

P. 12(b)(6).  JA62.[8]  On January 14, 2022, the district court issued a published opinion denying the 12(b)(6) motions as to CNS' First Amendment claims (Counts One and Two), but granting it as to CNS' Equal Protection claim (Count Three).

In declining to dismiss Counts One and Two, the district court concluded that CNS sufficiently alleged the OCRA restrictions limit fundamental First Amendment rights.  JA70-72.  With respect to Count One, the district court observed:

> Plaintiff … is not alleging that the public has a fundamental right to remotely access civil court records guaranteed by the First Amendment. Instead, Plaintiff argues that *if* Defendants provide Virginia attorneys remote access to civil court records, *then* the First Amendment also requires them to provide the public with remote access.  In effect, ***Plaintiff argues that Defendants are limiting an already established fundamental right***, the right to access to civil court records, in an unconstitutional manner by giving one group, Virginia lawyers, remote access while denying it to others.

JA70.[9]  Although the district court noted that "[s]trict scrutiny applies when a fundamental right … is involved," JA73, and that CNS had alleged a fundamental right was involved, it erroneously applied rational basis review to dismiss Count Three, *see infra* Section II.A, concluding that it was, "at a minimum, *rational* to believe that limiting OCRA access to attorneys would protect confidential and

---

[8] Hade also moved to dismiss under Fed. R. Civ. P. 12(b)(1), asserting sovereign immunity.  JA74.  That motion was denied, JA74, and no appeal was filed.

[9] Unless otherwise noted, bold and italic emphases are added, italic-only emphases are in the original, and internal quotations (or citations to same) are omitted.

private information because attorneys are more easily regulated by the court system." JA74.

### 2. Change In Defendants; Cross-Motions for Summary Judgment

During discovery, Hade provided sworn interrogatory responses stating that OES would not object, and had no authority to do so, if Smith provided CNS with access to civil court records via OCRA. JA194-195 ¶ 1. Hade also averred it was not necessary for OES to provide permission for Smith or any other Virginia circuit court clerk to provide OCRA access to CNS. JA195 ¶ 3. Based on these sworn statements, on May 31, 2022, CNS dismissed its action against Hade without prejudice. JA92-94. Later that day, the Commonwealth filed a Notice of Intent to Intervene. JA95-96.

In July 2022, the parties filed cross-motions for summary judgment. JA98, JA294. Appellees sought to justify the OCRA restrictions by insisting that non-attorneys *might* access court records remotely to obtain and "abuse" personal identifiers that *might* appear in those non-confidential records, despite the statutory redaction requirements. JA107, JA114. But instead of pointing to admissible evidence that remote access creates the dangers they suggested, and despite the many courts that provide remote access without limitation, Appellees relied primarily on law review articles and other secondary sources to claim the OCRA restrictions are necessary to protect against the "*potential*" for "widespread information harvesting,

resale, and dissemination," mass collection of PII by "anonymous bot accounts," and "identity theft, data mining, and other crimes."  JA99, JA121-122, JA308.[10]

On August 18, 2022, the district court heard oral argument on the parties' cross-motions.  JA429.  At the hearing, Appellees – and the district court – expressed a concern about extending remote access which had nothing to do with personal identifiers: rather, the concern was the impact of remote access on court revenue, specifically, that CNS would "republish" the cases available through OCRA on its subscriber-only news delivery platform, CasePortal, which provides subscribers with comprehensive coverage, daily reporting, and fast alerts about new case developments.  As reported in the MSJ hearing transcript:

> THE COURT: "[T]hat would have a detrimental economic impact on the clerk of the courts' budget, is that correct?
>
> MS. McNEILL: Oh, I'm sure it would, Your Honor.  I don't know that we're permitted to make that argument under the First Amendment.  But it's certainly true that CNS would then throw open the door.  They would download it and distribute it so that whoever was interested in the material would not have to pay the OCRA fee directly to the clerk.  They would pay CNS for the fee.

---

[10] CNS objected to Appellees' reliance on secondary sources because they constituted inadmissible hearsay.  JA349-350.  In its MSJ ruling, the district court apparently sustained this objection, stating that it "did not consider nor rely upon the contested secondary sources in reaching its decision."  JA536 n.6, JA549 n.13.

JA472.[11]  A 2018 Report issued by a work group consisting of circuit court clerks and OES staff to consider the adoption of OCRA statewide for the general public confirms Appellees' concern that a remote access system available to all would result in "significant lost revenue to circuit court clerks."  JA226, *see also* JA223-224.

On September 27, 2022, the district court granted summary judgment on Counts One and Two in favor of Appellees and denied CNS' MSJ.  JA553, JA564. As to the Non-Attorney Access Restriction (Count One), the district court applied intermediate TPM scrutiny, a decision rooted in a misreading of *Planet III*, which reviewed a denial of contemporaneous access under the same "rigorous" scrutiny that *Press-Enterprise II* prescribed for other restrictions on access.  *See infra* Section II.B.2.  In dismissing Count Two (the Dissemination Restriction), the district court again erroneously applied TPM scrutiny instead of the strict scrutiny this Court requires for prior restraints on speech about court proceedings.  *See infra* Section

---

[11] Contrary to the misrepresentations made by the Commonwealth's counsel at oral argument, CasePortal is not a tool used to mass "market," "resell," or "republish" court records.  JA468, JA471-472.  Rather, it is a web-based interface used by CNS' subscribers to view and manage docket sheets and alerts, and to access and download CNS' daily reports to which they subscribe.  JA491-492.  Those reports include staff-written summaries of newsworthy complaints, and sometimes those summaries include a link to download a copy of an already publicly available newsworthy complaint that CNS has covered in its daily report.  Not all complaints are available to download because CNS does not download complaints or any other court filings "in a mass way" to "resell it through their website."  JA468, JA475, JA493.

II.C.  The district court also failed to recognize both restrictions were content-based, also necessitating heightened review.  The district court then compounded its error by misapplying TPM scrutiny to both counts, finding in favor of Appellees on the basis of little more than conjecture – and contrary to the evidentiary requirements for TPM-level scrutiny mandated by this Court – about what ***might*** happen if Virginia's OCRA courts joined the many other state and federal courts that provide remote access without excluding the press and public.  *See infra* Section III.

## <u>SUMMARY OF ARGUMENT</u>

Virginia is the only one of 50 states to enforce a discriminatory two-tier system of access to court records.  Although Virginia's system for restricting access to and speech about pending civil cases may be novel, the First Amendment right of access it implicates is anything but.  Well-established Circuit and Supreme Court precedent dictates the proper outcome as to all three of CNS' claims.

Contrary to the district court's approach, this case does not turn on whether there is a First Amendment right of remote access as an abstract matter.  The records at issue here include categories of records this Court has held are subject to a First Amendment right of access, *Schaefer*, 2 F.4th at 327-28; *Doe v. Public Citizen*, 749 F.3d 246, 267 (4th Cir. 2014); *Rushford v. New Yorker Magazine, Inc*., 846 F.2d 249, 253 (4th Cir. 1988), and the type of document sought triggers the First Amendment, not the means by which access is available.  Additionally, as this Court

has recognized, "burdening a means of communication can burden speech." *Fusaro*, 930 F.3d at 249, 252. By selectively providing remote access to attorneys and the government, while withholding such access from the press and public, Appellees are denying the press and public "[c]ontemporaneous" access to those records "as expeditiously as possible," *Schaefer*, 2 F.4th at 328, which is unconstitutional unless Appellees showed the restriction "'is essential to preserve higher values and is narrowly tailored to serve those interests.'" *Planet III*, 947 F.3d at 595 (quoting *Press-Enterprise II*, 478 U.S. at 13-14).

Because CNS' Equal Protection claim involves a fundamental First Amendment right, Appellees must overcome strict scrutiny as a matter of law. *Lawson*, 677 F.3d at 637. And because Supreme Court and Fourth Circuit law confirms the OCRA restrictions are content based – and the Dissemination Restriction is a prior restraint – CNS' First Amendment claims are also subject to strict scrutiny. *See*, *e.g.*, *Reed*, 576 U.S. at 170; *Murphy-Brown*, 907 F.3d at 797.

The district court, however, incorrectly applied rational basis scrutiny to CNS' Equal Protection claim, and intermediate TPM scrutiny to its First Amendment claims. And it misapplied TPM scrutiny, bypassing the analytical steps and evidentiary requirements set forth in *Reynolds*, 779 F.3d at 226-29, and *Billups*, 961 F.3d at 685-88 & n.9. Record evidence showed many courts provide the press and public with remote access to non-confidential civil court records, JA79 ¶¶ 10-11,

20

and that simple, common protective measures are available to guard against any potential abuse of personal identifiers.  JA411-412 ¶¶ 10-12.  But the district court erroneously accepted Appellees' unsubstantiated, conclusory assertions these measures would not work – and ignored the lack of any evidence of harm – contrary to the requirements of *Billups* and *Reynolds*.  Moreover, the record shows at least part of the basis for restricting OCRA access has nothing to do with personal identifiers, but instead is to protect Appellees' revenue stream.  Not only does this reasoning ignore that CNS is in the news business, not the aggregation business, but it is antithetical to the First Amendment right of access and ignores that "when we protect the constitutional rights of the few, it inures to the benefit of all."  *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 604 (4th Cir.), *judgment vacated*, 138 S. Ct. 353 (2017).

## ARGUMENT

### I.

### THIS IS A FREE EXPRESSION CASE SUBJECT TO DE NOVO REVIEW, AND THE RESTRICTIONS ON EXPRESSION ARE NOT "SMALL"

The district court's errors in this case reflect "a basic misapprehension and undervaluation of the core first amendment value[s] at stake," *In re Charlotte Observer*, 882 F.2d 850, 856 (4th Cir. 1989), as well as the practical impact the OCRA restrictions have on "'free expression about the workings of government,'" *Planet III*, 947 F.3d at 589 (quoting *Planet I*, 750 F.3d at 785), specifically, the

"meaningful public discussion regarding the functioning of our nation's court systems." *Id*. at 602 (citing *Globe Newspaper*, 457 U.S. at 604-05). As the court's "fail[ure] to appreciate the significance of this underlying first amendment value" undoubtedly "contributed to [its] error[s]," *Charlotte Observer*, 882 F.2d at 856, CNS will address them in the first instance.

Preliminarily, however, CNS notes that the district court's errors cannot be shielded from reversal by the standard of review. This Court reviews de novo the dismissal of a complaint under Rule 12(b)(6), *Soderberg v. Carrion*, 999 F.3d 962, 967 (4th Cir. 2021), as well as orders adjudicating cross-motions for summary judgment. *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014). Moreover, "in a free speech case, where 'the reaches of the First Amendment are ultimately defined by the facts it is held to embrace,'" this Court is "obliged to 'make a fresh examination of crucial facts' and an 'independent examination of the whole record' to ensure that there is no 'forbidden intrusion on the field of free expression.'" *Billups*, 961 F.3d at 682. This Court also "review[s] de novo [a] district court's rulings concerning the constitutionality of a state statute." *Doe v. Cooper*, 842 F.3d 833, 842 (4th Cir. 2016).

***CNS' claims are grounded in fundamental First Amendment rights*** – The district court correctly recognized that OCRA includes categories of records that fall within the First Amendment right of access, JA543 (citing *Schaefer*, 2 F.4th at 327-

22

28 (complaints) and *Rushford*, 846 F.2d at 253 (summary judgment documents));

*see also Doe*, 749 F.3d at 267 (summary judgment documents and judicial

opinions).[12]  But the district court's belief that the constitutional analysis turned on

whether there is a "fundamental right to access civil court records ***remotely***," JA73;

*see also* JA534, missed the point.  Whether the First Amendment right of access to

court records is implicated "depends on what 'type of document' is being sought,"

*In re Reporter's Committee for Freedom of the Press*, 357 F. Supp. 3d 528, 535

(E.D. Va. 2019) (citing, *e.g.*, *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 178,

180 (4th Cir. 1988)), rather than the format in which it is maintained, or the "type of

restriction to access."  *South Carolina State Conf. of the NAACP v. Kohn*, 2023 WL

144447, *7 (D.S.C. Jan. 10, 2023) (rejecting argument that case "fail[ed] to implicate

the First Amendment because these records were historically unavailable online");

*see also United States v. Antar*, 38 F.3d 1348, 1360 n.13 (3d Cir. 1994) (one form

of "access is not a substitute for [another], and vice versa").

Where it applies, the First Amendment right of access "implicates ***the same***

***fundamental First Amendment interests as a free expression claim***."  *Planet I*, 750

F.3d at 787.  "[A] major purpose of [the First] Amendment was to protect the free

discussion of governmental affairs," *Globe Newspaper*, 457 U.S. at 604, and the

---

[12] Because the First Amendment has already been found to apply to these categories of documents – and applies regardless of the means (at-courthouse, remote) at which access is provided – this Court need not address the question of whether the *Press-Enterprise II* experience and logic test requires remote access as an abstract matter.

23

"deterred expression" caused by Appellees' policies stifles "informed public discussion about ongoing judicial proceedings." *Planet I*, 750 F.3d at 787.

Consequently, this Court held in *Schaefer* that the First Amendment guarantees "[c]ontemporaneous" access to court records "as expeditiously as possible." 2 F.4th at 328. Such access, which OCRA provides to attorneys and the government, but not the press and public, is necessary to ensure that the "constitutionally protected discussion of governmental affairs is an informed one," because "the public cannot discuss the content of" court records "about which it has no information." *Planet I*, 750 F.3d at 785, 788; *accord Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 587 n.3 (1980) ("'What is at stake here is the societal function of the First Amendment in preserving free public discussion of governmental affairs.'") (Brennan, J., concurring). The district court was only able to reach the conclusion that the First Amendment right of "contemporaneous" access was not implicated by ignoring the reality that even if "civil records are accessible more rapidly at the courthouse than they are electronically," JA544, by five minutes or less, JA87 ¶ 47, that does not matter if nobody is at the courthouse to see them.

Implicit in the First Amendment right of access is the idea that where it applies, access should be encouraged, not discouraged. Appellees insisted, without evidentiary support, that the danger that non-attorneys ***might*** access court records remotely to convey speech "'in conflict with the goals of the state'" justified the

24

OCRA restrictions. *Sorrell v. IMS Health*, 564 U.S. 552, 565 (2011). But whereas the question of "'whether the records are sought for improper purposes'" is a proper factor to be "weighed in the common law balancing test," *Virginia Dep't of State Police v. Washington Post*, 386 F.3d 567, 575 (4th Cir. 2004),[13] where the **constitutional** right of access is involved, the "'motive'" of any particular requestor is "'generally … irrelevant'" and does not "affect the weight of the presumption" of access. *Lugosch v. Pyramid Co*., 435 F.3d 110, 123 (2d Cir. 2006).

That includes a motive to profit, *id*, such as for news organizations. Gathering and disseminating information in court records is what journalists do, and news organizations that do not generate a profit must generally proceed into bankruptcy and ultimately stop publishing. As the Ninth Circuit explained in *Planet III*:

> To be clear: profit motive is entirely irrelevant to the determination of a news organization's First Amendment rights. "If a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases from *New York Times* to *Hustler Magazine* would be little more than empty vessels."

595 F.3d at 595 n.8 (quoting *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989)); *see also Sorrell*, 564 U.S. at 568 ("While the burdened speech results from an economic motive, so too does a great deal of vital expression.").

---

[13] "[T]he common law 'does not afford as much substantive protection to the interests of the press and public as does the First Amendment.'" *Virginia Dep't of State Police*, 386 F.3d at 575.

***The burden on free expression in this case is not "small"*** – Similarly, the district court's conclusion that the "burden on speech" imposed by the OCRA restrictions "is relatively small," JA551, betrayed a failure to appreciate the nature and significance of the First Amendment right as it relates to CNS' claims. Appellees have not only instituted an unconstitutional prior restraint, but have effectively created a two-tier system of access to information about the business of Virginia's courts, under which Virginia's 31,638 lawyers, RJN Req. No. 1, and unlimited numbers of government employees have a greater ability to engage in informed, contemporaneous discussion about Virginia court proceedings than the press and public.  Lawyers and government employees can have instant, "convenient, around-the-clock access," JA117, to the 105 courts that provide OCRA access, JA82 ¶ 27, and can discuss those records freely with their clients or other "third part[ies]."  Va. Code § 17.1-293(H).  In contrast, even for a national news service that ***specializes*** in reporting on civil litigation, the lack of OCRA access means, as a practical matter, not having access to those same court records because "it is not possible to visit [many of] these courts at all, and most certainly not on a daily basis."  JA150 ¶ 32; *see also* JA49 ¶ 5, JA157-158 ¶ 6, JA162 ¶ 22.  Moreover, even if CNS had OCRA access, § 17.1-293(H) would prevent it from using those records to inform its subscribers and the public regarding "who has been hauled into the courts and why."  JA151 ¶ 32.

26

Indeed, as CNS reported after it took to the Virginia roads to test what it actually takes to conduct in-person reporting on civil complaints filed in OCRA courts on Virginia's western side, CNS spent five days, covering over 1,000 miles, to visit just 25 OCRA courts. RJN Req. No. 3. Requiring the press to incur the insurmountable time and expense of traveling from courthouse to courthouse to access civil case records in a vain effort to report on them in a "contemporaneous" manner, despite the existence of an online access alternative Appellees have affirmatively chosen to offer, albeit only for favored groups, unnecessarily imposes burdens on speech about those records that are "far greater, too great … to survive First Amendment scrutiny." *Globe Newspaper Co. v. Pokaski*, 868 F.2d 497, 507, 509 (1st Cir. 1989) (holding unconstitutional statute that imposed an "economic burden" on the press to obtain court records and "routinely… forced [it] to expend time and resources obtaining information to which it has a right under the First Amendment").

Appellees acknowledge the dramatic disparities in access – and by extension, speech about pending judicial proceedings – their OCRA restrictions create. JA113 (Commonwealth's acknowledgement it takes "days traveling from jurisdiction to jurisdiction to get hard copies of these filings"); JA311 (Smith's acknowledgment in-person access is "expensive," "time-consuming," and causes "delays"). Indeed, making speech about court records harder for the press and public is ***precisely*** what

27

the OCRA restrictions are intended to do. JA117. All of which completely undermines the district court's conclusion that that the effect of the OCRA restriction on the right of access was "relatively small." JA551.

The restrictions at issue indisputably deny "contemporaneous access," a term defined as "'occurring, or existing at the same time,'" and "'at or near the same time,'" *Schaefer*, 440 F. Supp. 3d at 559, and which "in the context of" a reporter's daily visits to a predominantly paper-filing court, meant "'the same day on which the complaint is filed, insofar as is practicable.'" *Schaefer*, 2 F.4th at 328 (quoting district court). In the context of this case, contemporaneous access to court records "as expeditiously as possible" must mean access at the same time attorneys and the government have access – 24/7/365, via OCRA – which, as the record demonstrates, is "practicable" because Appellees have chosen to offer OCRA to sizeable segments of the public in the first instance (rather than limit it only to attorneys with respect to their own cases).

The district court's order also turns a blind eye to the fact that, by offering online access to any civil court records at any time only to attorneys and the government, Virginia's OCRA courts have in effect created a virtual courthouse that is always open – during evenings, weekends, and holidays – but only to judicial insiders: litigants, attorneys, and the government. That same virtual courthouse is closed to the press and general public except during business hours during the non-

holiday work week.  The result is a "partially close[d] … court," *Ridenour v. Schwartz*, 875 P.2d 1306, 1309 (Ariz. 1994) (en banc), which violates the First Amendment in its own right, separately from the right to contemporaneous access.[14]

Three other preliminary points about this appeal must be noted at the outset.

**First**, while this case does not pose the question of whether there is a per se right of online access to court records, it is likely that online access to all currently is, or will soon become, the norm.  All federal courts and courts in 38 states – including the Alexandria Circuit Court – currently provide it.  JA79-80 ¶¶ 10-11, 15, JA149 ¶¶ 26-28, JA382-383 ¶¶ 9-10; *see also* JA159-162 ¶¶ 12-19.

**Second**, the term "privacy," as used in this case, is a misnomer: as a matter of law, a public court record is not private.  "Once announced to the world, the information [has] lost its secret characteristic."  *In re Charlotte Observer*, 921 F.2d 47, 50 (4th Cir. 1990) (vacating injunction prohibiting reporters from disclosing information revealed in open courtroom); *see Bernstein v. Bernstein Litowitz Berger & Grossman LLP*, 814 F.3d 132, 141 (2d Cir. 2016) (the First Amendment right of

---

[14] In *Ridenour*, a judge's administrative rule closing court buildings at 3 p.m. even though proceedings were held until 5 p.m., thereby preventing access by anyone not inside before 3 p.m., was an "unconstitutional denial of public access" because it "significantly interfere[d] with free and open access to the courthouse" and "partially close[d] the court."  875 P.2d at 1309; *see State ex rel. Dispatch Printing Co. v. Loudon*, 741 N.E.2d 517, 522 (Ohio 2001) ("A trial court should not close a courtroom to the media when other members of the public are afforded access.").

access applies to civil complaints "even when they contain arguably sensitive information"); *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 494-95 (1975) ("[I]nterests in privacy fade when the information involved already appears on the public record."). Described more accurately, Appellees' real interest is in discouraging the possible "abuse," JA330, including through commercial "direct-marketing" the Commonwealth disfavors, JA331-332, of personal identifiers in public documents that, under Virginia law, filing parties are already required to (or can choose to) redact, or the legislature has chosen ***not*** to require filing parties to redact.

> **Third**, it is not just informed public discussion about ***Virginia*** court records that is at stake here. If the district court's decision is affirmed, nothing will stop other states from ushering in a new normal in which only attorneys, government employees, and other preferred groups have 24/7/365 online access to court records, the equivalent of the access superhighway. Meanwhile, under the district court's logic, the press may be treated as a second-class citizen, denied the benefits of online access given to others, and relegated to the equivalent of the access horse and buggy.

> Such a result cannot be constitutional, and as shown below, it is not.

## II.

## THE DISTRICT COURT MISUNDERSTOOD THE FUNDAMENTAL FIRST AMENDMENT RIGHT AT ISSUE AND THUS MISAPPLIED LOWER LEVELS OF SCRUTINY TO CNS' CLAIMS THAN REQUIRED

As shown above, the district court misperceived both the fundamental nature of the First Amendment right at issue and the substantial burdens Appellees' restrictions impose on that right.  It therefore misapplied lower levels of scrutiny than is constitutionally required – by clear precedent – to all three of CNS' claims.

The court misapplied the lowest level of scrutiny – rational basis review – to dismiss CNS' Equal Protection claim, even though "classifications … which impinge upon fundamental rights protected by the Constitution … are subjected to stricter scrutiny," *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001), and "CNS' right of access … implicates the same fundamental First Amendment interests as a free expression claim." *Planet I*, 750 F.3d at 787.  And it misapplied intermediate review to uphold the Dissemination Restriction, even though such "'prior restraints on speech … are the most serious and the least tolerable infringement of First Amendment rights.'" *Charlotte Observer*, 921 F.2d at 49.

These rulings, and applying intermediate scrutiny to CNS' claim that Appellees deny contemporaneous access, overlook that "the public benefits attendant with open proceedings are compromised by delayed disclosure of documents," *Doe*, 749 F.3d at 272, and must be corrected.

31

A.    **The Court Erred In Refusing To Apply Strict Scrutiny To CNS' Equal Protection Claim Because The Non-Attorney Access Restriction Clearly Impinges On The Fundamental First Amendment Right Of Access**

As the district court obliquely acknowledged, if the discriminatory access mandated by Appellees impinges upon a "fundamental right," it violates equal protection unless it survives "strict scrutiny." JA73. "If a statute classifies a person or group by race, alienage, or national origin, *or* if the activity impinges upon a fundamental right protected by the Constitution, the statute is subject to strict scrutiny review, and will be sustained only if the statute is narrowly tailored to serve a compelling governmental interest." *Lawson*, 677 F.3d at 637 (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)).

The district court also acknowledged that the basis of CNS' claims *is* in fact "an already established *fundamental* right, the right of access to civil court records," JA70, but refused to apply strict scrutiny on the theory that CNS did "not argue that there is any fundamental right to access civil court records *remotely*." JA73. That conclusion misstated both the law and CNS' argument.

As shown in Section I, whether the First Amendment right of access to court records is implicated "depends on what 'type of document' is being sought," *Reporter's Committee*, 357 F. Supp. 3d at 535, "rather than the type of restriction to access." *Kohn*, 2023 WL 144447 at *7. The existence of the right does not turn on whether access is only at the courthouse, *Planet I*, 750 F.3d at 780-81, or online for

courts that allow "electronic filing" and "electronic … access to court records." *Courthouse News Serv. v. Quinlan*, 32 F.4th 15, 17, 21 (1st Cir. 2022) (reversing dismissal "because the plaintiffs have plausibly alleged a First Amendment violation"); *Courthouse News Serv. v. Cozine*, 2022 WL 593603, *2, 6 (D. Or. Feb. 14, 2002) (First Amendment "'right of timely access'" to complaints filed and available at courthouse applies where "electronic copies … are available via remote access or courthouse computer terminals," as "'the need for immediacy of reporting news is even more vital in the digital age, where timeliness is measured in terms of minutes or seconds'") (quoting *Planet III*, 947 F.3d at 594), *report and recommendation adopted*, 2022 WL 1000775 (D. Or. Apr. 4, 2022).

This fundamental First Amendment right is not satisfied by limiting the press and public to "physical access" where online access is available to others, JA124, forcing reporters to travel for days over tens of thousands of miles to reach all 105 OCRA courts in order to obtain in person the same access a Virginia-barred attorney can obtain in minutes online. *See* RJN Req. Nos. 2 & 3. And the extreme access delays created by restricting the press and public to physical access are not limited to those who may want to obtain records in all Virginia circuit courts. For example, a reporter for the *Virginian-Pilot* in Norfolk must drive 4.5 to 5.5 hours and at least 250 miles to obtain a copy of, and inform the public about, a newsworthy complaint filed in Roanoke, a round trip of 9-10 hours and 500 miles, RJN Req. No. 2, while

an attorney in Norfolk could access that same complaint within minutes.

Such a requirement cannot be reconciled with this Circuit's recognition that "'the public and press generally have a *contemporaneous* right of access to court documents and proceedings when the right applies.'" *Schaefer*, 2 F.4th at 328 (quoting *Doe*, 749 F.3d at 272). This is particularly true of access to case-initiating pleadings. There are "immediate consequences precipitated by filing a complaint, consequences that the public must promptly understand if it is to help 'improve the quality of [the judicial] system by subjecting it to the cleansing effects of exposure and public accountability.'" *Id.* at 327 (quoting *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 587 (1976) (Brennan, J., concurring)).

As CNS explained in the district court, this fundamental First Amendment right of "contemporaneous access" requires that access be allowed "'as expeditiously as possible' based [on the facts] '[i]n the context of this case.'" JA359 (quoting *Schaefer*, 2 F.4th at 328). The record in this case conclusively establishes that the in-person access to which the press and public are restricted is not nearly as expeditious as the online access provided to Virginia-barred attorneys and the government. Allowing only those favored groups access "as expeditiously as possible," *Schaefer*, 2 F.4th at 328, denies the press and public the same right of contemporaneous access. *See Doe*, 749 F.3d at 272 ("'the value of openness … is threatened whenever immediate access is denied, whatever provision is made for

34

later public disclosure.'").

The Non-Attorney Access Restriction also impinges upon this fundamental First Amendment right in another way recently recognized by this Court. In reversing another ruling that a state statute "does not implicate the First Amendment right to free speech," this Court recognized that "burdening a means of communication can burden speech." *Fusaro*, 930 F.3d at 249, 252. Even where there was no First Amendment right of access – and here, of course, it is settled there is – this Court reiterated that "when the government has decided to make certain information available, there are 'limits to its freedom to decide how that benefit will be distributed.'" *Id.* at 255. While *Fusaro* did not directly address equal protection, this Court's reversal of the dismissal for failure to state a First Amendment claim over discriminatory access illustrates the flaw in the ruling below that discriminatory access did not burden First Amendment rights for Equal Protection purposes.[15]

---

[15] In the context of the "substantial deference" due "a complex scheme to regulate elections" – and where, unlike here, there was no First Amendment right of access – this Court in *Fusaro* held that requiring a one-time "visit [to] a State Board office" to obtain a copy of a voter list did not impose a "severe" burden on speech under the "'flexible standard'" used "to address 'a [First Amendment] challenge to a state election law." 930 F.3d at 256-57, 260 (quoting *Burdick v. Takushi*, 504 U.S. 428, 433 (1992)). That deference does not apply to an Equal Protection claim where, as here, the discriminatory access burdens a "fundamental First Amendment right[,]" *Donrey Media Group v. Ikeda*, 959 F. Supp. 1280, 1285 (D. Haw. 1996), and where reporters cannot make a single visit to a court but instead face a "government-imposed barrier" to informing the public about newsworthy cases by being compelled to repeatedly travel for physical access to complaints and other court records. JA154 ¶ 44.

This "discriminatory right of access" violates equal protection unless it satisfies "a heightened level of scrutiny." *Donrey Media Grp. v. Ikeda*, 959 F. Supp. 1280, 1284-85 (D. Haw. 1996) (statute restricting access to voter registration records to some members of the public while denying it to others, including members of the press, violated equal protection); *Bauer v. Kincaid*, 759 F. Supp. 575, 591-94 (W.D. Mo. 1991) (denying student journalist access to police reports of incidents involving students, while "the general public is given greater access to police reports which affect them," violated equal protection and First Amendment); *Quad-City Cmty. News Serv. v. Jebens*, 334 F. Supp. 8, 15-16 (S.D. Iowa 1971) (denying one newspaper access to police reports made available to "other media presents an obvious case of denial of equal protection" unless it satisfies strict scrutiny, even if access is discretionary under state law, because a newspaper "is entitled to the same right of access as other citizens").

In applying that scrutiny, "[t]he Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives." *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 101 (1972). As shown in Section III, the discriminatory access here cannot meet this standard.

36

**B.    CNS' First Amendment Challenge To The Non-Attorney Access Restriction Is Subject To Some Form Of Strict Or "Rigorous" Scrutiny Because It Is Content-Based And Because It Denies The Right Of "Contemporaneous" Access**

The district court also erred in concluding that CNS' First Amendment challenge to the Non-Attorney Access Restriction was the sort of "'time, place, and manner' restriction" that can receive "more relaxed scrutiny." JA544-545.  For one thing, restrictions that deny contemporaneous access cannot be saved by applying TPM scrutiny.  *Planet III*, 947 F.3d at 596 & n.9; *Courthouse News Serv. v. Gabel*, 2021 WL 5416650, *13 (D. Vt. Nov. 19, 2021).  For another, the district court erred in finding the restriction was content-neutral. This latter error, JA548, requires strict scrutiny even if TPM analysis might otherwise apply, so CNS turns to it first.

**1.    The Non-Attorney Access Restriction Is Not Content-Neutral, And Therefore Must Be Subjected To Strict Scrutiny**

Even when a speech restriction "is facially content neutral, it can nonetheless be considered content based if it 'cannot be justified without reference to the content of the regulated speech, or [it was] adopted by the government because of [a] disagreement with the message the speech conveys.'"  *Lucero v. Early*, 873 F.3d 466, 470-71 (4th Cir. 2017); *accord Cahaly v. Larosa*, 796 F.3d 399, 405 (4th Cir. 2015); *Sorrell*, 564 U.S. at 565 ("a statute's stated purpose may … be considered").

Moreover, "[b]ecause '[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content,'" *Reed*, 576 U.S. at 170

37

(quoting *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010)), "'laws favoring some speakers over others demand strict scrutiny when the … speaker preference reflects a content preference.'" *Fusaro*, 930 F.3d at 252 (quoting *Reed*, 576 U.S. at 170 (2015)). Indeed, as the Supreme Court observed in *Citizens United*, designating preferred speakers may constitute its own "constitutional wrong," 558 U.S. at 340, separate and apart from the content-based inquiry, at least "in the context of political speech." *Id.* at 341; *accord National Press Photographers Ass'n v. McCraw*, 594 F. Supp. 3d 789, 806 (W.D. Tex. 2022) (law that allowed professors, students, insurance employees and real estate brokers, but not journalists, to use drones to capture visual images "discriminate[d] based on the identity of the speaker" and thus strict scrutiny applied.).

The district court believed "'[t]here is nothing inherently suspect about providing some kind of exemption to allow individuals who' are Virginia-barred attorneys to access electronic civil court records so such attorneys can 'do their jobs.'" JA548. But the record contains no explanation as to why attorneys have any ongoing need for online access to records **outside their own cases** "to do their job more efficiently," JA549; *see also* JA310, or for "effective advocacy." JA113. Online access to records in one's **own** cases is certainly helpful (and is common in other online access programs), but Virginia law already provides for this, independent of the OCRA attorney-only access restriction. Va. Code § 17.1-

293(E)(5).  Moreover, if anybody has a job-related need to have effective and efficient access to court records across multiple cases on an ongoing basis, it is the press.  JA142-144 ¶¶ 6-7, 10.

In reality, the purpose and effect of the across-the-board attorney preference is to make it materially easier for judicial insiders – attorneys and the government, who, in the Commonwealth's view, "need it most," JA117 – to engage in "informed public discussion about ongoing judicial proceedings," *Planet I*, 750 F.3d at 787, while purposefully making such speech harder for those "outside of the justice system."  JA310-311.  That is the opposite of how the Supreme Court intended the right of access to work, as it viewed the press as "the likely, and fitting, chief beneficiary of a right of access because it serves as the 'agent' of interested citizens." *Richmond Newspapers*, 448 U.S. at 586 n.2 (Brennan, J., concurring); *id.* at 573 (Burger, C.J., announcing judgment) (press has a constitutional role to play as "surrogates for the public."); *accord, e.g., Cox*, 420 U.S. at 491-92 ("in a society in which each individual has but limited time and resources with which to observe at first hand the operations of the government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations.").

Indeed, by Appellees' own admission, the press and public are denied OCRA access because, in Appellees' view, the press and public cannot be trusted to engage in the "right" sort of speech about the non-confidential court records available on

OCRA.  Specifically, Appellees fear that once the public and press are given online access, some users might collect and disseminate personally identifying information – some of which is confidential by law and required to be redacted, Va. Code § 8.01-420.8(A), and some of which is not confidential at all.  As discussed below in Section III, there is no evidence in the record to support this speculative fear.  But even if such evidence existed, Appellees' stated purpose makes clear the Non-Attorney Access Restriction is content-based.

One of the Commonwealth's stated justifications for the OCRA restrictions is preventing public court records from being used for "direct-marketing offers" it disfavors.  JA331-332.  But as the Supreme Court has made clear, "the creation and dissemination of *information*" – not just the news – "are speech within the meaning of the First Amendment," and "'[a] restriction on disclosure is a regulation of speech, and the "sale" of [information] is simply disclosure for profit.'"  *Sorrell*, 564 U.S. at 570 (rejecting argument that "sales, transfer, and use of" drug "prescriber-identifying information are conduct, not speech").  To the extent such information is contained in fully public documents to which a constitutional right of access exists, Appellees are thus admittedly enforcing a "'[s]peech restriction[] based on the identity of the speaker," as a "means to control content.'"  *Reed*, 576 U.S. at 170; *Sorrell*, 564 U.S. at 565 (law content-based where legislative findings confirmed purpose was targeting commercial speech of pharmaceutical "detailers" based on

40

information provided by "data miners" and whose messages were "'often in conflict with the goals of the state'"); *Fusaro*, 930 F.3d at 253 (law "restrict[ing] the pool of speakers with access to an effective means of communicating that speech" contained "both content- and speaker-based restrictions"); *Boyer v. City of Simi Valley*, 978 F.3d 618, 623 (9th Cir. 2020) ("to execute its purpose, the City enacted an ordinance that prefers speakers likely to spread messages consistent with its purpose. This is a prudent preference, a reasonable rationale, *and a content-based choice that triggers strict scrutiny*").

### 2. By Denying Contemporaneous Access, The Non-Attorney Access Restriction Must At Least Survive *Press-Enterprise II* Scrutiny

Even if not content-based, a restriction that denies contemporaneous access to court records is not constitutional merely because it survives TPM scrutiny.

In *Schaefer*, the district court recognized that "Fourth Circuit precedent **requires** the application of strict scrutiny" to any restriction that denies the "'contemporaneous right of access.'" 440 F. Supp. 3d at 559 (quoting *Doe*, 749 F.3d at 266). But because *Planet III* said "claims such as the one before the Court" resembled a TPM restriction, the district court in *Schaefer* erroneously thought the Ninth Circuit had applied "intermediate" TPM scrutiny. *Id.* at 559-60. Because "Defendants cannot satisfy their burden under either test," the district court did not decide which level of scrutiny should apply but instead granted declaratory judgment to CNS under both. *Id.* This Circuit affirmed on TPM grounds. 2 F.4th at 328.

41

The district court here also thought the Non-Attorney Access Restriction "resembles a time, place, and manner restriction," and so it applied TPM scrutiny to both of CNS' First Amendment claims. JA545. But as the Ninth Circuit explained in *Planet III*, that a restriction may "***resemble***" a TPM restriction does not mean it ***is subject*** to TPM scrutiny. 947 F.3d at 594-96.

The Ninth Circuit ***refused*** to apply TPM scrutiny in *Planet III* even though the "access polices" there also "resemble time, place, and manner restrictions," *id.* at 595-96, ***rejecting*** the concurrence's argument – similar to that of the district court here – that TPM scrutiny should apply. *Id.* at 596 n.9. Because those policies had the impact of denying the "timely" – i.e., "contemporaneous" – access that is an essential component of the right of access, the Ninth Circuit found they must survive the same constitutional scrutiny the Supreme Court applied in *Press-Enterprise II*:

> Once we have determined that a qualified First Amendment right of access to newly filed nonconfidential civil complaints exists, a presumption of ***access*** arises under *Press-Enterprise II* that ***may be restricted only if*** "closure is essential to preserve higher values and is narrowly tailored to serve those interests."

*Id.* at 594-95 (quoting 478 U.S. at 13-14). As applied to a policy that delayed access, the Ninth Circuit held that a court administrator must "demonstrate … a 'substantial probability' that its interest in the fair and orderly administration of justice would be impaired by immediate access, and second, that no reasonable alternatives exist to 'adequately protect' that government interest." *Id.* at 596 (quoting *Press-Enterprise*

*II*, 478 U.S. at 14).  The Ninth Circuit described this as "'rigorous,' but not strict, scrutiny," *id.* at 596, yet stricter than the intermediate scrutiny applied to pure TPM rules.  *Id.* at 596 n.9.[16]

   *Charlotte Observer* confirms that at least *Press-Enterprise II* scrutiny applies where "timely access" is an element of the substantive right.  There, the Court rejected a district court's view that "a 'minimal delay' in access" did not deny the right of access.  882 F.2d at 856.  This Court's conclusion – that such a view "'unduly minimizes, if it does not entirely overlook, the value of "openness" itself, a value which is threatened whenever immediate access is … is denied, whatever provision is made for later public disclosure'" – has been cited to reject the argument that a "'slight delay' in availability is a reasonable time, place, or manner restriction." *Courthouse News Serv. v. Jackson*, 2009 WL 2163609, *4 (S.D. Tex. July 20, 2009) (quoting *Charlotte Observer*, 882 F.2d at 856); *see In re Associated Press*, 172 F.

---

[16] The *Schaefer* district court's misreading of *Planet III* may come from the Ninth Circuit's use of different terminology.  Where *Planet III* called *Press-Enterprise II* scrutiny "'rigorous,' but not strict," 947 F.3d at 596, *Schaefer* called it "strict."  440 F. Supp. 3d at 559 (citing *Doe* and *Press-Enterprise II*).  The Ninth Circuit apparently perceived a difference between the *Press-Enterprise II* test and the test used in *Globe Newspaper*, 457 U.S. at 606-07.  So when *Planet III* said the access restrictions at issue "should 'not be subject to such strict scrutiny'" as applied in *Globe*, "but to the more relaxed scrutiny the Supreme Court has applied in these cases," 947 F.3d at 595, it was not saying TPM scrutiny should apply, but instead the same *Press-Enterprise II* scrutiny applicable to other access restrictions.  While it does not matter for this case, as the Non-Attorney Access Restriction cannot even survive TPM scrutiny, this Court may want to clear up this semantical confusion.

App'x 1, 4 (4th Cir. 2006) (applying *Press-Enterprise II* scrutiny to claim asserting a "right to contemporaneous access to documentary exhibits and transcripts").

The Non-Attorney Access Restriction has the same pernicious effect; the general public is "denied contemporaneous access to news," *Globe Newspaper*, 868 F.2d at 507, as the press must travel prohibitively long distances to obtain records from far-off courthouses even though the records are available to a subset of the public remotely. Such a restraint on "reporting news 'just at the time [the] audience would be most receptive'" is "effectively equivalent to 'a deliberate statutory scheme of censorship.'" *Planet III*, 947 F.3d at 594 (restriction that "'postpone[s] disclosure undermines the benefit of public scrutiny and may have the same result as complete suppression'"). It therefore must be subject at a minimum to "rigorous" *Press-Enterprise II* scrutiny. *Id.* at 594-96.

## C. The Dissemination Restriction Is A Prior Restraint, And The Court Erred In Refusing To Apply The "Most Rigorous Form Of Review"

The district court misread the law prohibiting prior restraints on speech like the Dissemination Restriction. It found the "widely accepted" rule that "'state action to punish the publication of truthful information seldom can satisfy constitutional standards,'" JA59 (quoting *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 102 (1979)), was inapplicable because CNS "does not allege that the regulation punishes the press or public [sic] from publishing legally obtained, truthful information." *Id.*

44

But the First Amendment's prohibition against prior restraints is not limited to restrictions that "punish[]" the press or public for publishing; "*all* 'court orders that actually forbid speech activities,'" such as "gag orders," are "prior restraints," *Murphy-Brown*, 907 F.3d at 797 (quoting *Alexander v. United States*, 509 U.S. 544, 550 (1993)), as are all statutes and "'administrative … orders *forbidding* certain communications when issued in advance of the time that such communications are to occur.'" *Alexander*, 509 U.S. at 550.

There is no doubt that the Dissemination Restriction "forbid[s]" and "suppress[es]" speech concerning pending civil litigation. Specifically, it bans not only the sale but also the mere "post[ing]" on a website, or "redistribut[ing]" – i.e., publishing or other forms of dissemination – to "the general public," and in most instances "any third party," of "any data" – i.e., as the statute's title puts it, "information" – "accessed by secure remote access." Va. Code § 17.1-293(H).

This prior restraint "directly impairs" the First Amendment rights of CNS and all other media who cover litigation in Virginia. *In re Wall Street Journal*, 601 F. App'x 215, 218 (4th Cir. 2015). Unless struck down, it will render meaningless an order invalidating the Non-Attorney Access Restriction because media who are then able to obtain a complaint or civil court record by remote access cannot inform the public of that information. JA163 ¶ 26, JA191-192, JA282 ¶ 7. In the case of CNS,

45

that means "the expression of the newspapers, lawyers, libraries and others who rely on CNS for information will also be stifled." *Planet I*, 750 F.3d at 788.

Beyond that, the restriction acts like a "gag order" – which prohibits lawyers and other judicial participants from providing certain "extrajudicial statement[s]" concerning a pending case that "could reasonably reach 'public communications media,'" *Murphy-Brown*, 907 F.3d at 796 – by barring lawyers and other judicial insiders from providing the press complaints or other information about pending cases obtained via remote access. The Dissemination Restriction thus "affect[s] [the press'] constitutionally guaranteed right … to gather news." *CBS v. Young*, 522 F.2d 234, 237-38 (6th Cir. 1975) (gag order on lawyers and others "directly impaired or curtailed" media's ability to report on civil case over Kent State shootings and was an unconstitutional prior restraint); *Wall Street Journal*, 601 F. App'x at 218 (press had standing to challenge sealing and gag order "because their right under the First Amendment to gather news … has been directly impaired").

It is well-settled that "'[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity,'" *Baughman v. Freienmuth*, 478 F.2d 1345, 1350 (4th Cir. 1973) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963)). But "[i]nstead of engaging in the strict scrutiny assessment required" by precedent, "the district court erroneously treated" the Dissemination Restriction "as a content-neutral time, place and manner

regulation and thus subjected it to intermediate scrutiny." *Soderberg*, 999 F.3d at 969. The district court thought this system of prior restraint "resembles a 'time, place, and manner' restriction," JA559, because, as in *Soderberg* "it does not limit other means of disseminating the same information," 999 F.3d at 966, as CNS may "post … and redistribute information obtained *physically* from the courthouse." JA559.

The district court got it backwards. The fact that the same information is open to all at the courthouse is not a defense for the Dissemination Restriction; to the contrary, it renders the Dissemination Restriction indefensible. Just as "'[t]here is nothing that proscribes the press from reporting events that transpire in the courtroom,'" *Charlotte Observer*, 921 F.2d at 50 (quoting *Nebraska Press Ass'n*, 427 U.S. at 568), the First Amendment does not allow a state to prohibit the press from publishing information "'disclosed in public court documents open to public inspection.'" *Soderberg*, 999 F.3d at 967-68.

In short, "[t]he district court … erred in refusing to apply strict scrutiny on the premise … that *Cox Broadcasting* [and other precedent] demand such scrutiny only where there is an absolute prohibition on the publication of information in any form." *Soderberg*, 999 F.3d at 969. But even if the Dissemination Restriction could be subject to TPM scrutiny, the district court also erred in holding that restriction was "content-neutral" and thus subject to intermediate scrutiny. JA559-560.

47

As *Murphy-Brown* holds, "gag orders are presumptively unconstitutional" not only because they are a prior restraint but also "because they are content based." 907 F.3d at 797. "Gag orders inherently target speech relating to pending litigation, a topic right at the core of public and community life." *Id.* The same is true of the Dissemination Restriction; it gags attorneys (and other judicial insiders with OCRA access) from disclosing the contents of court records to the press, and prevents the public from learning about a litigation or case development, where the press cannot travel to the forum court to obtain that record. *See* JA154 ¶ 44.

*Murphy-Brown* thus shows the fallacy of the notion that § 17.1-293(H) is content-neutral because it "does not treat civil court records about a certain subject or topic differently than others," as the district court thought. JA547, JA560. The gag it imposes involves the subject of "pending litigation," 907 F.3d at 797, which "portends particularly egregious damage to First Amendment rights because it stifles the 'free discussion of governmental affairs' that the First Amendment exists to protect," particularly "informed public discussion of … judicial proceedings." *Planet I*, 750 F.3d at 787.

Like "gag orders," then, the Dissemination Restriction "warrant[s] a most rigorous form of review because [it] rest[s] at the intersection of two disfavored forms of expressive limitations: prior restraints and content-based restrictions." *Murphy-Brown*, 907 F.3d at 796-97.

48

## III.

## THE EVIDENCE IN THE RECORD FAILS TO SATISFY EVEN THE TPM SCRUTINY THE DISTRICT COURT APPLIED, LET ALONE THE <u>HIGHER STANDARDS IT SHOULD HAVE APPLIED</u>

Because the district court erroneously concluded that lower levels of scrutiny applied, it did not apply strict scrutiny to any of CNS' claims, even though, as shown, some form of strict or "rigorous" scrutiny was required for all three. Even under the TPM scrutiny the district court applied to CNS' two First Amendment claims, the evidence was plainly insufficient to meet Appellees' burden of proof. The Equal Protection claim would necessarily fail strict scrutiny for the same reason. This Court should reverse the district court's order of dismissal as to the Equal Protection claim, reverse the grant of summary judgment to Appellees and the denial of summary judgment to CNS as to the two First Amendment claims, and remand with instructions that judgment on all three claims be entered in CNS' favor.

**A.    The Strict (Or Rigorous) Scrutiny The District Court Should Have <u>Applied Poses High Evidentiary Hurdles That Appellees Did Not Meet</u>**

Under strict scrutiny, Appellees had the burden to establish the OCRA restrictions were "narrowly tailored to serve a compelling governmental interest." *Lawson*, 677 F.3d at 637 (Equal Protection); *Cent. Radio Co. v. City of Norfolk*, 811 F.3d 625, 633 (4th Cir. 2016) ("strict scrutiny" of a "content-based regulation of speech" requires "the government must show that the regulation 'further[ed] a compelling interest and [wa]s narrowly tailored to achieve that interest'").

49

Under *Press-Enterprise II*, a court administrator must "demonstrate … a 'substantial probability' that its interest in the fair and orderly administration of justice would be impaired by immediate access, and second, that no reasonable alternatives exist to 'adequately protect' that government interest." *Planet III*, 947 F.3d at 596 (quoting 478 U.S. at 14). As "[t]he burden to overcome a First Amendment right of access rests on the party seeking to restrict access," *Virginia Dep't of State Police*, 386 F.3d at 575, "the court cannot rubber-stamp an access restriction simply because the government says it is necessary." *Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012).[17] To carry its burden, the government must present "***evidence***" – "unsubstantiated or speculative claims of harm" are insufficient. *Doe*, 749 F.3d at 270; *accord, e.g., Virginia Dept. of State Police*, 386 F.3d at 573 ("[g]eneral concerns stated in a conclusory fashion are not sufficient to constitute a compelling government interest, and do not grant the Court a sufficient basis [to] deny access"); *Butigan v. Al-Malki*, 2017 WL 3097772, *3 (E.D. Va. July 20, 2017) (denying motion to seal where "the Parties have merely provided the court with a hypothetical scenario" and no "real evidence").

---

[17] Even in the deferential context of determining the "reasonableness" of an airport authority's speech restrictions, Judge Wilkinson noted "[w]hen managers say 'no' simply because saying 'no' is easier than having even to think about the First Amendment, ***we may not rubber-stamp decisions***." *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 612 F.3d 301, 303 (4th Cir. 2010).

**B.** **Even TPM Scrutiny Is Not Easily Met**

Further, under intermediate TPM analysis, "the burden … falls on the government to prove the constitutionality of the speech restriction.'" *Reynolds*, 779 F.3d at 226-27; *accord Billups*, 961 F.3d at 685 (government "bear[s] the burden of proving that the [restriction] survives intermediate scrutiny."). To survive TPM analysis, a restriction on speech must be "'narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication.'" *Reynolds*, 779 F.3d at 225-26.

*Reynolds* and *Billups* specifically address the evidentiary burden on the government under TPM scrutiny following the Supreme Court's decision in *McCullen v. Coakley*, 573 U.S. 464 (2014). While the "existence of a government interest" may be satisfied by "case law," *Reynolds*, 779 F.3d at 228, the government must still show that "the speech restriction furthers the government's interests." *Id.* at 228. Where this is "obvious," evidence is not required. However, where "the relationship is not so obvious," *Reynolds*, 779 F.3d at 228 & n.4 – that is, where it is not clear that "the recited harms are "'real, not merely conjectural,"'" or that the restriction ""''alleviate[s] these harms in a direct and material way,"'" *Ross v. Early*, 746 F.3d 546, 556 (4th Cir. 2014) – the government must "present evidence showing that the speech regulation furthers its asserted interests." *Reynolds*, 779 F.3d at 228 & n.4, 229-30; *accord Billups*, 961 F.3d at 685 n.6.

51

As for TPM narrow tailoring, evidence is always required. The government must "present actual evidence supporting its assertion that a speech restriction does not burden substantially more speech than necessary: argument unsupported by evidence will not suffice to carry the government's burden." *Reynolds*, 779 F.3d at 229 (citing *McCullen*); *accord Schaefer*, 2 F.4th at 329. Specifically, the government must present evidence demonstrating that "before enacting the speech-restricting law," it "'seriously undertook to address the problem with less intrusive tools readily available to it.'" *Billup*s, 961 F.3d at 688 & n.9 (quoting *McCullen*, 573 U.S. at 494). And "even if a governmental entity has tried or considered a less speech-restrictive alternative, it must still prove that the law in dispute does not 'regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.'" *Id.* at 668 n.9; *accord Doe v. Cooper*, 842 F.3d at 847-48.

## C.    Appellees Did Not Provide Evidence To Satisfy TPM Scrutiny, Let Alone Strict Or Rigorous Scrutiny

Under any standard, Appellees were required to provide evidence, not mere argument. But instead of evidence, Appellees relied mainly on law review articles and secondary sources to suggest a parade of horribles about what ***might*** happen if their unconstitutional restrictions on OCRA access were lifted. The district court said it did not consider these sources, JA536 n.6, JA549 n.13, which means all that was left, with the possible exception of the conclusory Declaration of Joby Knuth

52

("Knuth Declaration"), was attorney arguments. Indeed, portions of the MSJ ruling track arguments in Appellees' briefs. *Compare, e.g.,* JA553-554 with JA313, and JA555 with JA116-117.

That clearly was not enough. By developing almost no evidentiary record on a matter on which they had an evidentiary burden, Appellees failed to meet their burden of proof, and the district court erred in determining TPM scrutiny was satisfied. It necessarily follows that neither strict nor rigorous scrutiny could be met on such a record.

1.    **Even Under TPM Scrutiny, The District Court Erred In Accepting Appellees' Conclusory Assertions Of Harm**

All courts share an interest in preventing harm caused by misuse of personal identifiers, and ensuring the efficient administration of justice. But the undisputed evidence before the district court established that all federal courts and courts in 38 states – including in Alexandria, Virginia – provide remote access to the press and public. JA79-80 ¶¶ 10-11, 15, JA149 ¶¶ 26-28. It thus cannot be "obvious" that doing the same in Virginia's other courts would harm these interests. Nor can it be obvious that restricting OCRA access to lawyers and the government, and limiting use of these records, "alleviate[d]" these purported harms "in a direct and material way" for TPM purposes when there is no evidence those harms have arisen with respect to remote access in other courts. *Ross*, 746 F.3d at 556; *accord Billups*, 961 F.3d at 885 n.6; *Reynolds*, 779 F.3d at 228 & n.4, 229. The district court thus erred

in saying Appellees could satisfy their TPM burden to show OCRA's restrictions further their interest through "common sense and logic." JA551, JA562. It also erred in concluding there was "enough evidence" to show the restrictions "prevent[] the mass collection of PII by bots." JA552.

When the secondary sources the district court said it could not consider are set aside, JA536 n.6, JA549 n.13, the only evidence that would even arguably support Appellees' arguments was the Knuth Declaration. But the only admissible, non-speculative facts that declaration contains are:

(1)    Virginia's Circuit Court Online Case Information System ("Circuit OCIS"), General District Court Online Case Information System ("General OCIS"), and OCIS 2.0 (each of which allow the general public to search for docket information), as well as the Virginia Date of Birth Confirmation ("VDBC") database (which allows a registered user to search for an individual's birthday or SSN), have been, and continue to be, subjected to unspecified amounts of "manual and/or automated data mining," JA129 ¶ 9;

(2)    In 2010 – before Knuth was even employed by OES[18] – the General OCIS and Circuit OCIS systems, neither of which require an account, let alone a

---

[18] Because the Declaration does not establish Knuth's personal knowledge of facts that predated his employment, it lacks foundation, an objection CNS made below. JA352.

paid one, experienced "bot" traffic;[19] and

(3)    The VDBC system – which, unlike OCRA, does not require a notarized

user agreement or payment to access and is ***specifically designed*** to allow registrants

to search for personal identifiers – "has been mined for data."  JA130 ¶ 14.

Nothing in the Knuth Declaration establishes that VDBC has been mined for

personal identifiers "other than that for which the system was designed."  JA130

¶ 13.  Nor is there any evidence to show the General OCIS, Circuit OCIS, and OCIS

2.0 systems have ever been mined for personal identifiers.  And the Knuth

Declaration never addresses why, despite this supposed data mining, the

Commonwealth continues to operate these systems.

The MSJ record also does not contain any admissible evidence as to how

frequently, if at all, the personal identifiers specified in Va. Code § 17.1-293(B)

appear in non-confidential civil filings.  Smith acknowledged she was "unable to

provide" the number of filings in each of the last five years that contained personal

identifiers, JA245-247 ¶ 8, many of which attorneys are obligated to redact pursuant

to Va. Code § 8.01-420.8, and which Smith and her staff ensure are redacted prior

---

[19] As explained in the Bodis Declaration submitted by CNS, a "bot (short for 'robot')
is a software application that runs automated tasks over the internet.  Tasks run by
bots are typically simple," with the difference being that they are "performed at
much higher rates compared to human activity."  JA410 ¶ 6.  They often help to
index web content and are useful for finding relevant information, such as in
connection with academic research, generating news feeds, or a typical Google
search.  JA410 ¶¶ 6-8.

to making a filing available via OCRA.  JA88 ¶ 51.  As for the Commonwealth, it relied on law reviews and other secondary sources that were not only inadmissible and irrelevant to show the extent to which personal identifiers appeared in Virginia civil filings, but at least three of which contradicted the notion that personal identifiers are common in public documents.  For example, a 2015 law review analyzing North Carolina filings concluded "[m]ost of the ***documents contained relatively few incidences of sensitive information***."  David S. Aradia & Anne Kleinfelter, *Privacy and Court Records: An Empirical Study*, 30 Berkeley Tech. L.J. 1807, 1807-08 (2015).[20]

Appellees had the burden of proof.  Without something more concrete, it was error for the district court to find Appellees met that burden by crediting as true

---

[20] Similarly, the "Letter from Carl Malamud to The Honorable Lee H. Rosenthal" and a blog post from "computer scientist Timothy Lee," that the Commonwealth also relied on, JA117-118, further casts doubt on Appellees' conclusory assertions that personal identifiers are common.  The Malamud letter identified 1,669 out of 2,706,431 filings in 32 federal district courts that contained social security numbers or other private information; the Lee blog post identified 194 out of 1.8 million filings available on PACER where parties tried, but for technical reasons, did not successfully redact private information.  Thus, only ***0.062%*** and ***0.011%*** of the filings discussed in those secondary sources, respectively, contained arguably confidential or sensitive information, both a "minute fraction" that fall well short of justifying the challenged restrictions, and consistent with evidence on this point in other CNS litigation. *See Gabel*, 2021 WL 5416650 at *15-16 (withholding access to newly filed complaints was "not 'essential to preserve higher values" because "[a]s for protecting privacy interests," only 2 out of 4,156 complaints, i.e., ***0.048%***, "contained confidential information;" thus, "placing the onus on filers has been overwhelmingly effective").

56

conclusory claims that "Virginia's publicly available court databases have been mined by bots for" personal identifiers, JA540, *see also* JA552, as opposed to the many other reasons why bot traffic might exist, JA410, including for news reporting. Indeed, notwithstanding Appellees' heavy use of inflammatory terms like data "harvesting" and "mining" and the supposed harms they present, *see, e.g.,* JA99-102, JA106-107, JA308, "scraping is a popular journalistic technique – and has been for years," including by "[s]ome news organizations" that "use scraping daily to keep their ongoing projects up to date." D. Victoria Baranetsky, *Data Journalism and the Law*, Columbia Journalism Review, at 3-4 (Nov. 29, 2018) (available at https://www.cjr.org/tow_center_reports/data-journalism-and-the-law.php#newsgathering); *accord* JA410 ¶ 8.

Moreover, a review of the record reveals that a material factor in the district court's TPM analysis had nothing to do with protecting personal identifiers at all. Rather, as the MSJ transcript reflects, JA470-472, and as the district court noted twice in its MSJ ruling, Appellees were concerned that CNS, or someone else, might "download[] all content from the clerk's software, only paying one fee, and then post[] such information on their own website for profit, exploitation, or to sell such information to third parties." JA552; *see also* JA556.

As an initial matter, this concern is "merely conjectural," *Ross*, 746 F.3d at 556, especially given the lack of evidence that this has occurred in the many other

courts, including all federal courts, that already provide online access to court records. More fundamentally, a concern about maintaining a government monopoly over the dissemination of public records to protect the sizeable revenue streams OES and the clerks get from OCRA, JA472, JA552, JA556,[21] has no place in TPM analysis – let alone strict or rigorous scrutiny. Public records protected by the First Amendment right of access are just that: the public's records, not something that can be withheld to preserve a government monopoly.

### 2. Even Under TPM Scrutiny, There Is No Evidence To Support The Rejection Of Less Speech Restrictive Alternatives

The undisputed MSJ evidence offered by CNS demonstrated that all federal courts and courts in 38 states provide online remote access to the press and public. JA79-80 ¶¶ 10-11, 15.[22] Rather than creating an unequal system of online access and muzzling speech about records accessed online, other courts address concerns about personal identifiers by requiring redaction, or by restricting online access for all except the parties and their counsel in case types where identifiers commonly

---

[21] Indeed, it is this revenue stream, rather than any particularized need for access to records in which attorneys are not involved, that may explain why OCRA exists at all despite Appellees' stated concerns about making court records electronically available, and why Appellees are fighting so hard to keep OCRA a closed system. *See* JA134 ¶ 6, JA209 No. 12, JA86 ¶ 43.

[22] The district court erroneously believed it was CNS' burden to come forward with evidence there were no issues with this remote access. JA557. That flipped the applicable burden of proof, even under TPM analysis.

appear.  Federal Rule of Civil Procedure 5.2(a) requires, "in an electronic or paper filing," the filing parties to include only the last four digits of social security numbers, year (but not day or month) of birth, the initials (but not names) of a minor, and the last four digits of account numbers.  Federal courts also restrict remote access for two specific case types – social security appeals and immigration cases.  In those two case types, only the parties and attorneys involved in the particular case have remote access.  FRCP 5.2(c).

In Virginia, filing parties are already required to redact social security numbers and financial account numbers pursuant to Va. Code § 8.01-420.8, and the Commonwealth could, if it chose, expand the categories of items required to be redacted to include some or all of the additional personal identifiers listed in Va. Code § 17.1-293(B).  With respect to minor and maiden names, a less restrictive alternative is already partially in place, as many circuit court cases that concern minors are confidential by statute and thus not available on OCRA.  JA371-372; Va. Code §§ 16.1-307, 63.2-1246, 16.1-305, 16.1-305.01.  In addition, for child custody proceedings, if the "health, safety, or liberty of a … child would be jeopardized by disclosure of identifying information, the information shall be sealed and may not be disclosed to the … public."  Va. Code § 20-146.20.  Virginia law also provides for sealing of records in case types where maiden names are included.  Va. Code §§ 8.01-217(G) (name change applications), 20-124 (divorce proceedings).

The MSJ record establishes Smith already "reviews civil filings" to ensure the redaction of social security numbers, "driver's license numbers and other identification numbers as contemplated under Virginia Code § 8.01-420.8."  JA88 ¶ 51, JA242-243 No.1.  It would be a straightforward task to expand that review to include the other categories of information in § 17.1-293(B), as Smith acknowledged she already does when providing online access in certain high-profile cases.  JA208-209 No. 10.

In addition to these "readily available, less-speech-restrictive alternatives," CNS "identif[ied] a third alternative that … [Appellees] should have at least considered," *Billups*, 961 F.3d at 688 – the commonly-used bot management, mitigation and protection practices identified in the Bodis Declaration, which "[e]ven moderate combinations of … can prove effective in thwarting unwanted bot activity."  JA413.  Such practices would be particularly effective in the context of a paid, password-protected account like OCRA, which has the added requirements that the agreement must be signed by a notary and approved by the clerk, JA85 ¶ 40-41, thus assisting in the enforcement of subscriber agreements.  In the district court, Appellees made unsupported, conclusory assertions that enforcement does not work, JA130-131 ¶¶ 14-16, but provided little evidence of specific enforcement efforts, nor how enforcement would be ineffective despite the extensive information

required in the OCRA user agreement, the added protection that the agreement be notarized, and the placing of OCRA behind a paywall.  JA200-206.

Given the existence of these readily available less-speech-restrictive alternatives, the district court could not have properly resolved the narrow tailoring inquiry in Appellees' favor unless – viewing the evidence in the light most favorable to CNS – there was no genuine dispute of material fact that Appellees "seriously considered" these alternatives.  *Billups*, 961 F.3d at 690 (citing as examples of serious consideration "evidence that it conducted cost-benefit analyses, sanctioned formal reports, held workshops with city leaders, or spoke with leaders of other cities that have successfully implemented such a program"); *accord McCullen*, 573 U.S. at 492-95; *Reynolds*, 779 F.3d at 231-32.  The district court's MSJ ruling does not address this requirement, perhaps because the record contains no such evidence.[23]

Instead, the district court credited as true Appellees' conclusory "post-hoc justifications," *Billups*, 961 F.3d at 689-90, for why these alternatives would not work, JA555-557, which is plainly insufficient.  *Billups*, 961 F.3d at 689-90; *McCullen*, 573 U.S. at 494, 496; *Reynolds*, 779 F.3d at 231-32.  While Appellees

---

[23] The 2018 Work Group Report – which discusses requiring redaction by parties, along with other legislation as a prerequisite for turning OCRA into a statewide remote access system available to the public – comes the closest, JA225-226, but aside from observing that legislation would be needed and concerns that a statewide system would result in lost revenue to clerks, *id.*, there is nothing in the MSJ record that explains why this alternative was never pursued or would not work.

claimed the rules requiring redaction are frequently ignored, they did not offer any admissible evidence on this issue. They also said opening OCRA to the public and press would involve time and expense, both to redact documents online and to police bot activity, but this argument is premised on the unsubstantiated assumption that filing party redaction would be ineffective. Even if credited, Appellees did not offer any admissible evidence that would quantify the expense of redaction in any OCRA courts.

To add to this error, the district court improperly discounted CNS' evidence of remote access in all federal courts and courts in more than three-fourths of states, JA557, from which it should have drawn justifiable inferences in favor of the non-moving party for purposes of Appellees' MSJ. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

Moreover, while TPM analysis does not require that the measures taken by the government be "'the least restrictive or least intrusive means,' … the government still 'may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.'" *McCullen*, 573 U.S. at 486; *Billups*, 961 F.3d at 686 ("to zealously safeguard the right to free speech enshrined in our Constitution's First Amendment – undoubtedly among the most fundamental of American rights – we must also ensure that the government's chosen method for protecting its significant interests is not too broad"); *Reynolds*, 779 F.3d at 230

("courts must consider 'the amount of speech covered by the ordinance and whether there is an appropriate balance between the affected speech and the governmental interests that the ordinance purports to serve").

Under strict scrutiny, the burden on Appellees was even higher. Even where harm is shown, the government must overcome the narrowly tailoring requirement by demonstrating there is "no less restrictive way to serve [the] governmental interest." *Rushford*, 846 F.2d at 253 (citing *Globe Newspaper*, 457 U.S. at 606-07); *accord, e.g., Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021) ("[u]nder strict scrutiny, the government must adopt 'the least restrictive means of achieving a compelling state interest'"); *Murphy-Brown*, 907 F.3d at 799 ("Even when a gag order furthers a compelling interest, it must be the 'least restrictive means' of furthering that interest.'); *see also Planet III*, 947 F.3d at 596 (*Press-Enterprise II* requires government to show "no reasonable alternatives exist to 'adequately protect'" the interest asserted to justify "impair[ing] immediate access").

"At the outset," as the Supreme Court instructed in *McCullen*, the district court should have noted that the OCRA restrictions "are truly exceptional." 573 U.S. at 464. As noted above, *supra* at 7-8, only two other states maintain an attorney preference system, and one is eliminating it, while the other has been given authority to eliminate it by its Supreme Court. JA142 ¶ 5. "That of course does not mean

63

that the law is invalid. It does, however, raise concern that the Commonwealth has too readily forgone options that could serve its interests just as well, without substantially burdening the kind of speech in which [CNS] wish[es] to engage." *McCullen*, 573 U.S. at 490.

As shown, Appellees had other options, but they never meaningfully considered them. Instead of using less-speech-restrictive alternatives to "focus[] on the precise individuals and the precise conduct causing a particular problem," *id.* at 492 – the existence and extent of which is wholly speculative – Appellees chose "broad, prophylactic measures, … unnecessarily sweeping in innocent individuals and their speech," *id*. at 492-93, that make it a "practical" impossibility for a news organization to provide daily coverage of new civil filings in Virginia's circuit courts. JA149-150 ¶ 29. And Appellees have chosen this path all to protect possible, but unsubstantiated, "abuse" of personal identifiers that filing parties are already required to redact and other identifiers Virginia does not deem confidential, which filing parties are not required to redact, and are therefore a matter of public record at courthouses.

It is not enough for a court to conclude, as the district court did here, that "the state courts are best positioned to craft an informed and proper balance between [their] legitimate institutional needs and the public's interest in electronic access to civil court records." JA555. While Appellees' concerns about personal identifiers

64

are "not without some appeal," narrow tailoring cannot be decided based on a superficial reaction that a particular policy seems "reasonable."  Given the absence of evidence of a real problem and the available alternatives, even under TPM, the restrictions "burden more speech than necessary."  *Reynolds*, 779 F.3d at 231.  And they certainly do not satisfy strict scrutiny.

### 3.    Even If TPM Applies, Appellees' Policies Do Not Leave Ample Alternative Channels For Contemporaneous Access

The district court never addressed the final TPM requirement, *i.e.*, that a restriction on speech must be "'leave open ample alternative channels of communication.'"  *Reynolds*, 779 F.3d at 225-26.  But it clearly is not satisfied.  As shown, the dramatic disparities in the ability to access civil filings created by the travel time and expense the press and public must incur, but lawyers and the government do not, "'seriously burden[s],'" the ability of the public and press to access those records.  *Reynolds*, 779 F.3d at 232 n.5.  And of course, "the public cannot discuss the content of … complaints" and other civil filings "about which it has no information," *Planet I*, 750 F.3d at 788.  At the very least, "because there are genuine questions of material fact" on this last TPM element, summary judgment for Appellees "was inappropriate."  *Reynolds*, 779 F.3d at 232 n.9.

### CONCLUSION

"An informed citizenry is at the heart of this democracy, and narrowing the arteries of information in the manner sought by [Appellees] will only serve to impair

our country's coronary health." *News and Observer Publishing Co. v. Raleigh-Durham Airport Auth.*, 612 F.3d 301, 304 (4th Cir. 2010) (Wilkinson, J., concurring in the denial of rehearing en banc). Having joined the many other courts that provide online access, Virginia's OCRA courts may not discriminate in who may use that access to exercise their fundamental First Amendment rights, nor prohibit those who use that access from disseminating any information about court records obtained online. The district court's orders should be reversed, and this case remanded to the district court with instructions to enter summary judgment for CNS on all three of its claims.

Dated: February 3, 2023

BRYAN CAVE
LEIGHTON PAISNER LLP

By:   /s/ Roger Myers
Roger Myers
Rachel Matteo-Boehm
3 Embarcadero Center, 7th Floor
San Francisco, California 94111
Tel: (415) 675-3400
rachel.matteo-boehm@bclplaw.com
roger.myers@bclplaw.com

By:  /s/ Jonathan E. Ginsberg
Jonathan E. Ginsberg
1290 Avenue of the Americas
New York, New York 10104
Tel: (212) 541-2000
jon.ginsberg@bclplaw.com

TROUTMAN PEPPER
HAMILTON SANDERS LLP

By:   /s/ Dabney J. Carr IV
Dabney J. Carr IV
P.O. Box 1122
Richmond, Virginia 23218
Tel: (804) 697-1238
dabney.carr@troutman.com

*Counsel for Appellant Courthouse News Service*

66

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify:

1.    The attached complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i), as modified by this Court's order of January 25, 2023, granting Appellee Courthouse News Service leave to file an opening brief not in excess of 16,000 words.  The attached contains 15,939 words (according to the Microsoft Word 2016 count function), excluding those parts exempted by Rule 32(f) of the Federal Rules of Appellate Procedure.

2.    The attached complies with the typeface and typestyle requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6). The attached has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type style.

*/s/ Jonathan E. Ginsberg*