**22-2110**

# United States Court of Appeals

*for the*

# Fourth Circuit

COURTHOUSE NEWS SERVICE,

*Plaintiff/Appellant,*

– v. –

JACQUELINE C. SMITH, in her official capacity as Clerk of the Circuit Court for Prince William County, Virginia,

*Defendant/Appellee,*

and

COMMONWEALTH OF VIRGINIA,

*Intervenor/Defendant – Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA AT RICHMOND

# JOINT APPENDIX
# VOLUME ONE (PAGES 1-293)

DABNEY J. CARR, IV
TROUTMAN PEPPER HAMILTON SANDERS LLP
Post Office Box 1122
Richmond, Virginia 23218
(804) 697-1238

*Counsel for Appellant*

JONATHAN E. GINSBERG
BRYAN CAVE LEIGHTON PAISNER LLP
1290 Avenue of the Americas
36th Floor
New York, New York 10104
(212) 541-2000

*Counsel for Appellant*

ROGER MYERS
RACHEL MATTEO-BOEHM
BRYAN CAVE LEIGHTON PAISNER LLP
Three Embarcadero Center
7th Floor
San Francisco, California 94111
(415) 675 3400

*Counsel for Appellant*

JOHN C. ALTMILLER, JR.
HEATHER R. STEELE
PESNER ALTMILLER MELNICK, DEMERS & STEELE PLC
8000 Westpark Drive, Suite 600
Tysons, Virginia 22102
(703) 506-9440

*Counsel for Appellee Jacqueline C. Smith*

Andrew N. Ferguson
Graham K. Bryant
Erika L. Maley
OFFICE OF THE ATTORNEY GENERAL
202 North 9th Street
Richmond, Virginia 23219
(804) 786-2071

*Counsel for Appellee Commonwealth of Virginia*

COUNSEL PRESS • VA – (804) 648-3664

## TABLE OF CONTENTS

### VOLUME ONE

Docket Entries ........................................ 1

Amended Complaint,
With Exhibits,
filed September 14, 2021 ECF 21 ........................................ 11

Exhibits:

5. Letter to Karl R. Hade and Michael J. Riggs, Sr.
from Bryan J. Harrison
dated March 31, 2021 ECF 21-5 ........................................ 41

6. Response from Eddie Macon to Bryan J. Harrison
dated April 22, 2021 ECF 21-6 ........................................ 44

Attachments to Plaintiff Courthouse News Service's Omnibus Memorandum of Law in Opposition to Defendant Karl R. Hade's Rule 12(b)(1) Motion to Dismiss, Defendant Karl R. Hade's Rule 12(b)(6) Motion to Dismiss, and Defendant Jacqueline C. Smith's Rule 12(b)(6) Motion to Dismiss
filed November 16, 2016:

Declaration of William Girdner in Opposition to
Defendants' Motions to Dismiss
dated November 16, 2021 ECF 33-1 ........................................ 47

Color Coded Map of Virginia's OCRA courts ECF 33-2 ........................................ 61

Memorandum Opinion of
The Honorable Henry Hudson
filed January 14, 2022 ECF 48 ........................................ 62

Order of
The Honorable Henry Hudson
Re: Denying Defendants' Motion to Dismiss
filed January 14, 2022 ECF 49 ........................................ 76

Joint Stipulations of Fact
filed May 4, 2022 ECF 55 .......... 77

Stipulation and Order for Dismissal of Karl R. Hade without Prejudice
filed May 31, 2022 ECF 60 .......... 92

Notice of Intent to Intervene
filed May 31, 2022 ECF 61 .......... 95

Order of
The Honorable Henry E. Hudson
Re: Granting Dismissal of Karl R. Hade Without Prejudice
filed June 1, 2022 ECF 64 .......... 97

Defendant Commonwealth of Virginia's
Memorandum of Law in Support of its Motion for Summary Judgment,
With Exhibits,
filed July 9, 2022 ECF 67 .......... 98

Exhibits:

A. Declaration of Joby Knuth
sworn June 30, 2022 ECF 67-1 .......... 126

B. Declaration of Michael J. Riggs, Sr.,
sworn July 7, 2022 ECF 67-2 .......... 132

C. Declaration of Paul Ferguson
sworn July 5, 2022 ECF 67-3 .......... 136

Attachments to Plaintiff Courthouse News Service's Memorandum of Law in Support of its Motion for Summary Judgment
filed July 11, 2022:

Declaration of William Girdner in Support of
Plaintiff Courthouse News Service's Motion for Summary Judgment
dated July 11, 2022 ECF 71-1 .......... 141

Attachments to Plaintiff Courthouse News Service's Memorandum of Law in Support of its Motion for Summary Judgment
filed July 11, 2022, continued:


Declaration of Ryan Abbott in Support of
Plaintiff Courthouse News Service's Motion for Summary Judgment,
With Exhibits,
dated July 11, 2022 ECF 71-2 ........................................................ 156

Exhibits:

1. Subscriber Request Form for
Alexandria Justice Information System
dated January 11, 2022 ECF 71-3 ............................... 165

2. Subscriber Agreement for Secure Remote Access to
Alexandria Circuit Court Documents ECF 71-4 ................... 167

3. Emails
various dates ECF 71-5............................................... 170

4. Attorney Subscriber Agreement for Remote Access to
Prince William County Circuit Court Case Documents
dated May 5, 2021 ECF 71-6....................................... 172

5. Letter from Prince William County Circuit Court
dated May 13, 2021 dkt.71-7....................................... 181

6. Emails
various dates ECF 71-8............................................... 183

7. Emails
various dates ECF 71-9............................................... 190

A. Defendant Karl R. Hade's Responses to
Plaintiff's First Set of Interrogatories
dated March 25, 2022 ECF 71-10.......................................... 193

Exhibits, continued:

B. Attorney Subscriber Agreement for Remote Access to Prince William County Circuit Court Case Documents ECF 71-11 ........................ 199

C. Defendant Smith's Answers to Plaintiff's Second Set of Interrogatories dated July 5, 2022 ECF 71-12.............................................. 207

D. Work Group Report from Office of the Executive Secretary of the Supreme Court of Virginia dated November 30, 2018 ECF 71-13 .................................. 212

F. Defendant Smith's Supplemental Responses to Plaintiff's First Set of Interrogatories and Requests for Production dated July 5, 2022 ECF 71-15............................................... 241

H. Confidentiality Considerations PowerPoint ECF 71-17 ................. 251

J. Non-Attorney Subscriber Agreement for Remote Access to Prince William County Circuit Court Case Documents ECF 71-19 ........................................................... 280

K. SB980: Statewide e-filing system; creating for civil case filings dated January 19, 2018 ECF 71-20....................................... 288

**VOLUME TWO**


Defendant Jacqueline C. Smith's Memorandum in Support of Motion for Summary Judgment
filed July 14, 2022 ECF 75 ........................................................ 294

Defendant Commonwealth of Virginia's Brief in Opposition to Plaintiff's Motion for Summary Judgment
filed August 1, 2022 ECF 81 ........................................................ 317

Attachments to Plaintiff Courthouse News Service's Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment
filed August 1, 2022 ECF 82 ........................................................ 342

Attachments:

Declaration of William Girdner in Opposition to Defendants' Motions for Summary Judgment, With Exhibits,
dated August 1, 2022 ECF 82-1 ........................................................ 379

Exhibits:

1. Courthouse News Service articles
dated July 31, 2022 ECF 82-2 ........................................................ 385

B. Letter to The Honorable Jacqueline C. Smith from Robert B. McEntee, II
dated June 25, 2021 ECF 82-4 ........................................................ 396

C. Email from Heather Steele
dated July 5, 2022 ECF 82-5 ........................................................ 400

Defendant Jacqueline C. Smith's Memorandum in Opposition to
Plaintiff's Motion for Summary Judgment
filed August 1, 2022 ECF 83 .......... 402

Attachment to Plaintiff's Reply Memorandum of Law in
Further Support of its Motion for Summary Judgement
filed August 8, 2022:

Declaration of Andras Bodis
dated August 6, 2022 ECF 85-1 .......... 409

Exhibit to Minute Entry
filed August 18, 2022:

A. CasePortal hearing exhibit
various dates ECF 88-1 .......... 414

Transcript of Cross Motions for Summary Judgment before
The Honorable Henry E. Hudson
on August 18, 2022 ECF 89 .......... 429

Memorandum Opinion of
The Honorable Henry Hudson
filed September 27, 2022 ECF 91 .......... 533

Order of
The Honorable Henry Hudson
Re: Cross-Motions for Summary Judgment
filed September 27, 2022 ECF 92.......... 565

Plaintiff Courthouse News Service's Notice of Appeal
filed October 25, 2022 ECF 93.......... 566

APPEAL,CLOSED

# U.S. District Court
# Eastern District of Virginia − (Richmond)
# CIVIL DOCKET FOR CASE #: 3:21−cv−00460−HEH

Courthouse News Service v. Hade et al
Assigned to: District Judge Henry E. Hudson
Case in other court: 22−02110
Cause: 42:1983 Violation of Due Process and Equal Protection

Date Filed: 07/15/2021
Date Terminated: 09/27/2022
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Courthouse News Service** represented by

**Dabney Jefferson Carr , IV**
Troutman Pepper Hamilton Sanders LLP
(Richmond)
1001 Haxall Point
Suite 1500
Richmond, VA 23219
804−697−1238
Fax: 804−698−5119
Email: dabney.carr@troutman.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam Lee Shaw**
Bryan Cave Leighton Paisner LLP
1155 F Street NW
Suite 500
Washington, DC 20004
202−508−6078
Fax: 202−508−6200
Email: adam.shaw@bclplaw.com
*TERMINATED: 01/06/2022*

**Heather Goldman**
Bryan Cave Leighton Paisner LLP
(DC−NA)
1155 F Street, NW
Suite 500
Washington, DC 20004
NA
(202) 508−6000
Fax: (202) 508−6200
Email: heather.goldman@bclplaw.com
*TERMINATED: 11/19/2021*
*PRO HAC VICE*

**Jessica R Blaemire**
Bryan Cave Leighton Paisner LLP
1155 F St. NW
Washington DC, DC 20004
202−508−6357
Fax: 202−220−7657
Email: jblaemire@gmail.com
*TERMINATED: 07/26/2022*

**Jonathan Eric Ginsberg**
Bryan Cave Leighton Paisner LLP
(NY−NA)
1290 Avenue of the Americas
New York, NY 10104
NA
(212) 541−2000

Fax: (212) 541−1430
Email: jon.ginsberg@bclplaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **Karl R. Hade**<br>*in his official capacity as Executive Secretary of the Office of Executive Secretary of the Supreme Court of Virginia*<br>*TERMINATED: 06/01/2022* | represented by | **Erin Rose McNeill**<br>Office of the Attorney General (Richmond)<br>202 North 9th Street<br>Richmond, VA 23219<br>804−692−0598<br>Fax: 804−371−2087<br>Email: emcneill@oag.state.va.us<br><br>**Robert B McEntee , III**<br>Office of the Attorney General (Richmond)<br>202 North 9th Street<br>Richmond, VA 23219<br>(804) 786−8198<br>Email: rmcenteeiii@oag.state.va.us |

**Defendant**

| | | |
|---|---|---|
| **Jacqueline C. Smith**<br>*in her official capacity as Clerk of the Circuit Court for Prince William County, Virginia* | represented by | **John Connell Altmiller , Jr.**<br>Pesner Altmiller Melnick & DeMers<br>8000 Westpark Dive<br>Suite 600<br>22102<br>Tysons, VA 22102<br>703−506−9440<br>Email: jaltmiller@pesner.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Heather R. Steele**<br>Pesner Altmiller Melnick & DeMers PLC<br>8000 Westpark Drive<br>Suite 600<br>Tysons, VA 22102<br>703−506−9440<br>Fax: 703−506−0929<br>Email: hsteele@pesner.com<br>*ATTORNEY TO BE NOTICED* |

**Intervenor Defendant**

| | | |
|---|---|---|
| **Commonwealth of Virginia** | represented by | **Robert B McEntee , III**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Erin Rose McNeill**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 07/15/2021 | | Electronic Fee Payment − by Courthouse News Service. Filing fee $ 402, receipt number AVAEDC−7893397.. (Shaw, Adam) (Entered: 07/15/2021) |
| 07/15/2021 | 1 | Complaint , filed by Courthouse News Service. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Civil Cover Sheet)(Shaw, Adam) |

| | | |
|---|---|---|
| | | (Attachment 3 replaced on 7/15/2021) (jpow, ). (Entered: 07/15/2021) |
| 07/15/2021 | | Initial Case Assignment to District Judge Henry E. Hudson. (jpow, ) (Entered: 07/15/2021) |
| 07/15/2021 | 2 | Proposed Summons *to Defendants* by Courthouse News Service. (Attachments: # 1 Proposed Summons)(Shaw, Adam) (Entered: 07/15/2021) |
| 07/15/2021 | 3 | Corporate Disclosure Statement by Courthouse News Service. (Shaw, Adam) (Entered: 07/15/2021) |
| 07/15/2021 | 4 | Summons Issued as to Karl R. Hade and Jacqueline C. Smith. NOTICE TO ATTORNEY: Print out two electronically issued summons and one copy of the attachments for each defendant to be served with the complaint. (jpow, ) (Entered: 07/15/2021) |
| 07/15/2021 | 5 | Motion to appear Pro Hac Vice by Heather S. Goldman and Certification of Local Counsel Adam L. Shaw Filing fee $ 75, receipt number AVAEDC−7893616. by Courthouse News Service. (Attachments: # 1 Exhibit)(Shaw, Adam) (Entered: 07/15/2021) |
| 07/16/2021 | 6 | ORDER granting 5 Motion for Pro hac vice Heather S. Goldman for plaintiff, Courthouse News Services. Signed by District Judge Henry E. Hudson on 7/16/2021. (jpow, ) (Entered: 07/16/2021) |
| 07/28/2021 | 7 | SUMMONS Returned Executed, Courthouse News Service's Rule 7.1 Financial Interest Disclosure Statement, Complaint with Exhibits and Civil Cover Sheet served on Karl R. Hade on 7/20/2021, answer due 8/10/2021, filed by Courthouse News Service. (Shaw, Adam) Modified on 8/4/2021 (jpow, ). (Entered: 07/28/2021) |
| 07/28/2021 | 8 | SUMMONS Returned Executed, Courthouse News Service's Rule 7.1 Financial Interest Disclosure Statement, Complaint with Exhibits and Civil Cover Sheet served on Jacqueline C. Smith on 7/16/2021, answer due 8/6/2021, filed by Courthouse News Service. (Shaw, Adam) Modified on 8/4/2021 (jpow, ). (Entered: 07/28/2021) |
| 08/04/2021 | | Notice of Correction: Document numbers 7 and 8 were filed using the wrong docket event. For future filings the filing attorney should use the event "Summons Returned Executed." Clerk has corrected docket and set answer deadlines. (jpow, ) (Entered: 08/04/2021) |
| 08/06/2021 | 9 | NOTICE of Appearance by John Connell Altmiller, Jr on behalf of Jacqueline C. Smith (Altmiller, John) (Entered: 08/06/2021) |
| 08/06/2021 | 10 | Consent MOTION for Extension *of Time by Defendant Jacqueline Smith to Answer or Respond to Complaint* by Courthouse News Service. (Attachments: # 1 Proposed Order)(Shaw, Adam) (Entered: 08/06/2021) |
| 08/09/2021 | 11 | NOTICE of Appearance by Heather R. Steele on behalf of Jacqueline C. Smith (Steele, Heather) (Entered: 08/09/2021) |
| 08/10/2021 | 12 | NOTICE of Appearance by Robert B McEntee, III on behalf of Karl R. Hade (McEntee, Robert) (Entered: 08/10/2021) |
| 08/10/2021 | 13 | MOTION to Dismiss for Lack of Jurisdiction by Karl R. Hade. (McEntee, Robert) (Entered: 08/10/2021) |
| 08/10/2021 | 14 | Memorandum in Support re 13 MOTION to Dismiss for Lack of Jurisdiction filed by Karl R. Hade. (Attachments: # 1 Exhibit A)(McEntee, Robert) (Entered: 08/10/2021) |
| 08/10/2021 | 15 | ORDER − Having considered the Defendant's Unopposed Motion for Enlargement of Time to Answer or Respond to Plaintiffs Complaint, and the entire record herein, it is hereby ORDERED that the motion is GRANTED 10 ; and it is FURTHER ORDERED that Defendant shall answer or respond by no later than August 27, 2021. Signed by District Judge Henry E. Hudson on 8/10/2021. (jpow, ) (Entered: 08/10/2021) |
| 08/10/2021 | 16 | MOTION to Dismiss for Failure to State a Claim by Karl R. Hade. (McEntee, Robert) (Entered: 08/10/2021) |

| | | |
|---|---|---|
| 08/10/2021 | 17 | Memorandum in Support re 16 MOTION to Dismiss for Failure to State a Claim filed by Karl R. Hade. (McEntee, Robert) (Entered: 08/10/2021) |
| 08/10/2021 | 18 | NOTICE of Appearance by Erin Rose McNeill on behalf of Karl R. Hade (McNeill, Erin) (Entered: 08/10/2021) |
| 08/18/2021 | 19 | Consent MOTION for Extension − *Implementation of Briefing Schedule* by Courthouse News Service. (Attachments: # 1 Proposed Order)(Shaw, Adam) (Entered: 08/18/2021) |
| 08/18/2021 | 20 | ORDER re: implementation of a briefing schedule regarding the filing of anAmended Complaint and anticipated motions to dismiss that Amended Complaint 19 − Based upon the agreement of the parties and for good cause shown, it is hereby ORDERED that: Plaintiff shall file its Amended Complaint on or before 9/14/2021; Defendants shall file their Answers or Motions to Dismiss on or before 10/12/2021; Any Opposition papers shall be filed on or before 11/16/2021; and Any Reply papers shall be filed on or before 11/30/2021. It is so ORDERED. Signed by District Judge Henry E. Hudson on 8/18/2021. (jpow, ) (Entered: 08/18/2021) |
| 09/14/2021 | 21 | AMENDED COMPLAINT against Karl R. Hade, Jacqueline C. Smith, filed by Courthouse News Service. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7)(Shaw, Adam) (Attachment 1 replaced on 9/15/2021) (jpow, ). (Attachment 4 replaced on 9/15/2021) (jpow, ). (Entered: 09/14/2021) |
| 09/15/2021 | | Notice of Correction: Exhibits 1 and 4 in ECF 21 are incorrectly saved PDF fillable forms. The Clerk's Office has replaced exhibits 1 and 4 as nonfillable forms. The filing attorney is notified to correctly save the PDF fillable form, click on the File menu select Print, and then select your PDF writer from the Printer Name List, then click on Print or OK. No further action is required. (jpow, ) (Entered: 09/15/2021) |
| 10/12/2021 | 22 | MOTION to Dismiss for Lack of Jurisdiction pursuant to Rule 12(b)(1) by Karl R. Hade. (McEntee, Robert) Modified docket text on 10/14/2021 (jpow, ). (Entered: 10/12/2021) |
| 10/12/2021 | 23 | Memorandum in Support re 22 MOTION to Dismiss for Lack of Jurisdiction pursuant to Rule 12(b)(1) filed by Karl R. Hade. (McEntee, Robert) Modified docket text on 10/14/2021 (jpow, ). (Entered: 10/12/2021) |
| 10/12/2021 | 24 | MOTION to Dismiss for Failure to State a Claim pursuant to Rule 12(b)(6) by Karl R. Hade. (McEntee, Robert) Modified docket text on 10/14/2021 (jpow, ). (Entered: 10/12/2021) |
| 10/12/2021 | 25 | Memorandum in Support re 24 MOTION to Dismiss for Failure to State a Claim pursuant to Rule 12(b)(6) filed by Karl R. Hade. (McEntee, Robert) Modified docket text on 10/14/2021 (jpow, ). (Entered: 10/12/2021) |
| 10/12/2021 | 26 | MOTION to Dismiss for Failure to State a Claim pursuant to Rule 12(b)(6) by Jacqueline C. Smith. (Altmiller, John) Modified docket text on 10/14/2021 (jpow, ). (Entered: 10/12/2021) |
| 10/12/2021 | 27 | Memorandum in Support re 26 MOTION to Dismiss for Failure to State a Claim pursuant to Rule 12(b)(6) filed by Jacqueline C. Smith. (Altmiller, John) Modified docket text on 10/14/2021 (jpow, ). (Entered: 10/12/2021) |
| 11/02/2021 | 28 | SCHEDULING ORDER with Attachment # 1 Pretrial Schedule A − Initial Pretrial Conference set for 12/2/2021 at 11:00 AM before District Judge Henry E. Hudson *(Order issued by deputy clerk at the direction of the Court)* (rpiz) (Entered: 11/02/2021) |
| 11/04/2021 | 29 | Motion to appear Pro Hac Vice by Jonathan E. Ginsberg and Certification of Local Counsel Adam L. Shaw Filing fee $ 75, receipt number AVAEDC−8086297. by Courthouse News Service. (Attachments: # 1 Attachment − J. Ginsberg Bar and Court Admissions)(Shaw, Adam) (Entered: 11/04/2021) |
| 11/05/2021 | 30 | ORDER granting 29 Motion for Jonathan Ginsberg to appear as Pro Hac Vice for Courthouse News Service. Signed by Senior United States District Judge Henry E. Hudson on 11/5/2021. (sbea) (Entered: 11/05/2021) |

| | | |
|---|---|---|
| 11/08/2021 | 31 | Joint MOTION for Extension *to Reschedule Initial Pretrial Conference* by Courthouse News Service. (Attachments: # 1 Proposed Order)(Shaw, Adam) (Entered: 11/08/2021) |
| 11/16/2021 | 32 | ORDER (Granting Motion to Reschedule Initial Pretrial Conference; Setting Hearing on Motions to Dismiss; and Denying as Moot Motions to Dismiss) − THIS MATTER is before the Court on the parties' Joint Motion to Reschedule Initial Pretrial Conference (ECF No. 31 ) which is set for December 2, 2021. upon due consideration, the Motion is GRANTED. The Initial Pretrial Conference is RESCHEDULED to December 21, 2021. In addition, the Court will hear argument on Defendants Karl R. Hade and Jacqueline C. Smith's Motions to Dismiss (ECF Nos. 22, 24, 26) on December 21, 2021 at 10:00 a.m. The Initial Pretrial Conference will immediately follow the motion hearing. It appearing appropriate to do so, Defendant Hade's Motions (ECF Nos. 13 , 16 ) are DENIED AS MOOT. See order for details. Signed by District Judge Henry E. Hudson on 11/16/2021. (jpow, ) (Entered: 11/16/2021) |
| 11/16/2021 | 33 | Memorandum in Opposition re 24 MOTION to Dismiss for Failure to State a Claim , 26 MOTION to Dismiss for Failure to State a Claim , 22 MOTION to Dismiss for Lack of Jurisdiction filed by Courthouse News Service. (Attachments: # 1 Affidavit of William Girdner, # 2 Exhibit 1 to Girdner Declaration, # 3 Affidavit of Jonathan Ginsberg, # 4 Exhibit A to Ginsberg Declaration, # 5 Exhibit B to Ginsberg Declaration)(Shaw, Adam) (Entered: 11/16/2021) |
| 11/17/2021 | | Set Hearings as to 26 Motion to Dismiss, 24 Motion to Dismiss, and 22 Motion to Dismiss: Motions Hearing set for 12/21/2021 at 10:00 AM in Richmond Courtroom 7000 before District Judge Henry E. Hudson;<br>Set/Reset Hearings: Initial Pretrial Conference reset for 12/21/2021 at 10:00 AM in Richmond Courtroom 7000 before District Judge Henry E. Hudson *(to immediately follow motions hearing)* (rpiz) (Entered: 11/17/2021) |
| 11/18/2021 | 34 | MOTION to Withdraw as Attorney *Heather Goldman* by Courthouse News Service. (Attachments: # 1 Proposed Order)(Shaw, Adam) (Entered: 11/18/2021) |
| 11/19/2021 | 35 | ORDER (Granting Motion to Withdraw) − THIS MATTER is before the Court on Plaintiff's Motion to Withdraw as counsel for Courthouse News Service (ECF No. 34 ). It appearing good cause is shown, the Motion is GRANTED. Heather S. Goldman is RELIEVED as counsel of record in this matter. Signed by District Judge Henry E. Hudson on 11/19/2021. (jpow, ) (Entered: 11/19/2021) |
| 11/29/2021 | 37 | REPLY to Response to Motion re 22 MOTION to Dismiss for Lack of Jurisdiction , 24 MOTION to Dismiss for Failure to State a Claim filed by Karl R. Hade. (McEntee, Robert) (Entered: 11/29/2021) |
| 11/30/2021 | 38 | REPLY to Response to Motion re 26 MOTION to Dismiss for Failure to State a Claim filed by Jacqueline C. Smith. (Altmiller, John) (Entered: 11/30/2021) |
| 12/20/2021 | | Set/Reset Hearings as to 26 Motion to Dismiss, 24 Motion to Dismiss, and 22 Motion to Dismiss: Motion Hearing reset for 1/10/2022 at 11:00 AM in Richmond Courtroom 7000 before District Judge Henry E. Hudson;<br>Initial Pretrial Conference reset for 1/10/2022 at 11:00 AM in Richmond Courtroom 7000 before District Judge Henry E. Hudson *(to immediately follow motions hearing)* (rpiz) (Entered: 12/20/2021) |
| 01/06/2022 | 40 | NOTICE of Appearance by Jessica R Blaemire on behalf of Courthouse News Service (Blaemire, Jessica) (Entered: 01/06/2022) |
| 01/06/2022 | 41 | MOTION to Withdraw as Attorney *(Adam L. Shaw)* by Courthouse News Service. (Attachments: # 1 Proposed Order)(Shaw, Adam) (Entered: 01/06/2022) |
| 01/06/2022 | 42 | ORDER (Granting Motion to Withdraw) − THIS MATTER is before the Court on Plaintiffs Motion to Withdraw as counsel for Courthouse News Service (ECF No. 41 ). It appearing good cause is shown, the Motion is GRANTED. Adam L. Shaw is RELIEVED as counsel of record in this matter. Signed by District Judge Henry E. Hudson on 1/6/2022. (jpow, ) (Entered: 01/06/2022) |
| 01/10/2022 | 44 | Minute Entry for proceedings held before District Judge Henry E. Hudson (Court Reporter Harding, OCR): Matter came on for Motions Hearing and Initial Pretrial Conference on 1/10/2022. Motion Hearing held re 22 Motion to Dismiss filed by Karl |

| | | |
|---|---|---|
| | | R. Hade, 24 Motion to Dismiss filed by Karl R. Hade, and 26 Motion to Dismiss filed by Jacqueline C. Smith. Argument heard. Motions taken under advisement by the Court; Memorandum Opinion to enter. Initial Pretrial Conference held; bench trial set for July 19, 2022 at 9:00 AM. Motions for summary judgment to be filed at least 70 days prior to trial; proposed findings of fact and conclusions of law due 14 days before trial. (rpiz) (Entered: 01/10/2022) |
| 01/11/2022 | 45 | INITIAL PRETRIAL ORDER: Bench Trial set for 7/19/2022 at 9:00 AM in Richmond Courtroom 7000 before District Judge Henry E. Hudson (signed by District Judge Henry E. Hudson on 1/10/2022) (rpiz) (Entered: 01/11/2022) |
| 01/12/2022 | 46 | TRANSCRIPT of proceedings held on January 10, 2022, before Judge Henry E. Hudson, Court Reporter/Transcriber Krista Liscio Harding, Telephone number 804 916−2296. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 2/11/2022. Redacted Transcript Deadline set for 3/14/2022. Release of Transcript Restriction set for 4/12/2022.(liscio, krista) (Entered: 01/12/2022)** |
| 01/14/2022 | 47 | Letter *to Court regarding General Assembly*. (Blaemire, Jessica) (Entered: 01/14/2022) |
| 01/14/2022 | 48 | MEMORANDUM OPINION (Resolving Defendants' Motions to Dismiss). Signed by District Judge Henry E. Hudson on 1/14/2022. (smej, ) (Entered: 01/14/2022) |
| 01/14/2022 | 49 | ORDER (Resolving Defendants' Motions to Dismiss) − THIS MATTER is before the Court on Defendant Karl Hade's ("Defendant Hade") Motions to Dismiss (ECF Nos. 22, 24) and Defendant Jacqueline Smith's (collectively "Defendants") Motion to Dismiss (ECF No. 26). For the reasons set forth in the accompanying Memorandum Opinion, Defendant Hade's Motion to Dismiss (ECF No. 22) is DENIED. Defendants' Motions to Dismiss (ECF Nos. 24, 26) are GRANTED IN PART. Specifically, the Court GRANTS the Motions to Dismiss as to Count Three of the Amended Complaint. In all other respects, Defendants' Motions to Dismiss (ECF Nos. 24, 26) are DENIED. Signed by District Judge Henry E. Hudson on 1/14/2022. (smej, ) (Entered: 01/14/2022) |
| 01/28/2022 | 50 | ANSWER to Complaint by Karl R. Hade.(McEntee, Robert) (Entered: 01/28/2022) |
| 01/28/2022 | 51 | ANSWER to Complaint by Jacqueline C. Smith.(Altmiller, John) (Entered: 01/28/2022) |
| 01/31/2022 | 52 | NOTICE of Appearance by Dabney Jefferson Carr, IV on behalf of Courthouse News Service (Carr, Dabney) (Entered: 01/31/2022) |
| 05/02/2022 | 53 | Joint MOTION for Extension *of Time* by Courthouse News Service. (Attachments: # 1 Proposed Order)(Carr, Dabney) (Entered: 05/02/2022) |
| 05/02/2022 | 54 | Memorandum in Support re 53 Joint MOTION for Extension *of Time* filed by Courthouse News Service. (Carr, Dabney) (Entered: 05/02/2022) |
| 05/04/2022 | 55 | NOTICE by Courthouse News Service *of Joint Stipulation of Facts* (Carr, Dabney) (Entered: 05/04/2022) |
| 05/05/2022 | | Telephone Conference held on 5/5/2022 before District Judge Henry E. Hudson (rpiz) (Entered: 05/05/2022) |
| 05/05/2022 | 56 | ORDER (Granting in Part the Joint Motion for Extension of Time) − THIS MATTER is before the Court on the parties' Joint Motion for Extension of Time filed on May 2, 2022. (ECF No. 53 .) The Court held a conference call on May 5, 2022 to discuss the Motion. Upon due consideration and finding it appropriate to do so, the Court GRANTS the Motion in Part. The Court CONTINUES the trial date to August 9, 2022. All discovery shall be completed no later than June 5, 2022. Any motions for summary judgment shall be filed no later than June 9, 2022. In all other respects, this |

| | | |
|---|---|---|
| | | Court's Pretrial Scheduling Order entered on December 2, 2021 (ECF No. 28−1), shall remain in effect as adjusted based on the new trial date. Signed by District Judge Henry E. Hudson on 5/5/2022. (jpow, ) (Entered: 05/05/2022) |
| 05/05/2022 | | Set/Reset Hearings: Bench Trial reset for 8/9/2022 at 9:00 AM in Richmond Courtroom 7000 before District Judge Henry E. Hudson (rpiz) (Entered: 05/05/2022) |
| 05/19/2022 | 57 | Consent MOTION to Continue by Courthouse News Service. (Attachments: # 1 Proposed Order)(Carr, Dabney) (Entered: 05/19/2022) |
| 05/19/2022 | 58 | Memorandum in Support re 57 Consent MOTION to Continue filed by Courthouse News Service. (Carr, Dabney) (Entered: 05/19/2022) |
| 05/23/2022 | 59 | ORDER − It is hereby ORDERED that the Motion (ECF No. 57 ) is GRANTED. The deadline for completion of fact discovery is hereby EXTENDED until July 5, 2022, and the parties shall file any motions for summary judgment not later than July 9, 2022. The parties are directed to contact the Court no later than seven (7) calendar days after entry of this order to reschedule the bench trial in this matter. Signed by District Judge Henry E. Hudson on 5/23/2022. (jpow, ) (Entered: 05/23/2022) |
| 05/31/2022 | 60 | STIPULATION *and Order for Dismissal of Karl R. Hade Without Prejudice* by Courthouse News Service. (Carr, Dabney) (Entered: 05/31/2022) |
| 05/31/2022 | 61 | NOTICE *of Intent to Intervene* by Commonwealth of Virginia (McEntee, Robert) Modified docket text on 6/1/2022 (jpow, ). (Entered: 05/31/2022) |
| 05/31/2022 | 62 | NOTICE of Appearance by Robert B McEntee, III on behalf of Commonwealth of Virginia (McEntee, Robert) (Entered: 05/31/2022) |
| 05/31/2022 | 63 | ORDER (Continuing Trial Date) − THIS MATTER is before the Court on the parties' Consent Motion to Continue filed on May 19, 2022. (ECF No. 57.) In accordance with that Motion, the Court granted the parties an extension to complete discovery and file summary judgment motions with leave to reschedule the trial at a later date. (Order, ECF No. 59.) The parties have now determined an appropriate date, and therefore, the Court CONTINUES the trial date to September 29, 2022 at 9:00 a.m. Signed by District Judge Henry E. Hudson on 5/31/2022. (jpow, ) (Entered: 05/31/2022) |
| 05/31/2022 | | Set/Reset Hearings: Bench Trial reset for 9/29/2022 at 9:00 AM in Richmond Courtroom 7000 before District Judge Henry E. Hudson (rpiz) (Entered: 05/31/2022) |
| 06/01/2022 | 64 | ORDER − THIS MATTER is before the Court on the parties' Stipulation and Order for Dismissal of Karl R. Hade Without Prejudice filed pursuant to Federal Rule of Civil Procedure 41(a)(l). (ECF No. 60 .) The parties represent that Karl R. Hade, in his official capacity as Executive Secretary of the Office of Executive Secretary of the Virginia Supreme Court, should be dismissed from this action. Therefore, it appearing appropriate to do so, the Motion is GRANTED. Karl R. Hade, in his official capacity as Executive Secretary of the Office of Executive Secretary of the Virginia Supreme Court, is DISMISSED WITHOUT PREJUDICE. Signed by District Judge Henry E. Hudson on 6/1/2022. (jpow, ) (Entered: 06/01/2022) |
| 06/15/2022 | 65 | NOTICE by Courthouse News Service *Notice of Withdrawal of Appearance* (Blaemire, Jessica) (Entered: 06/15/2022) |
| 07/09/2022 | 66 | MOTION for Summary Judgment by Commonwealth of Virginia. (McEntee, Robert) (Entered: 07/09/2022) |
| 07/09/2022 | 67 | Memorandum in Support re 66 MOTION for Summary Judgment filed by Commonwealth of Virginia. (Attachments: # 1 Exhibit A)(McEntee, Robert) (Attachment 1 replaced on 7/14/2022) (jpow, ). Modified on 7/14/2022 (jpow, ). (Additional attachment(s) added on 7/14/2022: # 2 Exhibit B, # 3 Exhibit C) (jpow, ). (Entered: 07/09/2022) |
| 07/11/2022 | 68 | **DISREGARD.** MOTION for Summary Judgment by Jacqueline C. Smith. (Steele, Heather) Modified on 7/14/2022 (jpow, ). (Entered: 07/11/2022) |
| 07/11/2022 | 69 | **DISREGARD.** Memorandum in Support re 68 MOTION for Summary Judgment filed by Jacqueline C. Smith. (Attachments: # 1 Exhibit Exhibit 1 − Declaration of Paul Ferguson)(Steele, Heather) Modified on 7/14/2022 (jpow, ). (Entered: 07/11/2022) |

| | | |
|---|---|---|
| 07/11/2022 | 70 | MOTION for Summary Judgment by Courthouse News Service. (Carr, Dabney) (Entered: 07/11/2022) |
| 07/11/2022 | 71 | Memorandum in Support re 70 MOTION for Summary Judgment filed by Courthouse News Service. (Attachments: # 1 Declaration of William Girdner, # 2 Declaration of Ryan Abbott, # 3 Exhibit 1 to Abbott Declaration, # 4 Exhibit 2 to Abbott Declaration, # 5 Exhibit 3 to Abbott Declaration, # 6 Exhibit 4 to Abbott Declaration, # 7 Exhibit 5 to Abbott Declaration, # 8 Exhibit 6 to Abbott Declaration, # 9 Exhibit 7 to Abbott Declaration, # 10 Exhibit A, # 11 Exhibit B, # 12 Exhibit C, # 13 Exhibit D, # 14 Exhibit E, # 15 Exhibit F, # 16 Exhibit G, # 17 Exhibit H, # 18 Exhibit I, # 19 Exhibit J, # 20 Exhibit K, # 21 Exhibit L)(Carr, Dabney) (Main Document 71 replaced on 7/14/2022) (jpow, ). (Entered: 07/11/2022) |
| 07/11/2022 | 72 | NOTICE *of Request for Oral Argument* by Courthouse News Service re 70 MOTION for Summary Judgment (Carr, Dabney) Modified docket text on 7/14/2022 (jpow, ). (Entered: 07/11/2022) |
| 07/12/2022 | 73 | NOTICE of Appearance by Erin Rose McNeill on behalf of Commonwealth of Virginia (McNeill, Erin) (Entered: 07/12/2022) |
| 07/14/2022 | 74 | MOTION for Summary Judgment by Jacqueline C. Smith. (Altmiller, John) (Entered: 07/14/2022) |
| 07/14/2022 | 75 | Memorandum in Support re 74 MOTION for Summary Judgment filed by Jacqueline C. Smith. (Attachments: # 1 Exhibit Exhibit #1)(Altmiller, John) (Entered: 07/14/2022) |
| 07/14/2022 | | Notice of Correction re: ECF Nos. 68 and 69 ; The filing user's login does not match the signature on the document. The filing user must refile the document with the filing user's signature block, or the attorney whose signature block appears on the document must refile the document. The filing user has refiled both documents as ECF Nos. 74 and 75 . No further action is required at this time. (jpow, ) (Entered: 07/14/2022) |
| 07/22/2022 | 76 | Joint MOTION for Extension of Time to File Response/Reply as to 70 MOTION for Summary Judgment , 66 MOTION for Summary Judgment , 74 MOTION for Summary Judgment by Courthouse News Service. (Attachments: # 1 Proposed Order)(Carr, Dabney) (Entered: 07/22/2022) |
| 07/22/2022 | 77 | ORDER − The Motion is hereby GRANTED 76 , and it is ORDERED that the deadline for filing Memoranda in Opposition to the Motions for Summary Judgment filed herein [ECF Nos. 66 , 70 , 74 ] is hereby EXTENDED from July 25, 2022 to August 1, 2022. Signed by District Judge Henry E. Hudson on 7/22/2022. (jpow, ) (Entered: 07/22/2022) |
| 07/25/2022 | | Set Hearing as to 66 Motion for Summary Judgment, 70 Motion for Summary Judgment, and 74 Motion for Summary Judgment: Motions Hearing set for 8/19/2022 at 10:00 AM in Richmond Courtroom 7000 before District Judge Henry E. Hudson (rpiz) (Entered: 07/25/2022) |
| 07/26/2022 | 78 | MOTION to Withdraw as Attorney *Appearance of Jessica R. Blaemire* by Courthouse News Service. (Attachments: # 1 Proposed Order)(Carr, Dabney) (Entered: 07/26/2022) |
| 07/26/2022 | 79 | ORDER GRANTING WITHDRAWAL OF APPEARANCE − The Court hereby GRANTS the Motion for the withdrawal of the appearance of Jessica R. Blaemire as counsel for Plaintiff Courthouse New Service in the above−captioned case. 78 It is further ORDERED that the Clerk of the Court shall strike Jessica R. Blaemire's appearance and remove her from the CM/ECF service list in these matters. It is further ORDERED that the parties need not serve Jessica R. Blaemire with any pleadings, motions, or other papers in these matters. Signed by District Judge Henry E. Hudson on 7/26/2022. (jpow, ) (Entered: 07/26/2022) |
| 07/27/2022 | 80 | NOTICE by Commonwealth of Virginia, Karl R. Hade, Jacqueline C. Smith (Altmiller, John) (Entered: 07/27/2022) |
| 07/27/2022 | | Set/Reset Hearings as to 66 Motion for Summary Judgment, 70 Motion for Summary Judgment, and 74 Motion for Summary Judgment: Motions Hearing reset for 8/18/2022 at 10:00 AM in Richmond Courtroom 7000 before District Judge Henry E. |

| | | |
|---|---|---|
| | | Hudson (rpiz) (Entered: 07/27/2022) |
| 07/28/2022 | | Notice of Correction re: ECF No. 80 , Notice; Filing attorney is notified Request for Authorization to Bring Electronic Device(s) into the USDC for the EDVA are not to be filed electronically through CM/ECF. The Clerk has made Judge Hudson's Chambers aware of the filing. No further action is required at this time. (jpow, ) (Entered: 07/28/2022) |
| 08/01/2022 | 81 | RESPONSE in Opposition re 70 MOTION for Summary Judgment filed by Commonwealth of Virginia. (McEntee, Robert) (Entered: 08/01/2022) |
| 08/01/2022 | 82 | Memorandum in Opposition re 74 MOTION for Summary Judgment , 66 MOTION for Summary Judgment filed by Courthouse News Service. (Attachments: # 1 Declaration of William Girdner, # 2 Ex. 1 to Girdner Declaration, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C)(Carr, Dabney) (Entered: 08/01/2022) |
| 08/01/2022 | 83 | Memorandum in Opposition re 70 MOTION for Summary Judgment *of Courthouse News Service,* filed by Jacqueline C. Smith. (Steele, Heather) (Entered: 08/01/2022) |
| 08/08/2022 | 85 | REPLY to Response to Motion re 70 MOTION for Summary Judgment filed by Courthouse News Service. (Attachments: # 1 Declaration of Andras Bodis)(Carr, Dabney) (Entered: 08/08/2022) |
| 08/08/2022 | 86 | REPLY to Response to Motion re 66 MOTION for Summary Judgment filed by Commonwealth of Virginia. (McEntee, Robert) (Entered: 08/08/2022) |
| 08/18/2022 | 88 | Minute Entry for proceedings held before District Judge Henry E. Hudson (Court Reporter Harding, OCR): Motions Hearing held on 8/18/2022 re 66 Motion for Summary Judgment filed by defendant Commonwealth of Virginia, 70 Motion for Summary Judgment filed by plaintiff Courthouse News Service, and 74 Motion for Summary Judgment filed by defendant Jacqueline C. Smith. Argument heard. Motions taken under advisement by the Court; Memorandum Opinion to enter. *(Attachment # 1 Exhibit A submitted by defendant Commonwealth of Virginia)* (rpiz) (Entered: 08/19/2022) |
| 09/07/2022 | 89 | TRANSCRIPT of proceedings held on 8/18/2022, before Judge Henry E. Hudson, Court Reporter/Transcriber Krista Liscio, Telephone number 804 916−2296. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 10/7/2022. Redacted Transcript Deadline set for 11/7/2022. Release of Transcript Restriction set for 12/6/2022.(liscio, krista) (Entered: 09/07/2022)** |
| 09/09/2022 | 90 | ORDER (Continuing Trial Date) THIS MATTER is currently set for a bench trial on September 29, 2022. The Court has determined that a continuance is necessary. Therefore, the bench trial is CONTINUED to November 10, 2022 at 9:00 a.m. Signed by District Judge Henry E. Hudson on 9/9/2022. (asho, ) (Entered: 09/09/2022) |
| 09/09/2022 | | Set/Reset Hearings: Bench Trial reset for 11/10/2022 at 9:00 AM in Richmond Courtroom 7000 before District Judge Henry E. Hudson (rpiz) (Entered: 09/09/2022) |
| 09/27/2022 | 91 | MEMORANDUM OPINION (Resolving Cross−Motions for Summary Judgment). Signed by District Judge Henry E. Hudson on 9/27/2022. (smej, ) (Entered: 09/27/2022) |
| 09/27/2022 | 92 | ORDER (Resolving Cross−Motions for Summary Judgment) − For the reasons fully stated in the accompanying Memorandum Opinion, Defendants' Motions for Summary Judgment (ECF Nos. 66, 74) are GRANTED and Plaintiffs Motion for Summary Judgment (ECF No. 70) is DENIED. Signed by District Judge Henry E. Hudson on 9/27/2022. (smej, ) (Entered: 09/27/2022) |
| 10/25/2022 | 93 | NOTICE OF APPEAL as to 92 Order on Motion for Summary Judgment,,,,, 48 Memorandum Opinion, 49 Order on Motion to Dismiss/Lack of Jurisdiction,,,, Order |

| | | |
|---|---|---|
| | | on Motion to Dismiss for Failure to State a Claim,,,,,,, 91 Memorandum Opinion by Courthouse News Service. Filing fee $ 505, receipt number AVAEDC−8628387. (Carr, Dabney) (Entered: 10/25/2022) |
| 10/26/2022 | 94 | Transmission of Notice of Appeal to US Court of Appeals re 93 Notice of Appeal, (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (smej, ) (Entered: 10/26/2022) |
| 10/26/2022 | | USCA Case Number 22−2110, Case Manager E. Borneisen, for 93 Notice of Appeal, filed by Courthouse News Service. (smej, ) (Entered: 10/26/2022) |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>Plaintiff,<br><br>v.<br><br>KARL R. HADE, in his official capacity as Executive Secretary of the Office of Executive Secretary of the Supreme Court of Virginia,<br><br>and<br><br>JACQUELINE C. SMITH, in her official capacity as Clerk of the Circuit Court for Prince William County, Virginia,<br><br>Defendants. | Civil Action No. 3:21-cv-00460-HEH |

**AMENDED COMPLAINT**
**ALLEGING VIOLATION OF CIVIL RIGHTS PURSUANT TO 42 U.S.C. § 1983**
**AND SEEKING INJUNCTIVE AND DECLARATORY RELIEF**

Plaintiff Courthouse News Service ("CNS"), by and through its undersigned attorneys, alleges the following in support of its Amended Complaint for Injunctive and Declaratory Relief against Defendant Karl R. Hade, in his official capacity as Executive Secretary (the "Executive Secretary") of the Office of Executive Secretary of the Supreme Court of Virginia ("OES"), and Jacqueline C. Smith, in her official capacity as Clerk of the Circuit Court for Prince William County, Virginia ("Prince William Clerk," and with the "Executive Secretary," the "Defendants").

## INTRODUCTION

1. This case seeks to address the discriminatory treatment of the press, including CNS, with regard to access to newly-filed civil complaints. Defendants restrict remote electronic access

to Virginia-barred attorneys (and their staff), precluding the press and the public from accessing civil complaints remotely and effectively chilling free speech in violation of the First Amendment.

2. The First Amendment provides the press and public with a presumptive right of access to civil complaints filed with the court. Access to new civil complaints is essential to accurate and fair news reporting of, and speech about, civil disputes, and thus vital to the public's ability to discuss what is happening in an important branch of government as it is happening. *Courthouse News Serv. v. Schaefer*, 440 F. Supp. 3d 532 (E.D. Va. 2020) (holding that the First Amendment provides a contemporaneous right of access to newly filed civil complaints), *aff'd*, 2 F.4th 318, 328 (4th Cir. 2021) ("The press and public thus have an important interest in reasonably contemporaneous access to civil complaints"); *Doe v. Public Citizen,* 749 F.3d 246, 265, 272 (4th Cir. 2014) ("It is well settled that the public and press have a qualified right of access to judicial documents and records filed in civil and criminal proceedings" and "the public and press generally have a contemporaneous right of access to court documents and proceedings when the right applies.").

3. In the Virginia circuit court system, one segment of the public – Virginia-licensed attorneys (and their authorized agents) – are given remote electronic access to civil, nonconfidential, public court filings via the internet, including documents in cases in which they are not attorneys of record, through a system called Virginia Officer of the Court Remote Access ("OCRA"). Meanwhile, the public and press – including CNS, a news service specializing in news reporting about the courts, and whose reporters cover the Virginia courts on a daily basis – are effectively denied this remote access and, as a result, must bear a greater burden and expense, and delays, to access these same civil, nonconfidential, public court filings, by traveling to courthouses to view them at public access terminals, even though there is no difference between the filings

made available on OCRA and the filings made available at the public terminals – they are the exact same records.

4. In denying OCRA access to CNS, the clerks of some Virginia circuit courts have relied on Virginia Code § 17.1-293(B), which provides, in relevant part, that "no court clerk shall post on the Internet any document that contains the following information: (i) an actual signature, (ii) a social security number, (iii) a date of birth identified with a particular person, (iv) the maiden name of a person's parent so as to be identified with a particular person, (v) any financial account number or numbers, or (vi) the name and age of any minor child." The law provides an exception for "members in good standing with the Virginia State bar and their authorized agents." Va. Code Ann. § 17.1-293(E)(7).

5. The Prince William Clerk is one clerk that provides Virginia-licensed attorneys – but not the press or the public – with more favorable OCRA subscriber access. During a deposition in January 2019, the Prince William Clerk stated that she would be willing to provide OCRA subscriber access to CNS, and noted that she uses her "discretion to provide -- to offer to provide [OCRA] to [non-Virginia-licensed attorneys] who need access to the information in the interest of being transparent and providing the highest possible service." Following several requests, the Prince William Clerk offered CNS OCRA subscriber access in June 2021, but at an annual subscription cost that is six times the amount charged to Virginia-licensed attorneys. The access offered to CNS also restricted the dissemination and publication of information and filings gathered remotely – information and filings that are nonconfidential and public in nature and that are available at the courthouse.

6. The First Amendment to the United States Constitution provides the press and public with a presumptive right of access to certain civil, nonconfidential, public court filings.

Granting preferential access to these records to one segment of the public, while effectively denying it to others, violates principles of the First Amendment and Equal Protection Clause of the U.S. Constitution unless some legitimate state interest exists for such discrimination. And when a fundamental right is involved, such as the First Amendment right of access, the state interest must be a compelling one and the denial of access must be narrowly tailored to meet those interests.

7. Virginia Code § 17.1-293(H) further provides that "data accessed by secure remote access" is not permitted "to be sold or posted on any other website or in any way redistributed to any third party" and that such data cannot be "made available to the general public." This language also appears in the Non-Attorney Subscriber Agreement for Remote Access to Prince William County Circuit Court Case Documents ("Non-Attorney Subscriber Agreement") that was created by the Prince William Clerk in response to CNS' request for remote electronic access.

8. Thus, even if non-discriminatory remote access was provided to CNS, the OCRA prohibition on disseminating nonconfidential public court filings acts as a bar against using those nonconfidential public court filings to provide accurate and fair news reporting of civil disputes and from engaging in an informed discussion about those lawsuits. This violates the Constitution's dual guarantees of freedom of speech and freedom of the press, which ensure that when the press or the public "lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information absent a need to further a state interest of the highest order." *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 103 (1979).

9. CNS thus asks this Court to enjoin Defendants, in their official capacities – as well as their agents, assistants, successors, employees, and all persons acting in concert or cooperation with them or at their direction or under their control – from continuing their policies, practices,

and customs that (i) deny equal treatment of access to OCRA to the press and public and instead provide preferential treatment to Virginia-licensed attorneys for OCRA subscriber access, and (ii) prohibit the dissemination of public documents and information accessed via OCRA.

10. Further, should this Court determine that Va. Code § 17-1.293 either requires or permits Defendants to restrict such access and such dissemination, CNS requests this Court to enter a declaratory judgment that Va. Code § 17.1-293 is unconstitutional on its face, or, in the alternative, unconstitutional as applied by Defendants' policies, practices, and customs, and to enjoin Defendants from enforcing the challenged statute.

**JURISDICTION AND VENUE**

11. CNS' claims arise under the First and Fourteenth Amendments to the U.S. Constitution and the Civil Rights Act, Title 42 U.S.C. §§ 1983, *et seq.* This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights), and 2201 (declaratory relief).

12. Defendants are subject to personal jurisdiction in this District because they reside and/or conduct business within this District.

13. Venue is proper in this District under 28 U.S.C. § 1391(b) because the Executive Secretary's primary place of business is within the Richmond Division of this District and because a substantial part of the events or omissions giving rise to CNS' claims occurred in this District.

14. Divisional venue is proper in the Richmond Division under E.D. Va. Local Civil Rule 3(C) because the Executive Secretary resides in the Richmond Division, and Defendants are all residents of Virginia. In addition, divisional venue is proper in the Richmond Division because a substantial part of the events or omissions giving rise to CNS' claims occurred in the Richmond Division.

**PARTIES**

15. CNS is a California corporation with its principal place of business located in Pasadena, California. A widely read legal news service with thousands of subscribers across the nation, CNS specializes in news reporting about civil litigation, from the date of filing through the appellate level, in state and federal courts throughout the United States. CNS' comprehensive and timely coverage of civil litigation through its print, website, and e-mail publications has made it a go-to source of information about the nation's civil courts.

16. Defendant Karl R. Hade is the Executive Secretary of the Office of Executive Secretary of the Supreme Court of Virginia, and is sued in his official capacity. The Executive Secretary serves as "the administrator of the circuit court system, which includes the operation and maintenance of a case management system." Va. Code § 17.1-502(A). OES creates, operates, and maintains several programs and systems for the Virginia circuit court clerks, one of which is OCRA.

17. Acting in his official capacity, the Executive Secretary, as well as those acting at his direction and under his supervision, are directly involved with and/or responsible for acts giving rise to the preferential and discriminatory internet access to civil, nonconfidential, public court filings provided to Virginia-licensed attorneys through OCRA, but which the public and press do not share.

18. Acting in his official capacity, the Executive Secretary, as well as those acting at his direction and under his supervision, are directly involved with and/or responsible for acts giving rise to the prohibition on disseminating the civil, nonconfidential, public court filings gathered via remote access.

19. Defendant Jacqueline C. Smith is the Clerk of the Circuit Court for Prince William County, Virginia, and is sued in her official capacity. The Prince William Clerk is the custodian of and responsible for, among other things, the administration of court records and ensuring that those records are maintained and made available to the public for inspection and examination.

20. Acting in her official capacity, the Prince William Clerk, as well as those acting at her direction and under her supervision, are directly involved with and/or responsible for acts giving rise to the preferential and discriminatory internet access to civil, nonconfidential, public court filings that are filed in the Circuit Court for Prince William County, Virginia that is provided to Virginia-licensed attorneys through OCRA, but which is not provided to the press and public.

21. Acting in her official capacity, the Prince William Clerk, as well as those acting at her direction and under her supervision, are directly involved with and/or responsible for acts giving rise to the prohibition on disseminating the civil, nonconfidential, public court filings gathered via remote access.

22. Defendants' actions reflect Defendants' official policies, practices, and customs. Defendants' actions, as alleged in this Complaint, are under the color of Virginia law and constitute state action within the meaning of the Fourteenth Amendment to the Unites States Constitution and 42 U.S.C. § 1983.

23. CNS seeks relief against Defendants, as well as against their agents, assistants, successors, employees, and all persons acting in concert or cooperation with them or at their direction or under their control.

## FACTUAL ALLEGATIONS

### A. CNS' Publications and Subscribers

24. CNS is a nationwide news service founded almost 30 years ago out of a belief that great swaths of news about civil litigation went unreported because the traditional news media failed to cover much of the important business of the courts. CNS employs more than 240 people, most of them editors and reporters, covering approximately 3,000 state and federal trial and appellate courts in all 50 states in the United States.

25. CNS offers its readers a variety of publications. Its New Litigation Reports contain original, staff-written summaries of significant new civil complaints. These reports are sent to subscribers via e-mail each evening. CNS publishes two New Litigation Reports in Virginia – the *Virginia Report* and the *Southern Virginia State Report*. These New Litigation Reports do not cover criminal, domestic relations, or probate matters.

26. In addition, CNS publishes a freely available website, www.courthousenews.com, featuring news reports and commentary, which is read by hundreds of thousands of people each month. The website functions much like a daily print newspaper, featuring staff-written articles from across the nation that are posted throughout each day, and rotated on and off the page on a 24-hour news cycle.

27. CNS has been credited as the original source of reporting on various topics by a wide range of publications, including the *ABA Journal*, ABC News, *The Atlantic*, *Austin American Statesman*, Black Christian News Network, *California Bar Journal*, CBS News, *The Christian Science Monitor*, The Daily Beast, *The Dallas Morning News*, Forbes, Fox News, *The Guardian*, The Hill, *Houston Chronicle*, The Huffington Post, *Long Island Press*, *Los Angeles Times*, *Mother Jones*, National Public Radio (NPR); NBC News, *New York Daily News*, *New York Magazine*, *The*

*New York Times*, *The Orange County Register*, Politico, *Rolling Stone*, *Salt Lake City Tribune, San Antonio Express-News*, Slate, *The Telegraph* (UK), *The Wall Street Journal*, *The Washington Post*, *The Washington Times*, *Women's Health Policy Report*, United Press International (UPI), *USA Today*, *U.S. News and World Report*, the YouTube news channel, and others. In addition, U.S., Canadian, and New Zealand radio shows have interviewed CNS reporters.

28. CNS has more than 2,300 subscribers nationwide. A substantial set of news and entertainment outlets are CNS subscribers, including but not limited to *The Atlanta Journal Constitution*, *The Boston Globe*, Buzzfeed, *The Dallas Morning News*, *Detroit Free Press*, Fox Entertainment Group, *Houston Chronicle*, *Los Angeles Times*, North Jersey Media Group, *The Salt Lake Tribune*, *San Antonio Express News*, *San Jose Mercury News*, *Tampa Bay Business Journal*, *The Wall Street Journal*, Warner Bros., and many broadcast stations. The Washington, DC-based Center for Public Integrity is also a CNS subscriber.

29. Among academic institutions, subscribers to CNS' New Litigation Reports include Boston College Law School, Boston University, Case Western Reserve University, Harvard Law School, Loyola Law School, MIT Sloan School of Management, Southern Illinois University School of Law, UC Hastings College of Law, and UCLA School of Law.

30. Nearly all of the nation's large and mid-sized law firms also subscribe to one or more of CNS' publications. Non-law firm business entities, including large publicly-traded companies, government entities, and non-profit organizations, also subscribe to CNS' publications.

31. To prepare the New Litigation Reports and identify new cases that may warrant a website article, CNS reporters have traditionally visited their assigned courts on a daily or weekly basis to review all the complaints filed that day (or since their last visit) to determine which ones

are newsworthy. However, as the vast majority of federal courts and an increasing number of state courts are putting court records online via court web sites, CNS also covers courts remotely through the internet.

32. CNS currently employs three reporters who cover the state and federal trial and appellate courts of Virginia, and who are supervised by CNS' Southeast regional bureau chief. CNS' three Virginia reporters are based in the larger metropolitan areas – Prince William, Norfolk, and Richmond.

33. CNS previously had a reporter covering the courts in and around Alexandria, Virginia, but those courts are currently being covered by CNS' Prince William reporter on a weekly basis due to staffing constraints. If CNS had remote electronic access to the Prince William Circuit Court through OCRA and could disseminate information and filings it accessed through OCRA, CNS' current Prince William reporter could cover the Alexandria and Arlington courts on a daily basis.

34. Of the 120 Virginia circuit courts, CNS is able to cover five (5) live on a daily basis by sending a reporter to the courthouse every day to review the new complaints. Thirteen (13) other circuit courts are covered intermittently by sending a reporter to the courthouse. The remaining Virginia circuit courts are covered only with docket information due to their remote location and the expense of hiring numerous additional reporters to cover each of those far-off courts every day.

35. If CNS had access to OCRA – at a reasonable cost similar to that currently charged to Virginia-barred attorneys – it would be able to, and would, cover on a daily basis the approximately 90 circuit courts that use OCRA by reviewing the new complaints filed in those courts and posted on OCRA. While records are made available on OCRA after they have been

made available via public access terminals at the courthouse, it is CNS' understanding that the OCRA records lag behind only by a matter of a few minutes.

**B. Relevant Virginia Law**

36. Virginia law provides that the Virginia circuit court clerks "shall have custody of and shall keep all court records, including books, evidence, records, maps, and papers, deposited in their offices or at such location otherwise designated by the clerk, as well as records stored in electronic format whether the storage media for such electronic records are on premises or elsewhere." Va. Code § 17.1-242.

37. Virginia Law also provides that "[t]he Executive Secretary of the Supreme Court shall be the administrator of the circuit court system, which includes the operation and maintenance of a case management system and financial management system and related technology improvements." Va. Code § 17.1-502(A).

38. Virginia law permits remote access to nonconfidential court records through each Virginia circuit court clerk. *See* Va. Code § 17.1-225; *see also* State Officials and Employees-Costs, Fees, Salaries, Allowances, Courts of Record, 1998 Va. Laws Ch. 872 (H.B. 1114).

39. Pursuant to Virginia law, it is the filer's responsibility to redact confidential information appearing in non-sealed complaints. *See* Va. Code § 8.01-420.8(A) (filing party is responsible for redacting confidential information).

40. Va. Code § 17.1-293 contains two provisions that place unconstitutional limitations on the right of access to judicial documents.

41. First, Va. Code § 17.1-293(E)(7) states that a Virginia circuit court clerk can "[p]rovid[e] secure remote access to nonconfidential court records, subject to any fees charged by the clerk, to members in good standing with the Virginia State Bar and their authorized agents, pro

hac vice attorneys authorized by the court for purposes of the practice of law, and such governmental agencies as authorized by the clerk." Va. Code § 17.1-293(E)(7). However, the Virginia Code does not provide the same access for the press or public.

42. Second, Va. Code § 17.1-293(H) provides that:

> Nothing in this section shall be construed to permit any data accessed by secure remote access to be sold or posted on any other website or in any way redistributed to a third party, and the clerk, in his discretion, may deny secure remote access to ensure compliance with these provisions. However, the data accessed by secure remote access may be included in products or services provided to a third party of the subscriber provided that (i) such data is not made available to the general public and (ii) the subscriber maintains administrative, technical, and security safeguards to protect the confidentiality, integrity, and limited availability of the data.

43. These restrictions – on remote access and then dissemination – restrict and chill newsgathering, news reporting, and other speech activity protected by the First and Fourteenth Amendment.

44. While CNS can access nonconfidential civil complaints at the circuit courts, this is not a viable option for all 120 Virginia circuit courts because the cost and time necessary are prohibitive.

45. By restricting remote access for newsgathering purposes while permitting it for any Virginia-barred attorney and their staff, and by prohibiting dissemination to the general public, Va. Code § 17.1-293 discriminates against the media through disfavored treatment and imposes restraints on protected speech, in violation of the First and Fourteenth Amendments.

46. These restrictions infringe CNS' First Amendment rights, and the rights of the public, to gather and disseminate newsworthy information to which a constitutional right of access exists. The burdensome impact of the restrictions also infringes on the First Amendment right of the public to receive information.

## C. OCRA and Virginia's Preference-Based Access to Online Court Records

47. A new civil complaint filed at the Prince William Circuit Court goes through several stages before it is available for viewing online (at either the courthouse via the public access terminals or remotely via OCRA): (1) initial intake; (2) Circuit Court Case Management System (CCMS) data entry; and (3) scanning. Once a complaint is scanned, it can be viewed on the courthouse public access terminals almost immediately and on OCRA shortly thereafter – generally within five (5) minutes.

48. At the time the civil complaints and other judicial filings are made available on OCRA, they have already been made public via public access terminals at the courthouse.

49. To get remote access to judicial filings at a Virginia circuit court, a potential user must complete an OCRA Subscriber Agreement. Subscriptions are currently limited to attorneys, their support staff (who are presumably non-attorneys), and officers of the court.

50. The Attorney Access page for the Prince William Circuit Court states that OCRA "is the Office of the Executive Secretary of the Supreme Court of Virginia's (SCV) Officer of the Court Remote Access (OCRA) system that enables remote viewing of documents in the Virginia Judicial Case Imaging System." The Attorney Subscriber Agreement for Remote Access to Prince William County Circuit Court Case Documents known as Officer of the Court Remote Access (OCRA) ("Attorney Subscriber Agreement") defines OCRA similarly, as "the OES's Officer of the Court Remote Access system…." A copy of the Attorney Subscriber Agreement is attached hereto as **Exhibit 1**.

51. The Prince William Attorney Access page also states that "OCRA enables online inquiry only access to currently scanned court case documents in the Case Imaging System, except for juvenile, adoption and sealed cases, as well as those parts of a file that are marked confidential,

restricted, sealed, private addendum or victim/witness." The Attorney Subscriber Agreement includes similar language. *See* Attorney Subscriber Agreement, Ex. 1 at 2.

52. Upon information and belief, confidential documents are not available via OCRA. And, documents that contain confidential information are redacted by the filing party, as required by law. The documents available on OCRA are the same documents that have previously been made available on public access terminals.

53. To log in to the OCRA System, a subscriber visits a centralized website and enters his/her e-mail address, password, and bar number/authorized officer of the court number. The OCRA login page states: "This system is intended solely for the use of authorized Officer of the Court personnel to retrieve and review court documents they are specifically authorized to view. All other use is expressly prohibited."

54. Upon information and belief, after logging in, a user then has access to the various circuit courts for which he/she has "subscribed."

55. Upon information and belief, this login page was created by OES and would need to be edited by OES to allow use by CNS or other member of the media or public, who are not "Officer of the Court personnel."

56. According to the Attorney Subscriber Agreement, "[t]he servers that store the programs and data are maintained and managed by the OES." Attorney Subscriber Agreement, Ex. 1 at 2.

57. The Attorney Subscriber Agreement also releases a number of parties from liability, including the Prince William Clerk's Office and OES. *See* Attorney Subscriber Agreement, Ex. 1 at 3.

58. Upon information and belief, the Executive Secretary administers OCRA for over ninety Virginia circuit court clerks. Through OCRA, the Virginia circuit court clerks, including the Prince William Clerk, and OES provide preferential access to Virginia-licensed attorneys to the detriment of CNS, other members of the press, and the general public.

59. During a Federal Rule of Civil Procedure 30(b)(6) deposition in *Courthouse News Service v. Schaefer*, Case No. 2:18-cv-391 (E.D. Va. Norfolk Division), an OES designee testified that the restriction of OCRA to Virginia-barred attorneys was an "OES-imposed requirement" and that "[i]t's always been [OES'] stance that the Code does not support providing [OCRA] to anyone other than members of the bar."

60. After paying a nominal subscriber's fee and registering for OCRA, Virginia attorneys have the ability to view all civil, nonconfidential, public court filings remotely over the internet – on any day of the week, at any time of day, and from any location in the world. OCRA access also gives Virginia attorneys the ability to download, save, and print out the filings at no additional charge. In Prince William, the cost for an attorney and one support staff to have access to OCRA is $200 per year. Access for additional employees costs $75 per individual per year. *See* Attorney Subscriber Agreement, Ex. 1 at 1.

61. CNS is willing to pay a similar subscriber's fee for OCRA access to the Prince William Circuit Court and other courts throughout the Commonwealth. However, the Prince William Clerk changed the terms of the subscriber agreement and the cost of access to make it more expensive and more restrictive for non-attorneys. And, according to the clerks of various Virginia circuit courts and OES, non-Virginia-licensed attorneys cannot register for the same OCRA subscriber access as Virginia-licensed attorneys, and thus are not permitted to have the same remote access to court records as those attorneys enjoy.

62. None of CNS' reporters covering Virginia or CNS' Southeast Bureau Chief are attorneys, nor are any of CNS' reporters or CNS' Southeast Bureau Chief licensed to practice law in Virginia.

**D. <u>CNS' Good Faith Attempts to Obtain OCRA Access & to Resolve Short of Litigation</u>**

63. For many years, CNS has made repeated attempts to obtain OCRA subscriber access and also to resolve this issue with the Executive Secretary, the Prince William Clerk, and various other Virginia circuit court clerks.

64. In 2016, CNS requested OCRA access from almost fifty Virginia circuit court clerks. Of the Virginia circuit court clerks who did respond, they either denied OCRA subscriber access outright or offered CNS OCRA subscriber access if the CNS subscriber was a Virginia-licensed attorney, sometimes citing to Va. Code § 17.1-293.

65. During a deposition in January 2019 in the matter of *Courthouse News Service v. Schaefer*, Case No. 2:18-cv-391 (E.D. Va. Norfolk Division), the Prince William Clerk testified that she has, "on occasion … used [her] discretion to provide -- to offer to provide [OCRA] to others who need access to the information in the interest of being transparent and providing the highest service possible." To that end, the Prince William Clerk also testified that the offer applied to CNS and she was "still willing to provide it."

66. Since that time, CNS and its counsel have attempted to work with the Prince William Clerk and her counsel to obtain OCRA subscriber access. However, the Prince William Clerk denied CNS such access because the CNS applicant did not include a Virginia bar license number and a copy of a Virginia bar card – ostensibly due to the fact that the CNS applicant is not a Virginia-licensed attorney. A copy of the letter from the Prince William Clerk is attached hereto as **<u>Exhibit 2</u>**.

67. When CNS, through its counsel, inquired as to the denial of access, the Prince William Clerk responded by email stating that she does not "currently have an OCRA contract for non-attorneys. I will work on pulling one together now so we can complete same for Mr. Abbott and offer it to any other non-attorney parties who may wish to sign up for access." A copy of the May 25, 2021 email from the Prince William Clerk is attached hereto as **Exhibit 3**.

68. Thereafter, the Prince William Clerk provided CNS, through its counsel, the Non-Attorney Subscriber Agreement, which charged an annual subscription fee of $1,200 and imposed a variety of prohibitions on dissemination and publication of the nonconfidential, civil public court filings that are not included in the subscriber agreement for Virginia attorneys. A copy of the Non-Attorney Subscriber Agreement is attached hereto as **Exhibit 4**.

69. Some of the differences between the Attorney Subscriber Agreement and the Non-Attorney Subscriber Agreement include:

a. While Paragraph 5 of the Attorney Subscriber Agreement includes a "subscription fee [of] $200.00 per year for 1 attorney and 1 employee payable quarterly, semi-annually, or annually," Paragraph 5 of the Non-Attorney Subscriber Agreement provides that the "subscription fee is $1,200.00 per year for 1 non-attorney, payable annually."

b. Paragraph 7(j) is a new subparagraph added to the Non-Attorney Subscriber Agreement. It provides that: "The Subscriber understands and agrees that any data accessed by secure remote access is prohibited from being sold or posted on any other website or in any way redistributed to any third party, and the clerk, in her discretion, may deny secure remote access to ensure compliance with these provisions. However, the data accessed by secure

remote access may be included in products or services provided to a third party of the subscriber provided that (i) such data is not made available to the general public and (ii) the subscriber maintains administrative, technical, and security safeguards to protect the confidentiality, integrity, and limited availability of the data."

c. In addition, while Paragraph 3 of the Attorney Subscriber Agreement provides subscribers "access to an on-line database allowing inquiry-only access to scanned court cases" and cites Va. Code § 17.1-293(E), Paragraph 3 of the Non-Attorney Subscriber Agreement provides "access to an on-line database allowing inquiry access to scanned court cases," citing Va. Code § 17.1-293(F). Va. Code § 17.1-293(F) provides that court clerks may "provid[e] online access to a case management system that may include *abstracts* of case filings and proceedings…"

70. Given these and other terms of the Non-Attorney Subscriber Agreement, CNS could not and did not submit an application.

71. CNS also requested OCRA access from OES. In March 2021, CNS, through its counsel, wrote to the Executive Secretary and also OES' Director of Judicial Information Technology raising the issues addressed in this Complaint. By letter, CNS requested a conversation with the Executive Secretary regarding OCRA subscriber access. A copy of the letter is attached hereto as **Exhibit 5**.

72. CNS, through its counsel, followed up again in April 2021 via email and noted its willingness to engage in discussions to avoid litigation. The Executive Secretary, through the Assistant Executive Secretary and Counsel, responded by stating: "Although this Office hosts the

online records viewable through OCRA, after carefully reviewing your request and applicable Virginia statutes, we do not believe we are legally authorized to provide you with the access you request." After citing Va. Code §17.1-293(E)(7) and stating that access is limited to "*members in good standing with the Virginia State Bar*," OES's response went on to state that the Executive Secretary is "not in a position to provide" CNS with OCRA access because "the contents and records that are viewable [on OCRA] are under the custody and control of the circuit court clerks." A copy of the Executive Secretary's April 22, 2021 E-mail Response is attached hereto as **Exhibit 6**.

73. In or around January 2019, the Prince William Clerk requested an Opinion from the Attorney General regarding "whether a circuit court clerk may provide members of the press with secure remote access to nonconfidential court records" under Va. Code § 17.1-293. In response to that inquiry, on June 25, 2021, the Prince William Clerk received an informal opinion and advice from Robert B. McEntee, an Assistant Attorney General for the Commonwealth of Virginia and the Executive Secretary's counsel in this case, representing only his "individual view." Mr. McEntee's individual view is that "the Code of Virginia grants circuit court clerks the ability to provide secure remote access to nonconfidential court records to members of the general public under § 17.1-225" but that "[b]ecause systems like OCRA … exist in part to facilitate access by officers of the court to protected private information pursuant to § 17.1-293(E)(7), circuit court clerks cannot grant the general public remote access to nonconfidential documents through OCRA." A copy of the informal opinion is attached hereto as **Exhibit 7**.

74. Since, according to the Prince William Attorney Access page, "OCRA enables online inquiry only access to currently scanned court case documents in the Case Imaging System, except for juvenile, adoption and sealed cases, as well as those parts of a file that are marked

confidential, restricted, sealed, private addendum or victim/witness," and since filers are required to redact private and confidential information prior to filing," the nonconfidential filings available on OCRA should not include the protected private information listed in § 17.1-293(E)(7).

75. Virginia attorneys and their staff who subscribe to OCRA have access to not only records in their own cases, but also to records in other cases in which they are not attorneys of record, parties, or otherwise involved.

**E. Harms Caused By Discriminatory Access**

76. Once a Virginia circuit court clerk makes its documents available for remote or online viewing, it becomes incumbent on the clerk to offer that same access to all members of the public and press. Such even-handed access to court records is not merely a presumed right or good policy; it is a right conferred by the United States Constitution. Among the records for which the current discriminatory access exists are not just civil complaints, but also other categories of records for which courts have found a First Amendment right of access to apply, such as summary judgment records.

77. There is no difference in the content of the civil, nonconfidential, public court filings that CNS and other members of the press must travel to each individual court to see, and the civil records that Virginia-licensed attorneys can see remotely over the internet via OCRA – i.e., they are the exact same records. And yet, while Virginia-licensed attorneys can view these records any time of the day or night, without moving from their office or home chairs, and can print out copies of records without paying per-page copying fees, CNS must go through the time and expense of traveling to each Virginia circuit court clerk's office to review the documents in person. Even for occasional visits, this is not an insignificant expense or burden, especially if the Virginia circuit court is some distance away.

78. Indeed, to have anything near the access that a Virginia-licensed attorney has through OCRA, a news organization (such as CNS, which focuses its reporting on court records) would need to send a reporter to all of the Virginia circuit court clerk's offices that use OCRA every day.

79. In addition, non-attorneys – including CNS, other members of the press, and the general public – must pay a per page charge for any copies that they request, a cost that can add up quickly and that is not incurred by the Virginia-licensed attorneys with OCRA subscriber access.

80. Moreover, the Prince William Clerk charges non-attorneys $1,200 annually for an OCRA subscription, whereas Virginia-licensed attorneys are charged only $200 annually.

81. Finally, non-attorneys, while effectively being denied access to OCRA, can only review civil, nonconfidential, public court filings while the Virginia circuit court clerks' offices are open to the public. Practically speaking, this means that there is an inherent delay in access to nonconfidential, public court filings for non-attorneys, whereas there is no such delay for Virginia-licensed attorneys.

82. In the case of CNS, a news service specializing in reporting on civil litigation, Defendants' refusal to provide it with the same access to civil court records that Defendants are currently providing to Virginia-licensed attorneys means that, as a practical matter, CNS can only report on a select number of Virginia circuit courts on a daily basis, others on a less periodic basis, and some not at all.

83. If non-attorneys – including CNS, other members of the press, as well as the general public – were provided the same access to civil, nonconfidential, public court filings that Defendants are currently providing to Virginia-licensed attorneys, the media (including CNS)

would be able to provide more comprehensive news coverage about new civil actions in all or most of Virginia's circuit courts.

84. In addition, Va. Code § 17-1.293(H) has a severe chilling effect on CNS' protected speech and reporting activities. CNS requested remote access through OCRA so that its reporters can review new civil complaints, report on them in the New Litigation Reports and/or on the website, and provide interested subscribers with copies of the complaints. The risk of paying a $1,200 subscription fee and then having the subscription immediately terminated due to CNS providing its subscribers and the general public with a public judicial document, as well as other potential unspecified penalties and/or liabilities, has hindered – and continues to hinder – CNS' ability to contribute to public discourse surrounding civil complaints filed in the Virginia circuit courts.

85. This chilling effect on CNS' speech and reporting impedes the public's ability to learn about newly-filed civil litigation.

**COUNT ONE**
**Violation of U.S. Const. Amend. I and 42 U.S.C. § 1983**
**First Amendment – Access Restrictions**
**(Against Both Defendants)**

86. CNS incorporates and repeats the allegations of Paragraphs 1 – 85 herein.

87. The First Amendment to the U.S. Constitution, incorporated and made applicable to the states by the Fourteenth Amendment to the U.S. Constitution, protects CNS' right of access to newly-filed civil complaints.

88. The First Amendment also prohibits states from regulating speech based on the identity of the speaker unless the state can demonstrate a compelling government need for the regulation and that the regulation is narrowly tailored to fulfill that need. Speaker-based restrictions are presumptively unconstitutional.

89. Virginia Code § 17.1-293, on its face and as-applied by Defendants through their policies, practices, and customs, deprives CNS, and by extension its subscribers and the public, of their First Amendment right of access.

90. Defendants' actions under color of state law, including without limitation, their policies, practices, and customs of providing OCRA access to Virginia-licensed attorneys and their staff, including in cases in which they are not attorneys of record, but depriving that same access to others, including CNS, deprives CNS, and by extension its subscribers and the public, of the First Amendment right of equal access to certain civil, nonconfidential, public court filings and other public court records, as required by the First Amendment to the U.S. Constitution.

91. The policy, practice, and custom of providing remote online access to civil complaints and other public court records to Virginia-licensed attorneys and their staff, including in cases in which they are not attorneys of record, but depriving that same access to others, including CNS, impermissibly discriminates against CNS and other members of the press, and the classification burdens the fundamental First Amendment rights of CNS, its subscribers, and other readers of its news reports.

92. There is no compelling or overriding interest sufficient to justify Defendants' actions resulting in the denial of contemporaneous and equal access to new civil complaints and other public court records under the First Amendment. Even if an overriding or compelling interest did exist, there are far less restrictive means of protecting any such interest. As such, Defendants' policies and practices are not narrowly tailored, as required by law.

93. CNS has no adequate remedy at law to prevent or redress Defendants' unconstitutional actions and will suffer irreparable harm as a result of Defendants' violations of

CNS' First Amendment rights. CNS is therefore entitled to declaratory and injunctive relief to prevent further deprivation of these rights.

**COUNT TWO**
**Violation of U.S. Const. Amend. I and 42 U.S.C. § 1983**
**First Amendment – Dissemination Restrictions**
**(Against Both Defendants)**

94. CNS incorporates and repeats the allegations of Paragraphs 1 – 93 herein.

95. The First Amendment to the U.S. Constitution, incorporated and made applicable to the states by the Fourteenth Amendment to the U.S. Constitution, protects CNS' right to disseminate newsworthy information. That is especially true where, as here, the newsworthy information CNS wants to disseminate is information about public court records to which there is a First Amendment right of access.

96. Virginia Code § 17.1-293, on its face and as-applied by Defendants through their policies, practices, and customs, deprives CNS, and by extension its subscribers and the public, of their First Amendment rights.

97. The First Amendment generally precludes the government from suppressing the dissemination of truthful information about issues of civic importance. Thus, when a member of the press or the public "lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." *Florida Star v. B.J.F.*, 491 U.S. 524, 533 (1989).

98. Defendants' actions under color of state law, including without limitation, their policy, practice, and custom of restricting the dissemination of nonconfidential judicial documents obtained via OCRA, and the threatened termination of the Non-Attorney Subscriber Agreement for such dissemination, violates the First Amendment.

99. The policy, practice, and custom of restricting the dissemination of nonconfidential judicial documents obtained via OCRA and the threatened termination of the Non-Attorney Subscriber Agreement for such dissemination, impermissibly discriminates against CNS and other members of the press, and burdens the fundamental First Amendment rights of CNS, its subscribers, and other readers of its news reports.

100. There is no compelling or overriding interest sufficient to justify Defendants' actions. Even if an overriding or compelling interest did exist, there are far less restrictive means of protecting any such interest. As such, Defendants' policies and practices are not narrowly tailored, as required by law.

101. CNS has no adequate remedy at law to prevent or redress Defendants' unconstitutional actions and will suffer irreparable harm as a result of Defendants' violations of CNS' First Amendment rights. CNS is therefore entitled to declaratory and injunctive relief to prevent further deprivation of these rights.

## COUNT THREE
**Violation of U.S. Const. Amend. XIV and 42 U.S.C. § 1983**
**Equal Protection**
**(Against Both Defendants)**

102. CNS incorporates and repeats the allegations of Paragraphs 1 – 101 herein.

103. Virginia Code § 17.1-293, on its face and as-applied by Defendants through their policies, practices, and customs, deprives CNS, and by extension its subscribers and the public, of their Fourteenth Amendment right to equal protection of the laws.

104. Defendants' actions under color of state law, including without limitation, their policies, practices, and customs of providing OCRA access to Virginia-licensed attorneys and their staff, including in cases in which they are not attorneys of record, but depriving that same access

to others, including CNS, deprives CNS, and by extension its subscribers and the public, of their Fourteenth Amendment right of equal protection of the laws.

105. The policy, practice, and custom of providing remote online access to civil, nonconfidential, public court filings and other public court records to Virginia-licensed attorneys and their staff, including in cases in which those Virginia-licensed attorneys are not attorneys of record, but depriving that same access to others, including CNS, impermissibly discriminates against CNS and other members of the press, and the classification burdens the fundamental First Amendment rights of CNS, its subscribers, and other readers of its news reports.

106. There is no legitimate, compelling, or other justification for implementing a system of discriminatory access to civil, nonconfidential, public court filings and other public court records, and, even if there were, Defendants' practices and policies are not narrowly tailored, as is required by law.

107. CNS has no adequate remedy at law to prevent or redress Defendants' unconstitutional actions and will suffer irreparable harm as a result of Defendants' violations of CNS' First and Fourteenth Amendment rights. CNS is therefore entitled to declaratory and injunctive relief to prevent further deprivation of these rights.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Courthouse News Service seeks judgment in its favor and against Defendants Karl R. Hade, in his official capacity as Executive Secretary of the Office of Executive Secretary of the Supreme Court of Virginia, and Jacqueline C. Smith, in her official capacity as Clerk of the Circuit Court for Prince William County, Virginia as follows:

1. Injunctions against Defendants, including their agents, assistants, successors, employees, and all persons acting in concert or cooperation with them, or at their direction or under

their control, prohibiting them from continuing their policies, practices, and customs of denying remote online access to non-Virginia-licensed attorneys;

2. Injunctions against Defendants, including their agents, assistants, successors, employees, and all persons acting in concert or cooperation with them, or at their direction or under their control, prohibiting them from continuing their policies, practices, and customs of prohibiting the dissemination of public court records gathered via remote electronic access;

3. To the extent that this Court determines that Va. Code § 17.1-293 restricts such access, CNS seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 declaring Va. Code § 17.1-293 unconstitutional on its face because it impermissibly denies remote online access to non-attorneys, including CNS, because it denies non-Virginia-licensed attorneys, including CNS, of equal access and equal protection under the law in violation of the First and Fourteenth Amendments to the U.S. Constitution, and because it impermissibly discriminates against CNS and other members of the press and public, and the classification burdens the fundamental First Amendment rights of CNS, its subscribers, and other readers of its news reports;

4. In the alternative (and also to the extent that this Court determines that Va. Code § 17.1-293 restricts such access), CNS seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 declaring Va. Code § 17.1-293 unconstitutional as-applied by Defendants under the Fourteenth Amendment to the U.S. Constitution, for the reason that Defendants' policies, practices, and customs deprive non-attorneys, including CNS, of equal protection under the law in that those policies, practices, and customs impermissibly discriminate against CNS and other members of the press, and the classification burdens the fundamental First Amendment rights of CNS, its subscribers, and other readers of its news reports;

5. To the extent that this Court determines that Va. Code § 17.1-293 restricts the dissemination of civil, nonconfidential, public court records gathered via remote electronic access, CNS seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 declaring Va. Code § 17.1-293 unconstitutional on its face because it impermissibly burdens the fundamental First Amendment rights of CNS, its subscribers, and other readers of its news reports.

6. In the alternative (and also to the extent that this Court determines that Va. Code § 17.1-293 restricts dissemination), CNS seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 declaring Va. Code § 17.1-293 unconstitutional as-applied by Defendants under the Fourteenth Amendment to the U.S. Constitution, for the reason that her policies, practices, and customs impermissibly burden the fundamental First Amendment rights of CNS, its subscribers, and other readers of its news reports;

7. Injunctions against Defendants, including their agents, assistants, successors, employees, and all persons acting in concert or cooperation with them, or at their direction or under their control, prohibiting them from enforcing the challenged statute;

8. For an award of costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

9. For all other relief the Court deems just and proper.

[[SIGNATURE BLOCK APPEARS ON FOLLOWING PAGE]]

Dated: September 14, 2021

Respectfully Submitted,

*/s/ Adam L. Shaw*
Adam L. Shaw (Va. Bar No. 89559)
Heather S. Goldman (admitted *pro hac vice*)
**BRYAN CAVE LEIGHTON PAISNER LLP**
1155 F Street, NW, Suite 700
Washington, DC 20004
Telephone: (202) 508-6000
Fax: (202) 508-6200
Email: adam.shaw@bclplaw.com
heather.goldman@bclplaw.com

*Attorneys for Plaintiff*
*Courthouse News Service*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of September, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

*/s/ Adam L. Shaw*
Adam L. Shaw

Exhibit 5

BRYAN CAVE LEIGHTON PAISNER BCLP

BRYAN CAVE LEIGHTON PAISNER LLP
1155 F Street NW
Washington DC 20004 1357
T: +1 202 508 6000
F: +1 202 508 6200
www.bclplaw.com

Bryan Harrison
Direct: 202-508-6010
Fax: 202-508-6200
bryan.harrison@bclplaw.com

March 31, 2021

**VIA FEDERAL EXPRESS**
**VIA EMAIL (khade@vacourts.gov; mriggs@vacourts.gov)**

Mr. Karl R. Hade
Executive Secretary
Office of the Executive Secretary
Supreme Court of Virginia
100 North Ninth Street
Richmond, Virginia 23219

Mr. Michael J. Riggs, Sr.
Director of Judicial Information Technology
Office of the Executive Secretary
Supreme Court of Virginia
100 North Ninth Street
Richmond, Virginia 23219

**Re: Subscriber Access Request for Media to Officer of the Court Remote Access**

Dear Messrs. Hade and Riggs:

We represent Courthouse News Service ("CNS"), a nationwide news service that specializes in news reporting on civil litigation in state and federal courts across the country, including all of Virginia's trial and appellate courts. CNS offers a variety of publications, through which it reports on all stages of civil litigation, from the initial complaint or petition to subsequent filings, hearings, and rulings, through final appeal. CNS ' new litigation reports contain summaries of new filings and are sent to subscribers – which include media, law firms, law schools and other organizations – on a daily basis. CNS' free web site is open to everyone and contains staff-written articles about new and important litigation.

Virginia-licensed can view non-confidential court records remotely through the Officer of the Court Remote Access system ("OCRA"). Virginia-licensed attorneys can view these records at any time of the day or night, without moving from their office or home, and can print out copies of records without paying per-page copying fees. However, members of the press and public do not have such luxuries. In order to view non-confidential court records (including civil complaints) that Virginia-licensed attorneys can see remotely via OCRA, members of the press and public, including CNS' reporters, must travel to each individual Virginia Circuit Court. This means that members of the press and public, including CNS' reporters, can only see these non-confidential court records by incurring the time and expense of traveling to a courthouse, oftentimes hours away, and can only see the records while the courthouses are open, and also paying a per-page copying fee. This makes it prohibitive for CNS to comprehensively cover the Virginia Circuit Courts. While it may be appropriate for attorneys of record to receive heightened access to their own cases, it is inappropriate for attorneys as a group to have special access to all non-confidential court records that exceeds the access granted to others, including the press and public.

CNS believes that the discriminatory preference provided through OCRA to Virginia-licensed attorneys for access to non-confidential court records (including civil complaints) constitutes a violation of both the First and the Fourteenth Amendments. The right of the press and the public to access court filings has been reaffirmed by the Supreme Court of Virginia and the Fourth Circuit has held that the First

BRYAN CAVE LEIGHTON PAISNER BCLP

Amendment provides a right of access to documents filed in civil cases. *See Daily Press, Inc. v. Commonwealth*, 285 Va. 447, 739 S.E. 2d 636 (2013); *Company Doe v. Public Citizen*, 749 F.3d 246 (4th Cir. 2014).

CNS has made numerous attempts to request OCRA access. Over the past several years, CNS wrote to several Virginia Circuit Court clerks requesting subscriber access to OCRA, but CNS has been uniformly denied access. Several clerks told CNS' southeast regional bureau chief that he (or a CNS reporter) is not permitted to have subscriber access because he (or a CNS reporter) is not a Virginia-licensed attorney, citing to the provisions of Virginia Code § 17.1-293 allowing special preferential treatment of Virginia-licensed attorneys. In another instance, a Virginia Circuit Court clerk testified during a deposition that CNS could have subscriber access, but CNS was never allowed such access. CNS has more recently renewed these requests and continues to be refused OCRA subscriber access.

Because OES hosts, maintains, and manages the OCRA system for the Virginia Circuit Courts, we are writing to request that CNS be permitted remote online access to OCRA as utilized by Virginia-licensed attorneys in the Virginia Circuit Courts. CNS is agreeable to pay any applicable OCRA subscriber fees in each Virginia Circuit Court, and to complete any required application(s).

CNS welcomes any discussions to resolve this issue. However, should CNS be unable to resolve, CNS reserves all rights, including filing a legal challenge to the discriminatory preferences provided under the OCRA system. Thank you.

Sincerely,

Bryan J. Harrison

cc: Bill Girdner, CNS (by email)

Exhibit 6

**From:** Eddie Macon <EMacon@vacourts.gov>
**Sent:** Thursday, April 22, 2021 3:38 PM
**To:** Harrison, Bryan
**Cc:** Heather Hays Lockerman (hlockerman@oag.state.va.us); Myers, Elizabeth B.; Karl Hade
**Subject:** OCRA subscriber access request
**Attachments:** B. Harrison 3-31-2021 Ltr to K. Hade and M. Riggs.pdf

Dear Mr. Harrison,

Karl Hade asked that I respond to the email below and the attached letter, seeking access to view non-confidential court records remotely through the Officer of the Court Remote Access system ("OCRA").

Although this Office hosts the online records viewable through OCRA, after carefully reviewing your request and applicable Virginia statutes, we do not believe we are legally authorized to provide you with the access you request.

The circuit court clerks are the legal custodians of all circuit court records, including "*records stored in electronic format whether the storage media for such electronic records are on premises or elsewhere.*" Va. Code § 17.1-242. The OCRA system is authorized by the following language found in Va. Code § 17.1-293 that permits: *"[p]roviding secure remote access to nonconfidential court records, subject to any fees charged by the clerk, to members in good standing with the Virginia State Bar and their authorized agents, pro hac vice attorneys authorized by the court for purposes of the practice of law, and such governmental agencies as authorized by the clerk*." Va. Code § 17.1-293(E)(7). The plain language of Va. Code § 17.1-293 limits access to "*members in good standing with the Virginia State Bar and their authorized agents, pro hac vice attorneys authorized by the court for purposes of the practice of law, and such governmental agencies as authorized by the clerk*."

Although this Office (the Office of the Executive Secretary of the Supreme Court of Virginia) supports and hosts the OCRA system, the contents and records that are viewable are under the custody and control of the circuit court clerks. Those circuit court clerks who have chosen to offer OCRA control access to their respective records and the individual clerks establish the terms and conditions of access.

For the foregoing reasons, we are not in a position to provide you with the access you request. By copy to our Counsel in the Virginia Attorney General's Office, Heather Hays Lockerman and Elizabeth B. Myers, I am sharing this response with them and again ask that you include them on any future correspondence.

Sincerely,

Edward M. Macon
Assistant Executive Secretary & Counsel
Office of the Executive Secretary
Supreme Court of Virginia

Begin forwarded message:

> **From:** "Harrison, Bryan" <bryan.harrison@bclplaw.com>
> **Date:** April 14, 2021 at 4:07:53 PM EDT
> **To:** Karl Hade <khade@vacourts.gov>, Mike Riggs <mriggs@vacourts.gov>
> **Subject: RE: OCRA subscriber access request**

EXTERNAL EMAIL

THIS MESSAGE ORIGINATED FROM AN EXTERNAL ADDRESS. USE CAUTION CLICKING ON ANY LINKS OR DOWNLOADING ANY ATTACHMENTS

Good afternoon. I have not heard anything in response to the email and letter that I sent last month by both email and FedEx overnight mail. We remain willing to discuss the issues raised in my March 31, 2021 letter (reattached here). However, if we are unable to make progress on resolving by the end of next week (April 23, 2021), my client will be filing a lawsuit to address these issues. We are open and willing to have good faith discussions so to the avoid the cost, expense, and burden of litigation. Thank you.

Kind regards,
Bryan Harrison

BRYAN J. HARRISON
Attorney
BRYAN CAVE LEIGHTON PAISNER LLP
bryan.harrison@bclplaw.com
T: +1 202 508 6010

---

**From:** Harrison, Bryan
**Sent:** Wednesday, March 31, 2021 12:27 PM
**To:** 'khade@vacourts.gov'; 'mriggs@vacourts.gov'
**Subject:** OCRA subscriber access request

Messrs. Hade and Riggs - good afternoon. Please see the attached letter, which is also being sent to your attention via overnight mail. We look forward to the opportunity to discuss further.

Thank you.

Kind regards,
Bryan Harrison

BRYAN J. HARRISON
Attorney
bryan.harrison@bclplaw.com

BRYAN CAVE LEIGHTON PAISNER LLP
T: +1 202 508 6010
1155 F Street NW, Washington, DC 20004-1357

**bclplaw.com**

This electronic message is from a law firm. It may contain confidential or privileged information. If you received this transmission in error, please reply to the sender to advise of the error and delete this transmission and any attachments.

We may monitor and record electronic communications in accordance with applicable laws and regulations. Where appropriate we may also share

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>*Plaintiff,*<br>v.<br><br>KARL R. HADE, *et al*.,<br><br>*Defendants.* | ) | Civil Action No.3:21-cv-00460-HEH |

DECLARATION OF WILLIAM GIRDNER
IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

I, William Girdner, declare and state as follows:

1. I am the founder and editor of Courthouse News Service ("CNS"), a nationwide news service and the plaintiff in the above-captioned action. I make this declaration in support of CNS' Omnibus Opposition to the Motions to Dismiss filed by Defendant Karl R. Hade, in his official capacity as Executive Secretary (the "Executive Secretary") of the Office of Executive Secretary of the Supreme Court of Virginia ("OES"), and Defendant Jacqueline C. Smith, in her official capacity as Clerk of the Circuit Court for Prince William County, Virginia ("Prince William Clerk," and with the Executive Secretary, the "Defendants"). I have personal knowledge of the following facts, except where otherwise stated, and would and could testify to them if called as a witness.

2. This case seeks to address Defendants' discriminatory treatment of the public and press in precluding them from remotely accessing new civil filings in the Virginia courts on a statewide basis, access that Defendants do provide to a special class of its citizens – Virginia-barred attorneys, their staff, and officers of the court. Remote access through the Internet is the

only practical means for covering new civil filings throughout the state because going every day to visit each of the 120 circuit courts across the state is not practicable for any news entity.

3. Based on my many years as a journalist covering courts throughout this country and my personal experience overseeing CNS, I have developed a comprehensive understanding of how various courts' case management systems operate and how courts provide remote access to newly filed civil complaints and the court record as a whole.

4. I have also observed that access to newly filed civil complaints and the subsequent court record is essential to robust and accurate news reporting about the courts of our nation, a critical branch of government and one of the foundation stones of our democratic republic. Readers are interested in the course of legal events and in order to accurately report on those events, and to let the public know that a legal case has been filed, it is fundamental to have access to newly filed civil complaints. In order to follow the course of those new cases, it is also fundamental to have access to the court record as it is developed. But that is not possible in the Virginia circuit court system, where the press and public have been pushed behind one segment of the public – Virginia-licensed attorneys – who are given remote electronic access to newly filed civil complaints, and other filings, on a statewide basis, including in cases in which they are not attorneys of record.

5. The effect is that the practical ability of the press to report on new civil lawsuits on a statewide basis in a timely fashion is impaired. It is simply not possible for a news service to send reporters on a daily basis, if at all, to the 120 courts throughout the Virginia circuit court system. This means that the ability of the general public to learn about and comment on events in an important institution is impeded or eliminated altogether, all while one subclass of the public can view new filings remotely on a daily basis, wreaking havoc on the traditional press corps.

**CNS Publications and Subscribers**

6. CNS is a nationwide legal news service focusing on new civil litigation with a network of reporters based across the nation. We provide reports on appellate rulings, legislation, and new civil cases from federal and state courts around the country, as well as coverage of Congressional hearings and Supreme Court arguments.

7. I began CNS in 1990 out of a belief that news about civil litigation went unreported because the traditional news media failed to cover much of the important business of the courts. CNS is similar to other news services, such as the Associated Press, except that CNS specializes in reporting about civil lawsuits, from the inception of new cases and on to appellate rulings.

8. CNS' coverage of rulings, trials, and new civil complaints initially focused on the United States District Court for the Central District of California where journalists trooped down to the clerk's office every afternoon and gathered a stack of new complaints from the intake clerk to look over for news stories. By 1997, CNS' regional coverage in California included the major metropolitan state and federal courts in Los Angeles, Orange County, California, and San Francisco. By 2001, CNS was also covering state and federal courts in Houston, New York, and Chicago. CNS continued expanding its coverage of trial courts over the years, first in major metropolitan areas and then gradually extending into less populous areas. Today, CNS employs approximately 240 people, most of them editors and reporters, covering state and federal trial and appellate courts across all 50 states.

9. The result of CNS' nation-wide coverage by its reporters is a variety of publications offered to subscribers, reporting on all stages of civil litigation, from the initial complaint or petition to subsequent filings, hearings, and rulings, through final appeal in federal and state courts around the nation, including the U.S. Supreme Court.

10. One category of publications is CNS' New Litigation Reports, which contain original, staff-written summaries of significant and newsworthy new civil complaints. These reports are sent to subscribers via e-mail each evening. The New Litigation Reports focus on general jurisdiction complaints against business and government entities, as well as any other civil action that might be of interest to CNS' subscribers. The reports do not cover criminal, domestic relations, or probate matters. Nor does CNS seek to report on any filings that are statutorily confidential or accompanied by a motion to seal.

11. As of the date of this declaration, CNS offers 120 New Litigation Reports. CNS currently publishes two New Litigation Reports providing daily coverage of new Virginia litigation, including new civil actions filed in both federal district courts as well as daily coverage of new actions in the Virginia circuit courts, including the Circuit Court for Prince William County, Virginia. The *Virginia Report* provides coverage of new litigation filed in 29 courts, including the Prince William Circuit Court, and the *Southern Virginia State Report* provides coverage of new litigation filed in 92 courts.

12. To prepare the New Litigation Reports and identify new cases that may warrant a broader website article, CNS reporters have traditionally visited their assigned courts, so that they can review all the complaints to determine which ones are newsworthy. CNS reporters often visit courts daily, usually at the end of the day, to review the day's filings, but sometimes less frequently, especially in remote areas, where CNS is forced to base its reports on any docket information (*i.e.*, party names, case type, and court name) made available online.. As the federal courts and an increasing number of state courts are making court records, including newly filed complaints, available online, CNS also covers courts remotely through the Internet. To report on the onset of new litigation, a reporter must have access to the newly filed civil complaints.

13. Among CNS' other publications are its monthly newsletter, the *Entertainment Law Digest*, as well as the *Daily Brief*, which covers published, nationwide appellate rulings, including all U.S. Supreme Court and federal circuit decisions, as well as significant rulings from a growing number of federal district courts, including the federal district courts in Virginia. It also includes state supreme court and appellate court decisions.

14. CNS also publishes a publicly-available website (www.courthousenews.com) featuring news reports and commentary, which is read by an average of 265,000 unique readers each month. The website functions much like a daily print newspaper, featuring staff-written articles from throughout the nation that are posted and then rotate off the page in a 24-hour cycle. Many of the stories written by CNS staff writers focus on ongoing court cases and rulings in the state court as well as the federal courts.

15. CNS has more than 2,300 subscribers nationwide. All but a very few of the nation's large and mid-sized law firms subscribe to one or more of CNS' publications, and make them available to attorneys and others at the firm. CNS subscribers also include law schools, law libraries, government offices, judges, news organizations, public entities, Fortune 500 Companies, and entertainment and watchdog groups nationwide.

16. A substantial number of news and entertainment outlets are CNS subscribers, including but not limited to, *The Atlanta Journal Constitution*, *The Boston Globe*, Buzzfeed, *The Dallas Morning News*, *Detroit Free Press*, Fox Entertainment Group, *Los Angeles Times*, North Jersey Media Group, *The Salt Lake Tribune*, *San Antonio Express News*, *San Jose Mercury News*, *Tampa Bay Business Journal*, *The Wall Street Journal*, Warner Bros., and many broadcast stations. The Washington-based Center for Public Integrity also subscribes.

17. Among academic institutions, subscribers to CNS' New Litigation Reports include Boston College Law School, Boston University, Case Western Reserve University, MIT Sloan

School of Management, Southern Illinois University School of Law, UC Hastings College of Law, and UCLA School of Law, among many others.

18. CNS' news media subscribers rely on CNS to provide them with timely information about civil litigation, our specialty, so they can provide information about those cases to their readers and viewers. I have found that as resources for mainstream media have diminished, media outlets are increasingly relying on CNS for prompt information about court filings. CNS has been credited as the original source of reporting by a range of publications, including: *ABA Journal*, ABC News, *The Atlantic*, *Austin American Statesman*, Black Christian News Network, *California Bar Journal*, CBS News, *The Christian Science Monitor*, *The Daily Beast*, *The Dallas Morning News*, *Forbes*, Fox News, *The Guardian*, *The Hill*, *Houston Chronicle*, *The Huffington Post*, *Long Island Press*, *Los Angeles Times*, *The Mercury News, Mother Jones*, National Public Radio (NPR); NBC News, *New York Daily News*, *New York Magazine*, *The New York Times*, *The Orange County Register, Politico*, *Rolling Stone*, *Salt Lake City Tribune*, *San Antonio Express-News*, Slate, *The Telegraph* (UK), *The Wall Street Journal*, *The Washington Post*, *The Washington Times*, Women's Health Policy Report, United Press International (UPI), *USA Today*, *U.S. News and World Report,* and the YouTube news channel. In addition, American, Canadian, and New Zealand radio shows have interviewed CNS reporters.

19. In Virginia, CNS has been credited as the original source of reporting by WTKR News 3 (wtkr.com) and *The Virginia-Pilot* (PilotOnline.com). And, *The Washington Post* has credited CNS as the original source of reporting in articles it published on its website concerning new complaints filed in Fairfax County and in the United States District Court for the Eastern District of Virginia (Alexandria Division).

**The Tradition of Access to New Complaints**

20. It has been a long-standing tradition for the press to review new civil complaints in courts across the country on the day of filing. This practice ensures that interested members of the public learn about new cases in a contemporaneous manner, while the news is still fresh. As CNS expanded, I regularly visited federal and state trial courts to start our reporting on those courts. Each court, state and federal – whether in Los Angeles, Orange County, San Francisco, or San Jose – provided journalists with access to the new paper complaints filed that day. The complaints were usually in a stack in a bin of some kind, either wood, wire mesh, or cardboard. The same was true as our coverage expanded to the Midwest and East Coast, in Chicago, New York, and Washington D.C. The pattern also held true through the South, in Dallas and Houston; in the Southeast in Miami; and in the Southwest in Phoenix and Albuquerque. Those courts provided the press with access to the new complaints on the day of filing, with clerks allowing reporters to regularly check the stack of newly filed civil complaints. The reporters were looking for news, and the review of the new complaints that had just come across the counter was a standard and daily task for a reporter on the court beat.

21. In addition to seeing the new cases at the counter, as was the case in clerks' offices throughout Virginia, including at the Prince William County Circuit Court, journalists covering a courthouse traditionally had access to the records room, where they could review new civil complaints and subsequent filings, including motions and rulings, and check and research the record. As electronic technology and the Internet began to dominate the area of communication and record-keeping, the records room moved online in court after court. The common and nearly universal practice when courts were first starting to move things online was to first scan paper documents and electronically store the scans, often discarding the paper records. This was, and still is, the case in the Prince William Circuit Court, among other courts in Virginia. The next step

courts have taken is to require that the filers provide scans or electronic versions of their documents as part of electronic filing, with those records also being stored electronically.

22. Virginia's technological transition is halted between these two phases. The overwhelming number of new civil complaints are still filed in paper form but they are scanned by court staff and stored in electronic form. In individual courts, such as the Prince William Circuit Court and others, the records room is electronic and journalists and members of the public seeking to review records are directed to an electronic terminal in the clerks' office where they look at scans of paper records.

23. The overwhelming number of states and courts that have engaged in the technological transition have given access to their records online, via the Internet, through a court website. Even Ventura County Superior Court in California, a fully paper court and the focus of ten years of litigation over access, scans its paper records and puts them online through the court's website, for review by the press and public.

24. The list of states providing online access to the press is long. It includes, either on a statewide basis or through individual courts within the state: California, Louisiana, Massachusetts, Oklahoma, Tennessee, and Washington – in which several of the courts are predominantly paper-filing courts – as well as courts within Alabama, Arizona, Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Indiana, Iowa, Kansas, Kentucky, Maine, Minnesota, Mississippi, Montana, Nevada, New Jersey, New Mexico, New York, North and South Dakota, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, Texas, and Utah.

25. In addition, all federal courts in the nation, including this Court, give journalists and the public online access to public court records via PACER.

26. What all these state and federal courts permit, while carrying on the tradition of access in today's modern technological age, is a review of the new civil actions and subsequent filings, whether in a major urban area or rural area. They provide this access to journalists and often to the public as well. Virginia, by contrast, allows this access only to a special class of its citizens, those with a law degree and Virginia bar number, while excluding the press and public. The access allowed to attorneys cannot, in practical terms, be matched by the press or public. No press organization can afford to send a reporter on a daily basis to each circuit court using the statewide Officer of the Court Remote Access system ("OCRA"). The system covers most of the Virginia circuit courts, *i.e.*, 93 out of 120, in an area of 30,600 square miles with 6 million residents. I directed the staff of CNS to prepare a map coloring in the counties covered by OCRA and, for ease of reference, attach that map hereto as <u>Exhibit 1</u>. No private news organization can cover that area on a daily basis. Such a task would require a small army of reporters and is, in practical terms, impossible.

**<u>Access to New Complaints in Virginia</u>**

27. I learned a lot about the Virginia circuit court system and the policies, practices, and customs of the Prince William Clerk's office during the *Courthouse News Serv. v. Schaefer* litigation, in which CNS challenged a policy that withheld access to newly filed civil complaints from the press and public until those complaints were docketed and scanned, a policy that regularly delayed access. In February 2020, after a four-day bench trial, Judge Henry Coke Morgan Jr. of the Eastern District of Virginia, Norfolk Division, issued a declaratory judgment finding the press and public enjoy a First Amendment right of access to newly filed civil complaints "contemporaneous with the filing of the complaint." *Id.*, 440 F. Supp. 3d 532 (E.D. Va. 2020). On June 24, 2021, the Fourth Circuit affirmed, emphasizing that contemporaneous access means

that newly filed complaints must be made available "as expeditiously as possible." 2 F.4th 318, 328 (4th Cir. 2021).

28. Court filings at the Prince William Circuit Court go through several stages before they are available for viewing on public access terminals at the courthouse or remotely through the Internet via OCRA: (1) initial intake; (2) data entry into the Circuit Court Case Management System; and (3) scanning into the Case Imaging System. Subsequent filings are also made in paper form and must be scanned into the court record.

29. During the *Schaefer* litigation, I learned that once a complaint is scanned, it can be viewed on the courthouse public access terminals almost immediately and on OCRA shortly thereafter, generally within five minutes. The same is true for later filings.

30. I understand that OES is the administrator of the Virginia circuit court system, which includes OCRA.

31. CNS currently employs three reporters who are based in Prince William County, Norfolk, and Richmond and who cover the state and federal trial and appellate courts of Virginia, and who are supervised by CNS' Southeast Bureau Chief, Ryan Abbott.

32. Of the 120 Virginia circuit courts, CNS is only able to send reporters to five of them on a daily basis. Thirteen other circuit courts are covered intermittently by sending one of the Virginia-based reporters to the court on a less than daily basis.

33. Due to the remote location of many of the remaining 102 courts and the expense of hiring numerous additional reporters to cover each of those courts, it is not possible to visit these courts at all, and most certainly not on a daily basis. I am thus resigned to having those remaining courts covered with docket information only. This is less than ideal because, without access to the actual complaint, CNS cannot fully inform its subscribers and the public regarding who has been hauled into the courts and why. This, in turn, suppresses the ability of lawyers, professors, law

students, news reporters, and readers of our New Litigation Reports and website to know about and freely discuss a new legal contest pending in a public court of law.

34. Having access to OCRA would assist my reporters in covering the courts in a timely manner. If CNS had access to OCRA, I would have the three Virginia reporters cover the 93 circuit courts that use OCRA on a daily basis by having them review the complaints filed in those courts and posted on OCRA. Our reporters could also follow newsworthy cases in remote regions of Virginia as they progress through their courts.

35. For example, the CNS reporter covering the Prince William Circuit Court in person on a daily basis could instead cover that court via OCRA to allow her to visit other courts daily that do not utilize OCRA. Currently, that reporter visits the Prince William Clerk's office on a daily basis to review all newly filed civil complaints made available since her visit the previous day. She then reports on newsworthy complaints by preparing original summaries for inclusion in the *Virginia Report*. In addition to covering the Prince William Circuit Court, she also covers the Fairfax County Circuit Court on a daily basis, and the circuit courts in Alexandria, Arlington, Fauquier, and Loudoun on a weekly basis.

36. I used to have a different reporter covering these courts, but due to staffing constraints, those courts are now covered by the Prince William reporter. If she had access to OCRA, she could visit the courts in Fairfax, Alexandria and Arlington (which don't utilize OCRA) in person on a daily basis, while also covering the Prince William Circuit Court on a daily basis via OCRA, ensuring the timely delivery of news in each of these courts.

**<u>Requests for OCRA Access</u>**

37. In 2016, I instructed Mr. Abbott (CNS' Southeast Bureau Chief) to request OCRA access from circuit courts that used OCRA. Mr. Abbott requested such access from almost fifty Virginia circuit court clerks. Of those clerks who responded, they either denied OCRA subscriber

access outright or offered subscriber access on the condition that the person subscribing was a Virginia-barred attorney.

38. During her deposition in the *Schaefer* litigation, the Prince William Clerk testified that she was willing to provide OCRA access to CNS. Hearing that offer, I instructed Mr. Abbott and CNS' outside counsel at Bryan Cave Leighton Paisner to follow-up and request such access from the Prince William Clerk.

39. Upon my instruction, Mr. Abbott filled out an OCRA Subscriber Agreement and sent it to the Prince William Clerk. His application for access was rejected, however, because he did not include a Virginia Bar license number. *See* Complaint, Ex. 2. That number was not included because Mr. Abbott is not an attorney, and thus not a member of the Virginia bar, let alone any bar association.

40. I again instructed Mr. Abbott and CNS' outside counsel to follow-up regarding access to OCRA. In response, the Prince William Clerk created an OCRA Subscriber Agreement for non-attorneys. This Non-Attorney Subscriber Agreement increased the cost of OCRA from $200 per year to $1,200 per year, and imposed a variety of prohibitions on dissemination and publication of filings gathered via OCRA. *Compare* Complaint Ex. 1 *with* Complaint Ex. 4. It is my understanding that the prohibition on dissemination may be based on language in the Virginia Code, and it is my belief that a restriction on the dissemination of a public court filing, which this is, violates the First Amendment and is unconstitutional.

41. While I would be willing to have CNS pay $200 per year for access to Prince William Circuit Court filings via OCRA, because the Prince William Clerk increased the subscription cost sixfold and restricted public dissemination of any reporting based on that access, I instructed Mr. Abbott and CNS' outside counsel to not complete the Non-Attorney Subscriber agreement.

42. I also instructed CNS' outside counsel to request OCRA access from OES. *See* Complaint Ex. 5. That request was denied. *See id.* Ex. 6.

**<u>CNS is Not Seeking Access to Confidential Documents</u>**

43. It is my understanding that the documents available on OCRA are not confidential. By the time the documents are available on OCRA, they have already gone through the three stages of processing – (1) intake; (2) data entry; and (3) scanning – and are also already available for public viewing at the courthouse.

44. To the extent that Defendants argue that limiting remote access to Virginia barred attorneys, their staff, and officers of the court protects private and confidential information, I can say that in my decades of reporting on millions of court cases, it is extremely rare that such information has appeared in published complaints. Most importantly, as pointed out by Judge Morgan during the *Schaefer* trial, the duty to keep personal identifiers out of filings is the filer's responsibility based on Virginia's court rules.

45. And, to the extent that Defendants argue that Virginia-barred attorneys can have access because they are governed by a Code of Ethics, I note that CNS reporters abide by ethical proscriptions precluding inclusion of such data in original news stories. The CNS manual makes clear that if confidential information is inadvertently released, CNS is not to disclose such information, and in training, reporters are instructed that the rule applies to personal identifiers. The ethical prescripts that CNS follows are universal among journalists.

46. And, as is the practice in the vast majority of courts that utilize electronic filing, if confidential information is improperly included by the filing party, a court clerk can subsequently remove the filing from public access based on a motion to seal or otherwise. In fact, on rare occasion, a case may be sealed by the court *after* filing, and upon request, we remove that case from our database.

**Importance of Remote Access**

47. A new civil filing is a regular source of news, and can involve a contest of great public interest. Obtaining access to those filings on a statewide basis through a remote access system is critical to public knowledge and understanding of the courts and the events and controversies that are resolved within them. The only way for reporters to provide the public with consistent and reliable information about new civil actions at the court is to have access to the court record.

48. The breadth and completeness of our news reports is a fundamental part of their value to subscribers and to readers of our website.

49. Cutting off access to new filings on a statewide basis effectively suppresses reporting on court matters, and turns them into secret tribunals where only those directly involved – and members of the bar – know of the events taking place and the documents filed in association with those events.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Pasadena, California on this 16th day of November 2021.

William Girdner




1 Norton
2 Galax
3 Martinsville
4 Radford
5 Roanoke Co
6 Salem
7 Roanoke
8 Covington
9 Lexington
10 Buena Vista
11 Lynchburg
12 Staunton
13 Waynesboro
14 Harrisonburg
15 Charlottesville
16 Winchester
17 Fairfax
18 Falls Church
19 Manassas
20 Manassas Park
21 Fredericksburg
22 Richmond
23 Colonial Heights
24 Petersburg
25 Hopewell
26 Emporia
27 Franklin
28 Williamsburg
29 York
30 Poquoson
31 Hampton
32 Newport News
33 Portsmouth

JA61

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| COURTHOUSE NEWS SERVICE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:21cv460–HEH |
| | ) | |
| KARL R. HADE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**
**(Resolving Defendants' Motions to Dismiss)**

THIS MATTER is before the Court on Defendant Karl Hade's ("Defendant Hade") Motions to Dismiss (ECF Nos. 22, 24) and Defendant Jacqueline Smith's ("Defendant Smith")[1] Motion to Dismiss (ECF No. 26) all filed on October 12, 2021. Courthouse News Service ("CNS" or "Plaintiff") filed its Amended Complaint on September 14, 2021, alleging that Defendants' enforcement of two Virginia statutes violates the First Amendment of the United States Constitution and the Equal Protection Clause of the Fourteenth Amendment.[2] (Am. Compl., ECF No. 21.)

Defendants argue in their Motions to Dismiss that Plaintiff fails to state a claim upon which relief may be granted. Defendant Hade additionally argues that he enjoys sovereign immunity and thus, this Court does not have subject matter jurisdiction over him. (Def. Hade's Mem. Supp. at 4–5, ECF No. 23.) The parties have submitted

[1] The Court will refer to Defendant Hade and Defendant Smith collectively as "Defendants."

[2] Plaintiff's original Complaint was filed on July 15, 2021. (Compl., ECF No. 1.)

memoranda in support of their respective positions. On January 10, 2022, the Court heard oral argument on the issues, and the Motions to Dismiss are now ripe for review. For the reasons stated herein, the Court will grant the Motions as to Count Three but deny the Motions in all other respects.

## I. BACKGROUND

At its foundation, this case involves a web of Virginia statutes that govern public access to civil court records. In Virginia, the clerk of the circuit court for each county "shall have custody of and shall keep all court records . . . in their offices or at such location otherwise designated by the clerk." Va. Code § 17.1-242. In all Virginia circuit courts, clerks provide the public with access to these court records at the physical courthouse.[3] (Am. Compl. ¶ 3.) Beyond access at the courthouse, some circuit courts provide access to civil court records remotely, via the internet, on a system called "Virginia Officer of the Court Remote Access" ("OCRA"). (*Id.* ¶ 3.) It is *optional* for each circuit court clerk to have their records accessible via OCRA, but approximately 90 circuit courts do so. Va. Code § 17.1-293(E)(7); (Am. Compl. ¶ 35).

OCRA provides online access to the same civil court records that are accessible at physical courthouses. (Am. Compl. ¶ 52.) However, OCRA is subject to two important statutory limitations. First, OCRA is only accessible to Virginia-licensed attorneys, their staff, and related government officials (the "non-attorney access restriction"). Va. Code

[3] Those filing civil court records must redact all but the last four digits of social security numbers, driver's license numbers, and other identification numbers. Va. Code § 8.01-420.8(A).

§ 17.1-293(E)(7).[4] Second, OCRA users may not sell, post, or redistribute to a third party any "data" accessed on OCRA unless the "data" is included in a product or service created by the OCRA user and the data is not made available to the general public (the "dissemination restriction"). *Id.* § 17.1-293(H).[5]

Even so, circuit court clerks may provide the public with remote online access to civil court records via their own case management system outside of OCRA. (*Id.* § 17.1-225.) While this option is available, the Amended Complaint does not mention any circuit court that has created such a system.[6]

CNS is a nationwide news service that reports on civil cases in all 50 states

---

[4] The full text of Va. Code § 17.1-293(E)(7) reads:

> [A clerk may provide] secure remote access to nonconfidential court records, subject to any fees charged by the clerk, to members in good standing with the Virginia State Bar and their authorized agents, pro hac vice attorneys authorized by the court for purposes of the practice of law, and such governmental agencies as authorized by the clerk.

[5] The full text of Va. Code § 17.1-293(H) reads:

> Nothing in this section shall be construed to permit any data accessed by secure remote access to be sold or posted on any other website or in any way redistributed to any third party, and the clerk, in his discretion, may deny secure remote access to ensure compliance with these provisions. However, the data accessed by secure remote access may be included in products or services provided to a third party of the subscriber provided that (i) such data is not made available to the general public and (ii) the subscriber maintains administrative, technical, and security safeguards to protect the confidentiality, integrity, and limited availability of the data.

[6] The information a circuit court clerk may provide via a public remote access system is also more limited than the information available on OCRA. OCRA may contain documents with actual signatures, dates of birth, maiden names, and the names of minor children, while public online remote systems may not. *See* Va. Code §§ 17.1-293(B), (E)(7). Of course, filings in OCRA, or an additional system created by a circuit court clerk, would also have confidential information redacted according to Va. Code § 8.01-420.8(A); *see id.* § 17.1-293(A) (requiring full redaction in a non-OCRA online system).

including Virginia (Am. Compl. ¶ 24), and CNS reporters have traditionally traveled to Virginia circuit courts in each county to access the civil court records provided in physical courthouses. (*Id.* ¶ 31.) In an effort to save money and travel time, CNS asked many circuit court clerks for access to OCRA even though its staff members are not licensed attorneys. (*Id.* ¶ 64.) Every circuit court clerk denied CNS access to OCRA. (*Id.*)

Despite the statutory prohibition, the Clerk of the Circuit Court for Prince William County, Defendant Smith, offered to give CNS access to OCRA for a higher price than Virginia attorneys. (*Id.* ¶¶ 65–74.) At the hearing on January 10, 2022, however, counsel for Defendant Smith made clear that she no longer offers CNS access to OCRA and, in her opinion, the Virginia law bars her from doing so.

As CNS was seeking access to OCRA through individual circuit court clerks, it also sought access through the Office of the Executive of the Supreme Court of Virginia ("OES"). Defendant Hade is the Executive Secretary of OES. While circuit court clerks upload court records to the system and control those records, OES "operates and maintains" the servers and websites that OCRA exists on. Va. Code § 17.1-502(A); (Am. Compl. ¶ 16).

When CNS asked OES for access to OCRA, OES stated that it was not legally authorized to provide access because OCRA is limited to "members in good standing with the Virginia State Bar" and all court documents, though viewable on OCRA, are "under the custody and control of the circuit court clerks." (Am. Compl. ¶ 72.) Moreover, OCRA's website, which OES controls, states that OCRA "is intended solely

for the use of authorized Officer of the Court personnel . . . and [a]ll other use is expressly prohibited." (*Id.* ¶ 53.) Lastly, Robert Smith, then-Director of the Department of Judicial Information and Technology for OES and an employee of Defendant Hade, stated that it has "always been [OES'] stance that the [Va. Code] does not support providing [OCRA] to anyone other than members of the bar." (*Id.* ¶ 59.)

CNS now brings three claims via 42 U.S.C § 1983 against Defendants. First, CNS alleges that Defendants' enforcement of OCRA's non-attorney access restriction, Va. Code § 17.1-293(E)(7), violates the First Amendment (Count One). (*Id* ¶¶ 86–93.) Second, CNS alleges that Defendants' enforcement of OCRA's dissemination restriction, Va. Code § 17.1-293(H), violates the First Amendment (Count Two). (*Id.* ¶¶ 86–101.) Third, CNS alleges that Defendants discriminated against it by enforcing OCRA's non-attorney access restriction in violation of the Equal Protection Clause of the Fourteenth Amendment (Count Three). (*Id.* ¶¶ 102–107.)

## II. STANDARD OF REVIEW

First, Defendant Hade submitted a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(1). (ECF No. 22.) A motion made pursuant to Rule 12(b)(1) challenges the Court's jurisdiction over the subject matter of a complaint. Such a challenge can be facial, asserting that the facts as pled fail to establish jurisdiction, or factual, disputing the pleadings themselves and arguing that other facts demonstrate that no jurisdiction exists. *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017) (quoting *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009)). For a facial challenge, "the plaintiff is 'afforded the same procedural protection as she would receive under a Rule 12(b)(6) consideration.'"

*Id.* Defendant Hade is making a facial challenge. (Def. Hade's Reply at 2, ECF No. 37.) Thus, the familiar Rule 12(b)(6) standard of review applies to his Motion to Dismiss even though it was motioned for under Rule 12(b)(1). *See Beck*, 848 F.3d at 270.

A Rule 12(b)(6) motion "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013) (quoting *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). "A complaint need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (alteration in original) (quoting *Tobey*, 706 F.3d at 387). However, a "complaint must provide 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Turner v. Thomas*, 930 F.3d 640, 644 (4th Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Allegations have facial plausibility 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Tobey*, 706 F.3d at 386 (quoting *Iqbal*, 556 U.S. at 679). A court, however, "need not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *Turner*, 930 F.3d at 644 (quoting *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012)). In considering such a motion, a plaintiff's well-pleaded allegations are taken as true, and the complaint is viewed in the light most favorable to the plaintiff. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). Legal conclusions enjoy no such deference. *Iqbal*, 556 U.S. at 678.

## III. ANALYSIS

First, Defendant Hade asks the Court to dismiss Plaintiff's Amended Complaint under Rule 12(b)(1) because he enjoys sovereign immunity under the Eleventh Amendment. The Eleventh Amendment "render[s] States immune from being hauled into federal court by private parties." *Wright v. North Carolina*, 878 F.3d 256, 261 (4th Cir. 2015). State officers being sued in their official capacity receive sovereign immunity to the same extent as the state itself. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). *Ex Parte Young*, 203 U.S. 123 (1908), however, creates an expansive exception to sovereign immunity where state officers may be sued in their official capacity when the plaintiff is only seeking prospective injunctive relief to remedy the enforcement of an unconstitutional statute. *Id.* at 159–60. To fit within the exception, the officer must have a "special relation" to the challenged policy or statute; and (2) the officer must have "acted or threatened" to enforce the policy or statute. *McBurney v. Cuccinelli*, 616 F.3d 393, 402 (4th Cir. 2010).

Defendant Hade argues that he has no special relation to the challenged statutes here and never acted or threatened to enforce them. Yet, the Amended Complaint contains many factual allegations to the contrary. First, when CNS asked OES for access to OCRA, OES sent a letter denying CNS access because access is limited to "members in good standing with the Virginia State Bar" and because circuit court clerks control the information in OCRA, not OES. (Am. Compl. ¶ 72; *see* OES Letter, ECF No. 21-6.) Defendant Hade argues that this letter proves he has no authority to grant anyone access to OCRA and instead circuit court clerks must grant access. Read more closely,

however, the letter stipulates that OES refused to grant CNS access for *two* reasons. While one of these reasons was that circuit court clerks were the ultimate controllers of all court records, the other reason was the exact issue in this case: CNS and its reporters are not Virginia-licensed attorneys. This statement creates the reasonable inference that, even if CNS received permission from a circuit court clerk to access OCRA, Defendant Hade and OES would still deny CNS access because its reporters are not attorneys. *See Tobey*, 706 F.3d at 386.

Moreover, the OCRA website, which Defendant Hade operates and maintains, states that OCRA "is intented solely for the use of authorized Officer of the Court personnel . . . and [a]ll other use is expressly prohibited." (Am. Compl. ¶ 53.) Even if CNS received permission from a circuit court clerk to access OCRA, it would still be confronted with this overt warning that, since its employees are not attorneys, its access is "expressly prohibited." (*Id.* ¶ 53.) Lastly, an OES employee, in response to a deposition question, stated that it has "always been [OES'] stance that the [Va. Code] does not support providing [OCRA] to anyone other than members of the bar." (*Id.* ¶ 59.)

Based on the Amended Complaint, even accepting Defendant Hade's argument that he does not have unilateral control over court records inside of OCRA, CNS has adequately alleged that he maintains a "special relation" to the challenged policy and has "acted or threatened" to enforce it. *McBurney*, 616 F.3d at 402.[7] Thus, the Court has subject matter jurisdiction over the claims against Defendant Hade and his Motion to

[7] If discovery reveals that Defendant Hade does not have any power to enforce the challenged statutes, then he may, of course, make an appropriate motion at a later stage in this case.

Dismiss will be denied.

Next, the Court turns to Defendants' Motions to Dismiss under Rule 12(b)(6). (ECF Nos. 24, 26.) In Count One, Plaintiff alleges that Defendants' enforcement of OCRA's non-attorney access restriction, Va. Code § 17.1-293(E)(7), violates the First Amendment. It is well-settled that the press and public have a right of access to most, if not all, civil court records. *See Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 328 (4th Cir. 2021) (finding a right to reasonable contemporaneous access to civil complaints); *Rushford v. New Yorker Mag., Inc.*, 846 F.2d 249, 253 (4th Cir. 1988) (finding right to access summary judgment documents). Federal courts and most state courts allow the public to access these civil records via an online remote system. (Pl.'s Mem. Opp'n at 23–24, ECF No. 33.) Plaintiff, however, is not alleging that the public has a fundamental right to remotely access civil court records guaranteed by the First Amendment.[8] Instead, Plaintiff argues that *if* Defendants provide Virginia attorneys remote access to civil court records, *then* the First Amendment also requires them to provide the public with remote access.

In effect, Plaintiff argues that Defendants are limiting an already established fundamental right, the right to access civil court records, in an unconstitutional manner by giving one group, Virginia lawyers, remote access while denying it to others. Strict

[8] If that were Plaintiff's contention, the experience and logic test would guide this Court's analysis. *Press-Enter. Co. v. Superior Ct.*, 478 U.S. 1, 8–10 (1986); *Schaefer*, 2 F.4th at 326. While parties discuss the experience and logic test at length in their briefs, the Court need not do so here because, applying the test, the United States Court of Appeals for the Fourth Circuit has already held that the public has the right to "reasonably contemporaneous access to civil complaints." *Schaefer* 2 F.4th at 328.

scrutiny ordinarily applies to an alleged violation of the First Amendment. *Schaefer*, 2 F.4th at 328; *Globe Newspaper Co. v. Superior Ct. for Norfolk Cty.*, 457 U.S. 596, 606 (1982). But when a limitation on a right of access resembles a "time, place, and manner" restriction, the Court should apply more relaxed scrutiny. *Schaefer*, 2 F.4th at 328; *Globe Newspaper*, 457 U.S. at 607 n.17. The non-attorney access restriction challenged here does not stop CNS from accessing civil court records altogether but instead controls how and when it accesses them. Thus, it resembles a time, place, and manner restriction and relaxed scrutiny applies.

In this case, relaxed scrutiny requires the limitation to be "content-neutral,[9] narrowly tailored and necessary" to preserve a "significant governmental interest." *Schaefer*, 2 F.4th at 328 (first quotation) (quoting *Courthouse News Serv. v. Planet*, 947 F.3d 581, 585 (4th Cir. 2020)); *see McCullen v. Coakley*, 573 U.S. 464, 477 (2014) (second quotation) (describing relaxed scrutiny more generally). "A regulation is narrowly tailored under this standard if it "promotes a substantial government interest that would be achieved less effectively absent the regulation" and does not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ross v. Early*, 746 F.3d 546, 552–53 (4th Cir. 2014) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781,799 (1981)).

Here, Plaintiff alleges that OCRA's non-attorney access restriction is not narrowly tailored to preserve any significant governmental interest. Defendants argue that limiting

---

[9] At this stage, the Court assumes without deciding that the non-attorney access restriction is content neutral.

OCRA access to Virginia attorneys allows them to more easily police misuses of the confidential or private information contained therein. Yet, as alleged by Plaintiff, OCRA contains identical court records that are already available to the public at physical courthouses. (*Id.* ¶ 52.) Moreover, Plaintiff alleges that all users of OCRA also must sign "Subscriber Agreements" which could also be used by Defendants to police misuse of OCRA. (*Id.* ¶ 44.)

These allegations could lead to the reasonable inference that the non-attorney access restriction is not narrowly tailored to preserve a significant governmental interest and thus, could violate the First Amendment. *See Tobey*, 706 F.3d at 386. Of course, allegations are only allegations. Through discovery, the parties may be able to solidify the contours of the government's interests in enforcing the non-attorney access restriction and the burdens placed on the public. *See Ross*, 746 F.3d at 552–53. But on a Motion to Dismiss under Rule 12(b)(6), the Court must accept all of Plaintiff's allegations as true. *Nemet Chevrolet, Ltd.*, 591 F.3d at 250. For these reasons, the Court will deny Defendants' Motions to Dismiss Count One of the Amended Complaint.

In Count Two, Plaintiff alleges that Defendants' enforcement of OCRA's dissemination restriction, Va. Code § 17.1-293(H), violates the First Amendment. Defendants' only argument for dismissing Count Two is premised on the Court finding that Count One does not state a claim. Because the Court finds that Count One does state a claim, Count Two similarly survives. The Court will deny Defendants' Motion to Dismiss Count Two of the Amended Complaint.

Lastly, in Count Three, Plaintiff alleges that Defendants discriminated against it

by enforcing OCRA's non-attorney access restriction in violation of the Equal Protection Clause of the Fourteenth Amendment. To allege a violation of the Equal Protection Clause, a plaintiff must demonstrate "that he was treated differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus." *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 108 (4th Cir. 2011). The parties do not dispute that CNS and Virginia attorneys are similarly situated. The Amended Complaint also sufficiently alleges Defendants' discriminatory animus because the statute at issue explicitly limits OCRA access to Virginia attorneys. *Morrison v. Garraghty*, 239 F.3d 648, 657 (2001) (finding discriminatory animus where prison policy overtly treats Native-Americans differently).

After a plaintiff proves he was intentionally discriminated against, the court must apply the appropriate level of scrutiny. *Id.* at 654. Strict scrutiny applies when a fundamental right or suspect class is involved. *Id.* Non-attorneys are not a suspect class. *Id.* (listing race, alienage, or national origin as suspect classifications); *Equity in Athletics*, 639 F.3d at 104 (listing sex as a suspect classification). Moreover, as noted above, Plaintiff does not argue that there is any fundamental right to access civil court records *remotely*. Thus, strict scrutiny does not apply, and Defendants need only show that their discrimination is "rationally related to a legitimate state interest." *Id.*; *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440 (1985).

Under rational basis review, the restriction "must be afforded 'a strong presumption of validity,' and 'those attacking the rationality of the [statute] have the burden to negative *every conceivable basis* which might support it." *Int'l Refugee*

*Assistance Project v. Trump*, 961 F.3d 635, 651 (4th Cir. 2020) (emphasis in original) (quoting *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314–15 (1993)). The Court "hardly ever strikes down a policy as illegitimate under rational basis review." *Trump v. Hawaii*, 138 S. Ct. 2392, 2420 (2018); *Refugee Assistance Project*, 961 F.3d at 651 (applying the same language at the motion to dismiss stage).

Here, Defendants point to at least one legitimate interest of the government: protecting confidential and private information contained in the civil court records. While Plaintiff adequately alleges that this interest may not be "significant" and "narrowly tailored" under a First Amendment framework, *McCullen*, 573 U.S. at 477, the Amended Complaint does not contain any factual allegations that the government's interest is implausible or lacks all rationality. *See City of Cleburne*, 473 U.S. at 448. It is, at a minimum, *rational* to believe that limiting OCRA access to attorneys would protect confidential and private information because attorneys are more easily regulated by the court system. Thus, the Court finds that Count Three does not state a claim for which relief may be granted under the Equal Protection Clause. The Court will grant Defendants' Motions to Dismiss as to Count Three.

## IV. CONCLUSION

The Court finds that Plaintiff's Amended Complaint adequately alleges that Defendant Hade was empowered to enforce the statutes at issue and, therefore, Defendant Hade does not enjoy sovereign immunity. Thus, the Court will deny Defendant Hade's Motion to Dismiss. (ECF No. 22.) Further, the Court finds that the Amended Complaint sufficiently states a claim for relief in Counts One and Two but fails to state a claim for

relief in Count Three. Accordingly, the Court will grant Defendants' Motions to Dismiss (ECF Nos. 24, 26) as to Count Three but deny the Motions as to Counts One and Two.

An appropriate Order will accompany this Memorandum Opinion.

/s/
Henry E. Hudson
Senior United States District Judge

Date: January 14, 2022
Richmond, Virginia

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| COURTHOUSE NEWS SERVICE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:21cv460–HEH |
| | ) | |
| KARL R. HADE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**
**(Resolving Defendants' Motions to Dismiss)**

THIS MATTER is before the Court on Defendant Karl Hade's ("Defendant Hade") Motions to Dismiss (ECF Nos. 22, 24) and Defendant Jacqueline Smith's (collectively "Defendants") Motion to Dismiss (ECF No. 26). For the reasons set forth in the accompanying Memorandum Opinion, Defendant Hade's Motion to Dismiss (ECF No. 22) is DENIED. Defendants' Motions to Dismiss (ECF Nos. 24, 26) are GRANTED IN PART. Specifically, the Court GRANTS the Motions to Dismiss as to Count Three of the Amended Complaint. In all other respects, Defendants' Motions to Dismiss (ECF Nos. 24, 26) are DENIED.

The Clerk is directed to send a copy of this Order to all counsel of record.

It is so ORDERED.

/s/
Henry E. Hudson
Senior United States District Judge

Dated: January 14, 2022
Richmond, Virginia

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| **COURTHOUSE NEWS SERVICE,** <br> **Plaintiff,** <br> **v.** <br> **KARL R. HADE**, *et al.*, <br> **Defendants.** | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | **Civil Action No.: 3:21cv460-HEH** |

**JOINT STIPULATIONS OF FACT**

Plaintiff Courthouse News Service ("CNS"), Defendant Karl R. Hade, in his official capacity as Executive Secretary of the Office of Executive Secretary of the Supreme Court of Virginia (the "Executive Secretary"), and Defendant Jacqueline C. Smith, in her official capacity as Clerk of the Circuit Court for Prince William County, Virginia (the "Prince William Clerk") stipulate and agree as follows:

**About CNS**

1. CNS is a nationwide news service that specializes in reporting on civil litigation, from the initial complaint to subsequent filings, hearings, and rulings, through the appellate level, in state and federal courts across all 50 states, including Virginia.

2. CNS now has more than 2,750 subscribers nationwide, including law firms and libraries, academic institutions, publicly traded companies, government entities, non-profit organizations, news and entertainment media outlets, and watchdog groups.

3. A wide range of news and media outlets rely on CNS to learn about new civil filings, and CNS has been credited as the original source of reporting by newspapers, legal publications, magazines, television, radio, and online media.

4. CNS offers a variety of publications. One category of publications is CNS' New Litigation Reports, which contain original, staff-written summaries of significant and newsworthy new civil complaints. New Litigation Reports focus on general jurisdiction civil complaints against business institutions, public entities, prominent individuals, or other civil actions that might be of interest to CNS' subscribers.

5. CNS publishes two New Litigation Reports in Virginia: the *Virginia Report*, which covers new litigation filed in 31 Virginia circuit courts, including the Circuit Court for Prince William County (the "Prince William Circuit Court"), and the *Southern Virginia State Report*, which covers new litigation filed in 89 Virginia circuit courts. These reports are sent to subscribers via email each weekday evening.

6. Among CNS' other publications are its monthly newsletter, the *Entertainment Digest*, as well as the *Daily Brief*, which covers published, nationwide appellate rulings, including all U.S. Supreme Court and federal circuit decisions, as well as significant rulings from federal district courts, including the district courts in Virginia.

7. CNS also publishes a publicly-available website (www.courthousenews.com) featuring news reports and commentary, which is read by hundreds of thousands of readers each month. The website functions much like a print daily newspaper, featuring staff-written articles about the news of the day from throughout the nation that are posted and rotate on and off the page on a 24-hour news cycle. Many of the stories on the website focus on ongoing court cases and rulings in state and federal courts, including those in Virginia.

8. CNS' publications do not cover criminal, domestic relations, or juvenile matters, nor do they include name changes, probate filings, or most residential foreclosure.

9. To prepare the New Litigation Reports and identify civil filings that may warrant a website article, CNS reporters have traditionally visited their assigned courts on a daily or weekly basis to review complaints and other civil court documents filed that day, or since their last visit, to determine which ones are newsworthy. However, as the vast majority of federal courts and many state courts are putting court records online via court web sites, CNS also covers courts remotely through the Internet, without the need to require reporters to travel to those courts.

10. State courts that provide remote online access to all civil filings and other court records (except for those that are recognized as confidential under any applicable law or sealed pursuant to court order), either on a statewide basis or through individual courts within the state, include California, Louisiana, Massachusetts, Oklahoma, Tennessee, and Washington – in which several of the courts are predominantly paper-filing courts – as well as courts within Alabama, Arizona, Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Indiana, Iowa, Kansas, Kentucky, Maine, Minnesota, Mississippi, Montana, Nevada, New Jersey, New Mexico, New York, North and South Dakota, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, Texas, and Utah.

11. All federal courts in the nation, including the United States district courts in Virginia, give the press and public remote online access to civil court records via PACER.

12. CNS currently employs approximately 240 people, most of them editors and reporters, who review and report on the day's civil filings filed at their assigned courthouse(s).

13. In Virginia, CNS currently employs three reporters who cover the state and federal trial and appellate courts across the state and who are based in the larger metropolitan

areas – Prince William County, Norfolk, and Richmond. Those reporters are supervised by CNS' Southeast Bureau Chief, Ryan Abbott.

14. Of the 120 Virginia circuit courts, CNS currently sends reporters to five of them on a daily basis, *i.e.*, Prince William, Fairfax, Norfolk, Richmond City, and Virginia Beach.

15. CNS currently covers one circuit court, *i.e.*, Alexandria, remotely on a daily basis by accessing new civil filings through the Internet via the Alexandria Justice Information System ("AJIS"). CNS previously covered the Alexandria Circuit Court by sending a reporter to the court on a weekly basis.

16. Twelve other circuit courts are currently covered by sending one of the three Virginia-based reporters to the court on a less than daily basis, *i.e.*, Arlington, Chesapeake, Chesterfield, Fauquier, Hampton, Hanover, Henrico, Loudoun, Newport News, Portsmouth, Stafford, and Suffolk.

17. CNS covers the remaining 102 Virginia circuit courts only with docket information, *i.e.*, party names, case type, court name, due to their remote locations.

18. The CNS reporter covering the Prince William Court, Joan Hennessey, visits the courthouse in person on a daily basis. She also covers the Fairfax County Circuit Court in person on a daily basis. Upon arrival at the clerk's office at each courthouse, Ms. Hennessey reviews all newly filed complaints and other civil filings made available since her last visit, and then reports on the newsworthy filings that day. Any cases filed and made available after she leaves the courthouse each day are not covered until the next day.

19. Ms. Hennessey also currently covers the Alexandria Circuit Court remotely via AJIS on a daily basis, while covering the circuit courts in Arlington, Fauquier, and Loudoun in person on a weekly basis.

**About the Prince William Clerk and Virginia Circuit Courts**

20. The Prince William Clerk, Jacqueline C. Smith, was elected the Clerk of the Circuit Court for Prince William County, Virginia in April 2017.

21. The Prince William Clerk is an independently elected constitutional officer and serves as the custodian of all court records, including books, evidence, records, maps, and papers, deposited in her offices or other locations designated by her, including records stored in electronic format whether in the clerk's office or elsewhere, and the clerk is responsible for making those records available to the public for inspection and examination.

22. The Prince William Clerk is also responsible for developing and implementing the policies and procedures for operating the Prince William Circuit Court Clerk's Office, in conformance with applicable law, including those relating to access to non-confidential civil filings and other court records that are filed in the Prince William Circuit Court.

23. The term "non-confidential civil filings" and "non-confidential civil court records" as used herein shall mean any civil filing or other court record maintained by a clerk of a Virginia circuit court that is not recognized as confidential under any applicable law or sealed pursuant to court order.

24. In all Virginia circuit courts, including the Prince William Circuit Court, upon request, and subject to other demands of their office, clerks provide the public and press with access to non-confidential civil filings and other court records filed in their respective courts at the physical courthouse.

25. The Prince William Clerk provides the public and press, including CNS, with access to non-confidential electronic civil court records, including new filings and court rulings, through its public access terminals located in the Civil Division during normal business hours.

26. The Civil Division of the Prince William Clerk's Office is open to the public Monday through Friday, 8:30 a.m. to 5:00 p.m.

27. Since 2012, the Prince William Clerk has also provided all subscribers, whom the Clerk approves and authorizes, with remote online access to electronic images of all non-confidential civil court records filed in the Prince William Circuit Court, including new filings and court rulings, through an application known as the Officer of the Court Remote Access System ("OCRA"). OCRA is provided by OES to the Prince William Clerk and any other interested circuit court clerks. Currently, in addition to the Prince William Clerk, clerks for 104 other Virginia circuit courts provide subscribers, whom those clerks likewise approve and authorize, with remote online access to electronic images of certain non-confidential civil court records filed in their respective courts through OCRA. Other circuit clerks have acquired similar applications provided by private vendors.

28. The Prince William Clerk does not offer remote online access to civil court records to any members of the press or public unless they are a Virginia-barred attorney or the staff member of a Virginia licensed attorney.

**<u>About the Executive Secretary</u>**

29. The Executive Secretary serves as the administrator of the Virginia circuit court system, which includes the operation and maintenance of a case management system utilized by many circuit court clerks, including the Prince William Clerk, to conduct the business of the clerk's office.

30. The case management system used by the Prince William Clerk, as well as all but two Virginia circuit court clerks, which helps manage their court records, including new civil filings, is known as the Circuit Court Case Management System ("CCMS"), which was created,

and is now operated and maintained, by the Office of the Executive Secretary of the Supreme Court of Virginia ("OES").

31. In response to demand from circuit clerks, OES created, and now supports and maintains, a Case Imaging System ("CIS") that enables participating circuit courts, including the Prince William Circuit Court, to create and store electronic images of case documents that the clerk may, if he or she so chooses, make available for viewing by members of the public and press on public access terminals at the courthouse. The Prince William Clerk makes electronic images of case documents available for viewing by the public and press in this manner. Clerks using CCMS may or may not use CIS.

**About the Virginia Information Technologies Agency (VITA)**

32. Virginia Information Technologies Agency ("VITA") is the state agency "responsible for the administration and enforcement of" Chapter 20 of Title 2.2, which is the Chapter of the State Code related to Information Technology. *See* Virginia Code § 2.2-2005 *et. seq.*

33. VITA has developed and promulgated Information Technology Resource Management (ITRM) Standard SEC503-02.2: Security Standard for Restricted Remote Access to Documents on Court-Controlled Websites, available at https://www.vita.virginia.gov/media/vitavirginiagov/it-governance/psgs/pdf/RemoteAccessDocsCrtContrdSEC503.pdf.

34. VITA Standard SEC503-02.2 includes a model Application for Internet Access to Records Management System. This Standard also includes a model Subscriber Agreement For Internet Access to Circuit Court Documents.

**About OCRA Access**

35. OES also created, and now supports and maintains, OCRA, which is an application developed by OES for circuit courts that use CIS. The OCRA application enables circuit clerks to make non-confidential CIS case images available for secure online viewing by their subscribers at https://cisweb.vacourts.gov/Ocra. Clerks using CCMS may or may not use OCRA.

36. The records viewable through the OCRA application are stored on local servers controlled by the respective local circuit court clerks.

37. An OCRA subscriber is responsible for paying any subscriber fee charged by the circuit court clerk and for the proper use of the secure remote access system pursuant to the subscriber agreement and applicable Virginia law. OES has no statutory authority to set the subscriber fee and does not receive any part of the fee from individual subscribers.

38. The Executive Secretary provides maintenance and technical support for the OCRA platform for those Virginia circuit courts, such as the Prince William Clerk, that pay for this support and utilize OCRA. The application for government OCRA access is provided to clerks free of charge. There is a sliding scale for annual maintenance charges for clerks who have five (5) or more private (non-governmental) subscribers: the annual maintenance charge is $500 for clerks with 5-14 private subscribers; $1,500 for clerks with 15-34 private subscribers; $3,500 for clerks with 35-54 private subscribers; $5,500 for clerks with 55-94 private subscribers; and $9,500 for clerks with 95 – 400 private subscribers.

39. The Prince William Clerk currently has 269 private subscribers to OCRA, and pays OES an annual maintenance charge of $9,500.

40. To log in to the OCRA System, a subscriber visits a centralized website (https://cisweb.courts.state.va.us/Ocra/login/577728/a.html) – which OES provides and maintains for the participating circuit clerks – and enters his/her e-mail address, password, and bar number or assigned authorized subscriber number. The OCRA login page states: "This system is intended solely for the use of authorized Officer of the Court personnel to retrieve and review court documents they are specifically authorized to view. All other use is expressly prohibited." Each participating clerk ultimately determines who is authorized to access the clerk's records via OCRA, pursuant to and in compliance with applicable law.

41. For circuit court clerks that use OCRA, the clerk or someone designated by the clerk serves as the court's OCRA Administrator and this person is responsible for both approving and adding subscribers and for removing them, pursuant to and in compliance with applicable law. The court's OCRA Administrator is responsible for providing their subscribers with a username and temporary password that allows the subscriber to initially log in, and when the subscriber does log in, he/she will be prompted to change their password after their first log in. If OES receives questions about subscriber access, these are referred to the designated OCRA Administrator in the circuit clerk's office. If a clerk determines that a subscriber is authorized to have access to OCRA, pursuant to and in compliance with applicable law, then that subscriber will be provided access to OCRA. OES does not in any way evaluate or screen potential subscribers once the clerk determines they are authorized. OES receives the name and email addresses of subscribers but does not receive other information and does not know if a subscriber is a licensed attorney.

42. The OCRA application has been provided to 105 out of 120 Virginia circuit courts, including the Prince William Circuit Court, and these clerks now offer OCRA to their subscribers.

43. According to the Attorney Subscriber Agreement For Remote Access to Prince William County Circuit Court Case Documents (the "Attorney Subscriber Agreement") "[t]he subscription fee is $200.00 per year for 1 attorney and 1 employee" and any "additional employee for the attorney is $75 per individual per year." CNS is willing to enter into an agreement with each circuit court clerk, including the Prince William Clerk, and to pay a similar subscriber's fee for OCRA access to the Prince William Circuit Court and other circuit courts throughout Virginia for its non-attorney employees.

44. After paying a subscriber's fee and registering for OCRA, Virginia attorneys and their staff have the ability to view non-confidential civil filings that each court clerk has made available through OCRA remotely over the Internet – on any day of the week, at any time of day, and from any location in the world. To access the same court records without OCRA or an alternative means of remote access, CNS and other members of the press and public must travel to each individual courthouse that uses OCRA, including the Prince William Circuit Court, during business hours.

45. Subscribers, who are authorized and approved by the circuit court clerk, pursuant to and in compliance with applicable law, and who use OCRA have access to civil filings and records in their own cases, as well as filings and records in other cases in which they are not attorneys of record, parties, or otherwise involved, provided those records are scanned into CIS. Not all historical civil court records in a particular circuit court are viewable on OCRA because

each circuit court that uses OCRA began scanning records into CIS at different times. The Prince William Court began doing so in 2009.

46. A new non-confidential civil filing filed at the Prince William Circuit Court, and other Virginia circuit courts, goes through several stages before it is available for viewing online at either the courthouse via public access terminals or remotely via OCRA: (1) initial intake; (2) data entry into CCMS; and (3) scanning into CIS.

47. Once a new civil filing is scanned into CIS, it can be viewed by the press and public via public access terminals at courthouses that provide public terminals, like the Prince William Circuit Court, almost immediately and on OCRA, by subscribers authorized by the circuit clerk shortly thereafter, usually within five minutes of being scanned into CIS.

48. For courts that provide public access terminals at the courthouse, like the Prince William Circuit Court, every civil court record that is available remotely on OCRA has already been made available to the public and press via public access terminals at the courthouse in which the record was filed.

49. There is no difference in the content of the court records that CNS and other members of the press and public must travel to each individual court to see, and the court records that subscribers authorized by the circuit clerk can see remotely over the Internet via OCRA – they are the same records.

50. CNS and other members of the press and public must pay a per page charge for any paper copies of civil court records that they request at the courthouse. Those with OCRA subscriber access can download, save, and print out civil court records as part of their OCRA subscription fee.

51. Pursuant to Va. Code § 8.01-420.8, effective July 1, 2014, those filing civil court records in Virginia circuit courts, including the Prince William Circuit Court, are required to redact all but the last four digits of social security numbers or other identification numbers appearing on a driver's license, credit card, debit card, bank account, or other billing or payment system. The Prince William Clerk and her staff review new civil filings for any unredacted social security numbers or other identification numbers appearing on a driver's license, credit card, debit card, bank account, or other billing or payment system and, if discovered, redact such information before scanning the filing into CIS.

52. In 2018, the General Assembly passed a budget appropriations bill that required OES to convene a workgroup to evaluate issues related to the potential statewide adoption of electronic filing of civil cases in circuit courts and to evaluate the implementation of a system in which digital images of non-confidential records within civil cases in circuit courts may be viewed by subscribers of that system. The workgroup's findings are available at https://rga.lis.virginia.gov/Published/2018/RD526/PDF, and those findings shall be admissible for the purpose of this lawsuit.

**CNS' Requests for OCRA Access**

53. In 2016, CNS requested OCRA access from 46 Virginia circuit court clerks that utilized OCRA at that time. Many did not respond. Of the Virginia circuit court clerks who did respond, they either denied OCRA subscriber access outright or offered CNS OCRA subscriber access if the CNS subscriber was a Virginia-barred attorney.

54. In May 2021, CNS, through its Southeast Bureau Chief, Ryan Abbott, wrote to the Prince William Clerk to request OCRA access. In response, the Prince William Clerk sent a

letter to Mr. Abbott, dated May 13, 2021, denying CNS access to OCRA because Mr. Abbott did not include a Virginia bar license number and a copy of a Virginia bar card with his application.

55. Neither Mr. Abbott nor any of CNS' reporters covering Virginia are attorneys or licensed to practice law in Virginia.

56. In or around January 2019, the Prince William Clerk requested an Opinion from the Attorney General regarding "whether a circuit court clerk may provide members of the press with secure remote access to nonconfidential court records" under Va. Code § 17.1-293. In response to that inquiry, on June 25, 2021, the Prince William Clerk received an informal opinion and advice from Robert B. McEntee, an Assistant Attorney General for the Commonwealth of Virginia and the Executive Secretary's counsel in this case, representing only his "individual view." Mr. McEntee's individual view is that "the Code of Virginia grants circuit court clerks the ability to provide secure remote access to nonconfidential court records to members of the general public under § 17.1-225" but that "[b]ecause systems like OCRA … exist in part to facilitate access by officers of the court to protected private information pursuant to § 17.1-293(E)(7), circuit court clerks cannot grant the general public remote access to nonconfidential documents through OCRA."

57. The Prince William Clerk denies that she has now, or had at any time, discretion to provide CNS access to OCRA.

58. On March 31, 2021, CNS, through its counsel, wrote to the Executive Secretary and also OES' Director of Judicial Information Technology, Michael J. Riggs, Sr., requesting that CNS be permitted remote online access to OCRA.

59. On April 22, 2021, the Executive Secretary, through OES' Assistant Executive Secretary and Counsel, Edward M. Macon, responded by stating, in part, "The circuit court

clerks are the legal custodians of all circuit court records." After citing Va. Code § 17.1-293 and stating that OCRA access is limited to "members in good standing with the Virginia State Bar and their authorized agents," Mr. Macon also stated that "the contents and records that are viewable [on OCRA] are under the custody and control of the circuit court clerks." Mr. Macon then concluded, "For the foregoing reasons, [the Executive Secretary is] not in a position to provide you with the access you request."

Dated: May 4, 2022

____*Dabney Carr /s/*______________

Dabney J. Carr, IV (VSB No. 28679)
**Troutman Pepper Hamilton Sanders LLP**
1001 Haxall Point
Richmond, VA 23219
Tel: (804) 697-1238
Fax: (804) 697-1339
dabney.carr@troutman.com

*Counsel for Plaintiff Courthouse News Service*

Jonathan E. Ginsberg (admitted *pro hac vice*)
**Bryan Cave Leighton Paisner LLP**
1290 Avenue of the Americas
New York, NY 10104
Tel: (212) 541-2000
Fax: (212) 541-4630
jon.ginsberg@bclplaw.com

Jessica R. Blaemire (VSB No. 96356)
**Bryan Cave Leighton Paisner LLP**
1155 F Street, NW, Suite 700
Washington, DC 20004
Tel: (202) 508-6000
Fax: (202) 508-6200
jessica.blaemire@bclplaw.com

___*John C. Altmiller /s/*______

John C. Altmiller (VSB No. 34902)
Heather R. Steele (VSB No. 75473)
**Pesner Altmiller Melnick DeMers & Steele PLC**
8000 Westpark Drive, Suite 600
Tysons, VA 22102
Tel: (703) 506-9446
Fax: (703) 506-0929
jaltmiller@pesner.com
hsteele@pesner.com

*Counsel for Defendant Jacqueline C. Smith*

Erin McNeill

Robert B. McEntee, III (VSB No. 89390)
Erin R. McNeill (VSB No. 78816)
Assistant Attorneys General
**Office of the Attorney General**
202 North Ninth Street
Richmond, VA 23219
Tel: (804) 786-8198 (McEntee)
Tel: (804) 317-0977 (McNeill)
rmcenteeiii@oag.state.va.us
emcneill@oag.state.va.us

*Counsel for Defendant Karl R. Hade*

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| **COURTHOUSE NEWS SERVICE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.: 3:21cv460-HEH** |
| | ) | |
| **KARL R. HADE**, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**STIPULATION AND ORDER FOR**
**DISMISSAL OF KARL R. HADE WITHOUT PREJUDICE**

Plaintiff Courthouse News Service ("CNS"), Defendant Karl R. Hade, in his official capacity as Executive Secretary of the Office of Executive Secretary of the Supreme Court of Virginia (the "Executive Secretary"), and Defendant Jacqueline C. Smith, in her official capacity as Clerk of the Circuit Court for Prince William County, Virginia (the "Prince William Clerk") (together with the Executive Secretary, "Defendants") state as follows:

WHEREAS, on July 15, 2021, CNS commenced this action alleging, among other things, that Defendants violate the First Amendment of the United States Constitution by restricting remote access to Virginia-barred attorneys and their staff through a system called the Officer of the Court Remote Access System ("OCRA") (*see* ECF No. 1);

WHEREAS, on September 14, 2021, CNS filed its Amended Complaint (*see* ECF No. 21); and

WHEREAS, following discovery, the parties have met and conferred and agree that the Executive Secretary shall be dismissed from this action without prejudice;

WHEREFORE, the parties hereby stipulate and agree:

1. This case shall be dismissed solely as against the Executive Secretary without prejudice, and such dismissal shall take effect upon this stipulation being so ordered by the Court;

2. Nothing contained in this stipulation shall be construed as an adjudication on the merits of claims that the parties may have against each other or any other party, or as an admission or acknowledgment of any claim or defense as against the other by any party; and

3. Upon the dismissal without prejudice of the Executive Secretary, the caption for this action shall be amended to delete the Executive Secretary therefrom.

Dated: May 23, 2022

*/s/ Dabney Carr*

Dabney J. Carr, IV (VSB No. 28679)
**Troutman Pepper Hamilton Sanders LLP**
1001 Haxall Point
Richmond, VA 23219
Tel: (804) 697-1238
Fax: (804) 697-1339
dabney.carr@troutman.com

Jonathan E. Ginsberg (admitted *pro hac vice*)
**Bryan Cave Leighton Paisner LLP**
1290 Avenue of the Americas
New York, NY 10104
Tel: (212) 541-2000
Fax: (212) 541-4630
jon.ginsberg@bclplaw.com

Jessica R. Blaemire (VSB No. 96356)
**Bryan Cave Leighton Paisner LLP**
1155 F Street, NW, Suite 700
Washington, DC 20004
Tel: (202) 508-6000
Fax: (202) 508-6200
jessica.blaemire@bclplaw.com

*Counsel for Plaintiff*
*Courthouse News Service*

___*/s/ Heather R. Steele*__________
John C. Altmiller (VSB No. 34902)
Heather R. Steele (VSB No. 75473)
**Pesner Altmiller Melnick**
**DeMers & Steele PLC**
8000 Westpark Drive, Suite 600
Tysons, VA 22102
Tel: (703) 506-9446
Fax: (703) 506-0929
jaltmiller@pesner.com
hsteele@pesner.com

*Counsel for Defendant*
*Jacqueline C. Smith*

__*/s/ Robert B. McEntee*______________
Robert B. McEntee, III (VSB No. 89390)
Erin R. McNeill (VSB No. 78816)
Assistant Attorneys General
**Office of the Attorney General**
202 North Ninth Street
Richmond, VA 23219
Tel: (804) 786-8198 (McEntee)
Tel: (804) 317-0977 (McNeill)
rmcenteeiii@oag.state.va.us
emcneill@oag.state.va.us

*Counsel for Defendant Karl R. Hade*

SO ORDERED

Dated: May __, 2022
Richmond, Virginia

______________________________
Hon. Henry E. Hudson
Senior United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>Plaintiff,<br><br>v.<br><br>JACQUELINE C. SMITH, in her official Capacity as Clerk of the Circuit Court for Prince William County, Virginia,<br><br>Defendant. | ) | Civil Action No. 3:21-cv-00460-HEH |

**NOTICE OF INTENT TO INTERVENE**

In response to plaintiff's Amended Complaint (ECF No. 21) that challenges the constitutionality of Virginia Code § 17.1-293, the Commonwealth of Virginia hereby notifies the Court that it intervenes of right, pursuant to 28 U.S.C. § 2403(b) and Federal Rule of Civil Procedure 5.1, to defend the constitutionality of Virginia Code § 17.1-293.

Dated: May 31, 2022

Respectfully submitted,

Commonwealth of Virginia

By: *__/s/ Robert B. McEntee, III__*

Jason S. Miyares
*Attorney General*

Steven G. Popps
*Deputy Attorney General*

Jacqueline C. Hedblom
*Senior Assistant Attorney General/*
*Acting Trial Section Chief*

Robert B. McEntee, III (VSB No. 89390)
Erin R. McNeill (VSB No. 78816)
Assistant Attorneys General
Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-8198 – Telephone
(804) 371-2087 – Facsimile
rmcenteeiii@oag.state.va.us
emcneill@oag.state.va.us

**CERTIFICATE OF SERVICE**

I hereby certify that on May 31, 2022, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record for the parties.

*/s/ Robert B. McEntee, III*
Robert B. McEntee, III

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| COURTHOUSE NEWS SERVICE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:21cv460–HEH |
| | ) | |
| KARL R. HADE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

THIS MATTER is before the Court on the parties' Stipulation and Order for Dismissal of Karl R. Hade Without Prejudice filed pursuant to Federal Rule of Civil Procedure 41(a)(1). (ECF No. 60.) The parties represent that Karl R. Hade, in his official capacity as Executive Secretary of the Office of Executive Secretary of the Virginia Supreme Court, should be dismissed from this action. Therefore, it appearing appropriate to do so, the Motion is GRANTED. Karl R. Hade, in his official capacity as Executive Secretary of the Office of Executive Secretary of the Virginia Supreme Court, is DISMISSED WITHOUT PREJUDICE.

The Clerk is directed to send a copy of this Order to all counsel of record.

It is so ORDERED.

/s/
Henry E. Hudson
Senior United States District Judge

Date: June 1, 2022
Richmond, VA

**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>Plaintiff,<br><br>v.<br><br>JACQUELINE C. SMITH, in her official capacity as Clerk of the Circuit Court for Prince William County, Virginia,<br><br>Defendant,<br><br>and<br><br>THE COMMONWEALTH OF VIRGINIA,<br><br>Intervenor-Defendant. | Civil Action No. 3:21-cv-00460-HEH |

**DEFENDANT COMMONWEALTH OF VIRGINIA'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

The Commonwealth of Virginia (the "Commonwealth"), by counsel, hereby submits its memorandum of law in support of its motion for summary judgment. It states the following:

## INTRODUCTION

Plaintiff Courthouse News Service ("Plaintiff" or "CNS") challenges the constitutionality of Virginia's statutory scheme governing remote access to court records. Each Virginia circuit court clerk maintains civil court records, which the public may access by visiting the courthouse. In addition to this public access, some Virginia circuit court clerks also permit Virginia-licensed attorneys, their agents, and certain governmental agencies to view nonconfidential court records online through a paid-subscription system called Officer of the Court Remote Access ("OCRA").

CNS's lawsuit is premised on the notion that if Virginia's judicial system offers licensed attorneys remote access to civil court records via paid subscriptions, then the First Amendment compels it to also offer that same access to everyone. ECF No. 21 ¶ 76; ECF 48 at 9.

The Constitution, however, does not mandate online public access to records. Instead, the reasonable statutory restrictions on online court record access are narrowly tailored to further significant governmental interests. Limiting online access to court records—many of which contain private and personally identifiable information—to a narrow class of qualified court officers promotes critical privacy and security interests by sharply reducing the amount of private, sensitive information let out into the world, limiting the potential for widespread information harvesting, resale, and dissemination. Unlike reporters or the general public, licensed attorneys are subject to professional ethical rules that further reduce the risk that private information in court records will be misused. The "time and expense" required to review "documents in person," ECF No. 21 ¶ 77, similarly minimizes privacy risks through "practical obscurity". In the language of privacy scholars, information contained in court files stored at courthouses is "practically obscure" due to the logistical barriers to amassing large amounts of private information. Due to those barriers, private and sensitive information can appear in public records without creating a risk of actual widespread public disclosure or harm. David S. Ardia, *Privacy and Court Records: Online Access and the Loss of Practical Obscurity*, 2017 U. Ill. L. Rev. 1385 (2017).

Of course, the press and public enjoy a qualified right of access to nonconfidential civil court records, which helps ensure the transparency of the courts. But that right of access is qualified because it must not undermine the fair, orderly, and efficient administration of government. Unlimited public OCRA access would allow third parties interested in obtaining

private information to write a computer script and download every social security number ever printed on the face of a court record in a jurisdiction, exposing vulnerable litigants to harmful data mining and exploitation— all from anywhere in the world. The Constitution does not require Virginia's judicial system to facilitate such exploitation. Accordingly, this Court should grant the Commonwealth's motion for summary judgment.

## FACTS

The parties' Joint Stipulations of Fact, Dkt. No. 55, provide the relevant facts supporting the Commonwealth's Motion for Summary Judgment. In addition to these stipulations, the Commonwealth has identified further undisputed facts supporting its substantial governmental interests in protecting the private information contained in nonconfidential court filings while preserving the fair, orderly and efficient administration of justice. *See Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 328 (4th Cir. 2021). These additional facts demonstrate that OCRA would be particularly vulnerable to malicious and exploitative data mining if it were available to the public at large.

Data capture and analysis is an emerging and highly lucrative field of business in the modern world. There are innumerable ways in which entities harness data for commercial use. For instance, Major League Baseball records 24 terabytes of video per game to be analyzed by a team's analytics department;[1] musicians take data gleaned from virtual concerts to tailor their shows to future audiences;[2] satellites, aircraft, and ocean buoys provide data to scientists who can measure climate change via temperatures, ocean currents, soil moisture, air quality, cloud

---

[1] Paul Overberg & Kevin Hand, *How to Understand the Data Explosion*, Wall St. J. (Dec. 8, 2021, 11:00 AM), https://tinyurl.com/mr2efah5.

[2] Anne Steele, *Armed With Data, Musicians Have Big Plans to Court Their Superfans*, Wall St. J. (Dec. 7, 2021, 10:00 AM), https://tinyurl.com/mwap8r9s.

cover, and hundreds of other phenomena on Earth and in its atmosphere.[3]

Mass data harvesting, however, can also be used for criminal and quasi-criminal purposes. Personally Identifiable Information ("PII"), such as social security numbers, original signatures, and bank account numbers can be harvested from records to uniquely identify and even impersonate an individual. Bad actors can use an identification based on harvested PII to wreak financial havoc. With small amounts of PII, thieves can, for example, "create false accounts in the person's name, incur debt, create a falsified passport or sell a person's identity to a criminal."[4] As a result, a host of federal and state laws regulate the collection, use, processing, and disclosure of PII, including, for example, the Federal Trade Commission Act. 15 U.S.C. §§ 41-58; *see, e.g.*, *In re: Capital One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d 374 (E.D. Va. 2020) (discussing Section 5 of the FTC Act creating enforceable duties with regards to data breaches); *see also* Va. Code § 59.1-442 *et seq.* (creating a right of action for individuals aggrieved by the improper use of purchaser information, dates of birth, social security numbers, or driver's license information).

Beyond the potential for identify theft and other criminal exploitation, there is growing concern that mass data harvesting—even data from the legal sale of aggregated, publicly available information—can be a threat to democracy.[5] The concerns related to legal uses of data harvested from public records were raised as early as 2013 in a government report to the chairman of the Senate Committee on Commerce, Science, and Transportation.[6] The Data

---

[3] Robert Lee Hotz, *Climate Change Data Deluge Has Scientists Scrambling for Solutions*, (Dec. 5, 2021, 11:00 AM), https://tinyurl.com/mtscjps6.
[4] Corinne Bernstein, *Personally Identifiable Information*, TechTarget, https://tinyurl.com/yms4p8um (last visited July 6, 2022).
[5] *See, e.g.*, John Sherman, *Data Brokers Are a Threat to Democracy*, Wired (Apr. 13, 2021), https://www.wired.com/story/opinion-data-brokers-are-a-threat-to-democracy/.
[6] Office of Oversight and Investigations Majority Staff. "A Review of the Data Broker Industry: Collection, Use, and Sale of Consumer Data for Marketing Purposes," Staff Report for Chairman

Broker Report noted that publicly available "government records" were a major source of consumer data sold by data brokers.[7] Data brokers mined "court filings, including criminal convictions, judgments, liens, and bankruptcies"[8] for data to resell.[9] The brokers willingly purchased access to databases containing personal information.[10] The Data Broker Report observed that although "the practice of collecting and selling consumer data . . . has existed for many decades," by 2013, "[i]nformation that was previously public but required a trip to places such as a library or courthouse to retrieve can now be instantaneously accessible to millions when posted on the Internet."[11] Data brokers sort, aggregate, and analyze this now-easily accessible information to a wide variety of buyers who use it for purposes including marketing, for determining if a person is a good risk for employment, insurance, or credit, or even to target "financially vulnerable customers" who are likely to take out payday loans and other exploitative financial products.[12] In short, mass data mining of easily accessible public records can be used for criminal ends, and even when information is not used to commit a crime, it can be used to identify and target vulnerable individuals for exploitation.

Virginia's publicly available court databases are not immune from data mining, as the

---

Rockefeller, Dec. 18, 2013, https://www.commerce.senate.gov/services/files/bd5dad8b-a9e8-4fe9-a2a7-b17f4798ee5a (last visited July 5, 2022). [hereinafter "Data Broker Report"]. Courts may take judicial notice of public records. *Philips v. Pitt Cnty. Memorial Hosp.*, 572 F3d 176, 180 (4th Cir. 2009). Reports to Senate Committees are public records. *See* S.C. v. United States, 2017 U.S. Dist. LEXIS 35946 (D. S.C. 2017) (citing to records provided to government sources or generated by government sources and available either online or by request as being "public records" that can be considered even at the motion to dismiss stage).

[7] Data Broker Reporter at 15.

[8] Privacy scholars have noted that data brokers such as Acxiom, ChoicePoint, and LexisNexis routinely mine court records for PII, specifically. Fred H. Cate, *Government Data Mining: The Need for a Legal Framework*, 43 Harv. C.R.-C.L. L. rev. 435, 457 (2008).

[9] Id.

[10] Id.

[11] *Id.* at 1-2.

[12] *Id.* at "Executive Summary."

Office of the Executive Secretary of the Supreme Court of Virginia ("OES")—the entity that supplies all information technology and technical support to the courts in the Commonwealth[13]—has discovered. **Declaration of Joby Knuth, attached as Exhibit A**. In creating technology solutions and in providing technical support, OES must comply with Virginia's laws governing the use of technology as applied to court records and the public policy concerns that animate those statutory restrictions. Va. Code § 2.2-2009(A) (providing that the Chief Information Officer of the Virginia Information Technologies Agency shall develop policies, standards, and guidelines for assessing and mitigating unauthorized data usage that "shall apply to the Commonwealth's executive, legislative, and judicial branches and independent agencies."); *see also* Dkt. No. 55 ¶¶ 33-34 (VITA's Security Standard for Restricted Remote Access to Documents on Court-Controlled Websites).

OES applies these security standards in its development and maintenance of a variety of applications for usage by the courts. *See* Dkt. No. 55 ¶¶ 29-31; **Exhibit B** ¶ 2. These applications include the Circuit Court Case Management System ("CCMS"), the Case Imaging System ("CIS"), and OCRA, an application developed by OES for circuit courts that used CIS. Dkt No. 55 ¶ 35. OES also develops and maintains applications for public use, including the General District Court Online Case Information System ("General OCIS"), the Circuit Court Online Case Information System ("Circuit OCIS"), Online Case Information System 2.0 (OCIS 2.0), and the Virginia Date of Birth Confirmation ("VDBC"). **Exhibit A** ¶ 3. Circuit OCIS allows users to search for court cases in specific, participating circuit courts, using party name, case number, or hearing date.[14] Responsive results will show case numbers, party names, date and time of the

---

[13] *Office of the Executive Secretary*, Virginia's Judicial System, https://www.vacourts.gov/courtadmin/aoc/oes/home.html (last visited July 7, 2022).

[14] *See* Circuit OCIS, ewsocis1.courts.state.va.us/CIJSWeb/Main Menu.do (last visited July 8, 2022).

next hearing, the hearing type, and the result of the case.[15] For civil cases, selecting a result will identify the attorneys, all hearings, whether judgment has been entered, the date of the final order, a list of pleadings and orders (without showing the filed documents), and whether or not service was effectuated.[16] For criminal cases, Circuit OCIS shows similar information, along with charging information and the defendant's race, sex, date of birth (with the year redacted), and ZIP code. General OCIS provides nearly identical information in response to search queries.[17]

Despite adherence to VITA's security standards, both of these systems have been subject to data harvesting tactics. **Exhibit A** ¶ 8. In 2010, for example, Joby Knuth—the Deputy Director – Application Development Manager for OES—found an inordinate amount of traffic coming from IP addresses identified as "bots"[18] through log analysis.

> Our algorithms identified sessions in which search activities resembled those typically associated with non-human behavior. For example, instead of searching for a few cases or names within a single session, the bots would enter searches for every single possible case number within the database, sequentially. They would additionally make requests, per second, far faster than what a human is capable of entering.

*Id.* ¶ 9.

The VDBC is another system designed by OES "for individuals within a registered organization to confirm a consenting individual's last name, date of birth, and last four digits of

---

[15] Id.
[16] Id.
[17] *Id.*

[18] A "bot" is a computer program that operates as an agent for a user or other program. Bots are used to automate tasks and therefore can operate without specific input from a human user once activated. Bots can replace a repetitive task a human would otherwise have to perform and are often faster at performing those tasks than a human user would be. One common task for a bot program is to gather information from websites. Ben Lutkevich & Alexander Gillis, *Definition: Bot*, TechTarget, https://www.techtarget.com/whatis/definition/bot-robot (last visited Jul. 6, 2022).

the social security number associated with criminal and traffic cases maintained in the general district court case management system." *Id.* ¶ 11. Using the VDBC, a user searches based upon any combination of the following: a full last name, partial first name, full date of birth, the last four digits of a security number, a driver's license number and/or the driver's license state. *Id.* ¶ 12. The system searches the cases available on Circuit OCIS and General OCIS and returns a list of cases which match the entered information. *Id.* It additionally gives a column for whether the entered terms match those in the results. *Id.* The VDBC does not show PII, but one can glean PII by coding an algorithm with partial PII and determine by process of elimination. *Id.*

By its registrant agreement, the VDBC specifically prohibits data harvesting practices. *Id.* ¶ 13. Despite the registrant agreement, the VDBC has been, and continues to be, subjected to data harvesting tactics by bots. *Id.* ¶ 14. Mr. Knuth has observed bots searching for PII using very fast searching, entering searches using the last name and partial information to confirm social security numbers. *Id.* Although the social security numbers are not shown, when a hit is shown in response to a search, the "guessed" information on the search confirms the PII. *Id.* Mr. Knuth has expressed that anti-scripting tactics deployed to counter bot activity have had limited success. *Id.* ¶ 16. Because bots can quickly determine how their activity is being detected, bots will adapt their algorithms to avoid detection. *Id.* The bots can continue to collect data in violation of the registration terms, albeit usually more slowly, but nevertheless usually slip past detection. *Id.* And upon receiving a ban, a determined harvester can simply reapply for access to the VDBC using a different IP address. *Id.* While the VDBC utilizes a registrant agreement, there is no real way to vet registrants because the system is open for use to the general public. *Id.* As a result, the VDBC continues to be mined for data. *Id.*

Unlike the VDBC which links to aggregated data pulled from online case information, OCRA provides digital copies of actual court records. Dkt. No. 55 ¶ 35; Va. Code § 17.1-293(E)(7). These records contain unredacted PII because the Code of Virginia permits clerks to post PII online if it is posted to OCRA. *Id.* In addition, a clerk can choose to make Criminal, Civil, Chancery, Miscellaneous records, or any combination of these. **Exhibit B** ¶ 7. Once a clerk has determined the scope of the clerk's records that will be made available through the OCRA application, the subscriber has access to the entirety of the records made available through the OCRA application. *Id.* These records are downloadable as PDFs in OCRA. **Exhibit B** ¶¶ 4-5. This makes OCRA particularly vulnerable to data mining because there are many freely available programs which can scan through PDFs and turn the documents into searchable text and databases. **Exhibit A** ¶ 7. Persons with basic programming knowledge can develop algorithms to comb those databases for PII. This sort of data mining is impossible at courthouses where a user must print each court record at a per-page cost. *Id.*; Dkt. No. 55 ¶ 50. There is no per-page cost to access or download records through OCRA. *See* **Exhibit B** ¶ 5. Instead, users pay a one-time annual subscription fee for unlimited access to the available records. Dkt. No. 55 ¶ 43. As a result, if OCRA were to become publicly accessible, substantially more sensitive personal information would be subject to data mining and potential exploitation—a significant harm that OCRA's current limitations are narrowly tailored to prevent.

## STANDARD OF REVIEW

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). In order to preclude summary judgment, the dispute about a material fact must be "'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* However, if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 250. In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).

Where a nonmoving party fails to establish an essential element of his case, all other facts are rendered immaterial, and entry of summary judgment is required as a matter of law. *Celotex Corp.*, 477 U.S. at 322-23. The purpose of summary judgment is to facilitate the "prompt disposition of controversies on their merits without a[n] [unnecessary] trial, if in essence there is no real dispute as to the salient facts." *Bland v. Norfolk & Southern RR Co.*, 406 F.2d 863, 866 (4th Cir. 1969). When a careful consideration of the record reveals the absence of any genuine issue of material fact, it is "the affirmative obligation of the trial judge to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (citation omitted).

**ARGUMENT**

Given the sensitivity of the information available on OCRA and its susceptibility to malicious data mining, the General Assembly has provided that only licensed Virginia attorneys, their authorized agents, and certain governmental entities may access OCRA. Va. Code § 17.1-293(E)(7). To further protect against abuses, the legislature has also prohibited OCRA users from publicly disseminating the data obtained from OCRA access. Va. Code § 17.1-293(H). Where a limitation on a right of access resembles a "time, place, and manner" restriction, the

Court applies relaxed scrutiny. Dkt. No. 48 at 10 (citing *Globe Newspaper v. Superior Ct. for Norfolk Cty.*, 457 U.S. 596, 607 n. 17 (1982)). As this Court has previously observed, "[t]he non-attorney access restriction challenged here does not stop CNS from accessing civil court records altogether but instead controls how and when it accesses them. Thus, it resembles a time, place, and manner restriction and relaxed scrutiny applies." *Id.* "In this case, relaxed scrutiny requires the limitation to be content-neutral, narrowly tailored and necessary to preserve a significant governmental interest." *Id.* (citations and internal quotations omitted). Because the statutory limitations on OCRA access and dissemination are narrowly tailored to further significant government interests, they do not violate the First Amendment. As such, this Court should grant summary judgment for the Commonwealth.

**I. OCRA's non-attorney access and dissemination limitations are content neutral because they do not turn upon the communicative content of the court records.**

The non-attorney access and dissemination limitations apply to all non-confidential filings equally; therefore, the limitations are content-neutral. "To be content-neutral, the [challenged] policy cannot target speech based on its communicative content, or draw distinctions based on the message a speaker conveys." *Courthouse News Serv. v. Planet*, 947 F.3d 581, 601 (9th Cir. 2020) (citing *Reed v. Town of Gilbert*, 576 U.S. 155 (2015) (internal quotations omitted). "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 419 U.S. 781, 791 (1989).

The non-attorney access limitation does not change based on viewpoint or subject matter, nor does it discriminate among classes of the public seeking access to records, instead limiting it to attorneys, who have ethical obligations as court officers. No facts revealed in discovery have

shown that Clerk Smith discriminates among media outlets in granting or denying access to OCRA, nor has CNS pleaded that Clerk Smith does. In addition, the access and dissemination limitations apply equally to all court records in the system, and do not turn upon the communicative contents of the court records. Va. Code § 17.1-293; *see* Dkt. No. 55 ¶ 27 (stating that the Prince William Clerk provides to all subscribers "remote online access to electronic images of *all* non-confidential civil court records filed within the Prince William Circuit Court . . .")' Accordingly, the access and dissemination limitations are content neutral.

Although not advanced by CNS as this stage in the litigation, it is important to note that because the First Amendment would prohibit granting or denying access based on viewpoint, there is no meaningful way for clerks or the Commonwealth to craft a rule or law limiting access to members of the press. *See* Transcript of Motions to Dismiss and Initial Pretrial Conference, Dkt. No. 46 at 26 (suggesting that a legislative remedy would address CNS's claims). CNS is likely to claim, just as it did at the Motion to Dismiss stage, that as journalists, its employees are bound by a set of ethical standards, just as attorneys are. *Id.* at 37. But the First Amendment applies to even self-styled "citizen journalists" who publish their content on social media outlets, instead of through a traditional news outlet. *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938) ("The liberty of the press is not confined to newspapers and periodicals. . . . The press in his historic connotation comprehends every sort of publication which affords a vehicle of information and opinion."). Simply put, "a reporter's constitutional rights are no greater than those of any member of the public." *Estes v. Texas*, 381 U.S. 532, 589 (1965) (Harlan, J., concurring).

Therefore, there is no meaningful way to limit OCRA access to members of the press without risking viewpoint discrimination by only sanctioning accounts for journalists writing for

"mainstream" media news sources. In today's world, anyone who can create a Facebook, Twitter, TikTok, or Instagram account has access to a publishing medium that is "a vehicle of information and opinion" and can therefore claim they are journalists entitled to the same access as CNS. *Id.* Thus limiting access to Virginia Bar licensed attorneys, but excluding even members of the press is narrowly tailored to serve the state interest in protecting the privacy of the information.

### II. OCRA's non-attorney access and dissemination limitations further the Commonwealth's interest in the fair and orderly administration of justice by limiting the widespread dissemination of litigants' PII.

The fair and orderly administration of justice is a significant interest for the Commonwealth of Virginia and its courts. *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 328 (4th Cir. 2021). The Commonwealth promotes the fair and orderly administration of justice in promoting the privacy rights of its litigants, such that they will not be disincentivized from seeking out the justice system to vindicate their rights. *See Courthouse News Serv. v. Planet*, 947 F.3d 581, 604 (9th Cir. 2020). The Supreme Court has repeatedly held that protecting citizen privacy, particularly within the justice system, is a significant government interest. *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 596 (2011) ("[T]his Court has affirmed the importance of maintaining "privacy" as an important public policy goal—even in respect to information already disclosed to the public for particular purposes (but not others).") (citing *Dept. of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 762-771 (1989)); *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34-35, n. 22 (1984) (acknowledging the government's significant interest in protecting the privacy interests of litigants and third parties in civil litigation and finding that a protective order prohibiting a newspaper from publishing information which it had obtained through discovery procedures did not offend the First Amendment).

OCRA's access and dissemination limitations further the Commonwealth's significant interest in preventing widespread disclosure of the private information of litigants. Virginia Code § 17.1-293(B) prohibits a clerk from posting highly sensitive, private information online. This information includes actual signatures, dates of birth identified with a particular person, the maiden name of a person's parent so as to be identified with a particular person, any financial account number or numbers, or the name and age of any minor child. *Id.* at (B). A clerk is also forbidden from disclosing driver's license information, information on credit cards, debit cards, and other financial information. *Id.* at A. The Code states, however, that clerks may post the information described in either (A) or (B) on OCRA. Va. Code § 17.1-293(E)(7).

Virginia Code § 8.01-420.8, which applies only to civil litigants, places redaction requirements on attorneys and litigants. This section requires redaction of "all but the last four digits of the identification number" of social security numbers, driver's license numbers, and credit card, debit card, bank account, or other numbers associated with electronic billing and payment systems. *Id.* at (A). The Code explicitly waives civil liability "against the party or lawyer who filed the document or any court personnel, the clerk, or any employees of the clerk's office who received it for filing." *Id.* at (C). Thus, the redaction requirements do not cover the entirety of the sensitive information described in Code § 17.1-293(A)-(B). Further, empirical analysis shows that PII routinely finds its way into court filings even when redaction requirements are imposed. *See generally* David S. Ardia & Anne Klinefelter, *Privacy and Court Records: An Empirical Study*, 30 Berkeley Tech. L.J. 1807, discussed *infra* at 21.

But in Virginia, the PII reflected on those records is accessible on the internet only to lawyers, a self-policing, pre-vetted group subject to codified Rules of Professional Conduct and serious professional sanctions for violating those Rules. *See* Rules of the Supreme Court of

Virginia, Part Six, § II. Thus, publishing PII on OCRA carries far fewer risks than generally broadcasting it to the entire world via the internet, and the enforcement mechanism for misuse is more than what is imposed just by the user agreement.

Public access to records at a physical courthouse serves as a bulwark against widespread dissemination of the private information contained in court records. *See Dept. of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 764 (1989).[19] If, however, the Court finds that OCRA's attorney-only limitation is unconstitutional and eliminates it, any entity or individual from across the United States would have unfettered, unlimited access to the entirety of Virginia litigants' private information. Without these protective time and cost burdens, any entity could write an algorithm to harvest private information from each circuit court's filings, using that information to the detriment of Virginia litigants. *See* **Exhibit A** ¶ 7.

In contrast to members of the public, lawyers need the PII contained in court records to perform their jobs effectively. For example, attorneys practicing family law need access to pleadings reflecting the names and ages of minor children. Attorneys litigating a civil fraud case might need copies of pleadings reflecting the actual signatures of the parties or witnesses. Attorneys practicing collections work need access to financial information in order to identify assets and satisfy judgments. The instances where attorneys would need such private information to do their jobs are numerous; the instances where the public at large would need such information are not. Further, the efficiency of the justice system depends on attorneys gaining

---

[19] In *Reporters Committee*, the United States Supreme Court anticipated this exact problem, and specifically noted "the vast difference between the public records that might be found after a diligent search of courthouse files, county archives, and local police stations through the country and a computerized summary located in a single clearinghouse of information." *Id.* at 764. The Court additionally noted "the fact that an event is not wholly private does not mean that an individual has no interest in limiting disclosure or dissemination of the information." *Id.* at 770.

access to this information remotely – attorneys cannot waste days traveling from jurisdiction to jurisdiction to get hard copies of these filings, which may or may not be relevant for their purposes. Time spent traveling to and from courthouses is time that better spent performing any number of advocacy-related activities. It is also time that the attorney will not have to bill to a client, which makes affording competent representation in court matters more cost effective, lowering the barriers to justice for those who have fewer assets to satisfy legal fees.

The Commonwealth balances its promotion of effective advocacy with the need for protecting litigants' private information by generally restricting clerks from posting PII online except on OCRA. Va. Code § 17.1-293(E)(7). Limiting access to this potentially exploitable "clearinghouse of information", *Reporters Comm. for Freedom of Press*, 489 U.S. at 764, to Virginia-licensed attorneys is secured by the fact that lawyers are self-policing. As members of the Virginia State Bar, lawyers self-regulate subject to the Virginia Rules of Professional Conduct (the "RPC"):

> The legal profession is largely self-governing. Although other professions also have been granted powers of self-government, the legal profession is unique in this respect because of the close relationship between the profession and the processes of government and law enforcement. This connection is manifested in the fact that the ultimate authority over the legal profession is vested largely in the courts . . . To the extent that lawyers meet the obligations of their professional calling, the occasion for government regulation is obviated.
>
> Pmbl. to the Va. R. Prof'l Cond.

Consistent with self-regulation, lawyers are held to a higher standard than the public and face losing their livelihoods should they fail to meet those standards. A Virginia-licensed attorney found in violation of the RPC faces sanctions, which can include suspension or revocation of his or her license to practice law in Virginia. *See generally* Va. Sup. Ct. R. part 6, § IV ¶ 13. And the RPC prohibit improper usage of private information obtained from either

clients or third parties. Va. Sup. Ct. R. part 6, § II, R. 1.6 (Confidentiality of Information), R. 4.4(a) (Respect for Rights of Third Persons), R. 8.4 (Misconduct)[20].

Lawyers are also less likely to abuse the system not only because they risk public censure and their livelihoods for violating the Virginia RPC, but because they have been pre-vetted by the Virginia State Bar's Character and Fitness review in a way that clerks could never do with a subscriber agreement. *See* **Exhibit A** ¶ 16. Simply put, lawyers must be trusted to protect confidences; their duty to protect these confidences promotes, in turn, the public's confidence in the justice system.

> A lawyer's responsibilities as a representative of clients, an officer of the legal system and a public citizen are usually harmonious . . . [A] lawyer can be sure that preserving client confidences ordinarily serves the public interest because people are more likely to seek legal advice, and thereby heed their legal obligations, when they know their communications will be private.
>
> Pmbl. to the Va. R. of Prof'l Cond.

The Supreme Court of the United States has additionally recognized the important role that protecting privacy plays in maintaining the integrity of the justice system:

> [As] the trial court rightly observed, rather than expose themselves to unwanted publicity, individuals may well forgo the pursuit of their just claims. The judicial system will thus have made the utilization of its remedies so onerous that the people will be reluctant or unwilling to use it, resulting in frustration of a right as valuable as that of speech itself.

*Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 35 n. 22 (1984) (quoting *Rhinehart v. Seattle Times Co.*, 98 Wash. 2d 226, 254 (1982)).

The *Rhinehart* Court's reasoning applies with equal force here—the Commonwealth protects the widespread dissemination of litigants' PII by limiting OCRA access to attorneys. If

[20] Rule 8.4(b) specifically prohibits conduct, either criminal or "deliberately wrongful", which implicates a "serious interference with the administration of justice." Va. Sup. Ct. R. part 6, § II, R. 8.4(b), cmt 2.

the Commonwealth did not limit OCRA access to attorneys, but instead broadcast litigants' PII across the world, litigants would be disincentivized from vindicating their rights in court,[21] directly undermining the Commonwealth's significant government interest in the "fair and orderly administration of justice." *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 328 (4th Cir. 2021).

Virginia's approach of refraining from posting non-confidential court records online for public consumption is consistent with the practices of all other states in the Fourth Circuit, except for South Carolina, in which some, but not all, jurisdictions within the state post court records online. Dkt. No. 55 ¶ 10. North Carolina does not grant public access to court records, but maintains civil and criminal databases, similar to Virginia's Circuit OCIS, General OCIS, and OCIS 2.0, in which North Carolina prioritizes usage by court personnel, such as judges, clerks of court, public defenders, "and other State and local government agencies that access the system in order to perform their legal duties . . ." Remote Public Access Program, North Carolina Judicial Branch, https://www.nccourts.gov/services/remote-public-access-program (last visited July 8, 2022); RPA Online Access, Sample Licensing Agreement – Online Access, tinyurl.com/2p9sz9n6. In fact, very few states provide online access to court records to all members of the public. Dkt. No. 55 ¶ 10. Some of the states that provide online access to non-confidential court records exclude entire categories of records from that remote online access, posing serious problems under the "content neutrality" prong of a time, manner, or place restriction. *See, e.g.,* Colo. Judicial Dep't, Public Access to Court Records §§ 4.20(b), 4.60.

[21] "Indeed, we are already seeing privacy concerns drive an increase in the use of alternative dispute resolution ("ADR") procedures, particularly confidential arbitrations where no public right of access exists at all. Potential litigants who cannot afford ADR may simply view the privacy costs as too great and decide not to seek resolution in the courts – or worse, engage in self-help remedies." David S. Ardia, *Privacy and Court Records: Online Access and the Loss of Practical Obscurity*, 2017 U. Ill. L. Rev. 1385, 1446-48 (2017) (citations omitted).

**III. OCRA's non-attorney access and dissemination limitations are narrowly tailored because the Commonwealth would achieve its interests less effectively without them.**

OCRA's access and dissemination limitations protect the privacy of its litigants, which in turn promote the fair and orderly administration of justice. Adopting any other system of remote access would render litigants' private information less secure than it is on OCRA; accordingly, the challenged restrictions are narrowly tailored.

In the context of a time, place and manner restriction, "[a] regulation is narrowly tailored . . . if it promotes a substantial government interest that would be achieved less effectively absent the regulation and does not burden substantially more speech than is necessary to further the government's legitimate interests." *Ross v. Early*, 746 F.3d, 546, 552-53 (4th Cir. 2014) (quotation omitted). "In this vein, the regulation need not be the least restrictive or least intrusive means of serving the government's significant interests." *Id.* (citation and internal quotations omitted). "So long as the means chosen are not substantially broader than necessary to achieve the government's interest, however, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech restrictive alternative." *Ward v. Rock Against Racism,* 491 U.S. 781, 800 (1989).

For two reasons, the Commonwealth would achieve its substantial government interests less effectively if OCRA's non-attorney access limitation were eliminated. First, if OCRA were available to the global[22] community, the Commonwealth would have to pass a host of legislation

[22] "It is long settled as a matter of American constitutional law that foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082 (2020). Therefore, non-citizens residing outside the U.S. do not have a right of access to Virginia's court records, online or otherwise. Practically speaking, however, it would be difficult to limit OCRA access to only people residing in the U.S. and citizens residing abroad, without requiring either a lengthy application and some vetting of the documents provided to verify the person or company seeking access is a U.S. resident or U.S. citizen residing abroad. In addition, American data brokerage companies could sell the harvested

to protect the widespread distribution of PII, placing significant time and cost burdens on both clerks and litigants to both redact all filings or make separate filings containing PII. Empirical studies have shown redaction in particular to be an ineffective method at preventing PII and other sensitive information from appearing in non-confidential court records. Second, the Commonwealth and the clerks would be forced to expend substantial resources to aggressively police OCRA user activity to limit exploitation of personal information, likely with less success than under the current access restrictions.

a. Redaction has shown to be ineffective at preventing PII and other sensitive information from appearing in court records.

In 2018, OES convened a Working Group to examine, among other things, the legislative ramifications of eliminating OCRA's non-attorney access limitation. Dkt. No. 55 ¶ 52 (the "Work Group Report"). The group, mostly comprising circuit court clerks and legislative consultants, found that opening OCRA to the public would require drastic alterations to the Commonwealth's legislative scheme to prevent private information from being leaked to the public. Work Group Report at 13. At a minimum, opening OCRA to the public would require litigants or clerks to redact all filings, and litigants would have to provide separate filings, both redacted and unredacted. *Id.* OCRA's current attorney-only access limitation threads the needle by balancing the need for convenient, around-the-clock access at a cost to the parties who need it most: attorneys, clerks, and government agencies, while providing a measure of "practical obscurity" for the PII in court filings by making access a little more onerous but at a much lower cost for the general public.[23]

---

data abroad.

[23] Access to records at a courthouse is free via public access terminals. Dkt. No. 55 ¶ 46. Members of the public are typically only charged for the nominal cost of making a paper copy of the record. *Id.* ¶ 50.

But relying on redaction is not enough to protect PII. Even if all of the proposed legislative fixes were passed, research has shown that redaction rules have limited efficacy in preventing widespread disclosure of sensitive information. For example, in 2009 Carl Malamud used automated software to search a large sample of court filings downloaded from the federal court's Public Access to Court Electronic records (PACER) system. Malamud reported to the federal courts that a significant number of social security numbers and other types of sensitive information were present in the downloaded files. *See* Letter from Carl Malamud to The Honorable Lee H. Rosenthal, Chair, Committee on Rules of Practice and Procedure, Judicial Conference of the United States (Oct. 24, 2008), https://public.resource.org/scribd/7512583.pdf (documenting 1,669 unredacted social security numbers and other proximate sensitive information in records from 32 district courts). In addition, computer scientist Timothy Lee followed Malamud's report with a study that found some documents submitted to courts with intended redactions were not successfully redacted. Timothy B. Lee, *Studying the Frequency of Redaction Failures in PACER*, Freedom to Tinker (May 25, 2011), https://freedom-to-tinker.com/blog/ tblee/studying-frequency-redaction-failures-pacer.

Likewise, a 2015 empirical study in North Carolina showed a high frequency of sensitive information included in state court filings. David S. Ardia & Anne Klinefelter, *Privacy and Court Records: An Empirical Study*, 30 Berkeley Tech. L.J. 1807. North Carolina prohibits litigants and attorneys from filing documents which include "any person's social security, employer taxpayer identification, drivers license, state identification, passport, checking account, savings account, credit card, or debit card number, or personal identification (PIN) code or passwords in that document . . ." N.C. G.S. 132.1-10(d). This prohibition on filing sensitive information is broader than Virginia's redaction statute, Va. Code § 8.01-420.8, and even carries

a penalty of five hundred dollars ($500) for violating. *Id.*

To determine the rate at which sensitive information appeared in North Carolina filings despite these requirements, the 2015 empirical study analyzed nonconfidential briefs submitted to the North Carolina Supreme Court from 1984 to 2000. *Privacy in Court Records*, 30 Berkeley Tech L.J. at 1816. Based on a survey or privacy laws and privacy scholarship, the researchers created a taxonomy of thirteen categories of sensitive information, such as "Financial Information," "Identity," "Location," "Health," and "Sexual Activities," among others. *Id.* at 1837 *et seq.* They required that these sensitive information types be associated with individuals named within the court briefs. *Id.* at 1836 n. 101. They then coded a stratified random sample of 504 court filings "in order to determine the frequency of appearance of each sensitive information type . . ." *Id.* Of the 504 filings, 336 contained "Location" information, 331 contained "Identity" information, 175 contained information related to "Assets" and 134 contained "Financial Information." Just 37 of the documents in the sample contained no sensitive information. *Id.* at 1860, Table 4. The study also showed that information associated with criminal proceedings, such as witness and crime victim names, was pervasive in court records, appearing in civil cases as well as criminal, and that criminal filings showed a disproportionately high level of sensitive information. *Id.* at 1883-1886. Finally, the study failed to show any increase or reduction in the frequency of sensitive information included in the filings over the seventeen-year period. *Id.* at 1889.

The results of the 2015 empirical study are indisputable – even with redaction measures in place, sensitive information will continue to appear in non-confidential court records with high frequency. Research on data brokers has shown that even PACER, a system which relies on redaction and per-page fees to deter data harvesting, is nevertheless routinely mined for data.

Fred H. Cate, *Government Data Mining: The Need for a Legal Framework*, 43 Harv. C.R.-C.L. L. Rev. 435, 457 (2008). If the Commonwealth opened OCRA to the public, there is no reason to believe that legislation requiring redaction would prevent sensitive information being leaked, despite increasing costs for litigants and the courts. *See* **Sworn Declaration of Paul Ferguson, Clerk of Arlington Circuit Court, attached as Exhibit C**, ¶¶ 8, 11.

b. Policing misuse of OCRA via subscriber agreements and anti-data harvesting programming will have limited success at preventing mass dissemination of PII.

To mitigate the limited efficacy of redaction efforts, if OCRA were opened to the public, the Commonwealth and the clerks would be forced to implement security measures to limit the spread of PII. Databases developed for public usage and maintained by OES, however, have shown that the information on those databases can, and will, be subjected to data harvesting, despite OES's best efforts to mitigate those tactics. **Exhibit A**. As stated by OES's Deputy Director – Application Development Manager, at least four of its systems developed for public usage have been, and continue to be, subjected to manual and automated data mining from around the world. *Id.* ¶ 8. Notably, none of those systems reveal the sort of sensitive information contained on documents available via OCRA, such as social security numbers, maiden names, and financial account numbers. *See* Code § 17.1-293(B),(E). , If made public, OCRA will almost certainly be subject to targeted data harvesting in the same fashion that other publicly used systems developed by OES have been, particularly when data brokers were already looking to court records for data to harvest a decade ago. *See* Data Broker Reporter at 15.

Plaintiff has alleged that potential OCRA misuse could be policed through "Subscriber Agreements," *see* Dkt. No. 48 at 11, Dkt. No. 21 ¶ 44. Prior practice, however, has demonstrated that subscriber agreements are often ignored and circumvented. **Exhibit A** ¶ 13. For instance, in submitting a registrant agreement for the VDBC, the applicants agree not to "[e]xecute any form

or automated scripting against the system," "access or attempt to access the system in an excessive manner," or "misuse search criteria or conduct searches in a manner that may be construed as attempting to gather information for purposes other than that for which the system was designed." *Id.* Despite these specific representations, users nevertheless violate the terms and conditions. *Id.* ¶ 14. Violating users are subject to bans but banned users can simply reapply for access to the VDBC. *Id.* ¶ 16. And users get banned only if their activity sufficiently mimics non-human activity; should the bot adapt to OES's anti-scripting algorithm, the bot can evade detection and continue scraping data from the database, albeit more slowly than it otherwise would. *Id.* These experiences demonstrate that OCRA subscriber agreements would be no more effective in policing misuse than subscriber agreements for other OES applications have been.

The current system of access to OCRA, in contrast, keeps PII highly secure at a cost-efficient basis, furthering the "fair and orderly administration of justice." *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 328 (4th Cir. 2021). Misconduct can be policed effectively because users are asked for their Virginia State Bar number, a unique and easily identifiable number tied to a license to practice law. Dkt. No. 21 ¶ 53. The access and dissemination restrictions imposed in Virginia Code § 17.1-293 are thus narrowly tailored to achieve the Commonwealth's significant government interest of limiting the widespread dissemination of private information more effectively by allowing only lawyers, a self-policing class governed by binding ethics rules that impose significant real world penalties for misuse of data, to view it remotely.

Moreover, OCRA saves significant administrative support and development costs in allowing only officers of the court to use it because the Commonwealth is not required to set up and maintain evolving technical detection methods to identify and ban bots: OCRA accounts tied to a law license prevent a hoard of anonymous bot accounts from crawling the records on OCRA

to harvest the PII in the records. Instead, by relying on "practical obscurity" to prevent bad actors or even lawful profiteers like data brokers from accessing most court records without considerable and repeated expenditure of time and expense, the challenged statute prevents data exploitation.

In all of these ways, the Commonwealth achieves its substantial government interest in the fair, orderly, and efficient administration of justice. Any other system would have to provide a similar vetting process for new users to access the OCRA database. The users would have to be tied to an easily verified real-world identity, there would have to be real-world and significant costs for misusing the data to compensate for the difficulty in apprehending any misuse, and there would have to be some way to ensure that users are truly not looking to harvest and resell the information to data brokers or act as a data broker themselves. *See* **Exhibit A** ¶¶ 13-16. Limiting the class of users to licensed attorneys, their staff (for which the attorney is responsible), clerks, and government agencies meets that standard without imposing a major administrative burden on clerks vetting applicants for a new account. It also limits the number of people applying in the first place, which further reduces the administrative burden on clerks.

Finally, if OCRA's attorney-only access limitation were held to be unconstitutional, absent any further legislative changes, Virginia clerks would still be prohibited from posting PII on the internet under Virginia law. Va. Code § 17.1-293(B). Thus, a clerk could still provide remote access to subscribers, but in order to do so, the clerk would have to redact every court record in their custody containing PII before uploading it to OCRA. Under Virginia law, a clerk is "immune from suit arising from any acts or omissions relating to providing remote access on the Internet pursuant to this section unless the clerk was grossly negligent or engaged in willful misconduct." *Id.* at (G). A clerk cannot simply decline to provide any review and redaction

before publishing court records on the internet without risking losing her immunity from suit for good faith errors caused by records that make it past the review process without complete redaction.

Given that risk, a clerk may determine that given the immense time and fiscal resources needed to be expended on redaction, it would still simply not be worth the clerk's exposure to continue offering OCRA access and cut off the service entirely. Under those circumstances, the "fair and orderly administration of justice," *Schaefer*, 2 F.4th at 328, would be wholly disrupted, leaving many lawyers either unable to perform their duties, or forcing them to expend precious time and resources traveling to courthouses across the state. The end result of this suit could be all parties, including actual litigants and their counsel, sharing the same burdens CNS complains of currently, frustrating the justice system.

### IV. OCRA's non-attorney access and dissemination limitations leave open ample alternative channels for communication of the information.

CNS has not pleaded a single instance where Clerk Smith has denied its lawful access to, and dissemination of, courthouse records in Prince William County Circuit Court. Because CNS has an "ample alternative channel" to exercise its rights under the First Amendment in the form of courthouse visitation, the non-attorney and dissemination limitations are constitutional.

The government may impose reasonable restrictions on the time, place, or manner of protected speech, provided "they leave open ample alternative channels for communication of the information." *McCullen v. Coakley*, 134 S. Ct. 2518 (2014) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791). Because the challenged restriction here relates to access of court records, *Nixon vs. Warner Comm'cns, Inc.*, 435 U.S. 589 (1978) is particularly instructive. In that case, broadcasters petitioned for access to tapes admitted into evidence and played at a criminal trial arising out of the "Watergate" scandal. *Id.* at 591-594. Specifically, the

broadcasters sought to copy, broadcast, and sell to the public the portions of the tapes played at trial. *Id.* at 594. The Supreme Court found that, because the public had been able to listen to the tape recordings played in court, they had no right to physical access to the tapes as long as the transcripts were made available. *Id.* at 609.

Here, as in *Nixon*, there is "no question of a truncated flow of information to the public." *Id.* Indeed, CNS has not alleged that its practice of courthouse visitation in Prince William County has resulted in any diminution of newsworthy information to collect. Clerk Smith does not "deny or unwarrantedly abridge the opportunities for the communication of thought." *See Courthouse News Serv. v. Planet*, 947 F.3d 581, 605-06 (2020) (Smith, J., concurring). As stipulated, Clerk Smith provides CNS with access to all non-confidential records, through its public access terminals during normal business hours. Dkt. No. 55 ¶¶ 25-26. No court has found that the First Amendment requires more access than a clerk can provide at the courthouse. Accordingly, because courthouse visitation is an alternative channel for CNS to exercise its First Amendment rights, OCRA's non-attorney access and dissemination limitations do not burden those First Amendment rights.

## CONCLUSION

"The First Amendment does not require courts, public entities with limited resources, to set aside their judicial operational needs to satisfy the immediate demands of the press." *Planet*, 947 F.3d at 598. But in this suit, in order to reduce business expenses, CNS asks this Court to set aside a system of remote access by which attorneys receive the PII they need to perform their duties as advocates, and by which the Commonwealth prevents exploitation of litigants' sensitive personal information. These significant government interests would be achieved far less effectively without the challenged limitations, which are narrowly tailored to

achieve those government interests. Accordingly, OCRA's non-attorney access and dissemination limitations pass constitutional muster.

Wherefore, for the foregoing reasons, the Commonwealth respectfully requests that this Court grant its Motion for Summary Judgment, dismiss the claims brought against Defendant Jacqueline C. Smith with prejudice, and award the defendants any further relief that the Court deems necessary and proper.

Respectfully submitted,

COMMONWEALTH OF VIRGINIA

By: *<u>/s/ Robert B. McEntee, III</u>*
Counsel

Jason S. Miyares
*Attorney General*

Steven G. Popps
*Deputy Attorney General*

Jacqueline C. Hedblom
*Senior Assistant Attorney General/*
*Acting Trial Section Chief*

Robert B. McEntee, III (VSB No. 89390)
Erin R. McNeill (VSB No. 78816)
Assistant Attorneys General
Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-8198 – Telephone
(804) 371-2087 – Facsimile
rmcenteeiii@oag.state.va.us
emcneill@oag.state.va.us

**CERTIFICATE OF SERVICE**

I hereby certify that on July 9, 2022, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record for the parties.

*/s/ Robert B. McEntee, III*
Robert B. McEntee, III

EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| COURTHOUSE NEWS SERVICE, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 3:21-cv-00460-HEH |
| JACQUELINE C. SMITH, in her official capacity as Clerk of the Circuit Court for Prince William County, Virginia, | ) | |
| Defendant, | ) | |
| and | ) | |
| COMMONWEALTH OF VIRGINIA, | ) | |
| Intervenor-Defendant. | ) | |

**DECLARATION**

The Intervenor-Defendant, the Commonwealth of Virginia, by counsel, submits this Declaration as Exhibit A to their Memorandum in Support of its Motion for Summary Judgment.

Joby Knuth, pursuant to 28 U.S.C. § 1746, states as follows:

1. I am employed by the Office of the Executive Secretary of the Supreme Court of Virginia ("OES") as the Deputy Director – Application Development Manager of the Department of Judicial Information Technology ("DJIT"). I have served in this role since May 2020. Prior to this role, I was a Program Manager for Data Concepts, an independent contractor serving the Supreme Court of Virginia. I was employed in this position from April 2009 to May 2020.

2. In my capacity as Deputy Director – Application Development Manager, I have overseen new development projects, enhancement and maintenance releases for over 90 in-house developed software products. I am responsible for a team of project managers, business systems analysts, software architects, developers, quality assurance analysts, dev-ops engineers, and system administrators. I am proficient in many different programming languages, including Java, Javascript, HTML, CSS, Perl, and Python. I am a part of the architecture team responsible for the high-level architecture of software

products, design reviews, code reviews, developer assistance, etc. In addition, I have assisted development teams to troubleshoot, identify, and resolve complex technical problems associated with applications developed by the OES.

3. I provide oversight of and manage systems developed and maintained by OES, such as the Virginia Circuit Court Online Case Information System (Circuit OCIS) (available at http://ewsocis1.courts.state.va.us/CJISWeb/circuit.jsp), the General District Court Online Case Information System (General DistrictOCIS) (available at https://eapps.courts.state.va.us/gdcourts/landing.do?landing=landing), Online Case Information System 2.0 (OCIS 2.0) (available at https://eapps.courts.state.va.us/ocis/landing), and the Virginia Date of Birth Confirmation (VDBC) (available at https://www.vacourts.gov/online/vdbc/home.html).

4. Remote access to information, including "secure remote access", poses unique privacy concerns in contrast to access to information available only in person. In particular, the question is a matter of scale of the information available from either access point.

5. At the courthouse, one cannot digitally download court records. Necessarily then, the amount of data pulled from one courthouse visit is limited by several factors, such as time to print each court record, costs associated with a per-page fee, and travel to the courthouse. There can be additional limitations imposed by the clerks.

6. Outside of the courthouse, if one had remote access to the same records, one can download every available nonconfidential court record containing personally identifiable information (PII) without any of the time or cost limitations associated with in-person requests. This could happen from anywhere in the world.

7. There are many freely available web-scraping and Optical Character Recognition libraries and Application Programming Interfaces. Anyone with rudimentary programming knowledge could use these to extract PDFs from an online system, convert the PDFs to searchable text, aggregate that data in a database, and subsequently search through the data for PII or other information. This type of activity is commonly performed and is known as "data mining" or "data harvesting".

8. Circuit OCIS, General District OCIS, OCIS 2.0, and the VDBC have all been, and continue to be, subjected to manual and/or automated data mining from around the world.

9. To illustrate, in 2010, General District OCIS was consuming an inordinate amount of processing power on OES's server. This reduced the amount of resources available for the operation of other OES applications. Upon investigation, this was caused by an inordinate load of web requests placed on General District OCIS by large amounts of different Internet Protocol addresses (IP addresses). We identified the traffic coming from these IP addresses as probable "internet bots", or simply "bots", through log analysis. Our algorithms identified sessions in which search activities resembled those typically associated with non-human behavior. For example, instead of searching for a few cases or names within a single session, the bots would enter searches for every single possible case number within the database, sequentially. They would additionally make requests, per second, far faster than what a human is capable of entering.

10. Log analysis showed that bots were mining the public data available in Circuit OCIS in the same manner.

11. The VDBC was designed pursuant to Va. Code § 17.1-293 (F) and Item 40 (O) of the 2017 Appropriation Act for individuals within a registered organization to confirm a consenting individual's last name, date of birth, driver's license number, driver's license state, and last four digits of the social security number associated with the same criminal and traffic cases maintained in the general district and circuit court case management systems.

12. The VDBC system allows for search based upon a full last name, partial first name, a full date of birth ("DOB"), the last four digits of the social security number ("SSN"), and/or a driver's license number and state combination. It searches the same General District and Circuit traffic and criminal cases available in General District OCIS, Circuit OCIS, and OCIS 2.0 and returns a list of the cases which match the entered DOB, first and last name information. It additionally gives column(s) for whether the entered SSN and/or driver's license information match data in the case management system for those cases in the results. This gives them positive confirmation of the lists found on OCIS, but provides further

info, in terms of PII, that the case results match the entered PII. It does not show the PII. The results link to the case information on OCIS 2.0.

13. Prior to usage, a potential user must complete and submit a registration agreement to the VDBC Administrator in the OES to establish a subscription. Virginia Date of Birth Confirmation, https://www.vacourts.gov/online/vdbc/home.html (last visited Jun 30, 2022). In agreeing to the VDBC's terms and conditions, registrants agree not to "execute any form or automated scripting against the system", "access or attempt to access the system in an excessive manner", or "misuse search criteria or conduct searches in a manner that may be construed as attempting to gather information for purposes other than that for which the system was designed." Virginia Date of Birth Confirmation, https://eapps.courts.state.va.us/help/robo/dobcon/index.htm#t=vdbc_termsandconditions/vdbc_termsandconditions.htm (last visited Jun 30, 2022).

14. Despite these agreements, VDBC has been mined for data using tactics similar to those described in paragraph 9. By performing multiple searches based on guessed, partial data, one can piece together the PII underlying the VDBC which is not shown. For example, in order to discover the full date of birth, users and/or bots will enter a name, pick a starting year of birth, and then increment the year of birth until a responsive item (online case data) appears. The year of birth is not displayed, but because the search produced responsive data, it discovered the full birth date by process of elimination.

15. Every time a search is entered on VDBC, OES saves the metrics of that search for a period of time. OES specifically monitors these searches for abnormal behavior to deter data harvesting. Should abnormal behavior be detected, OES restricts access to the VDBC using an escalating ban feature.

16. Many of our anti-scripting tactics, however, can be anticipated and circumvented by determined data miners. For example, our algorithms can detect bot activity by determining that any session that makes over a given number of searches in a given time resembles bot activity. The bot can quickly determine that that number is the upper limit of searches after which it will get banned from using the system. The bot will then adapt and search just under our algorithm's limit. The bot still violates the VDBC's terms and conditions but slips past detection. And, upon receiving a ban, a determined data

harvester can simply reapply for access to the VDBC. Because there is no real way to vet registrants, many are successful. It has been my experience that no matter what types of anti-scripting we can put in place, a determined data harvester can find a way around it.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 06 / 30 / 2022

**Joby Knuth**
**Deputy Director – Application Development Manager**
**Office of the Executive Secretary**
**of the Supreme Court of Virginia**

EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| COURTHOUSE NEWS SERVICE, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 3:21-cv-00460-HEH |
| JACQUELINE C. SMITH, in her official capacity as Clerk of the Circuit Court for Prince William County, Virginia, | ) | |
| Defendant, | ) | |
| and | ) | |
| COMMONWEALTH OF VIRGINIA, | ) | |
| Intervenor-Defendant. | ) | |

**DECLARATION**

The Intervenor-Defendant, the Commonwealth of Virginia, by counsel, submits this Declaration as Exhibit B to their Memorandum in Support of its Motion for Summary Judgment.

Michael J. Riggs, Sr., pursuant to 28 U.S.C. § 1746, states as follows:

1. I am employed by the Office of the Executive Secretary of the Supreme Court of Virginia ("OES") as the Director of the Department of Judicial Information Technology. I have served in this role since 2018.

2. In my capacity as Director of the Department of Judicial Information Technology, I provide oversight of and manage systems developed and maintained by OES, such as the Case Imaging System ("CIS") and Officer of the Court Remote Access ("OCRA"), which OES provides to Virginia courts.

3. When Virginia Circuit Court Clerks opt to use CIS and OCRA, clerks store those records electronically on servers at their respective courthouses. These servers are purchased by the clerks. Server operating software as well as application software, including OCRA, is installed and maintained

by OES.

4. OES replicates the data on the courts' servers, storing it as backup data as well as using it to provide viewable data through a circuit court clerk's OCRA application. The data shown via this application can be downloaded on a viewer's device in a portable document format (PDF).

5. Once a clerk grants access to OCRA, the subscriber can download and save every filing in that jurisdiction as a PDF file to their desktop.

6. For providing CIS and OCRA to the clerks, OES bills out approximately $1.2 million to Virginia Circuit Court clerks annually.

7. When a clerk elects to use OCRA, a clerk may choose to provide remote access to certain court records, but only to those individuals and entities whom the clerk determines, in his or her sole discretion, are authorized to have access. The circuit court clerk determines the scope of the clerk's records that will be made available through the OCRA application. The clerk has four options with regard to records the clerk may choose to make available: Criminal, Civil, Chancery or Miscellaneous or any combination of these. Once a clerk has determined the scope of the clerk's records that will be made available through the OCRA application, a subscriber has access to the entirety of the records a clerk has placed on OCRA. For example, if a subscriber wished to gain access to only civil filings, and successfully obtained access to a jurisdiction's OCRA which offered both civil and criminal filings, that subscriber would have access to both criminal and civil filings available through OCRA. The clerk determines the scope of access and OES does not, thereafter, tailor OCRA access according to individual subscribers in any jurisdiction, nor does OES provide different levels of access to subscribers within the same jurisdiction to provide remote access to only civil, or only criminal filings if the circuit clerk has chosen to provide remote access to both.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 7, 2022

**Michael J. Riggs, Sr.**
**Director of the Department of Judicial Information Technology**
**Office of the Executive Secretary**
**of the Supreme Court of Virginia**

EXHIBIT C

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| **COURTHOUSE NEWS SERVICE,** <br><br> **Plaintiff,** <br><br> **v.** <br><br> **KARL R. HADE**, *et al.*, <br><br> **Defendants.** | ) | **Civil Action No.: 3:21cv460-HEH** |

**SWORN DECLARATION OF PAUL FERGUSON,**
**CLERK OF ARLINGTON CIRCUIT COURT**

Pursuant to 28 U.S.C. §1746, the undersigned Paul Ferguson makes this sworn declaration in the above-captioned case and states as follows:

1. My name is Paul Ferguson. I am over eighteen years of age, of sound mind, and competent to make this affidavit.

2. I am the Clerk of the Arlington County Circuit Court. I have held this position since January 1,2008

3. In my capacity as the Clerk of Court, I am responsible for managing the operations of the Arlington Circuit Court, including remote online access to the Court's records.

4. The Arlington Circuit Court received 3280 new civil cases in calendar year 2021. Arlington County has 236,000 residents as of 2020.

5. The Arlington County Clerk of Court uses software issued and managed by ImageSoft Inc. to post court records online.

6. The Arlington County Clerk of Court hires a redaction company (CSI) that is tasked with the job of redacting original signatures, social security numbers, Credit Cards, Bank

Accounts, Minor Children Names and Ages, Maiden Names, Judges Signatures, and Tax ID's. from the court records that are posted on the terminals that are available to the public at terminals located at the Clerk's office.

7. The Court's online court records access is not through the state's OCRA system; but the Court's online records access is similarly restricted to attorneys only, in compliance with Virginia Code §17.1-293 and Virginia Supreme Court Rule 1:17.

8. Secure Remote Access is provided to attorneys for their convenience, but it also creates efficiencies in the Clerk's Office. Minimizing in person copy requests from attorneys saves time and money for the Clerk's Office If Secure Remote Access contained only redacted documents, it is likely attorneys would choose to make in person requests for the unredacted documents.

9. The process of sending out new filings for redaction and receiving the redacted records back and then making them available on public terminals in the Clerk's office takes 3-5 days from filing date to posting date.

10. The Clerk's Office spends approximately $35,000 per year on redaction services with regard to Court records that are made available to the public on terminals located at the Clerk's office.

11. If a court were to determine that online access to court records must be provided to the public at large, it would cost substantial additional funds to modify the exacting secure remote access system to protect private information of my constituents. I estimate it would cost approximately $150,000 to provide access to redacted documents for records posted on our remote access system.

12. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 5th day of July, 2022.

Paul Ferguson, Clerk of the Circuit Court
Arlington VA and City of Falls Church, VA.

**COMMONWEALTH OF VIRGINIA**
**CITY/COUNTY OF ARLINGTON**, to-wit:

This 5th day of July, 2022, personally appeared before me, the undersigned Notary Public, PAUL FERGUSON, in the above-referenced matter, and made oath that the foregoing is true and correct.

Notary Public

MARY B. CARRIG
NOTARY PUBLIC
REG. #292426
MY COMMISSION EXPIRES 11/30/2025
COMMONWEALTH OF VIRGINIA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| COURTHOUSE NEWS SERVICE, *Plaintiff,* v. JAQUELINE C. SMITH, *et al.*, *Defendants.* | ) | Civil Action No. 3:21-cv-00460-HEH |

DECLARATION OF WILLIAM GIRDNER IN SUPPORT OF PLAINTIFF COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT

I, William Girdner, declare and state as follows:

1. I am the founder and editor of Courthouse News Service ("CNS"), a nationwide news service and the plaintiff in the above-captioned action. I make this declaration in support of CNS' motion for summary judgment as against Defendant Jacqueline C. Smith, in her official capacity as Clerk of the Circuit Court for Prince William County, Virginia ("Prince William Clerk") and the Intervenor-Defendant the Commonwealth of Virginia (the "Commonwealth") (collectively, "Defendants"). I have personal knowledge of the following facts, except where otherwise stated.

2. CNS commenced this case to address two access restrictions that blackout the press and public in favor of Virginia-barred attorneys and their staff in violation of the First Amendment. The first access restriction precludes the press and public from remotely accessing new civil filings in the Circuit Court for Prince William County ("Prince William Court"), even though the Prince William Clerk does provide remote access to a special class of the Commonwealth's citizens – Virginia-barred attorneys and their staff – through the Officer of the

Court Remote Access system ("OCRA"). The second access restriction prohibits the dissemination to the public of information accessed remotely.

3. OCRA is a permissions-based system of access. In other words, anyone seeking access must apply and receive a user name and password. The user's activity can then be monitored. The federal courts PACER system is a permissions-based access system, requiring registration and the use of a user name and password. This declaration, once filed, will be available via the Internet from where I work in Pasadena, California, through the PACER system, after I enter our PACER user name and password, and agree to pay a modest fee.

4. Almost all the state court systems that mandate e-filing also provide online access through a permissions-based system. New York is the principal exception in that it does not require registration for statewide public access to new court filings, public access that has been in place since 2017 without incident.

5. Within CNS, we refer to a system that grants access only to members of the bar as an "attorney preference" system. Other than Virginia, only two states in the nation maintain an attorney preference system. One is Missouri where the chair of the court automation committee announced in May of this year that the state would open its online system to public access. Illinois is the other state that follows a similar practice. *See* https://www.courts.mo.gov/page.jsp?id=89450. New Mexico was another state that used to operate an attorney preference system, but online access opened to press and public in 2017, based on a request from Courthouse News. That leaves Illinois and Virginia as the only states in the nation that maintain and defend an attorney preference system.

6. Online remote access is the only practical means for covering, and reporting on, new civil filings in the Prince William Court, and throughout the Commonwealth, because sending a reporter to visit each of the 120 circuit courts across the state on a daily basis, if at all,

is not practicable for any news entity. I looked on Google Maps to measure the commute time from the eastern-most OCRA court in Eastville on the Delmarva Peninsula in the Atlantic Ocean to the western-most OCRA court in Jonesville in the Appalachian Mountains. It would take a reporter eight hours and seventeen minutes to drive between the two courthouses and review their records. Starting at one courthouse when it opened, the reporter could not get to the other before it closed. A member of the bar, however, covers that distance in the blink of a virtual eye without budging from the office chair.

7. The undeniable effect of Defendants' access restrictions is that the practical ability of the press to report on new civil lawsuits and subsequent filings in a timely fashion is impaired. This means that the ability of the general public to learn about and comment on events in an important institution is impeded or eliminated altogether, all while one subclass of the public can view new filings remotely on a daily basis, wreaking havoc on the traditional press corps.

8. Based on my many years as a journalist covering courts throughout this country and my personal experience overseeing CNS, I have developed a comprehensive understanding of how various courts' case management systems operate and how courts provide remote access to new civil filings and the court record as a whole.

9. I have also observed that contemporaneous access to new civil filings and other court records is essential to robust and accurate news reporting about the courts of our nation, a critical branch of government and one of the foundation stones of our democratic republic. Readers are interested in the course of legal events and in the latest news. They are constantly seeking fresh information, particularly in an era of digital news coverage, where there is a 24/7 news cycle. That is why traditionally and now, news outlets report today's events today.

10. In order to accurately report on those events, and to let the public know that a legal case or significant record has been filed, it is fundamental to have practical contemporaneous access to newly filed civil complaints and subsequent civil filings as the court record is developed. Remote access is the best way to achieve contemporaneous access. But that is not possible in the Prince William Court, where the press and public are pushed behind one segment of the public – Virginia-licensed attorneys – who are in fact given remote electronic access to new civil filings, including in cases in which they are not attorneys of record, via OCRA. I believe the First Amendment, the number one right in the Bill of Rights, does not allow the government to impose such an onerous and obvious restriction on access to public records, when the government operates a common, permissions-based system of access that provides access to public court records only to one subset of the public, local lawyers.

**CNS Publications and Subscribers**

11. CNS is a nationwide legal news service focusing on new civil litigation with a network of reporters based across the nation. We provide reports on appellate rulings, legislation, and new civil cases from federal and state courts around the country, as well as coverage of Congressional hearings and Supreme Court arguments.

12. I began CNS in 1990 out of a belief that news about civil litigation went unreported because the traditional news media failed to cover much of the important business of the courts. CNS is similar to other news services, such as the Associated Press, except that CNS specializes in reporting about civil lawsuits, from the inception of new cases and on to appellate rulings.

13. CNS' coverage of rulings, trials, and new civil complaints initially focused on the United States District Court for the Central District of California where journalists trooped down to the clerk's office every afternoon and gathered a stack of new complaints from the intake clerk

to look over for news stories. By 2001, CNS' regional coverage in California included the major metropolitan state and federal courts in Los Angeles, Orange County, California, and San Francisco. Soon after, CNS was also covering state and federal courts in Houston, New York, and Chicago. CNS continued expanding its coverage of trial courts over the years, first in major metropolitan areas and then gradually extending into less populous areas. Today, CNS employs approximately 240 people, most of them editors and reporters, covering state and federal trial and appellate courts across all 50 states. *See also* Joint Stipulations of Facts, dated May 4, 2022, Dkt. No. 55 ("JSF"), ¶ 12.

14. The result of CNS' nation-wide coverage by its reporters is a variety of publications offered to subscribers, reporting on all stages of civil litigation, from the initial complaint or petition to subsequent filings, hearings, and rulings, through final appeal in federal and state courts around the nation, including the U.S. Supreme Court. *See also* JSF ¶¶ 4-7.

15. One category of publications is CNS' New Litigation Reports, which contain original, staff-written summaries of significant and newsworthy new civil complaints. These reports are sent to subscribers via e-mail each evening. The New Litigation Reports focus on general jurisdiction complaints against business and government entities, as well as any other civil action that might be of interest to CNS' subscribers. The reports do not cover criminal, domestic relations, or probate matters, nor do they include name changes, probate filings, or most residential foreclosures. *See also id.* ¶¶ 4-5, 8. Nor does CNS seek to report on any filings that are statutorily confidential or accompanied by a motion to seal.

16. To prepare the New Litigation Reports and identify new filings that may warrant a broader article on CNS' website – which functions much like a print daily newspaper, featuring staff-written articles about the news of the day that are posted and rotate on and off the page on a 24-hour news cycle – CNS reporters have traditionally visited their assigned courts, so that they

can review the filings to determine which ones are newsworthy. *See also id.* ¶¶ 7, 9. CNS reporters often visit courts daily, usually at the end of the day, to review the day's filings, but sometimes less frequently, especially in remote areas, where CNS is forced to base its reports on any docket information (*i.e.*, party names, case type, and court name) made available online.

17. As the federal courts and an increasing number of state courts are making court records, including new civil filings, available online, CNS also covers courts remotely through the Internet. To report on the onset of new litigation and subsequent developments in a case, a reporter must have access to newly filed civil complaints and subsequent filings on a contemporaneous basis.

18. CNS now has more than 2,750 subscribers nationwide. All but a very few of the nation's large and mid-sized law firms subscribe to one or more of CNS' publications, and make them available to attorneys and others at the firm. CNS subscribers also include law schools, law libraries, government offices, judges, news organizations, public entities, Fortune 500 Companies, and entertainment and watchdog groups nationwide. *See also* JSF ¶ 2.

19. A substantial number of news and entertainment outlets are CNS subscribers, including but not limited to, *The Atlanta Journal Constitution*, *The Boston Globe*, Buzzfeed, *The Dallas Morning News*, *Detroit Free Press*, Fox Entertainment Group, *Los Angeles Times*, North Jersey Media Group, *The Salt Lake Tribune*, *San Antonio Express News*, *San Jose Mercury News*, *Tampa Bay Business Journal*, *The Wall Street Journal*, Warner Bros., and many broadcast stations. The Washington-based Center for Public Integrity also subscribes.

20. Among academic institutions, subscribers to CNS' New Litigation Reports include Boston College Law School, Boston University, Case Western Reserve University, MIT Sloan School of Management, Southern Illinois University School of Law, UC Hastings College of Law, and UCLA School of Law, among many others.

21. CNS' news media subscribers rely on CNS to provide them with timely information about civil litigation, our specialty, so they can provide information about those cases to their readers and viewers. I have found that as resources for mainstream media have diminished, media outlets are increasingly relying on CNS for prompt information about court filings. CNS has been credited as the original source of reporting by a range of publications, including: *ABA Journal*, ABC News, *The Atlantic*, *Austin American Statesman*, Black Christian News Network, *California Bar Journal*, CBS News, *The Christian Science Monitor*, *The Daily Beast*, *The Dallas Morning News*, *Forbes*, Fox News, *The Guardian*, *The Hill*, *Houston Chronicle*, *The Huffington Post*, *Long Island Press*, *Los Angeles Times*, *The Mercury News, Mother Jones*, National Public Radio (NPR); NBC News, *New York Daily News*, *New York Magazine*, *The New York Times*, *The Orange County Register, Politico*, *Rolling Stone*, *Salt Lake City Tribune*, *San Antonio Express-News*, Slate, *The Telegraph* (UK), *The Wall Street Journal*, *The Washington Post*, *The Washington Times*, Women's Health Policy Report, United Press International (UPI), *USA Today*, *U.S. News and World Report,* and the YouTube news channel. In addition, American, Canadian, and New Zealand radio shows have interviewed CNS reporters.

22. In Virginia, CNS has been credited as the original source of reporting by WTKR News 3 (wtkr.com) and *The Virginia-Pilot* (PilotOnline.com). And, *The Washington Post* has credited CNS as the original source of reporting in articles it published on its website concerning new complaints filed in Fairfax County and in the United States District Court for the Eastern District of Virginia (Alexandria Division).

**The Tradition of Access to New Complaints and Other Civil Filings**

23. It has been a long-standing tradition for the press to review new civil complaints in courts across the country on the day of filing. This practice ensures that interested members of

the public learn about new cases in a contemporaneous manner, while the news is still fresh. As CNS expanded, I regularly visited federal and state trial courts to start our reporting on those courts. Each court, state and federal – whether in Los Angeles, Orange County, San Francisco, or San Jose – provided journalists with access to the new paper complaints filed that day. The complaints were usually stacked in a bin, made of either wood, wire mesh, or cardboard. The same was true as our coverage expanded to the Midwest and East Coast, in Chicago, New York, and Washington D.C. The pattern also held true through the South, in Dallas and Houston; in the Southeast in Miami; and in the Southwest in Phoenix and Albuquerque. Those courts provided the press with access to the new complaints on the day of filing, with clerks allowing reporters to regularly check the stack of newly filed civil complaints. The reporters were looking for news, and the review of the new complaints that had just come across the counter was a standard and daily task for a reporter on the court beat.

24. In addition to seeing the new cases at the counter, as was the case in clerks' offices throughout Virginia, including at the Prince William Court, journalists covering a courthouse traditionally had access to the records room, where they could review new civil complaints and subsequent filings, including motions and rulings, and check and research the record. As electronic technology and the Internet began to dominate the area of communication and record-keeping, the records room moved online in court after court. The common and nearly universal practice when courts were first starting to move things online was to first scan paper documents and electronically store the scans, often discarding the paper records. This was, and still is, the case in the Prince William Court, among other courts in Virginia. The next step courts have taken is to require that the filers provide scans or electronic versions of their documents as part of electronic filing, with those records also being stored electronically.

25. Virginia's technological transition is stuck between these two phases. The overwhelming number of new civil filings are still filed in paper form but they are scanned by court staff and stored in electronic form. In individual courts, such as the Prince William Court and others, the records room is electronic and journalists and members of the public seeking to review records are directed to an electronic terminal in the clerks' office where they look at scans of paper records. *See also* JSF ¶ 24-26.

26. The overwhelming number of states and courts that have engaged in the technological transition have given access to their records online, via the Internet, through a court website. Even Ventura County Superior Court in California, a fully paper court and the focus of ten years of litigation over access, scans its paper records and puts them online through the court's website, for review by the press and public.

27. Where courts provide the press with access to filings on a remote online basis, CNS covers most of them remotely. The list of states providing online access to the press is long. It includes, either on a statewide basis or through individual courts within the state: California, Louisiana, Massachusetts, Nebraska, Oklahoma, Tennessee, and Washington – in which several of the courts are predominantly paper-filing courts – as well as courts within Alabama, Arizona, Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Indiana, Iowa, Kansas, Kentucky, Maine, Minnesota, Mississippi, Montana, Nevada, New Jersey, New Mexico, New York, North and South Dakota, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, Texas, and Utah. *See also* JSF ¶ 10.

28. In addition, all federal courts in the nation, including this Court, give journalists and the public online access to public court records via PACER. *Id.* ¶ 11.

29. What all these state and federal courts permit, while carrying on the tradition of access in today's technological age, is a review of new civil actions and subsequent filings in

courts urban and rural. They provide this access to journalists and often to the public as well. Virginia, by contrast, allows this access only to a special class of its citizens, those with a law degree and Virginia bar number, while excluding the press and public. The access allowed to attorneys cannot, in practical terms, be matched by the press or public. No press organization can afford to send a reporter on a daily basis to each circuit court that uses OCRA, which covers most of the Virginia circuit courts, *i.e.*, 105 out of 120, in an area of over 30,600 square miles with 6 million residents. *See also* JSF ¶ 27; Dkt No. 33-2 (map of counties covered by OCRA). No private news organization can cover that area on a daily basis. Such a task would require a small army of reporters and is, in practical terms, impossible.

**<u>Access to Civil Filings in the Prince William Court and Other Virginia Circuit Courts</u>**

30. Of the 120 Virginia circuit courts, CNS is only able to send reporters to five of them on a daily basis, including the Prince William Court. *See also* JSF ¶ 14. Twelve other circuit courts are covered intermittently by sending one of the Virginia-based reporters to the court on a less than daily basis. *See also id.* ¶ 16.

31. As explained in more detail in the accompanying declaration of Ryan Abbott, CNS' Southeast and Mid-Atlantic Bureau Chief ("Abbott Decl."), CNS currently covers one Virginia circuit court, *i.e.*, the Alexandria Circuit Court, remotely on a daily basis by accessing new civil filings through the Internet via the Alexandria Justice Information System. That system, unlike OCRA in the Prince William Court, and other Virginia circuit courts, is not restricted to attorneys only.

32. Due to the remote location of many of the remaining 102 courts and the cost-prohibitive expense of hiring numerous additional reporters to cover each of those far off courts in person, it is not possible to visit these courts at all, and most certainly not on a daily basis. *See also* JSF ¶ 17. I am thus resigned to having those remaining courts covered with docket

information only. This is less than ideal because, without access to the actual complaints and other filings, CNS cannot fully inform its subscribers and the public regarding who has been hauled into the courts and why. This, in turn, suppresses the ability of lawyers, professors, law students, news reporters, and readers of our New Litigation Reports, website, and other publications to know about and freely discuss a new or ongoing legal contest pending in a public court of law. The practical effect of the exclusion is a press blackout for public records in the smaller, far-flung counties in the OCRA system.

33. Having access to OCRA would assist my reporters in covering the courts in a timely manner. If CNS had access to OCRA on a statewide basis, I would have the three Virginia reporters cover the 105 circuit courts that use OCRA on a daily basis by having them review the complaints filed in those courts and posted on OCRA. Our reporters could also follow and report on newsworthy cases in remote regions of Virginia as they progress through their courts.

34. For example, the CNS reporter covering the Prince William Court, Joan Hennessey, could instead cover that court via OCRA to allow her to visit other courts daily that do not offer OCRA or any other online access. Currently, Ms. Hennessey visits the Prince William Clerk's office on a daily basis to review all newly filed civil complaints and other filings made available since her visit the previous day. She then reports on newsworthy complaints by preparing original summaries for inclusion in CNS' *Virginia Report*. In addition to covering the Prince William Court, she also covers the Alexandria Circuit Court remotely on a daily basis, while covering the Fairfax Circuit Court (which does not utilize OCRA) in person on a daily basis, and the circuit courts in Arlington, Fauquier, and Loudoun in person on a weekly basis.

If Ms. Hennessey had access to OCRA, particularly on a statewide basis, she could visit the Fairfax court in person on a daily basis, while also covering the Prince William Court and others on a daily basis via OCRA, ensuring the timely delivery of news in each of these courts.

**<u>Requests for OCRA Access</u>**

35. In 2016, I instructed Ryan Abbott to request OCRA access from circuit courts that used OCRA. Mr. Abbott requested such access from almost fifty Virginia circuit court clerks. Of those clerks who responded, they either denied OCRA subscriber access outright or offered subscriber access on the condition that the person subscribing was a Virginia-barred attorney. *See* Abbott Decl., ¶ 23.

36. During her deposition in the *Courthouse News Serv. v. Schaefer* litigation, in which Judge Henry Coke Morgan, Jr. issued a declaratory judgment finding the press and public enjoy a First Amendment right of access to newly filed civil complaints "contemporaneous with the filing of the complaint," *id.*, 440 F. Supp. 3d 532 (E.D. Va. 2020), the Prince William Clerk testified that she was willing to provide OCRA access to CNS. *See* Dkt No. 33-4 at 6-7. Hearing that offer, I instructed Mr. Abbott and CNS' outside counsel at Bryan Cave Leighton Paisner to follow-up and request such access from the Prince William Clerk.

37. Upon my instruction, Mr. Abbott filled out an OCRA Subscriber Agreement and sent it to the Prince William Clerk. *See* Abbott Decl., Ex. 4.

38. I again instructed Mr. Abbott and CNS' outside counsel to follow-up regarding access to OCRA. In response, the Prince William Clerk created an OCRA Subscriber Agreement for non-attorneys. This Non-Attorney Subscriber Agreement increased the cost of OCRA from $200 per year to $1,200 per year, and imposed a variety of prohibitions on dissemination and publication of filings gathered via OCRA. It is my understanding that the prohibition on dissemination may be based on language in the Virginia Code, and it is my belief

that a restriction on the dissemination of a public court filing, which this is, violates the First Amendment and is unconstitutional.

39. While I would be willing to have CNS pay $200 per year for access to Prince William Court filings via OCRA, because the Prince William Clerk increased the subscription cost sixfold and restricted public dissemination of any reporting based on that access, I instructed Mr. Abbott and CNS' outside counsel to not complete the Non-Attorney Subscriber agreement.

40. It is my understanding that the Prince William Clerk denies that she has no, or had at any time, discretion to provide CNS access to OCRA.

**CNS is Not Seeking Access to Confidential Documents**

41. It is also my understanding that the documents available on OCRA are not confidential. By the time the documents are available on OCRA, they have already gone through the three stages of processing – (1) intake; (2) data entry; and (3) scanning – and are also already available for public viewing at the courthouse.

42. To the extent that Defendants argue that limiting remote access to Virginia-barred attorneys and their staff protects private and confidential information, as pointed out by Judge Morgan during the *Schaefer* trial, the duty to keep personal identifiers out of filings is the filer's responsibility based on Virginia statues and court rules.

43. And, to the extent that Defendants argue that Virginia-barred attorneys can have access because they are governed by a Code of Ethics, I note that CNS reporters abide by ethical proscriptions precluding inclusion of such data in original news stories. The CNS manual makes clear that if confidential information is inadvertently released, CNS is not to disclose such information, and in training, reporters are instructed that the rule applies to personal identifiers. Reporters are members of a profession, just as lawyers are, with attendant professional standards. More importantly, OCRA is a permissions-based system, which requires registration,

a user name and password, and provides the ability to monitor use, if need be, whether users are lawyers, reporters or anyone else.

**<u>Importance of Remote Access</u>**

44. New civil filings are a traditional source of news, and can involve matters of great public interest, from constitutional challenges to environmental complaints to opioid class actions, many of which were filed in rural counties in the Appalachian region. The only way for reporters to provide the public with consistent and reliable information about those filings is to have access to the court record. In practical terms, OCRA, the Clerk, and the Commonwealth have placed a barrier in front of access to the public record in a great swath of the state, a barrier that is high and wide. The result of that barrier, in practice, is that the public record has been blacked out. No news organization can hire the dozens of reporters necessary to travel on a daily basis to the 105 courts in the OCRA system. No news organization can come close to matching the ease with which local attorneys can see the public record in the Commonwealth's courts. As a result, the news contained in the new public filing in a critical institution of democratic government is limited to one professional class and cannot be conveyed to the public. At the same time, that government-imposed barrier can be brought down with remarkable ease. Reporters can be allowed to register and obtain a user name and password so they can enter the great public records room that is OCRA, and report on the public business of the Commonwealth's courts to the people of Virginia and the nation.

45. Restricting remote access to new filings effectively suppresses reporting on court matters, and turns them into secret tribunals where only those directly involved – and members of the bar – know of the events taking place and the documents filed in association with those events.

*   *   *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Pasadena, California on this 11th day of July 2022.

William Girdner

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| COURTHOUSE NEWS SERVICE,<br>*Plaintiff,*<br>v.<br>JACQUELINE C. SMITH, *et al.*,<br>*Defendants.* | ) | Civil Action No. 3:21-cv-00460-HEH |

DECLARATION OF RYAN ABBOTT IN SUPPORT OF PLAINTIFF COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT

I, Ryan Abbott, declare and state as follows:

1. I am employed as the Mid-Atlantic and Southeast Regional Bureau Chief for Courthouse News Service ("CNS"), the plaintiff in the above-captioned action, and I make this declaration in support of CNS' motion for summary judgment. I have personal knowledge of the following facts, except where otherwise stated.

**My Background and Role at CNS**

2. I have worked for CNS since 2004 in various roles. Before working for CNS, I was an intern and fact-checker with *Baltimore Magazine* for about two years. I majored in Political Science and minored in Creative Writing and Journalism at Towson University in Maryland.

3. When I began working for CNS, I was hired as a part-time reporter. In 2005, I became a full-time reporter. In that role, I covered courts in Virginia and Maryland. In 2012, I became the bureau chief for Virginia and Pennsylvania.

4. In May 2013, I was promoted to my current position of Mid-Atlantic and Southeast Regional Bureau Chief. In that role, I currently supervise approximately 30 CNS reporters and four researchers, who cover state and federal courts in the Mid-Atlantic and Southeastern United States, including the two reporters who currently cover the state and federal courts of Virginia: Joan Hennessey and Jocelyn Rardin.[1] I also personally visit many of the courts that I supervise in order to train reporters, stay up to date on the various courts' access procedures, and keep apprised of issues impacting our reporting.

5. I have also personally observed CNS reporters as they have accessed and reported on new civil filings in the 120 Virginia circuit courts, including the Prince William County Circuit Court (the "Prince William Court"), and I regularly communicate with those reporters I supervise in order to stay apprised of their procedures for reviewing and reporting on new civil filings at each of those courts. I can therefore speak to those reporters practices for reviewing and reporting on civil filings at each of the Virginia circuit courts, including the Prince William Court. I am also familiar with the access barriers imposed by the Prince William Court, as well as 104 other Virginia circuit courts, that restrict remote online access to Virginia-barred attorneys, while prohibiting general public and press access, through the Officer of the Court Remote Access system ("OCRA").

6. These access restrictions mean that in order for CNS to review and report on a day's filings at the Prince William Court, or any other Virginia circuit court that does not provide remote access to the press or public, a reporter must travel to the individual courthouse during business hours to review records on computer access terminals in the Clerk's office, all while a

[1] As of the date of the parties' joint stipulations of fact filed in this case, Dkt. No. 55, an additional reporter, Brad Kutner, also covered the Virginia courts but he no longer works for CNS.

Virginia attorney can access the same case records from the comfort of their home, office, or anywhere else in the world on a 24/7/365 basis.

7. As Mid-Atlantic and Southeast Regional Bureau Chief, I also assign stories for publication on CNS' website (www.courthousenews.com) to reporters in my bureau who cover a wide variety of political and legal topics, including but not limited to, trial and appellate court pleadings and rulings in state and federal court, including those in Virginia.

8. CNS reporters across the country make regular courthouse visits in their assigned area to report on civil lawsuits, and then publish those reports in daily "New Litigation Reports," which contain original, staff-written summaries of significant new civil complaints and are broken up by region or court. CNS reporters also publish articles daily on CNS' publicly-available website (www.courthousenews.com), and many of those articles focus on ongoing court cases in state and federal courts, including those in Virginia.

9. CNS publishes two New Litigation Reports for courts in Virginia – the *Virginia Report*, which covers new litigation filed in 31 Virginia circuit courts, including the Prince William Court, and the *Southern Virginia State Report*, which covers new litigation filed in 89 Virginia circuit courts.

**Access to Civil Filings in the Virginia Circuit Courts**

10. Timely reporting on new civil filings is a core part of what CNS strives to do for its readers. Our readers are interested in the news as it occurs, and we routinely report on newly filed civil complaints and other subsequent notable filings the same day we receive access to them.

11. It is my understanding that the Clerk of the Prince William Court (the "Clerk" or "Prince William Clerk"), as well as the Commonwealth of Virginia, contend that the Virginia

Code requires the non-attorney remote access restriction because the Code prohibits the Clerk from posting on the Internet social security numbers, financial account numbers, dates of birth, maiden names, minor names, and signatures, but qualifies that prohibition by stating that it shall not apply to providing secure remote access to non-confidential court records to Virginia attorneys. Va. Code § 17.1-293(B), (E)(7).

12. Nonetheless, the Circuit Court for Alexandria County, Virginia (the "Alexandria Circuit Court") provides remote online access to non-confidential civil court records to subscribing members of the press and public via the Alexandria Justice Information System ("AJIS"). CNS has covered the Alexandria Circuit Court on a daily basis by accessing new civil filings through AJIS, since February 7, 2022. Prior to that time, CNS was only able to cover the Alexandria Circuit Court by sending a reporter to the court on a weekly basis.

13. In order to obtain remote access to the AJIS system, on January 11, 2022, I, on behalf of CNS, visited the Alexandria Clerk's website at www.alexandriava.gov/clerkofcourt[2], and then clicked on the "online records" link, which redirected me to the AJIS website located at https://secure.alexandriava.gov/ajis/index.php. Once I was on that page, I clicked on the "New Subscriber Registration" link, which redirected me to the AJIS registration website (located at https://secure.alexandriava.gov/ajis/registration1.php), which stated, among other things, that a paid subscription account was required to access certain parts of AJIS; asked me to enter my first name, last name, street address, city, state, zip code, phone number, and email information; and to print, sign, and return the form to the Office of the Clerk of Circuit Court either by email, in

[2] In preparing this declaration, I learned that this website is no longer functional. Instead, the equivalent website is now located at https://www.alexandriava.gov/ClerkOfCircuitCourt (last visited July 11, 2022), and there is an instruction with respect to those members of the public that wish to request remote access: "To request remote access visit https://alexandriava.gov/courtrecords and click New Subscriber Registration."

person, or via email to land.records@alexandria.gov. A true and correct copy of a screenshot of the AJIS registration page I completed on January 11, 2022 is reproduced below:




14. After entering the requested information detailed in the preceding paragraph, I then clicked "Continue" at the bottom of the webpage, which brought me to a new webpage on which I confirmed the information I entered, and then I was able to proceed to choose a username and password.

15. After clicking to confirm my chosen username and password, I was provided with a subscriber request form for paid public access, which I printed and then signed to certify that the information I provided was true and correct and that I received, read, and understand the Subscriber Agreement pertaining to remote access to civil court records via AJIS, and that I accepted all terms set out therein. After signing the subscriber request form, I emailed a scanned PDF version of the executed form to land.records@alexandriava.gov. A true and correct copy of the subscriber request from signed by me is attached hereto as Exhibit 1. A true and correct copy

of the AJIS Subscriber Agreement that I reviewed in connection therewith, which is publicly available, is attached hereto as Exhibit 2.

16. The AJIS Subscriber Agreement states that the purpose of the agreement is "to participate in a program whereby the public ("Subscriber") may inspect and copy information in court records via remote access whereby such inspection may be made without the need to physically visit the courthouse where the record is maintained." Ex. 2 at 1. The AJIS Subscriber Agreement further states that the subscriber fee for a full year of AJIS access is $500.00. I paid the subscriber fee of $500.00, on behalf of CNS, on January 12, 2022 by credit card over the phone directly to a member of the Alexandria's clerk's office.

17. On January 12, 2022, after my application for remote access via AJIS was reviewed and approved by the Alexandria Clerk, I received notice via email that my subscriber username and a temporary password was issued by the clerk's office. A true and correct copy of that email is attached hereto as Exhibit 3. Since January 12, 2022, CNS has been able to obtain non-confidential civil court records filed in the Alexandria Circuit Court via remote access through the AJIS system, without the need to physically visit the courthouse, "seven days a week, twenty-four hours a day, including holidays, except during periods of System maintenance." Ex. 2 at 1.

18. On February 7, 2022, I instructed CNS reporter Joan Hennessey to begin covering the Alexandria Circuit Court on a daily basis via AJIS, using the user credentials I obtained on behalf of CNS, after being approved by the Alexandria clerk, on January 12, 2022.

19. In order to access civil filings remotely via AJIS, Ms. Hennessey, who also covers the Prince William Court in person on a daily basis (as well as Fairfax in person on a daily basis, and Arlington, Fauquier, and Loudon in person on a weekly basis), visits a secure website

(https://secure.alexandriava.gov/ajis/index.php) to log on to the AJIS system with CNS' user name and password. Once logged into AJIS, Ms. Hennessey searches for new cases, and other filings, by doing a date range search to see what has been filed since the prior day.

20. To my knowledge, the Alexandria Circuit Court takes no steps to redact dates of birth, maiden names, or minor names before making court records available on AJIS, but signatures are often redacted, presumably by the clerk's office. In my 18 years of covering courts, I am not aware of any other state, besides Virginia, that purports to prohibit clerks or parties from posting signatures on the Internet. And only courts in four states, to my knowledge, *i.e.*, Connecticut, Massachusetts, New Hampshire, and Oregon, require the redaction of maiden names.

21. In addition to the Alexandria Circuit Court, CNS covers five other Virginia circuit courts on a daily basis, *i.e.*, Prince William, Fairfax, Norfolk, Richmond City, and Virginia Beach, by sending reporters to the physical courthouse. *See also* JSF ¶ 14.

22. Twelve other circuit courts are covered intermittently by sending one of the Virginia-based reporters to the court on a less than daily basis. *See also id.* ¶ 16. CNS covers the remaining 102 Virginia circuit courts only with docket information, *i.e.*, party names, case type, court name, due to their far off locations and the cost-prohibitive expense of hiring numerous additional reporters to cover each of those courts in person. *See also id.* ¶ 17.

**<u>CNS' Requests for OCRA Access</u>**

23. In 2016, I requested OCRA access from almost fifty Virginia circuit court clerks. Of those clerks who responded, they either denied OCRA subscriber access outright or offered subscriber access on the condition that the person subscribing was a Virginia-barred attorney.

24. In May 2021, at the instruction of CNS' editor, William Girdner, I filled out an OCRA Subscriber Agreement and sent it to the Prince William Clerk to request OCRA access. A true and correct copy of that agreement is attached hereto as Exhibit 4. In response, I received a letter from the Prince William Clerk, dated May 13, 2021, rejecting my application because I did not include a Virginia Bar license number. A true and correct copy of that letter is attached hereto as Exhibit 5. A bar number was not included because I am not an attorney, and thus not a member of the Virginia bar, let alone any bar association.

25. On May 25, 2021, CNS' counsel, on my behalf, wrote to the Prince William Clerk via email to inquire as to the denial of access. It is my understanding that the Prince William Clerk responded by email stating, in part "[W]e don't currently have an OCRA contract for non-attorneys. I will work on pulling one together now so we can complete same for Mr. Abbott and offer it to any other non-attorney parties who may wish to sign up for access." *See* Exhibit 6 hereto, which is an email chain that was produced by the Prince William Clerk in discovery in this case and forwarded to me by CNS' counsel.

26. Thereafter, the Prince William Clerk provided CNS, through its counsel, a Non-Attorney Subscriber Agreement, offering to provide OCRA access to CNS at an annual subscription fee of $1,200 for one non-attorney, while also imposing a variety of prohibitions on dissemination and publication of non-confidential civil court filings that are not included in the Attorney Subscriber Agreement. *See* Exhibit 7, which is an email chain that was produced by the Prince William Clerk in discovery in this case and forwarded to me by CNS' counsel. The Non-Attorney Subscriber Agreement itself is attached as Ex. J to CNS' motion for summary judgment. CNS did not sign or submit the Non-Attorney Subscriber Agreement.

* * *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Ocean City, Maryland on this 11th day of July 2022.

________________________________________

Ryan Abbott

# EXHIBIT 1
# to Declaration
# of Ryan Abbott

CITY OF Alexandria VIRGINIA

Home > Online Court Records > Registration Print

January 11, 2022

Office of the
Clerk of Circuit Court

**Online Alexandria Circuit Court Records**
**Paid Public Access**
**Subscriber Request**

| | |
|---|---|
| **Date :** | **January 11, 2022** |
| **Subscriber Name :** | **Ryan Abbott** |
| **Address :** | **10109 Queens Circle** |
| | **Ocean City, MD 21842** |
| **Phone :** | **(443) 783-1463** |
| **E-mail :** | **ocsurfingryan@gmail.com** |

**I certify that the information I have provided is true and correct and that I have received, read and understand the Subscriber Agreement dated 07/01/2008 and accept all terms set out therein.**

**Subscriber's Signature :** [signature]

Print

In order to view the records of the Alexandria Circuit Court by remote access you must make an appointment and personally meet with the Clerk of the Court to have your application approved. You may make an appointment by calling Benjamin Ortiz at (703) 746-4552, John S. Knippenberg at (703) 746-4564. At the time of your appointment you must bring with you personal identification and proof that you hold a current business license. You will also need to have your Application fully completed and be familiar with our Subscriber Agreement.

Done

# EXHIBIT 2
# to Declaration
# of Ryan Abbott

# CLERK OF CIRCUIT COURT

## CITY OF ALEXANDRIA, VIRGINIA

520 KING STREET, ALEXANDRIA, VA 22314

**J. Greg Parks**
Clerk of Court

**John Knipppenberg**
Chief Deputy

**Benjamin Ortiz**
Chief Deputy, Operations
**Jeffrey Harmon**
Chief, Land Records
**Shavon Thomas**
Chief, Court Services

**SUBSCRIBER AGREEMENT FOR SECURE REMOTE ACCESS TO ALEXANDRIA CIRCUIT COURT DOCUMENTS**

**1. Purpose of the Agreement**: It is the intent of both parties to participate in a program whereby the public ("Subscriber") may inspect and copy information in court records via remote access whereby such inspection may be made without the need to physically visit the courthouse where the record is maintained.

**2. Description of System**: The Clerk of the Circuit Court ("Clerk") provides an on-line database system ("System") allowing Subscribers inquiry-only access to the court's indices and documents. The information, data and documents accessed by Subscribers in the System may or may not be the official government record required by law. To ensure accuracy of the data or information, the Subscriber should consult the official governmental record.

**3. Application**: To become a Subscriber, a member of the public must complete an application as prescribed on the Clerk's public webpage at https://www.alexandriava.gov/ClerkOfCourt. A complete application must be submitted before access to the system will be granted. Once the application is reviewed and approved by the Clerk, the Subscriber ID and Password will be issued. By submitting the application, the Subscriber acknowledges and accepts the terms of this Subscriber Agreement.

**4. Term of the Agreement:** Subscriber is granted remote access to commence on the day the Subscriber ID and Password(s) are assigned. Access to the System will continue for the term the Subscriber requests and for which the applicable fees are paid, unless terminated as provided herein.

**5. Days and Hours of Operation**: The System is available seven days a week, twenty-four hours a day, including holidays, except during periods of System maintenance. The System may be down for other periods due to issues beyond the control of the Clerk such as security intrusions or other unforeseeable technical or operational issues. The Clerk will inform all Subscribers of any known periods when the System will be unavailable.

**6. Fees**: The fee for the Subscriber is $50.00 per month. If the Subscriber pays for a full year, the fee is $500.00 (Subscriber receives two months free). The Clerk does not charge a transactional fee or copy fees. Payment is due prior to the issuance of the Subscriber ID and Password. The Clerk will suspend or terminate a Subscriber's access once the paid-for period has elapsed unless additional payment is received. All fees are subject to change upon renewal of this agreement by the Subscriber, either monthly or yearly.

**7. Services**: The Clerk will provide the Subscriber with inquiry-only access to the System. The Clerk will provide the Subscriber with limited consultation on specific problems that arise in the use of the System. The Clerk does not guarantee consultation results nor warrant or represent that all errors or problems will be corrected.

**8. Subscriber's Obligations**: The Subscriber must provide the computer hardware and software necessary for access to the System. The Subscriber will make every effort to ensure that unauthorized personnel do not use the Subscriber's ID and Password(s) to gain access to the System. A Subscriber shall immediately notify the Clerk when they terminate an employee who has access to the System.

**9. Limitations of Liability**:

a. The Subscriber, and all employees, officers and agents thereof, assumes all risks associated with the use of the System, including the risks that damage may occur to computer systems, hardware, software or data stored on or contained in computer systems.

b. The Subscriber relieves and releases the Clerk, the City of Alexandria, and the Office of the Executive Secretary (OES), Supreme Court of Virginia, and all deputies, employees, officers, and agents of the Clerk, City and OES from responsibility and liability for all types of damages from the Subscriber's use of the System including loss of use, loss of profits, business interruption, procurement of substitute goods or services, loss of revenues caused by any failure of performance, error, omission, interruption, deletion, defect, incorrect data, delay in operation or transmission of information, data communication line failure, computer virus, theft, destruction, unauthorized access or alteration, regardless of whether from negligence, breach of contract, or any other cause of action, and for all damages resulting from any claim or demand against the Subscriber by any other party.

**10. Termination**:

a. Either party may terminate this agreement with fifteen (15) days written notice to the other. Such notice may be sent via email or U.S. mail. Subscriber remains responsible for payment of fees, pro rata, for services rendered or obligations incurred. Refunds will be given on a monthly prorated basis for yearly subscribers.

b. This agreement may be terminated immediately by the Clerk for Subscriber's failure to comply with the terms of this agreement, or failure to pay fees.

c. This agreement shall terminate immediately if the Commonwealth of Virginia or the City of Alexandria fail to appropriate and continue funding for the services provided by the Clerk under this agreement. In such case, the Clerk will refund pro rata fees to Subscribers for any period of lapse of service.

d. The Clerk may monitor the use of this system for illegal, criminal, and unauthorized activities. If such activities are detected, the Clerk may provide evidence of those activities to law enforcement officials. Subscribers consent to monitoring of all their activities on the System. Unauthorized attempts to modify any information stored on the System, to defeat or circumvent security features, or to utilize the System in a manner other than the intended purposes are prohibited and may result in criminal prosecution and immediate termination of all access to the System.

# EXHIBIT 3 to Declaration of Ryan Abbott

**From:** Ryan Abbott <ocsurfingryan@gmail.com>
**Sent:** Monday, July 11, 2022 3:45 PM
**To:** CNS Ryan Abbott <rabbott@Courthousenews.com>
**Subject:** Fwd: City of Alexandria Secured Remote Access

Begin forwarded message:

**From:** "land.records@alexandriava.gov" <land.records@alexandriava.gov>
**Subject: City of Alexandria Secured Remote Access**
**Date:** January 12, 2022 at 3:38:07 PM EST
**To:** "ocsurfingryan@gmail.com" <ocsurfingryan@gmail.com>

Good Afternoon,

Your account has been developed and re-set. The temporary password is new2vacourts!. If you have any more questions or concerns do not hesitate to ask. Below is the url to our secured remote access https://risweb.vacourts.gov/jsra/sra/#/home.

Jeffrey Harmon
Alexandria Circuit Court
Land Records Division
703-746-4568

# EXHIBIT 4
# to Declaration
# of Ryan Abbott

**ATTORNEY SUBSCRIBER AGREEMENT FOR REMOTE ACCESS TO PRINCE WILLIAM COUNTY CIRCUIT COURT CASE DOCUMENTS**
known as Officer of the Court Remote Access (OCRA)

This Agreement is made and entered into by and between the Prince William County Circuit Court Clerk's Office (hereinafter "Clerk's Office") and Ryan Abbott *(Name of Applicant)* (hereinafter "Subscriber"), a member of the Virginia State Bar.

**TERMS AND CONDITIONS OF AGREEMENT**

**1. TERM OF AGREEMENT**
It is the intent of both parties to participate in a remote access program to commence upon the day of approval by both parties and to continue until terminated as provided herein.

**2. DEFINITIONS**
a. "Remote Access" means that inspection can be made without the need to physically visit the courthouse where the court record is maintained.
b. "Subscriber" means any person authorized by the Clerk of Circuit Court to have remote access to court case documents on its website.
c. "Inquiry Only Access" means access to only search for, view and print document images.
d. "OES" is the Office of the Executive Secretary of the Supreme Court of Virginia.
e. "OCRA" is the OES's Officer of the Court Remote Access system that enables remote viewing of documents in the OES Case Imaging System utilized by the Prince William County Circuit Court.

**3. SUBSCRIBER OPTIONS**
The Clerk's Office provides one subscriber option: access to an on-line database allowing inquiry-only access to scanned court cases. (Virginia Code § 17.1-293(E)) The Subscriber must complete an application. (Attachment A).

**4. DAYS AND HOURS OF OPERATION**
Internet access to the Circuit Court documents will generally be available seven days a week, twenty-four hours a day, including all holidays, or otherwise at the discretion of the Clerk, except:
a. For periods of preventative maintenance;
b. For such other periods of remedial maintenance as may be required;
c. For operational issues beyond the control of the Clerk's Office; and
d. When intrusions against security are being remedied.

**5. SUBSCRIPTION FEE**
The subscription fee is $200.00 per year for 1 attorney and 1 employee payable quarterly, semi-annually or annually. Additional employee for the attorney is $75 per individual per year. Those identified employees must also sign an Individual Subscriber Agreement.



RA
Subscriber's Initials

The charges provided for in this Agreement shall commence on the effective date per Section 1 of the Agreement hereof. No reminder notices will be sent when payment is due.

The Clerk's Office reserves the right to suspend or terminate service to the Subscriber(s) if payment is not received by the due date; however, if suspended or terminated, the Subscriber is not relieved from the obligations set forth in this Agreement, up to and including the date upon which the service is discontinued. Subscription fees are non-refundable and not pro-rated.

All charges specified are those currently in effect and are subject to change. Any legislative changes, additions or deletions shall automatically become a part of this contract as of the effective date of said legislative changes. Subscriber has the option of terminating this Agreement in accordance with Section 15.

**6. SERVICES**

a. The Clerk's Office or its agents will provide the Subscriber with inquiry only access to all currently scanned court case documents in its Case Imaging System except for juvenile, adoption, and sealed cases as well as those parts of a file that are marked confidential, restricted, sealed, private addendum or victim/witness.
b. The servers that store the programs and data are maintained and managed by the OES.
c. The Clerk's Office, its employees or agents will assume responsibility for:
    1) Providing the Subscriber with the current OCRA link on the Circuit Court's Web Page.
    2) Providing the Subscriber with limited consultation, via e-mail, on specific problems that arise in the use of OCRA. The Clerk's Office does not guarantee consultation results nor warrant or represent that all errors or problems will be corrected.
    3) Limited customer support is only available Monday through Friday, 8:30AM to 4:30PM excluding Prince William County (hereinafter "County") or Circuit Court holidays.

**7. SUBSCRIBER'S OBLIGATIONS**

a. It is the responsibility of the Subscriber to provide the computer hardware and software and/or make modifications to their existing equipment that are necessary to effect access to OCRA.
b. Subscriber shall not use automated tools to navigate this website. Subscriber must manually enter any requests using the queries provided on the website.
c. The Subscriber is responsible for ensuring that unauthorized personnel do not use the Subscriber's account. Unauthorized personnel for the purposes of this contract shall be any person, employee, support staff, or entity other than the Subscriber or an employee of the Subscriber who has not signed an Attorney Employee Subscriber Agreement.
d. Data accessed from OCRA is for the use of the Subscriber in the ordinary course of their business and in accordance with Virginia Code § 17.1-293(E).
e. Data accessed from OCRA may not be sold or posted on any other Internet website or in any way redistributed to any third party.
f. The Subscriber is responsible for ensuring that the use of OCRA is conducted in a proper and legal manner. If the Subscriber is convicted of a crime, including but not limited to, a violation of the Virginia Computer Crimes Act (Section 18.2-152.1 of the Code of Virginia), arising out of their use of OCRA, the Clerk's Office shall have the right to terminate this



RA
Subscriber's Initials

Agreement immediately. This shall not be construed as prohibiting the Clerk's Office from pursuing any other remedy available to it for such breach.

g. The Attorney Subscriber is responsible for ensuring that the use of OCRA by the employees designated in Attachment A is conducted in a proper and legal manner. The Attorney Subscriber must immediately notify the Clerk's Office when an employee who has an Attorney Employee Subscriber Agreement is no longer employed by the Attorney Subscriber.

h. The Subscriber is responsible for ensuring the security of the Subscriber's assigned username and password. If at any time Subscriber has knowledge of compromised security of the Subscriber's access credentials, Subscriber will IMMEDIATELY notify the Clerks Office in writing.

i. The Subscriber may NOT share passwords or login credentials with anyone for any reason. Access is STRICTLY one username login for one individual Subscriber.

**8. LIMITATION OF LIABILITY**

**a. The Subscriber hereby relieves and releases the clerk's office, its employees or agents from liability for any and all damages resulting from the use of this service or interrupted service of any kind. The Subscriber further relieves and releases the County of Prince William, its Board of Supervisors, officers, employees and agents and OES from liability for any and all damages resulting from the use of this service or interrupted service of any kind.**

**b. The Subscriber hereby relieves, releases, indemnifies and holds harmless the Clerk's Office, the County of Prince William, its Board of Supervisors, officers, employees and agents and OES of any liability for any and all damage resulting from incorrect data or any other information accessed from this service.**

**c. The Subscriber agrees that the Clerk's Office, its employees or agents shall not be liable for negligence or lost profits, resulting from any claim or demand against the Subscriber by any other party.**

**d. In no event will the Clerk's Office, its employees or its agents be liable for consequential damages even if the Clerk's Office has been advised of the possibility of such damages.**

**e. It is acknowledged by the Subscriber that the County of Prince William, its Board of Supervisors, officers, employees or agents and OES are not a party to this Agreement and that the County shall incur no liability hereunder.**

**f. This Agreement creates no rights or privileges that are enforceable by anyone not a party to this Agreement.**

**g. The information or data accessed by Subscriber may or may not be the official governmental record required by law. In order to assure the accuracy of the data or information, the Subscriber should consult the official governmental record.**

**h. Nothing in this Agreement shall be construed as waiving the sovereign or governmental immunity of the Clerk of the Court, the County of Prince William, its Board of Supervisors, or their respective officers, employees and agents.**

**9. WARRANTIES**

**Neither the Clerk, deputy clerks, employees, or agents, nor the County of Prince William, its Board of Supervisors, employees or agents expressly or impliedly warrant that the**

**information or data accessed by Subscriber is accurate or correct. There are no expressed or implied warranties in connection with this service.**

**10. ASSIGNMENT**
The Subscriber agrees not to assign any right or interest in this Agreement. Any attempt by the Subscriber to transfer by any means, any of the rights, duties, or obligations of this Agreement is null and void.

**11. GOVERNING LAW**
This Agreement and/or any dispute arising there from shall in all respects be governed by and interpreted in accordance with the applicable law of the Commonwealth of Virginia.

**12. ENTIRE AGREEMENT**
This Agreement contains the entire understanding of the parties, there being no promises, warranties, or undertakings, written or oral, other than those expressly set forth herein. Furthermore, no modifications, alterations or amendments to this Agreement shall be valid unless in writing, and signed by all parties, except as otherwise provided herein.

**13. ATTACHMENTS**
Any attachments referred to in the body of this contract are an integral part of this Agreement and reference to this Agreement shall be deemed to include all the attachments.

**14. NOTICE**
Any notice or written communication of any kind required or desired to be given or sent pursuant to the terms hereof shall be delivered in person, mailed postage prepaid by certified or registered mail, mailed electronically and/or posted on the Clerk's Office Web Page, unless otherwise specifically stated herein.

**15. TERMINATION**

a. This Agreement may be terminated without cause by either party on ten (10) days written notice to the other.
b. This Agreement may be terminated by the Clerk's Office for Subscriber's failure to comply with the terms of this Agreement, failure to make payments of charges or breach of Agreement.
c. The Clerk reserves the discretion to deny secure remote access to ensure compliance with this Agreement and the Code of Virginia.
d. This Agreement shall be terminated immediately if the Board of Supervisors of Prince William County fails to appropriate and continue funding for the services provided under this Agreement. Subscriber acknowledges that the Clerk's Office has no control over the amount of appropriations, if any, that the Board of Supervisors will provide for continuation of the services under this Agreement.
e. This Agreement may be terminated as otherwise specified.

**16. RATES, FEES AND TERMS MAY CHANGE.**



RA
Subscriber's Initials

The Clerk's Office may change the Agreement terms, at any time for any reason. If the Clerk's Office changes the terms of the Agreement, Subscriber will receive notice and have the right to terminate this Agreement.

**17. SEVERABILITY**
If any provision (or part thereof) of this Agreement is found to be invalid, then it shall be stricken and have no effect. The remaining provisions shall continue in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date last written below.

**THIS AGREEMENT must be executed by the individual requesting authorization to use OCRA.**

[signature] 5/5/21
**Signature** **Date**

Ryan Abbott N/A
**Printed/Typed Name** **VSB#**

City/County of: Maryland
State of: Worcester
I, Shantee J. Pike, a Notary Public or Deputy Clerk, do hereby certify
(Name of Notary or Deputy Clerk)
that on this 5th day of May, 2021, Ryan Abbott
(Name of Subscriber)
personally appeared before me and swore and acknowledged that the statements contained herein are true and correct.

My Commission Expires: 10/24/2024 [signature]
Notary Public or Deputy Clerk

Registration Number: N/a Shantee J. Pike 410-213-8880
Print or Type Name & Phone # of Notary

PRINCE WILLIAM COUNTY CIRCUIT COURT CLERK'S OFFICE by:

Jacqueline C. Smith, Esquire, Clerk of Court Date

WORCESTER COUNTY MD SHANTEE JEANNETTE PIKE NOTARY PUBLIC

ATTACHMENT A

**APPLICATION FOR REMOTE ACCESS TO PRINCE WILLIAM COUNTY COURT CASE DOCUMENTS (OCRA)**

**This application must be completed by an attorney and each individual user.**

The approval of this application is at the Clerk of the Circuit Court's discretion. By signing this application, the subscriber acknowledges and accepts the terms and conditions of the *Attorney Subscriber Agreement for Remote Access* as incorporated by reference herein.

**All Information below is mandatory.**

APPLICANT'S LAST NAME: Abbott

APPLICANT'S FIRST NAME: Ryan

BUSINESS NAME: Courthouse News Service

STREET ADDRESS: 30 N. Raymond Ave.

CITY/STATE/ZIP: Pasadena, California 91103

PHONE NUMBER: 443 - 783 - 1463

E-MAIL ADDRESS: rabbott@courthousenews.com

VIRGINIA STATE BAR NUMBER: N/A
**(include a copy of your Virginia State Bar card)**

**Option Requested**:

X $200 annually for 1 attorney and 1 employee

___ $200 annually for 2 employees and attorney choosing not to use the system, but signs an agreement

___ $75 annually per employee for ___ additional employee(s)

**Payment Option**: X Annually ___ Semi-Annually ___ Quarterly

It is requested that the following employees be authorized users pursuant to this Agreement (use additional pages if necessary). The application and Agreement for each user is attached.

**Authorized Users**:

1. Ryan Abbott
2. ______
3. ______
4. ______



RA
Subscriber's Initials

It is the responsibility of the Attorney Subscriber to notify the Clerk's Office immediately upon the termination or resignation of an authorized user. Liability for the fee will continue until the Attorney Subscriber properly notifies the Clerk's Office of said termination or resignation. New authorized users can be added by having the individual complete an Agreement and Application. The completed documents should be sent to the Clerk's Office with a request on letterhead that the individual be added to the list of authorized users.

I certify that the information above is true and correct.

**SIGNATURE:** [signature]

City/County of: Worcester

State of: Maryland

I, Shantee J. Pike, a Notary Public or Deputy Clerk, do hereby certify that on

this 5th day of May, 2021, Ryan Abbott personally appeared before me and swore and acknowledged that the statements contained herein are true and correct.

My Commission Expires: 10/26/2024 [signature]
Notary Public or Deputy Clerk

Registration Number: n/a Shantee J. Pike 410-213-8880
Print or Type Name & Phone # of Notary

**Subscriber**, please choose the User ID and Password you would prefer to use. The password must be a minimum of 3 characters, and not more than 10. It is case sensitive and must be in lower case.

SHANTEE JEANNETTE PIKE NOTARY PUBLIC WORCESTER COUNTY MD

User ID (your e-mail) rabbott@courthousenews.com
Password casnova

**Please mail the signed agreement and check to:**
**Clerk of the Circuit Court, Attn: OCRA Web Subscription, 9311 Lee Avenue, Manassas, VA 20110**

*For Clerk's Office Use Only: Processed by:* ______________ *Date:* ______________



RA
Subscriber's Initials

# EXHIBIT 5
# to Declaration
# of Ryan Abbott

# Circuit Court Clerk

## Prince William, Manassas & Manassas Park

9311 Lee Avenue, Third Floor, Manassas, Virginia 20110
https://www.pwcgov.org/government/courts/circuit
(703) 792-6015 circuitcourt@pwcgov.org

Jacqueline C. Smith, Circuit Court Clerk
Kristina L. Gleason, Chief Deputy Clerk


May 13, 2021

Ryan Abbott, Esq.
10109 Queens Circle
Ocean City, Maryland 21842

Re: Application for Remote Access

Dear Mr. Abbott:

Thank you for submitting an "Attorney Subscriber Agreement" for access to our Officer of the Court Remote Access (OCRA) system. You have indicated on page 1 of the application that you are applying as a member of the Virginia State Bar. In order to complete your application, kindly provide my office with a Virginia State Bar Card in support of your bar membership as directed on page 6 of the Agreement. Please forward same to us at your earliest convenience so we may complete processing of your application and provide you with log in credentials. For your convenience, we will hold your application open until we hear from you. Please let me know if you have any questions.

Sincerely yours,

Jacqueline C. Smith

# EXHIBIT 6
# to Declaration
# of Ryan Abbott

**Smith, Jacqueline**

**From:** Smith, Jacqueline
**Sent:** Tuesday, May 25, 2021 12:49 PM
**To:** Harrison, Bryan
**Subject:** RE: OCRA subscriber access in Prince William Circuit Court

**Follow Up Flag:** Follow up
**Flag Status:** Flagged

Good morning,

As Mr. Abbott was informed on May 17, I was out of the office last week and promised to get back to him after I returned today. I did not deny Mr. Abbott access to OCRA and indicated in my correspondence that his application remains open. I assume you have a copy of the application filed by Mr. Abbott wherein he stated he was "a member of the Virginia Bar". I took that to be a true statement. I had no knowledge that Mr. Abbott was not a "Virginia-licensed attorney" until your email this morning. We don't currently have an OCRA contract for non-attorneys. I will work on pulling one together now so we can complete same for Mr. Abbott and offer it to any other non-attorney parties who may wish to sign up for access. Which person should be my point of contact on this: you or Mr. Abbott?

Thanks,
Jacqueline

---

**From:** Harrison, Bryan <bryan.harrison@bclplaw.com>
**Sent:** Tuesday, May 25, 2021 11:19 AM
**To:** Smith, Jacqueline <JSmith5@pwcgov.org>
**Subject:** RE: OCRA subscriber access in Prince William Circuit Court

**This email is from an EXTERNAL source. Use caution when replying or clicking embedded links.**

---

Ms. Smith – good morning. Several weeks ago, CNS' Southeast Bureau Chief Ryan Abbott submitted his application (with payment) for OCRA access to your attention and per your instructions in the copied email below. However, Mr. Abbott received the attached May 13, 2021 letter, which is a denial of the OCRA access that you offered to CNS. As you and your staff are well aware, Mr. Abbott is not a Virginia-licensed attorney, which makes it is impossible for him to provide the information requested in your letter as a precondition to obtain OCRA subscriber access.

Could you please confirm whether your office will provide CNS/Ryan Abbott access to OCRA?

Thank you.

Regards,
Bryan Harrison

BRYAN J. HARRISON
Attorney
BRYAN CAVE LEIGHTON PAISNER LLP
bryan.harrison@bclplaw.com
T: +1 202 508 6010

---

**From:** Harrison, Bryan
**Sent:** Wednesday, April 21, 2021 4:59 PM
**To:** 'Smith, Jacqueline' <JSmith5@pwcgov.org>
**Subject:** RE: OCRA subscriber access in Prince William Circuit Court

Thank you for the response. CNS remains interested in OCRA access and will send to your attention an application with the necessary information and payment.

Kind regards,
Bryan

BRYAN J. HARRISON
Attorney
BRYAN CAVE LEIGHTON PAISNER LLP
bryan.harrison@bclplaw.com
T: +1 202 508 6010

---

**From:** Smith, Jacqueline [mailto:JSmith5@pwcgov.org]
**Sent:** Wednesday, April 21, 2021 4:14 PM
**To:** Harrison, Bryan
**Subject:** RE: OCRA subscriber access in Prince William Circuit Court

Good afternoon,

I am not aware of any follow up from your firm or your client requesting OCRA access following my statements in my deposition. My understanding was that CNS did not want OCRA access. Nonetheless, you can find application and payment instructions on our website here: https://www.pwcgov.org/government/courts/circuit/Pages/Attorney-Access.aspx

Please have the applicant(s) forward the application(s) to my attention in order to complete the sign up process.

Thank you,
Jacqueline

*Jacqueline*

Jacqueline C. Smith, Esquire
Clerk of Circuit Court for Prince William County, Manassas & Manassas Park
9311 Lee Avenue, Manassas, Virginia 20110

Connect with us

**From:** Harrison, Bryan <bryan.harrison@bclplaw.com>
**Sent:** Wednesday, April 21, 2021 10:25 AM
**To:** Smith, Jacqueline <JSmith5@pwcgov.org>
**Cc:** Circuit Court <circuitcourt@pwcgov.org>; Richards, Jillian <jrichards@vacourts.gov>
**Subject:** FW: OCRA subscriber access in Prince William Circuit Court

**This email is from an EXTERNAL source. Use caution when replying or clicking embedded links.**

Ms. Smith - good morning. As you know, my firm represents Courthouse News Service. Last month we reached out to your previous counsel, Will Prince and Mike Matheson, but learned for the first time on Monday that they do not currently represent you regarding the inquiry made on behalf of Courthouse News Service. The email thread is copied below for your reference, although you may already be aware of it based on Mr. Prince's email response.

He suggested that I communicate directly with you on the issue. I have included what I believe to be your email address here, but have also included the general email address listed on the Clerk's office website, as well as Jillian Richards in case this email does not reach you directly.

During your deposition in January 2019, you offered OCRA subscriber access to CNS and said that you had used your discretion to provide OCRA subscriber access to others and would be willing to do so for CNS. We followed up on obtaining such access, but CNS was never provided such access. CNS again renews that request and asks that the Prince William Circuit Court Clerk's Office permit it OCRA subscriber access. CNS will pay any OCRA subscriber fees and associated costs. As explained in the email thread below, CNS hopes to avoid litigation and remains willing to discuss possible resolution of the issue.

We look forward to an opportunity to discuss further. Thank you.

Kind regards,
Bryan Harrison

BRYAN J. HARRISON
Attorney
BRYAN CAVE LEIGHTON PAISNER LLP
bryan.harrison@bclplaw.com
T: +1 202 508 6010

**From:** William D. Prince [mailto:wprince@t-mlaw.com]
**Sent:** Monday, April 19, 2021 11:48 AM
**To:** Harrison, Bryan; Michael Matheson
**Subject:** RE: OCRA subscriber access in Prince William Circuit Court

Thanks for the well wishes. Just so my message is clear, we do not currently represent her regarding your below request or a potential response. You may want to communicate with her directly on this issue.

William D. Prince IV, Esq.

*Thompson*McMullan, P.C.
P 804.698.6254 | F 804.780.1813

wprince@t-mlaw.com | t-mlaw.com
Twitter | LinkedIn | Facebook
100 Shockoe Slip | 3rd Floor | Richmond, Virginia 23219
MERITAS LAW FIRMS WORLDWIDE

---

**From:** Harrison, Bryan <bryan.harrison@bclplaw.com>
**Sent:** Monday, April 19, 2021 11:39 AM
**To:** William D. Prince <wprince@t-mlaw.com>; Michael Matheson <mmatheson@t-mlaw.com>
**Subject:** RE: OCRA subscriber access in Prince William Circuit Court

Will – thanks for the message and the update. We'll be on the lookout for a response and remain open and willing to resolve short of litigation.

Congrats on the new addition to your family! I hope that everyone is doing well, safe, and healthy!

- Bryan

BRYAN J. HARRISON
Attorney
BRYAN CAVE LEIGHTON PAISNER LLP
bryan.harrison@bclplaw.com
T: +1 202 508 6010

---

**From:** William D. Prince [mailto:wprince@t-mlaw.com]
**Sent:** Monday, April 19, 2021 11:31 AM
**To:** Harrison, Bryan; Michael Matheson
**Subject:** RE: OCRA subscriber access in Prince William Circuit Court

Bryan:

Thanks for following up. I have been working sporadically and/or from home because of the arrival of baby no. 2 at my house, and I inadvertently forgot to respond to your email from March 30. Your request falls outside the scope of our current representation of Ms. Smith, which is limited to the lawsuit currently on appeal. However, I expect she will have a response for you in the next couple of weeks, which may or may not come through my firm depending on whether we are appointed to represent her. I hope CNS will provide Ms. Smith with an opportunity to respond before filing another lawsuit.

Will

William D. Prince IV, Esq.

*Thompson*McMullan, P.C.
P 804.698.6254 | F 804.780.1813
wprince@t-mlaw.com | t-mlaw.com
Twitter | LinkedIn | Facebook
100 Shockoe Slip | 3rd Floor | Richmond, Virginia 23219
MERITAS LAW FIRMS WORLDWIDE

**From:** Harrison, Bryan <bryan.harrison@bclplaw.com>
**Sent:** Wednesday, April 14, 2021 4:08 PM
**To:** William D. Prince <wprince@t-mlaw.com>; Michael Matheson <mmatheson@t-mlaw.com>
**Subject:** RE: OCRA subscriber access in Prince William Circuit Court

Will, Mike – good afternoon.

I have not heard anything in response to my email from last month (below). We remain willing and available to discuss. However, if we are unable to make progress on resolving by the end of next week (April 23, 2021), CNS will be filing a lawsuit to address.

Kind
regards,

Bryan

BRYAN J. HARRISON
Attorney
BRYAN CAVE LEIGHTON PAISNER LLP
bryan.harrison@bclplaw.com
T: +1 202 508 6010

---

**From:** Harrison, Bryan
**Sent:** Tuesday, March 30, 2021 4:05 PM
**To:** 'William D. Prince'; Michael Matheson
**Subject:** OCRA subscriber access in Prince William Circuit Court

Will, Mike – good afternoon; I hope both of you are doing well.

I do not know if the scope of your representation of Jacqueline Smith includes this, but figured to start with you both. If so, CNS has asked me to circle back with her regarding the OCRA subscription that she offered to CNS during her deposition in the *Schaefer* matter. Do you have a few minutes to talk this week or next? I am happy to work around your schedules and am generally available.

Thanks!
Bryan

BRYAN J. HARRISON
Attorney
bryan.harrison@bclplaw.com

BRYAN CAVE LEIGHTON PAISNER LLP
T: +1 202 508 6010
1155 F Street NW, Washington, DC 20004-1357

**bclplaw.com**

This electronic message is from a law firm. It may contain confidential or privileged information. If you received this transmission in error, please reply to the sender to advise of the error and delete this transmission and any attachments.

We may monitor and record electronic communications in accordance with applicable laws and regulations. Where appropriate we may also share certain information you give us with our other offices (including in other countries) and select third parties. For further information (including details of your privacy rights and how to exercise them), see our updated Privacy Notice at www.bclplaw.com.

This electronic message is from a law firm. It may contain confidential or privileged information. If you received this transmission in error, please reply to the sender to advise of the error and delete this transmission and any attachments.

We may monitor and record electronic communications in accordance with applicable laws and regulations. Where appropriate we may also share certain information you give us with our other offices (including in other countries) and select third parties. For further information (including details of your privacy rights and how to exercise them), see our updated Privacy Notice at www.bclplaw.com.

This electronic message is from a law firm. It may contain confidential or privileged information. If you received this transmission in error, please reply to the sender to advise of the error and delete this transmission and any attachments.

We may monitor and record electronic communications in accordance with applicable laws and regulations. Where appropriate we may also share certain information you give us with our other offices (including in other countries) and select third parties. For further information (including details of your privacy rights and how to exercise them), see our updated Privacy Notice at www.bclplaw.com.

This electronic message is from a law firm. It may contain confidential or privileged information. If you received this transmission in error, please reply to the sender to advise of the error and delete this transmission and any attachments.

We may monitor and record electronic communications in accordance with applicable laws and regulations. Where appropriate we may also share certain information you give us with our other offices (including in other countries) and select third parties. For further information (including details of your privacy rights and how to exercise them), see our updated Privacy Notice at www.bclplaw.com.

# EXHIBIT 7 to Declaration of Ryan Abbott

**Smith, Jacqueline**

| | |
|---|---|
| **From:** | Smith, Jacqueline |
| **Sent:** | Friday, June 4, 2021 2:23 PM |
| **To:** | Harrison, Bryan |
| **Subject:** | RE: OCRA subscriber access in Prince William Circuit Court |
| **Attachments:** | OCRA Non-Lawyer.pdf |

Good afternoon,

Please see attached our OCRA Application for non-lawyers. Let me know once it's submitted and we will expedite processing.

Thanks,

*Jackie*

Jacqueline C. Smith, Esquire
Clerk of Circuit Court for Prince William County, Manassas & Manassas Park
9311 Lee Avenue, Manassas, Virginia 20110

Connect with us

**From:** Harrison, Bryan <bryan.harrison@bclplaw.com>
**Sent:** Tuesday, May 25, 2021 3:01 PM
**To:** Smith, Jacqueline <JSmith5@pwcgov.org>
**Subject:** RE: OCRA subscriber access in Prince William Circuit Court

**This email is from an EXTERNAL source. Use caution when replying or clicking embedded links.**

Understood and apologies for the misunderstanding with the OCRA subscriber application. Although he did not strike out the portion you reference, Ryan Abbott wrote "N/A" in several places where it asked to provide his Virginia State Bar number. In any event, we appreciate your offer to provide non-attorney access and to circulate a non-attorney OCRA subscriber agreement. As for point of contact, please send to me when it is prepared and I will work with Mr. Abbott on having it completed and submitted. Thank you again.

Kind regards,
Bryan Harrison

BRYAN J. HARRISON
Attorney
BRYAN CAVE LEIGHTON PAISNER LLP

bryan.harrison@bclplaw.com
T: +1 202 508 6010

---

**From:** Smith, Jacqueline <JSmith5@pwcgov.org>
**Sent:** Tuesday, May 25, 2021 12:49 PM
**To:** Harrison, Bryan <bryan.harrison@bryancave.com>
**Subject:** RE: OCRA subscriber access in Prince William Circuit Court

Good morning,

As Mr. Abbott was informed on May 17, I was out of the office last week and promised to get back to him after I returned today. I did not deny Mr. Abbott access to OCRA and indicated in my correspondence that his application remains open. I assume you have a copy of the application filed by Mr. Abbott wherein he stated he was "a member of the Virginia Bar". I took that to be a true statement. I had no knowledge that Mr. Abbott was not a "Virginia-licensed attorney" until your email this morning. We don't currently have an OCRA contract for non-attorneys. I will work on pulling one together now so we can complete same for Mr. Abbott and offer it to any other non-attorney parties who may wish to sign up for access. Which person should be my point of contact on this: you or Mr. Abbott?

Thanks,
Jacqueline

---

**From:** Harrison, Bryan <bryan.harrison@bclplaw.com>
**Sent:** Tuesday, May 25, 2021 11:19 AM
**To:** Smith, Jacqueline <JSmith5@pwcgov.org>
**Subject:** RE: OCRA subscriber access in Prince William Circuit Court

**This email is from an EXTERNAL source. Use caution when replying or clicking embedded links.**

---

Ms. Smith – good morning. Several weeks ago, CNS' Southeast Bureau Chief Ryan Abbott submitted his application (with payment) for OCRA access to your attention and per your instructions in the copied email below. However, Mr. Abbott received the attached May 13, 2021 letter, which is a denial of the OCRA access that you offered to CNS. As you and your staff are well aware, Mr. Abbott is not a Virginia-licensed attorney, which makes it is impossible for him to provide the information requested in your letter as a precondition to obtain OCRA subscriber access.

Could you please confirm whether your office will provide CNS/Ryan Abbott access to OCRA?

Thank you.

Regards,
Bryan Harrison

BRYAN J. HARRISON
Attorney
BRYAN CAVE LEIGHTON PAISNER LLP
bryan.harrison@bclplaw.com
T: +1 202 508 6010

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>Plaintiff,<br><br>v.<br><br>KARL R. HADE, in his official capacity as Executive Secretary of the Office of Executive Secretary of the Supreme Court of Virginia,<br><br>and<br><br>JACQUELINE C. SMITH, in her official capacity as Clerk of the Circuit Court for Prince William County, Virginia,<br><br>Defendants. | Civil Action No. 3:21-cv-00460-HEH |

**KARL R. HADE'S RESPONSES TO PLAINTIFF COURTHOUSE NEWS SERVICE'S FIRST SET OF <u>INTERROGATORIES</u>**

Karl R. Hade ("Hade"), by counsel pursuant to Rule 26 of the Federal Rules of Civil Procedure and Rule 26(C) of the Rules for the United States District Court for the Eastern District of Virginia, serves upon Plaintiff, the following objections and answers to Plaintiff Courthouse News Service's First Set of Interrogatories to Defendant Karl R. Hade.

These answers will be supplemented from time to time as additional information is obtained through discovery.

<u>INTERROGATORIES</u>

1. Please state whether OES must provide permission or any other authorization in order for the Prince William Clerk, or any other participating Virginia circuit court, to provide

OCRA access to CNS.

ANSWER:

**No, it is not necessary for OES to provide permission or authorization. Each clerk is responsible for specific OCRA subscription policies in his/her jurisdiction and for how they manage user subscriptions. OES does not mandate how a clerk should manage OCRA subscriptions. OES provides an administrative module that allows for the mechanics of adding users to the system and the programming enforces a maximum level of users per tier for invoicing purposes, but OES does not have any oversight other than that.**

**OES does not have any policy either mandating how a clerk manages individual OCRA subscriptions or limiting who can access OCRA. OES recognizes that Va. Code § 17.1-293 limits the remote online access circuit clerks may provide to their case records to "members in good standing with the Virginia State Bar and their authorized agents, pro hac vice attorneys authorized by the court for purposes of the practice of law, and such governmental agencies as authorized by the clerk." OES has also long recognized that circuit court clerks are independent constitutional officers and that they (not OES) are the legal custodians of all circuit court records, including "records stored in electronic format whether the storage media for such electronic records are on premises or elsewhere." See Va. Code § 17.1-242.**

2. Please identify any steps that OES would have to take in order for CNS to obtain access to New Civil Filings at the Prince William Circuit Court via OCRA.

ANSWER: **OES takes no steps to authorize new users to have access to a circuit court's OCRA system. All the steps required administratively are taken by individual court clerks or their employees.**

3. Please state whether OES would object if the Prince William Clerk provided CNS with access to New Civil Filings via OCRA.

ANSWER: **OES would not object and has no authority to do so.**

4. Please state whether reports are generated or can be generated by OES or the Virginia circuit courts regarding any of the following: (i) the number of New Civil Filings that

contain, in unredacted form upon filing, any of the information that is identified in Va. Code § 17.1-293(B) (*i.e.*, actual signature; social security number; date of birth identified with a particular person; maiden name of a person's parent so as to be identified with a particular person; financial account number; name and age of a minor child); (ii) the number of New Civil Filings that clerks have redacted because they contain, in unredacted form upon filing, information identified in Va. Code § 17.1-293(B); or (iii) the number of New Civil Filings that clerks have rejected or otherwise held back from scanning into CIS because they contain, in unredacted form upon filing, information identified in Va. Code § 17.1-293(B).

ANSWER: **OES does not and cannot generate such reports. Defendant Hade lacks sufficient information to know whether any Virginia circuit courts generate or are able to generate such reports.**

I hereby acknowledge that the Answer to the foregoing Interrogatories, in *Courthouse News Service v. Karl R. Hade et al.*, is true and correct to the best of my knowledge.

KRH

Karl R. Hade

City/~~County of~~ Richmond to wit:
Commonwealth of Virginia

Sworn and subscribed to before me, a Notary Public in and for the City/~~County and~~ State aforesaid, on this 25th day of March 2022.

Sharon L. Abernathy
Notary Public

My Commission #: 245733
My Commission expires: 12/31/25

Sharon L. Abernathy
Commonwealth of Virginia
Notary Public
Commission No. 245733
My Commission Expires 12/31/2025

Dated: March 25, 2022

Respectfully submitted,
**EXECUTIVE SECRETARY KARL R. HADE**

By: /s/ Robert B. McEntee, III
Robert B. McEntee, III (VSB No. 89390)
Erin R. McNeill (VSB No. 78816)
Assistant Attorney General
Office of the Attorney General
202 North 9th Street
Richmond, Virginia 23219
(804) 786-8198 Telephone
(804) 371-2087 Facsimile
rmcenteeiii@oag.state.va.us
emcneill@aog.state.va.us
*Counsel for Defendant*

Jason S. Miyares
Attorney General of Virginia

Steven C. Popps
Deputy Attorney General

**CERTIFICATE OF SERVICE**

I hereby certify that on the 25th day of March, 2022, I electronically mailed the foregoing to:

Jonathan E. Ginsberg (admitted *pro hac vice*)
Bryan Cave Leighton Paisner LLP
1290 Avenue of the Americas New York, NY 10104
Tel: (212) 541-2000
Fax: (212) 541-4630
jon.ginsberg@bclplaw.com

Jessica Blaemire (VSB No. 96356)
Bryan Cave Leighton Paisner LLP
1155 F Street, NW, Suite 700
Washington, DC 20004
Tel: (202) 508-6000
Fax: (202) 508-6200
jessica.blaemire@bclplaw.com

Dabney J. Carr, IV (VSB No. 28679)
Troutman Pepper Hamilton Sanders LLP
1001 Haxall Point
Richmond, VA 23219
Tel: (804) 697-1238
Fax: (804) 697-1339
dabney.carr@troutman.com

*Counsel for Plaintiff Courthouse News Service*

/s/Robert B. McEntee, III
Robert B. McEntee, III (VSB No. 89390)
Assistant Attorney General
Office of the Attorney General
202 North 9th Street
Richmond, Virginia 23219
(804) 786-8198 Telephone
(804) 371-2087 Facsimile
rmcenteeiii@oag.state.va.us
*Counsel for Defendant*

# EXHIBIT B

**ATTORNEY SUBSCRIBER AGREEMENT FOR REMOTE ACCESS**
**TO PRINCE WILLIAM COUNTY CIRCUIT COURT CASE DOCUMENTS**
known as Officer of the Court Remote Access (OCRA)

This Agreement is made and entered into by and between the Prince William County Circuit Court Clerk's Office (hereinafter "Clerk's Office") and ________________________ *(Name of Applicant)* (hereinafter "Subscriber"), a member of the Virginia State Bar.

**TERMS AND CONDITIONS OF AGREEMENT**

**1. TERM OF AGREEMENT**
It is the intent of both parties to participate in a remote access program to commence upon the day of approval by both parties and to continue until terminated as provided herein.

**2. DEFINITIONS**
a. "Remote Access" means that inspection can be made without the need to physically visit the courthouse where the court record is maintained.
b. "Subscriber" means any person authorized by the Clerk of Circuit Court to have remote access to court case documents on its website.
c. "Inquiry Only Access" means access to only search for, view and print document images.
d. "OES" is the Office of the Executive Secretary of the Supreme Court of Virginia.
e. "OCRA" is the OES's Officer of the Court Remote Access system that enables remote viewing of documents in the OES Case Imaging System utilized by the Prince William County Circuit Court.

**3. SUBSCRIBER OPTIONS**
The Clerk's Office provides one subscriber option: access to an on-line database allowing inquiry-only access to scanned court cases. (Virginia Code § 17.1-293(E)) The Subscriber must complete an application. (Attachment A).

**4. DAYS AND HOURS OF OPERATION**
Internet access to the Circuit Court documents will generally be available seven days a week, twenty-four hours a day, including all holidays, or otherwise at the discretion of the Clerk, except:
a. For periods of preventative maintenance;
b. For such other periods of remedial maintenance as may be required;
c. For operational issues beyond the control of the Clerk's Office; and
d. When intrusions against security are being remedied.

**5. SUBSCRIPTION FEE**
The subscription fee is $200.00 per year for 1 attorney and 1 employee payable quarterly, semi-annually or annually. Additional employee for the attorney is $75 per individual per year. Those identified employees must also sign an Individual Subscriber Agreement.

The charges provided for in this Agreement shall commence on the effective date per Section 1 of the Agreement hereof. No reminder notices will be sent when payment is due.

The Clerk's Office reserves the right to suspend or terminate service to the Subscriber(s) if payment is not received by the due date; however, if suspended or terminated, the Subscriber is not relieved from the obligations set forth in this Agreement, up to and including the date upon which the service is discontinued. Subscription fees are non-refundable and not pro-rated.

All charges specified are those currently in effect and are subject to change. Any legislative changes, additions or deletions shall automatically become a part of this contract as of the effective date of said legislative changes. Subscriber has the option of terminating this Agreement in accordance with Section 15.

**6. SERVICES**

a. The Clerk's Office or its agents will provide the Subscriber with inquiry only access to all currently scanned court case documents in its Case Imaging System except for juvenile, adoption, and sealed cases as well as those parts of a file that are marked confidential, restricted, sealed, private addendum or victim/witness.
b. The servers that store the programs and data are maintained and managed by the OES.
c. The Clerk's Office, its employees or agents will assume responsibility for:
   1) Providing the Subscriber with the current OCRA link on the Circuit Court’s Web Page.
   2) Providing the Subscriber with limited consultation, via e-mail, on specific problems that arise in the use of OCRA. The Clerk's Office does not guarantee consultation results nor warrant or represent that all errors or problems will be corrected.
   3) Limited customer support is only available Monday through Friday, 8:30AM to 4:30PM excluding Prince William County (hereinafter “County”) or Circuit Court holidays.

**7. SUBSCRIBER'S OBLIGATIONS**

a. It is the responsibility of the Subscriber to provide the computer hardware and software and/or make modifications to their existing equipment that are necessary to effect access to OCRA.
b. Subscriber shall not use automated tools to navigate this website. Subscriber must manually enter any requests using the queries provided on the website.
c. The Subscriber is responsible for ensuring that unauthorized personnel do not use the Subscriber’s account. Unauthorized personnel for the purposes of this contract shall be any person, employee, support staff, or entity other than the Subscriber or an employee of the Subscriber who has not signed an Attorney Employee Subscriber Agreement.
d. Data accessed from OCRA is for the use of the Subscriber in the ordinary course of their business and in accordance with Virginia Code § 17.1-293(E).
e. Data accessed from OCRA may not be sold or posted on any other Internet website or in any way redistributed to any third party.
f. The Subscriber is responsible for ensuring that the use of OCRA is conducted in a proper and legal manner. If the Subscriber is convicted of a crime, including but not limited to, a violation of the Virginia Computer Crimes Act (Section 18.2-152.1 of the Code of Virginia), arising out of their use of OCRA, the Clerk's Office shall have the right to terminate this

Agreement immediately. This shall not be construed as prohibiting the Clerk's Office from pursuing any other remedy available to it for such breach.

g. The Attorney Subscriber is responsible for ensuring that the use of OCRA by the employees designated in Attachment A is conducted in a proper and legal manner. The Attorney Subscriber must immediately notify the Clerk's Office when an employee who has an Attorney Employee Subscriber Agreement is no longer employed by the Attorney Subscriber.

h. The Subscriber is responsible for ensuring the security of the Subscriber's assigned username and password. If at any time Subscriber has knowledge of compromised security of the Subscriber's access credentials, Subscriber will IMMEDIATELY notify the Clerks Office in writing.

i. The Subscriber may NOT share passwords or login credentials with anyone for any reason. Access is STRICTLY one username login for one individual Subscriber.

**8. LIMITATION OF LIABILITY**

**a. The Subscriber hereby relieves and releases the clerk's office, its employees or agents from liability for any and all damages resulting from the use of this service or interrupted service of any kind. The Subscriber further relieves and releases the County of Prince William, its Board of Supervisors, officers, employees and agents and OES from liability for any and all damages resulting from the use of this service or interrupted service of any kind.**

**b. The Subscriber hereby relieves, releases, indemnifies and holds harmless the Clerk's Office, the County of Prince William, its Board of Supervisors, officers, employees and agents and OES of any liability for any and all damage resulting from incorrect data or any other information accessed from this service.**

**c. The Subscriber agrees that the Clerk's Office, its employees or agents shall not be liable for negligence or lost profits, resulting from any claim or demand against the Subscriber by any other party.**

**d. In no event will the Clerk's Office, its employees or its agents be liable for consequential damages even if the Clerk's Office has been advised of the possibility of such damages.**

**e. It is acknowledged by the Subscriber that the County of Prince William, its Board of Supervisors, officers, employees or agents and OES are not a party to this Agreement and that the County shall incur no liability hereunder.**

**f. This Agreement creates no rights or privileges that are enforceable by anyone not a party to this Agreement.**

**g. The information or data accessed by Subscriber may or may not be the official governmental record required by law. In order to assure the accuracy of the data or information, the Subscriber should consult the official governmental record.**

**h. Nothing in this Agreement shall be construed as waiving the sovereign or governmental immunity of the Clerk of the Court, the County of Prince William, its Board of Supervisors, or their respective officers, employees and agents.**

**9. WARRANTIES**

**Neither the Clerk, deputy clerks, employees, or agents, nor the County of Prince William, its Board of Supervisors, employees or agents expressly or impliedly warrant that the**

**information or data accessed by Subscriber is accurate or correct. There are no expressed or implied warranties in connection with this service.**

**10. ASSIGNMENT**
The Subscriber agrees not to assign any right or interest in this Agreement. Any attempt by the Subscriber to transfer by any means, any of the rights, duties, or obligations of this Agreement is null and void.

**11. GOVERNING LAW**
This Agreement and/or any dispute arising there from shall in all respects be governed by and interpreted in accordance with the applicable law of the Commonwealth of Virginia.

**12. ENTIRE AGREEMENT**
This Agreement contains the entire understanding of the parties, there being no promises, warranties, or undertakings, written or oral, other than those expressly set forth herein. Furthermore, no modifications, alterations or amendments to this Agreement shall be valid unless in writing, and signed by all parties, except as otherwise provided herein.

**13. ATTACHMENTS**
Any attachments referred to in the body of this contract are an integral part of this Agreement and reference to this Agreement shall be deemed to include all the attachments.

**14. NOTICE**
Any notice or written communication of any kind required or desired to be given or sent pursuant to the terms hereof shall be delivered in person, mailed postage prepaid by certified or registered mail, mailed electronically and/or posted on the Clerk's Office Web Page, unless otherwise specifically stated herein.

**15. TERMINATION**
a. This Agreement may be terminated without cause by either party on ten (10) days written notice to the other.
b. This Agreement may be terminated by the Clerk's Office for Subscriber's failure to comply with the terms of this Agreement, failure to make payments of charges or breach of Agreement.
c. The Clerk reserves the discretion to deny secure remote access to ensure compliance with this Agreement and the Code of Virginia.
d. This Agreement shall be terminated immediately if the Board of Supervisors of Prince William County fails to appropriate and continue funding for the services provided under this Agreement. Subscriber acknowledges that the Clerk's Office has no control over the amount of appropriations, if any, that the Board of Supervisors will provide for continuation of the services under this Agreement.
e. This Agreement may be terminated as otherwise specified.

**16. RATES, FEES AND TERMS MAY CHANGE**.

The Clerk's Office may change the Agreement terms, at any time for any reason. If the Clerk's Office changes the terms of the Agreement, Subscriber will receive notice and have the right to terminate this Agreement.

**17. SEVERABILITY**
If any provision (or part thereof) of this Agreement is found to be invalid, then it shall be stricken and have no effect. The remaining provisions shall continue in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date last written below.

**THIS AGREEMENT must be executed by the individual requesting authorization to use OCRA.**

________________________________________ ________________________
**Signature** **Date**

________________________________________ ________________________
**Printed/Typed Name** **VSB#**

City/County of: _________________
State of: ____________________
I, __________________________________, a Notary Public or Deputy Clerk, do hereby certify
(Name of Notary or Deputy Clerk)
that on this _______ day of ______________________, 20___, __________________________
(Name of Subscriber)
personally appeared before me and swore and acknowledged that the statements contained herein are true and correct.

My Commission Expires: ________________ _____________________________________
Notary Public or Deputy Clerk

Registration Number: ________________ _____________________________________
Print or Type Name & Phone # of Notary

PRINCE WILLIAM COUNTY CIRCUIT COURT CLERK'S OFFICE by:

________________________________________ _______________________________
Jacqueline C. Smith, Esquire, Clerk of Court Date



____________
Subscriber's Initials

ATTACHMENT A

**APPLICATION FOR REMOTE ACCESS TO PRINCE WILLIAM COUNTY COURT CASE DOCUMENTS (OCRA)**

**This application must be completed by an attorney and each individual user.**

The approval of this application is at the Clerk of the Circuit Court's discretion. By signing this application, the subscriber acknowledges and accepts the terms and conditions of the *Attorney Subscriber Agreement for Remote Access* as incorporated by reference herein.

**All Information below is mandatory.**

**APPLICANT'S LAST NAME:** ____________________________________________

**APPLICANT'S FIRST NAME:** ____________________________________________

**BUSINESS NAME:** ____________________________________________

**STREET ADDRESS:** ____________________________________________

**CITY/STATE/ZIP:** ____________________________________________

**PHONE NUMBER:** ____________________________________________

**E-MAIL ADDRESS:** ____________________________________________

**VIRGINIA STATE BAR NUMBER:** ____________________________________________
**(include a copy of your Virginia State Bar card)**

**Option Requested**:
___ $200 annually for 1 attorney and 1 employee
___ $200 annually for 2 employees and attorney choosing not to use the system, but signs an agreement
___ $75 annually per employee for ___ additional employee(s)

**Payment Option**: ___ Annually ___ Semi-Annually ___ Quarterly

It is requested that the following employees be authorized users pursuant to this Agreement (use additional pages if necessary). The application and Agreement for each user is attached.
**Authorized Users**:

1. ____________________________________________

2. ____________________________________________

3. ____________________________________________

4. ____________________________________________



____________
Subscriber's Initials

It is the responsibility of the Attorney Subscriber to notify the Clerk's Office immediately upon the termination or resignation of an authorized user. Liability for the fee will continue until the Attorney Subscriber properly notifies the Clerk's Office of said termination or resignation. New authorized users can be added by having the individual complete an Agreement and Application. The completed documents should be sent to the Clerk's Office with a request on letterhead that the individual be added to the list of authorized users.

I certify that the information above is true and correct.

**SIGNATURE:** ________________________________________________

City/County of: _______________

State of: __________________

I, ______________________________, a Notary Public or Deputy Clerk, do hereby certify that on

this ______ day of ______________________, 20___, __________________________ personally appeared before me and swore and acknowledged that the statements contained herein are true and correct.

My Commission Expires: ______________ _________________________________
Notary Public or Deputy Clerk

Registration Number: ______________ _________________________________
Print or Type Name & Phone # of Notary

**Subscriber**, please choose the User ID and Password you would prefer to use. The password must be a minimum of 3 characters, and not more than 10. It is case sensitive and must be in lower case.

User ID (your e-mail) _________________________
Password________________________

**Please mail the signed agreement and check to:**
**Clerk of the Circuit Court, Attn: OCRA Web Subscription, 9311 Lee Avenue, Manassas, VA 20110**

*For Clerk's Office Use Only: Processed by: ______________________ Date: _______________*

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>*Plaintiff*,<br>v.<br><br>KARL R. HADE, *et al*.,<br><br>*Defendant.* | ) | Civil Action No.3:21-cv-00460-HEH |

**DEFENDANT SMITH'S ANSWERS TO PLAINTIFF'S SECOND SET OF INTERROGATORIES**

COMES NOW the Defendant, JACQUELINE SMITH, by counsel, and for her Answers to the Second Set of Interrogatories from Plaintiff COURTHOUSE NEWS SERVICE, states as follows:

Statement of Non-Waiver

These answers are made without waiver of, and with preservation of: (a) questions as to competence, relevancy, materiality, privilege, and admissibility of the responses and the subject matter thereof as evidence for any purpose in any further proceeding in this action, including trial, and in any other action; (b) the right to object on any ground at any time to a demand or request for further responses, including further production of documents, to these or any other interrogatories to which response is made; and (c) the right at any time to revise, correct, add to, supplement, or clarify any of these responses.

**ANSWERS TO INTERROGATORIES**

10. As a follow up to Your responses to Interrogatories Nos. 1-6, in which You state, in relevant part, that You and your staff "do redact [certain] information if a civil filing is posted

on the Prince William County Circuit Court's website," please identify (i) under what circumstances a civil filing is posted on the Prince William County Circuit Court's website and (ii) the specific URL where such a civil filing would be posted.

**ANSWER:** *The cases that are posted on the Court's public-facing website are related to exceptional cases that are of public interest or for which the Clerk's office anticipates repeated requests for information. The URL for such postings would be at https://www.pwcva.gov/department/circuit-court. There are presently no cases posted on the Court's public-facing website.*

11. Please identify all civil filings that You have posted on the Prince William County Circuit Court's website in each of the last five years, *i.e.*, 2021, 2020, 2019, 2018, and 2017. If for any reason You are unable to provide a complete response to this Interrogatory, please state how often a civil filing has been posted on the Prince William County Circuit Court's website in each of the last five years.

**ANSWER:** *The only case that has been posted on the Court's public website during Clerk Smith's tenure was related to the trial of criminal defendant Ronald Hamilton, who was charged with capital murder for shooting and killing police officer Ashley Guindon in 2016. The criminal case went to trial in 2018. There have been no civil filings posted on the public-facing website in the last five years.*

12. Identify the number of paying users that currently subscribe to OCRA at the Prince William Circuit Court.

**ANSWER:** *There are a total of 551 users of OCRA for Prince William County Circuit Court. 274 are paying users.*

**JACQUELINE SMITH**
**BY COUNSEL**

*/s/* __________
John C. Altmiller (VSB No. 34902)
Heather R. Steele (VSB No. 75473)
PESNER ALTMILLER MELNICK DEMERS & STEELE PLC
8000 Westpark Drive, Suite 600
Tysons, VA 22102
Telephone: (703) 506-9446
Facsimile: (703) 506-0929
jaltmiller@pesner.com
hsteele@pesner.com
*Counsel for Jacqueline Smith*

**CERTIFICATE OF SERVICE**

I hereby certify that I have this 5th day of July, 2022 served the foregoing Plaintiff's Answers to Second Interrogatories upon the following counsel:

Jonathan E. Ginsberg
BRYAN CAVE LEIGHTON PAISNER LLP
1155 F Street, NW, Suite 700
Washington, DC 20004
Telephone: (202) 508-6000
Facsimile: (202) 508-6200
jon.ginsberg@bclplaw.com

Robert B. McEntee, III (VSB No. 89390)
Erin R. McNeill (VSB No. 78816)
Assistant Attorneys General
Office of the Attorney General
202 North Ninth Street
Richmond, VA 23219
Telephone: (804) 786-8198 (McEntee)
Telephone: (804) 317-0977 (McNeill)
rmcenteeiii@oag.state.va.us
emcneill@oag.state.va.us
*Counsel for Defendant*
*Karl R. Hade*

*/s/* _________
John C. Altmiller (VSB No. 34902)
Heather R. Steele (VSB No. 75473)
PESNER ALTMILLER MELNICK
DEMERS & STEELE PLC
8000 Westpark Drive, Suite 600
Tysons, VA 22102
Telephone: (703) 506-9446
Facsimile: (703) 506-0929
jaltmiller@pesner.com
hsteele@pesner.com
*Counsel for Jacqueline Smith*

# EXHIBIT D

EXECUTIVE SECRETARY
KARL R. HADE

ASSISTANT EXECUTIVE SECRETARY & LEGAL COUNSEL
EDWARD M. MACON

COURT IMPROVEMENT PROGRAM
SANDRA L. KARISON, DIRECTOR

EDUCATIONAL SERVICES
CAROLINE E. KIRKPATRICK, DIRECTOR

FISCAL SERVICES
JOHN B. RICKMAN, DIRECTOR

HUMAN RESOURCES
RENÉE FLEMING MILLS, DIRECTOR

SUPREME COURT OF VIRGINIA

OFFICE OF THE EXECUTIVE SECRETARY
100 NORTH NINTH STREET
RICHMOND, VIRGINIA 23219-2334
(804) 786-6455

JUDICIAL INFORMATION TECHNOLOGY
ROBERT L. SMITH, DIRECTOR

JUDICIAL PLANNING
CYRIL W. MILLER, JR., DIRECTOR

JUDICIAL SERVICES
PAUL F. DELOSH, DIRECTOR

LEGAL RESEARCH
STEVEN L. DALLE MURA, DIRECTOR

LEGISLATIVE & PUBLIC RELATIONS
KRISTI S. WRIGHT, DIRECTOR

MAGISTRATE SERVICES
MASON L. BYRD, DIRECTOR

November 30, 2018

The Honorable Mark D. Obenshain
Chair, Courts of Justice Committee
Senate of Virginia
P.O. Box 555
Harrisonburg, Virginia 22803

The Honorable Robert B. Bell
Chair, Courts of Justice Committee
Virginia House of Delegates
2309 Finch Court
Charlottesville, VA 22911

The Honorable Thomas K. Norment, Jr.
Co-Chair, Finance Committee
Senate of Virginia
P.O. Box 6205
Williamsburg, Virginia 23188

The Honorable S. Chris Jones
Chair, Appropriations Committee
Virginia House of Delegates
P.O. Box 5059
Suffolk, VA 23435

The Honorable Emmett W. Hanger, Jr.
Co-Chair, Finance Committee
Senate of Virginia
P.O. Box 2
Mount Solon, Virginia 22843-0002

RE: Item 38, Paragraph O, of the Appropriation Act, Chapter 2, Virginia Acts of Assembly, 2018 Special Session I

Dear Chairmen Obenshain, Norment, Hanger, Bell, and Jones:

Please find enclosed a summary of the findings and recommendations of the working group to evaluate issues related to statewide adoption of electronic filing of civil cases in circuit courts, as required by Item 38, Paragraph O, of the Appropriation Act, Chapter 2, Virginia Acts of Assembly, 2018 Special Session I.

If you have any questions regarding this report, please do not hesitate to contact me.

With kind regards, I am

Very truly yours,

Karl R. Hade

KRH:jrp
Enclosure

MEMORANDUM

To: Co-Chairman of the Senate Committee on Finance
Chairman of the Senate Committee on Courts of Justice
Chairman of the House Committee on Appropriations
Chairman of the House Committee on Courts of Justice

From: Office of the Executive Secretary of the Supreme Court of Virginia

Date: November 30, 2018

Re: Response of Work Group Established Pursuant to Item 38 O of the Appropriations Act of 2018

Background

This report was prepared in response to the following language in the 2018 Appropriation Act ("the Budget Language"). Item 38 (O) of the 2018 Appropriation Act (House Bill 5002, Chapter 2 of Special Session I) reads as follows:

> *O. The Executive Secretary shall convene a working group, to include a minimum of five circuit court clerks, to evaluate issues related to statewide adoption of electronic filing of civil cases in circuit courts, and the implementation of a statewide system through which images of nonconfidential records within civil case files in the circuit courts may be viewed by subscribers of that system. The evaluation shall include consideration of (i) the benefits of the availability of electronic case filing of civil cases in all circuit courts; (ii) the benefits of the adoption of one statewide electronic case filing system by all circuit courts; (iii) the benefits of a statewide system through which images of nonconfidential records within civil case files in the circuit courts may be viewed by subscribers via a single subscription for statewide access; (iv) the types of information to be made available to subscribers of the system or, alternatively, excluded from the system; (v) how a subscription process may be established to provide a clear definition of the duties of the Office of the Executive Secretary and each circuit court clerk with respect to implementation and operation of the system; (vi) the estimated one-time and ongoing costs of all circuit courts implementing and operating a) an electronic case filing system, and b) one statewide electronic case filing system for use by all circuit courts; (vii) the estimated one-time and ongoing costs of implementing and operating a statewide system through which images of nonconfidential records within civil case files in the circuit courts may be viewed by subscribers of that system via a single subscription for statewide access; (viii) a fee schedule for subscribers and how such fee schedule should be established, and (ix) any potential loss of revenues by circuit court clerks reasonably attributed to the implementation of one statewide electronic case filing system and a statewide system through which images of nonconfidential records within civil*

*case files in the circuit courts may be viewed by subscribers of that system. The Executive Secretary shall provide a summary of the findings and recommendations of the working group to the Chairmen of the House Committees on Courts of Justice and Appropriations, and the Senate Committees on Courts of Justice and Finance no later than November 30, 2018.*

## Work Group Meetings

The Office of the Executive Secretary (OES) convened a Work Group in accordance with the Budget Language. Specifically, the Work Group focused on addressing the considerations enumerated in the Budget Language.

The membership of the Work Group is attached as Appendix A – and included circuit court clerks representing the Virginia Court Clerks Association ("VCCA") and staff within the OES. The first meeting of the Work Group was held on June 20, 2018, during which it was determined that OES and the VCCA would separately develop draft responses to components of the specific considerations within the Budget Language. Following the June 20 meeting, OES met internally and worked on potential draft responses to the Budget Language, and VCCA met internally and worked on potential drafts of legislation. The next meeting was held on September 5, 2018, with the members of the Work Group doing research and working internally on the potential draft responses to the Budget Language between the June 20 meeting and the September 5 meeting. At the September meeting the Work Group discussed OES' draft responses to the Budget Language with the VCCA expressing concerns that the responses were too heavily focused on OES developed systems. There was consensus that neither the VCCA nor OES believes that legislation relating to the considerations set forth in the Budget Language should be introduced in the 2019 General Assembly. At the meeting on October 4, 2018, the VCCA presented alternative responses to the considerations set forth in the Budget Language and those responses were discussed.

The Work Group discussions revealed that OES approaches the development and implementation of technology systems in a manner that is uniform and system-wide, to the extent possible, while the VCCA prefers preserving the authority of circuit court clerks to select technology systems that are tailored to the needs of the individual circuit court the clerk serves. The VCCA does not believe that a "one-size fits all technology approach" recognizes the diverse needs of the circuit courts in the Commonwealth of Virginia.

Consequently, what follows is a list of findings upon which the Work Group achieved consensus, followed by responses to the considerations the Work Group was asked to evaluate. While many of the considerations were phrased in the affirmative, as an examination of the benefits of a course of action, discussion must necessarily be had concerning the downside of any given course of action. OES has sought to provide a summary of both.

Finally, the options set forth in this report seek to inform the legislature as to how certain policy goals may be achieved and wherein lie the shortfalls of any given policy choice. Recognizing that those policy decisions lie squarely with the legislative branch, the

"recommendations" set forth in this report are offered without endorsement under the heading of "Options."

## Findings

Following hours of discussion and extensive work over the course of six months, the Work Group has reached the following conclusions:

1. Circuit court clerks are independent elected constitutional officers and by law are given the discretion to make decisions about the technologies utilized by their offices.

2. It has been demonstrated by the example of other states that until attorneys are required to use electronic case filing the benefits associated with it cannot be realized. Indeed, adoption of e-filing while maintaining traditional paper filing increases the workload of the clerks by creating parallel systems for the same process.

3. Any mandate that the clerks adopt a single, statewide e-filing system could be costly for individual clerk's offices. Clerks' offices may be required to transition from an existing system or acquire a system not currently in use and depending on the selected system's ability to interface with other existing systems, pay for any necessary interfaces. If a single statewide e-filing system were required, the circuit court clerks and localities that have invested in technology systems to support the needs of that particular court would experience a loss of investment and would likely have costs associated with integrating a new system.

   If a system other than the current OES e-filing system is required, OES would experience a significant loss of the investments made in the existing systems and would likely have significant costs associated with integrating a new system with existing systems.

4. Providing a technology system for e-filing of civil cases has benefits to litigants and to the members of the Virginia State Bar but also can be expensive for the clerks to operate and for OES to maintain, including the training of staff and providing support to users of the system, particularly if members of the Virginia State Bar do not use such systems.

5. In those jurisdictions currently offering e-filing in civil cases, user rates are very low as a percentage of total cases filed.

6. The Work Group does not recommend any legislation to mandate use of a single civil e-filing system in the circuit courts.

7. Significant participation by Virginia lawyers is a prerequisite to successful adoption of any comprehensive civil e-filing system. Therefore, the Virginia State Bar should seek input from its members as to whether they would support mandatory electronic filing of civil cases by attorneys in any jurisdiction where e-filing of civil cases is available.

Discussion of Considerations

Because a rudimentary understanding of the technology currently employed by the circuit court clerks is necessary to understand the discussion that follows, the various OES systems are described briefly here. For a detailed overview of the OES systems currently in use in the circuit courts for both e-filing and online viewing of case documents, please see Appendix B. What follows is an explanation of the OES systems available to the circuit court clerks; however, pursuant to Va. Code § 17.1-502, any clerk may choose a private vendor to supply any one or a combination of these foundational systems. Pursuant to this authority, some clerks have implemented technology systems offered by private vendors. A table detailing the known systems used by each circuit court is provided in Appendix C.

The Circuit Case Management System (CCMS) is the operational system maintained by OES that serves as the main case-processing mechanism for all circuit court clerks' offices, except Fairfax and Alexandria that do not use CCMS. Multiple technology systems developed by OES are built upon CCMS' structure. The Virginia Judiciary E-Filing System (VJEFS), Case Imaging System (CIS), and Officer of the Court Remote Access System (OCRA) require use of CCMS before they can be implemented by any circuit court. VJEFS allows electronic filing of most civil cases in circuit court and is available for use by members of the Virginia State Bar and their designated staff. CIS provides circuit courts the ability to create and store electronic documents that are part of a case file. OCRA allows participating circuit court clerks to grant attorneys, attorneys' agents, pro hac vice attorneys, and government agencies secure remote access to documents in CIS.

*1. Benefits of the availability of electronic case filing of civil cases in all circuit courts*

In addition to the general benefits of e-filing, such as avoidance of travel to the courthouse and extended hours to file, attorneys throughout the Commonwealth with a statewide or multi-jurisdictional practice would benefit from the ability to manage their cases remotely. Circuit court clerks would benefit from the reduced amount of case processing functions such as case entry and case receipting, as well as the scanning necessary to create and store images of documents in case imaging systems, as the case data, payment information, and e-filed documents would already be available in an electronic format.

However, if lawyers do not use the e-filing system, then making e-filing available increases the workload of the clerk by creating a second, parallel process for case filing which must also be staffed. It is for this reason that clerks in some smaller courts with limited staff report not wanting to adopt e-filing even though that court may otherwise be equipped to do so.

*2. Benefits of the adoption of one statewide electronic case filing system by all circuit courts*

Use of one statewide e-filing system would provide uniformity and consistency across the Commonwealth and would create efficiencies for the attorneys and their staff who must learn

only one system. In addition, there are efficiencies for OES with the operation and support of one e-filing system.

However, adoption of a single system to be used by every circuit court would be disruptive and costly to those courts forced to transition to a new system. Some circuit court clerks have invested significantly in private sector technology systems that meet the needs of the community they serve. In some larger, wealthier localities the court technology systems are included in the local government IT contract with an outside vendor. For those communities, forcing the adoption of an e-filing system incompatible with the existing IT systems would be a hardship that would affect multiple local institutions, including those that have system interoperability with the local judicial system. Even if the state chose an outside private vendor to provide statewide e-filing, it would force the 35 courts currently using the OES' VJEFS off of the current system, as well as any court using a different private vendor than the one selected for e-filing. An outside vendor system would significantly impact the interoperability of the OES' case management, imaging, and OCRA systems across the Commonwealth.

*3. Benefits of a statewide system through which images of nonconfidential records within civil case files in the circuit courts may be viewed by subscribers via a single subscription for statewide access*

A statewide system through which images of nonconfidential records within the civil case files could be viewed would benefit subscribers[1] wishing to access case information across multiple courts. Currently, a subscriber seeking such access may be required to pay a separate subscription fee for each circuit court that offers electronic access to nonconfidential records or visit each court in-person to access the case file. In addition, a single statewide system would only require users to learn to use a single system, as opposed to the multiple systems that are currently offered by circuit court clerks statewide. Operation of a single statewide system would likely reduce both foot traffic and calls to the clerk's offices. Subscribers accessing the records would possibly avoid paying a copy fee to obtain a copy of the electronically-viewed document.

However, a subscriber wishing to remotely view files within a single court may potentially face a higher subscription fee to access the statewide system than would normally be charged to access files within a single court. Such subscriber may view the cost increase to access records statewide as a detriment, although these higher costs could be reduced through the implementation of a multi-tier fee structure, with the costs of such subscription dependent on the number of courts accessible within each tier. Also, changing the manner in which users access images of records in civil case files to a statewide, single subscription model would result in loss of revenue to individual clerks' offices, as discussed in greater detail in Consideration #9.

OCRA, which was developed by OES and is currently being utilized in 92 of the 120 circuit courts, is a system through which images of nonconfidential records within civil case files in the circuit courts may be viewed by subscribers, who are limited by statute to attorneys,

[1] Subscribers are currently limited to members in good standing with the Virginia State Bar and their authorized agents, pro hac vice attorneys authorized by the court for purposes of the practice of law, and such governmental agencies as authorized by the clerk as set forth in Va. Code § 17.1-293(E)(7).

attorneys' agents, pro hac vice attorneys, and government agencies as authorized by the clerk. Currently, subscribers are limited to viewing images for only the circuit courts to which they have a paid subscription. In order to access the records of all 92 courts that offer OCRA, subscribers currently must subscribe with each of the 92 circuit court clerks' offices.

*4. The types of information to be made available to subscribers of the system, or alternatively, excluded from the system*

Information available to subscribers would include all documents in civil cases except sealed, juvenile, adoption, and other confidential cases, as well as those documents that are marked confidential or sealed or are contained in a confidential addendum. The current manner in which information is filed for a civil case in circuit court would need to be altered to protect sensitive information if remote access to electronic documents is available to the public rather than as restricted by VA. Code § 17.1-293.

*5. How a subscription process may be established to provide a clear definition of the duties of the Office of the Executive Secretary and each circuit court clerk with respect to implementation and operation of the system*

OES could develop, operate and maintain OCRA as a single statewide system for viewing of nonconfidential civil case documents. In doing so, OES would establish an automated subscription process with the capability for online payments of the subscription fee. Each circuit court clerk would be responsible for imaging, maintaining and making available the case records through the system, including properly coding confidential documents to prevent unauthorized access to such records.

If this course of action is mandated, OES would request that the money generated from subscription fees be directed to OES to support the costs associated with the development, maintenance, and support of the system. OES would develop and distribute to the clerks the requirements necessary for implementing case imaging including hardware and server requirements, as it currently does when a court wants to implement CIS. Circuit courts that do not already have the equipment necessary to create or maintain electronic images of case records would need to obtain the necessary equipment.

In recognition of the fact that moving to a statewide, single subscription access to images of civil case records would deprive clerks of the fees they are currently receiving via OCRA subscriptions, the VCCA would request that the General Assembly provide for the initial equipment and ongoing maintenance costs so that OES could provide this service to clerks without having to pass along the costs. Currently, imaging is not mandatory and acquiring CIS is an option for the circuit court clerk. As this is an option, there are costs associated with this application, which include initial set-up, equipment and ongoing maintenance. OES charges the clerks for use of CIS to defray the costs of operation and maintenance of this system.

*6. The estimated one-time and ongoing costs of all circuit courts implementing and operating 1) an electronic case filing system, and 2) one statewide electronic case filing system for use by all circuit courts*

*1) One-time and ongoing costs for all circuit courts implementing and operating an electronic case filing system*

If the current OES systems are used, the one-time cost for all circuit courts to implement and operate an electronic case filing system can be ascertained by determining the number of courts that do not currently have e-filing capability, and the hardware and software costs associated with adopting VJEFS in each of these courts. We cannot determine what the costs would be if courts not currently offering e-filing were to do so through a private vendor. Currently, 35 of 120 circuit courts offer e-filing via VJEFS. OES has been able to ascertain that five courts offer e-filing through private vendors.

The cost for a court to implement VJEFS is determined by calculating the cost for the court to purchase the required hardware and software that will support VJEFS. OES offers a "CIS package," which includes VJEFS within the software, along with customizable hardware options that would provide participating courts with the equipment necessary to scan and print case records. Upon purchase of the CIS package, a court can offer VJEFS at no additional cost to the court. Ninety-three circuit courts currently utilize the CIS package, and OES is in the process of adding CIS capabilities for 8 additional circuit courts (see Appendix C). Thus, there are 101 circuit courts that have (or will soon have) the capability of offering VJEFS at no further cost to the Clerk.

Of the remaining 19 circuit courts that do not operate CIS, 13 do not operate any type of case imaging system, and therefore would have to purchase a CIS package from OES or a technology system from a private vendor to offer e-filing. The total amount necessary for OES to provide the CIS package in these 13 circuit courts, which would also provide e-filing capability, is $53,608 (see Appendix D, Table 1). The six remaining courts operate case imaging systems other than CIS and may offer e-filing through independent systems other than VJEFS. If all six courts offer e-filing through an independent system, no further costs would be necessary to establish e-filing in every circuit court. However, if none of these six courts offer e-filing through an independent system, and the courts opted to offer e-filing through use of VJEFS, the cost to implement CIS and VJEFS in four of the six courts would be $34,688 (see Appendix D, Table 2).[2]

If the current OES systems are used, in addition to the one-time costs, there would be ongoing costs associated with system maintenance. System maintenance would include server upkeep, security updates, scanner support, and software licensing for components of

[2] This amount does not include the cost to convert Fairfax and Alexandria's case management systems to CCMS and CIS. The estimated cost to convert Alexandria Circuit Court and Fairfax Circuit Court to CCMS is unknown and cannot be determined without extensive investigation into and analysis of their existing systems. Also, in consideration of the scale and complexity of converting Fairfax Circuit Court to CCMS, it is anticipated that the cost will be exorbitant and any effort to convert will take more than two years to complete. For these reasons, and because CCMS is required to implement CIS, the costs for converting Alexandria Circuit Court and Fairfax Circuit Court to CIS are not available, and listed as "Not Available" in Table 2 of Appendix D.

applications. Each circuit court that offers CIS is currently responsible for paying fees to OES for maintenance of the system. The fees paid by each individual court vary based on system usage and services provided.

If the current OES systems are used and if interconnectivity among OES systems and private e-filing systems were required, the maintenance costs would increase significantly with each independent system operated by the circuit court clerks and linked through an interface, as the system complexity and potential fail points would increase with each additional system.




*2) One-time and ongoing costs for all circuit courts implementing and operating one statewide electronic case filing system for use by all circuit courts*

VJEFS offers interconnectivity among all participating circuit courts, and thus could serve as the statewide system if every circuit court were to utilize it. Again, we are unable to determine the costs associated with adopting a statewide electronic case filing system provided by a private vendor.

If the current OES systems are used, the one-time costs of a statewide e-filing system is directly related to the amount required for every circuit court to operate the CIS package offered by OES, which includes access to VJEFS for no additional cost. As previously stated, 101 circuit courts already operate, or are scheduled to operate, the CIS package offered by OES. The cost for 13 of the remaining courts to purchase the CIS package would be $53,608. The cost for four of the six remaining courts to purchase CIS would be $34,688. (see Appendix D, Table 2). As noted within Footnote 3, the amounts provided in Appendix D do not include the costs associated with converting Alexandria Circuit Court or Fairfax Circuit Court to CCMS or CIS. The costs associated with converting these two circuit courts to CCMS and CIS would need to be determined to provide the total amount for establishing a fully statewide e-filing system for circuit courts.

Regarding ongoing costs, circuit courts are currently required to pay maintenance costs for their use of CIS. Those costs vary based on services provided and system usage. However, efficiencies would be created in development, training, support, compatibility, and security of the statewide system if all circuit courts were to use the same e-filing system.

If the current OES systems are used, OES would need two additional dedicated personnel to provide technical support to clerks and VJEFS users. Although VJEFS is currently supported by the individual participating circuit clerk's offices, OES staff are often needed to assist with questions and provide support to both clerks and attorneys and their staff who use the system. If VJEFS were to be available statewide, the need for technical support and assistance is expected to increase. The total estimated yearly cost for dedicated VJEFS technical support personnel in OES is approximately $126,000.

If a single statewide e-filing system is mandated by the General Assembly, the costs to the circuit court clerks and the localities who have invested in development, maintenance and operation of private e-filing systems to address the needs of that circuit court are indeterminate but potentially substantial. The loss of ongoing revenue in terms of fees paid to the circuit court clerks is also indeterminate.

In the clerks' experience, when an attorney has a question, they call the clerk where they are trying to e-file something. Therefore, the clerks believe they will need additional employees to handle this additional workload.

*7. The estimated one-time and ongoing costs of implementing and operating a statewide system through which images of nonconfidential records within civil case files in the circuit courts may be viewed by subscribers of that system via a single subscription for statewide access*

The estimated costs are highly dependent upon the type of statewide electronic access system that would be implemented. The estimated costs provided below assume the uniform use of the current OES systems in all circuit courts, including use of CCMS. Integrating independent systems into an OES system through an interface would increase the costs, both for the clerks and OES.

There are currently 19 circuit courts that either do not have an imaging system in place, have no plans of acquiring such a system, or do not use an electronic imaging system that is compatible with systems maintained by OES. The one-time cost to purchase and install hardware for 17 of these 19 courts is approximately $88,296. This estimate does not include the costs for converting Alexandria Circuit Court and Fairfax Circuit Court to CCMS and CIS (see Footnote 3).

Persons seeking secure remote access to electronic court documents within the system maintained by OES would be required to register for a paid subscription service. The cost associated with creating the electronic registration portal includes the cost of programming and

developing this electronic registration feature. The estimated one-time cost to develop an automated and paperless user registration process is approximately $78,000[3].

In addition, if the current OES systems are used, there would be ongoing personnel costs. Two additional record management services personnel would be needed in OES to maintain oversight and assist users in their registration and use of the system. Currently, OCRA is supported by the individual participating circuit clerks but it is expected, if legislation is enacted mandating a statewide system, that support would be provided by OES since clerks would no longer receive the registration fees. Users of the system would be directed to OES for support. In addition, records management services personnel would provide support to circuit clerks regarding document imaging. If the current OES systems are used, the total estimated yearly cost for record management services personnel is approximately $126,000. The costs to the circuit court clerks to operate a statewide e-filing in each circuit court are indeterminate in terms of personnel costs.

If the current OES systems are used, OES would offer semi-annual training sessions to attorneys to demonstrate the system's capabilities and increase public usage of the system. Training would also be offered to circuit court personnel to increase their familiarity with the system and convey best practices. OES estimates yearly training costs to be approximately $10,000.

If the current OES systems are used, based on prior experience with the development and maintenance of applications similar in size and scope, OES would need two full-time development contractors to ensure a high level of security and performance of the application. These dedicated resources would be needed to maintain system security and integrity, ensure ongoing performance, and develop system enhancements. If the current OES systems are used, the estimated yearly cost for two development contractors is approximately $256,000.

*8. The fee schedule for subscribers and how such fee schedule should be established*

If a single statewide system for viewing nonconfidential civil case documents is implemented, such a system should be subscriber based. The fees charged for the service would be applied to the costs of development and maintenance of the system. If OES were to develop and maintain such a system, OES would recommend that the fee structure be established by the Judicial Council, as this would allow for the fee to be adjusted based on a range of determinants in the future without the need for further legislation. The fee schedule to be established would vary depending upon the number of users if such system were to be self-supporting. The VCCA would request that, regardless of whether OES develops and maintains a statewide system, or a private vendor does so, the fee structure be established by the General Assembly.

*9. Any potential loss of revenues by circuit court clerks reasonably attributed to the implementation of one statewide electronic case filing system and a statewide system through*

[3] The VITA Security Standard for Remote Access to Court Documents Online would apply to this process and would need to be updated to allow for automated and paperless user registration.

*which images of nonconfidential records within civil case files in the circuit courts may be viewed by subscribers of that system*

It is difficult to estimate the potential loss of revenues by circuit court clerks in this circumstance. Circuit court clerks anticipate an indeterminate loss of revenues due to loss of copy fees, loss of OCRA fees (where applicable), additional expenses to pay OES for these additional technology systems, loss of funds from the clerks' nonreverting local funds and expenses related to imposition of additional duties for Clerks with no new staffing.

The most finite numbers available suggest a statewide loss of $78,714.97 annually from the optional fee charged pursuant to Code § 17.1-258.3 for paper filing when e-filing is available and $286,034.49 in lost revenue from OCRA fees. These numbers were gathered by running a fiscal year 2017 report for the two accounts into which these two types of fees are deposited. The circuit court clerks anticipate an additional indeterminate negative fiscal impact for the reasons stated herein.

If a course of action is taken that removes a revenue stream to the clerks, it could be offset by an increase in technology funding that would allow OES to provide the clerks with OES systems without having to pass along costs for initial hardware, maintenance, and updates. In addition, the VCCA believes that the circuit court clerks need annual appropriations to cover the expense of being on the front line with users of such a system.

## Options

1. Incentivize those courts that do not currently offer e-filing.

The Commonwealth could continue to allow each circuit court clerk to select the technology system for e-filing of civil cases that fits the needs of that circuit court. The General Assembly could incentivize those courts that do not have the technology infrastructure to offer e-filing by funding the costs for those courts, whether this is the OES technology or technology from a private vendor. This would also lay the necessary groundwork for remote access to those courts' case papers. OES and the VCCA believe that e-filing would be more widely adopted if the General Assembly incentivized circuit courts to offer e-filing for civil cases.

OES could offer a single page of web links on its website where practitioners could link to each circuit court's e-filing web page, regardless of whether an individual circuit court clerk uses the OES technology or that of a private vendor. In combination with these efforts, outreach to the Bar to educate and gauge interest in civil e-filing in circuit court could hasten the pace at which e-filing becomes available across the Commonwealth.

2. Adoption of one statewide electronic filing system by all circuit courts.

Option 2A: VJEFS, which was developed by OES, is utilized in 35 circuit courts and could be implemented in an additional 66 courts within six months, and could serve as the single

statewide electronic case filing system, as users of the system can register once and then e-file in any circuit court that uses VJEFS.

Benefits of adopting VJEFS as a single statewide electronic case filing system: There are efficiencies for OES with the operation and support of one e-filing system. VJEFS is already available in 35 circuit courts. An additional 58 circuit courts have, and eight will soon have, the OES technology infrastructure in place to enable them to adopt VJEFS at no additional cost to the clerk. Use of VJEFS provides the assurance of continued service because there is no risk that OES will become insolvent or discontinue support and service as has occurred with commercial vendors.[4]

Challenges of adopting VJEFS as a single statewide electronic case filing system: Although OES provides VJEFS at no additional cost to the clerks, circuit court clerks must have CIS in place to implement VJEFS. There are costs to circuit court clerks associated with the implementation of CIS, which are discussed in Consideration 6 above. As discussed above, clerks who have chosen to invest in private technology systems would lose the benefit of that investment if they were mandated to switch to VJEFS. In addition, both clerks and OES would incur significant costs associated with the conversion and migration of various existing systems to OES systems.

Option 2B: Alternatively, the Commonwealth could seek an outside vendor to provide or develop an electronic case filing system for statewide use in the circuit courts. The VCCA believes that the competitive procurements could request that bids from private vendors accommodate the diverse needs of the circuit courts in the Commonwealth. Benefits of adopting a private technology system for statewide electronic case filing: clerks would have the opportunity to evaluate various types of systems and select one that best fits the clerks' needs.

Challenges of adopting a private technology system for statewide electronic case filing: clerks would likely have difficulty selecting a single system that meets the needs of diverse jurisdictions but the VCCA would advocate that any competitive procurement request private technology vendors to submit proposals that would not limit technology solutions to "one size fits all" systems. In addition, OES would lose the benefit of the investment it has made in the development of existing systems and may incur costs in the process of converting and supporting clerks who would need to transition to a new system.

3. Adoption of a statewide system through which images of nonconfidential records within civil case files in the circuit courts may be viewed by subscribers via a single subscription for statewide access.

OCRA, which was developed by OES and is being utilized in 92 circuit courts, could serve as the statewide system through which images of nonconfidential records within civil case files in the circuit courts may be viewed by subscribers.

---

[4] The Virginia Beach Circuit Court is again using CCMS after the private vendor it used for over six years went out of business and no longer provided updates and support for their system. A great deal of OES resources were expended in the process of transferring the case records back to CCMS. Similar situations have occurred nationally, leaving courts around the country with either incomplete systems or without support for existing systems.

Benefits of adopting OCRA statewide: Subscribers of OCRA would benefit from having access to images of civil case records of circuit courts statewide, as they currently are limited to viewing images for only the circuit courts to which they have a paid subscription. Currently, to access the records of all 92 courts that offer OCRA, subscribers need a subscription with each of the 92 circuit court clerks' offices, which is likely cost prohibitive.

Challenges of adopting OCRA statewide: As discussed above, some circuit court clerks have invested in private technology systems and would lose the benefit of those investments as well as incurring conversion costs if they were required to transition to OCRA. In addition, and as previously explained, the current OCRA system is limited to officers of the court. If made available to the public (which the VCCA does not feel is appropriate), steps would need to be taken to prevent unauthorized access to sensitive information such as social security numbers, dates of birth and financial account numbers. Remote access to records that contain such information is currently allowed by Va. Code § 17.1-293 when secure remote access is restricted to "members in good standing with the Virginia State Bar and their authorized agents, pro hac vice attorneys authorized by the court for purposes of the practice of law and such governmental agencies as authorized by the clerk." To avoid the need for clerks to redact certain information, legislation would need to provide that any petition, pleading, motion, order, decree, agreement of parties, or transcript that is filed in a civil case in circuit court could not contain sensitive information such as social security numbers, financial information that provides identifying account numbers, names of minors, or other information deemed confidential. The legislation would also need to provide that the party that prepares and submits the document that would otherwise contain such information would instead be required to include the confidential or sensitive information on a separate addendum, which would only be made available to the parties, their attorneys, and to such other persons deemed necessary by the court. The legislation would further need to provide that the party who submits documents in circuit court would also be required to ensure that any such information is removed prior to filing with the clerk and that the separate addendum is incorporated by reference within the document. Clerks would need to have the authority to reject any document that does not comply with this requirement and would need to be immune from liability for disclosures that may result from a party's failure to protect the information within documents that are filed with the clerk. OES would also need to be immune from liability for disclosures that may result from a party's failure to protect the information within documents that are available within the system. Due to the need to restrict the public's remote access to sensitive information, only cases filed after the implementation of the above described addendum requirement would be available within the system.

Because centralization of OCRA would result in indeterminate but likely significant lost revenue to circuit court clerks, some thought should be given to how that revenue might be replaced or how the clerks' operating costs for the requisite systems that make remote access to case contents possible might be reduced or eliminated in order to offset that lost revenue stream.

## Appendix A

The Budget Language stated that "[t]he Executive Secretary shall convene a working group, to include a minimum of five circuit court clerks, to evaluate issues related to statewide adoption of electronic filing of civil cases in circuit courts, and the implementation of a statewide system through which images of nonconfidential records within civil case files in the circuit courts may be viewed by subscribers of that system." In accordance with this language, OES and the VCCA worked together to establish the membership of the Work Group. The following individuals participated in the development of this report.

- Hon. Gayle Ashworth, Clerk, Essex Circuit Court
- Hon. John B. Chappell, Clerk, Dinwiddie Circuit Court
- Hon. Gail P. Clayton, Clerk, Surry Circuit Court
- Hon. Gary M. Clemens, Clerk, Loudoun Circuit Court
- Chip Dicks, Gentry Locke
- Hon. Paul Ferguson, Clerk, Arlington Circuit Court
- Hon. John Frey, Clerk, Fairfax Circuit Court
- Jo Fronfelter, Circuit Court Analyst, OES
- Norma Gates, Circuit Court Services Manager, OES
- Hon. Ed Jewett, Clerk, Richmond City Circuit Court
- Myron McClees, Staff Attorney, OES
- Hon. Kristen N. Nelson, Clerk, York County/Poquoson Circuit Court
- Alisa Padden, Staff Attorney, OES
- Jaime Reyes, Records Management Services Manager, OES
- Hon. Thomas E. Roberts, Clerk, Staunton Circuit Court
- Brandy Singleton, Staff Attorney, OES
- Hon. Tina Sinnen, Clerk, Virginia Beach Circuit Court
- Judy Worthington, Legislative Consultant, Sage Consulting LLC
- Kristi Wright, Director of Legislative and Public Relations, OES

# Appendix B

**Current OES Systems**

The Office of the Executive Secretary (OES) has developed and currently maintains both an electronic filing system and a system that provides electronic access to imaged records for use in the circuit courts. Multiple circuit courts provide electronic filing and/or electronic access to images of records within case files, with some clerks using the systems developed by OES, and others may use privately developed or purchased systems.[5] A table detailing the known systems used by each circuit court is provided in Appendix C. Included below is a brief explanation of the OES systems, including their functionality.

*Circuit Case Management System*

The Circuit Case Management System (CCMS) is the operational system maintained by OES that serves as the main case-processing mechanism for participating circuit court clerks' offices and allows clerks to manage numerous office functions. Once clerks enter case information into CCMS, or the information is imported from a separate system, CCMS provides tools that allow clerks to process day-to-day operations, such as creation of an interactive docket, and automatic updating of a master calendar. CCMS has database capabilities that allow for storage and timely retrieval of entered case information, which limits the amount of manual processes that must be conducted by clerks. As cases are processed by the courts, CCMS can automatically generate reports and abstracts for state agencies through interfaces with other state-operated systems. For instance, criminal case information can be transmitted to the Department of State Police by means of an automatically-generated Central Criminal Records Exchange Report after the case is properly updated in CCMS. In addition, CCMS also provides specialized metrics, such as caseload statistics, that can be used by clerks to enhance office operations and efficiency.

Multiple technology systems developed by OES rely upon CCMS' structure. The Virginia Judiciary E-Filing System (VJEFS), Case Imaging System (CIS), and Officer of the Court Remote Access System (OCRA) require use of CCMS before they can be implemented by any circuit court. Currently, all circuit courts except Alexandria Circuit Court and Fairfax Circuit Court use CCMS, which is provided to the clerks by OES at no cost.

*Virginia Judiciary E-Filing System*

VJEFS, which began as a pilot in 2013, allows electronic filing of most civil cases in circuit court and is available for use by members of the Virginia State Bar and their designated staff. VJEFS can be used to track case submissions, receive status and other notifications by email, request service of process, and calculate and pay fees online. For example, when a case is filed in VJEFS, the system automatically calculates the fees for the filing attorney. Once the case is accepted by the clerk, the system creates a receipt in the Financial Accounting System,

[5] Pursuant to Va. Code § 17.1-502, the clerks are authorized to operate their own systems that are independently developed and maintained.

file stamps the document with the time of submission, and sends notification that a document has been filed in the case. If service is requested by the attorney, VJEFS also produces forms for service. The automation of these steps reduces the amount of processing that must be carried out by personnel in the clerk's office.

Currently, 35 of the 120 circuit court clerks use VJEFS as their e-filing system. Any member of the Virginia State Bar who completes the registration process through a participating circuit court clerk's office may file cases in any of the 35 circuit courts that use VJEFS. The ability to e-file is not limited to the operating hours of the circuit court clerk's offices. Cases may be filed in VJEFS weekdays from 7 a.m. to 7 p.m.

Implementation of VJEFS in a circuit court requires that the court use CCMS. This requirement is necessary because of the interaction between the two systems. In addition, a court must also use OES' CIS to offer VJEFS.

*Case Imaging System*

CIS provides circuit courts the ability to create and store electronic documents that are part of a case file. Stored documents can be accessed by the court or the public at the courthouse, or by OCRA subscribers, who can view the documents through the OCRA interface. To view the documents, users can retrieve cases based on various search criteria, including name, case number, file date, or hearing date.

Implementation of CIS requires that the court be a user of CCMS. A court can use CIS after purchasing a "CIS package" from OES, which will include necessary software and hardware to allow for the scanning and printing of case records. Among the software included within the CIS package is VJEFS and OCRA, though not every court that purchases a CIS package opts to use these programs.

*Officer of the Court Remote Access System*

OCRA has been available to circuit courts since July 1, 2011. OCRA allows participating circuit court clerks to grant attorneys, attorneys' agents, pro hac vice attorneys, and government agencies secure remote access to documents in CIS. Users can view all documents for cases associated with the specific circuit court(s) for which they are registered except sealed, juvenile, adoption, and other confidential cases, as well as those documents that are marked confidential or sealed. Each circuit court clerk determines the subscription fee for accessing its documents through OCRA, and subscription fees are paid to and retained by the circuit court clerk. Currently, 92 of the 120 circuit court clerks offer secure remote access through OCRA.

## Appendix C

The following table details the known systems operated by each circuit court. Courts in rows with no shading operate the Court Imaging System (CIS) maintained by OES. Courts that are shaded in blue do not have CIS and have not previously requested a quote for adopting use of CIS. The courts shaded in green are in the process of adopting CIS. These courts have either been sent a quote, signed a quote, or they are awaiting CIS installation. The courts that are shaded red have a third-party case imaging system that is not maintained by OES and have not requested a quote for adopting use of CIS.

| | Court | Case Management System | Case Imaging System | Public Search of Images at Courthouse | OCRA | e-Filing |
|---|---|---|---|---|---|---|
| 1 | Albemarle County | CCMS | CIS | Yes | OCRA | No |
| 2 | Amelia County | CCMS | CIS | Yes | OCRA | No |
| 3 | Amherst County | CCMS | CIS | No | OCRA | No |
| 4 | Augusta County | CCMS | CIS | Yes | OCRA | VJEFS |
| 5 | Bath County | CCMS | CIS | No | OCRA | No |
| 6 | Bedford County | CCMS | CIS | Yes | OCRA | VJEFS |
| 7 | Bland County | CCMS | CIS | No | OCRA | No |
| 8 | Bristol | CCMS | CIS | Yes | OCRA | VJEFS |
| 9 | Buchanan County | CCMS | CIS | No | OCRA | No |
| 10 | Buena Vista | CCMS | CIS | No | OCRA | No |

| | Court | Case Management System | Case Imaging System | Public Search of Images at Courthouse | OCRA | e-Filing |
|---|---|---|---|---|---|---|
| 11 | Campbell County | CCMS | CIS | No | OCRA | No |
| 12 | Caroline County | CCMS | CIS | Yes | OCRA | VJEFS |
| 13 | Carroll County | CCMS | CIS | No | OCRA | VJEFS |
| 14 | Charles City County | CCMS | CIS | Yes | OCRA | No |
| 15 | Charlotte County | CCMS | CIS | Yes | OCRA | No |
| 16 | Chesapeake | CCMS | CIS | Yes | OCRA | VJEFS |
| 17 | Chesterfield County | CCMS | CIS | Yes | OCRA | No |
| 18 | Colonial Heights | CCMS | CIS | No | OCRA | No |
| 19 | Craig County | CCMS | CIS | Yes | OCRA | VJEFS |
| 20 | Culpeper County | CCMS | CIS | Yes | OCRA | No |
| 21 | Danville | CCMS | CIS | Yes | OCRA | VJEFS |
| 22 | Dickenson County | CCMS | CIS | Yes | OCRA | VJEFS |
| 23 | Dinwiddie County | CCMS | CIS | Yes | OCRA | VJEFS |
| 24 | Fauquier County | CCMS | CIS | Yes | OCRA | No |

| | Court | Case Management System | Case Imaging System | Public Search of Images at Courthouse | OCRA | e-Filing |
|---|---|---|---|---|---|---|
| 25 | Floyd County | CCMS | CIS | Requested | OCRA | No |
| 26 | Fluvanna County | CCMS | CIS | Yes | OCRA | No |
| 27 | Franklin County | CCMS | CIS | No | OCRA | No |
| 28 | Frederick County | CCMS | CIS | Yes | OCRA | No |
| 29 | Fredericksburg | CCMS | CIS | Yes | OCRA | VJEFS |
| 30 | Gloucester County | CCMS | CIS | No | OCRA | No |
| 31 | Goochland County | CCMS | CIS | Yes | OCRA | No |
| 32 | Grayson County | CCMS | CIS | Yes | OCRA | VJEFS |
| 33 | Greene County | CCMS | CIS | No | OCRA | No |
| 34 | Greensville County | CCMS | CIS | Yes | OCRA | No |
| 35 | Halifax County | CCMS | CIS | Yes | OCRA | No |
| 36 | Hampton | CCMS | CIS | No | OCRA | No |
| 37 | Hanover County | CCMS | CIS | Yes | OCRA | VJEFS |
| 38 | Henrico County | CCMS | CIS | Yes | OCRA | No |

| | Court | Case Management System | Case Imaging System | Public Search of Images at Courthouse | OCRA | e-Filing |
|---|---|---|---|---|---|---|
| 39 | Henry County | CCMS | CIS | Yes | OCRA | No |
| 40 | Highland County | CCMS | CIS | No | OCRA | No |
| 41 | Hopewell | CCMS | CIS | Yes | OCRA | No |
| 42 | Isle of Wight County | CCMS | CIS | Yes | OCRA | VJEFS |
| 43 | King and Queen County | CCMS | CIS | Yes | OCRA | No |
| 44 | King George County | CCMS | CIS | Yes | OCRA | No |
| 45 | King William County | CCMS | CIS | No | No | No |
| 46 | Lancaster County | CCMS | CIS | Yes | OCRA | No |
| 47 | Lee County | CCMS | CIS | Yes | OCRA | VJEFS |
| 48 | Loudoun County | CCMS | CIS | Yes | OCRA | No |
| 49 | Louisa County | CCMS | CIS | Yes | OCRA | No |
| 50 | Lynchburg | CCMS | CIS | Yes | OCRA | No |
| 51 | Madison County | CCMS | CIS | Yes | OCRA | No |
| 52 | Martinsville | CCMS | CIS | Yes | OCRA | No |

| | Court | Case Management System | Case Imaging System | Public Search of Images at Courthouse | OCRA | e-Filing |
|---|---|---|---|---|---|---|
| 53 | Mecklenburg County | CCMS | CIS | Yes | OCRA | VJEFS |
| 54 | Montgomery County | CCMS | CIS | Yes | OCRA | VJEFS |
| 55 | Nelson County | CCMS | CIS | No | OCRA | No |
| 56 | New Kent County | CCMS | CIS | No | OCRA | No |
| 57 | Newport News | CCMS | CIS | Yes | OCRA | VJEFS |
| 58 | Norfolk | CCMS | CIS | Yes | OCRA | VJEFS |
| 59 | Northampton County | CCMS | CIS | No | OCRA | No |
| 60 | Northumberland County | CCMS | CIS | No | OCRA | No |
| 61 | Orange County | CCMS | CIS | No | OCRA | No |
| 62 | Petersburg | CCMS | CIS | Requested on 4/11/18 | OCRA | No |
| 63 | Pittsylvania County | CCMS | CIS | Yes | OCRA | VJEFS |
| 64 | Portsmouth | CCMS | CIS | Yes | OCRA | VJEFS |
| 65 | Powhatan County | CCMS | CIS | Yes | OCRA | VJEFS |
| 66 | Prince Edward County | CCMS | CIS | Yes | OCRA | No |

| | Court | Case Management System | Case Imaging System | Public Search of Images at Courthouse | OCRA | e-Filing |
|---|---|---|---|---|---|---|
| 67 | Prince George County | CCMS | CIS | No | OCRA | No |
| 68 | Prince William County | CCMS | CIS | Yes | OCRA | VJEFS |
| 69 | Pulaski County | CCMS | CIS | Yes | OCRA | VJEFS |
| 70 | Rappahannock County | CCMS | CIS | Yes | OCRA | No |
| 71 | Richmond | CCMS | CIS | Yes | OCRA | VJEFS |
| 72 | Richmond County | CCMS | CIS | No | OCRA | No |
| 73 | Roanoke City | CCMS | CIS | Yes | OCRA | VJEFS |
| 74 | Roanoke County | CCMS | CIS | Yes | OCRA | VJEFS |
| 75 | Rockingham County | CCMS | CIS | Yes | OCRA | Tyler |
| 76 | Russell County | CCMS | CIS | No | OCRA | No |
| 77 | Salem | CCMS | CIS | Yes | OCRA | No |
| 78 | Shenandoah County | CCMS | CIS | Yes | OCRA | VJEFS |
| 79 | Smyth County | CCMS | CIS | Yes | OCRA | VJEFS |
| 80 | Southampton County | CCMS | CIS | Yes | OCRA | No |

| | Court | Case Management System | Case Imaging System | Public Search of Images at Courthouse | OCRA | e-Filing |
|---|---|---|---|---|---|---|
| 81 | Spotsylvania County | CCMS | CIS | Yes | OCRA | No |
| 82 | Stafford County | CCMS | CIS | Yes | OCRA | No |
| 83 | Staunton | CCMS | CIS | Yes | OCRA | VJEFS |
| 84 | Suffolk | CCMS | CIS | Yes | OCRA | No |
| 85 | Tazewell County | CCMS | CIS | Yes | OCRA | VJEFS |
| 86 | Virginia Beach | CCMS | CIS | Yes | OCRA | No |
| 87 | Warren County | CCMS | CIS | Yes | OCRA | VJEFS |
| 88 | Washington County | CCMS | CIS | Yes | OCRA | VJEFS |
| 89 | Waynesboro | CCMS | CIS | Yes | OCRA | VJEFS |
| 90 | Williamsburg | CCMS | CIS | Yes | OCRA | VJEFS |
| 91 | Winchester | CCMS | CIS | Yes | OCRA | No |
| 92 | Wythe County | CCMS | CIS | Yes | OCRA | No |
| 93 | York County | CCMS | CIS | Yes | OCRA | No |
| 94 | Alleghany County | CCMS | No | No | No | No |

| | Court | Case Management System | Case Imaging System | Public Search of Images at Courthouse | OCRA | e-Filing |
|---|---|---|---|---|---|---|
| 95 | Brunswick County | CCMS | No | No | No | No |
| 96 | Clarke County | CCMS | No | No | No | No |
| 97 | Essex County | CCMS | No | No | No | No |
| 98 | Giles County | CCMS | No | No | No | No |
| 99 | Lunenburg County | CCMS | No | No | No | No |
| 100 | Page County | CCMS | No | No | No | No |
| 101 | Patrick County | CCMS | No | No | No | No |
| 102 | Radford | CCMS | No | No | No | No |
| 103 | Rockbridge County | CCMS | No | No | No | No |
| 104 | Surry County | CCMS | No | No | No | No |
| 105 | Sussex County | CCMS | No | No | No | No |
| 106 | Westmoreland County | CCMS | No | No | No | No |
| 107 | Accomack County | CCMS | E-Legal | Unknown | No | eLegal Case Pro |
| 108 | Appomattox County | CCMS | No | No | No | No |

| | Court | Case Management System | Case Imaging System | Public Search of Images at Courthouse | OCRA | e-Filing |
|---|---|---|---|---|---|---|
| 109 | Botetourt County | CCMS | No | No | No | No |
| 110 | Buckingham County | CCMS | No | No | No | No |
| 111 | Cumberland County | CCMS | No | No | No | No |
| 112 | Mathews County | CCMS | No | No | No | No |
| 113 | Middlesex County | CCMS | No | No | No | No |
| 114 | Nottoway County | CCMS | No | No | No | No |
| 115 | Alexandria | Other | Other | Unknown | No | Unknown |
| 116 | Arlington County | CCMS | Other | Unknown | No | TrueFiling |
| 117 | Charlottesville | CCMS | Conduent | Unknown | No | Unknown |
| 118 | Fairfax County | Other | CPAN | Unknown | No | Unknown |
| 119 | Scott County | CCMS | E-Legal | ClerkePass | No | eLegal Case Pro |
| 120 | Wise County | CCMS | E-Legal | ClerkePass | No | eLegal Case Pro |

## Appendix D

The following tables detail the costs associated with converting individual courts to CIS. All courts that do not currently operate CIS and are not currently in the process of adopting CIS, are included within the table. Table 1 lists courts that do not have CIS or any other case imaging system and have not previously requested a quote for adopting use of CIS. Table 2 lists the courts that have a third-party case imaging system that is not maintained by OES and have not requested a quote for adopting use of CIS.
Amounts marked with an asterisk (*) include the cost of database and server purchase and licensing.

**TABLE 1:**

| | Court | Case Management System | One-time Conversion Costs |
|---|---|---|---|
| 1 | Alleghany County | CCMS | $2,700.00 |
| 2 | Brunswick County | CCMS | $1,700.00 |
| 3 | Clarke County | CCMS | $1,700.00 |
| 4 | Essex County | CCMS | $500.00 |
| 5 | Giles County | CCMS | $500.00 |
| 6 | Lunenburg County | CCMS | $2,300.00 |
| 7 | Page County | CCMS | $6,720.00 |
| 8 | Patrick County | CCMS | $5,700.00 |
| 9 | Radford | CCMS | $500.00 |
| 10 | Rockbridge County | CCMS | $3,300.00 |

| | Court | Case Management System | One-time Conversion Costs |
|---|---|---|---|
| 11 | Surry County | CCMS | $25,088.00* |
| 12 | Sussex County | CCMS | $1,200.00 |
| 13 | Westmoreland County | CCMS | $1,700.00 |
| **TOTAL** | | | **$53,608.00** |

**TABLE 2:**

| | Court | Case Management System | CIS or Other? | One-time Conversion Costs |
|---|---|---|---|---|
| 1 | Alexandria | Other | Other | Not Available |
| 2 | Arlington County | CCMS | Other | $4,300.00 |
| 3 | Charlottesville | CCMS | Conduent | $24,988.00* |
| 4 | Fairfax County | Other | Other | Not Available |
| 5 | Scott County | CCMS | E-Legal | $2,700.00 |
| 6 | Wise County | CCMS | E-Legal | $2,700.00 |
| **TOTAL** | | | | **$34,688.00** |

# EXHIBIT F

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>*Plaintiff*,<br>v.<br><br>KARL R. HADE, *et al*.,<br><br>*Defendant.* | ) ) ) ) ) ) ) ) ) ) | Civil Action No.3:21-cv-00460-HEH |

**DEFENDANT SMITH SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION**

COMES NOW the Defendant, JACQUELINE SMITH, by counsel, and supplements her Answers to the First Set of Interrogatories and Responses to First Requests for Production as follows:

Statement of Non-Waiver

These answers are made without waiver of, and with preservation of: (a) questions as to competence, relevancy, materiality, privilege, and admissibility of the responses and the subject matter thereof as evidence for any purpose in any further proceeding in this action, including trial, and in any other action; (b) the right to object on any ground at any time to a demand or request for further responses, including further production of documents, to these or any other interrogatories to which response is made; and (c) the right at any time to revise, correct, add to, supplement, or clarify any of these responses.

**SUPPLEMENTAL ANSWERS TO INTERROGATORIES**

1. State whether You currently review New Civil Filings to ensure that a social security number has been redacted by the filer before You scan such filings into CIS and make

them available for viewing on OCRA. If so, please state whether You redact a social security number, if discovered in unredacted form, before scanning such filings into CIS and making them available for viewing on OCRA, or describe such other steps You take.

**ANSWER:** Yes and yes. Defendant's office also reviews civil filings for drivers license numbers and other identification numbers as contemplated under Virginia Code §8.01-420.8.

2. State whether You currently review New Civil Filings to ensure that a date of birth identified with a particular person has been redacted by the filer before You scan such filings into CIS and make them available for viewing on OCRA. If so, please state whether You redact a date of birth identified with a particular person, if discovered in unredacted form, before scanning such filings into CIS and making them available for viewing on OCRA, or describe such other steps You take.

**ANSWER:** No. Defendant further states that she and her staff do not "ensure" that a date of birth identified with a particular person has been redacted by the filer because filers are not required to redact that information, nor is the clerk of court. Defendant and her staff do redact this information if a civil filing is posted on the Prince William County Circuit Court's website.

3. State whether You currently review New Civil Filings to ensure that the maiden name of a person's parent so as to be identified with a particular person has been redacted by the filer before You scan such filings into CIS and make them available for viewing on OCRA. If so, please state whether You redact the maiden name of a person's parent so as to be identified with a particular person, if discovered in unredacted form, before scanning such filings into CIS and making them available for viewing on OCRA, or describe such other steps You take.

**ANSWER:** No. Defendant further states that she and her staff do not "ensure" that the maiden name of a person's parent so as to be identified with a particular person has been redacted

by the filer because filers are not required to redact that information, nor is the clerk of court. Defendant and her staff do redact this information if a civil filing is posted on the Prince William County Circuit Court's website.

4. State whether You currently review New Civil Filings to ensure that any financial account number or numbers have been redacted by the filer before You scan such filings into CIS and make them available for viewing on OCRA. If so, please state whether You redact financial account numbers, if discovered in unredacted form, before scanning such filings into CIS and making them available for viewing on OCRA, or describe such other steps You take.

**ANSWER:** No. Defendant and her staff do redact this information if a civil filing is posted on the Prince William County Circuit Court's website.

5. State whether You currently review New Civil Filings to ensure that the name and/or age of any minor child has been redacted by the filer before You scan such filings into CIS and make them available for viewing on OCRA. If so, please state whether You redact the name and/or age of any minor child, if discovered in unredacted form, before scanning such filings into CIS and making them available for viewing on OCRA, or describe such other steps You take.

**ANSWER:** No. Defendant further states that she and her staff do not "ensure" that the name and/or age of any minor child has been redacted by the filer because filers are not required to redact that information, nor is the clerk of court. Defendant and her staff do redact this information if a civil filing is posted on the Prince William County Circuit Court's website.

6. State whether You currently review New Civil Filings to ensure that an actual signature has been redacted by the filer before You scan such filings into CIS and make them available for viewing on OCRA. If so, please state whether You redact an actual signature, if

discovered, before scanning such filings into CIS and making them available for viewing on OCRA, or describe such other steps You take.

**ANSWER:** No. Defendant further states that she and her staff do not "ensure" that an actual signature has been redacted by the filer because filers are not required to redact that information, nor is the clerk of court. Defendant and her staff do redact this information if a civil filing is posted on the Prince William County Circuit Court's website.

7. State the total number of New Civil Filings that were filed in the Prince William Circuit Court in each of the last five years, *i.e.*, 2017, 2018, 2019, 2020, and 2021.

**ANSWER**: Defendant is unable to provide the information sought. These statistics are not tracked or maintained by Defendant. These statistics may be tracked and maintained by the Office of the Executive Secretary (the "OES") of the Supreme Court of Virginia and not the Office of the Clerk of Court. Defendant does receive information regarding the total number of all new filings from the OES for budget purposes, but does not know if the OES maintains information regarding the total number of new civil filings.

**SUPPLEMENTAL ANSWER:** *Defendant has provided Plaintiff's counsel with a copy of each new civil Complaint that was filed during the month of March for each of the last five years. In March 2018, there were 392 new civil filings. In March 2019, there were 379 new civil filings. In March 2020, there were 319 new civil filings. In March 2021, there were 461 new civil filings. In March 2022, there were 457 new civil filings. Extrapolating this data, there are likely around 4,800 new civil cases filed yearly.*

8. Describe For each of last five years, please identify the number of New Civil Filings that (i) have contained, in unredacted form upon filing, any of the information that is identified in Va. Code § 17.1-293(B) (i.e., actual signature; social security number; date of birth

identified with a particular person; maiden name of a person's parent so as to be identified with a particular person; financial account number; name and age of a minor child); (ii) You have redacted because they contained, in unredacted form upon filing, any of the information identified in Va. Code § 17.1-293(B); and (iii) You have rejected or otherwise held back from scanning into CIS because they contained, in unredacted form upon filing, any of the information identified in Va. Code § 17.1-293(B). In your answer to each part of this Interrogatory, please provide the Number of New Civil Filings that corresponds with each of the six categories of information identified in Va. Code § 17.1-293(B) (i.e., actual signature; social security number; date of birth identified with a particular person; maiden name of a person's parent so as to be identified with a particular person; financial account number; name and age of a minor child).

**ANSWER:** To Defendant's knowledge, the information sought is not tracked by the Office of the Clerk of Court or any group. Therefore, Defendant is unable to provide the information sought. Defendant further states that filers are not required to redact the information identified in Virginia Code §17.1-293(B) pursuant to that statute; that pursuant to Virginia Code §8.01-420.8, filers are required to "make reasonable efforts to redact" all but the last four digits of (i) a social security number or other identification number appearing on a driver's license or other document issued under Chapter 3 (§ 46.2-300 et seq.) of Title 46.2 or the comparable law of another jurisdiction, or (ii) on a credit card, debit card, bank account, or other electronic billing and payment system; that Defendant and her staff are not obligated to make any redactions to civil filings, other than to civil filings that are posted on the Internet (not including documents available on OCRA); that Defendant does review and redact civil filings as noted in her answers to the Interrogatories above; and that, during Defendant's tenure as clerk of court, Defendant is not aware

that if her office has rejected any civil filing on the basis of the filer failing to redact information identified in Virginia Code §17.1-293.

9. State whether you have offered OCRA access to any non-attorney during the last five years. If so, please identify each non-attorney to which you have offered OCRA access and whether that non-attorney subscribed to OCRA at any time.

**ANSWER:** Yes, Defendant offered OCRA access to Plaintiff CNS. To Defendant's knowledge, Plaintiff did not subscribe to OCRA at any time.

**SUPPLEMENTAL RESPONSES TO PLAINTIFF'S REQUESTS FOR PRODUCTION**

1. All documents relating to CNS' requests to the Prince William Circuit Court for OCRA access, including without limitation, any communications between or among employees or agents of the Prince William Circuit Court and/or OES concerning CNS' requests for OCRA access.

**RESPONSE**: Please find attached Bates Nos. Smith RPD 1-35

2. All documents reflecting any policies relating to the restriction of OCRA access to Virginia-barred attorneys and their staff.

**RESPONSE:** Defendant is not aware of any such policy, other than applicable provisions of the Virginia Code.

3. All documents reflecting any policies relating to the dissemination to the public of any information obtained via OCRA.

**RESPONSE**: See attached relevant portions of the Virginia Code, along with the Non-Attorney Application.

4. All agreements between the Prince William Circuit Court and OES relating to the Prince William Circuit Court's use of OCRA.

**RESPONSE**: Defendant is not aware of any responsive documents in her possession. Defendant will supplement this response if such responsive documents are found.

5. All communications with OES regarding the restriction of OCRA access to Virginia-barred attorneys and their staff, within the last five years.

**RESPONSE**: Defendant is not aware of any responsive documents in her possession. Defendant will supplement this response if such responsive documents are found.

6. All communications relating to the Prince William Clerk's January 2019 request for an Opinion from the Attorney General regarding "whether a circuit court clerk may provide members of the press with secure remote access to nonconfidential court records" under Va. Code § 17.1-293.

**RESPONSE:** See Bates Nos. Smith RPD 1-35, attached.

7. For the months of March in each of the last five years, *i.e.*, 2017, 2018, 2019, 2020, and 2021, please produce in electronic form all New Civil Filings that were filed in the Prince William Circuit Court.

**RESPONSE**: See Bates Nos. as follows:

- Smith, Jacqueline – March 2018 OCRA Documents, 1-3374
- Smith, Jacqueline – March 2019 OCRA documents, 1-3262 (also Bates stamped in the right bottom corner as Smith 0003365-0006583)
- Smith, Jacqueline – March 2020 OCRA documents, 1-3060
- Smith, Jacqueline – March 2021 OCRA documents, 1-4169
- Smith, Jacqueline – March 2022 OCRA documents, 1-3522[1]

[1] If counsel would like these documents re-Bates stamped to flow consecutively from page one forward, Smith's counsel will need to remove the Bates stamping in the March 2019 set of documents by hand, which may take a significant amount of time.

**JACQUELINE SMITH**
**BY COUNSEL**

*/s/* _________
John C. Altmiller (VSB No. 34902)
Heather R. Steele (VSB No. 75473)
PESNER ALTMILLER MELNICK DEMERS & STEELE PLC
8000 Westpark Drive, Suite 600
Tysons, VA 22102
Telephone: (703) 506-9446
Facsimile: (703) 506-0929
jaltmiller@pesner.com
hsteele@pesner.com
*Counsel for Jacqueline Smith*

## CERTIFICATE OF SERVICE

I hereby certify that I have this 5th day of July, 2022 served the foregoing Plaintiff's Supplemental Answers to Interrogatories and Response to Requests for Productions upon the following counsel:

Jonathan E. Ginsberg
BRYAN CAVE LEIGHTON PAISNER LLP
1155 F Street, NW, Suite 700
Washington, DC 20004
Telephone: (202) 508-6000
Facsimile: (202) 508-6200
jon.ginsberg@bclplaw.com

Robert B. McEntee, III (VSB No. 89390)
Erin R. McNeill (VSB No. 78816)
Assistant Attorneys General
Office of the Attorney General
202 North Ninth Street
Richmond, VA 23219
Telephone: (804) 786-8198 (McEntee)
Telephone: (804) 317-0977 (McNeill)
rmcenteeiii@oag.state.va.us
emcneill@oag.state.va.us
*Counsel for Defendant*
*Karl R. Hade*

*/s/* __________
John C. Altmiller (VSB No. 34902)
Heather R. Steele (VSB No. 75473)
PESNER ALTMILLER MELNICK
DEMERS & STEELE PLC
8000 Westpark Drive, Suite 600
Tysons, VA 22102
Telephone: (703) 506-9446
Facsimile: (703) 506-0929
jaltmiller@pesner.com
hsteele@pesner.com
*Counsel for Jacqueline Smith*

# EXHIBIT H

# Confidentiality Considerations

Norma Gates & Jo Fronfelter
August 22, 2019

## Sealed vs. Confidential

- Sealed
  - Sealed by Court/Statute
  - Cases/Documents
  - Inspection Prohibited
  - "Sealed record to be opened only upon order of the court"
  - CC-1075 Sealed Documents Envelope/Scan
  - Examples
    - Certain Name Changes, Expungements

## Sealed vs. Confidential

- Confidential
  - Not "Sealed"/Confidential by statute
  - Cases/Documents
  - May be viewable by certain parties by statute
  - CC-1075 Sealed Documents Envelope/Scan
  - Examples
    - Adoptions
    - Juvenile Appeals

## Adoptions/Foreign Adoptions

- Va. Code §§ 63.2-1220, 63.2-1245 & 63.2-1246, 63.2-1247
- Case & pleadings confidential

- CCMS/CIS Process
  - CCMS Adoption Division is confidential
  - CA orders pass to CIS/COVERS in a confidential fips

Blood Bourne Pathogens – Public Safety Employees and Testing

- Va. Code §§ 32.1-45.2(E) & 32.1-45.1(M)
- Hepatitis B or C/HIV
- Record sealed
- CCMS/CIS Process

Blood Bourne Pathogens – Public Safety Employees and Testing

- Effective July 1, 2019
  - CCMS Filing Type
  - CIS

HB1998 **Civil Filing Type Code** (prod00078327)

The civil filing type of GABP (GABL-Blood-Bourne Pathogens) was replaced with civil Filing Type code **GABT (GAPL-Blood Test)**. GABT has been added to accommodate the new general district case type of BT for appeals of §32.1-45.1 on a DC-406 PETITION TO REQUIRE BLOOD TEST.

This filing type is considered sealed by statute and will be masked from public view on OCIS, CIS Public View, OCRA and any external docket selections made on the Legacy Batch Report submissions and the CCMS Interactive Docket.

## Concealed Handgun Permits

- Va. Code § 18.2-308.02
- Application & Order confidential
- Exceptions
  - Law-enforcement officers
  - Applicant himself
- Order books pre-7/1/08
- CCMS/CIS/OCIS Process

## Concealed Handgun Permits

All CHP filing types (CHP, CHPL, CHPN, CHPR, CWP, CWPL, CWPN, CWPR) are confidential and masked from public searches:

- CCMS,
- CIS,
- RMS/COVERS,
- OCIS,
- OCRA,
- SRA

## Criminal History Records

- Va. Code § 9.1-134
- Criminal Justice Services Board to adopt procedures
- Sealing/purging/opening

## Custody/Visitation/Support

- Child Custody Proceeding – Uniform Child Custody Jurisdiction and Enforcement Act
  - Va. Code § 20-146.20
  - Identifying information of child may be sealed – health/safety/liberty in jeopardy
  - CCMS/CIS Process
    - Civil vs JDR Appeals

## Custody/Visitation/Support

- Effective July 1, 2018

**D. HB613 Child and Spousal Support Cases Appealed from JDR only open for inspection to certain persons or agencies.**

Pursuant to HB613, case papers cannot be viewed for certain cases, although the case information can still be viewed. Please refer to these CIS/OCRA Release Notices for details regarding the viewing of images.

- Circuit Imaging System (CIS), Version 6.11.0.4 (Effective June 29, 2018)
  http://oesinet/courtadmin/ta/rms/2018_0629_cis_61104.pdf
- Officer of the Court Remote Access (OCRA) (Effective June 29, 2018)
  http://oesinet/courtadmin/ta/rms/2018_0629_ocra.pdf
- Circuit Imaging System, Public Search (CIS Public Search), Version 6.0.3.8 (Effective July 2, 2018)
  http://oesinet/courtadmin/ta/rms/2018_0629_cis_public.pdf

**Case Type Restrictions**

HB613 requires that all child support and spousal support case files shall only be available to specific persons. When cases from the following four case types have new eligible orders copied to COVERS from CIS, these documents will automatically move into the 901 Confidential FIPS, just as manually sealed orders and fully restricted case types do:

- JAVS - JAPL - Civil Support
- JACS - JAPL - Criminal Support
- JARS - JAPL - Remand Support
- JAOT - JAPL – Other

## Disciplinary Proceedings Against Attorneys

- Va. Code § 54.1-3936
- "Papers" sealed
- CCMS/CIS Process
  - Manual sealing

## Divorces

- Va. Code § 20-124
  - Record or agreement may be sealed
- Va. Code § 20-121.03
  - Addendum confidential by statute
  - CC-1462 Addendum for Protected Identifying Information - Confidential
  - Availability & Distribution
- CCMS/CIS Process
  - Manual sealing

## Discovery from a Subpoena Duces Tecum

- Rule 3A:12
  - Press & public – no right to access documents until entered into evidence
  - Counsel may view unless prohibited by court order
  - Court Order quashing/limiting access
- CCMS/CIS Process
  - Manual sealing

## Election Material/Voting Machine Keys

- Election Material
  - Va. Code § 24.2-668
  - Sealed boxes/locked room
  - Retain custody for recount
- Voting Machine Keys
  - Va. Code § 24.2-659
  - Sealed envelope
  - Only opened by court order/Request of State Board of Elections or electoral board

## Exhibits

- Offered/Not Offered into evidence
- AG Opinion to Judge Sweeny dated 11/13/87 (1987-88, page 255)

## Expungements

- Va. Code § 19.2-392.3
- Sealed record
- To be opened only by court order
- Clerical Steps
- CCMS/CIS Process
  - CIS Expungement Module

## Expungements




- Note: If Filing Type = XPUN and Hearing Result is G, the case will be masked from public view (OCIS/internet)

## Guardian/Conservator

- Va. Code § 64.2-2002
- CC-1642 Addendum to Petition for Appointment of Guardian or Conservator – Under Seal
- CCMS/CIS Process
  - Manual sealing

## Health Records

- Va. Code § 32.1-127.1:03
- Sealed envelope
- CIS - manual sealing

## Judge's Notes

- Not official court record
- Viewable/Not Copied
- CIS Process
  - Case File Section
  - Manual sealing

## Judicial Complaints

- Va. Code § 17.1-107
- Name of complainant not to be disclosed

## Judicial Inquiry & Review Commission

- Va. Code §§ 17.1-913
- Papers confidential

## Juries

- Special Grand Jury
  - Va. Code § 19.2-212
  - Records – sealed container
- Special Grand Jury Report
  - Va. Code § 19.2-213
  - Report sealed

## Juries

- Jury Lists
  - Grand
    - Va. Code § 19.2-194
    - Not a public record
  - Master
    - VA Supreme Court case & AG Opinion
    - Judge determination re: good cause
  - Term
    - Va. Code § 8.01-351
    - Counsel may inspect but not copy
    - Not available to public

## Juvenile Cases

- Va. Code § 16.1-307
  - Confidential in general
  - Exceptions
- Custody/Visitation
  - Older cases in civil division with JAPL & CVS
  - Juvenile Appeal Division
- Child or Spousal Support
  - Va. Code § 16.1-305.01
  - Inspection by certain entities only

## Juvenile Cases

- Children in Need of Services/Supervision, Neglected/Abused/Delinquent
  - Va. Code § 16.1-305
  - Inspection by certain entities only
- Abortion Denial
  - Va. Code § 16.1-241(W)
  - Confidential
- Certified Cases (Felony)
- CCMS/CIS Process

## Juvenile Cases

- JDR District Court Case Matrix
- **http://oesinet/courtadmin/ta/reference_materials/cc_jdrcase matrix.pdf**



CIRCUIT COURT
JUVENILE AND DOMESTIC RELATIONS DISTRICT COURT CASE MATRIX

| Case Type | Confidential? | CCMS Division | CCMS Comm by / Filing Type | Appeal K Form |
|---|---|---|---|---|
| **Juvenile Delinquency** - an act designated a crime under the law of this Commonwealth, or other ordinance - violation of § 18.2-308.7 - violation of a court order as provided for in § 16.1-292, but shall not include an act other than a violation of § 18.2-308.7, which is otherwise lawful, but is designated a crime only if committed by a child. - refusal to take a blood or breath test | No – Felony (after adjudication) – Unless, hearing closed by Court for good cause shown. Yes – Misd. | Juvenile – Criminal / Juvenile Criminal Misd | JAPL F / JAPL M | DC-580, No Appeal-C |
| **CHINS & STATUS OFFENSES** Child in need of: SERVICES: Psychological/medical SUPERVISON: Truancy STATUS: Act that is prohibited by law but not an offense if committed by adult | Yes | Juvenile Civil | INIT / OT-Child in Need of Services / OT-Truancy / ST-Status | DC-581 No Appeal- J Civil Ap |

## Juvenile Cases

- Effective July 1, 2018

D. HB613 **Child and Spousal Support Cases Appealed from JDR only open for inspection to certain persons or agencies.**

Pursuant to **HB613**, case papers cannot be viewed for certain cases, although the case information can still be viewed. Please refer to these CIS/OCRA Release Notices for details regarding the viewing of images.

- Circuit Imaging System (CIS), Version 6.11.0.4 (Effective June 29, 2018)
  http://oesinet/courtadmin/ta/rms/2018_0629_cis_61104.pdf
- Officer of the Court Remote Access (OCRA) (Effective June 29, 2018)
  http://oesinet/courtadmin/ta/rms/2018_0629_ocra.pdf
- Circuit Imaging System, Public Search (CIS Public Search), Version 6.0.3.8 (Effective July 2, 2018)
  http://oesinet/courtadmin/ta/rms/2018_0629_cis_public.pdf

**Case Type Restrictions**

HB613 requires that all child support and spousal support case files shall only be available to specific persons. When cases from the following four case types have new eligible orders copied to COVERS from CIS, these documents will automatically move into the 901 Confidential FIPS, just as manually sealed orders and fully restricted case types do:

- JAVS - JAPL - Civil Support
- JACS - JAPL - Criminal Support
- JARS - JAPL - Remand Support
- JAOT - JAPL – Other

## Marriage License/Register

- Va. Code § 32.1-267
- SSN must not be disclosed
- On and after 7/1/97
- AG Opinion to Black

## Medical Examiner's Report

- Va. Code § 32.1-283
- Confidential

## Mental, Psychological and/or Psychiatric Documents

- Va. Code § 19.2-169.1
- Place in envelope with notice on outside
- Competency evaluation as part of court's record - open to inspection unless sealed by court order

## Military Discharge/Separation

- Va. Code § 17.1-265(B)(C)
- Confidential - Open for inspection/copying by certain entities

## Money Under Control of Court

- Va. Code § 8.01-600 – by Clerk
- Va. Code § 8.01-582 – General Receiver
- Affidavit under seal

## Name Change

- Va. Code § 8.01-217
- Record may be sealed - serious threat to health/safety of applicant or family
- CC-1412 Order for Change of Name (Adult)
  - [ ]Public recording of the name change would pose a serious threat to the health or safety of the applicant/applicant's family and the record of this cause is hereby Ordered sealed. The Clerk shall not spread or index this Order and shall not transmit any copy of this Order to the Registrar of Vital Records or to the Central Criminal Records Exchange.

## Name Change

- CC-1428 Order for Change of Name (Minor)
  - [ ]Public recording of the name change would pose a serious threat to the health or safety of the Applicant/Applicant's family and the record of this cause is hereby Ordered sealed. The Clerk shall not spread or index this Order and shall not transmit any copy of this Order to the Registrar of Vital Records or to the Central Criminal Records Exchange.
- CCMS/CIS Process
  - Manual sealing

## Passport Information

- Privacy Act of 1974
- Information provided only to adult applicant or minor's parent/guardian

## Pen Register or Trap and Trace Device

- Va. Code § 19.2-70.2(D)(I)
- Sealed

## Photos/X-rays in Child Abuse Cases

- Va. Code § 63.2-1520
- Court may impose confidentiality restrictions

## Pre-Sentence Report

- Va. Code § 19.2-299(A)
- Sealed upon entry of final order/available only by court order

## Presentence Mental Evaluation of Sex Offenders

- Va. Code § 19.2-301
- Examiner's report confidential
- Sealed upon entry of sentencing order

## Pre-trial and Community-based Probation Records

- Va. Code §§ 9.1-177.1 & 19.2-299
- Sealed upon final order of court
- Available upon request to certain entities by statute

## Probate Tax Returns

- Va. Code § 58.1-1714
- Confidential
- Available upon request of beneficiary/heir at law/Commissioner of Accounts

## Protective Orders

- Va. Code §§ 16.1-253, 16.1-253.1, 16.1-253.4, 16.1-279.1, 19.2-152.10
- Certain information confidential
- DC-621 Non-Disclosure Addendum
- CCMS/CIS Process
  - Manual Sealing in CCMS/CIS
  - Masked on OCIS

## Request of Confidentiality of Victim

- Va. Code § 19.2-11.2
- Certain information confidential
- DC-301-Request for Confidentiality
- CCMS/CIS

## Request of Confidentiality of Victim



CIRCUIT CASE MANAGEMENT SYSTEM, VERSION 5.13.0.19

Operational Date: July 2, 2018 Page 6

D. HB840 DC-301 Confidentiality of Victim Information. (prod00070258)

Currently there is a **301 Confidentiality** Indicator on the Services tab in the Criminal and Juvenile Appeal Criminal divisions to indicate confidentiality of the address, it will not appear on service information in CCMS on a public search.



Note: CIS/OCRA will not display images for a service marked 301 Confidential.

Added a **301 Confidentiality** indicator on the Case Information tab in the Criminal, Juvenile Criminal and Sealed Indictment Divisions to indicate a request for confidentiality was received.

# Request of Confidentiality of Victim

When checked, **301:Y** will appear in the Information Banner bar as an indication to users to mark confidential any documents/pleadings received containing the address, any telephone number or email address to prohibit disclosure.

When the 301 Indicator is checked and a service is added without the 301 Confidentiality checked, an informational message will appear as a reminder to check if the service should be marked confidential as well. If the service is not for the requested victim, press Add again and the service will be added to the listing.




# Request of Confidentiality of Victim

**View Service Images**



Pursuant to HB840, in criminal cases upon the request of the victim or witness their telephone number or email address may be made confidential. As a result, service images which are marked as confidential is restricted to all users. The index will show **SERVICE** only, as shown above.

In CCMS when a service is issued, and a DC-301 has been filed requesting confidentiality, the clerk selects **301(Confidentiality)** on the Services screen in CCMS.




**SMITH-0060**



JA275

## Restitution Victim Contact Information

- Va. Code § 19.2-305.1(E)
- Confidential
- DC-317 Supplemental Sheet to Order for Restitution for Victim Information (Adult/Juvenile)
- CIS Process
  - Manual sealing

## Search Warrants

- Affidavit for Search Warrant
  - Va. Code § 19.2-54
  - Public inspection after warrant executed or 15 days after warrant issued; unless ordered sealed
- Search Warrant for Tracking Device
  - Va. Code § 19.2-56.2
  - Sealed and to be unsealed only by court order
- CCMS/CIS Process
  - Manual sealing

## Set-Off Debt Collection

- Va. Code §§ 58.1-533
- Confidential

## Statement of Facts – Subpoena Duces Tecum for Financial Records

- Va. Code §§ 18.2-246.2 and 19.2-10.1
- Sealed

## Victim Impact Statement

- Va. Code § 19.2-299.1
- Confidential
- Available to defendant/counsel
- Sealed upon entry of sentencing order
- CIS Process
  - Manual sealing

## Wills Lodged for Safekeeping

- Va. Code § 64.2-409
- Delivery to certain individuals
- Destruction – 100 years

Wiretaps, Intercepted Communications

- Va. Code § 19.2-68(F)
- Sealed

# EXHIBIT J

**NON-ATTORNEY SUBSCRIBER AGREEMENT FOR REMOTE ACCESS TO PRINCE WILLIAM COUNTY CIRCUIT COURT CASE DOCUMENTS**

This Agreement is made and entered into by and between the Prince William County Circuit Court Clerk's Office (hereinafter "Clerk's Office") and________________________*(Name of Applicant)* (hereinafter "Subscriber"), an employee of _________________________________ *(Name of Employer)*.

**TERMS AND CONDITIONS OF AGREEMENT**

**1. TERM OF AGREEMENT**
It is the intent of both parties to participate in a remote access program to commence upon the day of approval by both parties and to continue until terminated as provided herein.

**2. DEFINITIONS**

a. "Remote Access" means that inspection can be made without the need to physically visit the courthouse where the court record is maintained.
b. "Subscriber" means any person authorized by the Clerk of Circuit Court to have remote access to court case documents in its case management system.
c. "Clerk's Office" means the Clerk of Circuit Court, members of her office, her employees and agents.
d. "Inquiry Access" means access to search for, view and print document images.
e. "OES" is the Office of the Executive Secretary of the Supreme Court of Virginia.
f. "Officer of the Court" means any attorney, judge, deputy sheriff, court personnel or any person who has affirmed an obligation to promote justice and effective operation of the judicial system;
g. "OCRA" is the OES's Officer of the Court Remote Access system that enables remote viewing of documents in the OES Case Imaging System utilized by the Prince William County Circuit Court.

**3. SUBSCRIBER PERAMETERS**
Under this contract, if approved, the Clerk's Office will provide access to an on-line database allowing inquiry access to scanned court cases. (Virginia Code § 17.1-293(F)) The Subscriber must complete an application for acceptance and approval by the Clerk's Office. (Attachment A).

**4. DAYS AND HOURS OF OPERATION**
Internet access to the Circuit Court documents will generally be available seven days a week, twenty-four hours a day, including all holidays, or otherwise at the discretion of the Clerk, except:

a. For periods of preventative maintenance;
b. For such other periods of remedial maintenance as may be required;
c. For operational issues beyond the control of the Clerk's Office; and
d. When intrusions against security are being remedied.

**5. SUBSCRIPTION FEE**

The subscription fee is $1,200.00 per year for 1 non-attorney, payable annually.

The charges provided for in this Agreement shall commence on the effective date per Section 1 of the Agreement hereof. No reminder notices will be sent when payment is due.

The Clerk's Office reserves the right to suspend or terminate service to the Subscriber(s) if payment is not received by the due date; however, if suspended or terminated, the Subscriber is not relieved from the obligations set forth in this Agreement. Subscription fees are non-refundable and not pro-rated.

All charges specified are those currently in effect and are subject to change. Any legislative changes, additions or deletions shall automatically become a part of this contract as of the effective date of said legislative changes. Subscriber has the option of terminating this Agreement in accordance with Section 15.

**6. SERVICES**

a. The Clerk's Office or its agents will provide the Subscriber with inquiry access to all currently scanned court case documents in its Case Imaging System except for juvenile, adoption, and sealed cases as well as those parts of a file that are marked confidential, restricted, sealed, private addendum or victim/witness.
b. The servers that store the programs and data are maintained and managed by the OES.
c. The Clerk's Office, its employees or agents will assume responsibility for:
   1) Providing the Subscriber with the current OCRA link on the Circuit Court's Web Page.
   2) Providing the Subscriber with limited consultation, via e-mail, on specific problems that arise in the use of OCRA. The Clerk's Office does not guarantee consultation results nor warrant or represent that all errors or problems will be corrected.
   3) Customer support is available Monday through Friday, 8:30AM to 4:30PM excluding Prince William County Circuit Court holidays and other closures.

**7. SUBSCRIBER'S OBLIGATIONS**

a. It is the responsibility of the Subscriber to provide the computer hardware and software and/or make modifications to their existing equipment that are necessary to effect access to OCRA.
b. Subscriber shall not use automated tools to navigate this website. Subscriber must manually enter any requests using the queries provided on the website.
c. The Subscriber is responsible for ensuring that unauthorized personnel do not use the Subscriber's account. Unauthorized personnel for the purposes of this contract shall be any person, employee, support staff, or entity other than the Subscriber.
d. Data accessed from OCRA is for the use of the Subscriber in the ordinary course of their business and in accordance with Virginia Code § 17.1-293(F).
e. Data accessed from OCRA may not be sold or posted on any other Internet website or in any way redistributed to any third party.
f. The Subscriber is responsible for ensuring that the use of OCRA is conducted in a proper and legal manner. If the Subscriber is convicted of a crime, including but not limited to, a

violation of the Virginia Computer Crimes Act (Section 18.2-152.1 of the Code of Virginia), this Agreement is immediately terminated. This shall not be construed as prohibiting the Clerk's Office from pursuing any other remedy available to it for such breach.

g. The Subscriber is responsible for ensuring the security of the Subscriber's assigned username and password. If at any time Subscriber has knowledge of compromised security of the Subscriber's access credentials, Subscriber will immediately notify the Clerk's Office in writing.

h. The Subscriber may not share passwords or login credentials with anyone for any reason. Access is strictly one username login for one individual Subscriber. Any violation of this term agreement will terminate same for the Subscriber, their employer and all employees thereof.

i. The Subscriber affirms by their entry into this agreement an obligation to promote justice and effective operation of the judicial system and agrees not to access or disseminate any information erroneously entered into the OCRA system including but not limited to (i) an actual signature, (ii) a social security number, (iii) other identification numbers appearing on a driver's license, (iv) a date of birth identified with a particular person, (v) the maiden name of a person's parent so as to be identified with a particular person, (vi) the name and age of any minor child, (vii) information on credit cards, debit cards, bank accounts, or other electronic billing and payment systems.

j. The Subscriber understands and agrees that any data accessed by secure remote access is prohibited from being sold or posted on any other website or in any way redistributed to any third party, and the clerk, in her discretion, may deny secure remote access to ensure compliance with these provisions. However, the data accessed by secure remote access may be included in products or services provided to a third party of the subscriber provided that (i) such data is not made available to the general public and (ii) the subscriber maintains administrative, technical, and security safeguards to protect the confidentiality, integrity, and limited availability of the data.

**8. LIMITATION OF LIABILITY**

a. The Subscriber hereby relieves and releases the Clerk, clerk's office, its employees or agents from liability for any and all damages resulting from the use of this service or interrupted service of any kind. The Subscriber further relieves and releases the County of Prince William, its Board of Supervisors, officers, employees and agents and OES from liability for any and all damages resulting from the use of this service or interrupted service of any kind.

b. The Subscriber hereby relieves, releases, indemnifies and holds harmless the Clerk, clerk's office, the County of Prince William, its Board of Supervisors, officers, employees and agents and OES of any liability for any and all damage resulting from incorrect, private or erroneously posted data or any other information accessed from this service.

c. The Subscriber agrees that the Clerk, clerk's office, its employees or agents shall not be liable for negligence or lost profits, resulting from any claim or demand against the Subscriber by any other party.

d. In no event will the Clerk, clerk's office, its employees or its agents be liable for consequential damages even if the Clerk or clerk's office has been advised of the possibility of such damages.

e. It is acknowledged by the Subscriber that the County of Prince William, its Board of Supervisors, officers, employees or agents and OES are not a party to this Agreement and that the County shall incur no liability hereunder.
f. This Agreement creates no rights or privileges that are enforceable by anyone not a party to this Agreement.
g. The information or data accessed by Subscriber may or may not be the official governmental record required by law. In order to assure the accuracy of the data or information, the Subscriber should consult the official governmental record.
h. Nothing in this Agreement shall be construed as waiving the sovereign or governmental immunity of the Clerk of the Court, the County of Prince William, its Board of Supervisors, or their respective officers, employees and agents.

**9. WARRANTIES**

**Neither the Clerk, deputy clerks, employees, or agents, nor the County of Prince William, its Board of Supervisors, employees or agents expressly or impliedly warrant that the information or data accessed by Subscriber is accurate or correct. There are no expressed or implied warranties in connection with this service.**

**10. ASSIGNMENT**

The Subscriber agrees not to assign any right or interest in this Agreement. Any attempt by the Subscriber to transfer by any means, any of the rights, duties, or obligations of this Agreement is null and void.

**11. GOVERNING LAW**

This Agreement and/or any dispute arising therefrom shall in all respects be governed by and interpreted in accordance with the applicable law of the Commonwealth of Virginia.

**12. ENTIRE AGREEMENT**

This Agreement contains the entire understanding of the parties, there being no promises, warranties, or undertakings, written or oral, other than those expressly set forth herein. Furthermore, no modifications, alterations or amendments to this Agreement shall be valid unless in writing, and signed by all parties, except as otherwise provided herein.

**13. ATTACHMENTS**

Any attachments referred to in the body of this contract are an integral part of this Agreement and reference to this Agreement shall be deemed to include all the attachments.

**14. NOTICE**

Any notice or written communication of any kind required or desired to be given or sent pursuant to the terms hereof shall be delivered in person, mailed postage prepaid by certified or registered mail, and/or mailed electronically, unless otherwise specifically stated herein.

**15. TERMINATION**

a. This Agreement may be terminated without cause by either party on ten (10) days written notice to the other.

b. This Agreement may be immediately terminated by the Clerk's Office for Subscriber's failure to comply with the terms of this Agreement, failure to make payments of charges or breach of Agreement.
c. The Clerk reserves the right to deny secure remote access to ensure compliance with this Agreement and the Code of Virginia.
d. This Agreement shall be terminated immediately if the Board of Supervisors of Prince William County fails to appropriate and continue funding for the services provided under this Agreement. Subscriber acknowledges that the Clerk's Office has no control over the amount of appropriations, if any, that the Board of Supervisors will provide for continuation of the services under this Agreement.
e. This Agreement may be terminated as otherwise specified.

**16. RATES, FEES AND TERMS MAY CHANGE**.
The Clerk's Office may change the Agreement terms, at any time for any reason. If the Clerk's Office changes the terms of the Agreement, Subscriber will receive written notice and have the right to terminate this Agreement.

**17. SEVERABILITY**
If any provision (or part thereof) of this Agreement is found to be invalid, then it shall be stricken and have no effect. The remaining provisions shall continue in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date last written below.

**THIS AGREEMENT must be executed by the individual requesting authorization to use OCRA.**

_________________________________________________ ____________________________
**Signature** **Date**

_________________________________________________ ____________________________
**Printed/Typed Name** **Employer Name**
City/County of: _________________
Commonwealth/State of: __________
I,___________________________________, a Notary Public or Deputy Clerk, do hereby certify that on this________day of_______________________, 20___, __________________________ personally appeared before me and swore and acknowledged that the statements contained herein are true and correct.
My Commission Expires: ________________ _____________________________________
Notary Public or Deputy Clerk

Registration Number: ________________ _____________________________________
Print or Type Name & Phone # of Notary
PRINCE WILLIAM COUNTY CIRCUIT COURT CLERK'S OFFICE by:

_________________________________________ _______________________________
Jacqueline C. Smith, Esquire, Clerk of Court Date



____________
Subscriber's Initials

ATTACHMENT A

**APPLICATION FOR REMOTE ACCESS TO PRINCE WILLIAM COUNTY COURT CASE DOCUMENTS (OCRA)**

**This application must be completed by each individual user.**

The approval of this application is at the Clerk of the Circuit Court's discretion. By signing this application, the subscriber acknowledges and accepts the terms and conditions of the *Non-Attorney Employee Subscriber Agreement for Remote Access* as incorporated by reference herein.

**All Information below is mandatory.**

**APPLICANT'S LAST NAME:** ____________________________________________

**APPLICANT'S FIRST NAME:** ____________________________________________

**BUSINESS/EMPLOYER'S NAME:** ____________________________________________

**STREET ADDRESS:** ____________________________________________

**CITY/STATE/ZIP:** ____________________________________________

**PHONE NUMBER:** ____________________________________________

**E-MAIL ADDRESS:** ____________________________________________

I hereby certify that the information above is true and correct. I hereby affirm my obligation under this contract to promote justice and effective operation of the judicial system and agree not to access or disseminate any information erroneously entered into the OCRA system including but not limited to (i) an actual signature, (ii) a social security number, (iii) other identification numbers appearing on driver's licenses, (iv) a date of birth identified with a particular person, (v) the maiden name of a person's parent so as to be identified with a particular person, (vi) the name and age of any minor child, (vii) information on credit cards, debit cards, bank accounts, or other electronic billing and payment systems.

**SIGNATURE:** ____________________________________________

City/County of: ________________________________

Commonwealth/State of: ________________________________

I,________________________________, a Notary Public or Deputy Clerk, do hereby certify that on this________________________day of_, 20 , _____ personally appeared before me and swore and acknowledged that the statements contained herein are true and correct.

My Commission Expires: ______________ ________________________________

Notary Public or Deputy Clerk

Registration Number: ______________ Print Name: ________________________



__________

Subscriber's Initials

**Subscriber**, please choose the User ID and Password you would prefer to use. The password must be a minimum of 3 characters, and not more than 10. It must be in lower case.

User ID (your e-mail) ______________________________

Password________________________________________

**Please mail the original signed agreement to:**

**Clerk of the Circuit Court**
**Attn: OCRA Non-Attorney**
**9311 Lee Avenue**
**Manassas, VA 20110**

*For Clerk's Office Use Only: Processed by:*__________________________*Date:* __________________

# EXHIBIT K

# SB980: Statewide e-filing system; creating for civil case filings.

- SB980E
- SB980

SENATE BILL NO. 980

Offered January 19, 2018

*A BILL to amend and reenact §§ 17.1-132, 17.1-258.3, and 17.1-293 of the Code of Virginia and to amend the Code of Virginia by adding sections numbered 8.01-271.02 and 17.1-293.1, relating to certain identifying information confidential; separate addendum required; secure remote access to nonconfidential civil case documents and records.*

Patron-- Obenshain

Referred to Committee for Courts of Justice

Be it enacted by the General Assembly of Virginia:

1. That §§ 17.1-132, 17.1-258.3, and 17.1-293 of the Code of Virginia are amended and reenacted and that the Code of Virginia is amended by adding sections numbered 8.01-271.02 and 17.1-293.1 as follows:

§ 8.01-271.02. Certain identifying information confidential; separate addendum.

Except as otherwise provided by law, beginning July 1, 2019, no petition, pleading, motion, order, or decree filed in a civil case in a circuit court of the Commonwealth, including any agreement of the parties or transcripts, shall contain the social security number of any party, or of any minor child of any party, or any financial information of any party that provides identifying account numbers for specific assets, liabilities, accounts, or credit cards. Such information, if required by law, shall be contained in a separate addendum filed by the attorney or party. Such separate addendum shall be used to distribute the information only as required by law. Such addendum shall otherwise be made available only to the parties, their attorneys, and to such other persons as the court in its discretion may allow. The attorney or party who prepares or submits a petition, pleading, motion, agreement, order, or decree shall ensure that any information protected pursuant to this section is removed prior to filing with the clerk and that any separate addendum is incorporated by reference into the petition, pleading, motion, agreement, order, or decree. The clerk has the authority to reject any petition, pleading, motion, agreement, order, or decree that does not comply with the provisions of this section.

§ 17.1-132. Courts Technology Fund.

A. There is hereby established the Courts Technology Fund as a special nonreverting fund to be administered by the Supreme Court of Virginia. A portion of the sums collected pursuant to §§ 16.1-69.48:2, 17.1-275, 17.1-293.1, 17.1-328, and 17.1-418 as specified in each section shall be deposited into the state treasury to the credit of the Fund.

B. The Fund shall be established on the books of the Comptroller. Any funds remaining in the Fund at the end of the biennium shall not revert to the general fund, but shall remain in the Fund. Interest earned on the Fund shall be credited to the Fund. Except for transfers pursuant to this section, there shall be no transfers out of the Fund, including transfers to the general fund.

C. Money in the Fund shall be allocated at the direction of the Supreme Court of Virginia to staff, advance, update, maintain, replace, repair, and support the telecommunications and technology systems of the judicial system. The revenue raised in support of the Fund shall not be used to supplant current funding to the judicial branch.

§ 17.1-258.3. Electronic filing system.

Any clerk of Each circuit court may clerk shall establish and operate a system for electronic filing in civil or criminal proceedings that shall be governed by the Rules of Supreme Court of Virginia. The circuit court clerk may require each person whom the clerk authorizes to file documents electronically to provide proof of identity to the clerk and to enter into an agreement specifying the electronic filing procedures to be followed, including, but not limited to, security procedures, as defined in the Uniform Electronic Transactions Act (§ 59.1-479 et seq.), for transmitting signed or notarized documents. The clerk may charge copy fees per page, as provided in subdivision A 8 of § 17.1-275, and obtain reimbursement for fees paid by subscribers to its designated application service providers for the technology systems used to operate electronic filing in civil and criminal cases in the clerk's office. The fees and reimbursements collected shall be deposited by the clerk into the clerk's nonreverting local fund to be used to cover operational expenses as defined in § 17.1-295. Nothing herein shall be construed to prevent the clerk from entering into agreements with designated application service providers to provide all or part of the network or system for electronic filing of civil or criminal records as provided herein. Further, nothing herein shall be construed to require the electronic filing of any civil or criminal record, and such records may continue to be filed in paper form.

Any clerk of circuit court with an electronic filing system established in accordance with the Rules of Supreme Court of Virginia may charge an additional $5 fee for every civil case initially filed by paper, except that a person who is determined to be indigent pursuant to § 19.2-159 shall be exempt from the payment of such fee. The fee shall be paid to the clerk's office and deposited by the clerk into the clerk's nonreverting local fund to be exclusively used to cover the operational expenses as defined in § 17.1-295.

§ 17.1-293. Posting and availability of certain information on the Internet; prohibitions.

A. Notwithstanding Chapter 37 (§ 2.2-3700 et seq.) of Title 2.2 or subsection B, it shall be unlawful for any court clerk to disclose the social security number or other identification numbers appearing on driver's licenses or information on credit cards, debit cards, bank accounts, or other electronic billing and payment systems that was supplied to a court clerk for the purpose of paying fees, fines, taxes, or other charges collected by such court clerk. The prohibition shall not apply where disclosure of such information is required (i) to conduct or complete the transaction for which such information was submitted or (ii) by other law or court order.

B. Beginning January 1, 2004, no court clerk shall post on the Internet any document that contains the following information: (i) an actual signature, (ii) a social security number, (iii) a date of birth identified with a particular person, (iv) the maiden name of a person's parent so as to be identified with a particular person, (v) any financial account number or numbers, or (vi) the name and age of any minor child.

C. Each such clerk shall post notice that includes a list of the documents routinely posted on its website. However, the clerk shall not post information on his website that includes private activity for private financial gain.

D. Nothing in this section shall be construed to prohibit access to any original document as provided by law.

E. This section shall not apply to the following:

1. Providing access to any document among the land records via secure remote access pursuant to § 17.1-294;

2. Postings related to legitimate law-enforcement purposes;

3. Postings of historical, genealogical, interpretive, or educational documents and information about historic persons and events;

4. Postings of instruments and records filed or recorded that are more than 100 years old;

5. Providing secure remote access to any person, his counsel, or staff which counsel directly supervises to documents filed in matters to which such person is a party;

6. Providing official certificates and certified records in digital form of any document maintained by the clerk pursuant to § 17.1-258.3:2; ~~and~~

7. Providing secure remote access to nonconfidential court records filed before July 1, 2019, subject to any fees charged by the clerk, to members in good standing with the Virginia State Bar and their authorized agents, pro hac vice attorneys authorized by the court for purposes of the practice of law, and such governmental agencies as authorized by the clerk; and

8. Providing secure remote access to nonconfidential court records on and after July 1, 2019, subject to any fees charged by the clerk and the Office of the Executive Secretary as authorized by § 17.1-293.1.

F. Nothing in this section shall prohibit the Supreme Court or any other court clerk from providing online access to a case management system that may include abstracts of case filings and proceedings in the courts of the Commonwealth, including online access to subscribers of nonconfidential criminal case information to confirm the complete date of birth of a defendant.

G. The court clerk shall be immune from suit arising from any acts or omissions relating to providing remote access on the Internet pursuant to this section unless the clerk was grossly negligent or engaged in willful misconduct.

This subsection shall not be construed to limit, withdraw, or overturn any defense or immunity already existing in statutory or common law, or to affect any cause of action accruing prior to July 1, 2005.

H. Nothing in this section shall be construed to permit any data accessed by secure remote access to be sold or posted on any other website or in any way redistributed to any third party~~, and the clerk, in his discretion, may deny secure remote access to ensure compliance with these provisions~~. However, the data accessed by secure remote access may be included in products or services provided to a third party of the subscriber provided that (i) such data is not made available to the general public and (ii) the subscriber maintains administrative, technical, and security safeguards to protect the confidentiality, integrity, and limited availability of the data.

§ 17.1-293.1. Secure remote access to nonconfidential civil case documents and records.

A. In any civil case filed on or after July 1, 2019, clerks of the circuit courts of the Commonwealth shall maintain all nonconfidential documents and records in electronic form and make such documents and records available through secure remote access. Civil case documents and records that are available through secure remote access shall be searchable by name and case number across all circuit courts of the Commonwealth that use the Office of the Executive Secretary's electronic imaging system. The Executive Secretary of the Supreme Court shall administer a paid subscription service that provides access to all electronic documents and records maintained by the circuit court clerks who use the Office of the Executive Secretary's electronic imaging system for civil cases filed on or after July 1, 2019. Each subscription shall be on an annual basis, and the annual subscription fee shall be established by the Judicial Council of Virginia. Sums collected pursuant to this section shall be deposited into the state treasury to the credit of the Courts Technology Fund established under § 17.1-132.

B. Beginning July 1, 2019, any petition, pleading, motion, order, or decree filed in a civil case in a circuit court of the Commonwealth shall comply with the provisions of § 8.01-271.02.

C. Nothing in this section shall be construed to prohibited access to any original document as provided by law.

D. Absent a showing of gross negligence or willful misconduct, the Office of the Executive Secretary and the clerk of the circuit court of any jurisdiction of the Commonwealth shall be immune from suit arising from any acts or omissions relating to providing secure remote access to case documents and records pursuant to this section.

2. That by July 1, 2019, the Virginia Information Technologies Agency shall update its document entitled "Security Standard for Restricted Remote Access to Documents on Court-Controlled Websites" consistent with the provisions of this act.

3. That the provisions of the first enactment of this act shall become effective on July 1, 2019.

## Explanation

For a plain English description of this bill, comments, voting, tagging, etc., return to the main page for SB980.

This is the actual text of the bill—the legislation itself. Generally this is amending existing law, proposing the addition or removal of words from laws that are already on the books, but sometimes it's proposing an entirely new law.

Words that are highlighted in green are proposed additions to the existing law, and words that are ~~crossed out in red~~ are proposed to be removed from the existing law.

The numbers with the § symbol before them are references to existing laws, and if you click on them they'll take you to that section of the Code of Virginia.