# 22-2110

# United States Court of Appeals

*for the*

# Fourth Circuit

COURTHOUSE NEWS SERVICE,

*Plaintiff/Appellant,*

– v. –

JACQUELINE C. SMITH, in her official capacity as Clerk of the Circuit Court for Prince William County, Virginia,

*Defendant/Appellee,*

and

COMMONWEALTH OF VIRGINIA,

*Intervenor/Defendant – Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT RICHMOND

# JOINT APPENDIX
# VOLUME TWO (PAGES 294-567)


DABNEY J. CARR, IV
TROUTMAN PEPPER
HAMILTON SANDERS LLP
Post Office Box 1122
Richmond, Virginia 23218
(804) 697-1238

*Counsel for Appellant*

JONATHAN E. GINSBERG
BRYAN CAVE
LEIGHTON PAISNER LLP
1290 Avenue of the Americas
36th Floor
New York, New York 10104
(212) 541-2000

*Counsel for Appellant*

ROGER MYERS
RACHEL MATTEO-BOEHM
BRYAN CAVE
LEIGHTON PAISNER LLP
Three Embarcadero Center
7th Floor
San Francisco, California 94111
(415) 675 3400

*Counsel for Appellant*

JOHN C. ALTMILLER, JR.
HEATHER R. STEELE
PESNER ALTMILLER MELNICK,
DEMERS & STEELE PLC
8000 Westpark Drive, Suite 600
Tysons, Virginia 22102
(703) 506-9440

*Counsel for Appellee Jacqueline C. Smith*

Andrew N. Ferguson
Graham K. Bryant
Erika L. Maley
OFFICE OF THE ATTORNEY GENERAL
202 North 9th Street
Richmond, Virginia 23219
(804) 786-2071

*Counsel for Appellee Commonwealth of Virginia*



COUNSEL PRESS • VA – (804) 648-3664

## TABLE OF CONTENTS

**VOLUME ONE**

Docket Entries ........................................................................................ 1

Amended Complaint,
With Exhibits,
filed September 14, 2021 ECF 21 ............................................................ 11

Exhibits:

5. Letter to Karl R. Hade and Michael J. Riggs, Sr.
from Bryan J. Harrison
dated March 31, 2021 ECF 21-5 ............................................ 41

6. Response from Eddie Macon to Bryan J. Harrison
dated April 22, 2021 ECF 21-6 ............................................. 44

Attachments to Plaintiff Courthouse News Service's Omnibus Memorandum of Law in Opposition to Defendant Karl R. Hade's Rule 12(b)(1) Motion to Dismiss, Defendant Karl R. Hade's Rule 12(b)(6) Motion to Dismiss, and Defendant Jacqueline C. Smith's Rule 12(b)(6) Motion to Dismiss
filed November 16, 2016:

Declaration of William Girdner in Opposition to
Defendants' Motions to Dismiss
dated November 16, 2021 ECF 33-1 ................................................ 47

Color Coded Map of Virginia's OCRA courts ECF 33-2 ........................... 61

Memorandum Opinion of
The Honorable Henry Hudson
filed January 14, 2022 ECF 48 ................................................................. 62

Order of
The Honorable Henry Hudson
Re: Denying Defendants' Motion to Dismiss
filed January 14, 2022 ECF 49 ................................................................. 76

Joint Stipulations of Fact
filed May 4, 2022 ECF 55 .......... 77

Stipulation and Order for Dismissal of Karl R. Hade without Prejudice
filed May 31, 2022 ECF 60 .......... 92

Notice of Intent to Intervene
filed May 31, 2022 ECF 61 .......... 95

Order of
The Honorable Henry E. Hudson
Re: Granting Dismissal of Karl R. Hade Without Prejudice
filed June 1, 2022 ECF 64 .......... 97

Defendant Commonwealth of Virginia's
Memorandum of Law in Support of its Motion for Summary Judgment,
With Exhibits,
filed July 9, 2022 ECF 67 .......... 98

Exhibits:

A. Declaration of Joby Knuth
sworn June 30, 2022 ECF 67-1 .......... 126

B. Declaration of Michael J. Riggs, Sr.,
sworn July 7, 2022 ECF 67-2 .......... 132

C. Declaration of Paul Ferguson
sworn July 5, 2022 ECF 67-3 .......... 136

Attachments to Plaintiff Courthouse News Service's Memorandum of Law in
Support of its Motion for Summary Judgment
filed July 11, 2022:

Declaration of William Girdner in Support of
Plaintiff Courthouse News Service's Motion for Summary Judgment
dated July 11, 2022 ECF 71-1 .......... 141

Attachments to Plaintiff Courthouse News Service's Memorandum of Law in Support of its Motion for Summary Judgment
filed July 11, 2022, continued:


Declaration of Ryan Abbott in Support of Plaintiff Courthouse News Service's Motion for Summary Judgment, With Exhibits,
dated July 11, 2022 ECF 71-2 ........................................................ 156

Exhibits:

1. Subscriber Request Form for Alexandria Justice Information System
dated January 11, 2022 ECF 71-3 ............................... 165

2. Subscriber Agreement for Secure Remote Access to Alexandria Circuit Court Documents ECF 71-4 ................... 167

3. Emails
various dates ECF 71-5............................................... 170

4. Attorney Subscriber Agreement for Remote Access to Prince William County Circuit Court Case Documents
dated May 5, 2021 ECF 71-6....................................... 172

5. Letter from Prince William County Circuit Court
dated May 13, 2021 dkt.71-7....................................... 181

6. Emails
various dates ECF 71-8............................................... 183

7. Emails
various dates ECF 71-9............................................... 190

A. Defendant Karl R. Hade's Responses to Plaintiff's First Set of Interrogatories
dated March 25, 2022 ECF 71-10......................................... 193

<u>Exhibits</u>, continued:


B. Attorney Subscriber Agreement for Remote Access to Prince William County Circuit Court Case Documents ECF 71-11 ........................ 199

C. Defendant Smith's Answers to Plaintiff's Second Set of Interrogatories dated July 5, 2022 ECF 71-12 .............................................. 207

D. Work Group Report from Office of the Executive Secretary of the Supreme Court of Virginia dated November 30, 2018 ECF 71-13 .................................. 212

F. Defendant Smith's Supplemental Responses to Plaintiff's First Set of Interrogatories and Requests for Production dated July 5, 2022 ECF 71-15 ............................................... 241

H. Confidentiality Considerations PowerPoint ECF 71-17 ................. 251

J. Non-Attorney Subscriber Agreement for Remote Access to Prince William County Circuit Court Case Documents ECF 71-19 ........................................................... 280

K. SB980: Statewide e-filing system; creating for civil case filings dated January 19, 2018 ECF 71-20 ....................................... 288

**VOLUME TWO**


Defendant Jacqueline C. Smith's Memorandum in Support of Motion for Summary Judgment
filed July 14, 2022 ECF 75 .......... 294

Defendant Commonwealth of Virginia's Brief in Opposition to Plaintiff's Motion for Summary Judgment
filed August 1, 2022 ECF 81 .......... 317

Attachments to Plaintiff Courthouse News Service's Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment
filed August 1, 2022 ECF 82 .......... 342

Attachments:

Declaration of William Girdner in Opposition to Defendants' Motions for Summary Judgment, With Exhibits,
dated August 1, 2022 ECF 82-1 .......... 379

Exhibits:

1. Courthouse News Service articles
dated July 31, 2022 ECF 82-2 .......... 385

B. Letter to The Honorable Jacqueline C. Smith from Robert B. McEntee, II
dated June 25, 2021 ECF 82-4 .......... 396

C. Email from Heather Steele
dated July 5, 2022 ECF 82-5 .......... 400

Defendant Jacqueline C. Smith's Memorandum in Opposition to
Plaintiff's Motion for Summary Judgment
filed August 1, 2022 ECF 83 .................................................................... 402

Attachment to Plaintiff's Reply Memorandum of Law in
Further Support of its Motion for Summary Judgement
filed August 8, 2022:

Declaration of Andras Bodis
dated August 6, 2022 ECF 85-1 ....................................................... 409

Exhibit to Minute Entry
filed August 18, 2022:

A. CasePortal hearing exhibit
various dates ECF 88-1 .......................................................... 414

Transcript of Cross Motions for Summary Judgment before
The Honorable Henry E. Hudson
on August 18, 2022 ECF 89 ..................................................................... 429

Memorandum Opinion of
The Honorable Henry Hudson
filed September 27, 2022 ECF 91 ............................................................. 533

Order of
The Honorable Henry Hudson
Re: Cross-Motions for Summary Judgment
filed September 27, 2022 ECF 92............................................................... 565

Plaintiff Courthouse News Service's Notice of Appeal
filed October 25, 2022 ECF 93.................................................................. 566

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| **COURTHOUSE NEWS SERVICE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.: 3:21cv460-HEH** |
| | ) | |
| **KARL R. HADE**, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**DEFENDANT JACQUELINE C. SMITH'S**
**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

COMES NOW the Defendant, Jacqueline C. Smith ("Defendant" or the "Clerk"), by counsel, hereby submits this memorandum of law in support of her Motion for Summary Judgment.

**PROCEDURAL BACKGROUND**

Plaintiff Courthouse News Service ("Plaintiff" or "CNS") has filed its claim for injunctive and declaratory relief against the Clerk, alleging that Virginia Code § 17.1-293 places unconstitutional limitations on CNS's access to online court records, both on its face and as-applied by the Clerk, and that such limitations are in violation of CNS's civil rights pursuant to 42 U.S.C. § 1983. This Court has previously granted Defendant's Motion to Dismiss Count Three of CNS's Amended Complaint, in which CNS asserted an equal protection claim under the Fourteenth Amendment. The Court noted that "under rational basis review, the restriction 'must be afforded a strong presumption of validity." Memorandum Opinion, p. 12 [Doc. 48]. The Court further observed that Defendants pointed to a legitimate interest of the government: protecting confidential and private information contained in the civil court records. The Court found that it

is, at a minimum, rational to believe that limiting OCRA access to attorneys would protect confidential and private information because attorneys are more easily regulated by the court system.

The Court denied Defendants' motion to dismiss Plaintiff's First Amendment claims. In doing so, the Court noted that the Clerk may be able to solidify the contours of the government's interests in enforcing the non-attorney access restriction and the burdens placed on the public.

## STATEMENT OF UNDISPUTED FACTS

### Parties

- Plaintiff Courthouse News Service ("CNS") is a California corporation specializing in news reporting about civil litigation in state and federal courts of the United States. (Am. Compl. ¶ 15.)
- Defendant is the Clerk of the Circuit Court for Prince William County, Virginia. (Am. Compl. ¶ 19.)

### Remote Access in the Virginia Courts

- In all Virginia circuit courts, clerks provide the public with access to these court records at the physical courthouse. (Am. Compl. ¶ 13.)
- Beyond access at the courthouse, some circuit courts also provide access to civil court records remotely, via the internet, on a system called "Virginia Officer of the Court Remote Access" ("OCRA"). (Am. Compl. ¶ 13.)
- It is optional for each circuit court clerk to have their records accessible via OCRA, but approximately 90 circuit courts do so. Va. Code§ 17.1-293(E)(7); (Am. Compl. ¶ 35).
- Along with other circuit courts in Virginia, Prince William County Circuit Court has placed its civil court records onto OCRA. (Am. Compl. ¶¶ 3, 5.).

- OCRA is generally available to officers of the court (for an annual fee), but not to the general public. (Am. Compl. ¶ 3.).

- The clerks of some Virginia circuit courts, including Defendant, have denied Plaintiff access to OCRA based upon Virginia Code §17.1-293(B), which provides, in relevant part, that "no court clerk shall post on the Internet any document that contains the following information: (i) an actual signature, (ii) a social security number, (iii) a date of birth identified with a particular person, and (iv) the name of the person's parents so as to be identified with a particular person, (v) any financial account number or numbers, or (vi) the name and age of any minor child." (Am. Compl. ¶ 4.)

- The statute contains an exception, allowing for "secure remote access to nonconfidential court records, subject to any fees charged by the clerk, to members in good standing with the Virginia State Bar and their authorized agents, pro hac vice attorneys authorized by the court for purposes of the practice of law, and such governmental agencies as authorized by the clerk." (Am. Compl. ¶ 4.)

- Defendant, as the Clerk of the Prince William County Circuit Court, has denied Plaintiff access to OCRA. (Am. Compl. ¶ 66.)

- In response to Defendant's inquiry to the Attorney General for the Commonwealth of Virginia, Defendant received an opinion letter stating that "pursuant to §17.1-293, circuit court clerks cannot grant the general public remote access to nonconfidential documents through OCRA." (Am. Compl. ¶ 73.)

- Virginia Code §17.1-293 also provides that "data accessed by secure remote access" is not permitted "to be sold or posted on any other website or in any way redistributed to any third party" and that such data cannot "be made available to the general public." (Am. Compl. ¶ 7.)

- The code section prohibiting dissemination contains no exceptions, including for Virginia-licensed attorneys. (Am. Compl. ¶ 7.)
- Plaintiff does not assert that it has been denied access to non-confidential civil filings, and admits that it "can access non-confidential civil complaints at the circuit courts." (Am. Compl. ¶ 44.)
- In fact, "[a]t the time the civil complaints and other judicial filings are made available on OCRA, they have already been made public via public access terminals at the courthouse." (Am. Compl. ¶ 48.)

**<u>Plaintiff's Redaction Practices</u>**

- Defendant's office reviews civil filings to ensure the redaction of social security numbers, driver's license numbers, and other identification numbers as contemplated under Virginia Code §8.01-420.8. (Def. Ans. to Pl. First Set of Interrogatories, No. 1.)
- Defendant's office does not currently review or redact new civil filings to ensure that (i) a date of birth identified with a particular person, (ii) the maiden name of a person's parent so as to be identified with a particular person, (iii) any financial account number or numbers, (iv) the name and/or age of any minor child, or (v) an actual signature has been redacted. (Def. Ans. to Pl. First Set of Interrogatories, Nos. 2-6.)

**<u>Declaration Paul Ferguson</u>**

- Paul Ferguson is the Clerk of the Arlington County Circuit Court, and has held that position since January 1, 2008. (Exhibit 1, Declaration of Paul Ferguson, ¶ 2.)
- In his capacity as the Clerk of Court, Mr. Ferguson is responsible for managing the operations of the Arlington Circuit Court, including remote online access to the Court's records. (Exhibit 1, Declaration of Paul Ferguson, ¶ 3.)

- The Arlington Circuit Court received 3280 new civil cases in calendar year 2021. (Exhibit 1, Declaration of Paul Ferguson, ¶ 4.)

- The Arlington County Clerk of Court uses software issued and managed by ImageSoft Inc. to post court records online. (Exhibit 1, Declaration of Paul Ferguson, ¶ 5.)

- The Arlington County Clerk of Court hires a redaction company (CSI) that is tasked with the job of redacting original signatures, social security numbers, credit cards, bank accounts, minor children names and ages, maiden names, judges signatures, and tax ID's from the court records that are available to the public at terminals located at the Clerk's office. (Exhibit 1, Declaration of Paul Ferguson, ¶ 6.)

- The Arlington County Circuit Court's online court records access is not through the state's OCRA system; but the Arlington Circuit Court's online records access is similarly restricted to attorneys only. (Exhibit 1, Declaration of Paul Ferguson, ¶ 7.)

- Secure Remote Access is provided to attorneys for their convenience, but it also creates efficiencies in the Clerk's Office, because minimizing in-person copy requests from attorneys saves time and money for the Clerk's Office. (Exhibit 1, Declaration of Paul Ferguson, ¶ 8.)

- If Secure Remote Access contained only redacted documents, it is likely attorneys would choose to make in person requests for the unredacted documents. (Exhibit 1, Declaration of Paul Ferguson, ¶ 8.)

- The Clerk's Office spends approximately $35,000 per year on redaction services with regard to Court records that are made available to the public on terminals located at the Clerk's office. (Exhibit 1, Declaration of Paul Ferguson, ¶ 10.)

- If a court were to determine that online access to court records must be provided to the public at large, it would cost substantial additional funds to modify the existing secure remote

access system to protect private information of Arlington County's constituents; Mr. Ferguson estimates that it would cost approximately $150,000 to provide access to redacted documents for records posted on his court's remote access system. (Exhibit 1, Declaration of Paul Ferguson, ¶ 11.)

**LEGAL STANDARD**

"Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." *Gleich v. Wachovia Sec., LLC*, No. 3:04CV422, 2005 U.S. Dist. LEXIS 16748, at *2-3 (E.D. Va. Mar. 28, 2005), *citing to Smith v. Continental Casualty Co*., 369 F.3d 412, 417 (4th Cir. 2004) (citing Fed. R. Civ. P. 56(c) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). By its very definition, the summary judgment standard provides "that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986) (emphasis added).

At the summary judgment stage, the Court will only concern itself with disputes over facts "that might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id*. at 248. Moreover, "a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Id*. The threshold inquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id*. at 250.

In determining whether the moving party has shown that there is no genuine issue of material fact, a court must assess the factual evidence and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *See Ross v. Communications Satellite Corp*., 759 F.2d 355, 364 (4th Cir. 1985).

Summary judgment is appropriate when a party who will bear the burden at trial fails to make a showing sufficient to establish an essential element of the case, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986), such that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Laughlin v. Metro. Wash. Airports Auth*., 149 F.3d 253, 258 (4th Cir. 1998), *citing to* Fed. R. Civ. P. 56(c).

## ARGUMENT

### A. <u>The Statutes</u>

Plaintiff seeks to have remote online access to all civil filings made in the Prince William County Circuit Court. The Clerk's rights and obligations with regard to the posting of court filings online are governed by statute, including both Va. Code § 17.1-293 and Va. Code § 8.01-420.8. Plaintiff asserts that, to the extent that the Clerk's is restricted from providing access to Plaintiff by Va. Code § 17.1-293, the Court should declare that statute unconstitutional under the First Amendment.[1] Therefore, any analysis of this issue must begin with the statutes themselves.

Clerks of court in Virginia may, but are not required, to provide "remote access, including Internet access, to all nonconfidential court records on an automated case management or other

[1] Plaintiff also sought in its Amended Complaint to have Virginia Code §17.1-293 declared unconstitutional under the Fourteenth Amendment, but the Court has previously granted Defendants' motion to dismiss that claim. (Memorandum Opinion [Doc. 48].)

system maintained by [the Clerk's] office and described in § 17.1-242."[2] Va. Code § 17.1-225. That statute also makes the clerk's "responsible for insuring that proper security measures are implemented and maintained to prevent remote access users from obtaining any data that are confidential under this Code and to prevent the modification or destruction of any records by remote access users." *Id.*

The protection of confidential information in court files is addressed by Va. Code § 8.01-420.8, which states that:

> Whenever a party files, or causes to be filed, with the court a motion, pleading, subpoena, exhibit, or other document containing a social security number or other identification number appearing on a driver's license or other document issued under Chapter 3 (§ 46.2-300 et seq.) of Title 46.2 or the comparable law of another jurisdiction, or on a credit card, debit card, bank account, or other electronic billing and payment system, the party shall make reasonable efforts to redact all but the last four digits of the identification number.

Va. Code § 8.01-420.8(A). This statute makes it clear that it applies to all civil actions in the circuit court, unless there is a specifically applicable statute to the contrary. Va. Code § 8.01-420.8(B). One notable aspect of § 8.01-420.8 is that it does not contain an absolute requirement that the filing party redact the information, but rather that the party simply make "reasonable efforts to redact all that the last four digits of the identification number." Furthermore, § 8.01-420.8 imposes no obligation upon the court clerks with regard to redacting or otherwise removing or protecting confidential information. The statute makes clear that it shall not be construed to "create a private cause of action against the party or lawyer who filed the document or any court personnel, the clerk, or any employees of the clerk's office who received it for filing." Va. Code § 8.01-420.8(C).

[2] Virginia Code §17.1-242 simply states that the clerks "shall have custody of and shall keep all court records, including books, evidence, records, maps, and papers, deposited in their offices or at such location otherwise designated by the clerk, as well as records stored in electronic format whether the storage media for such electronic records are on premises or elsewhere."

For the sake of clarity, Defendants will hereafter refer to the categories of information identified in Virginia Code § 8.01-420 as "Confidential Information."

The rights and restrictions regarding the posting of certain information by court clerks on the Internet are addressed in Va. Code § 17.1-293. Title 17.1 of the Virginia Code governs the Commonwealth's Courts of Record, and Article 8 of Title 17.1 (Va. Code §§ 17.1-292 through -295) expressly deals with Secure Remote Access to court records. Va. Code § 17.1-293 prohibits circuit court clerks from posting on the Internet "any document that contains the following information: (i) an actual signature, (ii) a social security number, (iii) a date of birth identified with a particular person, (iv) the maiden name of a person's parent so as to be identified with a particular person, (v) any financial account number or numbers, or (vi) the name and age of any minor child." Va. Code § 17.1-293(B). In order to avoid any confusion, Defendants will hereafter refer to the categories of information identified in this statute—which is broader in scope than the Confidential Information identified in § 8.01-420.8—as "Private Information."

The restrictions on posting Private Information on the Internet in Va. Code § 17.1-293 are subject to several exceptions. As is relevant to this case, one of the exceptions allows the clerk to provide "secure remote access to nonconfidential court records, subject to any fees charged by the clerk, to members in good standing with the Virginia State Bar and their authorized agents, pro hac vice attorneys authorized by the court for purposes of the practice of law, and such governmental agencies as authorized by the clerk." Va. Code § 17.1-293(E)(7). This exception in § 17.1-293(E)(7) permits court clerks to provide remote access to civil filings over the Internet to attorneys, their staff, and certain governmental agencies, even if there exists Private Information contained therein that has not been redacted.

§ 17.1-293 also contains restrictions on dissemination. Specifically, the statute states that

it shall not be "construed to permit any data accessed by secure remote access to be sold or posted on any other website or in any way redistributed to any third party, and the clerk, in [her] discretion, may deny secure remote access to ensure compliance with these provisions." Va. Code § 17.1-293(H).

### B. Plaintiff's Claims Regarding the Constitutionality of Virginia Code §17.1-293

In its Amended Complaint, Plaintiff seeks a declaration that Virginia Code § 17.1-293 is unconstitutional on its face, and as applied, under the First and Fourteenth Amendment. The Court has dismissed Plaintiff's Fourteenth Amendment claim (Count Three); Plaintiff's First Amendment claims (Counts One and Two) remain. The first count asserts that the restriction under the statute regarding *access* to the court records remotely constitutes a violation of the First Amendment; the second count asserts that the restriction under the statute regarding *dissemination* of information in court records that are posted online constitutes a violation of the First Amendment. The distinction between Plaintiff's claims regarding access and its claims regarding dissemination may be of consequence.

To the extent that Va. Code §17.1-293 restricts its *access* to court records, Plaintiff asserts that the statute is unconstitutional on its face "because it denies non-Virginia-licensed attorneys, including CNS, of equal access and equal protection under the law in violation of the First and Fourteenth Amendments to the U.S. Constitution, and because it impermissibly discriminates against CNS and other members of the press and public, and the classification burdens the fundamental First Amendment rights of CNS, its subscribers, and other readers of its news reports." (Am. Compl., Prayer for Relief, ¶ 3.).[3] Since Plaintiff's equal protection and Fourteenth

---

[3] Plaintiff also claims that, with regard to restrictions on remote access, the statute is unconstitutional as applied under the Fourteenth Amendment. However, Plaintiff's Fourteenth Amendment claims have been dismissed.

Amendment claims have been dismissed, the only remaining issue with regard to access is whether the provisions of Va. Code § 17.1-293 amount to a "classification [that] burdens the fundamental First Amendment rights of CNS, its subscribers, and other readers of its news reports."

To the extent that Va. Code § 17.1-293 restricts *dissemination* of court records access remotely, Plaintiff asserts that the statute is unconstitutional on its face, and as applied, because it "impermissibly burdens the fundamental First Amendment rights of CNS, its subscribers, and other readers of its news reports." (Am. Compl., Prayer for Relief, ¶¶ 5, 6.).

**C. <u>Plaintiff's First Amendment Claims Are Subject to Relaxed Scrutiny.</u>**

In its previous Memorandum Opinion, the Court clarified that Plaintiff "is not alleging that the public has a fundamental right to remotely access civil court records guaranteed by the First Amendment," but rather that Plaintiff is only arguing that "if Defendants provide Virginia attorneys remote access to civil court records, then the First Amendment also requires them to provide the public with remote access." (Memorandum Opinion, p. 9 [Doc. 48].) The Court further refined the nature of Plaintiff's argument by noting that "[i]n effect, Plaintiff argues that Defendants are limiting an already established fundamental right, the right to access civil court records, in an unconstitutional manner by giving one group, Virginia lawyers, remote access while denying it to others." (Memorandum Opinion, p. 9 [Doc. 48].) In this context, the Court held that § 17.1-293's limitation of access resembles a time, place, and manner restriction and therefore, the relaxed scrutiny standard applies. (Memorandum Opinion, p. 10 [Doc. 48]).

The Court has noted in its Memorandum Opinion that the non-attorney access restriction challenged by CNS does *not* stop CNS from accessing civil court records altogether; instead, the restriction only controls *how* and *when* the public may access such records. Relaxed scrutiny requires the limitation to be "content-neutral, narrowly tailored and necessary" to preserve a

"significant governmental interest." *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 328 (U.S. 4th Cir. 2021). A regulation is narrowly tailored under this standard if it "promotes a substantial government interest that would be achieved less effectively absent the regulation" and does not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ross v. Early*, 746 F.3d 546, 552-53 (4th Cir. 2014); *Ward v. Rock Against Racism*, 491 U.S. 781,799 (1981).

To pass the test under a relaxed scrutiny standard, the law must meet three requirements: it must be (i) content-neutral, (ii) narrowly tailored, and (iii) necessary to preserve a significant governmental interest. Va. Code § 17.1-293 meets each of these requirements.

**D. <u>The Restrictions Contained in Virginia Code §17.1-293 As to Remote Access and Dissemination Are Content-Neutral</u>.**

The principal inquiry in determining content neutrality, in free speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the *message* it conveys. *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S. Ct. 2746, 2754 (1989). The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others. *Id.* Government regulation of expressive activity is content neutral so long as it is justified without reference to the content of the regulated speech. *Id.* "To be content-neutral, the [challenged] policy cannot target speech based on its communicative content, or draw distinctions based on the message a speaker conveys." *Courthouse News Serv. v. Planet*, 947 F.3d 581, 601 (9th Cir. 2020).

The provisions of Virginia Code §17.1-293 that relate to access are content-neutral. Remote access under the statute is not limited by the communicative content or message of the documents at issue. Instead, the statute is focused upon Private Information, and the limitation of

remote access to that Private Information. None of the categories of Private Information identified in the statute relate to the content or message being communicated.

The same analysis applies to the provisions of Virginia Code §17.1-293 that are related to restrictions on dissemination. The statute specifically restricts the dissemination of "*any data* accessed by secure remote access." Virginia Code §17.1-293(H) (emphasis added). Because this restriction applies to all information accessed remotely, it is not targeted at any specific content. Thus, the limitations on both access and dissemination contained in the statute are content-neutral.

**E. <u>The Restrictions Contained in Virginia Code §17.1-293 as to Both Remote Access and Dissemination Promote a Significant Government Interest</u>.**

The government holds a significant interest in protecting the Private Information of its citizens. Any information posted online is at risk of being misused for nefarious purposes. The government further holds a significant interest in ensuring the efficient administration of its justice system. Delays in the administration of the Clerk's office can lead to delays in court hearings, which can result in a slowdown of the entire judicial process. Persons accused of a crime have their own constitutional rights, including a right to a speedy trial, and the efficient administration of the justice system is crucial for ensuring that the rights of criminal defendants (as well as the private information of civil litigants) are protected and preserved. The balancing act in determining the constitutionality of §17.1-293 requires that the demands of CNS to unfettered online OCRA access must be weighed against the government's significant interests in protecting its citizens and its courts.

**1. <u>Protection of Private Information</u>**

There are at least two significant governmental interests that are sought to be protected by Va. Code § 17.1-293. The first is the Commonwealth's significant interest in the protection of the

Private Information[4] of its litigants from wholesale distribution and publication. Protection of individual privacy is a substantial government interest. *Wollschlaeger v. Governor*, 848 F.3d 1293, 1314 (11th Cir. 2017).

The substantial government interest in protecting individual privacy has arisen in numerous cases involving the First Amendment. For example, protecting the privacy of consumer credit information is a substantial governmental interest. *Trans Union Corp. v. FTC*, 345 U.S. App. D.C. 301, 245 F.3d 809, 818 (D.C. Cir. 2001). In a case challenging the constitutionality of a statute that limited access to information regarding individuals charged with certain criminal offenses, the Tenth Circuit held that privacy considerations constitute a substantial state interest. *Lanphere & Urbaniak v. Colorado*, 21 F.3d 1508, 1514 (10th Cir. 1994). The government also has a substantial interest in has a substantial interest in protecting consumers, and more specifically, protecting their privacy in and control over their biometric data. *Sosa v. Onfido, Inc*., No. 20-cv-4247, 2022 U.S. Dist. LEXIS 74672, at *42 (N.D. Ill. Apr. 25, 2022) In another case, the court held that the government has a substantial interest in protecting residential privacy. *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 421 (D. Md. 2011)(citing *Frisby v. Schultz*, 487 U.S. 474, 484, 108 S. Ct. 2495, 101 L. Ed. 2d 420 (1988)).

At the core of the government interest in protecting the dissemination of Private Information is the right of a citizen to have some control over when and how such information is made available to third parties. The United States Supreme Court has noted that "both the common law and the literal understandings of privacy encompass the individual's *control of information* concerning his or her person." *United States DOJ v. Reporters Comm. for Freedom of Press*, 489

---

[4] As noted above, the term Private Information is used in this brief when referring to the information in Va. Code §17.1-293; whereas, the term Confidential Information is used in this brief when referring to the narrower scope of information contained in Va. Code §8.01-420.8.

U.S. 749, 763, 109 S. Ct. 1468, 1476 (1989)(emphasis added). Because "[i]n an organized society, there are few facts that are not at one time or another divulged to another . . . the extent of the protection accorded a privacy right at common law rested in part on *the degree of dissemination* of the allegedly private fact and the extent to which the passage of time rendered it private." *Id.*(emphasis added). As the court observed in that case, "[p]lainly there is a vast difference between the public records that might be found after a diligent search of courthouse files, county archives, and local police stations throughout the country and a computerized summary located in a single clearinghouse of information." *United States DOJ*, 489 U.S. at 764, 109 S. Ct. at 1477.

Potential litigants should not be faced with the dilemma of either not seeking legal relief to which they may be entitled, or having their Private Information posted on the Internet constitute the price for exercising that fundamental right. Such an outcome could have a chilling effect on citizens exercising their right under the Petition Clause of the First Amendment to seek redress of grievances. It is well-established that the Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes. *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387, 131 S. Ct. 2488, 2494 (2011). This includes the right to file a lawsuit. *Borough of Duryea*, 564 U.S. at 390, 131 S. Ct. at 2496. It should not be controversial to assert that the government has a substantial interest in promoting its citizens' First Amendment rights.

The statute specifically targets information that is highly sought after by third parties to engage in identity theft, data mining, and other crimes, as well as information regarding minor children. The promotion of this governmental interest is indicated by the restrictions on both access to, and dissemination of, Private Information. In fact, Plaintiff does not appear to take any issue with constitutionality of subsection (B) of the statute, which sets forth the categories of

Private Information that may not be posted on the Internet. Presumably, CNS agrees that these categories of information are reasonable and should remain protected and private; CNS is not arguing that the scope of the information deemed private is unacceptably broad. Although attorneys are exempt from the remote access limitation, they are not exempt from the restriction on dissemination. The breadth of the dissemination section of the statute is another indication of the importance of the governmental interest in preventing Private Information from getting into the wrong hands, as the dissemination portion of § 17.1-293 restricts everyone from publishing that information when it is obtained from remote access.

As identified in the Statement of Undisputed Facts above, at least two Circuit Court clerks in the Commonwealth (Defendant and Paul Ferguson) engage in the time and expense of redaction for the filings that are available at the public terminals at their office, even though no Virginia statute requires them to do so. That these clerks undertake these efforts to protect the Private Information of their constituents in the absence of a legislative mandate further demonstrates the significance of the governmental interest in such protection. The harms that could arise from allowing Private Information to become publicly available and widely disseminated are readily apparent; there are entire industries devoted to the protection of Private Information and combating identity theft. The government's significant interest in protecting the Private Information is a reasonable and sound interest that is beneficial and advantageous to the government's constituents.

**2. <u>The Orderly and Efficient Administration of Justice</u>**

The second significant governmental interest promoted by Virginia Code §17.1-293 is the orderly and efficient administration of justice. This interest has been previously recognized by federal appellate courts, including two recent decisions involving CNS. In one case, the Fourth Circuit recognized "the court's important interest in the fair and orderly administration of justice."

*Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 328 (U.S. 4th Cir. 2021). In another, the Ninth Circuit recognized a governmental entities "legitimate administrative concerns about privacy and confidentiality, accounting protocols, quality control and accuracy, [and] efficient court administration." *Courthouse News Serv. v. Planet*, 947 F.3d 581, 597 (9th Cir. 2020). Even absent such authority, the significance of a governmental interest in the orderly and efficient administration of its court systems appear to be self-evident; for example, an orderly and efficient court can provide relief to litigants more quickly and can comply with criminal defendants' rights to a speedy trial, among other benefits.

This substantial interest as it applies to the deployment of resources in a circuit court clerk's office has also been specifically recognized in a case involving a temporal limitation limitation on access to files in the clerk's office. In that case, the plaintiff sought to review thousands of files in person at the clerk's office. Because of the demands that these ongoing requests put upon her staff, the clerk imposed a limit upon the plaintiff of two hours per week for review of files. The court, after establishing that such a limitation must further a substantial government interest, stated that it had "no trouble holding that the efficient administration of the domestic relations division of the circuit clerk's office is a substantial government interest." *Barber v. Conradi*, 51 F. Supp. 2d 1257, 1267 (N.D. Ala. 1999)

As discussed in more detail below, this significant interest is manifested in at least two ways. First, remote access to unredacted civil filings by licensed attorneys clearly aids those attorneys in executing their duties. Attorneys are an integral part of the judicial system, and their ability to perform their duties efficiently benefits the entire judicial system; similarly, lack of remote access to that information impairs the attorney's efficacy in the performance of their job, and therefore affects the efficacy of the system at large. Attorneys are not outside of the justice

system—they are officers of the court. Attorneys are an integral part of the overall operation of the courts, and as officers of the court, attorneys have a special duty and burden to act out a key role in the overall administration of justice. Providing access to OCRA to attorneys supports a significant government interest in providing the officers of the court a method to access the records needed in order to perform their job functions without standing in line at the courthouse and causing expensive and time-consuming delays for their clients or the Clerk's office.

Second, remote access improves the efficiency and performance of the clerk's office. Because the documents sought by attorneys are available through remote access, the clerk's office no longer has to dedicate staff to handling in-person requests for the retrieval and copying of those documents. *See* Declaration of Paul Ferguson, ¶ 8. This also improves the efficacy of the judicial system by freeing up clerks to process incoming filings faster and with fewer interruptions, and by freeing up resources to allow the Clerk's office to focus on its true work of ensuring the efficient operation of the courts.

**F. <u>The Provisions of Virginia Code §17.1-293 as to Remote Access and Dissemination Are Narrowly Tailored</u>.**

"It has long been a tenet of First Amendment law that in determining a facial challenge to a statute, if it be 'readily susceptible' to a narrowing construction that would make it constitutional, it will be upheld." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397, 108 S. Ct. 636, 645 (1988). "A regulation is narrowly tailored under this standard if it promotes a substantial government interest that would be achieved less effectively absent the regulation and does not burden substantially more speech than is necessary to further the government's legitimate interests." *Ross v. Early*, 746 F.3d 546, 552-53 (4th Cir. 2014) (internal quotations omitted). Regulations that control the time, place, and manner of expression must be evaluated in terms of their general effect. *United States v. Albertini*, 472 U.S. 675, 688-89, 105 S. Ct. 2897, 2906 (1985).

Such regulations are not "invalid simply because there is some imaginable alternative that might be less burdensome on speech." *Id.* Such regulation is permissible "so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id.* "The validity of such regulations does not turn on a judge's agreement with the responsible decision maker concerning the most appropriate method for promoting significant government interests." *Id.* The statute's limitation of access to attorneys is narrowly tailored to promote the government's interest in protecting that Private Information from widespread dissemination, and to preserve the efficient and orderly administration of the justice system.

**1. <u>Limitations on Remote Access</u>**

At the outset, is important to note that Plaintiff is not alleging that it has a First Amendment right to remote access the civil filings made in the Prince William County Circuit Court (or other courts that only provide remote access to attorneys). Rather, Plaintiff asserts that its constitutional right to remote access arises from the fact that Virginia attorneys are given remote access to those civil filings.[5] Therefore, Plaintiff's objection to the constitutionality of the statute under the First Amendment with regard to access must relate solely to subsection (E), which creates an exception for attorneys as to the restrictions found in the statute. An analysis of the statute, along with the governmental interests in both the protection of Private Information and the orderly and efficient administration of the justice system, demonstrates that the statute—and subsection (E) in

[5] As stated in its Amended Complaint, Plaintiff's constitutional claims with regard to the access provisions of Virginia Code § 17.1-293 would appear to be based entirely upon the different levels of access provided to attorneys and non-attorneys, and therefore only implicate the equal protection clause of the Fourteenth Amendment. Nevertheless, in light of the Court's previous Memorandum Opinion, this claim can now only be based upon a claim of impermissible limitation on time, place, and manner of speech.

particular—is narrowly tailored to promote both of those interests.

The provision of the statute restricting the posting of Private Information on the Internet is specifically targeted at keeping such information out of the hands of third parties who could engage in criminal conduct or otherwise misuse that information. It does not restrict access to that information entirely. Instead, it simply makes that information unavailable to the public over the Internet, where it would be much easier to access significant amounts of data from anywhere in the world with an Internet connection and quickly republish it, or download it for other illegitimate or improper purposes.

The provision of the statute exempting attorneys from the restrictions on clerks posting certain information on the Internet is also narrowly targeted at promoting the significant governmental interest in the orderly and efficient administration of the justice system. The exemption is narrow, and applies to attorneys and their staff. Attorneys are an essential part of the justice system. Their access to this information is necessary for the performance of their professional obligations, and remote access to this information promotes their efficient performance of those obligations. As officers of the court and members of the judicial system, they stand on entirely different footing than other members of the public.

There are very few, if any, legitimate reasons why one citizen would need to comb through online court records to learn the maiden name of another citizen, or to know the names and ages of their children, or to have a copy of their signature. Even if any such reasons existed, they would be far outweighed by the government's interest in protecting that information from the risk of being widely misused. On the other hand, there are entirely valid—even compelling—reasons why attorneys should have online access to court records. The information contained in court records is often necessary in prosecuting and defending civil lawsuits. Furthermore, having remote access

to this information not only promotes the efficient performance of their duties, but also creates less of a burden upon the clerks' offices that would otherwise have to provide that information in person.

Under relaxed scrutiny, the issue is whether providing remote access to attorneys, but not providing that access to the public, promotes "a substantial government interest that would be achieved less effectively absent the regulation." *Albertini*, 472 U.S. at 89, 105 S. Ct. at 2906. Without this statute, the government interest in protecting Private Information would be achieved less effectively. If Private Information was available on the Internet, without any restriction, such information would be subject to misuse or wholesale dissemination. Worse, the wide availability of that information on the Internet might have a chilling effect on individuals seeking legitimate judicial relief for fear of having such information published, data-mined, stolen, or otherwise used to harm them in some way. Furthermore, in the absence of an exception permitting attorneys to access this information remotely, the administration of the court system would be less efficient and orderly.

**2. <u>Limitations on Dissemination</u>**

Virginia Code §17.1-293(H) limits the dissemination of information obtained through remote access. Specifically, it prohibits all persons from selling or posting such information on any other website or in any way redistributed to any third party. However, this provision does not apply to the dissemination of information obtained in person at the courthouse. Attorneys are not exempt from this provision.

As with the provisions of the statute applicable to remote access, this subsection seeks to promote the substantial government interest in protecting Private Information. Unlike the provision limiting remote access, it applies equally to attorneys and non-attorneys, so there is no

necessity to determine whether that aspect of the statute is narrowly tailored. The question is therefore whether the government's significant interest in protecting the wholesale dissemination of Private Information would be achieved less effectively without this statutory provision.

It is clear that the interest being promoted relates to the type of misuse of data that is unique to information that is posted online. The protection of Private Information from wholesale misuse and publication is therefore limited only to information that is posted on the Internet. That significant interest would be substantially less effectively achieved without a limitation on dissemination of information posted on the Internet. It is for this reason that the provision is limited only to information that is posted on the Internet.

## CONCLUSION

On the basis of the foregoing, the Court should grant Defendant's Motion for Summary Judgment.

Dated: July 11, 2022.

Respectfully submitted,

*/s/ John C. Altmiller*

John C. Altmiller, Esq., VSB No. 34902
Heather R. Steele, Esq., VSB No. 75473
Pesner Altmiller Melnick & DeMers PLC
8000 Westpark Drive, Suite 600
Tysons, VA 22102
703-506-9440 (phone)
jaltmiller@pesner.com
hsteele@pesner.com
*Counsel for Defendant Jacqueline C. Smith*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 11th day of July, 2022, I will electronically file the foregoing Memorandum in Support of Defendant Smith's Rule 56 Motion for Summary Judgment with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing (NEF) to all counsel of record.

*/s/ John C. Altmiller*
John C. Altmiller

**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>Plaintiff,<br><br>v.<br><br>JACQUELINE C. SMITH, in her official capacity as Clerk of the Circuit Court for Prince William County, Virginia,<br><br>Defendant,<br><br>and<br><br>THE COMMONWEALTH OF VIRGINIA,<br><br>Intervenor-Defendant. | Civil Action No. 3:21-cv-00460-HEH |

**DEFENDANT COMMONWEALTH OF VIRGINIA'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

The Commonwealth of Virginia (the "Commonwealth"), by counsel, hereby responds to Plaintiff Courthouse News Service's ("CNS") Motion for Summary Judgment. CNS has failed to articulate a restriction to its rights under the First Amendment. But even if the Court determines that requiring the public to view court records at the courthouse is a First Amendment restriction, that restriction is subject to relaxed scrutiny. CNS has likewise failed to show that it is entitled to OCRA access under the Code of Virginia. Finally, CNS has failed to show that the Commonwealth would effectively achieve its interest in the fair and orderly administration of justice absent the non-attorney access and dissemination restrictions because redaction, subscriber agreements, and sealing are ineffective at preventing harmful data harvesting.

**LISTING OF DISPUTED FACTS**
**PURSUANT TO LOCAL CIVIL RULE 56**

1. The Commonwealth disputes the facts contained in Dkt. No. 71 ¶ 9. While the Commonwealth stipulated to the facts included in Dkt. No. 55 ¶ 10, the Commonwealth disputes the allegations contained in Dkt. No. 71-1, which are incorporated into paragraph 9 of CNS's listing of undisputed facts. Specifically, the Commonwealth disputes that "[t]he overwhelming number of states and courts that have engaged in the technological transition have given access to their records online . . . through a court website." *Id.* ¶ 26. The degree to which some states, and individual courts within states, have made all nonconfidential court records available online to the general public, is a disputed fact.

The Commonwealth additionally avers that the information contained in Dkt. No. 71 ¶ 8 is irrelevant. The record is devoid of any facts as to those states' policy interests in protecting the privacy of their litigants; the record is likewise devoid of any facts showing that those systems of remote access effectively achieve those interests. In contrast, Virginia has articulated an interest in protecting the privacy of its litigants, and in protecting personal privacy generally. Va. Code § 17.1-293(A)-(B); Va. Code § 59.1-442 (the "Personal Information Privacy Act"). This Court is tasked only with deciding whether the Commonwealth would achieve these interests less effectively absent the non-attorney access and dissemination restrictions. *Ross v. Early*, 746 F.3d 546, 552 (4th Cir. 2014). Other states' practices with regards to remote access to court records have no bearing on this analysis without further facts as to their interests in protecting personal privacy and how their systems achieve those interests.

In the event of a trial, the Commonwealth would demand proof of the online access practices described in the states listed in both Dkt. Nos. 71 ¶ 9 and 71-1 ¶ 27, and for the states where individual courts provide such access, evidence of those practices by each court.

2. The Commonwealth disputes that handwritten notes present on a draft of the 2018 Work Group Report, Dkt. No. 71-14, "reflect its view that no authority may exist for clerks' concerns that non-attorney OCRA users could scrape data." Dkt. No. 71 at 10 ¶ 33.The Work Group Report stated that "[i]f the [statewide e-filing] system is publicly available, there is a high probability that certain entities will scrape the data and make the information available in commercial databases that are not under the control of OES." Dkt. No. 71-14 at 5. Alisa Padden, then Staff Attorney for OES, in response to this statement, commented: "What's the authority for this? Has it happened in other states?" *Id.*; *see also* Dkt. No. 71-13 (listing Alisa Padden as one of seven OES employees and nineteen individuals total, who "participated in the development of [the 2018 Work Group] report."). This handwritten question, added to a working draft of the report by a single individual in 2018, does not represent OES's "view that no authority may exist for clerks' concerns that non-attorney OCRA users could scrape data" in 2022. Dkt. No. 71 at 10 ¶ 33. As has been developed on the record, OES has confirmed that every publicly accessible system that it has developed has been subject to data harvesting. Dkt. No. 67 at 5-9 (discussing how General OCIS, Circuit OCIS, OCIS 2.0, and the VDBC have been mined by bots for information, with the VDBC in particular being mined for social security numbers). The Commonwealth additionally maintains that this Court can take judicial notice that data brokers routinely mine court records for information on litigants, often to target the financially vulnerable. Office of Oversight and Investigations Majority Staff, A Review of the Data Broker Industry: Collection, Use and Sale of Consumer Data for Marketing Purposes, Staff Report for Chairman Rockefeller, Dec. 18, 2013, https://www.commerce.senate.gov/services/files/0d2b3642-6221-4888-a631-08f2f255b577 at "Executive Summary" (hereinafter, the "Data Broker Report"); Fred H. Cate, *Government Data*

*Mining: The Need for a Legal Framework*, 43 Harv. C.R.-C.L. L. Rev. 435, 457 (2008).

3. The Commonwealth disputes that the privacy measures described in Dkt. No. 71 ¶¶ 43-44 achieve the Commonwealth's interest in protecting the privacy interests of its litigants. Specifically, CNS states that "[m]any circuit court cases that concern minors are confidential by statute and thus not available on OCRA", "[m]aiden names are . . . often sealed from public view", and "minor names may be sealed where the health, safety or liberty of the child is in jeopardy", and *Id.* (citations omitted). Sealing the information described in these paragraphs does not address the wide array of private information contained in state court records. *See infra* at 21. And by the qualified language it uses ("many," "often" and "may be"), CNS admits that Virginia courts can only seal or protect this particular information on a case-by-case basis.

## ARGUMENT

### I. The Constitution does not require Virginia clerks to provide unlimited remote public access to court records, but if the Court finds that requiring the public to visit a courthouse limits CNS's First Amendment rights, that limitation is nevertheless subject to relaxed scrutiny.

There is no First Amendment right to remote access to court records. No court has found that requiring records requesters to visit the courthouse to obtain copies of records violates the First Amendment, nor has CNS argued that the public has a fundamental right to remotely access civil court records. *See* Memo. Op. at 9, Dkt. No. 48. This otherwise constitutional requirement is not rendered violative of the First Amendment if a clerk chooses to offer remote record access to officers of the court. *Cf.* Dkt. No. 1 ¶ 41 ("While a Virginia Circuit Court clerk need not make its documents available for remote or online viewing, once a clerk does so . . . it becomes incumbent on the clerk to offer that same access to all members of the public and the press."). But should the Court be inclined to view courthouse visitation as restrictive to CNS's First Amendment rights, the Court should examine the non-attorney access and dissemination

restrictions under relaxed scrutiny.

A. There is no First Amendment right to remote access to court records.

No court has held that the First Amendment requires more access to court records than can be granted at the courthouse. The Supreme Court has explicitly held only that there is a First Amendment right of public access to criminal trials and criminal trial-like proceedings, and has never addressed the question of whether there is a constitutional right of access to civil proceedings or to court records. David S. Ardia, *Court Transparency and the First Amendment*, 38 Cardozo L. Rev. 836, 840 (2017). In the Fourth Circuit, only in 2021 was the First Amendment right of access to the courts extended to include access to civil complaints. *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 326 (4th Cir. 2021) ("*Schaefer*"). In *Schaefer*, the Fourth Circuit applied the "experience and logic test" to conclude that the "First Amendment right of access exists as to *some* documents submitted in conjunction with judicial proceedings that themselves would trigger a right of access," but that the public also has a right of access to nonconfidential civil complaints and docket sheets independently from the right to observe a judicial proceeding. *Id.* at 326-27 (internal quotations omitted) (emphasis added).

But the right of access the Fourth Circuit found in *Schaefer* is not unlimited. "This flexible standard does not require perfect or instantaneous access" because "the Constitution does not require the impossible." *Id.* at 328. "Rather, it provides courts with some leeway where same-day access would be impracticable, and fully exempts inconsequential delays and those caused by extraordinary circumstances." *Id.* Delays in accessing civil complaints must be "content-neutral, narrowly tailored and necessary to preserve the court's important interest in the fair and orderly administration of justice." *Id.* Accordingly, the court held that the defendant clerks had arbitrarily delayed the public's access to civil complaints, finding that the clerks could

end delays of public access to civil complaints "without changing any policies, hiring any new employees, or increasing employees' hours." *Id.* at 329. Although the clerks attempted to show "possible explanations" for the delays that occurred prior to the lawsuit, "they failed to offer facts establishing that any of these explanations action did actually cause delays." *Id.* The court observed that if the clerks "had conclusively demonstrated that the delays during this period were . . . due to inclement weather or a security threat, for example – the result might well be different." *Id.* Without that factual justification, however, the court held that the delays in accessing newly filed complaints were arbitrary and therefore an unconstitutional infringement on the public's right to access court records. *Id.*

In this case, however, any "delay" caused by OCRA's non-attorney access limitation is, in fact, due to cyber security threat. In contrast to the factually empty justifications offered by the clerks in *Schaefer*, cyber security threats to digital records compiled by the government are well-known matters of public record recognized by both Congress and the Supreme Court of the United States. *See* Dkt. No. 67 at 4-5 (discussing the Data Broker Report); *see also infra* at 7-9, 14-23. Furthermore, the Defendants have put forth uncontested evidence that granting the general public OCRA access would require a change in policies, hiring new employees or increasing the hours worked by existing employees, and expenditure of funds to build the server infrastructure for the increased traffic. *See, e.g.*, Dkt. No. 69-1, ¶¶ 6, 10-11 (Declaration of Arlington County Clerk as to costs and labor expended to comply with redaction requirements for public access to online court records); Dkt. No. 67-1 (Declaration of IT Manager for the Commonwealth detailing ongoing efforts by state employees to combat data mining on publicly-accessible court records databases). To paraphrase the Fourth Circuit: with this evidence, the result in this case should well be different than the result reached in *Schaefer*. *Id.* at 329.

The cyber security threat that justifies the non-attorney access limitation additionally illustrates why no court has found a right to remotely access data compiled by the government. As the Supreme Court has noted, mass data dissemination intrudes on privacy interests, even when that same information is disseminated in other circumstances. *See generally U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749 (1989) ("*Reporters Committee*"); *see also U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 500 (1994) ("An individual's interest in controlling the dissemination of information regarding personal matters does not dissolve simply because that information may be available to the public in some form.")

In *Reporters Committee*, reporters ("respondents") sought, under the Freedom of Information Act ("FOIA"), criminal "rap sheets" compiled by the Department of Justice and the Federal Bureau of Investigation on a group of people alleged to be "organized crime figures" accused of bribing a Congressman. *Id.* at 757. Rap sheets "contain certain descriptive information, such as date of birth and physical characteristics, as well as a history of arrests, charges, convictions, and incarcerations of the subject." *Id.* at 752. "Because events summarized in a rap sheet have been previously disclosed to the public," the respondents contended that the subject of the rap sheet had no privacy interest in the disclosure of the compiled information. *Id.* at 762-63.

The Supreme Court "reject[ed] respondents' cramped notion of personal privacy." *Id.*

> [T]he issue here is whether the compilation of otherwise hard-to-obtain information alters the privacy interest implicated by disclosure of that information. Plainly, there is a vast difference between the public records that might be found after a diligent search of courthouse files . . . throughout the country and a computerized summary located in a single clearinghouse of information.

*Id.* at 764. The Supreme Court found that the compilation of data *heightened* the individual's privacy interest in the amassed information: "The privacy interest in maintaining the practical obscurity of rap-sheet information will always be high. When the subject of such a rap sheet is a private citizen and when the information is in the Government's control as a compilation . . . the privacy interest . . . is in fact at its apex . . ." *Id.* at 780; *see also Whalen v. Roe*, 429 U.S. 589, 607 (1977) (Brennan, J., concurring) ("The central storage and easy accessibility of computerized data vastly increase the potential for abuse of that information . . .").

While the Court in *Reporters Committee* analyzed these considerations within the prism of FOIA disclosure, the Court's holding is instructive as to why a right to mass data compiled by the government is nonexistent under the First Amendment or otherwise. There is no right to unlimited remote access to "cumulative, indexed, computerized data," *id.* at 760, because such a right would, in turn, infringe upon individuals' privacy interests, which are heightened when the government compiles personal information into a single place.

In *Reporter's Committee*, the information in the rap sheet was relatively non-sensitive and limited in scope, such as charges, convictions, incarcerations. 489 U.S. at 752. In contrast, state court records contain a far broader assortment of sensitive information, including data relating to individuals' location, identity, health, assets, financial information, employment, sexual activities, and education. David S. Ardia & Anne Klinefelter, *Privacy and Court Records: An Empirical Study*, 30 Berkeley Tech L.J. 1807, 1860 at Table 4 (hereinafter, the 2015 Empirical Study). Sensitive information appears in state court records at an extremely high rate, even when redaction laws are put in place. *See id.* at 1881-1891.[1] And in Virginia, there is no

[1] For further discussion, *see* Dkt. No. 67 at 21-23; *see also infra* at 18-21.

way to segregate a user's access to particular records in OCRA. Dkt. No. 67-2, ¶ 7. Once a user has access, they have access to every record uploaded to OCRA, both civil and criminal. *Id.* This compilation heightens the privacy risk for the individuals described in the records, because as noted *supra*, court records are routinely mined for personal information, which is then sold at the expense of the most vulnerable litigants;[2] if there were a First Amendment right to remotely access compiled data, such as court records, there is no reason to believe that Virginia's court records would not be mined and exploited in the same fashion. On the contrary, Defense witness Joby Knuth is prepared to testify as to the ongoing "bot" attacks on state records databases to scrape information. Dkt. No. 67-1, ¶¶ 9-16. Finding a First Amendment right to remotely access court records would leave the Commonwealth "transformed in one fell swoop into *the* clearinghouse for highly personal information, releasing records on any person, to any requester, for any purpose." *Reporters Comm.* 489 U.S. at 761 (emphasis in the original) (quotation omitted). The First Amendment does not require Virginia to facilitate this exploitation of its own litigants.

B. If the Court is inclined to view OCRA's non-attorney access and dissemination limitations as restrictive to CNS's First Amendment rights, the Court should apply relaxed scrutiny because they resemble "time, place, and manner" restrictions.

Although CNS does not dispute that the challenged restrictions are content-neutral and viewpoint neutral, CNS argues that requiring the public to visit the courthouse during business hours to gain access to court records is a "total restraint on the public's first amendment right of access . . ." and therefore, strict scrutiny applies, directly disputing this Court's analysis in deciding the motions to dismiss. Dkt. No. 71 at 20 (quoting *Associated Press v. Dist. Ct.*, 705

[2] Office of Oversight and Investigations Majority Staff, A Review of the Data Broker Industry: Collection, Use and Sale of Consumer Data for Marketing Purposes, Staff Report for Chairman Rockefeller, Dec. 18, 2013, https://www.commerce.senate.gov/services/files/0d2b3642-6221-4888-a631-08f2f255b577 at "Executive Summary."

F.2d 1143, 1147, 1149 (9th Cir. 1983)); *cf.* Memo. Op. at 10, Dkt. No. 48.

But not only is *Associated Press* not binding on this Court, the Ninth Circuit Court of Appeals was silent as to levels of scrutiny and involved a blanket restriction on access to documents. In that case, appellants challenged a district judge's order sealing every single document filed in a certain case. *Id.* at 1144. Specifically, the judge, in response to wide press coverage, ordered that "all future filings of documents" in the matter would need to be filed *in camera* and under seal. *Id.* The order "was not accompanied by any findings" and was issued "*sua sponte*, without any notice to, or opportunity to be heard by, the parties, the press, or the public." *Id.* The court found that this "blanket order" constituted a "total restraint on the public's first amendment right of access . . ." even though some documents were unsealed after 48 hours. *Id.* at 1147.

In contrast, simply requiring CNS to visit the Prince William courthouse to access any nonconfidential court record it might want does not begin to approach the "total restraint" contemplated by *Associated Press*. And even if it did, not only is precedent from the Ninth Circuit nonbinding, the Ninth Circuit neither applied strict scrutiny nor articulated that strict scrutiny was required under the circumstances presented in *Associated Press*. Accordingly, *Associated Press* is totally inapposite to the case at bar.

Should this Court find that Smith has restricted CNS's access rights, that restriction should be examined under relaxed scrutiny because it resembles a time, place, and manner restriction. Mem. Op. at 10, Dkt. No. 48 (citing *Schaefer*, 2 F.4th at 328; *Glove Newspaper v. Superior Ct.* 457 U.S. 596, 607 n.17 (1982)). "The non-attorney access restriction challenged here does not stop CNS from accessing civil court records altogether but instead controls how and when it accesses them." Dkt. No. 48 at 10. Indeed, CNS can access court records under

Smith's custody by using a public-access terminal at the courthouse during regular business hours. Dkt. No. 55 ¶¶ 25-26. Because the record is devoid of any fact or allegation showing Smith has denied or delayed CNS access to any court record, relaxed scrutiny applies.

**II. The Code of Virginia limits OCRA access to attorneys.**

In an attempt to circumvent the constitutional argument, CNS argues that the Code of Virginia permits Virginia Clerks to grant non-attorneys access to OCRA, because Code §17.1-225 overrides Code § 17.1-293. Dkt. No. 71 at 21 ("Defendants contend that this carve-out [Code § 17.1-293] requires the Clerk to restrict remote access via OCRA to attorneys . . ."); Dkt. No. 71 at 22 ("Section 17.1-225 . . . is [not] limited to systems other than OCRA.") Applying ordinary principles of statutory interpretation, however, shows that the Code is not internally contradictory, and even if it were, the specific language of Code § 17.1-293 trumps the general language of Code § 17.1-225.

"[W]hen [a] statute's language is plain, the sole function of the courts — at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000). Applying the plain language of competing statutes, statutes employing specific language supersede statutes of general applicability. *Fourco Glass Co. v. Trasmirra Products Corp.*, 353 U.S. 222, 228 (1957). "However inclusive may be the general language of a statute, it will not be held to apply to a matter specifically dealt with in another part of the same enactment." *Id.* (citations omitted). The same principle is used to resolve apparent conflict between two statutes. *See, e.g., United States v. Estate of Romani*, 523 U.S. 517, 532 (1998) (later, more specific statute governs).

CNS argues that Code § 17.1-225 overrides the specific provisions of Code § 17.1-293, because § 17.1-225 generally permits a clerk to provide remote access to records in her custody.

Dkt. No. 71 at 22 ("Section 17.1-225 does not limit remote access to Virginia-barred attorneys, nor is it limited to systems other than OCRA.") Code § 17.1-225 authorizes Virginia clerks to "provide remote access . . . to all nonconfidential court records on an automated case management or other system maintained by his office . . ." *Id.* This section applies to any system the Clerk might use to grant remote access, whether it be OCRA or its own system, such as the Alexandria Justice Information System. *See, e.g.*, Dkt. No. 71-4; *see generally* AJIS2 System, City of Alexandria, https://ajis.alexandriava.gov/default.aspx (last visited July 18, 2022). But Code § 17.1-293 prevents a clerk from disclosing a variety of PII in any context, Va. Code § 17.1-293(A), and from posting certain PII online. Va. Code § 17.1-293(B).[3] In turn, Code § 17.1-293(E)(7) states that the prohibitions in (A) and (B) shall not apply to "[p]roviding secure remote access to nonconfidential court records . . . to members in good standing with the Virginia State Bar and their authorized agents . . ." *Id.* Thus, access to OCRA, described in Code § 17.1-293(E)(7), is clearly limited to attorneys, their staff, and authorized governmental agencies because of its categorical exemption from the dissemination prohibitions articulated in subsections (A) and (B).

Likewise, a plain language interpretation of these two statutes shows no conflict, as Code § 17.1-293, a specific statute, qualifies § 17.1-225, a statute of general applicability. Code § 17.1-225 permits a clerk to provide a system of remote access to court records in her custody; but, under § 17.1-293, if the clerk chooses her own system of remote access, then she must ensure that the information described in Code § 17.1-293(A)-(B) is not posted on that system. If, however, she selects OCRA as her system of remote access, she may forgo the prohibition described in Va. Code § 17.1-293(B) because subsection (E)(7) states that "[t]his section shall

[3] *See also* Dkt. No. 67 at 14 (discussing the types of information prohibited from disclosure in Virginia Code § 17.1-293).

not apply" to providing attorneys and their staff access to nonconfidential court records. *Id.* This plain language interpretation is bolstered by the fact the Virginia General Assembly codified Code § 17.1-225 in 1998. H 1114, 150th Gen. Assemb. Ch. 872 (1998). Eight years later, Virginia codified § 17.1-293, (S 824, H 2062, 154th Gen. Assemb. Ch. 548 (2007), and added (E)(7) four years after that. S 1369, 156th Gen. Assemb. Ch. 715 (2011). Thus, to the extent that the Court sees any conflict between the two statutes, Code § 17.1-293 governs as the later, more specific statute. *Estate of Romani*, 523 U.S. at 532. Accordingly, under Code § 17.1-225, a clerk is permitted to provide remote access to records in her custody although the records must be redacted pursuant to Virginia Code § 17.1-293(B). Pursuant to that authority, if she chooses to provide OCRA as her system of remote access to court records in her custody, then that OCRA access is limited to the individuals described in Code § 17.1-293(E)(7).

### III. OCRA's non-attorney access and dissemination restrictions further the Commonwealth's significant government interest in the fair and orderly administration of justice.

In its Motion for Summary Judgment, the Commonwealth addressed the points raised in CNS's argument that OCRA's non-attorney access and dissemination restrictions are not narrowly tailored to achieving a significant government interest. Dkt. No 71 at 22-28. Specifically, the Commonwealth has addressed the rate at which sensitive information is included in nonconfidential court filings, Dkt. No. 67 at 21-23, and the limited efficacy of redaction and subscriber agreements in preserving privacy, Dkt. No. 67 at 22-24. CNS likewise fails to acknowledge the difference in privacy interests implicated by unlimited remote access versus courthouse visitation. Dkt. No. 67 at 4-5; *supra* at 6-9. Accordingly, CNS fails to show how the Commonwealth's interests would be achieved more effectively utilizing redaction, sealing, and subscriber agreements.

A. CNS completely fails to address the unique privacy concerns raised by remote access to mass quantities of court data.

CNS fails to appreciate how modern technology has sharpened individuals' privacy interest in information compiled by the government. While OCRA contains the same records that are available at the courthouse, Dkt. No. 55 ¶ 49, the facility of complete and instantaneous access to all records within a given jurisdiction via OCRA heightens the potential for abuse of the information contained within those records. CNS ignores this potential for abuse, arguing that because the information is already public, the Commonwealth cannot require the public to visit the court for copies of court records. Dkt. No. 71 at 24. "Defendants only assert[] a general concern about protecting private information without any specifics, and any information that the Clerk seeks to protect is *already public*." *Id.* (emphasis in the original). The Supreme Court has repeatedly rejected CNS's idea that there is no privacy interest in public records. *U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. at 500 ("An individual's interest in controlling the dissemination of information regarding personal matters does not dissolve simply because that information may be available to the public in some form."). In fact, the government's compilation of personal information into a single place heightens that privacy interest, specifically because it increases the risks of abuse of that information. *Reporters Comm.*, 489 U.S. at 780; *see also Whalen v. Roe*, 429 U.S. 589, 607 (1977) (Brennan, J., concurring). CNS wholly fails to address the unique privacy concerns posed by mass data accessibility, which simply are not implicated by courthouse visitation.

The risk that court records will be abused to the detriment of Virginia litigants is not an abstract threat—Virginia court records *will* be abused by data miners if OCRA is opened to the public. Congress has specifically noted that court records on PACER are regularly mined for data. *See* Data Broker Report at 15. The Data Broker Report went to great lengths to describe

how the digital availability of records on PACER enables data brokers to exploit vulnerable groups. *Id.* at 24, Table 1.

For example, consumer credit reporting company Experian markets a "ChoiceScore" service, which the company asserts "helps marketers identify and more effectively market to under-banked consumers." *Id.* at 25. (citation omitted). "These consumers include 'new legal immigrants, recent graduates, widows, those with a generation bias against the use of credit, followers of religions that historically have discouraged credit,' and 'consumers with transitory lifestyles, such as military personnel.'" *Id.* (citation omitted). Experian suggests using the product to identify these groups, and then target them with direct-marketing offers for risky fiscal transactions such as payday loans, check-cashing services, target invitation-to-apply credit card offers, among others. *Id.* at 26.

The Office of the Attorney General for the State of Vermont has identified even more disturbing lists sold by data brokers and harvested from public records accessed digitally. Office of the Attorney General Department of Financial Regulation, Report to the Vermont General Assembly of the Data Broker Working Group (December 15, 2017), https://ago.vermont.gov/wp-content/uploads/2018/02/2017-12-15-Data-Broker-Working-Group-Report.pdf ("Vermont report"). The Vermont reports references the testimony of Pam Dixon, Executive Director, World Privacy Forum, before the Senate Committee on Commerce, Science, and Transportation on December 18, 2013. *Id.* at 4. She reported that the following list products are available for sale and have been sold by data brokers:

- Rape survivors
- Addresses of domestic violence shelters (which keep their locations secret under law)
- Police officers' and state troopers' home addresses
- Genetic disease sufferers
- Senior citizens suffering from dementia

- HIV/AIDS sufferers
- People with addictive behaviors and alcohol, gambling and drug additions
- People with diseases and prescriptions taken (including cancer and mental illness)
- Consumers who might want payday loans, including targeted minority groups
- People with low consumer credit scores

*Id.* at 8. In addition to making it easier to prey on the financially vulnerable, the Vermont report noted that data brokers enabled stalking and harassing, as well as identity theft, scams, and other forms of fraud. *Id.*; *see also* Data Broker Report at 26 (highlighting how telemarketing criminals purchased name and contact information from a data broker to raid the bank account of a 92-year old Army veteran).

At the state level, there is no real way to prevent or police data brokers' misuse of remotely accessible public records. While some data brokers assert that internal policies "ensure that information is used properly," because data brokers operate in the shadows, with little oversight or regulation "companies in this industry have discretion regarding their voluntary enforcement of such restrictions." *Id.* "Indeed, an investigation into [data broker] InfoUSA showed that employees routinely ignored rules about selling data to known fraudsters," and "three of the largest companies – Acxiom, Experian, and Epsilon – to date have declined to disclose their customers to this Committee." *Id.* (citation omitted).

Mass data harvesting from court records accessed online not only poses a threat to vulnerable individuals, it can pose further threats to national security and democracy. Justin Sherman, *Data Brokers and Sensitive Data on U.S. Individuals: Threats to American Civil Rights, National Security, and Democracy*, Duke Sanford School of Public Policy, Cyber Policy Program, https://sites.sanford.duke.edu/techpolicy/report-data-brokers-and-sensitive-data-on-u-s-individuals/ (last visited July 21, 2022). For example, data brokers have sold products which can micro-target individuals with election disinformation intended to sow chaos or dissuade voter

participation. *Id.* at 11 (citations omitted). Likewise, data brokers openly and explicitly advertise data on current and former U.S. military personnel, which, because of any lack of accountability, can be sold to organizations which might use the information for "coercion, blackmail, or intelligence-gathering." *Id.* Virginia disproportionately bears this security risk, as the Commonwealth is home to more active duty servicemembers than any other state besides California.[4]

In sum, remote access to mass data poses a bevy of risks to both individuals and society with little accountability for those who abuse access to those records. On the other hand, requiring the public to visit the courthouse to print records minimizes those risks because it shifts the costs of policing abuse to the would-be data harvester. As CNS admits "[i]t is simply not possible for a news service . . . to send reporters on a daily basis, if at all, to the 120 courts throughout the Virginia circuit court system . . ." Dkt. No. 71 at 1. Data brokers face the same limitations. The record is absent of evidence that mass data brokers like Acxiom physically visit courthouses in Virginia to print volumes of court records to mine for information, because doing so is not cost-effective; yet, the record is replete with examples of both data brokers harvesting court records remotely, as discussed *supra*, and unknown entities scraping publicly accessible court databases in Virginia. Declaration of Joby Knuth, Dkt. No. 67-1.

The foregoing illustrates that the concerns articulated by the Supreme Court in *Reporters Committee*, 489 U.S. at 780, have been fully realized: when the government digitally compiles data into a single location, the privacy interest in that information is heightened because its exposure risks abuses not faced when that same information is only available physically. This

[4] U.S. Dep't of Def., 2019 Demographics: Profile of the Military Community, https://download.militaryonesource.mil/12038/MOS/Reports/2019-demographics-report.pdf (last visited July 26, 2022) at 33.

potential for abuse is the key distinction between records made available via courthouse visitation and those made available remotely to anyone, which are routinely and consistently mined for information to the detriment of litigants. OCRA's non-attorney access and dissemination restrictions mitigate the potential for abuse by limiting remote access to lawyers, a pre-vetted group of individuals who have significant professional and personal reasons to refrain from abusing the privilege of remote access.

B. Not only is redaction ineffective at concealing personally identifiable information, redaction laws would not apply to many types of sensitive information.

CNS argues that, in Virginia, "because the filing party is required to redact much of the information Defendants are concerned about . . . a less restrictive alternative is already in place with respect to this particular information." Dkt. No. 71 at 4. The First Amendment, however, does not prevent the Commonwealth from taking additional measures to prevent the widespread dissemination of its litigants' private information. *Ross v. Early*, 746 F.3d 546, 552-53 (4th Cir. 2014) (holding that under relaxed scrutiny "the regulation need not be the least restrictive or least intrusive means of serving the government's significant interests."). Instead, under relaxed scrutiny, this Court need only consider whether the Commonwealth's interest in preventing the widespread dissemination of private information "would be achieved *less effectively* absent the regulation . . ." *Id.* (emphasis added).

Redaction is an ineffective solution in protecting the privacy of litigants. To illustrate this point, in 2010, Paul Ohm, a leading privacy scholar, found that computer scientists "have demonstrated that they can often 'reidentify' or 'deanonymize' individuals hidden in anonymized data with astonishing ease." Paul Ohm, *Broken Promises of Privacy: Responding to the Surprising Failure of Anonymization*, 57 UCLA L. Rev. 1701 (2010). In particular, Ohm studied three well-known events: the 2006 AOL data release, the Massachusetts Group Insurance

Commission's release of "de-identified" medical records, and the 2006 Netflix prize data study. *Id.* at 1717-1721. Each of these cases revealed that people can be uniquely identified using small amounts of information, such as zip code, birth date, and sex (none of which are protected as "personally identifiable information," or PII, under Virginia law). *Id.* at 1705 (finding that, for 87% of the American population, zero other people share the same combination of ZIP code, birth date, and sex). In response, some areas of federal law, such as HIPAA, have broadened their definitions of redactable PII to include ZIP codes, sex, and birth date. 45 C.F.R. §§ 164.502(d)(2), 164.514(a)-(b) (2000). But privacy scholars have noted that indefinitely broadening what constitutes PII will prove ineffective, because "[w]hile some data elements may be uniquely identifying on their own, *any* element can be identifying in combination with others." Arvind Narayanan & Vitaly Shmatikov, De-Anonymizing Social Networks, https://www.cs.utexas.edu/~shmat/shmat_oak09.pdf (last visited July 26, 2022) at 18 (emphasis in the original).

The Netflix prize data study is particularly revealing as to the inefficacy of redaction because it shows that anonymized individuals can be "reidentified" using trivial personal information, such as how they rate movies. In 2006, in an effort to improve its film recommendations, Netflix publicly released "one hundred million records revealing how nearly a half-million of its users had rated movies from December 1999 to December 2005." Paul Ohm, *Broken Promises of Privacy: Responding to the Surprising Failure of Anonymization*, 57 UCLA L. Rev. 1701, 1720 (2010) (citation omitted). "In each record, Netflix disclosed the movie rated, the rating assigned . . . and the date of the rating," but first "anonymized the records, removing identifying information like usernames, but assigning a unique user identifier to preserve rating-to-rating continuity." *Id.* Only two weeks after the data release, researchers from the University

of Texas announced that people within the database could be easily reidentified and discover all of the movies they have rated with only a little outside knowledge about their movie-watching preferences. *Id.* The resulting report, released in 2008, showed that if an "adversary" knows how a Netflix user had rated six movies, and nothing else, that person could be identified 84 percent of the time. *Id.* (citation omitted). If an adversary knows only two movies a rating user had viewed, with the dates the ratings were made (give or take three days), the adversary can reidentify 68 percent of the users. *Id.* (citation omitted).

Redaction is likewise ineffective at maintaining privacy in court records, as Judge Posner noted in *Northwestern Memorial Hospital v. Ashcroft*, 362 F.3d 923, 929 (7th Cir. 2004). In that case, quashing a government subpoena for redacted medical records relating to late-term abortions performed at a hospital, Judge Posner stated:

> Some of these women will be afraid that when their redacted records are made a part of the trial record in New York, persons of their acquaintance, or skillful "Googlers," sifting the information contained in the medical records concerning each patient's medical and sex history, will put two and two together, "out" the 45 women, and thereby expose them to threats, humiliation, and obloquy. As the court pointed out in *Parkson v. Central DuPage Hospital* . . . "whether the patients' identities would remain confidential by the exclusion of their names and identifying numbers is questionable at best. The patients' admit and discharge summaries arguably contain histories of the patients' prior and present medical conditions, information that in the cumulative can make the possibility of recognition very high."

*Id.* (quoting *Parkson v. Central DuPage Hospital*, 436 N.E.2d 140, 144 (Ill. 1982)).

Not only is redaction inefficient at concealing the identity of individuals, the redaction requirements in Virginia Code § 8.01-420.8 do not apply to many types of private information harvested by data brokers for exploitation. Code § 8.01-420.8 requires only that a party redact "a social security number or other identification number appearing on a driver's license . . ., or on a credit card, debit card, bank account, or other electronic billing and payment system . . ." *Id.* But

court records contain wide varieties of private information beyond just these listed categories. *See, e.g., David S. Ardia & Anne Klinefelter, Privacy and Court Records: An Empirical Study*, 30 Berkeley Tech. L.J. 1807, 1860 Table 4 (finding that personal information relating to criminal proceedings, identity, and location was present in over half of studied filings in the North Carolina Supreme Court, while personal information relating to health, assets, and financial information was present in 41%, 35%, and 27%, respectively).

There is no reason to believe that records from Virginia would differ from those studied in North Carolina. The Virginia circuit courts process a very high volume of cases with filings reflecting high amounts of sensitive information, such as domestic relations cases (11, 921 cases in 2021), felonies (103,920 in 2021), and probate matters (3,005 in 2021). Caseload Statistical Information: Circuit Court Caseload reports, Virginia's Judicial System, cr01_2021_dec.pdf (vacourts.gov) (last visited July 27, 2022); *see also id.* at cr01_2021_dec.pdf (vacourts.gov) (reflecting filings by case category in the Circuit Court of Prince William County). If made available online, redaction would not protect any of the sensitive information contained in these filings, which would be harvested and sold by data brokers to the detriment of, for example, rape victims, genetic disease sufferers, and senior citizens, to name only a few. *See* discussion of data broker lists, *supra* at 13-14.

C. Sealing court records is inefficient and ineffective at protecting private information.

CNS argues that a "less restrictive alternative is already in place with respect to minor and maiden names" in the form of sealing. Dkt. No. 71 at 25. But for the same reasons redaction is ineffective at preventing mass data harvesting, so is sealing. The two examples of sealing offered by CNS simply do not address the private information described in the 2015 Empirical Study. Nor would more sealing address Virginia's interest in the fair and orderly administration

of justice. Sealing is a burdensome and expensive process for the court and litigants and expanding Virginia's sealing requirements would prompt more First Amendment litigation, as many of the cases to which CNS cites make plain. *See, e.g., Va. Dept. of State Police v. Washington Post*, 386 F.3d 567 (4th Cir. 2004); *Associated Pres v. Dist. Ct.*, 705 F.2d 1143 (9th Cir. 1983); *Doe v. Public Citizen*, 749 F.3d 246 (4th Cir. 2014).

D. Subscriber agreements have proven ineffective at preventing data harvesting.

Finally, CNS suggests that private information available on OCRA will not be subject to widespread dissemination if opened to the public because subscriber agreements ensure that "OCRA records are not available to any anonymous internet user." Dkt. No. 71 at 26. But PACER, which likewise requires a subscription fee and user agreement, is mined by data brokers routinely. Fred H. Cate, *Government Data Mining: The Need for a Legal Framework*, 43 Harv. C.R.-C.L. L. Rev. 435, 457 (2008). Nor have PACER's subscriber requirements proven effective at preventing significant data breaches. Maggie Miller, Justice Department Investigating Data Breach of Federal Court System (July 28, 2022, 8:49PM), https://www.politico.com/news/2022/07/28/justice-department-data-breach-federal-court-system-00048485 (discussing House Judiciary Committee Chair Jerrold Nadler's report that "three hostile foreign actors" had attacked the federal judiciary's Case Management/Electronic Case Files system); United States Courts, Judiciary Addresses Cybersecurity Breach: Extra Safeguards to Protect Sensitive Court Records (January 6, 2021), https://www.uscourts.gov/news/2021/01/06/judiciary-addresses-cybersecurity-breach-extra-safeguards-protect-sensitive-court. Likewise, OES has confirmed that at least one subscriber-based database it maintains is regularly scraped for social security numbers. *See* Dkt. No. 67 at 23-24 (discussing current data-scraping of the OES-maintained Virginia Date of Birth

Confirmation system).

CNS argues that these "less restrictive safeguards work" in preventing widespread dissemination of private information but fails to provide any empirical data in support of that assertion. Dkt. No. 71 at 26. Under relaxed scrutiny, the Court need only consider how *effective* these alternative restrictions would be at protecting sensitive information from widespread disclosure, because a "regulation will not be invalid simply because a court concludes that the government's interests could be adequately served by some less-speech restrictive alternative." *Ward v. Rock Against Racism*, 491 U.S. 781, 800 (1989). In this case, the overwhelming weight of empirical evidence shows that the Commonwealth's interest in protecting the privacy of its litigants would be achieved far less effectively if it made court records generally available via remote public access.

**IV. CNS has failed to show it is entitled to injunctive relief.**

A. CNS has failed to show that it will suffer irreparable injury.

CNS has failed to show it will suffer irreparable injury absent an injunction because it can immediately access court records in the Prince William Circuit Court. CNS argues that "access restrictions that violate the First Amendment necessarily constitute irreparable harm," citing *Legend Night Club v. Miller*, 637 F.3d 291 (4th Cir. 2011). But in *Legend*, the appellants challenged a statute which would revoke their license to sell alcoholic beverages if the night club allowed certain attire and conduct on business premises. *Id.* at 295-96. In that case, the "threatened injury" was the imminent threat of license revocation, which would significantly affect the night club's business operations. *Id.* at 302. "At a minimum, each Plaintiff faces a loss of its license coupled with a loss of valuable business opportunities." *Id.*

In contrast, CNS has not articulated a future injury that CNS will incur should the Court

deny its request for an injunction. CNS will continue to visit the Prince William Courthouse each day to collect civil filings, where it can view every civil filing it desires "immediately," as CNS has stipulated. Dkt. No. 71 ¶ 35. This "restriction" of having to visit the courthouse to obtain copies of court filings has never been found to violate the First Amendment, nor would it affect CNS's current business practices.

B. The balance of equities and the public interest favor the Commonwealth.

CNS argues that there "can be no irreparable harm to a governmental entity when it is prevented from enforcing an unconstitutional statute . . ." Dkt. No. 71 at 30 (citation and internal quotations omitted). CNS has neither identified any harm it will incur in the future should the Court refrain from issuing an injunction, nor articulated why having to visit the courthouse to view court records is unconstitutional. On the other hand, the Commonwealth and Smith will both suffer substantial hardships should the Court require OCRA be opened to the public. *See* Declaration of Michael Riggs, Dkt. No. 67-1 at 9, ¶ 6 (discussing the cost of OCRA to Virginia clerks). If an injunction is granted, if a clerk chooses to continue offering OCRA, pursuant to Code § 17.1-293(B), the clerk would be forced to redact every single record in her custody before posting to OCRA, both civil and criminal. As Smith has identified, this would significantly increase redaction costs. Declaration of Paul Ferguson, Dkt. No. 67-3 at 2, ¶ 11. Should a clerk decide that redaction would be too costly, the Clerk may forgo offering OCRA altogether, resulting in wasted costs in purchasing and maintaining electronic servers stored at the courthouse. Dkt. No. 67-1 at 1-2, ¶ 3. Such a decision would carry a high cost to Virginia litigants as well, as their lawyers would instantaneously lose remote access to court records, frustrating the administration of justice. Time spent traveling to and from courthouses, and funds spent on printing pages, would be passed from lawyers on to the litigants. And finally, Virginia

litigants would suffer immeasurable costs in terms of privacy exposure to data brokers, scam artists, and stalkers, as discussed *supra*.

## CONCLUSION

Wherefore, for the foregoing reasons, the Commonwealth respectfully requests that this Court deny Courthouse News Service's Motion for Summary Judgment, and award the defendants any further relief that the Court deems necessary and proper.

Respectfully submitted,

COMMONWEALTH OF VIRGINIA

By: */s/ Robert B. McEntee, III*
Counsel

Jason S. Miyares
*Attorney General*

Steven G. Popps
*Deputy Attorney General*

Jacqueline C. Hedblom
*Senior Assistant Attorney General/*
*Acting Trial Section Chief*

Robert B. McEntee, III (VSB No. 89390)
Erin R. McNeill (VSB No. 78816)
Assistant Attorneys General
Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-8198 – Telephone
(804) 371-2087 – Facsimile
rmcenteeiii@oag.state.va.us
emcneill@oag.state.va.us

## CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2022, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record for the parties.

*/s/ Robert B. McEntee, III*
Robert B. McEntee, III

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| COURTHOUSE NEWS SERVICE, | ) | |
| | ) | |
| *Plaintiff,* | ) | Civil Action No. 3:21-cv-00460-HEH |
| v. | ) | |
| | ) | |
| JACQUELINE C. SMITH, *et al*., | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

**COURTHOUSE NEWS SERVICE'S MEMORANDUM OF LAW**
**<u>IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT</u>**

**BRYAN CAVE LEIGHTON PAISNER LLP**
Jonathan E. Ginsberg (admitted *pro hac vice*)
1290 Avenue of the Americas
New York, New York 10104
Tel: (212) 541-2000
Fax: (212) 541-4630
jon.ginsberg@bclplaw.com

**TROUTMAN PEPPER**
**HAMILTON SANDERS LLP**
Dabney J. Carr, IV (VSB No. 28679)
P.O. Box 1122
Richmond, Virginia
Tel: (804) 697-1238
Fax: (804) 697-1339
dabney.carr.@troutman.com

*Counsel for Plaintiff*
*Courthouse News Service*

# TABLE OF CONTENTS

**Page**


**PRELIMINARY STATEMENT** ........ **1**

**COUNTERSTATEMENT OF UNDISPUTED FACTS** ........ **2**

A. Response to Commonwealth's Facts Section ........ 2

B. Response to the Clerk's Statement of Undisputed Facts ........ 7

C. CNS' Statement of Undisputed Facts in Opposition to Defendants' Motions ........ 10

**ARGUMENT** ........ **10**

A. Defendants Concede There Is a First Amendment Right of Access to Civil Court Records ........ 11

B. Defendants Fail to Carry Their Burden of Showing that Their Policies and Practices, and Reliance on the Virginia Code, Survive Constitutional Scrutiny ........ 12

1. Defendants Fail to Demonstrate that the Virginia Code Compels the Challenged Restrictions, and Even if it Did, the Requirements of the First Amendment Trump the Code ........ 14
2. Defendants Fail to Demonstrate That the Challenged Restrictions are Supported By a Compelling or Significant Government Interest ........ 16
3. Defendants Fail to Demonstrate that the Challenged Restrictions are Narrowly Tailored ........ 18

**CONCLUSION** ........ **30**

**TABLE OF AUTHORITIES**

**Cases** **Page**

*Associated Press v. Dist. Ct.*,
705 F.2d 1143 (9th Cir. 1983) ....................13

*Barber v. Conradi*,
51 F. Supp. 2d 1257 (N.D. Ala. 1999)....................20

*Bartnicki v. Vopper*,
532 U.S. 514 (2001)....................13

*Bernstein v. Bernstein Litowitz Berger & Grossman LLP*,
814 F.3d 132 (2d Cir. 2016)....................11, 19

*Bowman v. Johnson*,
2011 WL 1167320 (E.D. Va. Mar. 24, 2011)....................3

*In re Charlotte Observer*,
921 F.2d 47 (4th Cir. 1990) ....................19

*Courthouse News v. Forman*,
2022 WL 2105910 (N.D. Fla. June 10, 2022) ....................28, 29

*Courthouse News v. Gabel*,
2021 WL 5416650 (D. Vt. Nov. 19, 2021)....................25

*Courthouse News v. Planet*,
947 F.3d 581 (9th Cir. 2020) .................... *passim*

*Courthouse News v. Quinlan*,
32 F.4th 15 (1st Cir. 2022)....................11

*Courthouse News v. Schaefer*,
2 F.4th 318 (4th Cir. 2021) .................... *passim*

*Courthouse News v. Tingling*,
2016 WL 8739010 (S.D.N.Y. Dec. 16, 2016) ....................26

*Consol. Edison Co. v. Pub. Serv. Comm'n*,
447 U.S. 530 (1980)....................14

*Cox Broadcasting Corp. v. Cohn*,
420 U.S. 469 (1975)....................13

*Doe v. Public Citizen*,
749 F.3d 246 (4th Cir. 2014) ....................10, 11

*Educ. Media Co. at Virginia Tech v. Insley*,
731 F.3d 291 (4th Cir. 2013) ....................................................................................15

*Francisco v. Verizon S., Inc.*,
756 F. Supp. 2d 705 (E.D. Va. 2010), *aff'd* 442 F. App'x 752 (4th Cir. 2011)........................3

*Greater Balt. Ctr. For Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*,
721 F.3d 264 (4th Cir. 2013) ....................................................................................15

*Holmes v. Gen. Dynamics Mission Systems, Inc.*,
835 Fed. App'x 688 (4th Cir. 2020)..........................................................................4

*Hoyle v. Freightliner, LLC*,
650 F.3d 321 (4th Cir. 2011) ......................................................................................4

*McCullen v. Coakley*,
573 U.S. 464 (2014)......................................................................................13, 14, 24

*News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*,
612 F.3d 301 (4th Cir. 2010) ....................................................................................11

*Ostergren v. Cuccinelli*,
615 F.3d 263 (4th Cir. 2010) ...............................................................................20, 21

*Press-Enterprise Co. v. Superior Court of California for Riverside Cnty.*,
478 U.S. 1 (1986).............................................................................................. *passim*

*Reynolds v. Middleton*,
779 F.3d 222 (4th Cir. 2015) ....................................................................................13

*Richmond Med. Ctr. for Women v. Herring*,
570 F.3d 165 (4th Cir. 2009) (en banc) ....................................................................15

*Robinson v. Fenner*,
2021 WL 771753 (E.D. Va. Feb. 26, 2021)..................................................................9

*Rushford v. New Yorker Mag., Inc.*,
846 F.2d 249 (4th Cir. 1988) ....................................................................................10

*Seattle Times Co. v. Rhinehart*,
467 U.S. 20 (1984)....................................................................................................20

*Soderberg v. Carrion*,
999 F.3d 962 (4th Cir. 2021) ....................................................................................14

*Sorrell v. IMS Health, Inc.*,
564 U.S. 552 (2011)...................................................................................................20

*Stone v. Univ. of Maryland Medical System Corp.*,
855 F.2d 178 (4th Cir. 1988) ........................................................ 10-11

*SwimWays Corp. v. Zuru, Inc.*,
2014 WL 3615981 (E.D. Va. July 18, 2014)........................................................3

*Turner Broad. Sys. v. F.C.C.*,
512 U.S. 662 (1994)........................................................................................13

*U.S. Dep't of Justice v. Reporters Committee for Freedom of the Press*,
489 U.S. 749 (1989)........................................................................................19, 21

*U.S. v. Bissonnette*,
2021 WL 1438309 (E.D. Va. Mar. 24, 2021)........................................................3

*U.S. v. Taylor*,
2011 WL 13195944 (E.D. Va. Mar. 3, 2011)........................................................3

*Va. Dept. of State Police v. Washington Post*,
386 F.3d 567 (4th Cir. 2004) ..........................................................10, 11, 13, 19

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989)........................................................................................14

**Statutes and Rules**

Fed. R. Civ. P. 37(c)(1)........................................................................................4

Local Rule 56(B)........................................................................................ *passim*

Va. Code 17.1-293 ...................................................................................... *passim*

Va. Code § 8.01-217(G)........................................................................................22

Va. Code § 8.01-314 ..........................................................................................23

Va. Code § 8.01-420.8(A)....................................................................................21, 22

Va. Code § 17.1-225 ..........................................................................................8, 16

Va. Code § 17.1-294(B)........................................................................................21

**Other Authorities**

David S. Ardia & Anne Klinefelter, *Privacy and Court Records: An Empirical Study*, 30
Berkeley Tech. L.J. 1807 (2015) ........................................................................18

David S. Ardia, *Privacy and Court Records: Online Access and the Loss of Practical Obscurity*,
2017 U. Ill. L. Rev. 1385 (2017)........................................................................24

Fred H. Cate, *Government Data Mining: The Need for a Legal Framework,* 43 Harv. C.R.-C.L. L. rev. 435 (2008)........................................................................................25

Oversight and Investigations Majority Staff, *A Review of the Data Broker Industry: Collection, Use, and Sale of Consumer Data for Marketing Purposes* (Dec. 18, 2013)............................25

## PRELIMINARY STATEMENT

Defendants' motions for summary judgment ignore that in order to survive constitutional scrutiny they must demonstrate, with record evidence, that the Non-Attorney Access and Dissemination Restrictions, which blackout the press and public in favor of Virginia-barred attorneys and their staff, are justified by a compelling or significant interest and that withholding remote access and prohibiting the dissemination of information accessed remotely is narrowly tailored to serve those interests. Defendants do not do so. This alone warrants denial of their motions, as well as summary judgment in favor of CNS.[1]

Instead of pointing to factual evidence, Defendants set forth a parade of horribles as to what *might* happen if non-attorneys are provided with remote access to civil filings via OCRA – a permissions-based system that requires the Clerk to vet and approve subscribing users – even though they admit that the same non-confidential records are already available on public access terminals at the Prince William Court (and other Virginia circuit courts). There is no difference in the content of the court records that CNS and other members of the press and public must travel to each individual court to see, on the one hand, and the court records that Virginia-barred attorneys can see remotely via OCRA, on the other hand.

Despite this reality, Defendants seek to justify the challenged restrictions based on generalized concerns of privacy, but they fail to square their concerns with the fact that less restrictive alternatives, such as requiring filer redaction, as well as subscriber agreements, already exist. And they ignore that all federal district courts and courts in at least 38 states –

[1] For brevity and the convenience of both the Court and the parties, CNS submits this single memorandum of law in opposition to each motion for summary judgment, as the factual and legal issues are inextricably linked. All capitalized terms not defined herein shall have the meanings assigned to them in CNS' memorandum of law in support of its summary judgment motion, Dkt. No. 71 ("CNS Br.").

including the Alexandria Circuit Court – provide the press and public with remote access to new civil filings via secure court websites. Defendants' motions, which lack evidentiary foundation, offer no basis for concluding that the Clerk, and other Virginia circuit courts that offer OCRA, cannot provide the same remote access that other courts already do.

Defendants rely on a tortured reading of Va. Code § 17.1-293 as part of their effort to justify the restriction of access to *all* civil filings – regardless of whether they actually contain personal identifiers – but the plain language of the statute does not mandate that non-attorneys should be precluded from accessing or disseminating information accessed remotely. And consistent with *Press-Enterprise Co. v. Superior Court of California for Riverside Cnty.*, 478 U.S. 1 (1986) ("*Press-Enterprise II*") and its progeny, even if the Virginia Code did mandate the challenged restrictions, the First Amendment trumps the code.

## COUNTERSTATEMENT OF UNDISPUTED FACTS

### A. Response to Commonwealth's Facts Section

As a threshold matter, the Commonwealth's "facts" section violates Local Rule 56(B). Contrary to the requirements of that Rule, the Commonwealth does not "list[ ] all material facts" nor does it, for the most part, "cit[e] the parts of the record relied on to support" the alleged facts. Instead, the Commonwealth provides a narrative, in paragraph form – relying mainly on law review articles, blog posts, and other secondary sources – in an effort to "demonstrate that OCRA would be particularly vulnerable to malicious and exploitative data mining if it were available to the public at large." Commonwealth's Memorandum of Law in Support of its Motion for Summary Judgment, Dkt. No. 67 ("Comm. Br.), at 3. Not only does the narrative form make it near impossible for CNS to meaningfully respond to the Commonwealth's alleged "facts," but perhaps more significantly, the Commonwealth's reliance on unauthenticated

secondary sources, many of which constitute hearsay, are inadmissible on a motion for summary judgment. *See, e.g., U.S. v. Taylor*, 2011 WL 13195944, at *3-4 (E.D. Va. Mar. 3, 2011) ("the Fourth Circuit has 'consistently held that newspaper articles are inadmissible hearsay to the extent they are introduced 'to prove the factual matters asserted therein'") (internal citations omitted); *Francisco v. Verizon S., Inc.*, 756 F. Supp. 2d 705, 713 (E.D. Va. 2010), *aff'd* 442 F. App'x 752 (4th Cir. 2011) ("[h]earsay evidence, inadmissible at trial, is likewise insufficient to support a motion for summary judgment" and "unsworn, unauthenticated documents cannot be considered on a motion for summary judgment") (quoting *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993)). Accordingly, the Commonwealth's motion should be denied for failing to comply with Local Rule 56(B), *U.S. v. Bissonnette*, 2021 WL 1438309, at *7 (E.D. Va. Mar. 24, 2021); *Bowman v. Johnson*, 2011 WL 1167320, at *3 (E.D. Va. Mar. 24, 2011), or at the very least, the Court should disregard all statements contained in the Commonwealth's fact section that are not supported by a record cite. *SwimWays Corp. v. Zuru, Inc.*, 2014 WL 3615981, at *9 (E.D. Va. July 18, 2014).

Notwithstanding the above, CNS responds to the Commonwealth's "Facts" as follows:

With respect to the first paragraph, Comm. Br. at 3, it is undisputed that the parties' Joint Stipulations of Fact, Dkt. No. 55 ("JSF"), provide the relevant facts in this case. The remainder of that paragraph is not supported by any record cites, but to the extent it requires a response, CNS disputes that "OCRA would be particularly vulnerable to malicious and exploitative data mining if it were available to the public at large," in light of redaction practices and subscriber agreements that are already in place, *see* CNS. Br., Statement of Undisputed Material Facts ("SUF") ¶¶ 24, 26-27, 39-44; and considering that the practices of all federal district courts and

courts in at least 38 other states that provide remote access to civil filings to the press and public without issue. JSF ¶¶ 10-11; Girdner Decl. [attached to Dkt. No. 71] ¶¶ 26-27.

With respect to the second paragraph, Comm. Br. at 3-4, the statements within that are based on unsworn, unauthenticated secondary sources constitute inadmissible hearsay with no evidentiary weight. CNS also notes that the Commonwealth's citations to statutory provisions and case law do not satisfy Local Rule 56(B).

With respect to the third paragraph, Comm. Br. at 4-5, the statements within are based on unsworn, unauthenticated secondary sources. They constitute inadmissible hearsay with no evidentiary weight.

With respect to the fourth paragraph, *id.* at 5-6, the Declaration of Joby Knuth ("Knuth Declaration") is not entitled to any evidentiary weight, as that declaration is submitted by a witness who was not disclosed until after the close of discovery, *see* Exhibit A hereto, and contains statements of expert opinion which were not disclosed as required under the Court's Pretrial Schedule A [Dkt. No. 28-1]. *See* Fed. R. Civ. P. 37(c)(1) ("[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion…"); *Holmes v. Gen. Dynamics Mission Systems, Inc.*, 835 Fed. App'x 688, 691 (4th Cir. 2020) (affirming district court's decision to strike from the summary judgment record a declaration from a witness disclosed after the close of discovery); *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 330 (4th Cir. 2011) (same). Nonetheless, to avoid any doubt, CNS disputes that any supposed data mining in Virginia's publicly available court databases, other than OCRA, are relevant to the constitutional inquiry at

issue.[2] CNS also notes that the Commonwealth's citation to the Virginia Code does not satisfy Local Rule 56(B), but CNS does not dispute that OES "must comply with Virginia's laws…."

With respect to the fifth paragraph, Comm. Br. at 6-7, CNS does not dispute those portions that cite to the parties' joint stipulation of facts, Dkt. No. 55. Moreover, as explained above, the statements based on the Knuth Declaration are not entitled to any evidentiary weight. Nonetheless, to avoid any doubt, CNS does not dispute the existence of the applications described in this paragraph but denies that those applications are material to this matter.

With respect to the sixth paragraph, Comm. Br. at 7, the statements within are based on the Knuth Declaration, which is not entitled to any evidentiary weight.[3] Nonetheless, to avoid any doubt, CNS disputes that supposed "data harvesting tactics" with respect to General OCIS and Circuit OCIS – neither of which is a permissions-based system – support the Non-Attorney Access or Dissemination Restrictions or are material to this matter. *See infra* at 27.

With respect to the seventh paragraph, Comm. Br. at 7-8, the statements within are based on the Knuth Declaration, which is not entitled to any evidentiary weight. Nonetheless, to avoid any doubt, CNS does not dispute the Commonwealth's description of the Virginia Date of Birth Confirmation ("VDBC") system, but it does dispute that "one can glean PII by coding an

---

[2] CNS, however, does not believe that any issues of fact raised by either of Defendants' motions are material to the determination of the parties' respective summary judgment motions.

[3] The statements in this paragraph should also be disregarded because they involve events that took place in 2010, ten years before Mr. Knuth was employed at OES. In 2010, Mr. Knuth was employed by an independent contractor serving the Supreme Court of Virginia, *see* Knuth Decl. ¶ 1, and his declaration provides no foundation establishing that he has personal knowledge of any alleged data mining of Virginia's General District Court Online Case Information System ("General OCIS") or Circuit Court Online Case Information System ("Circuit OCIS") in 2010.

algorithm with partial PII and determine by process of elimination," which is based on speculation not factual evidence.[4]

With respect to the eighth paragraph, Comm. Br. at 8, the statements within are based on the Knuth Declaration, which is not entitled to any evidentiary weight and constitutes an undisclosed expert opinion. Nonetheless, to avoid any doubt, CNS disputes that VDBC requires a registrant agreement similar to OCRA's subscriber agreement; VDBC does not require a paid subscription service, like OCRA. JSF ¶ 43, Ex. B.[5] Thus, VDBC's registrant agreement has no bearing on the issues herein. Moreover, the statement concerning "bots" searching VDBC to "guess" social security numbers is not substantiated by the Knuth Declaration, which also does not present any evidence to establish that any data purportedly mined from VDBC has been used for nefarious purposes.

With respect to the ninth paragraph, Comm. Br. at 9, CNS does not dispute the portions that rely on the parties' joint stipulation of facts, Dkt. No. 55. CNS disputes the statements in the second sentence that "the Code of Virginia permits clerks to post PII online if it is posted to OCRA." To the contrary, Va. Code § 17.1-293(E)(7) permits remote access only to "nonconfidential court records." As to the statements that are based on the Knuth Declaration, those are not entitled to any evidentiary weight and constitute undisclosed expert opinions. For the avoidance of doubt, CNS disputes that "OCRA is particularly vulnerable to data mining," as that statement is based on pure speculation not evidence. As to the statements that are based on

---

[4] In addition, paragraph 12 of the Knuth Declaration, which is cited as support for this statement, does not state anything about gleaning PII by coding an algorithm with partial PII. Even if it did, such statements would be admissible only as expert opinion, and Mr. Knuth has not been disclosed as an expert in this matter.

[5] All references to exhibits, unless otherwise noted as attached hereto, are to those attached to CNS' memorandum of law in support of its motion for summary judgment. Dkt. No. 71.

the Declaration of Michael Riggs, CNS does not dispute that an OCRA subscriber "has access to the entirety of the records made available through the OCRA application," but emphasizes that those records are already disclosed to the public at the physical courthouse. JSF ¶¶ 48-49. Finally, CNS disputes the last sentence, which is attorney argument, not fact, and affirmatively states that "OCRA's current limitations" are not narrowly tailored. *See infra* at 18-30.

**B. <u>Response to the Clerk's Statement of Undisputed Facts</u>**

Although the Clerk "lists all material facts" as required by Local Rule 56(B), she does so in bullet point form rather than numbered paragraphs. Accordingly, CNS responds as follows:

The first through fourth bullet points, Clerk's Memorandum of Law in Support of Motion for Summary Judgment, Dkt. No. 75 ("Clerk Br.), at 2, are undisputed.

The fifth bullet point, Clerk Br. at 2, is undisputed, except that 105 (not 90) of the 120 Virginia circuit courts currently provide subscribers with remote access via OCRA. JSF ¶ 27.

The sixth bullet point, Clerk Br. at 2, is undisputed.

The seventh bullet point, Clerk Br. at 3, is undisputed, except that CNS clarifies that "officers of the court" is limited to Virginia-barred attorneys and their staff. JSF ¶¶ 28, 53.

The eighth bullet point, Clerk Br. at 3, is undisputed.

The ninth bullet point, Clerk Br. at 3, contains a statement of law, not fact, which does not require a response. Nonetheless, to avoid any doubt, CNS disputes that the cited statutory language permits the Non-Attorney Access Restriction. *See infra* at 14-16.

The tenth bullet point, Clerk Br. at 3, is undisputed.

The eleventh bullet point, Clerk Br. at 3, cherry-picks language from the cited opinion letter. CNS does not dispute that the quoted language appears in the cited letter, but affirmatively states that the letter was an informal opinion from Robert B. McEntee, an Assistant

Attorney General representing the Commonwealth in this case, representing only his "individual view," which also explained that "the Code of Virginia grants circuit court clerks the ability to provide secure remote access to nonconfidential court records to members of the general public under § 17.1-225." *See* Exhibit B, hereto, at 1, 3.

The twelfth bullet point, Clerk Br. at 3, is undisputed.

The thirteenth bullet point, Clerk Br. at 4, is a statement of law and is disputed. By virtue of the Non-Attorney Access Restriction, the Dissemination Restriction is limited to Virginia-barred attorneys and their staff since they are the only individuals to whom the Clerk offers remote access to civil court records. JSF ¶ 28. Moreover, the Non-Attorney Subscriber Agreement that the Clerk provided to CNS in June 2021 imposed prohibitions on dissemination and publication of non-confidential civil filings that are not included in the Attorney Subscriber Agreement. Ex. J, ¶ 5.

With respect to the fourteenth bullet point, Clerk. Br. at 4, CNS disputes that it "does not assert that it has been denied access to non-confidential civil filings" because the effect of the Non-Attorney Access Restriction is the denial of the ability of the press and public to access new civil filings in a timely fashion, if at all, in violation of the First Amendment. Girdner Decl., ¶¶ 6-7, 10, 32, 44-45; *see also infra* at 23-24. The fact that CNS "can access non-confidential civil complaints at the circuit court[houses]" is undisputed, but due to the remote location of 102 Virginia circuit courts and the cost-prohibitive expense of hiring numerous additional reporters to cover each of those far off courts in person, it is not viable to visit these courts at all, and most certainly not on a daily basis. JSF ¶ 17; Girdner Decl. ¶¶ 29, 32.

The fifteenth and sixteenth bullet points, Clerk Br. at 4, are undisputed.

The seventeenth bullet point, Clerk Br. at 4, is disputed because the Clerk does review new civil filings for any unredacted identification numbers appearing on a credit card, debit card, bank account, or other billing or payment system and, if discovered, redact such information. JSF § 51. The Clerk and her staff also seek to redact dates of birth, maiden names, minor names, and signatures "if a civil filing is posted on the Prince William County Circuit Court's website," which occurs in "exceptional cases that are of public interest or for which the Clerk's office anticipates repeated requests for information." Ex. C, No. 10; Ex. E, Nos. 2-6.

The eighteenth through twenty-third bullet points, Clerk Br. 4-5, to the extent they pertain solely to the practices of the Arlington County Clerk, are undisputed for purposes of the parties' summary judgment motions. However, the Declaration of Paul Ferguson ("Ferguson Declaration"), submitted by a party who is not a defendant in or involved in this case, should be disregarded because Mr. Ferguson was not identified as a witness until the evening of the last day of discovery, *see* Exhibit C, hereto, and CNS did not have an opportunity to depose him.

The twenty-fourth and twenty-fifth bullet points, Clerk Br. 5, are speculative and lack foundation, and are thus disputed. *See, e.g.*, *Robinson v. Fenner*, 2021 WL 771753, at *2 (E.D. Va. Feb. 26, 2021) ("[t]he absence of an 'affirmative showing of personal knowledge of specific facts' prevents the consideration of such facts in conducting a summary judgment analysis") (citation omitted). For the avoidance of doubt, CNS disputes that the practices of Clerk Ferguson are probative of the practices of Clerk Smith.

The twenty-sixth bullet point, Clerk Br. 5, is undisputed for the purpose of the parties' summary judgment motions.

The twenty-seventh bullet point, Clerk Br. 6-7, is speculative and lacks foundation, and is thus disputed.

**C. CNS' Statement of Undisputed Facts in Opposition to Defendants' Motions**

CNS hereby incorporates by reference the statement of undisputed material facts set forth in CNS' memorandum of law in support of its summary judgment motion.

**ARGUMENT**

**DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT BECAUSE THEY FAIL TO MEET THEIR CONSTITUIONAL BURDEN**

In *Press-Enterprise II*, the Supreme Court established a two-step framework for claims challenging access restrictions in violation of the First Amendment. 478 U.S. at 8-10. The first step of the analysis asks whether there is a First Amendment right of access to the documents at issue, *id.* at 8-9, and as this Court recognized, "[i]t is well-settled that the press and public have a right of access to most, if not all, civil court records." Mem. Op. at 9 (citing *CNS v. Schaefer*, 2 F.4th 318, 328 (4th Cir. 2021); *Rushford v. New Yorker Mag., Inc.*, 846 F.2d 249, 253 (4th Cir. 1988)). Once that right of access is established, as here, the second step of the analysis is an examination of the interests offered to justify the challenged restrictions by applying the requisite level of constitutional scrutiny. *Press-Enterprise II*, 478 U.S. at 10; *Doe v. Public Citizen*, 749 F.3d 246, 266 (4th Cir. 2014); *see also Schaefer*, 440 F. Supp. 3d 532, 559 (E.D. Va. 2020).

In other words, Defendants must demonstrate that the Non-Attorney Access and Dissemination Restrictions are "'necessitated by a compelling government interest'" and that the restrictions of access are '"narrowly tailored to serve that interest.'" *Doe*, 749 F.3d at 266 (quoting *In re Wash. Post Co.*, 807 F.2d 383, 390 (4th Cir. 1986)); *see also CNS v. Planet*, 947 F.3d 581, 594-95 (9th Cir. 2020) ("*Planet III*") ("[o]nce…a presumption of access arises under *Press-Enterprise II*" it "may be restricted only if 'closure is essential to preserve higher values and is narrowly tailored to serve those interests'") (quoting *Press-Enterprise II*, 478 U.S. at 13-14), *accord Va. Dept. of State Police v. Washington Post*, 386 F.3d 567, 575 (4th Cir. 2004); *Stone v.*

*Univ. of Maryland Medical System Corp.*, 855 F.2d 178, 180 (4th Cir. 1988); *Rushford*, 846 F.2d at 253.

Defendants bear the burden of justifying the challenged restrictions by presenting factual evidence, not mere conjecture, in support of their position. *See, e.g.*, *Va. Dep't. of State Police,* 386 F.3d at 575 (citing *Press-Enterprise II*, 478 U.S. at 15). Unable to do so, Defendants essentially ask this Court to rubber stamp the challenged restrictions based on general concerns of privacy and the orderly administration of justice. But they do not provide the requisite evidentiary showing.

### A. Defendants Concede There Is a First Amendment Right of Access to Civil Court Records

Defendants do not dispute that "the press and public enjoy a qualified right of access to nonconfidential civil court records, which helps ensure the transparency of the courts." Comm. Br. at 2; Smith Br., *generally*; *see also CNS v. Quinlan*, 32 F.4th 15, 20, n.8 (1st Cir. 2022); *Planet III*, 947 F.3d at 59; *Bernstein v. Bernstein Litowitz Berger & Grossman LLP*, 814 F.3d 132, 141 (2d Cir. 2016). As CNS explained in its summary judgment motion, "the public and press generally have a contemporaneous right of access to court documents and proceedings *when the right applies*." *Doe*, 749 F.3d at 272 (emphasis added); *see also* CNS Br. at 18, n.3 (collecting cases finding that First Amendment right of access attaches when a court record is filed). This is because "public access promotes not only the public's interest in monitoring the functioning of the courts but also the integrity of the judiciary." *Id.* at 266. "An informed citizenry is at the heart of this democracy, and narrowing the arteries of information…will only serve to impair our country's coronary health." *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 612 F.3d 301, 304 (4th Cir. 2010).

In *Schaefer*, the court emphasized that "reasonably contemporaneous access" is required "as expeditiously as possible" based on "the context of th[e] case." 2 F.4th at 328. In doing so, the Fourth Circuit affirmed the district court's holding that because the public enjoys a right of access "contemporaneous with the filing of the complaint," same-day access is required "insofar as practicable." 440 F. Supp. 3d at 562.[6] In the context of a court, like the Prince William Court, where remote access is available, and thus practicable, restricting such access to Virginia-barred attorneys interferes with CNS' right to contemporaneous access "as expeditiously as possible."

Notwithstanding the foregoing legal principles, the Commonwealth contends that the First Amendment does not mandate *remote* access. Comm. Br. at 2. This Court should reject that illusory argument, as it has already observed:

> [CNS] is not alleging that the public has a fundamental right to remotely access civil records guaranteed by the First Amendment. Instead, [CNS] argues that *if* Defendants provide Virginia attorneys remote access to civil court records, *then* the First Amendment also requires them to provide the public with remote access. In effect, [CNS] argues that Defendants are limiting an already established fundamental right, the right to access civil court records, in an unconstitutional manner by giving one group, Virginia lawyers, remote access while denying it to others.

Mem. Op. at 9 (emphasis within). CNS is not seeking a *per se* right of remote access. Instead, CNS simply asserts that where, as here, a First Amendment right of access applies, Defendants must meet their burden of justifying any access restrictions.

**B. Defendants Fail to Carry Their Burden of Showing that Their Policies and <u>Practices, and Reliance on the Virginia Code, Survive Constitutional Scrutiny</u>**

Critically, "[t]he burden to overcome a First Amendment right of access rests on the party seeking to restrict access, and that party must present specific reasons in support of its position."

---

[6] Judge Henry Coke Morgan Jr. of this Court specifically found, after applying *Press Enterprise II*, that the clerks' policies that withheld access to new civil complaints until they were "fully indexed and docketed" violated the First Amendment because the clerks "failed to prove that their practices and customs that lead to the substantial delays. . .were narrowly tailored." *Schaefer*, 440 F. Supp. 3d at 532, 560. The Fourth Circuit agreed. 2 F.4th at 328.

*Va. Dep't of State Police*, 386 F.3d at 575. "General concerns stated in conclusory fashion," and unsupported speculation, are insufficient to justify the deprivation of public access. *Id.* at 573; *see also id.* at 575 (quoting *Press-Enterprise II*, 478 U.S. at 15).

Relying on this Court's Memorandum Opinion, Defendants contend that the challenged restrictions "resemble" time, place, and manner ("TPM") restrictions and thus advocate for "relaxed scrutiny." Comm. Br. at 11; Clerk Br. at 11. Defendants are mistaken; nonetheless, as was also the case in *Schaefer*, no matter what level of scrutiny, "both standards of review require Defendants to come forward with evidence, not mere argument, to show that the [restrictions] are narrowly tailored to some higher governmental interest." *Id.*, 440 F.Supp.3d at 560; *see also Reynolds v. Middleton*, 779 F.3d 222, 225 (4th Cir. 2015); Mem. Op. at 10 (quoting *Schaefer*, 2 F.4th at 328; *Planet III*, 947 F.3d at 585; and *McCullen v. Coakley*, 573 U.S. 464, 477 (2014)).

Even under TPM scrutiny, "[t]hat the Government's asserted interests are important in the abstract" is not enough. *Turner Broad. Sys. v. F.C.C.*, 512 U.S. 662, 664 (1994). Defendants must show that "the recited harms are real, not merely conjectural….," *id.* at 664, and that "no reasonable alternatives exist to 'adequately protect' that government interest." *Planet III*, 947 F.3d at 603 (quoting *Press Enterprise II*, 478 U.S. at 14). They have not done so.

Moreover, the level of scrutiny itself is governed not by what the challenged practices resemble but by whether they are "a total restraint on the public's first amendment right of access even though the restraint is limited in time." *Associated Press v. Dist. Ct.*, 705 F.2d 1143, 1147 (9th Cir. 1983). Indeed, "state action to punish the publication of truthful information seldom can satisfy constitutional standards." *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) (citation omitted). "Once true information is disclosed in public court documents open to public inspection, the press cannot be sanctioned for publishing it." *Cox Broadcasting Corp. v. Cohn*,

420 U.S. 469, 496 (1975). Thus, efforts to restrict the dissemination of "truthful information" in "official court records" must be narrowly tailored to "further a state interest of the *highest order*." *See Soderberg v. Carrion*, 999 F.3d 962, 969 (4th Cir. 2021) (emphasis added).

While the Ninth Circuit in *Planet III* observed that access restrictions to civil complaints "resemble" TPM restrictions, that court still applied what it called the "rigorous" standard from *Press-Enterprise II*. 947 F.3d at 595-96, 603.[7] Even so, Defendants concede TPM restrictions must be content-neutral, *see* Comm. Br. at 11-12; Smith Br. at 12-13, but the challenged restrictions are anything but. They are expressly supported by concerns *over content, i.e.*, that civil filings might contain certain personal identifiers. Restricting access and dissemination based on content Defendants believe would otherwise result in exploitation of litigants' personal information clearly is content-based. *McCullen*, 573 U.S. at 480 (a restriction is content-neutral only if "justified without reference to the content of the regulated speech"). And contrary to the Commonwealth's assertion that the Non-Attorney Access Restriction is content-neutral because it does not "discriminate among classes of the public seeking access records," Comm. Br. at 11, the Non-Attorney Access Restriction does exactly that, providing remote access only to a special class of the Commonwealth's citizens – Virginia-barred attorneys and their staff.

**1. Defendants Fail to Demonstrate that the Virginia Code Compels the Challenged Restrictions, and Even if it Did, the Requirements of the First Amendment Trump the Code**

Defendants rely on Va. Code § 17.1-293, but nothing in that statute mandates that clerks withhold remote access for non-attorneys, nor does the First Amendment permit them to do so.

[7] Unlike *Planet III*, case law regarding reasonable TPM restrictions pertain to restrictions on the exercise of free speech rights in traditional public forums like performance venues, schools, and city streets. *See, e.g., Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Consol. Edison Co. v. Pub. Serv. Comm'n*, 447 U.S. 530, 536 (1980).

Indeed, when an access restriction is a broadly applicable statute, it is not necessary to determine whether the statute is unconstitutional on its face or as-applied. *See, e.g., Press-Enterprise II*, 478 U.S. at 8-13 (challenge to a section of the California Penal Code restricting access to preliminary hearings). Rather, what matters is whether Defendants have justified the access restrictions under constitutional scrutiny. *See supra* at 10-13. Thus, to the extent Va. Code § 17.1-293 purports to require Defendants to restrict remote access to civil filings to Virginia-barred attorneys (and their staff), the requirements of the First Amendment trump the Code.[8]

Defendants contend that two provisions of Va. Code § 17.1-293, when considered together, mandate the Non-Attorney Access Restriction. The first, Section 17.1-293(B), merely prohibits court clerks from posting generally "on the Internet" – as opposed to a secured permission-based subscriber system – certain personal identifiers. The second, Section 17.1-293(E)(7), qualifies that prohibition by stating, in relevant part, that it "shall not apply to…[p]roviding secure remote access to nonconfidential court records, subject to any fees charged by the clerk, to members in good standing with the Virginia State Bar…" Contrary to Defendants' assertion, Section 17.1-293(E)(7) does not permit the Clerk to post confidential

[8] To the extent this Court deems it necessary to rule on the constitutionality of Va. Code § 17.1-293, the record supports a finding that the statute is unconstitutional on its face and as applied to CNS. A plaintiff sustains its burdens on a facial challenge by demonstrating either (i) "no set of circumstances exists under which the law would be valid, or that the law lacks any plainly legitimate sweep;" or (2) "that the law is overbroad because a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Greater Balt. Ctr. For Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 282 (4th Cir. 2013) (en banc) (quotations and citations omitted); *see also Educ. Media Co. at Virginia Tech v. Insley*, 731 F.3d 291, 298 (4th Cir. 2013). Defendants cannot claim that the current preferential access is consistent with any tradition of access in the Virginia circuit courts. Traditionally, everyone – including attorneys – were provided exactly the same type of access to non-confidential public court records. An as-applied challenge is "based on a developed factual record and the application of a statute to a specific person[.]" *Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165, 172 (4th Cir. 2009) (en banc). Here, Defendants' practices and policies are unconstitutional as applied to CNS. Defendants, through their actions, are exposing CNS to a burden and expense not suffered by Virginia-licensed attorneys.

information or private information on OCRA or any other remote access system. Rather, it simply permits the Clerk to provide attorneys with remote access to *non-confidential* records notwithstanding the prohibition in Section 17.1-293(B). And the Clerk concedes there is nothing confidential about a signature, date of birth, maiden name, or minor name. Clerk Br. at 9.

Nonetheless, Defendants contend that Section 17.1-293(E)(7) requires the Clerk to restrict remote access via OCRA to attorneys, and that the Clerk is otherwise prohibited from providing the public or press with remote access to non-confidential records, *even if they do not include any of the personal identifiers identified in Section 17.1-293(B)*. Not only do the requirements of the First Amendment trump this practice, but it is also foreclosed by Va. Code § 17.1-225, which expressly *permits* clerks to provide remote access to the non-confidential court records sought in this case, *i.e.*, the same access permitted by Section 17.1-293(E)(7). Section 17.1-225 does not limit remote access to Virginia-barred attorneys, nor is it limited to systems other than OCRA. *Id.*

**2. Defendants Fail to Demonstrate That the Challenged Restrictions are Supported By a Compelling or Significant Government Interest**

In an effort to avoid constitutional scrutiny, Defendants rely primarily on fear mongering, claiming, among other things, that the challenged restrictions are necessary to promote the fair and orderly administration of justice by protecting against the *potential* misuse of private information that *might* appear in a non-confidential civil filing. For her part, the Clerk contends, without any factual support, that the challenged restrictions "target[ ] information that is highly sought after by third parties to engage in identify theft, data mining, and other crimes, as well as information regarding minor children" because "[a]ny information posted online is at risk of being misused for nefarious purposes." Clerk Br. at 13, 15; *see also id.* at 20. The Clerk, however, does not attempt to set forth any evidence that this risk is a reality in her court or any

others. The Commonwealth likewise relies on generalized privacy concerns – not factual evidence – to argue that "[l]imiting online access to court records – many of which contain private and personally identifiable information – to a narrow class of qualified court officers promotes critical privacy and security interests by sharply reducing the amount of private, sensitive information let out into the world, limiting the potential for widespread information harvesting, resale, and dissemination." Comm. Br. at 2.

Defendants' concerns about private information *possibly* being "let out into the world," *id.*, for anyone to access "with an Internet connection," Clerk Br. at 20, is premised on the false notion that OCRA, without the Non-Attorney Access Restriction, would be available to any anonymous internet user like other free, public websites. OCRA, however, is a permissions-based system, which provides the ability to monitor use, if need be; it requires that a user (i) apply to, and be approved and authorized by, the Clerk; (ii) sign a subscriber agreement in front of a notary with the applicant's name, address, phone number, and email address in order to obtain a user ID and password that permits OCRA access; and (iii) pay an annual subscription fee, *i.e.*, $200 per year per user. SUF ¶¶ 24, 26-27; Ex. B. To be clear, CNS does not dispute that privacy interests are important, but any supposed harm that is curtailed by Defendants' policy and practice of restricting remote access to non-attorneys, as well as the dissemination of information accessed remotely – regardless of whether a filing contains any personal identifiers – does not override CNS' First Amendment right of access.

CNS demonstrated in its summary judgment motion that the Clerk is "unable to provide" factual data to support Defendants' position that the challenged restrictions are even necessary to protect private information. SUF ¶ 38. In discovery, CNS asked the Clerk to identify the number of filings in each of the last five years that contained the information described in Va.

Code § 17.1-293(B); in response, the Clerk could only state that "the information sought is not tracked by the Office of the Clerk of Court or any group." Ex. F, No. 8; CNS Br. at 23. Having failed to demonstrate the frequency that personal identifiers appear in civil filings at the Prince William Court, Defendants cannot establish, with specific evidence, that the challenged restrictions further their stated interests. Summary judgment for Defendants must be denied on that basis alone.[9]

**3. Defendants Fail to Demonstrate that the Challenged Restrictions are Narrowly Tailored**

Even if Defendants were able to substantiate their privacy concerns, the challenged restrictions are not narrowly tailored to preserve a compelling or significant interest.

**a. Defendants' Ignore That the Same Records They Shield From Remote Access for Non-Attorneys, And For Which They Prohibit Dissemination, Are Already Disclosed to the Public at the Courthouse**

There is no dispute that the non-confidential documents court records available on OCRA, even to the extent that they *may* contain certain sensitive information, are the same non-confidential court records that are available to the public and press via public access terminals at the Prince William courthouse. Clerk Br. at 4; SUF ¶ 36. "Once announced to the world, the

[9] Instead of providing any data with respect to the Prince William Court, the Commonwealth cites to "a 2015 empirical study in North Carolina" that purportedly "showed a high frequency of sensitive information included in state court filings" in the North Carolina Supreme Court (the "2015 North Carolina Report"). Comm. Br. at 21-22. Not only is that "study" inadmissible hearsay and irrelevant to the First Amendment right of access to civil filings at the Prince William Court, but it, in reality, concluded that "[m]ost of the documents contained relatively few incidences of sensitive information" and that "criminal cases have disproportionately more sensitive information than civil [ ] cases." David S. Ardia & Anne Klinefelter, *Privacy and Court Records: An Empirical Study*, 30 Berkeley Tech. L.J. 1807, 1807-08 (2015). Moreover, the "study" observes that because "court records vary significantly in the types of sensitive information they contain," "when scholars and policymakers discuss privacy and court records, *they must be cautious of generalizing*," *id.* at 1892 (emphasis added) – the exact approach Defendants advocate for here.

information [has] lost its secret characteristic." *In re Charlotte Observer*, 921 F.2d 47, 50 (4th Cir. 1990) (vacating injunction prohibiting reporters from disclosing information revealed in open courtroom); *see also Va. Dep't of State Police*, 386 F.3d at 579 (one consideration "which may be considered in deciding whether an asserted interest is compelling….is whether the granting of access….will disclose facts that are otherwise unknown to the public"); *Bernstein*, 814 F.3d at 141 ("easily conclud[ing]" that the First Amendment right of access applies to civil complaints "*even when they contain arguably sensitive information*") (emphasis added).

To avoid this reality, Defendants misguidedly rely on *U.S. Dep't of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749 (1989), *see* Comm. Br. at 15; Clerk Br. at 14-15, in which the Supreme Court held that FBI criminal rap sheets (created by collecting biographical data and criminal history from various state and local public records *across the country*) were not subject to disclosure "*within the meaning of the Freedom of Information Act*," 489 U.S. 751 (emphasis added), based on a specific statutory exception within FOIA for "records or information compiled for law enforcement purposes…the production of [which]…could reasonably be expected to constitute an unwarranted invasion of personal privacy." *Id.* at 755-56 (quoting 5 U.S.C. § 522(b)(7)(C)). In that specific context, which did not concern the First Amendment, the Supreme Court observed that "there is a vast difference between the public records that might be found after a diligent search of courthouse files, county archives and local police stations throughout the country and a computerized summary located in a single clearinghouse of information." 489 U.S. at 764. The Court, however, was not describing a remote access system, like OCRA, that provides access to the very same records (not a summary) available at a single courthouse (not several).[10]

[10] The Commonwealth also suggests that "information contained in court files stored at courthouses is 'practically obscure' due to the logistical barriers to amassing large amounts of

The Commonwealth's reliance on *Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984) and *Sorrell v. IMS Health, Inc.*, 564 U.S. 552 (2011), *see* Comm. Br. at 13, 17, is similarly misguided. In *Seattle Times*, the Supreme Court held that a protective order, limiting the disclosure of *otherwise non-public information* obtained in discovery, did not offend the First Amendment. 467 U.S. at 37. That is not the issue here. As to *Sorrell*, the Commonwealth leans on the dissent as part of its effort to establish that the challenged restrictions further Defendants' "interest in preventing widespread disclosure of [ ] private information of litigations," Comm. Br. at 14, but *Sorrell* ultimately held that a Vermont law that restricted pharmacies and health insurers from disclosing and selling prescriber-identifying information to pharmaceutical marketers and data miners violated the First Amendment, despite privacy concerns, "given the information's widespread availability." *Id.* at 573.[11]

The Fourth Circuit took a similar approach in *Ostergren v. Cuccinelli*, 615 F.3d 263 (4th Cir. 2010), in which the court recognized a difference between records available at courthouses and those available through secure remote access, but ultimately concluded that prohibiting the posting of already public records online is not "narrowly tailored to protecting individual

---

private information" and thus "private and sensitive information can appear in public records without creating a risk of actual widespread public disclosure or harm." Comm. Br. at 2. The article cited for this premise, however, urges *against* online access restrictions because such practices violate the First Amendment; thus, courts should offer less restrictive alternatives to remote access blackouts, like redaction. *See infra* at 24-25. And as William Girdner, CNS' founder and editor, explains in his accompanying declaration in opposition to Defendants' motions, the banner of "practical obscurity" is a nonsensical philosophy that incorrectly posits paper records are hard to find in practice so access to electronic records should be restricted, notwithstanding the requirements of the First Amendment. *Id.* ¶¶ 6-7.

[11] *Barber v. Conradi*, 51 F. Supp. 2d 1257 (N.D. Ala. 1999), cited by the Clerk, *see* Clerk Br. at 17, is also inapposite. In that case, the documents at issue were *not* available on public access terminals or any online system; thus, the limitation imposed was narrowly tailored to avoid a labor intensive effort that would require court clerks, unlike here, to pull thousands of files each week. *Id.* at 1267-68.

privacy." *Id.* at 286. That case involved a secure, permissions-based remote access system (like OCRA but not restricted to attorneys only) through which Virginia circuit court clerks provided online access to the same unredacted land records available at the courthouse. *Id.* at 266. Plaintiff, a privacy advocate, brought a First Amendment challenge to Virginia's Personal Information Privacy Act, which prohibited the intentional communication of another's social security number to the general public, after the Attorney General sought to prosecute her for displaying on her website copies of Virginia land records containing unredacted SSNs that she obtained by logging on to the secure remote access land records system. In concluding that the statute violated the First Amendment as applied to plaintiff, the Fourth Circuit in *Ostergren* discussed the Supreme Court's distinction in *Reporters Committee*, *supra*, between public records available at courthouse's nationwide and a single computerized summary of that information but held that "Virginia could curtail SSNs' public disclosure much more narrowly by directing clerks not to make land records available through secure remote access until after SSNs have been redacted." *Id.* at 286 The same is true here.[12]

**b. Less Restrictive, Effective Alternatives Such as Redaction and <u>Subscriber Agreements Achieve Defendants' Stated Interests</u>**

Defendants largely ignore that because the filing party is required to redact much of the information they are concerned about, *i.e.*, social security numbers and financial account numbers, *see* Va. Code § 8.01-420.8(A), a less restrictive alternative is already in place with respect to this particular information.[13] Indeed, the Clerk and her staff review new civil filings to

[12] Notably, the *Ostergren* court did not suggest that circuit court clerks restrict remote access to land records in their entirety. In response to that decision, the General Assembly amended the Virginia Code to require that "[b]eginning July 1, 2012, any land record made available to subscribers via secure remote access may contain only the last four digits of the social security number of any party." Va. Code § 17.1-294(B).

[13] The Clerk appears to concede that SSNs and financial account numbers are the only personal

ensure that any social security numbers and other identification numbers, such as those appearing on a bank account or other billing or payment system, are redacted before making records available via OCRA. SUF ¶ 40. Thus, like in *Schaefer*, because the "filer is responsible for redacting confidential information" and the Clerk takes steps to "ensur[e] that confidential information is protected," *id.* 440 F.Supp.3d at 560, the challenged restrictions are not "narrowly tailored and necessary to preserve the court's important interest in the fair and orderly administration of justice." 2 F. 4th at 328 (quoting *Planet III*, 947 F.3d at 595).[14]

CNS' summary judgment motion also explains that less restrictive alternatives are in place with respect to minor and maiden names. *See* CNS Br. at 25-26; SUF ¶ 43. Many circuit court cases that concern minors are confidential by statute and thus not available on OCRA, and for those that are, minor names may be redacted or sealed where disclosure of the name would pose a health or safety threat. *Id.* The same is true for maiden names. Va. Code § 8.01-217(G).

Instead of confronting this evidence, or presenting much of their own, Defendants assert that lawyers for some reason need personal identifiers contained in court records to perform their jobs. Comm. Br. at 15; Smith Br. at 17, 20. This argument ignores that OCRA subscribers have access to filings not only in their own cases, but also in other cases in which they are not

---

identifiers that the General Assembly has deemed confidential. *See* Clerk Br. at 8-9. But she oddly argues that Va. Code § 8.01-420.8(A) "does not contain an absolute requirement that the filing party redact the information, but rather that the party simply make 'reasonable efforts'" to do so. *Id.* at 8. This is a distinction without meaning, and one that is contrary to the parties' stipulated facts. SUF ¶ 39, citing Dkt. No. 55 ¶ 51.

[14] Defendants cite to *Schaefer* and *Planet III* throughout their briefs to show that those courts acknowledged government concerns about privacy and the fair and orderly administration of justice," Comm. Br. at 3, 13, 18, 24, 26; Clerk Br. at 12, 16-17, but conveniently fail to point out that those courts both found that the clerks' policies that withheld access to new civil complaints violated the First Amendment because they were *not* narrowly tailored and necessary to preserve those interests. *Schaefer*, 2 F. 4th at 328; *Planet III*, 947 F.3d at 595.

attorneys of record. SUF ¶ 31; *see also* Va. Code § 17.1-293(E)(7).[15] Defendants do not explain why attorneys would need access to personal identifiers that may appear in court filings in cases in which they are not involved. They do not. Moreover, Defendants overlook that Virginia attorneys are served with all pleadings in every case in which they represent a party. *See* Va. Code § 8.01-314. OCRA access simply provides them with access to an additional copy of such pleadings on a 24/7/365 basis.[16]

Defendants also contend that, for attorneys, "[t]ime spent traveling to and from courthouses is time that [is] better spent performing any number of advocacy-related activities," Comm. Br. at 16, "without [having to] stand[ ] in line at the courthouse and causing expensive and time-consuming delays," Clerk Br. at 18, but the same reasoning holds true for journalists. As Mr. Girdner illustrated in connection with CNS' summary judgment motion:

> Online remote access is the only practical means for covering, and reporting on, new civil filings in the Prince William Court, and throughout the Commonwealth, because sending a reporter to visit each of the 120 circuit courts across the state on a daily basis, if at all, is not practicable for any news entity…. In order to accurately report on those events, and to let the public know that a legal case or significant record has been filed, it is fundamental to have practical contemporaneous access to newly filed civil complaints and subsequent civil filings as the court record is developed. Remote access is the best way to achieve contemporaneous access.

Girdner Decl. ¶¶ 6-7, 10.

For these reasons, the challenged restrictions do not "leave open ample alternative channels for communication of the information," as would be required to survive TPM scrutiny.

---

[15] Va. Code § 17.1-293(E)(5) separately permits "secured remote access to any person, his counsel, or staff which counsel directly supervises to documents filed in matters to which such person is a party."

[16] Contrary to the Commonwealth's assertion, the rules of professional conduct cited at pages 16-17 of their brief do not expressly prohibit lawyers from disclosing information obtained through OCRA or other court records.

*McCullen*, 573 U.S. at 477. The access allowed to attorneys cannot, in practical terms, be matched by the press or public. No press organization can afford to send a reporter on a daily basis to each of the 105 Virginia circuit courts that use OCRA. SUF ¶ 15. Contemporaneous access, "as expeditiously as possible," *Schaefer*, 2 F. 4th at 328, is simply not viable.[17]

The Commonwealth's next gambit is to contend that redaction practices fail to protect against disclosure of personal identifiers, Comm. Br. at 20-23, while the Clerk does not meaningfully address redaction at all. The Commonwealth relies largely on a series of law review articles and blog posts to argue that notwithstanding redaction practices, OCRA, if accessible to non-attorneys, would "expos[e] vulnerable litigants to harmful data mining and exploitations" which "can also be used for criminal and quasi-criminal purposes." *Id.* at 3-4. Not only do those secondary sources constitute hearsay, *see supra* at 2-3, but they also do not support Defendants' position. As one of those articles explains, "[c]ourts can significantly reduce the amount of privacy-harming information in their records by shifting the responsibility for protecting private information to lawyers and litigants, who should not be permitted to include highly sensitive information in court files if it is not relevant to the case." David S. Ardia, *Privacy and Court Records: Online Access and the Loss of Practical Obscurity*, 2017 U. Ill. L. Rev. 1385, 1389 (2017); *see also id.* at 1445-47. That approach is preferred where "a

[17] The Clerk's suggestion that CNS, and other members of the press and public, should not receive the remote access that is currently available to Virginia-barred attorneys because a citizen does not "need to comb through online court records to learn the maiden name of another citizen, or to know the names and ages of their children, or to have a copy of their signature," Clerk Br. at 20, misses the point. The record does not demonstrate that CNS, or any Virginia citizens, seek to do this. Rather, as Mr. Girdner explained, CNS seeks remote access to all civil filings for the purpose of informing the public about the day's events in the Prince William Court and other Virginia circuit courts. Girdner Decl. ¶¶ 6-7, 10. And in connection with its reporting, CNS, like attorneys, abides by ethical proscriptions precluding inclusion of personal identifiers in original news stories. *Id.* ¶ 43.

court does provide online access to some or all of its court records" because "it cannot impose restrictions on who may access those records or how the information can be used unless those restrictions comply with the First Amendment." *Id.* at 1442; *see also id.* at 1453 (explaining that restricting online access to protect privacy, "while superficially appealing, is contrary to established First Amendment doctrines that mandate a presumption of public access and require case-specific analysis before public access can be restricted"). "The fact is, without online access to court records, the benefits of public access will be reduced. Curtailing remote access to court records, for example, would reduce the frequency and quality of media reporting about the courts…And it would diminish the accountability of the court system as a whole." *Id.* at 1449.

Other secondary sources cited by the Commonwealth likewise do not help Defendants, nor do they even mention that court filings accessed remotely are mined for nefarious purposes. *See* Fred H. Cate, *Government Data Mining: The Need for a Legal Framework*, 43 Harv. C.R.-C.L. L. rev. 435 (2008) (discussing *government* data aggregating activities on websites that belong to companies like LexisNexis and credit bureaus); Office of Oversight and Investigations Majority Staff, *A Review of the Data Broker Industry: Collection, Use, and Sale of Consumer Data for Marketing Purposes* (Dec. 18, 2013) ("focus[ing] specifically on the collection and sale of consumer information for the purpose of marketing" not "criminal ends").[18]

---

[18] As explained *supra* in note 9, the Commonwealth's citation to the 2015 North Carolina Report to support its contention that redaction is not effective is misplaced. So too is the Commonwealth's reliance on a "Letter from Carl Malamud to The Honorable Lee H. Rosenthal" and a blog post from "computer scientist Timothy Lee." Comm. Br. at 20-21. The Malamud letter identifies 1,669 out of 2,706,431 filings in 32 district courts that contained social security numbers or other private information; the Lee blog post identifies 194 out of 1.8 million filings available on PACER where parties tried, but for technical reasons, did not successfully redact private information. In other words, only ***0.062%*** and ***0.011%*** of the filings discussed in those secondary sources, respectively, contained arguably confidential or sensitive information, both a "minute fraction" that fall well short of justifying the challenged restrictions. *See CNS v. Gabel*, 2021 WL 5416650, at *15-16 (D. Vt. Nov. 19, 2021) (withholding access to newly filed complaints was "not 'essential to preserve higher values" because "[a]s for protecting privacy

The Commonwealth points to the 2018 Work Group Report to argue that "opening OCRA to the public would require litigants or clerks to redact all filings, and litigants would have to provide separate filings, both redacted and unredacted" and that this would somehow be a "drastic alteration." Comm. Br. at 20. Not so. Litigants are already redacting filings. *See supra* at 21-22. In any event, the Work Group Report demonstrates that less restrictive alternatives to an access blackout exist. Ex. E at 5 (requiring additional redactions by the filing party or a separate addendum could protect sensitive information if OCRA is available to the public). And because the Clerk is already reviewing each new civil filing to redact social security numbers and other identification numbers, there is no reason she cannot also redact any other information Defendants are concerned about.[19]

While an OCRA user must apply to, and be approved and authorized by, the Clerk, and must sign a subscriber agreement and pay a fee in order to access OCRA, SUF ¶¶ 23-24, 26-27, the Commonwealth claims, without evidentiary support, that subscriber agreements are often ignored and circumvented and thus not effective at policing misuse. Comm. Br. at 23-24.[20] Much of their argument, however, hinges on the false notion that only Virginia-barred attorneys can be "pre-vetted" since they "are asked for their Virginia State Bar number" and therefore can

---

interests," only 2 out of 4,156 complaints, *i.e.*, 0.048%, "contained confidential information;" thus, "placing the onus on filers has been overwhelmingly effective"); *CNS v. Tingling*, 2016 WL 8739010 (S.D.N.Y. Dec. 16, 2016) (withholding access to newly filed complaints "to prevent a narrow category of errant pleadings" was not "essential to preserve higher values or [ ] narrowly tailored to serve that interest"). A similar outcome is warranted here.

[19] The General Assembly, however, has already determined that dates of birth, maiden names, minor names, and signatures are not sensitive enough to warrant mandatory redaction. *See* Va. Code 17.1-293(B).

[20] Like with redaction, the Clerk fails to address that the use of OCRA subscription agreements adequately addresses her stated interest.

be "easily identifiable." Comm. Br. at 14, 24. The Clerk's subscriber agreements, however, including the Non-Attorney Subscriber Agreement that she sent to CNS in June 2021, *see* Ex. J at 6, asks the applicant to identify their employer, address, phone, and email address, all of which allow the Clerk to "easily identify" the subscriber. Indeed, an OCRA user is responsible for the proper use of OCRA pursuant to the terms of the subscriber agreement, which, among other things, require the subscriber to acknowledge responsibility "for ensuring that the use of OCRA is conducted in a proper and legal manner." SUF ¶ 26; Ex. B at ¶ 7.g.

The Commonwealth points to the Knuth Declaration to claim this is not sufficient because Virginia's General OCIS and Circuit OCIS systems – neither of which is a permissions-based system – have purportedly "been subject to data harvesting tactics," relying simply on the fact that OES has determined that "instead of searching [these databases] for a few cases or names within a single session, [ ] bots [ ] enter searches for every single possible case number within the database, sequentially…far faster than what a human is capable of entering." Comm. Br. at 6-7, Knuth Decl. ¶¶ 8-10.[21] The Commonwealth, however, does not explain why these supposed search activities justify the challenged restrictions.

The Commonwealth also contends that the VDBC system – which by design, unlike OCRA, allows registrants to search using an individual's date of birth and last four digits of their SSN – "has been, and continues to be, subjected to data harvesting tactics by bots" despite its registrant agreement. Comm. Br. at 7-8, Knuth Decl. ¶¶ 11-14. But unlike OCRA, VDBC is not a paid subscription service. Even so, like General OCIS and Circuit OCIS, the Knuth Declaration does not present any evidence to establish that VDBC has been mined *for nefarious*

[21] As explained *supra*, the Knuth Declaration is submitted by a witness who was not disclosed until after the close of discovery. Accordingly, the Court should disregard that declaration in its entirety.

*purposes*. Indeed, despite such supposed data mining, the Commonwealth, through OES, continues to operate these systems, regardless of these supposed harms. And perhaps most significantly, even accepting Knuth's remarks as true, it is purely speculative to posit that OCRA, if accessible to non-attorneys via a subscriber agreement vetted and monitored by the Clerk, would be mined to malicious ends.

In light of the many available less restrictive alternatives, Defendants are left to argue that, without the Non-Attorney Access and Dissemination Restrictions, the Clerk (and any other Virginia circuit court clerk that offers OCRA to non-attorneys) would be forced to expend an *unspecified* amount of money to redact filings and police misuse of OCRA. Comm. Br. at 20, 23; Clerk Br. at 5, 18. But Section 17.1-293(E)(7) only permits remote access to *nonconfidential* court records. Further, "[i]f budget implications of any amount…justified the suppression of constitutional rights, the last two centuries of constitutional jurisprudence would be eviscerated." *CNS v. Forman*, 2022 WL 2105910, at *15 (N.D. Fla. June 10, 2022).

Defendants attempt to support their supposed cost concern by relying on a declaration from Paul Ferguson, the Clerk of the Arlington County Circuit Court, who is not a defendant in or involved in this case. *See* Exhibit L. As more fully explained in CNS' summary judgment motion, and as summarized here, Mr. Ferguson's declaration lacks foundation and, in any event, is not probative of the challenged restrictions that are before the Court. *See* CNS Br. at 27-28. Unlike the Prince William Clerk, the Arlington Clerk does not make non-confidential court records accessible to the public at the courthouse in unredacted form. Ex. L ¶ 6. Instead, the Arlington Clerk states that his court pays a third-party vendor approximately $35,000 per year to "redact[ ] original signatures, social security numbers, Credit Cards, Bank Accounts, Minor Children Names and Ages, Maiden Names, Judges Signatures, and Tax IDs" before making

court records available on public terminals in the Clerk's office. *Id.* ¶ 10. He then "estimates," without any explanation, that "it would cost approximately $150,000 to provide access to redacted documents for records posted on [his court's] remote access system." *Id.* ¶ 11.[22] Mr. Ferguson does not estimate how much it would cost for Ms. Smith to redact filings at the Prince William Court that are available on OCRA, nor does Ms. Smith provide this information herself. Thus, Mr. Ferguson's declaration is of no help to Defendants in meeting their constitutional burden. *See, e.g., Forman*, 2022 WL 2105910, at *15 (rejecting cost as sufficient justification where defendant "did not provide an amount but simply pointed to [the cost in another court]").

**c. Defendants Ignore That The Practices of Other Courts, Including the Alexandria Circuit Court, Demonstrate that the Access Restrictions Are Not Narrowly Tailored to Serve Any Compelling or Significant Interest**

Defendants' concerns regarding fair and orderly administration of justice and protecting privacy are not unique. They are shared by all courts nationwide, state and federal, yet all federal district courts, as well as courts in at least 37 other states, give the press and public remote online access to civil court records. SUF ¶¶ 9-10.[23] At least one other Virginia circuit court, *i.e.*, Alexandria – notwithstanding the language in Section 17.1-293 of the Virginia Code – provides subscribing members of the press and public, including non-attorneys, with remote online access to all non-confidential civil records filed in that court. SUF ¶¶ 13-14. Indeed, as David Ardia law review article cited by the Commonwealth explains:

> In practical terms, the recognition that the First Amendment precludes the courts from discriminating between members of the public with regard to access to court records would not mark a dramatic shift in the current practice of most courts. The federal courts, for example, do not exclude any individuals or entities from

---

[22] Mr. Ferguson fails to explain, for example, why he cannot simply post the redacted documents already available on public terminals on his court's remote access system (which is not OCRA).

[23] The Commonwealth's assertion that "very few states provide online access to court records to all members of the public," Comm. Br. at 18, is simply not true.

> accessing publicly available court records, and PACER is available to anyone who registers for an account.

2017 U. Ill. L. Rev. at 1413.

Unable to escape this truth, the Commonwealth misleadingly asserts that "Virginia's approach of refraining from posting non-confidential court records online for public consumption is consistent with the practices of all other states in the Fourth Circuit, except for South Carolina, in which some, but not all, jurisdictions within the state post court records online." Comm. Br. at 18. This argument misses the mark. What matters is that the Clerk, and other Virginia circuit court clerks that offer OCRA, provide remote access to attorneys while restricting it for all other members of the public. No other state in the Fourth Circuit, or for that matter, nationwide (except one), maintains and defends an attorney preference system. *See* Girdner Decl. ¶ 5.

The Prince William Court, and other Virginia circuit courts, are not distinct from the overwhelming majority of states and all federal district courts that provide the public and press with remote access to civil filings. They too can provide remote access, and without restricting the dissemination of information accessed remotely, consistent with the First Amendment, while also protecting Defendants' stated interests. It is not an either/or proposition.

**<u>CONCLUSION</u>**

Restricting remote access to attorneys only and prohibiting the publication of information accessed remotely, suppresses reporting on court matters, and darkens the halls of government where only those directly involved are privy to the day's events. Defendants say these blackout policies are justified by privacy interests, but they fail to support their position with any record evidence, as they must to survive constitutional scrutiny. Summary judgment is warranted for CNS, not Defendants.

Dated: August 1, 2022

Respectfully submitted,

*/s/ Dabney J. Carr*

Dabney J. Carr, IV (VSB No. 28679)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
P.O. Box 1122
Richmond, Virginia 23218
Tel: (804) 697-1238
Fax: (804) 697-1339
dabney.carr@troutman.com

Jonathan E. Ginsberg (admitted *pro hac vice)*
**BRYAN CAVE LEIGHTON PAISNER LLP**
1290 Avenue of the Americas
New York, New York 10104
Tel: (212) 541-2000
Fax: (212) 541-4630
jon.ginsberg@bclplaw.com

*Counsel for Plaintiff Courthouse News Service*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| COURTHOUSE NEWS SERVICE, *Plaintiff,* v. JAQUELINE C. SMITH, *et al.*, *Defendants.* | ) | Civil Action No. 3:21-cv-00460-HEH |

DECLARATION OF WILLIAM GIRDNER IN OPPOSITION
TO DEFENDANTS' MOTIONS FOR SUMMARY JUDMENT

I, William Girdner, declare and state as follows:

1. I am the founder and editor of Courthouse News Service ("CNS"), the plaintiff in the above-captioned action. I make this declaration in opposition to the motions for summary judgment filed by Defendant Jacqueline C. Smith, in her official capacity as Clerk of the Circuit Court for Prince William County, Virginia ("Prince William Clerk") and the Intervenor-Defendant the Commonwealth of Virginia (the "Commonwealth") (collectively, "Defendants"). I have personal knowledge of the following facts, except where otherwise stated.

2. In their motions, Defendants rely on fear, fantasy, and distortion to support their arguments: fear of the internet; fantasy about the magnitude of risk of remote access for the press and public; and distortion of arguments made in a law review article that launched the so-called "practical obscurity" doctrine. The Commonwealth describes the danger latent in remote access to courts records as "information harvesting, resale, and dissemination." Commonwealth Brief at 2. Those words could well describe the free press of this nation which gathers information,

sells subscriptions and advertisements, and disseminates news to an open and democratic society that relies on the media to stay informed about what their government is up to.

3. As part of my personal experience overseeing CNS and guarding against attacks on press and public access, I have become familiar with how various court administrators have pointed to the "practical obscurity" doctrine advanced by the Commonwealth to restrict public access when switching from paper to the electronic medium for filing. The doctrine was used to justify restraining public access to electronic records in two ways, one by delaying access and two by blocking access online. The second method – blocking online access – lives on in the Commonwealth of Virginia. But it has been abandoned by federal courts and state courts all across the nation that now provide the public with remote access to civil filings. *See also* Declaration of William Girdner [attached to Dkt. No. 70] ("Girdner Decl."), ¶¶ 4-5, 26-29.

4. To its rough point conjuring fear of the internet, the Commonwealth adds the academic veneer of a law review article by David Ardia, a former general counsel to the Washington Post and now a professor at the University of North Carolina School of Law. *See* pages 2 and 18 of the Commonwealth's Brief, citing David S. Ardia, *Privacy and Court Records: Online Access and the Loss of Practical Obscurity*, 2017 U. Ill. L. Rev. 1385 (2017). A read of the article makes it clear that Mr. Ardia is not advocating for restriction on information contained in public records. His article in fact makes the very point CNS is making here: "This article pushes back against the categorical exclusion of information in court records. In doing so, it makes three core claims. First, the First Amendment provides a qualified right of public access to all court records that are material to a court's exercise of its adjudicatory power. Second, before a court can restrict public access, it must engage in a case-specific evaluation of the

privacy and public access interests at stake. Third, per se categorical restrictions on public access are not permissible." *Id.* at 1385-86.

5. In addition, Mr. Ardia's article points out that the way to protect privacy is not to block off access to court records, but it is instead to primarily require that filers omit privacy identifiers from their filings. *Id.* at 1389, 1445-47. In a recent opinion regarding delays in access to newly filed civil complaints in violation of the First Amendment, Judge Christina Reiss of the District of Vermont wrote that this solution, *i.e.*, filer redaction, is "overwhelmingly effective." *Courthouse News Serv. v. Gabel*, 2021 WL 5416650, at *16 (D. Vt. Nov. 19, 2021).

6. Yet, just as Defendants have done in their briefs, the straight-forward First Amendment points made by Mr. Ardia have been widely distorted by state court clerks hungry for a doctrine that would allow them to restrict access to court filings. The doctrine that gives them intellectual cover is based on words used by Mr. Ardia referring to the "practical obscurity" of paper records, positing that paper records were practically obscure so internet records should also be obscure. This nonsensical logic assumes paper records are hard to find in practice and should continue to be in the electronic world. But my experience as a journalist covering and regularly visiting courts nationwide for over 30 years has showed me that in fact paper records were well indexed and easy to find. The federal courts, for example, indexed their paper dockets and documents in a manner that journalists could easily navigate in searching for information for articles, and the same is now true in the PACER system which provides online access to dockets and filings in every federal court in the nation.

7. In 2021, I participated on an online panel with Professor Ardia called "Digitizing Court Records" at a conference named "Technology, Privacy & Law," organized by the University of Florida Law School. Within the broad topic of electronic access to court records,

the panel talked about a rule change in Florida's state courts taking clerks out of the business of reviewing and redacting new civil filings for confidential information, while leaving the duty placed squarely on the filing lawyers themselves. When towards the end of our panel discussion I described the situation where a court, like the Prince William Circuit Court, provides online access to one group, *i.e.* lawyers, but not to journalists or the general public, Professor Ardia expressed his opinion that online access once provided should not be limited to one group because that practice is not consistent with First Amendment principles.

8. The benefits of online access are especially evident when it comes to the OCRA system. As fully explained in my declaration in support of CNS' motion for summary judgment, access to OCRA would allow a journalist or a member of the public to keep track of litigation from one end of the state to the other. *See, e.g.,* Girdner Decl., ¶¶ 6, 10, 33, 44. Even before the time when print newspapers started to shrink and die, the option of sending reporters to the 105 different circuit courts in Virginia that currently give lawyer-only access to OCRA was not practicable for any news outlet, and that is doubly so now. The policy that blocks online access to the records of a great majority of Virginia's circuit courts is an attack on the principle of open courts, a foundation stone of our great American democracy.

9. Defendants' access and dissemination restrictions are also at odds with courts in 38 other states that provide the press and public with unrestricted access to filings on a remote online basis, as I explained in my moving declaration. Girdner Decl., ¶¶ 26-27. With uniformity, these state courts, like federal courts, have proscribed the inclusion of private identifiers by lawyers and other filers in court documents, no matter the medium, yet they, unlike the Commonwealth's circuit courts, provide remote access to court filings without issue. This prohibition has been effective. In addition, most federal and state courts require registration and

a user name and password to review records online. Had the internet hobgoblins conjured by Defendants been anything other than phantasms, the long list of state courts that provide remote access would be unlikely to continue giving public access online.

10. Illustrating the point, New York's state courts give online access to new court filings to the public for free. They have done so since the beginning of 2017, without any of the calamities imagined in Defendants' briefs. This Court itself provides online public access through PACER, which stands for Public Access to Court Electronic Records, requiring registration, a user name, a password plus a small fee to review and download court documents.

11. As part of the long campaign by CNS combatting restrictions in access to court records, I have written a series of columns and articles for the CNS website contesting the "practical obscurity" doctrine, the motives behind it, and its consequences. Three are attached as Exhibit 1. They include: "First Amendment: Never Ending War," published August 31, 2021; "First Amendment action filed against Columbus clerk over access blackout," published June 15, 2022; and "Media jumps into Vermont First Amendment fray, published July 13, 2022. In the latter, I wrote: "Resistance from court clerks coalesces under an anti-public access rubric called 'practical obscurity.' The notion is premised on an inaccurate idea that paper records were hard to find or 'obscure,' and therefore electronic records should also be made hard to find even though they are public, thus, 'practical obscurity.' The clerks' motives are regularly shown to be less than altruistic, however. The clerks are openly trying to hang onto the records as a source of income from copy fees, and are defiant of federal court orders in defense of their local fiefdoms."

12. The PACER system of the federal courts, along with the long list of state courts that provide online access to new civil filings in courts urban and rural, proves that access to court filings should be anything but difficult. New civil filings are a traditional source of news.

They often involve matters of great public interest, and the only way for reporters to cover those filings in a practicable way all across the Commonwealth is to have access to the court record in the same manner granted to one small set of the public, Virginia-barred attorneys. The illusion of "practical obscurity" is not a basis for upholding that restriction.

* * *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Pasadena, California on this 1st day of August 2022.

William Girdner

# EXHIBIT 1
# to
# Declaration of
# William Girdner

**Sunday, July 31, 2022** | Back issues    Courthouse News Service    Try CasePortal    or Log in

Op-Ed

# First Amendment: Never ending war

August 31, 2021

*Even though the Ninth Circuit has spoken, court bureaucracies within its vast jurisdiction are fighting against access to court records on receipt.*

Link copied



**By Bill Girdner**
Editor of Courthouse News Service.

After ten years of legal combat, the Ninth Circuit affirmed a First Amendment decision saying the right of access attaches upon the filing of a court document. Even so, the judiciary establishments in Oregon and Idaho continue the fight against public access at the time of receipt.

The resistance by clerks to traditional access, even within the Ninth Circuit, comes against a backdrop, an ideological setting. That backdrop was painted by the Conference of State Court Administrators, founded in 1953 and comprised of the top state court administrator in each of the 50 states.

As an organization, COSCA considered the basic question of whether the force of the Internet should be used to keep the tradition of open courts or, alternatively, to throttle public information.

The group developed model guidelines in 2002 that hewed to the tradition of access when court documents crossed the counter. The guidelines adopted a policy that "maximizes accessibility to court records."

Section 3.1 of the guidelines defined "court record" as "Any document, information, or other thing that is collected, received, or maintained by a court or clerk of court in connection with a judicial proceeding."

Section 3.2 defined public access as "'Public access' means that the public may inspect and obtain a copy of the information in a court record."

Those guidelines were presented after being developed during the preceding two years when David Byers, director of Arizona's Administrative Office of the Courts, was president of the COSCA. The same director, twenty years later, OK'd an electronic inbox put for new court filings throughout Arizona.

During his COSCA leadership, the person in charge of the policy committee was the director of Utah's court administration, Daniel Becker. Utah now also provides public access to e-filed complaints when they are received.

But in the decade after those model guidelines were set out, a movement antagonistic to those principles has emerged. The split between the two camps was described in a paper by the Council for Court Excellence, a Washington D.C. nonprofit:

"Thus, a dichotomy in the development of rules governing public access to electronic court files rests on two conflicting views of privacy:

"1. One view has been described as 'public is public' and recommends generally broad and unrestricted access to all court files— paper and electronic."

"2. The contrasting approach aims to limit public access to electronic files both to parallel the way the public must use the paper files, by visiting the courthouse and using a computer terminal there (labeled 'practical obscurity') and by restricting certain major areas of court files."

The council paper published in 2017 described the obscurity *zeitgeist* in a footnote: "'Practical obscurity' … refers to the idea that even though some information may be public… the information is obscure because it is not easily accessible."

In a letter to the attendees of the 2013 COSCA conference, when the practical obscurity philosophy was surging, I noted the results of a survey of state judges on the issue at the heart of the conflict.

The survey asked, "Do judges favor delayed access to court records over immediate access?" A strong plurality, 43%, had answered "no" to that question. In other words, they favored "immediate access" to court records. A lesser 32% said they favored delay. A total of 705 judges answered the question.

"Courthouse News agrees with the great majority of the more than 700 judges who said the court record should remain presumptively open to public access, and access should not change based on whether records are paper or electronic," I wrote at the time.

"We also agree with the big plurality of judges in favor of immediate access to court records, and the six out of seven who say access policy should not be subject to individual interpretation.

The letter sent to all those attending the conference pointed to the PACER model as one that follows the principles and preserves traditional access to public court records.

"The federal model differs from state models that depart from those principles, that use technological change to undermine traditional access, that in the name of progress are marching backwards — through redaction, preferential access, private monopolies on the record, delays that kill news coverage, and e-filing rules that seek to reinvent the definition of filing and give clerks wide latitude to withhold public access."

The divergence from the model COSCA principles has only increased since then, and flourishes even now within the Ninth Circuit.

Subscribe to this Column

*Want to receive new op-eds directly to your inbox? Subscribe below.*

enter your e-mail address Subscribe

Additional Reads

Western flames spread, California sees its largest 2022 fire
July 31, 2022

The last giant pandas of Europe finally have a name
July 31, 2022

# First Amendment action filed against Columbus clerk over access blackout

*A court that once provided access to new civil complaints as they were filed now delays access for up to two weeks as a result of the transition from paper to electronic filing.*

BILL GIRDNER / June 15, 2022




*Courthouse News Service bureau chief Ryan Abbott (right) and reporter Charly Himmel (center) speak with court staff at the Mahoning County Court of Common Pleas in Youngstown, Ohio. (Bill Girdner / CNS)*

Ohio's courts, like many across the land, allowed news reporters to see paper filings when they crossed the clerk's counter. Then when the electronic revolution finally came to those state courts, like many across the land, they took traditional press access away.

One of the clearest examples of the effects of that take-away can be seen in Columbus where the new state court cases languish in a docketing queue for days before becoming public. A local court rule declares all of them confidential — in effect a blanket sealing order — until whenever the clerk gets around to docketing them.

Challenging the take-away, Courthouse News on Monday filed a First Amendment action against Franklin County Court of Common Pleas in Columbus.

"The advent of e-filing should not erase the historical tradition of access to new civil complaints. Technology should illuminate the halls of government, not darken them," said the memo accompanying the complaint.

The complaint seeks, and the memo argues for, an injunction against the clerk for violating the First Amendment right of access. In the two most recent decisions addressing what is called a "no-access-before-process" policy, federal judges in Vermont and Florida enjoined clerks from enforcing that policy.

The Florida injunction by Chief U.S. Judge Mark Eaton Walker forbids the chairwoman of Florida's e-filing authority from holding back access to new court filings while the clerical work of docketing is done. The Vermont injunction by U.S. Judge Christina Reiss similarly forbids the Vermont court administrator from delaying public access until the clerical review process is complete.

The policy followed by the clerks in Florida and Vermont is the same in its essentials as the policy followed by Clerk Maryellen O'Shaughnessy in Columbus. In other words, she is denying access to the new civil complaints until the clerical work of docketing, now often called processing, is done.

In the Florida and Vermont cases, and in the Columbus case, the clerks rejected requests to provide access when the new cases are received. Rather than simply agree to return public access, they have shown themselves willing to use publicly paid lawyers to defend their withholding policies and risk the public expense of paying for this news agency's attorney fees if they lose.

The source of obduracy is found partly in a set of yearly clerk conferences in Williamsburg in 2013. The body organizing the meeting, the Conference of State Court Administrators, was originally led by administrators who believed in public access and saw the power of electronic filing to improve public access.

But by the time of the Williamsburg conferences, the organization had been taken over by members who distrusted electronic access and who developed a philosophy called "practical obscurity." This notion argued that paper records were hard to find — obscure in practice – so electronic records should be too.

The belief in practical obscurity has mixed with other factors causing a rigid opposition to timely public access in the electronic era. They include the fact that state court clerks often sell public records to supplement their local budgets, and the clerks believe they are the custodians of the court records, a belief that, according to clerks themselves, often slurs into a sense of ownership.

Ohio traditionally gave excellent public access to new filings – the court record as it was created. Reporters as well as the public could review the new civil cases in a box at the counter in Cleveland, Columbus, Cincinnati, Youngstown and other locations.

Included in the First Amendment action filed Monday is a declaration by bureau chief Adam Angione who described the once-upon-a-time access in Columbus.

"In those paper filing days at Franklin County Court of Common Pleas, the newly-filed complaints were stacked on top of a desk behind the intake counter," he wrote. "For about a day or so, the complaints remained on that desk so that the court's official newspaper, The Daily Reporter, and Courthouse News could review and report the news of the court without delay."

The clerical work of creating a docket to keep track of future events in the case was done later. "The next day, those complaints were sent on to the docketing clerk who entered case information," said the Angione declaration.

A second declaration by this author describes the tradition of access throughout the courts of America. It also talks about traditional access in Youngstown and the transition to delayed access with e-filing.

"There on the counter I saw the vestiges – what I call 'the bones' – of traditional access," said the Girdner declaration. "There was a wooden box labeled 'civil complaints' where, in the days of paper, the new complaints were placed once they crossed the counter."

An opinion piece about the discovery of that artifact is attached to the declaration. The synopsis for that piece says, "Accomplishing chrysalis in reverse, the court in Youngstown was caught at the moment it was metamorphosing from a traditional box-on-the-counter paper access court to a delayed access efiling court, a terrible sight to behold."

Courthouse News is represented in the suit by Alexandra Berry and Jack Greiner with the Graydon law firm in Ohio. Early last year, they filed a similar action against the clerk in Cincinnati, over the same policy. But that case has languished. A motion to dismiss filed by the clerk more than a year ago has not been decided.

The suit filed this week in federal court in Columbus was assigned to Judge Sarah Morrison, a 2018 appointee.

The memo asking her to enjoin the Columbus clerk notes extensive delays that render the new complaints stale by the time they can be seen. Very few cases, 6%, are seen on the day they are filed. Fully 40% are withheld for three days or more with a substantial number blacked out for more than a week.

| Total Cases (All Cases) | | |
|---|---|---|
| **Category** | **# of cases** | **Percent of Total** |
| Zero Delay | 171 | 5.76% zero delay |
| One Day Delay | 1038 | 34.98% one day delay |
| Two Days Delay | 548 | 18.47% two day delay |
| Three Days Delay | 377 | 12.71% three day delay |
| Four Days Delay | 435 | 14.66% four day delay |
| Five to Ten Days Delay | 391 | 13.18% five to ten day delay |
| More Than Ten Days Delay | 7 | 0.24% more than ten days delay |
| **Total Cases** | **2967** | |

Unlike any court that this news service has familiarity with, the Columbus court has put in place a rule that declares all new civil filings confidential until they are reviewed by a clerk and docketed. "All documents submitted for e-Filing shall be confidential until accepted by the Clerk," says the local court's e-filing rules.

The Courthouse News memo argues that the rule and the practice of holding back the complaints restrict the First Amendment right of access. U.S. Supreme Court precedent makes it clear that a clerk cannot restrict press and public access once the right is established – unless the clerk has an overriding reason and uses the least restrictive alternative.

The local rule's blunderbuss approach to the new filings, automatically declaring all of them confidential, cannot pass the Supreme Court test of Press Enterprise

v. Riverside II, the memo argues. That is because the clerk does not have an overriding reason and has less restrictive alternatives.

Specifically, the clerk is using e-filing software by Tybera Development Corp. which also supplies the software used in Utah where the state courts automatically render the new filings public when they are received, in other words with no delay. The same is true in the federal court in the Southern District of Ohio where this week's complaint was filed.

In conclusion, the memo says, "The public depends on the press for news and information about the judicial branch of government and thus the right of access to court filings serves an important role in the free expression of not just the press, but also the public. Courthouse News respectfully requests that Defendants be preliminarily enjoined from restricting access to newly filed civil complaints until after such complaints are processed, and that Defendant be directed to make such complaints accessible in a contemporaneous manner upon receipt."

## Read the Top 8

*Sign up for the Top 8, a roundup of the day's top stories delivered directly to your inbox Monday through Friday.*

enter your e-mail address

Sign Up

## Additional Reads



Western flames spread, California sees its largest 2022 fire

July 31, 2022



The last giant pandas of Europe finally have a name

July 31, 2022



Competing styles and alliances shape US Senate, governor primaries in Wisconsin

July 30, 2022



Anti-abortion activists and lawmakers explore what comes next in a post-Roe Texas

July 30, 2022

# Media jumps into Vermont First Amendment fray

*News organizations join appellate arguments over Vermont clerk's policy of blocking access to new complaints for a limitless time until clerical work is completed.*

BILL GIRDNER / July 13, 2022




*(Art by Carlos Ayala/Courthouse News)*

(CN) — A coalition of media filed a brief Wednesday in the Manhattan-based Second Circuit Court of Appeals supporting a decision that found Vermont court clerks in violation of the First Amendment.

The clerks were blocking public access to new complaints in order to first run through clerical work, often called "docketing." U.S. District Judge Christina Reiss in Burlington enjoined their blocking practice which had destroyed a centuries-old tradition of public access to new paper filings when they crossed the clerk's counter.

Local court clerks are often virulent in their opposition to press access ahead of their clerical work and they drive opposition. As a federal judge in a related case remarked recently, the clerks appear to be trying to protect their little fiefdoms.

In Vermont, the clerks' reaction to the judge's ruling was to appeal to the Second Circuit, a court that has developed a strong body of law protecting the First Amendment right of access.

"Robust, accurate news reporting requires timely access to civil complaints," said the media brief. "Because freshness and speed are key features of the news

business, a delay of even a day can result in a complete denial of meaningful access."

News organizations signing onto the amicus brief include The Associated Press, The Boston Globe, The New York Times, Politico and The Seattle Times, among many others.

The underlying case was brought in Vermont by Courthouse News and the resulting opinion by Judge Reiss serves as a paradigm opinion in the area of First Amendment access to the public record of the courts.

She rejected weaker strands within First Amendment law, such as allowing clerks a few hours to docket or using a weak standard tied to speech in public forums. Instead she stuck to the main line of Supreme Court precedent that analyzes access to court proceedings and records in light of the 1983 Supreme Court opinion *Press Enterprise v. Riverside Superior Court*.

Referred to as *Press Enterprise II*, the ruling sets out a demanding test for any clerk attempting to limit public access to the public record. That test requires that the clerk have an overriding reason for the restriction and use the least restrictive alternative.

Once placed in that legal paddock, clerks usually lose. Because there is no overriding need to do clerical work before public access and because there are a number of easy electronic alternatives that provide public access as quickly as the old way, at the counter.

Judges hearing access cases were once practicing lawyers and they often remember the clerk's office. "What we're saying is, 'Oh for about 230 years you could walk into a Missouri courthouse, into the clerk's office, and say, 'Hey, can I see what's been filed today,' and now all of a sudden you can't, right?"

That comment by Judge Ralph Erickson who is based in Fargo, North Dakota and sits on the Eighth Circuit was made earlier this year to a lawyer defending the St. Louis County clerk's practice of blacking out new complaints for one to two weeks before allowing public access.

Likewise, U.S. District Judge Sarah Morrison in a recent scheduling conference in Columbus, Ohio, remembered that access at the clerk's counter. "I remember those days, when they had them there, some sitting there in the little cubicle, and they were there, that's what they did."

Because their goose is cooked in the *Press Enterprise II* box, clerks scramble to stay out of it.

Their most recent tactic is to play hide the evidentiary ball. In both Texas and Maryland, lawyers working for the state attorney general have tried to withhold evidence of delays in access. The evidence, which is in electronic form, is pivotal for proving injury, a key element in any First Amendment case.

In an electronic filing system, the date and time a new complaint is received is recorded, and so is the date and time it becomes public. With that electronic data, delays can be proven in a manner that is unassailable.

So the clerks simply refuse to give up the electronic evidence.

In Baltimore, Maryland, U.S. District Judge Ellen Hollander this week expressed a high degree of skepticism about the effort by government lawyers to withhold

the electronic records, but allowed them two weeks to file a written response to a Courthouse News motion to compel production of the evidence.

And this afternoon, U.S. Magistrate Mark Lane granted a motion to compel brought by Courthouse News seeking electronic records that had been denied by the Texas Office of Court Administration. The Texas case is headed for a trial in roughly one week before U.S. Judge Lee Yeakel in Austin.

Resistance from court clerks coalesces under an anti-public access rubric called "practical obscurity." The notion is premised on an inaccurate idea that paper records were hard to find or "obscure," and therefore electronic records should also be made hard to find even though they are public, thus, "practical obscurity."

Paper records were in fact well organized in courthouse records rooms, and traditional access at the counter was at the time of receipt.

The clerks' motives are regularly shown to be less than altruistic, however. The clerks are openly trying to hang onto the records as a source of income from copy fees, and are defiant of federal court orders in defense of their local fiefdoms.

In a survey of Texas court clerks asking what they had to say about a request by the media for access at the time a new complaint is filed, one clerk wrote, "THAT REQUEST IS TOTALLY RIDICULOUS!!!"

In the Vermont case, the media amicus brief set the table for the appellate panel, invoking the test of *Press Enterprise II*.

"As the District Court found, Defendants have made no showing to justify that restricting public access to civil complaints until a clerk completes a multi-point administrative review is 'necessary to protect the orderly administration of justice,'" said the media brief.

"Moreover, it is difficult to imagine that there are no less restrictive means available to advance Defendants' purported interest than to deny public access to civil complaints for an indefinite period of time—which could range from hours to weeks—while a court clerk completes an administrative review."

The brief also provided a strong example of the need for reporting on new civil complaints:

"For example, on the morning of August 26, 2021, seven U.S. Capitol police officers filed a complaint in the U.S. District Court for the District of Columbia, alleging that former President Donald Trump and others conspired to incite the violent attack on the U.S. Capitol. By 11:11 a.m., BuzzFeedNews legal reporter Zoe Tillman tweeted a link to the complaint which was quickly re-shared by users more than one thousand times.

"Within the next two hours, Tillman and other reporters published articles reporting on the lawsuit in greater depth. And, that evening, MSNBC news anchor Chris Hayes examined the lawsuit in detail during his 8:00 p.m. ET news broadcast. Without contemporaneous access to the complaint, this level of timely reporting and robust discussion would not have been possible."

The amicus brief is written by Katie Townsend with The Reporters Committee for Freedom of the Press.

The main brief on behalf of Courthouse News is written by Jonathan Ginsberg with Bryan Cave in New York.

The brief on behalf of the Vermont clerks is written by David Boyd working for Vermont Attorney General Susanne Young.

New entities signing in support of the media brief also include: BuzzFeed, The Center for Investigative Reporting, First Amendment Coalition, First Look Institute, Hearst Corporation, The Inter American Press Association, The Media Law Resource Center, Mother Jones, The National Association of Black Journalists, The National Association of Broadcasters, The National Freedom of Information Coalition, The National Press Club, National Press Photographers Association, News Media Alliance, Online News Association, Pro Publica, Inc., Pulitzer Center on Crisis Reporting, Radio Television Digital News Association, The Society of Environmental Journalists, Society of Professional Journalists and the Student Press Law Center.


### Read the Top 8

*Sign up for the Top 8, a roundup of the day's top stories delivered directly to your inbox Monday through Friday.*

enter your e-mail address    Sign Up


## Additional Reads



Western flames spread, California sees its largest 2022 fire

July 31, 2022



The last giant pandas of Europe finally have a name

July 31, 2022



Competing styles and alliances shape US Senate, governor primaries in Wisconsin

July 30, 2022



Anti-abortion activists and lawmakers explore what comes next in a post-Roe Texas

July 30, 2022

© 2022, Courthouse News Service

About Us / Masthead / Advertise / Terms of Use / Privacy Policy

Do Not Sell My Personal Information

Connect with us on our social channels:

# EXHIBIT B

# *COMMONWEALTH of VIRGINIA*

*Office of the Attorney General*

Mark R. Herring
Attorney General

202 North Ninth Street
Richmond, Virginia 23219
804-786-2071
Fax 804-786-1991
Virginia Relay Services
800-828-1120
7-1-1

June 25, 2021

The Honorable Jacqueline C. Smith
Clerk of the Prince William Circuit Court
9311 Lee Avenue
Third Floor
Manassas, VA 20110

Dear Ms. Smith:

The Supreme Court of Virginia recognizes that construction of the Constitution and statutes of the Commonwealth by the Attorney General under the provisions of § 2.2-505 of the Code of Virginia "is of the most persuasive character and is entitled to due consideration."[1] The same status and weight, however, are not afforded informal opinions and advice rendered by deputy and assistant attorneys general. The views expressed herein do not constitute an Opinion of the Attorney General under the provisions of § 2.2-505. Consequently, this response to your inquiry represents only the individual view of one of the counsel to the Attorney General.[2]

**Issue Presented**

You ask whether a circuit court clerk may provide members of the press with secure remote access to nonconfidential court records. You additionally ask whether such access may be granted under § 17.1-293, which permits a circuit court to provide: ". . . secure remote access to nonconfidential court records . . . to members in good standing with the Virginia State Bar and their authorized agents, pro hac vice attorneys . . . and such governmental agencies as authorized by the Clerk."

---

[1] Barber v. City of Danville, 149 Va. 418, 424 (1928); *see also* City of Va. Beach v. Va. Rest. Ass'n, Inc., 231 Va. 130, 135 (1986); Bd. of Supvrs. v. Marshall, 215 Va. 756, 762 (1975).

[2] *See* VA. CODE ANN. § 2.2-501 (permitting Attorney General to appoint such assistant Attorneys General as may be necessary). This and all other citations to the Code of Virginia herein are from the electronic version of the Code on LexisNexis and are current through the 2021 Regular Session of the General Assembly and Acts 2021 Sp. Sess. I, cc. 55, 56, 78, 82, 110, 117, 118, 171, 216, 220 and 243.

**Applicable Law and Discussion**

Section 17.1-293 generally prohibits any circuit court clerk from publishing documents containing certain private information on the internet.[3] Section 17.1-293(E)(7) states that this prohibition does not apply when a clerk provides "secure remote access to nonconfidential court records," restricted to "members in good standing with the Virginia State Bar and their authorized agents, pro hac vice attorneys authorized by the court for purposes of the practice of law, and such governmental agencies as authorized by the clerk."[4] As elected constitutional officers, each circuit court clerk determines how to facilitate the access contemplated by § 17.1-293(E)(7) in his or her jurisdiction.[5] The Office of the Executive Secretary of the Supreme Court of Virginia (OES) has developed a system, known as Office of the Court Remote Access (OCRA), that a substantial majority of jurisdictions have adopted to provide remote access to nonconfidential documents. I understand that the Prince William County Circuit Court Clerk's Office is one such jurisdiction.

You advise that, in your opinion, this statute is silent as to the question of whether a circuit court clerk may provide members of the press remote access to nonconfidential court records. The Code of Virginia, however, specifically grants circuit court clerks this authority in § 17.1-225. This section provides:

> The clerk of the circuit court of any county or city may provide remote access, including Internet access, to all nonconfidential court records on an automated case management or other system maintained by his office and described in § 17.1-242. The clerk shall be responsible for insuring that proper security measures are implemented and maintained to prevent remote access users from obtaining any data that are confidential under this Code and to prevent the modification or destruction of any records by remote access users. For purposes of this section, remote access users are those individuals who are not employees of the clerk's office. Secure remote access to land records shall be governed by § 17.1-294.[6]

Section 17.1-225 clearly allows circuit court clerks to operate and maintain their own systems of secure, remote access to nonconfidential court records. The Code is additionally careful to define "remote access users" as "those individuals who are not employees of the clerk's office."[7] Thus, members of the press would have access to such a system.

However, § 17.1-293 restricts the information that members of the public, including the press, may remotely access to only those documents containing non-private information. Systems like OCRA, which provide remote access to documents that may include social security numbers, dates of birth, or financial account numbers, must be restricted to officers of the court pursuant to § 17.1-293(E)(7). Any system providing access to the public pursuant to § 17.1-225 must redact this type of private information or exclude the relevant documents. The Code does not permit remote access by the public to nonconfidential documents available on OCRA pursuant to § 17.1-293(E)(7). Nonconfidential

---

[3] VA. CODE ANN. § 17.1-293.

[4] VA. CODE ANN. § 17.1-293(E)(7).

[5] Virginia Office of the Executive Secretary, Memorandum on statewide electronic filing procedures (Nov. 20, 2018).

[6] VA. CODE ANN. § 17.1-225.

[7] *Id.*

documents that do not contain private information could be remotely accessed via some other system pursuant to § 17.1-225.

**Conclusion**

Accordingly, it is my view that the Code of Virginia grants circuit court clerks the ability to provide secure remote access to nonconfidential court records to members of the general public under § 17.1-225. Under this section, circuit court clerks may operate and maintain systems of secure remote access, but they must prevent remote access users from obtaining private information. Because systems like OCRA, however, exist in part to facilitate access by officers of the court to protected private information pursuant to § 17.1-293(E)(7), circuit court clerks cannot grant the general public remote access to nonconfidential documents through OCRA.

Very truly yours,

Robert B. McEntee, III

Robert B. McEntee, III
Assistant Attorney General

# EXHIBIT C

**Ginsberg, Jon**

---

| | |
|---|---|
| **From:** | Heather Steele <hsteele@pesner.com> |
| **Sent:** | Tuesday, July 5, 2022 5:26 PM |
| **To:** | Ginsberg, Jon; 'Carr, Dabney J.'; McNeill, Erin R.; 'McEntee III, Robert B.' |
| **Cc:** | Alexis J. Sadural; Kimberly Robinson; Lauren Gillespie |
| **Subject:** | CNS v. Smith - Answers to Discovery, Supplemental Discovery, Amended Initial Disclosures, and Sworn Declaration |
| **Attachments:** | DEF ANS to Second INT from CNS - final.pdf; DEF Supplemental ANS to INT and RPDs - FINAL.pdf; DEF Jackie Smith Amended Initial Disclosures - FINAL.pdf; Signed Paul Ferguson Declaration220705170647.PDF |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

All,

Please find attached the following documents:

- Defendant Smith's Answers to Plaintiff's Second Set of Interrogatories
- Defendant Smith's Supplemental Answers to Interrogatories and Requests for Production
    - Below is a link to the ShareFile which contains the Complaints previously provided along with 35 pages of additional Bates-stamped documents
- Defendant Smith's Amended Initial Disclosures
- Sworn Declaration from Paul Ferguson, Clerk of the Arlington Circuit Court

https://pesneraltmillermelnickdemers.sharefile.com/d-s2baf35b2cae7483998d73c0d008783e6

Thank you,

**Heather R. Steele**
**Attorney at Law**

**PESNER ALTMILLER MELNICK DEMERS & STEELE PLC**

Main: 703·506·9440
Direct: 703·506·9446
Fax: 703·506·0929
Email: hsteele@pesner.com

Pesner Altmiller Melnick DeMers & Steele PLC
8000 Westpark Drive, Suite 600
Tysons, Virginia 22102
www.pesner.com

REAL ESTATE · LITIGATION · ESTATE PLANNING · COMMUNITY ASSOCIATIONS
FAMILY LAW · TRUST & ESTATE ADMINISTRATION · LENDER REPRESENTATION

This electronic message transmission contains information from the law firm of Pesner Altmiller Melnick DeMers & Steele PLC that may be confidential or privileged. The information is intended for the recipient only and use by any other party is not authorized. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this transmission is prohibited. If you have received this electronic transmission in error, please notify us immediately by telephone (1.703.506.9440x224) or by fax (1.703.506.0929) or by electronic mail hsteele@pesner.com. Thank you.

Please consider the environment before printing this email

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| **COURTHOUSE NEWS SERVICE,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Civil Action No.: 3:21cv460-HEH** |
| **KARL R. HADE**, *et al.*, | ) | |
| **Defendants.** | ) | |

**DEFENDANT JACQUELINE C. SMITH'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW the Defendant, Jacqueline C. Smith ("Defendant" or the "Clerk"), by counsel, and hereby submits this memorandum of law in opposition to Plaintiff's Motion for Summary Judgment.

**DISPUTED FACTS**

Pursuant to Local Rule 56, the following undisputed facts set forth in Plaintiff's memorandum are not admitted by Defendant:

Plaintiff's Undisputed Fact 7 states: "And CNS' reporters observe ethical proscriptions precluding inclusion of confidential information and personal identifiers in any of CNS' publications." This statement does not indicate what precisely are the ethical proscriptions to which CNS is referring, or what the declarant's foundations are for this conclusion.

Plaintiff's Undisputed Fact 14 states: "The filings on AJIS are available to any subscribing member of the press or public, and those filings are the same records available at the courthouse." It is not clear that the declarant has sufficient foundation to attest to the fact that every filing available on the AJIS system is the same as the records available at the courthouse.

Plaintiff's Undisputed Fact 29 states: "The Prince William Clerk currently has 274 paying private, i.e., attorney, OCRA subscribers, meaning the Clerk collects at least $54,800 in annual subscriber fees, despite only paying an annual maintenance fee of $9,500." Although it is true that the Clerk pays the amount of $9,500 annually as a maintenance fee in connection with its use of OCRA, that is not the only expense that the Clerk incurs in connection with its processing of civil filings and their placement in the OCRA system, contrary to what this statement implies.

Plaintiff's Undisputed Fact 33 states: "OES notes made in connection with the 2018 Work Group Report reflect its view that no authority may exist for clerks' concerns that non-attorney OCRA users could scrape data." Although it is certainly true that OES made notes that reflect their opinion in this regard, this is not an undisputed fact. At best, it is an unsubstantiated opinion; at worst, it is simply hearsay.

## ARGUMENT

### A. Plaintiff's Reliance upon *Press-Enterprise II* Is Misplaced

Plaintiff relies heavily upon the Supreme Court's decision in *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 106 S. Ct. 2735 (1986). However, both the facts of that case and the test articulated by the Court in its opinion have very limited applicability in this case. *Press-Enterprise II* involved access to the transcript of a preliminary hearing in a criminal case. The hearing itself had been closed to the public, and a newspaper publisher sought access to a transcript of the hearing. After the magistrate holding the hearing refused to grant access to the transcript, the state, later joined by the publisher, moved to have the transcript released. When the court ultimately refused to grant the publisher's writ of mandamus, the Supreme Court reversed. The issue in that case was access to the proceeding—not the time, place, or manner in which that access would be provided. The issue before the Supreme Court was therefore whether access to the

transcript could be completely denied.

In this case, Plaintiff is not being denied access to the civil filings at issue. Plaintiff is not even being denied contemporaneous access to the information sought. It is for this reason that this Court previously ruled that any restriction in this case resembled time, place, and manner, and was therefore subject to relaxed scrutiny. This distinction is crucial. There is no dispute between the parties that Plaintiff has a First Amendment right of access to the filings generally. Furthermore, as noted by this Court in its prior Memorandum Opinion, Plaintiff "is not alleging that the public has a fundamental right to remotely access civil court records guaranteed by the First Amendment." (ECF No. 48). "Instead, Plaintiff argues that *if* Defendants provide Virginia attorneys remote access to civil court records, *then* the First Amendment also requires them to provide the public with remote access." *Id.* (emphasis in original). Therefore the standard set forth in *Press-Enterprise II* is not applicable here; rather, the relaxed scrutiny standard articulated in *Globe Newspaper Co. v. Superior Ct. for Norfolk Cty*., 457 U.S. 596, 102 S. Ct. 2613, 73 L. Ed. 2d 248 (1982) is the appropriate test to be employed.

The type or manner of access being provided—as distinguished from a complete closure from access—informs the entire analysis in this case. As the Ninth Circuit observed in another case involving Plaintiff:

> Even in this era of electronic filing systems, instantaneous public access to court filings, especially complaints, could impair the orderly filing and processing of cases with which clerk's offices are charged. After all, litigants are not uploading their complaints to the internet; they are filing them with a court, making them subject to judicial administration. The First Amendment does not require courts, public entities with limited resources, to set aside their judicial operational needs to satisfy the immediate demands of the press.

*Courthouse News Serv. v. Planet*, 947 F.3d 581, 596 (9th Cir. 2020). As another court observed, "[t]he qualified right of access does 'not require perfect or instantaneous access,' but it does require

contemporaneous access -- something in line with what the press has traditionally enjoyed." *Courthouse News Serv. v. N.M. Admin. Office of the Courts*, 566 F. Supp. 3d 1121, 1171 (D.N.M. 2021).

**B. <u>Providing Remote Access to Attorneys—But Not to the General Public—Is Constitutional under the Relaxed Scrutiny Standard.</u>**

The Court held in its prior Memorandum Opinion that "[t]he non-attorney access restriction challenged here does not stop CNS from accessing civil court records altogether but instead controls how and when it accesses them," and that it therefore "resembles a time, place, and manner restriction and relaxed scrutiny applies." (ECF No. 48). As set forth in more detail in Defendant's memorandum in support of her motion for summary judgment, the remote access provided by the Clerk to attorneys—but not to the general public—passes constitutional muster under the relaxed scrutiny standard. Defendant expressly incorporates the arguments in her memorandum in support of her motion for summary judgment herein, particularly as they relate to the significant government interests in play in this case, and the fact that the statutes at issue are narrowly tailored to promote those significant governmental interests. As set forth in Defendant's memorandum in support, the statutes at issue in this case promote the significant governmental interests of protecting the private information of litigants and the efficient and orderly administration of the court system.

Plaintiff's memorandum also contains certain specific arguments that Defendant will now address in turn.

**C. <u>The Fact That the Clerk Has Not Historically Tracked the Number of Filings That Contain Information Identified in Virginia Code §17.1-293(B) Does Not Automatically Mean That She Has Not Met Her Burden with Respect to an Analysis under the Relaxed Scrutiny Standard.</u>**

Plaintiff argues that because the Clerk is unable to provide the number of filings in each of the last five years that contained the information identified in Va. Code § 17.1-293(B) (because that information sought is not tracked by the Clerk or any other group), the Clerk is therefore unable to meet her burden under the relaxed scrutiny standard. Taken at face value, the implication is that the statutory regime at issue, and the Clerk's compliance with the applicable statutes, can only survive a constitutional challenge if the Clerk (or some other governmental entity) anticipated years ago that Plaintiff would file this lawsuit and seek the specific discovery request in question. Essentially, the contention appears to be that Defendant's position in this case was doomed long before the case was filed by her inability to anticipate the current litigation.

**D. <u>The Prohibitions Contained in Virginia Code §17.1-293 Apply to Secure Remote Access.</u>**

Plaintiff asserts that Va. Code § 17.1-293(B) "merely prohibits court clerks from posting generally 'on the Internet' (as opposed to a secured permission-based subscriber system) certain personal identifiers." Although Plaintiff does not expand upon this argument, it appears to be arguing that providing information remotely over the Internet is not the same thing as posting information "on the Internet." The Internet is defined as "an electronic communications network that connects computer networks and organizational computer facilities around the world." *See* https://www.merriam-webster.com/dictionary/Internet. The Internet is also defined in Virginia Code §17.1-292 as "the international computer network of interoperable packet-switched data networks."

Neither Virginia Code nor the dictionary have limited the definition of Internet to exclude permission-based subscriber networks. No remote access system can exist without being part of, and making use of, the Internet. Any remote access will involve the use of Internet protocols and

Internet addresses, and will require an Internet connection in order to utilize the remote access. Without the Internet there is no remote access. The suggestion that §17.1-293 (B) has no applicability to secure remote access ignores the fact that such access must employ the Internet.

**E. There Is No Enforceable Obligation on the Filing Party (or the Clerk) to Redact Any Confidential Information in Court Filings.**

Plaintiff asserts that "the filing party is required to redact much of the information Defendants are concerned about, *i.e.*, social security numbers and financial account numbers, *see* Va. Code § 8.01-420.8(A), a less restrictive alternative is already in place with respect to this particular information." This is not strictly accurate. As noted in Defendant's memorandum in support of its motion for summary judgment, the statute does not require filers to redact, but instead simply requires them to make an effort to do so. The statute specifically states that "the party shall make reasonable efforts to redact." Va. Code Ann. § 8.01-420.8. There is no actual consequence for failing to redact. The statute specifically states that "[n]othing in this section shall create a private cause of action against the party or lawyer who filed the document or any court personnel, the clerk, or any employees of the clerk's office who received it for filing." Va. Code Ann. § 8.01-420.8. Because there is no enforceable obligation on the filing party, the redaction efforts of the filing party are not sufficiently reliable to promote the significant governmental interest of protecting the litigants' private information, and thus the redaction efforts of the filing party cannot constitute a "less restrictive alternative" as Plaintiff suggests.

**CONCLUSION**

On the basis of the foregoing, the Court should deny Plaintiff's Motion for Summary Judgment.

Dated: August 1, 2022.

Respectfully submitted,

*/s/ Heather R. Steele*

John C. Altmiller, Esq., VSB No. 34902
Heather R. Steele, Esq., VSB No. 75473
Pesner Altmiller Melnick DeMers & Steele PLC
8000 Westpark Drive, Suite 600
Tysons, VA 22102
703-506-9440 (phone)
jaltmiller@pesner.com
hsteele@pesner.com
*Counsel for Defendant Jacqueline C. Smith*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 1st day of August, 2022, I will electronically file the foregoing Memorandum in Opposition to Plaintiff CNS's Rule 56 Motion for Summary Judgment with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing (NEF) to all counsel of record.

*/s/ Heather R. Steele*
Heather R. Steele

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>*Plaintiff,*<br>v.<br><br>JAQUELINE C. SMITH, *et al.*,<br><br>*Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 3:21-cv-00460-HEH |

DECLARATION OF ANDRAS BODIS IN FURTHER SUPPORT OF PLAINTIFF COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT

I, Andras Bodis, declare and state as follows:

1. I am a partner in a software development firm, The Development Factory ("TDF"), that designs and develops secure web and mobile applications and business systems for customers operating in healthcare, media, agriculture, and commercial business activities. I have been a partner in TDF since its establishment in 2010.

2. I have been working as a technology leader and consultant for more than 22 years, and have extensive experience in designing, architecting, and developing secure applications for businesses and their customers. I have built and led teams on hundreds of development projects in my career. I am proficient in many different technologies, platforms, and software languages such as software applications, web applications, mobile development, machine learning, Azure Cloud, AWS, ASP.NET, C#, Java, Python, Javascript, and CSS.

3. As part of my current job responsibilities, I am the acting Technology Director for Courthouse News Service ("CNS"), the plaintiff in this action. In that role, I am responsible for a large team of product managers, software architects, and developers. I am the designer, architect, and implementation leader for all new CNS systems, including security protocol and systems infrastructure management.

4. I have been provided with, and reviewed, the Declaration of Joby Knuth, submitted by the Commonwealth of Virginia in support of its motion for summary judgment in this case. That declaration focuses on cyber security concerns tied to "bot" activity on three websites maintained by the Commonwealth: the Virginia Circuit Court Online Case Information System, the General District Court Online Case Information System, and the Virginia Date of Birth Confirmation system.

5. I submit this declaration in order to assist the Court with understanding the shortcomings of Mr. Knuth's declaration. There are two primary pieces of information missing from Mr. Knuth's analysis. One is an understanding of what a bot does, and two, and more importantly, the host of available measures website operators can use successfully to limit malicious activity on their sites.

6. An internet bot (short for "robot") is a software application that runs automated tasks over the internet. Tasks run by bots are typically simple and performed at much higher rates compared to human activity. Bots are not inherently good or evil. Depending on the purpose for which they were devised, they can be useful (such as for customer service or indexing search engines).

7. Bots known as "web crawlers" are often welcomed by website operators because they index web content and help internet users find relevant information. The best-known example of this is Googlebot, the generic name for Google's web crawler, which powers the Google search engine.

8. There are also bot types known as "web scrapers," as mentioned in paragraph 7 of Mr. Knuth's declaration, whose primary purpose is to collect or store data and reuse it (sometimes described as "data mining" or "data acquisition"). Frequently, these web scrapers are designed to automate data collection for academic research purposes, to generate aggregate news feeds, and even to collect and compare the lowest airline prices.

9. In paragraph 9 of his declaration, Mr. Knuth describes a "log analysis" of the General District OCIS site from which investigation determined "an inordinate load of web requests" and identified those requests as "probable 'internet bots.'" This analysis does not appear to offer any information other than that bots exist, which is consistent with the descriptions I've outlined above.

10. It is generally understood by website operators that bots are not unusual and it is estimated that bot traffic currently represents more than half of all internet activity. Accordingly, website operators routinely establish protocols for managing bots who visit their sites in order to continue to provide their website content to the general public while safeguarding against the potential for unwelcome bot activity. This practice is colloquially known as "bot management," and it allows website operators to reasonably prevent against abusive data mining without restricting the use of their website to the public at large.

11. There are a host of documented bot management, mitigation, and protection practices, such as:

"Bot Identification" – where a website operator can analyze the visiting user's machine, IP address and location and cross-check the information in a database of known users;

"Block lists" or "Allowlists" – where a website operator can specifically block IP addresses, to prevent access to the site for visitors from that location, or, in reverse, specifically and only allow visitors from certain IP addresses:

"CAPTCHA Verification" – part of a category known as "challengers," where website operators can include challenges and tests that help distinguish robots from humans. The most common method is CAPTCHA, which requires users to verify words, numbers, and images that are dynamically displayed. Challengers are particularly easy for humans to circumvent and very difficult for bots to solve:

"Dynamic Activity Profiling" – where the website operator monitors the activity of a visitor and slows down or blocks access dependent on how quickly the visitor appears to be navigating and clicking through information;

"Rate Limiting" – similar to Dynamic Activity Profiling, Rate Limiting sets rules about how quickly (or often) information can be viewed or downloaded within a specific time-based period;

"Two Factor Authentication" – sometimes described as "2FA," an electronic authentication method in which registered users can only login successfully after providing a second method of verification, usually in the form of a unique code sent by SMS to the user's mobile device or email account, or using a companion "authenticator" application;

"Limitations for Login and Password Resets" – website operators can set rules about how many (incorrect) attempts can be made when logging in or resetting passwords in order to prevent determined bot activity;

"Geolocation-based Security" – similar to Block lists and Allowlists, this method uses the geographical location of the visiting user's IP address to deny or grant access. For example, a website operator could permit only US-based visitors to a website; and

"Paywalls" – prevents remote users from accessing certain web content without payment.

12. Typically, website operators will combine some or all of these bot management, mitigation, and protection practices to encourage the collection of information that should be publicly available (such as creating and adding an index file called "sites.xml," which contains the full structure of the website's content and willfully provides it to the web crawler so that the site content can be fully mined and indexed) and to discourage the collection of information that is private or abuse of the site.

13. In paragraph 16 of his declaration, Mr. Knuth references his team's many "anti-scripting tactics," but makes no explicit mention of what these tactics are or how they have

failed. Even moderate combinations of any of the methods I outline above can prove sufficient in thwarting unwanted bot activity.

* * *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Montrose, California on this 6th day of August 2022.

Andras Bodis

Call us at 909-483-6165

Log in

Civil Litigation Bankruptcies Opinions

CASEPORTAL BY COURTHOUSE NEWS SERVICE

< Back to Search

# Donald Erwin v. Paul Hannon, et al.

Want access to unlimited case records and advanced research tools? Create your free CasePortal account now. No credit card required to register.

Try CasePortal for Free

## Summary

Contract. Defendant failed to complete a roofing project for plaintiffs. $3,000.

## Docket Sheet

© 2022, Courthouse News Service

Privacy Policy / Terms of Use / We No Longer Sell Your Personal Information

Call us at 909-483-6165

Log in

**Civil Litigation** **Bankruptcies** **Opinions**

CASEPORTAL

BY COURTHOUSE NEWS SERVICE

**Courts**

- Los Angeles County Superior Court (60269)
- Kings County Supreme Court (26613)
- Miami-Dade County Circuit Court (25036)
- New York County Supreme Court (16601)
- USDC Northern District of Florida (16592)
- Orange County Superior Court (15823)
- USDC Central District of California (13944)
- Broward County Circuit Court (13937)
- Los Angeles County Superior Court Branches (13641)
- Harris County District Court (13520)

Apply Filter

**Natures of Suit**

- Personal Injury - Product Liability (25526)
- Other Civil Rights (17481)
- Insurance (16971)
- Personal Injury - Health Care/Pharmaceutical Personal Injury/Product Liability (14380)
- Amer w/Disabilities - Other (12849)
- Employment (11301)
- Other Contract (10502)
- Consumer Credit (10366)
- Other Personal Injury (9947)
- Other Immigration Actions (7313)

Apply Filter

Search Civil Litigation from Federal and State Courts | Search

Past Year | Select Courts | See search tips

**1,306,366 Civil Litigations in CasePortal**

## Donald Erwin v. Paul Hannon, et al.

**Court:** Tippecanoe County, **Filed On:** August 9, 2022, **Case #:** 79D02-2208-PL-000071

Contract. Defendant failed to complete a roofing project for plaintiffs. $3,000.

## Melissa B. Snitko v. Marco L. Vranish, if alive, if deceased, all unknown heirs and/or devisees of Marco L. Vranish, et al.

**Court:** Jefferson County District Court, **Judge:** Berger, **Filed On:** August 9, 2022, **Case #:** DV-22-49

Quiet title.

## American Transit Insurance Company v. Tiffany Mason, et al.

**Court:** Bronx County Supreme Court, **Filed On:** August 9, 2022, **Case #:** tc220809-b908

Petition for stay of arbitration.

## Adr Provider; Tamara Carter; Adr Provider; Tamara Carter As Administrator Of The Estate Of Brandon Rodriguez; Adr Provider; City Of New York; Adr Provider; New York Health And Hospitals Corporation; Adr Provider; Mental Health Professional Marie Richard; Adr Provider; John/Jane Does 1-10

**Court:** USDC Southern District of New York, **Filed On:** August 9, 2022, **Case #:** 1:22cv6798

Complaint. 42:1983 Civil Rights Act

## Matthew Hopkins v. Autoweb Inc., et al.

**Court:** USDC Southern District of New York, **Filed On:** August 9, 2022, **Case #:** 1:22cv6799

Complaint. 15:78m(a) Securities Exchange Act

Want access to unlimited case records and advanced research tools? Create your free CasePortal account now. No credit card required to register.

Try CasePortal for Free

### Epic Worldwide; Alan Tucker; Pm Barbee Holdings; Goldwater Group; Energy 101 Consulting Llc; Exuma Capital Inc.; Jjm Consulting Inc.; Kcg Americas Llc; National Financial Services Llc; John Bryan Pike; All Plaintiffs; Sportsquest Inc.

**Court:** USDC Southern District of New York, **Filed On:** August 9, 2022, **Case #:** 1:22cv6802

Complaint. 15:78m(a) Securities Exchange Act

### Sentinel Marine Underwriters Llc, As Subrogor Of v. Msc Mediterranean Shipping Company S.A., et al.

**Court:** USDC Southern District of New York, **Filed On:** August 9, 2022, **Case #:** 1:22cv6805

Complaint. 28:1333mc Marine Contract Demand: $101,000

### Discover Bank v. Shanna L Willett, et al.

**Court:** Fort Bend County District Court , **Filed On:** August 9, 2022, **Case #:** 22-DCV-295868

Contract - Consumer/Commercial/Debt

### VW Credit Inc. v. Innovative Automotive LLC, et al.

**Court:** Bergen County Superior Court, **Judge:** Wilson, **Filed On:** August 9, 2022, **Case #:** BER-L-4351-22

Contract. Plaintiff seeks release of a vehicle being held at defendants' property following a third party defaulting on financing payments.

### Kathy Walton Lafon v. In Re, et al.

**Court:** Staunton Circuit Court, **Filed On:** August 9, 2022, **Case #:** CL22000378-00

Rites Of Marriage Celebrant

### Summer Park Property Owners Associatioin Inc. v. Rosenburg Ltd., et al.

**Court:** Fort Bend County District Court , **Filed On:** August 9, 2022, **Case #:** 22-DCV-295878

Contract. Defendants' failed to make payments on a vacation property lien owned by the plaintiff. $55,000.

### James M. Tracy v. Richard Taylor, et al.

**Court:** Hartford Superior Court, **Filed On:** August 9, 2022, **Case #:** HHD-CV22-6159294

Dog bite action.

### Cynthia Spitler v. Sandoz Inc., et al.

**Court:** USDC Eastern District of Louisiana , **Judge:** Triche Milazzo, **Filed On:** August 9, 2022, **Case #:** 2:22cv2601

Complaint. 28:1332 Diversity-Product Liability

### Vesta Smith v. Accord Healthcare Inc., et al.

**Court:** USDC Eastern District of Louisiana , **Judge:** Triche Milazzo, **Filed On:** August 9, 2022, **Case #:** 2:22cv2602

Complaint. 28:1332 Diversity-Product Liability

### Kyung Hi Seo v. Corinna Chan, et al.

**Court:** Queens County Supreme Court, **Filed On:** August 9, 2022, **Case #:** 716558/2022

Slip and fall on an icy sidewalk.

### Antigonee Mosley v. Greenwood Motor Lines Inc. dba R&L Carriers, et al.

**Court:** Angelina County District Court , **Filed On:** August 9, 2022, **Case #:** CV-00461-22-08

Car collision.

### Keenan Accounting & Tax Services LLC v. Daniel T. Howell Roofing Company Inc., et al.

**Court:** Bergen County Superior Court, **Judge:** Geiger, **Filed On:** August 9, 2022, **Case #:** BER-L-4355-22

Collections action for failure to pay for accounting services. $4,000.

### Prosperum Capital Partners LLC dba Arsenal Funding v. CES Energy LLC dba CES Energy, et al.

**Court:** Kings County Supreme Court, **Filed On:** August 9, 2022, **Case #:** 523018/2022

Collections complaint for an unpaid future receivables agreement. $15,000.

### Advance Servicing Inc. v. Preferred Star Service Corp., et al.

**Court:** Kings County Supreme Court, **Filed On:** August 9, 2022, **Case #:** 523022/2022

Collections complaint for an unpaid future receivables agreement. $26,000.

### Grover Stamps v. Davol Inc., et al.

**Court:** USDC Southern District of Ohio, **Judge:** Sargus, **Filed On:** August 9, 2022, **Case #:** 2:22cv3084

Complaint. 28:1332 Diversity-Product Liability

### Frank Sciro v. Gabriella Batarseh, et al.

**Court:** Bergen County Superior Court, **Judge:** Geiger, **Filed On:** August 9, 2022, **Case #:** BER-L-4359-22

Car collision.

### Jossleydan Hassiel Cruz Reyes v. BPT 295 LLC, et al.

**Court:** Queens County Supreme Court, **Filed On:** August 9, 2022, **Case #:** 716588/2022

Construction injury. Plaintiff was hit by a vehicle at defendant's job site.

### Victoria G. Kelley v. West Bend Mutual Insurance Co., et al.

**Court:** Waukesha County Circuit Court, **Judge:** Aprahamian, **Filed On:** August 9, 2022, **Case #:** 2022CV001150

Car collision.

### Jerry L McLaughlin v. Jane Ayers Watson, et al.

**Court:** Bedford County Circuit Court, **Filed On:** August 9, 2022, **Case #:** CL22001867-00

Declaratory Judgment

### Downriver Spine Management Clinic PLLC v. Fremont Insurance Company, et al.

**Court:** Wayne County Circuit Court, **Judge:** Berry, **Filed On:** August 9, 2022, **Case #:** 22-009499-NF

Insurance contract. No fault benefits.

### The Provident Bank v. Tymeshops LLC, et al.

**Court:** Sussex County Superior Court, **Judge:** Mcgovern, **Filed On:** August 9, 2022, **Case #:** SSX-L-317-22

Collections action for failure to pay on a loan. $63,000.

### First & First Llc v. Owners Insurance Company, et al.

**Court:** USDC Minnesota, **Filed On:** August 9, 2022, **Case #:** 0:22cv1986

Complaint. 28:1332 Diversity Demand: $75,000,000

### Joseph Arthur v. Los Angeles Times Communications Llc, Trading As, et al.

**Court:** USDC Western District of Virginia, **Judge:** Moon, **Filed On:** August 9, 2022, **Case #:** 3:22cv45

Complaint. 28:1332 Diversity-Libel,Assault,Slander Demand: $25,000,000

### Jerome Ensminger, As Personal Representative Of The Estate Of Jane Ensminger v. United States Of America, et al.

**Court:** USDC Eastern District of North Carolina, **Judge:** Boyle, **Filed On:** August 9, 2022, **Case #:** 2:22cv28

Complaint. 28:1331 Fed. Question

### Michael Sean Partain v. United States Of America, et al.

**Court:** USDC Eastern District of North Carolina, **Judge:** Dever, **Filed On:** August 9, 2022, **Case #:** 2:22cv29

Complaint. 28:1331 Fed. Question

1 2 3 4 5 6 ... 43546 Next»

© 2022, Courthouse News Service

Privacy Policy / Terms of Use / We No Longer Sell Your Personal Information

Call us at 909-483-6165

Log in

**Civil Litigation** **Bankruptcies** **Opinions**

CASEPORTAL
BY COURTHOUSE NEWS SERVICE

# CasePortal has it covered.

Get case details, documents, and insights for civil litigation, bankruptcies, and opinions from more than 3,000 federal, state, and international courts.

From AM LAW 100 to regional practitioners and in-house counsel— CasePortal has the tools and the data to keep you informed.




**Search Civil Cases**

**Search Opinions**

## Start searching for free

Try searching civil cases or judicial opinions right now and see why our subscribers say nobody beats our case coverage.

## 25,308,403 Cases Tracked!

Since 1990, Courthouse News Service© has been a trusted resource for capturing and reporting case data across the United States and around the globe. Our news delivery platform, CasePortal, provides attorneys with comprehensive coverage, daily reporting, and fast alerts.




**Request a Free Trial**

---

**Lawyers from over 4,400 law firms and in-house counsel teams use CasePortal to stay briefed**

---

# Features that keep your practice sharp

From full text search of complaints and opinions, to email and SMS alerts for cases you're tracking, CasePortal's friendly features help lawyers and research support teams to **quickly find relevant cases**, and to **stay informed about new filings and rulings** that could impact your clients.




**COMPREHENSIVE COVERAGE**

## 3,000+ federal *and* state courts

Quit bouncing between multiple services while you're trying to research. When you use CasePortal, you can find cases from thousands of federal, state, and international courts at once.

**SIMPLE SEARCH**

## A search engine that supports both simple and advanced research

CasePortal's deceptively simple search tool makes it easy to find cases using plain language *or* build highly targeted advanced search queries in seconds. You can even search the text of filed documents and opinions!

"class action" AND def:(Google OR "Alphabet Inc.") AND plaint:(Samsung* or Apple~) ⊗ Reset Search Create Dinger

Past 10 Years ▾ | 05/18/2012 to TODAY | Select Courts

[redacted]

**Summary:** J. Gibbons finds that the lower court properly ordered a mother to return her children to their father in Venezuela despite his history of domestic violence because a single, relatively minor instance of abuse had been confirmed, and the children would not be in "grave danger" if removed from the U.S. Military conflict and famine in Venezuela were insufficient to require that the children remain with their mother because evidence indicated protests could be avoided and that the family home has access to a generator, local schools, and all other basic necessities. Affirmed.

**Court :** 6th Circuit
**Judge :** Gibbons
**Case No :** [redacted]
**Filed On :** 03/30/2022

**NOS :** [redacted]
**Cause :** [redacted]
**Category :** FAMILY LAW;IMMIGRATION

Download Opinion

**QUICK ANALYSIS**

## Save time with our crafted case summaries

When you're mining thousands of records, you don't have time to look at every case detail. With CasePortal, case summaries display in the search results, making it easier and faster to scan large data sets and filter out irrelevant matches.

**FIRST ALERTS**

## Get notified fast about new cases and updates to existing cases

Only CasePortal offers Dingers and Trackers. Save your search parameters with one-click and let us notify you as soon as new matching cases are filed, or alert you to docket sheet updates and subsequent filings on cases you're following.






**MOBILE-FRIENDLY**

## Dockets sheets and document downloads direct to your mobile phone

You won't always be at your desk when alerts come in. CasePortal boasts mobile-friendly docket sheets so you can check case details on the go and even download complaints and opinions with your phone.

**API-DRIVEN**

## Create custom workflows with apps you already use

Imagine getting a notification in Microsoft Teams or Jabber whenever your client has been named as a party in a lawsuit. How about getting an Excel spreadsheet automatically populated with new cases from courts you care about?

CasePortal's REST API makes it possible to automate manual tasks, and easily combine data from multiple sources. Ask your IT team to check out our developer documentation.



---

## Find out what CasePortal can do for you

Request a Demo

## Try our Case Reports free for 14 days!

No credit card required. No obligation to continue.

### Civil Litigation Reports

Sign up to start receiving up to 3 of our civil litigation reports in the geographic region of your choice.

**Try Civil Litigation**

### Bankruptcy Reports

Sign up to start receiving up to 3 of our bankruptcy and adversary proceedings reports in the geographic region of your choice.

**Try Bankruptcies**

### The Daily Brief

Sign up to start receiving a daily report of newly issued judicial opinions from appellate courts across the country.

**Try Opinions**

---

© 2022, Courthouse News Service

Privacy Policy / Terms of Use / We No Longer Sell Your Personal Information

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

COURTHOUSE NEWS SERVICE }
}
v. } Civil Action No.
} 3:21 CV 460
JACQUELINE C. SMITH and }
COMMONWEALTH OF VIRGINIA }

August 18, 2022

COMPLETE TRANSCRIPT OF CROSS MOTIONS FOR SUMMARY JUDGMENT
BEFORE THE HONORABLE HENRY E. HUDSON
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

Jonathan E. Ginsberg, Esquire
BRYAN CAVE LEIGHTON PAISNER LLP
1155 F Street NW
Washington, DC 20004

Dabney J. Carr, IV, Esquire
TROUTMAN PEPPER HAMILTON SANDERS LLP (RICHMOND)
1001 Haxall Point, Suite 1500
Richmond, Virginia 23219
Counsel on behalf of Courthouse News Service

Robert B. McEntee III, Esquire
Erin R. McNeill, Esquire
OFFICE OF THE ATTORNEY GENERAL (RICHMOND)
202 North 9th Street
Richmond, Virginia 23219
Counsel on behalf of Commonwealth of Virginia

John C. Altmiller, Jr., Esquire
PESNER KAWAMOTO CONWAY PLC
7926 Jones Branch Drive, Suite 930
McLean, Virginia 22102
Counsel on behalf of Jacqueline C. Smith

KRISTA L. HARDING, RMR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

(The proceeding commenced at 10:01 a.m.)

THE COURT: Good morning.

MR. GINSBERG: Good morning, Judge.

MR. McENTEE: Good morning.

MS. McNEILL: Good morning.

MR. ALTMILLER: Good morning, Your Honor.

THE COURT: All right, Ms. Pizzini, call our first case this morning.

THE CLERK: Case Number 3:21 CV 460. *Courthouse News Service v. Jacqueline C. Smith and Commonwealth of Virginia.*

Plaintiff is represented by Mr. Jonathan E. Ginsberg and Mr. Dabney Carr, IV.

Defendant Smith is represented by Mr. John Altmiller, Jr.

Defendant Commonwealth of Virginia is represented by Mr. Robert McEntee, III and Ms. Erin McNeill.

Are counsel ready to proceed?

MR. GINSBERG: Yes, we are.

MR. McENTEE: We are.

THE COURT: The matter is before the Court this morning on cross motions for summary judgment.

I have read all the pleadings you've filed, I have read all the cases you have cited, plus some others,

and I am prepared to proceed this morning.

Courthouse News being in the top end of the pleading, I'll allow them to go first. Go right ahead.

MR. GINSBERG: Thank you, Judge.

THE COURT: And you may lower your mask so the court reporter can hear you more clearly when you give your argument.

MR. GINSBERG: I will certainly do that. Thank you.

THE COURT: Yes, sir.

And you are Mr. Ginsberg, is that correct?

MR. GINSBERG: I am, Judge.

THE COURT: Good to see you this morning. Nice to have you here.

MR. GINSBERG: Good to see you again.

Your Honor, we're here today because the undisputed material facts demonstrate that defendants' restriction of remote access to non-attorneys, to nonconfidential civil court records, violates the First Amendment.

THE COURT: Has any other court so held? I don't find any.

MR. GINSBERG: No court has so held because no court has considered this issue before.

THE COURT: All right.

MR. GINSBERG: In fact, Virginia really is one of two states that maintains and defends an attorney preference system. And the other one, I believe Illinois, the Supreme Court has issued an order allowing clerks to get rid of that preference system down the road.

THE COURT: I don't want to interfere with your argument at all, and I apologize if I do, but why didn't you take the simple route in going to the General Assembly and having 17.1-293(H) repealed or modified? Did you go to the General Assembly?

MR. GINSBERG: We did not, Your Honor. Actually, in 2018, Senator Obenshain did go to the General Assembly to attempt exactly what this case is about. That attempt was tried and it failed. The General Assembly in 2019, I believe, rejected a bill to amend the Virginia code to expressly require that clerks of the circuits to provide secure remote access to nonconfidential court filings.

THE COURT: Of course you have a different composition of the General Assembly now then you did when Mark Obenshain was there, but I'll leave that up to you. You can handle your case as you wish.

MR. GINSBERG: Well, the only other thing I'll say, Judge, is that this is a First Amendment case, and we believe that question belongs in the federal courts.

THE COURT: All right. That's a fair answer.
Go right ahead.

MR. GINSBERG: I'd like to start by saying that neither Courthouse News, nor any other non-attorney, can match the 24/7/365 access allowed to Virginia lawyers who can view filings wherever they may be from their home, their office. While Courthouse News, in order to see the same filings, needs to go to the individual courthouse, 105 circuit courts that offer OCRA.

THE COURT: I don't think anyone would argue with you that it would be far more convenient for the media to have this access. Absolutely agreed. But the question is whether or not it is required.

The media has access. It's the same access the public has, and their right is no greater than the public. You know that Judge Motz said that in *Schaefer*.

Why do you think the press -- and I think it would be great if the press had access to it, frankly, but the question is, is it legally required? Is it constitutionally founded?

MR. GINSBERG: Yes. And we believe the First Amendment requires the access that we seek in this case.

The key, and what this case really comes down to as a matter of law, Judge, is that First Amendment jurisprudence requires the defendants, not the plaintiff,

but the defendants, that they bear the burden of proof to justify the challenge restrictions here by pointing to specific evidence, not conjecture, not generalizations, and they failed to do that here.

Now, Judge, if I may, before I jump into the first -- the merits of the First Amendment argument, I think it's absolutely critical to frame that argument by briefly addressing the key facts, which the parties do not dispute.

First, Your Honor, there's no dispute that defendants restrict remote access via OCRA, which is a permission-based system behind the pay wall --

THE COURT: You're going to have to slow down just a little bit because this young lady has got to take it down.

MR. GINSBERG: I'm sorry about that. Yes.

THE COURT: Just slow down a little bit.

MR. GINSBERG: I will certainly slow down, Judge.

THE COURT: Okay.

MR. GINSBERG: OCRA is a permission-based system. It's behind the pay wall, and it requires the clerk to vet and approve subscribing users. It also requires those users to sign a subscriber agreement, which provides all sorts -- a subscriber provides all sorts of

personal information in connection with that agreement: name, email, address, phone number, all of which allow the clerk to monitor one's use.

Now, there's also no dispute, as Your Honor recognized, that the same nonconfidential records -- and this is critical, Judge. The records Courthouse News seeks in this case are nonconfidential. They're already disclosed to the public and press at the physical courthouse.

And the parties agree that the contents of those records are exactly the same. There's no difference whatsoever. So by the time they're already posted to OCRA, the cat's already out of the bag.

Now, the Commonwealth, who's an intervening defendant in this case, attempts to skirt this reality in many ways, one of which is to argue that OCRA instead provides an attorney with what they, really misleadingly, call "unredacted records," but that's not true. OCRA only gives attorneys access to nonconfidential, already public records. Not unredacted records.

And those records do in fact contain redactions. There's no dispute that filers are required to redact all information deemed confidential by the legislature. That's social security numbers and financial account numbers, mainly. And the clerk -- Clerk Smith in this

case, says that she too is redacting that information before posting filings to OCRA.

THE COURT: She said there's limited redaction. Just certain areas like social security numbers, date of birth, and other information about their names. But it's not the kind of total redaction that I think that you would want to have if it were publicly available over the Internet.

MR. GINSBERG: Well, yes. What the clerk is redacting and what the filers are required to redact are social security numbers and financial account numbers. I don't think, actually, that filers are required to redact date of birth. I just want to make that clear for the record.

But the other things that the defendants are concerned about, things like minor names and maiden names, filers are permitted to redact those things if there is a concern about public safety or health.

And what I also want to point out, Judge, is one of the other undisputed facts in this case is that all federal district courts, including this one, via PACER, and courts in at least 38 other states, including the Alexandria circuit court in this state, provide the press and public with remote access to civil filings. And the parties have stipulated that those courts do so via secure

websites that are permission-based, just like OCRA.

Now, defendants, as Your Honor is observing, say that they must restrict remote access based on privacy concerns. But those concerns are not unique to Virginia. And more importantly, Judge, the defendants have not demonstrated why the clerk, and other Virginia circuit courts that offer OCRA, cannot provide the same remote access that these other courts already do using filer redaction and subscriber agreements that are paid subscriber agreements.

Now, I just want to be very clear on this one point. Courthouse News is not disputing that privacy interests aren't important, but First Amendment jurisprudence that requires that the defendants point to specific evidence, not hysteria about -

THE COURT: No court has ever held that remote access is elevated to a constitutional right. Certainly no appellate court has ever held that. And again, I'm not saying that it wouldn't be good public policy to make it available to the press. That's not the standard. The standard is whether or not they're constitutionally required to do it under your argument.

MR. GINSBERG: Well, I -- I think there's an important distinction to be made here, and that is that we do not contend that this case -- in this case, that the

First Amendment requires a per se right to remote access. Rather, where the defendant, like here, has chosen to limit public access in the way that favors one group of individuals while blacking out the rest of the public, the First Amendment requires them to justify that access restriction by --

THE COURT: Well, isn't the fact that they're attorneys, that they're licensed in Virginia, that their background is well-known, they're subject to sanctions for any abuse, that doesn't change the equation at all in your mind?

MR. GINSBERG: The fact that attorneys are held to professional standards, so are journalists. And attorneys are vetted just like another user.

THE COURT: Yes, but the Court can't revoke their license and put them out of business if they violate these standards.

MR. GINSBERG: But the Court can pull back remote access. The Court can monitor their use of the system. There are other mechanisms in place to protect the private information here like redactions, like subscriber agreements. There are a whole host of mechanisms available that all other courts -- that all other courts use.

And I want to refer the Court to a District of

Vermont case, Your Honor. Judge Christina Reiss recently explained in the *Gabel* case, which was cited in our papers, and this is a quote: The protection of the privacy of litigants is an important one. It does not, however, trump the First Amendment right of access unless the challenge restrictions are narrowly tailored and essential to preserve higher values.

THE COURT: Was that a remote access case?

MR. GINSBERG: It was not. But it was a case concerning access delays. It was -- it was a First Amendment challenge similar to the *Schaefer* case.

THE COURT: I mean, as far as public records are concerned, I don't think any reasonably well-educated lawyer disagrees with that. I mean, you've got -- unless they're sealed by the Court. Everything filed in the clerk's office is accessible by the public once they've had a chance to redact identifiers, and things like that. That's beyond dispute.

MR. GINSBERG: Yes. But here, Judge, where filings are redacted and access is restricted for one sect -- most of the public, but allowed for another sect, the defendants must show that the restrictions are necessitated by a compelling or significant interest. That's one.

And two, that the restrictions are narrowly

tailored to serve that interest.

Here, the defendants are unable to even justify their concern about personal identifiers appearing in civil filings, which they must do because there's no dispute here that they have not even attempted to demonstrate the frequency by which those things appear in civil filings at the Prince William Court, or any other Virginia circuit court. And the clerk had her opportunity to do so in discovery, but she did not meet her burden in response to targeted interrogatories asking for that very information. And we contend that that alone warrants summary judgment in Courthouse News's favor.

And, Your Honor, I cannot emphasize what I'm about to say enough, but the common law strategy of pointing to law review articles about things like --

THE COURT: I didn't review those. I stuck right to the record.

MR. GINSBERG: Okay. Understood, Judge.

THE COURT: With all due respect, a law professor's opinion is not going to change my mind.

MR. GINSBERG: Okay. Understood, Judge.

I think it's important to emphasize that other than law review articles, the Commonwealth has not pointed to any evidence in this case, and those law review articles are inadmissible hearsay, and they have nothing

to do with civil filings at the Prince William court.

Now, defendants -- they spent a lot of time advocating for intermediate time, place and manner scrutiny in this case. And we recognize that Your Honor, at the motion to dismiss stage, applied that standard. But no matter the test, Judge, they must come forward with evidence, not conjecture. But they must show that the recited harms are real. And even under time, place and manner scrutiny, Your Honor, it's critical that they demonstrate that there's no reasonable alternatives that exist to adequately protect the government interest. They have not done that here.

In fact, to the contrary, Judge. Those interests are already served as I've, you know, started getting into today, by redaction and secure -- subscriber agreements.

THE COURT: Yes, but I guess you do agree with Judge Motz, in her opinion in *Schaefer*, that if you make it available to the press, you've got to make it available to the public as well. So you would have to make it available to the public remotely as well?

MR. GINSBERG: Well, we're not contending that the press has any greater rights than the public.

THE COURT: Okay. All right.

MR. GINSBERG: But what we are saying, Judge,

that no matter the level of scrutiny, in order to determine if the defendants are violating the First Amendment -- and this is key as well. The Court must apply what is known as the *Press-Enterprise Test*. That -- it requires the Court to first determine if the First Amendment applies to the particular documents at issue, not the type of access at issue, whether it be at the courthouse or on a remote basis, but the particular documents at issue.

And then the test secondly requires the Court to undergo a factual inquiry into whether defendants have met their burden of showing that the restrictions imposed on access are justified under constitutional scrutiny.

THE COURT: But you don't -- kind of going back to square one here. Your client does have access. Your argument is they want a more direct access to those documents.

MR. GINSBERG: We have access at the courthouse.

THE COURT: You do. Like every citizen.

MR. GINSBERG: Yes. And those documents are publically available.

THE COURT: Right.

MR. GINSBERG: But when -- when the extra step is taken to provide remote access to attorneys and restrict that access to the public, the press, then a

constitutional inquiry is required. And that first step that I referred to under the *Press-Enterprise Test*, at the motion to dismiss stage Your Honor recognized that the Fourth Circuit, Judge Motz, has definitively answered that part of the test finding that experience and logic dictate there's a First Amendment right of access to civil filings.

The clerk doesn't dispute this, the Commonwealth doesn't dispute this, but they do, you know, try and point to the fact that there's no First Amendment right of remote access. But, you know, as I mentioned, Judge, that's not -- that's not what this case is about. It's not -- the question is not whether there is a First Amendment right of remote access. The question is whether when defendants have limited public access, in the way that they're doing here, whether they have justified the restrictions imposed.

In fact, in *Schaefer*, the Fourth Circuit held that access must be contemporaneous with filing as expeditiously as possible based on the facts and the context of that case -- of the case, and that same-day access is required insofar as practicable. So in its context of a court, like the Prince William court, where remote access is available, and thus practicable, restricting that access to Virginia barred attorneys

interferes with Courthouse News' right to contemporaneous access as expeditiously as possible.

And defendants in this case are essentially asking the Court to ignore *Schaeffer*.

THE COURT: But of course Judge Motz also said it need not be immediate access as long as it is reasonable access.

MR. GINSBERG: Well, remote access in this case would be anything but immediate. Before filings are posted to OCRA, they go through a -- they go through a whole host of things at their clerk's office. They're filed, they're scanned into the case in the Jencks {sic} system and then -- and then they are first posted to OCRA. And they're not available on OCRA, I think the record reflects -- it's about five minutes or so after they're scanned into the system.

It's almost as if, Judge, the defendants are asking the Court to call that *Schaefer*'s requirements that access be as expeditious as possible apply to attorneys only. That's not how the First Amendment works. Instead, in light of *Schaefer*, and other First Amendment jurisprudence, the million dollar question here -- and I'm -- and I'm repeating this, Judge, because it -- it really is so critical. But the question is whether the access restrictions are narrowly tailored to serve a

compelling or significant government interest. The case law is very clear on that.

So let's talk a little bit more about the justifications offered here. They mainly -- the defendants mainly seek to justify the restrictions, the non-attorney access restrictions, as well as the restrictions prohibiting the dissemination of any information accessed remotely based on these generalized privacy concerns. And their argument is essentially that the Internet is rampant with security fraud, and all types of nefarious conduct.

And based on this fearmongering, they say that because this private information might appear in a filing without pointing to actual records at Prince William court, and that that information might be misused, so they must restrict access to all civil filings regardless of whether they even contain the information they're concerned about.

But defendants haven't pointed to any evidence about why -- as to whether that information appears in Prince William filings, as I've noted. And they don't even explain why OCRA would be particularly vulnerable to malicious data mining.

So generalized concerns, they fall well short of what is required to meet the constitutional burden. In

fact, not only have defendants failed to show the frequency by which confidential or private information appears in filings, but they've also failed to show that the restrictions are narrowly tailored for several reasons, some of which I've already discussed this morning. The first documents -- these documents are already available at the courthouse. They're publically available.

And Fourth Circuit case law stresses that a critical consideration in deciding whether an asserted interest is compelling or significant is whether the requested access will disclose facts that are already known -- that are otherwise unknown to the public. That's because once disclosed, Your Honor, as they are at the courthouse, the information has lost its secrecy. That's the *Virginia Department of State Police* case, that's the *Charlotte Observer*.

And in the *Soderberg* case, the Fourth Circuit also held that efforts to restrict the dissemination of information in official court records must be narrowly tailored to serve a state interest of the highest order, and that's because once open to public inspection the press cannot be sanctioned for publishing that information.

Now, rather than really address any of the cases

I just mentioned, both of the defendants, they heavily focus on the Supreme Court's decision in the *Reporters Committee* case. And that case noted in the context of a FOIA request for criminal rap sheets that there is a difference between records that appear in numerous court files throughout the country and -- versus one computerized summary of those records. The *Reporters Committee* court was not, however, considering or describing a remote access system like OCRA that provides access to the very same records at a single courthouse.

And case law is clear that when the First Amendment is implicated, the standard of review is much higher than in FOIA cases. In fact, in the *Ostergren* case, the Fourth Circuit observed that the *Reporters Committee* decision did not support precluding the posting online of already public records that contain social security numbers.

THE COURT: Those were the land records cases, is that correct?

MR. GINSBERG: That is the land records case, Judge. Yes.

And that was the case because, you know, in doing so in that case was not narrowly tailored to protect individual privacy. And the Court noted that the Commonwealth could curtail public disclosure of social

security numbers by requiring redactions. The defendants don't address the *Ostergren* case. And the same is true here with respect to redaction, which brings me back to another reason why these restrictions are not narrowly tailored filer redaction.

Because filers are already required to redact any confidential information, information that's been deemed confidential by the legislature, by the General Assembly, a less restrictive, just as effective alternative, is already in place. That's exactly what the Court held in *Schaefer* where Clerk Smith, the defendant here, similarly sought to justify the access delays in that case by pointing to the potential for filings to contain confidential information.

And late Judge Morgan, of this Court, rejected the clerk's argument, finding that her policies were not narrowly tailored or necessary to preserve the Court's interest in the administration of justice because the filer is responsible for redacting confidential information.

And the Fourth Circuit affirms Judge Morgan, even under a time, place and manner analysis. And the same result is warranted here. In fact, we believe that filer redaction, which is already in place, means that much of the stated privacy concern is a mere fantasy.

Clerk Smith, for her part, does not even explain in her papers why redaction is not a less restrictive alternative.

And the Commonwealth tries to make much of the fact that only social security numbers, financial account numbers, those are the only things that the filers are required to redact. But again, I think this is critical to repeat, Judge. The legislature has already determined that these other things that they are concerned about - date of birth, maiden names, minor names - they're not worthy of confidentiality such that the filer must redact these things. But the filer -- the statutory framework permits the filer to redact many of these things like maiden names, minor names.

In fact, many cases that concern minors are confidential --

THE COURT: But it's not required.

MR. GINSBERG: It's not required, Judge.

THE COURT: Right.

MR. GINSBERG: But in the instance that, you know, disclosure of such a name would require a risk or a threat, I should say, to the health or safety of that individual, that's exactly the situation under which the statute permits redaction for minor names and maiden names. And many cases that concern minors, Your Honor,

are confidential by statute so they're not available on OCRA.

Even so, defendants must validate their concern by demonstrating with factual evidence that these things -- minor names, maiden names -- that they appear in filings unredacted, how often that occurs, and that this justifies the restrictions. They have not done any one of those things.

Now, the *Gabel* case, which I mentioned earlier, Your Honor, it specifically found that filer redaction is overwhelmingly effective. It's not a remote access case. We acknowledge that. It is a First Amendment restriction of access case, though. And the Court there found that filer redaction is overwhelmingly effective to protect privacy interests, but that's not the only less restrictive alternative.

Another one, as we've discussed a little bit here today, are subscriber agreements. OCRA users must be approved by, and authorized by, the clerk and then must sign a subscriber agreement. And they must pay an annual fee in order to access OCRA. Courthouse News is perfectly willing to pay that fee. And the parties in fact stipulated that an OCRA user is responsible for the proper use of the remote access system pursuant to the terms of the subscriber agreement.

Now, the clerk doesn't really offer any arguments in response -- in response to this, but the Commonwealth says that subscriber agreements are not effective for two reasons. Well, one, they claim without any factual foundation that attorneys are the only folks who can be pre-vetted. But as I mentioned, the clerk must approve an OCRA user who, in order to apply, must provide a host of personal information, and they sign the subscriber agreement in front of a notary, and that subscriber agreement, among other set things, says that their use of OCRA must be conducted in a legal manner.

And in fact, the clerk herself, Judge, when sending Courthouse News a non-attorney subscriber agreement in June 2021, which albeit increased the cost sixfold for Courthouse News, but the clerk included an additional verifiable credential to the application process which was an employer name or a business name.

So, yes, now that the clerk has offered to provide OCRA access to Courthouse News, and has since been retracted, but her conduct shows there are ways to verify a non-attorney user. So this notion this only attorneys can be vetted because they have bar numbers, it's just not true.

Now, the Commonwealth also points to a declaration of an OES employee, Joby Knuth. And that

employee states that other Virginia systems, namely the online docket search system known as OCIS, and this Virginia date of birth confirmation system, the VDBC system, that they've supposedly been subject to so-called bot attacks.

Now, a couple of things to say about that, Judge, because I think this is important. With respect to OCIS, that system is open to the public, it's not permission based, and it's free of charge. And Mr. Knuth says simply back in 2010, 12 years ago, and 10 years before he was employed by OES, that OES discovered bots searching -- performing searches on OCIS at a rate faster than a human is capable of. That's it.

The Commonwealth doesn't explain why quicker search activities justify complete access blackout. And we have submitted a declaration in response, the Bodis declaration, to make clear that bots are not necessarily a bad thing. They are often used to index web content in order to generate news feeds, for example. And there are a host of ways to protect against bots, such as a pay wall.

And standards for remote access that have been developed by the Virginia Information Technology Agency, known as VITA, V-I-T-A, those standards also explain that mechanisms, such as software, that give the clerk

additional surveillance and monitoring capability, they are available to prevent misuse of a remote access system.

And as to the VDBC system, the date of birth confirmation system, that system, by design, allows registered users to search for an individual's date of birth, their social security number, the very information defendants say they're concerned about. And as I mentioned, Mr. Bodis explains that a pay wall is one effective way of mitigating the risk of unwanted data mining.

But putting aside any supposed data mining activities on these other Virginia databases, there's no record evidence to support the supposition that OCRA would be mined to malicious ends. And the fact that the VDBC system continues to be operated by the Commonwealth to this day we believe casts doubts on any private -- any of its unique privacy concerns. And so too does its operation of the online docket search system, which operates without any safeguards, such as a subscriber agreement or a pay wall.

Now, if I may get back to, Your Honor, another reason why these -- there are less restrictive alternatives and the restrictions are not narrowly tailored. The practices of all federal district courts, and those courts in 38 other states, including the

Alexandria court, those practices show that the Prince William court, and other Virginia circuit courts, can also provide remote access without restricting the dissemination of information access remotely while also protecting privacy. It's not an all or nothing proposition.

And as Your Honor observed at the motion to dismiss stage, Courthouse News's allegations that OCRA contains identical records available at the courthouse, and the allegation that users of OCRA must sign a subscriber agreement, both of which discovery has confirmed, lead to the reasonable inference that the non-attorney access restriction is not narrowly tailored to preserve the significant government interest and thus could violate the First Amendment.

Now, despite all of these less restrictive alternatives that I've just walked through, Judge, defendants also say that the clerk would be forced to spend an unspecified amount of money to open up OCRA to non-attorneys, and that this somehow should excuse them from complying with the First Amendment. The defendant, Ms. Smith, though, she doesn't submit her own declaration to substantiate these concerns. Instead, she relies on a declaration from another clerk of the Arlington circuit court, Paul Ferguson, which unlike Prince William does not

use OCRA and does not make nonconfidential court records accessible to the public without first using a third-party vendor to redact things like date of birth.

Now, the practices -- for those reasons, the practices of Clerk Ferguson are not probative of the practices of Clerk Smith. That declaration was also -- Mr. Ferguson was only disclosed as a witness on the last day of discovery, and he guesses -- you know, evidentiary issues aside, he guesses without any pure speculation -- without any explanation that it would cost, I think he says, $150,000 to provide remote access to records in his court, but does not estimate how much it would do so in Clerk Smith's court.

In fact, it's hard to imagine why there would be any cost in allowing the press and public to pay a subscription fee to the clerk in order to access the same records that are already available on OCRA.

Now, the defendants also argue that the Virginia code, specifically Section 17.1-293, prohibits remote access for non-attorneys, but the plain language of the statute says no such thing. What it does do is prohibit clerks from posting certain information on the Internet. That's namely social security numbers, date of birth, maiden name, minor name, financial account number, and original signatures. That's -- that's in 17.1-293(B).

The code then states --

THE COURT: Doesn't Subsection (H) talk about it being used for a commercial purpose?

MR. GINSBERG: Well, what Subsection (H) talks about is that the prohibition of -- oh, Subsection (H). Sorry. I was about to refer to (E)(7). But Subsection (H) prohibits the other restriction that we are challenging here, which is the prohibition on disseminating any information accessed remotely.

It's -- it's not just for --

THE COURT: That's why I asked you why you haven't gone to the General Assembly, the currently composed General Assembly, and made an attempt to have that repealed or modified.

MR. GINSBERG: Well, a couple things to say about that, Judge. That -- that section, without having the other -- the other sections regarding access for attorneys only via OCRA, which is (E)(7), we'd be right back here before Your Honor discussing the restrictions because the defendants would still restrict access to --

THE COURT: Well, couldn't you ask the General Assembly to modify that as well?

MR. GINSBERG: We could go that route. But as I mentioned, Your Honor, this is a First Amendment case that belongs in federal court.

THE COURT: Okay.

MR. GINSBERG: And that attempt was made already and failed with the General Assembly -

THE COURT: All right.

MR. GINSBERG: - only a couple of years ago.

Now, (E)(7), that's 17.1-293(E)(7), it does state that the prohibition on posting these certain personal identifiers on the Internet, it doesn't apply to providing remote access to nonconfidential records through Virginia barred attorneys. But then defendants say that (E)(7) requires the clerk to preclude remote access to all civil filings for non-attorneys, regardless of whether they contain the personal identifiers listed in 17.1-293(B).

But while we acknowledge that (E)(7) permits the clerk to provide remote access to Virginia barred attorneys, it does not expressly prohibit such access for others. In fact, to the contrary. The plain language of another section of the code, 17.1-225, permits the clerks of each circuit court to provide remote access to nonconfidential, already public, court records such as those available to attorneys on OCRA.

The Commonwealth concedes that 17.1-225, that it applies to any remote access system, whether it be OCRA or something else like the Alexandria circuit court's remote

access system. And the fact that Alexandria is providing the press and public with remote access to nonconfidential filings, notwithstanding the provisions of 17.1-293, that demonstrate that code permits remote access for non-attorneys, and attorneys alike, consistent with 17.1-225.

And critically, Judge, 17.1-225, it already has safeguards in place to address the defendants' concern in this case. That statute requires that the clerk implement proper security measures to prevent remote access users from obtaining any data that are confidential. That's exactly what redaction subscriber agreements and the pay wall achieve.

Unless Your Honor has any other questions for me, we will --

THE COURT: You'll have a chance to reply.

MR. GINSBERG: Thank you.

THE COURT: All right. Thank you, sir.

Mr. McEntee.

MS. McNEILL: Your Honor, Mr. McEntee and I have divided the arguments. I'm presenting the opposition to CNS's motion, whereas Mr. McEntee is arguing in favor of the Commonwealth's own motion.

THE COURT: All right.

MS. McNEILL: Which would you prefer at this

time?

THE COURT: Well, I think we ought to go ahead and have you address his arguments, and then I will let him make his arguments, and I'll let Mr. McEntee respond.

MS. McNEILL: Thank you, Your Honor.

Once again, Your Honor, may it please the Court. My name is Erin McNeill, arguing for the Commonwealth in opposition to CNS's motion for summary judgment.

THE COURT: Okay.

MS. McNEILL: And throughout this case, we've struggled with CNS's framing of this as a First Amendment issue and not a Fourteenth Amendment equal protection argument. Because they do have an undisputed right of access at the courthouse, what they're really arguing, and challenging, is that attorneys have a preferential access.

THE COURT: It's a time, place and manner argument basically. And that's -- one of the most important questions in the case is whether or not if they have public access over the counter, is there a statutory or constitutional right giving them remote access. That's the core issue.

MS. McNEILL: Absolutely, Your Honor. And I want to be clear that what the Commonwealth calls a database of records, redacted or unredacted, we're specifically referring to that information -- the

information listed in Virginia Code 17.1-293 that says that the clerk can put information -- put pleadings on the Internet as long as they don't have an original signature, a date of birth associated with the person, a social security number, maiden name, financial account number, or the name and age of a minor child.

And counsel previously said that that is an optional redaction opportunity for filers, but it is not optional for the clerk. They cannot put it on the Internet if it has any of those elements in it.

And counsel spent a great deal of time arguing that there's no evidence that this information actually appears in Virginia court filings. But, Your Honor, every single pleading has at least one original signature of the attorney or the *pro se* filing party. The orders have the original signatures of the judges and the court clerks, depending on the nature of the order. Every pleading, at least, has an original signature.

That means every pleading would have to be redacted before it can be put in a publicly accessible Internet database. Only lawyers have access to court records that don't have those redactions of things like the original signatures or the names and ages of minor children.

And the argument that parties could redact that

information before the pleadings are even filed is disingenuous because this -- the Supreme Court of Virginia requires pleadings to be signed before they're filed. It's a requirement that every pleading have a signature. Unlike the federal system where you can type a signature, it's not an original signature. In the Virginia courts, it does have to be a real, original signature.

So it is on every single pleading, Your Honor.

THE COURT: One of the questions that was raised by counsel is the fact that there have been very, very few, if any, cases where information within the system has been exploited or misused. At some point during your argument, if you could kind of touch on that I would appreciate it.

MS. McNEILL: Well, Your Honor, I think that's a very good point because exploited or misused is in the eye of the beholder, isn't it? The -- and I apologize for the reference to the law review article. I think it was also in that congressional report that we cited to that data brokers harvest this information from court records and then they process it.

And truthfully, CNS is a data broker. They're intended to be a data broker for court records. They will tag it with relevant information. They tout that you can search for pleadings mentioning your client. But it

doesn't have to be your client. It could be your ex-girlfriend. CNS doesn't --

THE COURT: But if it's available to the public over the counter, why is it more of a problem if it's remotely available if they can get it at the front counter?

MS. McNEILL: Exactly, Your Honor, that it is because the very nature of online data is vulnerable to that kind of bot harvesting, mass harvesting, which then allows you to sort the data into buckets and then resell that data to clients and customers and interested parties.

The data brokers themselves who engage in the data harvesting might be laudable, like LexisNexis. I think that most of us feel that LexisNexis is a laudable organization. They might be neutral like Google, who doesn't particularly -- they could be used for good or evil. And then they might be something much more sinister where it's a data broker selling marketing lists of people who have been victims of sexual assault. And -- and all three of those kinds of data brokers exist.

But it doesn't -- the point is that those data brokers sell the data. They package it, they market it. They sell the data en masse to users, and then we don't know if the users are going to use that for good or evil. We just don't know. They're a step away.

And I guess it depends on how -- how you view marketing efforts, like marketing payday loans to people that have filed for bankruptcy. Is that a laudable purpose or not? Is that marketing a service to people who might need it, or is it preying on the financially vulnerable? I think it just depends on your moral philosophy. And it would be very hard for us to argue that that -- the morality of that, Your Honor.

The fact is that it exists. And Virginia has taken a position that we want to make it harder for people to engage in that mass harvesting of data which then allows you to repackage it and resell it. And, in fact, CNS is a data broker. They are not just a press organization publishing news stories like Virginia Lawyers Weekly or Bloomberg might.

But they have a new product called CasePortal at CNScaseportal, P-O-R-T-A-L, .com, where you will be able to search for cases in state court cases and get at least the complaint, but it also says orders. And who knows how those products will expand because we're talking about what restrictions Virginia can put in the code that will survive a constitutional challenge.

This Court's order will echo far into the future and will be applicable to what we can do 5 years from now, 10 years from now, 15 years from now. So it isn't just

what CNS intends to do today or tomorrow, but what do they intend to do in the future.

And CNS has made much about the fact that to survive --

THE COURT: Of course, as I mentioned before, -

MS. McNEILL: Yes, sir.

THE COURT: - and I want to make sure that I'm clear on this, all the information you're talking about that you're arguing can be brokered and sold en masse is available over the counter, is it not?

MS. McNEILL: It is. But CNS's exact argument is that they cannot effectively amass the data and then resell it to lawyers, or their client base, because it's too onerous to reliably get every complaint in every court across the Commonwealth. They can't market it. They can't sell it because they can't provide the service they want to provide to their clients because Virginia's current scheme makes it too difficult to get to every circuit court across the Commonwealth and harvest those complaints on a daily basis. That's why they want OCRA access because it would allow them to do that efficiently and cost-effectively enough that they could then repackage that data and market it and resell it.

Under our current scheme, the data is -- we have called it practical obscurity. You cannot -- if you're

interested in a particular case, you can certainly go to the courthouse and get it. But commercial entities cannot mass harvest this data, repackage it and resell it to whomever wants it.

THE COURT: So your argument is that it's not a matter of access, it's a matter of convenience?

MS. McNEILL: Correct. And profit margin.

And although there is a constitutional right to access the court records, there is not a constitutional right for the state to protect your bottom line and maximize data brokers' profit margins.

And this is a reasonable time, place and manner to require them to go to the courthouse to get access, as has been true since the beginning of this country, because the alternatives of the pay wall, the vetting, the subscriber agreements, the redactions, they are contingent on every user of this information going directly to the clerk's office, petitioning for an account, paying for the subscriber agreement and getting it that way.

But once CNS gets access, and CNS unleashes their bots on the OCRA systems of all the different circuit courts that participate across the Commonwealth, CNS can then repackage the information and sell it to their subscribers under their subscriber agreement, and we have no control over what that looks like, Your Honor.

And it is material that CNS is challenging the subscriber agreements. That are challenging the statutory restriction on commercial use of this information because that's what they intend to do with it. We cannot vet who has access to this information. We cannot have an effective pay wall that would prevent people from misusing this information. And our subscriber agreements are completely useless once CNS gets access because then the cull is coming from within the house, Your Honor.

THE COURT: Of course you can't control how the media presents a story under any circumstances.

MS. McNEILL: We're not talking about presenting a story, Your Honor.

And I do encourage you to look at their publically accessible website, CNScaseportal.com. If it's helpful, I printed out some key pages that show exactly what I'm talking about.

Would you like me to pass them as exhibits?

THE COURT: We'll take a look at it.

MS. McNEILL: And I have a copy for opposing counsel as well.

THE COURT: All right.

MR. GINSBERG: Your Honor, if I may? I'll address this in response to Ms. McNeill's arguments in fuller fashion, but these documents are not part of the

record at all.

MS. McNEILL: I'm making them part of the record, Your Honor, right now.

THE COURT: All right.

(Commonwealth Exhibit A is received.)

THE COURT: What this case really comes down to, as I mentioned in my opening comments, is not so much access. It's time, place and manner of their access. And I want you to concentrate on that during the course of your argument.

MS. McNEILL: Well, Your Honor, the -- the point is that requiring entities to go to the courthouse and viewing the cases one by one, that they print out physical copies one by one and they pay the five cents per page, or whatever it is one by one, prevents the kind of mass data harvesting and republication that is the privacy interests that we're getting at with this.

And that's what the -- that's the reason for the restriction. That's the motivation for the restriction, Your Honor.

And if you look at the web pages I've just handed up, I'll call them collectively Commonwealth Exhibit A, these are publically accessible on the CNS website CasePortal. And it shows how the information would be used and how different this is than a Bloomberg

or a Virginia Lawyers Weekly or a classic press where they're writing case -- writing about the events of the day.

This allows people to search cases and download pleadings in a way -- in a mass way and then market it. And once you subscribe to CNS's website where CNS is republishing and reselling this information, you no longer have to go through the clerk's office. And that makes the alternatives proposed by Mr. Ginsberg wholly inadequate because only CNS will have been vetted. Only CNS will have agreed to a subscriber agreement. Only CNS will pay to get through the pay wall.

Then they'll republish it on this website, and who knows who will get access to it. Who knows who CNS will sell access to it, or what that subscriber agreement will look like. We don't have any other way to exclude bad actors from the information.

And to be clear, Your Honor, I'm not alleging that CNS is a bad actor. But simply that by allowing a mass harvesting of data from every circuit court that participates in the OCRA system on a daily basis -- and again, this process can be automated through bots. So it isn't like you would have to have an army of reporters going to the courthouse like you do for SCOTUSblog, for example. This would be mass harvesting of the data by

bots, and then you can put it in a database like this one of CNSs where it can be accessed by whomever CNS chooses to sell it to without a vetting process, without Virginia having any recourse or use of the information.

And CNS has challenged the statutory restriction on commercial use of data and the subscriber agreements that say that you can't mass republish. And that's different, Your Honor, than saying you can't take this information and mention it in a news story. That that's -- that's not what we're talking about here. We're talking about using access and leveraging it to create your own database and then selling access to that database unrestricted. And you can't do that going courthouse to courthouse because if you could CNS wouldn't have brought this case.

They brought the case -- and it's in their pleadings that they can't go courthouse to courthouse sufficiently enough to build a business model on it. They can't -- it's too onerous to go courthouse to courthouse and get it through the -- get it through traditional channels. They have to have online access to be able to make this business model of CasePortal work because people wouldn't subscribe if they only got one in 10 cases, and it would be a shot in the dark whether they got the one your client was mentioned in or that you were interested

in.

They need to have access to a mass of database, a digital database, to be able to make this business model work. And so that's why -- this very case shows why online access is different than traditional courthouse access, and why we need the ability to vet and control who has access to the unredacted information in court pleadings on an online database. Specifically in that medium, we do allow access to original signatures at the courthouse, but to harvest them and resell them en masse online, and make a business out of it --

THE COURT: Well, you're not suggesting that they couldn't go into the courthouse, get a certified copy of the document and publish it in one of their publications?

MS. McNEILL: They absolutely could.

THE COURT: Absolutely. Right.

MS. McNEILL: But they couldn't do a CasePortal, Your Honor. Not through that way. It -- it would take an army of people going to every courthouse every day, and then you would have to pay copying fees. And I don't -- I don't know how much the court's offices would even accommodate your army of folks camping out every morning and making copies of the previous day's pleadings.

THE COURT: When you talk about a CasePortal,

explain to me how you use that term of art?

MS. McNEILL: CasePortal is not a term of art, Your Honor. It's the reference to this product, this website, the CasePortal website, where they republish the cases. It appears to me -- and again, some of the information is behind a pay wall. It's behind CNS's pay wall. So I don't have access to what a paying subscriber would be able to get. Only the marketing I've printed out.

But the publically accessible information is the style of the case and then they purport that they are going to make at least the initial pleading, the complaint or the petition available, and the orders entered in the case. That's on that first page, "CasePortal has it covered."

If you look through those sheets, they market that they intend to make the complaints and the orders available in cases so their users could then search their CasePortal website, get access to civil court filings across all the jurisdiction that CNS has access to for the one subscribing fee. And that's the convenience they're marketing that you pay the one fee to CNS and you get access to all the court pleadings that CNS has access to.

If they prevail in this case, that would mean they would get access to over 100 circuit courts in

Virginia that are OCRA subscribers or OCRA participants. They could then access each OCRA database for $200 per court, and then put it all in this one stop shop and resell that to their subscriber base and their subscribers would no longer have to subscribe to each individual circuit court's OCRA system.

They could just subscribe to CNS instead, and get access to all the Virginia circuit court cases with the one fee through CNS's product instead of going directly to the circuit court clerks' OCRA websites. And it would be accessible to anybody who was a CNS subscriber. Not just to attorneys.

THE COURT: So if they bypass the fee, that would have a detrimental economic impact on the clerk of the courts' budget, is that correct?

MS. McNEILL: Oh, it sure would, Your Honor. I don't know that we're permitted to make that argument under the First Amendment. But it's certainly true that CNS would then throw open the door. They would download it and distribute it so that whoever was interested in the material would not have to pay the OCRA fee directly to the clerk. They would pay CNS for the fee.

And the clerk -- the clerk -- I mean, CNS would pay the fee so that they would get the $200 from CNS, but they wouldn't get all the fees from each individual

subscriber. Now the subscribers would go to CNS as a clearing house for all the Virginia circuit courts.

And the point of this case here, the whole point of this lawsuit, the whole reason that CNS has made this pleading, it's in their complaint, is that it's not efficient for them to do that by going to the courthouses and physically printing out the new complaints and then taking those complaints back to the office, scanning them in, and then creating their database that way. It's too inefficient for them to be able to build a business model on it. They have to have access to OCRA.

And they are arguing that we could just redact and satisfy our privacy interests that way. But again, the information that is required to be redacted before it goes online is original signatures. And that's on every pleading. We would have to redact every pleading.

And, Your Honor, it's simply not true that signatures could be redacted before they're filed. Like, that's contrary to Virginia law. Pleadings have to be signed. They would have to -- you would have to change a number of policies under the Virginia court system to meet the redaction requirement of 17.1-293 for every pleading that was filed if it was required to put it online.

I think what the result would be here is that clerks would simply no longer put anything online and

require everybody to go to the courthouse. And Virginia would lose the efficiency of making anything available online, including the OCRA system to attorneys, as it stands now. And I don't think that First Amendment requires that. I think the First Amendment says as long as they have access to the courthouse, like they have had since before America was even a country, that is sufficient to meet the First Amendment standard that was in the framer's intention.

A limitation on this new way to access court records, in addition to the in-person access, can be limited and comply with the First Amendment. They're trying to leverage the opinion in *Schaefer* that any delay in access has to be justified as a reasonable time, place and manner restriction to say that not allowing them access to these unredacted records --

THE COURT: That was a delay in access over the counter, not a delay in access to any other kind of media.

MS. McNEILL: Right. But now they're saying that because there is potentially access online, requiring them to go to the courthouse is a delay. And that's simply not what the First Amendment contemplates. The delay is not the delay in driving to the courthouse. They meant a delay imposed by the government without any --

THE COURT: Making it available at the counter.

MS. McNEILL: Yeah.

THE COURT: Right.

MS. McNEILL: That's what they're talking about in *Schaefer*. *Schaefer* never contemplated unfettered access to an online database that you could just mass download and resell yourself, cutting out the clerk's control of its own court records.

And there is -- I think even CNS concedes there is a legitimate privacy interest in protecting this information. And that's why they have been standing here and talking about redaction as a viable way to meet that state interest. They've talked about the payroll -- a pay wall, they've talked about subscriber agreements. Although, then they said subscriber agreements also conflict with their First Amendment right to resell the information.

And then the declaration of Andras Bodis -- Andras Bodis had further technical ideas about ways that a clerk could impose additional controls to prevent -- you know, do a capture, or something like that. But what we're looking at here is where a user like CNS would log in lawfully, do their thing. Once they get access, they download it all and then they cert -- they would permit people to circumvent those protections when they resell it through their website.

THE COURT: And they would market the information, correct?

MS. McNEILL: Yes. They are marketing the information, even though they don't have it yet. They have it for other courts. As I've mentioned, Your Honor, they -- they've been able to do this in many other courts across the country. And I don't know that those courts have even challenged them, but Virginia is challenging them.

Virginia does care very much about this personal information. Virginia has a statutory public policy. And it is right there in 17.1-293 that imposes additional redaction for records posted online that doesn't exist for records at the courthouse, and that's because we recognize records online are different. They're vulnerable to exploitation and resale in a way that records at the courthouse are not.

THE COURT: Okay. I'm going to ask this question again, just because I want to make sure the record is clear. I could not find, nor could my clerks, any case anywhere where a court has found that there is a right to remote access to documents that are available over the counter at a government office. Am I right or wrong?

MS. McNEILL: As far as we know you're right.

We haven't found one.

THE COURT: I just want to make sure I'm right.

MS. McNEILL: We haven't found anything or we would have had a duty to bring it up, I believe, Your Honor, under the ethics rules.

THE COURT: All right.

MS. McNEILL: And we believe the statutory scheme, therefore, is constitutional because there is that access at the courthouse. If you care enough about a particular record, you can absolutely go get it. And as Mr. Ginsberg conceded, you can get it faster if you happen to be standing at the courthouse then downloading it because it doesn't hit that online system until a little bit later then it's available in the courthouse terminal.

But because you don't have to wait for the courthouse to open, because you don't have to physically drive there, they're arguing that the burden of having to go to a courthouse is an unconstitutional barrier to access, and that's simply not true. And it's never been true.

The -- they depend upon the fact that lawyers have access without going to the courthouse, but that preferential treatment of a particular group, that's a Fourteenth Amendment equal protection claim. Their argument that they have a right of access to online

records simply fails if lawyers didn't have access. And to the degree they're arguing they should be treated the same as lawyers who, as you noted, are vetted, we pass a character and fitness review. We have to take CLEs on ethical use of information every year. We are subject to a tremendous amount of regulatory oversight from the Bar, and them from the Supreme Court itself in its promulgation of our ethical duties and the rules of professional responsibility.

We are absolutely governed in how we use the information. Even once we download it off of OCRA, we could not resell it wholesale the way CNS can. And we certainly would be subject to sanctions if we did -

THE COURT: Okay.

MS. McNEILL: - in a way that the general public is not.

And I feel like I've made my point, Your Honor.

THE COURT: You have. Thank you.

MS. McNEILL: Thank you.

THE COURT: Yes, ma'am.

MR. GINSBERG: Your Honor, would you prefer that I respond to Ms. McNeill now or --

THE COURT: I'm going to hear everyone on this particular point.

MR. GINSBERG: Okay.

THE COURT: I assume, sir, your argument is based upon the same one that we heard from the young lady that just spoke?

MR. ALTMILLER: Your Honor, yes.

THE COURT: Okay.

I'll let him go ahead and do that, and then I'll give you a chance to respond, Mr. Ginsberg.

MR. GINSBERG: Very good, Judge.

THE COURT: Okay.

MR. ALTMILLER: And, Your Honor, I do want to focus on the issues --

THE COURT: Could you give me your name just one more time. I'm sorry.

MR. ALTMILLER: I apologize, Your Honor. It is John Altmiller on behalf of Jacqueline Smith.

May it please the Court.

THE COURT: Glad to have you here, sir. You go right ahead.

MR. ALTMILLER: Thank you, Your Honor.

THE COURT: And you represent the clerk of the court?

MR. ALTMILLER: I do, Your Honor.

THE COURT: Okay.

MR. ALTMILLER: And I do want to say that -- I want to focus on the issues that the Court has raised. I

don't want to be repetitious, which the Court may have noted that with the paucity of pages in my opposition in my lack of reply is not indicative of a lack of zealousness on behalf of my client.

THE COURT: As someone who has to read it, I appreciate that.

MR. ALTMILLER: I was only going to be saying the same things over and over again.

THE COURT: All right.

MR. ALTMILLER: And my view about advocacy is is repeating things is not the same thing as advocacy, Your Honor.

THE COURT: Okay. You go right ahead.

MR. ALTMILLER: Thank you, Your Honor.

What I did want to focus on is Your Honor has given us I think a pretty clear roadmap about what the issues are in its prior ruling. This is a time, place and manner restriction.

Now, I know that Mr. Ginsberg would like it to be *Press-Enterprise* and strict scrutiny, but it is not. And similarly, Your Honor, we would argue that because the issue seems to be that we give attorneys access, that it really is an equal protection claim which has been dismissed. But rather than argue the case the way that we might prefer, or the way that Mr. Ginsberg would, I think

it would be better for me to address the issues that the Court has outlined by establishing what the Court thinks about this.

So where we are is in a relaxed scrutiny. Relaxed scrutiny requires content neutrality. That's clearly not an issue here. It requires that the -- that there be a substantial government interest, which I'm going to discuss in a minute, and that it be narrowly tailored. This is the legal standard, therefore, this is what I will be arguing.

The substantial government interest in this case, Your Honor, is, number one, the orderly and efficient administration of justice. This is not controversial that this is a substantial government interest. It was found in *Schaeffer*, it was found in *Planet*. These are both CNS cases that they've brought. That is on Page 17 of our brief, our opening brief. So I don't think that's controversial.

Protecting private information - I have provided in our initial brief examples of that. I don't think that's controversial. In fact, really what we're doing here in this statute is the legislature is saying you can provide remote access of this information to attorneys. Attorneys are not -- they're not customers, right? They are part of the system. The judicial system does not work

unless attorneys are working within that system and are given access to certain things that others are not.

The examples are, I would argue, at least several, if not more than several. For example, since I've been practicing for the last 30 years in the courts in Virginia, there are places in the courtroom where I am allowed to go and members of the public are not. There are things I'm allowed to bring to court. For example, a cell phone, depending on what court that I'm in. Others are not allowed to do that.

Now, why do we do that? Why do we have that -- that understanding? Because sometimes you have a door that says "employees only." Sometimes you have a door that says "attorneys only." The reason you do is because it is necessary for the efficient administration of the judicial system.

Providing attorneys this type of access, Your Honor, is essential. I don't know how any attorney in this courtroom could argue other than that having access as an attorney, not for some other reason, not because I'm going to check up on my neighbor, not because I want to scrape data and sell it, but because I want to do my job. There's a recognition not only that we are vetted, and I'm not going to repeat that. That's been addressed more than -- thoroughly by both the Court and by counsel. But

very clearly, attorneys are different.

So then the question becomes if there's a substantial interest in the administration of justice, and if there is a substantial government interest in protecting private information, is this particular statute, this particular legal regime, is it narrowly tailored? So I haven't yet heard anyone yet address the issue of what that means, but the law on it I think is pretty clear.

Regulation is narrowly tailored under the standard if it promotes a substantial government interest that would be achieved less effectively absent the regulation and does not substantially burden more speech than is necessary to further the government's legitimate interest. Well, we know that there is no fundamental First Amendment right to remote access. That's clear. That's been established, I think. It doesn't appear to be an issue that's controverted.

So the question is would it be achieved less effectively? Well, if you don't give attorneys remote access, then it will be. If you -- to the extent plaintiff wants to frame it this way, if you want to give CNS, or any other person, therefore, any commercial enterprise, there's been a focus on, well, what will CNS do with this information? I'm worried about what anybody

is going to do with this information.

Jacqueline Smith is not a mere figurehead. She's not a totem. She is a real person who is an elected official and who cares about the interest of her constituents. And I am here to tell the Court that she cares very much about the privacy interests of her constituency.

Now, she's compelled to do certain things by statute, and that's certainly the case that she's sort of caught in the crossfire. But I will tell you that she has an interest in protecting the private information of her constituents. She's also interested in the efficient operation of her court. So that is also in play as well.

So if we look further -- and I'm sorry. I have some notes here. I apologize. I need some notes.

So the -- such regulations of -- the Courts have said, and I've cited *United States v. Albertini*, are not invalid simply because there is some imaginable alternative that might be less burdensome on speech. It is permissible so long as the neutral regulation promotes the substantial government interest that would be achieved less effectively without the regulation. As I mentioned, I think it's fairly axiomatic that it would be less effectively achieved if you gave everybody access, it would be less effectively achieved if you did not give

attorneys access. And again, I'm not even getting into the issue that this is not a fundamental First Amendment right, but --

THE COURT: And as I understand the law on this, if I were to determine that the media had enhanced access, you would pretty much have to give that to every citizen.

MR. ALTMILLER: This is exactly the point.

THE COURT: Because, as Judge Motz said in her case, the First Amendment right is the same.

MR. ALTMILLER: And CNS is not even arguing that they're special. I mean, they may be impliedly arguing that they're special. But really, legally, they're saying exactly what the Court is saying: Everybody gets access. If they get access, everybody.

So -- so how do you start denying people access because they're a commercial enterprise? Well, CNS is a commercial enterprise. Most press outlets are commercial enterprises. I suppose there might be a few exceptions.

And there's actually an interesting -- there's an interesting passage from the *CNS v. Planet* case, the Ninth Circuit case, where the Court says, "Even in this era of electronic filing systems, instantaneous public access to court filings, especially complaints, could impair the orderly filing and processing of cases with which the clerk's offices are charged."

And it says -- they continue to say, "The First Amendment does not require courts, public entities with limited resources, to set aside their judicial operational needs to satisfy the immediate demands of the press."

And there's another court --

THE COURT: And in that case, there was a two-week review before the documents were available.

MR. ALTMILLER: Right. Exactly.

And that was impermissible. But the Court, even in that context, is pointing out there's some limitation here. And there's another CNS case that I cited in my brief, which is *CNS v. New Mexico* administration -- or Administrative Office -- I know it says *Admin. Office of Courts.* And it says, "The qualified right of access does not require perfect or instantaneous access."

I think that's a very useful observation, Your Honor, which is to say you have a right of access, but you don't have a right of instantaneous access. And again, we know there's no fundamental First Amendment right to remote access.

So I would point these things out because I think that when you look at the test of relaxed scrutiny, when you look at narrowly tailored, I mean, you look at substantial government interest, Your Honor, I think really the arguments I'm making, I'm not -- they're not

controversial. They're not -- the interests are there.

I don't have to create a bogeyman where I say -- although I think Ms. McNeill, whose arguments I thought was very effective on the points that she addressed, is -- kind of gets to the heart of it, which is when the horse is out of the barn, that's it. The horse is out of the barn. It doesn't mean that we absolutely have to prove that all kinds of nefarious conduct will occur.

I think what's necessary is that there's enough information for us to know that that's an interest. There's enough information to know that that's a possibility. And it's enough to -- to -- all it needs to do is promote the interest that would be achieved less effectively absent the regulation.

So forgive me, Your Honor, for not getting into the weeds on these various scenarios, although I'm certainly very pleased that counsel has gotten into them because I think it's interesting, and perhaps even useful to the Court, particularly that CasePortal website. But having said that, Your Honor, I think that it's not even necessary to go to that point based on the Court's prior rulings and based on the law as it exists with regard to relaxed scrutiny.

If the Court doesn't have any additional questions, I am hopefully keeping to my promise of being

somewhat brief.

THE COURT: All right. Very well. Thank you, sir.

MR. ALTMILLER: Thank you, Your Honor.

All right, Mr. Ginsberg, you now have a chance to respond.

MR. GINSBERG: Yes. Thank you, sir.

THE COURT: And actually, while you're at the podium -- well, go ahead. Go ahead.

MR. GINSBERG: Your Honor, to first address one of your questions that you had, I believe from Ms. McNeill, no case has held that we are entitled to the access we seek in this case because no court has considered it before. And we are not saying that Courthouse News is entitled to remote access here simply because of the fact that we must go to the courthouse, and that that's an inconvenience. But it's the fact that there's a restriction of remote access to attorneys only. That is what must be justified under the First Amendment.

And Your Honor already held in connection with the motion to dismiss that Courthouse News has cited a valid First Amendment claim. And --

THE COURT: Facially.

MR. GINSBERG: At the motion to dismiss stage.

THE COURT: Right.

MR. GINSBERG: Yes.

Now, the fact that defendants have chosen to offer OCRA, but to only the special class of individuals – attorneys – under those circumstances, the First Amendment requires them to justify the access restrictions imposed.

And the heart of this matter, this is about a restriction of access. Not a fundamental right to remote access, but a restriction of access. And not about access delays, but an access restriction in violation of the First Amendment.

THE COURT: Of course, once again, they do have access. This is a method of access. They have access to the information, they just don't have it as easily accessible as your client would prefer it.

MR. GINSBERG: Your Honor, there is no denying that access of -- at the courthouse is not as easy or is not as feasible. But a Virginia attorney, on the other hand, can achieve that access wherever they may be, 24/7/365.

And the effect of that, in other words, the harm here, is that the practical ability of Courthouse News to report on new cases filed statewide, and to follow events that may occur in those cases, that's impaired. And without access to an actual filing -- which, by the way, attorneys have -- no matter if they represent a party in

the case, there -- Mr. Altmiller said that attorneys need access to this information remotely. But I believe the opposite is true. There's no reason why attorneys need access to filings statewide in cases where they don't represent -- represent a party.

THE COURT: Well, that would depend. If you have a case, and you know that another lawyer has filed a similar case, or there's a court order in a similar case that this might be instructive, I think they might have a right to access that to effectively represent their clients.

MR. GINSBERG: I don't disagree, Your Honor, that they might have an interest in some other cases, but they certainly don't have an interest in accessing all filings statewide.

THE COURT: That's true. That's very true.

MR. GINSBERG: And I'd like to address -- you know, Ms. McNeill spent a lot of time discussing this idea of widespread data brokers and how Courthouse News is allegedly also this data broker. But the Commonwealth has not substantiated the existence of widespread data brokers that sell information in court records in Virginia, or any other courts. And there is no evidence that Courthouse News is a data broker that uses bots, for instance, to review filings or that they -- they sell filings en masse.

Rather, Courthouse News is a news agency. Our argument has nothing to do with collecting -- the need to collect data and sell them and to resell them. This -- this issue about --

THE COURT: Well, clarify one point for me then. The impression I have is that your client disburses the news to their various clients, so they do have an interest in the information for the purpose of disseminating it to their subscribers, as well as other individuals purchasing the information from them, am I correct?

MR. GINSBERG: Only their subscribers would have -- would have access to the actual filings.

And let me clear up something else because there's been many misrepresentations about what actually is available to the subscribers.

THE COURT: Please.

MR. GINSBERG: This idea that that -- that CasePortal -- which there's no record evidence of it until today, Your Honor, but let me set the record straight about CasePortal. CasePortal is simply an updated version of an online database that Courthouse News subscribers already use to access information available under their current subscriptions. Just like subscribers can do now, CasePortal allows Courthouse News subscribers to search publically available docket information for things like

party name, court name.

And it also allows subscribers to access one of Courthouse News' publications, New Litigation Reports, that they subscribe to, which the parties have stipulated to, contain Courthouse News original staff-written summaries of newly filed complaints.

The Virginia Report, for example, contains such summaries for Prince William court complaints. And those reports also sometimes provide links to a copy of a publicly available complaint that a reporter used to draft their report. That has been a staple subscription product of Courthouse News for years. There's nothing new about that.

And the complaints -- a link to the complaints are sometimes available in these newsworthy cases because they're nonconfidential, publically available documents, just like the filings we seek remote access to in this case. And the case law is clear that the press cannot be sanctioned for publishing that information.

And speculation, which is all that's offered here today, speculation about a parade of horribles about what Courthouse News might do with publically available documents is not -- is not a reason to hold that the First Amendment is not violated in this case. All that Courthouse News plans to do is report on the news of the

courts.

It's certainly -- I want to make this very clear. It does not seek to make a copy of every single complaint available, as Ms. McNeill has alluded to today. And they certainly -- Courthouse News certainly doesn't seek to make any subsequent filings after a complaint is available because those filings are just not available to Courthouse News subscribers, with the exception of appellate rulings and federal district court rulings. So the notion that Courthouse News is going to get OCRA access, download all the filings, and make them available en masse to their subscribers, circumventing the OCRA system, is simply false.

Now, one of the other points that Ms. McNeill alluded to is this idea of practical obscurity.

THE COURT: Of what?

MR. GINSBERG: Practical obscurity. The Commonwealth's argument is that courthouse records at -- that records at the courthouse are more difficult to get than records online, so there should be remote access -- there should be remote access restrictions. The only citation that is cited for this notion of practical obscurity is an article, a law review article, which actually urges against online access restrictions because such violate the First Amendment and urges that courts

should actually consider less restrictive alternatives, such as filer redaction.

And Mr. Girdner, Courthouse News's editor who is here with us in the court today, explains in his declaration that this banner of practical obscurity is simply contrary to his experience as a journalist covering courts for over 30 years, and visiting courts nationwide where paper records, contrary to the suggestion of the Commonwealth, were well-indexed and easy to find.

Now, a lot of time was spent by both Ms. McNeill and Mr. Altmiller discussing time, place and manner scrutiny. A couple of things to say about that: First, even under time, place and manner scrutiny, what needs to be demonstrated, defendants have the burden of demonstrating that no reasonable alternatives exist to adequately protect the stated interests. Now, Mr. Altmiller said that these alternatives cannot be imaginable, but they are anything but that in this case.

I'm not going to repeat myself, but I've discussed at length this morning these reasonable alternatives that are effective, such as redaction and subscriber agreements.

And this notion that --

THE COURT: Reasonable alternatives to publication or access?

MR. GINSBERG: Reasonable alternatives to the restrictions imposed here, which is a complete blackout of remote access to filings for non-attorneys.

THE COURT: All right.

MR. GINSBERG: And we contend that the defendants have not established that the challenged restrictions here are actually content-neutral, which would be required for a time, place and manner scrutiny. Instead, the restrictions are specifically supported by concerns over the content of these records. In other words, that civil filings might contain personal identifiers.

And the Supreme Court's decision in the *McCullen* case, which is cited in our papers, makes clear that a restriction is not content-neutral if it's justified as here by reference to the content of the restricted speech.

And we also don't believe, as it would be required for time, place and manner scrutiny, that the restrictions leave open ample alternative channels for communication of the information. Yes, the records are available at the courthouse, but it's not the same. Courthouse News -- neither Courthouse News nor any non-attorney or press organization can match the access allowed to attorneys. Courthouse News cannot practically send a reporter on a daily basis, if at all, to the

circuit courts across the state that attorneys can see from their tablet, computer, phone, you know, whatever.

But defendants say that attorneys should have remote access. One of the reasons they say this is because time spent traveling to the courthouse is expensive and time consuming. And we agree that the same is true for journalists. There is no reason why attorneys should benefit from this remote access on that basis and no one else.

Now, I think I should mention -- talk about the *Planet* case a little bit, and the New Mexico *Pepin* case that Mr. Altmiller referred to, to make the Court very clear on what those cases actually held.

THE COURT: Well, I have read the *Planet* case. So I know that.

MR. GINSBERG: Understood. Understood, Your Honor. I just would like to sort of correct a statement that Mr. Altmiller made which, yes, *Planet* and also *Schaefer* recognize that there is an important interest in the administration of justice. But both of those cases also find that the restriction challenged in those cases violated the First Amendment.

In *Planet III*, what the Court ultimately said is, yes, there's no mandatory right of immediate access. And that's certainly not what we're asking for here. But

when the right of access attaches, as here, there's a presumption of access that arises, and which can be overcome only if the defendants show, through the application of constitutional scrutiny, that the interest claimed -- the interest they claim support the access restrictions would otherwise be impaired by the access that we seek.

And in the *Pepin* case, the Court made clear that the First Amendment requires access in line with what the press traditionally enjoyed. And as Mr. Girdner explains in one of his declarations in this case, the press and attorneys traditionally enjoyed at the courthouse the same access to records soon after they cross the counter, as well as in the records room where journalists could review subsequent filings, but the restrictions challenged here have eviscerated that traditional access while only allowing it to attorneys.

And this -- this notion that attorneys are bound by ethics, yes, they are bound by a professional code of ethics, but there is no violation -- there is no ethical violation for attorneys to -- that specifically says that attorneys can't go and disclose information that they've obtained on OCRA.

Another point made by Ms. McNeill is the fact that because one must go to the courthouse and pay a clerk

a copy fee in order to access filings, that this, you know, prevents mass data harvesting, but so does paying a subscriber fee for -- for a remote access system like OCRA.

And there's been a lot of time focusing on the fact that signatures appear on filings. Yes, signatures appeal on filings. They also appear on attorney-signed documents. They also appear on filings in courts across the country, but no other court has held that signatures are required to be redacted. And the fact that signatures might be in a filing doesn't mean that the defendants are automatically excused from not violating the First Amendment.

I'll wrap up by just coming back to this idea because this idea that Courthouse News is looking to, you know, gain access to OCRA to resell filings en masse because I think it's so critical to make the Court aware that that is not what this case is about. Courthouse News is a news agency. Its subscriptions allow subscribers access to reports that offer summaries on new newsworthy civil complaints. Yes, sometimes a subscriber can click on a link and access a complaint. That is not always the case. But it doesn't matter. Those complaints are publically available.

Once they're out in the open, Courthouse News,

or anyone, can do whatever they want with those complaints. It's publically available information. And there are certainly no other filings in this case -- OCRA doesn't only allow access to civil complaints. It allows access to all civil filings. There are no other civil filings in this case that are going to be available on CasePortal, or any other Courthouse News database, which again, is only available to subscribers. It's nothing new, and this information is not available en masse as the Commonwealth would like this Court to believe.

Thank you, Judge.

THE COURT: Thank you, sir.

All right. That completes the motion for summary judgment filed by Courthouse News. We'll shift now to the one filed by the Commonwealth of Virginia.

THE CLERK: Your Honor, can we take a brief recess?

THE COURT: Yes, ma'am. We sure can.

We'll take about a 10-minute recess, then we'll come back and proceed.

(Recess taken.)

THE COURT: All right. Mr. McEntee on behalf of the Commonwealth of Virginia.

MR. McENTEE: Good morning, sir. May it please the Court.

Once again, Robert McEntee for the Commonwealth of Virginia presenting argument in support of its motion for summary judgment.

THE COURT: I apologize how I've gotten some of the people's names wrong. There were just so many names on the pleadings. I'm doing the best I can to navigate through it.

MR. McENTEE: Absolutely. Understood, sir.

THE COURT: All right. Go right ahead.

MR. McENTEE: I know the Court has read all the briefs. We have gone through a significant argument today. I'm not going to repeat anything I've already said in briefing. I believe many of the points Ms. McNeill and Mr. Altmiller have already made.

THE COURT: To me there are a lot of peripheral issues.

MR. McENTEE: Yes, sir.

THE COURT: But the key central issue here is whether or not if Courthouse News has a right -- or has a path of access to the information, do they have a constitutional right to have it remotely available to them?

MR. McENTEE: That's correct, sir. I think that's well-stated. And I believe the Court stated it even better in the Courthouse News Services motion for

summary judgment in that this case is really about convenience of access rather than access per se.

And to that extent, we have shown that there's a difference when the convenience that's associated with courthouse visitation, which has been constitutional since the founding of this republic, it's just simply different than the -- like the uber-convenience that's associated with remote online access. The instantaneous and easy facility of access online has proven itself to show very unique security and privacy risks, even when that same information is all disclosed at the courthouse.

And those concerns are not just shared by the Commonwealth. They're shared by Congress, as we've shown through the Data Broker Report, and the U.S. Supreme Court which has been shown through the *Reporters Committee* decision.

But we also believe that some of the facts alleged by Mr. Bodis in his declaration, which was submitted, I believe, in reply to our response to CNS's motion for summary judgment, those facts support our motion for summary judgment as well. And Mr. Bodis, I believe, is their technology director at CNS. And he agrees with our definition of bots. He -- he admits that they are these automated scripts which can take digital information and instantly turn any amount into easily

searchable databases. He admits that over 50 percent of all internet traffic is attributable to bots.

And he goes on to say that this is how Google works. That they use bots to search websites and to make searchable results. I put it to the Court that the Commonwealth has an interest in preventing OCRA from being Google in this case.

But these facts also show that the risks that are associated with 50 percent of all --

THE COURT: And what do you perceive to be the down side or the dangers in allowing them to market this information in that fashion?

MR. McENTEE: I'm sorry. Can you repeat the first part of your question?

THE COURT: Sure. What do you consider to be the detriment to the Commonwealth of Virginia in allowing, hypothetically, Courthouse News to market this information using these other mediums?

MR. McENTEE: Well, I don't believe it's just Courthouse News Service. It's any data broker which is in a similar position. And what we've shown is that Congress is concerned about some of these usages as well is that data brokers, like Acxiom, take this information, which is compiled from a bunch of different sources. They might take a court record in Washington state, they might take a

court record in Virginia, they might take a court record in Florida, and they can start to compile a very -- a dossier on this person, which in itself is a compilation which is very sensitive, they then resell that information as a list.

Some of these lists that we mentioned in briefing are genetic disease sufferers, military and police officer's home addresses. I don't have to lecture -- I know the Court has substantial experience in law enforcement. I don't have to lecture the Court when the bad guys get that kind of information. So, even if it's already publically available, making it easier for someone to get that same information is a security interest that the Commonwealth has.

Now, this is simply not implicated at courthouse visitation because, as Ms. McNeil has already stated, one has to go into the courthouse, they have to pay a per page fee. It's simply not -- they can't utilize the economy of scale that's associated with online access.

And Mr. Bodis goes on to outline a series of other methods which the Commonwealth could undertake to combat bot activity, but he admits these aren't going to be completely effective. And he -- he says that it would only reduce bot activity to around what he calls reasonable levels.

Now, he doesn't define what reasonable levels are in the context of court records. I would put it to the Court that what is a reasonable level of bot activity for Google is simply not reasonable in the context of court records where we've shown that there is sensitive private information that we don't want the bad actors to have.

And this is consistent with the facts that we've shown in the Knuth declaration that we submitted in part of our motion for summary judgment. And we've shown that if this Court grants the relief that CNS is requesting and turns OCRA into a publically accessible database, what's going to happen is that information will be scrapped. It's happened to every publically accessible court database in Virginia, even the Virginia date of birth confirmation system which doesn't actually show social security numbers, but can be mined for social security numbers, and other related sensitive information.

Now, I believe these facts also support our argument under the standard of review, which Mr. Altmiller touched on a little bit in his argument. Again, I don't have to lecture the Court, but under time, place and manner, all that matters is that we have an interest, a significant interest, which is -- and the restriction is narrowly tailored to meeting that interest.

And the Supreme Court has defined narrowly tailored in this context to mean that we would simply achieve our interest less effectively absent the interest -- I'm sorry, the restriction.

Now, I believe *Courthouse News Service v. Schaefer* from the Fourth Circuit, which I'm sure the Court has read, kind of explicates this efficacy requirement in the context of access to courthouse records. And I know that case was about delayed access at the courthouse. It didn't really implicate the issue that's here before us. But I think it speaks to that efficacy element.

And in that case, the clerks were delaying access -- or the same access to complaints at the courthouse. They had proffered forth reasons why they might be necessary, but both Judge Morgan and Judge Motz found that they hadn't really substantiated those claims factually.

And what had happened, actually, is that over the course of the litigation they had increased same-day access without changing any policies, without hiring any extra staff, without doing anything extra. I think Prince William actually doubled same-day access, and I think Norfolk tripled same-day access without really changing anything.

THE COURT: Now, I assume your colleague here is

going to address the burden on Prince William County in adopting this more expanded system?

MR. McENTEE: I assume so, sir.

THE COURT: Personnel wise, cost wise?

MR. McENTEE: Yes, sir. I think that it's been done to an extent in the briefing already.

THE COURT: All right.

MR. McENTEE: But the Fourth Circuit was careful to note that if the clerks had shown that they had had to change policies to affect their interest, the analysis would have been totally different. And we've shown facts here -- and in fact, Mr. Bodis' declaration shows that if we are to make OCRA a publically accessible database, well, we have to put in a host of other security measures.

So what I really think this illustrates is that the efficacy requirement under relaxed scrutiny is really just a safeguard against arbitrary government action. So in *Courthouse News Service v. Schaefer*, the clerks had put forth these reasons. They couldn't really justify why they needed those reasons and therefore they were totally arbitrary.

And that's simply not the case here where we have shown that cyber security is a publically -- I'm sorry, is a privacy and security risk which is shared by -- with Congress and the United States Supreme Court.

Now, this case is devolved a little bit into a debate about the Commonwealth's public policy. It's devolved into a debate over the Commonwealth's methods in executing its cyber security goals in the extent to which the Commonwealth should really be concerned about cyber security.

But I'm going to quote the Supreme Court here, Your Honor. This is from *Ward v. Rock Against Racism*. And I believe Mr. Altmiller also alluded to this. It's that under TPM scrutiny, the validity of time, place, or manner regulations does not turn on a judge's agreement with the responsible decision-maker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted.

So this discussion about, well, we'd have to implement further cyber security concerns, I believe, really misses the mark. We're really talking about Virginia public policy here. And because we've already made these records available at the courthouse, and we merely extend a privilege to attorneys and licensed staff in some Virginia agencies, the Commonwealth -- the standard cedes some discretion to the Commonwealth in how it chooses it promote cyber security.

THE COURT: So you believe that if they want the

relief they're requesting they should go to the General Assembly?

MR. McENTEE: That is exactly my assertion, Your Honor.

THE COURT: Okay.

MR. McENTEE: So not only is the -- the continued assertion that less restrictive alternatives exist forbidden under the bare terms of *Ward v. Rock Against Racism* --

COURT REPORTER: Your Honor, --

THE COURT: You're going to have to slow down so she can take it down.

MR. McENTEE: I'm sorry, sir.

THE COURT: Okay. Just slow down.

MR. McENTEE: So CNS continues to assert that less restrictive alternatives exist. This analysis is forbidden under the bare terms of the legal standard that's applicable in this case. And I believe they also made reference to some standard with regards to we have to establish no reasonable alternatives exist under time, place and manner. I don't -- I don't know what -- to what case they're citing to that's cited that standard. All that needs to happen is that we show that we actually achieve our government interest here.

So -- but this is essentially a public policy

argument. And it's challenging the public policy of Virginia as it has been developed through the General Assembly and through the political process. CNS has agreed by their lack of access to OCRA they can go to the General Assembly, they can petition through the political process to either have the Commonwealth change its interests or promote them in a different way. But, as the Court has noted, they choose not to because a similar measure failed four years ago. Simply because it failed four years ago, and they chose not to pursue that path, does not make this a First Amendment claim.

And I pose to the Court further that because the General Assembly actually revisited the issue in 2018, it shows that they considered -- they made a considered public policy decision, Your Honor. It's not an incidental public policy argument we're making. Rather, the General Assembly did the balancing themselves. They're trying to balance how to use discrete state funds and also promote privacy while also promoting open access at the Courts.

The General Assembly is aware that non-attorneys do not have unfettered, instantaneous, the easiest remote access possible in Virginia. That limitation is made with how to achieve those policy balances. And I believe under time, place and manner scrutiny, the First Amendment is

simply not a vehicle for challenging that policy determination.

Thank you.

THE COURT: All right.

Mr. Altmiller.

MR. ALTMILLER: Thank you, Your Honor.

I don't have -- on the points that I addressed earlier, I don't know that I have a lot more to say about that. I will add a few. One is --

THE COURT: Do you -- you do agree -- or you're arguing that this is an issue of public policy more than one that is constitutionally framed?

MR. ALTMILLER: Yes and no. So the text of the constitutionality of the process or the statute is a constitutional issue, and we've got that framed. We know that it is relaxed scrutiny.

THE COURT: Time, place and manner.

MR. ALTMILLER: Time, place and manner.

THE COURT: Right.

MR. ALTMILLER: So we are operating within a constitutional standard. It would be possible for this to be unconstitutional for some -- something -- we know this from *Schaefer*. There's something that a clerk could do that could be unconstitutional. So what we need to look --

THE COURT: Within the context of the facts of this case?

MR. ALTMILLER: I'm sorry?

THE COURT: Within the context of the facts of this case?

MR. ALTMILLER: No, I don't actually think within the context.

THE COURT: You're talking in the abstract?

MR. ALTMILLER: Just in the abstract.

THE COURT: Okay.

MR. ALTMILLER: Just in the abstract.

I don't think within the context of this case it could be -- or I could probably imagine another set of facts that it could, but the point I make to answer the Court's question is to say it falls within that framework. But once we're there, we have to look at whether or not there's a substantial governmental interest, and then we have to look at whether or not the regulation, in this case the statute, is narrowly tailored to do that.

So in some respect you're dealing with policy, you know, small "p," policy, I suppose. Here is what I would say about that: The Court talked about the idea about the additional burden that it might be upon a court clerk. And I want to make a distinction that perhaps in an absolute sense, cost doesn't determine

constitutionality.

However, when we're dealing with an area in which we are in time, place and manner, when we are dealing in an area where we are looking at relaxed scrutiny and we're looking at whether or not there's a substantial governmental interest, and how the regulation promotes that, we have to look at what the governmental interest is in this case. One of them, I would say primarily, in addition to the privacy is judicial efficiency.

Therefore, the burdens of having to devote more resources to a particular process or regime that might be demanded by the plaintiff matters because -- and I think this is alluded to in some of the cases that we cited. You can't insist -- within the context of this analysis, you can't insist that it be done instantaneously, or some other way, and that a clerk allocate effectively an unlimited amount of resources or a great deal of resources.

THE COURT: When you're talking about resources, you're talking about time?

MR. ALTMILLER: Time and money.

THE COURT: Okay.

MR. ALTMILLER: Time is money in a sense, right? If you have to have your clerks spend more time, for

example, dealing with attorneys who now cannot get remote access and must send somebody down to the Court, it's inefficient for the judicial system at large.

I can tell you as a participant in the judicial system that there is a big difference between a courthouse where I can -- where I have to go down and get it, like Fairfax presently, or some other court like Prince William potentially where I can get it online. It's just very different.

But the other thing is that if you're a courthouse that is not providing that remote access, you now have to dedicate resources to the people who come in the door. And those resources now must be -- and I would suggest to Your Honor it wouldn't be, you know, out of experience to suggest that when there's not remote access, the people who are coming to the courthouse are largely going to be attorneys and their staff, and people on their behalf, because those are the folks who most need that information.

But my point being that when you dedicate resources to that because you don't have remote access, you're taking resources away from other aspects of the administration of the clerk's office and, by extension, the court itself. And as somebody who has practiced in state courts in Virginia for 30 years, you can see what

happens when courts are denied resources or they are taxed. They don't have enough judges, they don't have enough staff, whatever the case may be. And this is just a practical reality.

And if I file a lawsuit in a courthouse in Virginia -- and the Virginia Supreme Court has said we want cases tried within a year. That's our aspiration. You can file a lawsuit today in Fairfax that is a one- or two-day bench trial and feel reasonably confident that you will get a trial within eight to 10 months. That is not true in other jurisdictions.

THE COURT: I will say it was even faster when I was a circuit court judge in Fairfax.

MR. ALTMILLER: Right. But, you know, what's interesting, Your Honor, is that the courthouse in Fairfax is actually a good example for this reason. It shows what happens when a court decides to really think about how it deploys its resources. It can create a totally different experience for a citizen seeking redress of wrongs petitioning the government and exercising their First Amendment right to have that case decided by a judge. That is another First Amendment right nobody likes -- nobody brings up a lot.

But the right to petition the government for redress of wrongs, i.e., the right to file a lawsuit and

have it heard, and so judicial efficiency matters in these cases.

And again, I think -- I would argue --

THE COURT: Judicial efficiency is deploying the people in the clerk's office toward the accomplishment of the Court's mission?

MR. ALTMILLER: Yes.

THE COURT: Okay.

MR. ALTMILLER: I -- I think Your Honor, as a former circuit court judge in the state courts, knows how much the judges in the system itself relies upon the clerk's office to do their job, and if the clerk doesn't do their job, the troubles that that can lead to. And I'll leave it at that.

Some clerks are better than others. That's probably a tautology to say that. But it -- it matters. And so it doesn't -- we would contend, and I think with great basis for contending this, that it is enough to recognize that there is an additional burden for denying attorneys remote access, and that there is some reasonable, I would argue, much more than reasonable concern, that simply putting everything out on the Internet so that any company -- again, I'm not necessarily concerned about CNS.

CNS is a commercial concern. They're -- you

know, they're out to make a profit, which is fine. We have a market economy. There's nothing wrong with that.

But there are other people who are going to seek to use that if it's advantageous to them. And right now that -- and I forget the term that Ms. McNeill used. Practical obscurity, I think maybe it was. But the idea that you can find the thing that you're looking for, and so it's not obscure to people who are interested in that particular issue, but it's not something that you can just, you know, data mine.

Because, you know, part of -- part of the idea of scraping data and data mining, and that whole process, is that you don't -- every one doesn't have to be a hit, right? You know, think about -- think about scam calls. The scam calls, most people are just hanging up. They're doing it for the few people that they can -- that they can get. And so it is with data mining.

But again, the issue is whether or not there is a substantial government interest in the privacy of the information of its citizens. And that's got to be balanced against the access, the First Amendment right --

THE COURT: But of course it is available if they come in and ask for the file at the front counter.

MR. ALTMILLER: This is exactly the point. And, Your Honor has identified this. They have that right.

If there was a right, if there was a First Amendment right, a fundamental right to remote access, we would be having a far different conversation. We would be under a different standard. But that is not the case, and so we are under the standard we are now which is CNS saying we don't think that we're entitled to remote access right up until the moment that attorneys are entitled to access, and that's when we're entitled to access.

Now, we believe that sounds a lot more like a equal protection claim. But even regardless, we don't need to, I think, get into that issue any further if we look at time, place and manner and we say what -- what are the facts of this case? Why does this legal -- why does this regulation, this statute exist? What is it to promote? And what it promotes is on the face of it, Your Honor, I believe.

And so although I think there is information out there, there are submissions to the Court with regard to that that I think indicate why these are serious concerns, but I would argue that they are plain and clear what those concerns are. And once you have established that there's an interest, then you have --

THE COURT: And define those again for me one more time for the record, please.

MR. ALTMILLER: Certainly, Your Honor.

They are, number one, judicial efficiency and the efficient administration of justice in the court systems. That is number one.

And number two is the protection of personal information of the citizens of the circuit. Well, in this case, Prince William.

THE COURT: And that is from data brokers? Because it's available to the average citizen that comes to the front counter?

MR. ALTMILLER: Right.

And I think that CNS's argument in this case makes that particular argument for us. They want this access because it is more convenient, because it is less expensive, because it changes the economies of accessing this information, but it doesn't change the economies just for them. It changes it for anyone else.

And the ability to warehouse this information and to store it, for $100 you can get a little storage device that will keep a terabyte of information. It -- the ability to pull down and store data is great now, and it's only going to be greater as the years go by. And so the concern about that information, I would argue to Your Honor, is only going to grow as the technology grows to do that.

And so what CNS says, essentially, is the clerks

can engage -- they can protect that through some other way. The problem with that argument is that what they're saying is we want you to do it the way we want you to do it. We want you to deploy resources the way we want you to deploy resources. That is not the test.

The test is what's the -- what do we believe is the best way, you know, reasonably, right, within the standard of does it promote the interest? Would it be less well promoted if we didn't do it? And does it promote it?

And it does promote the interest.

THE COURT: Now, do you have information, or would you have evidence, that you can identify data brokers that are out there right now that are misusing this information?

MR. ALTMILLER: I can't because I don't have access to that information. So the problem is I am asked to demonstrate what would happen --

THE COURT: Hypothetically.

MR. ALTMILLER: Hypothetically. And I think there are examples, and the Commonwealth probably knows a bit more about this than I do. Respectfully, they deal with it a bit more or their experience is going to be more limited.

Have there been issues? I know, for example, in

Fairfax there was a big problem with data brokers in the general district court. I've been advised by a -- by them that that was the case.

And Mr. Ferguson has also, you know, identified these types of issues. This is something that I can certainly comfortably represent to the Court has been an ongoing concern of clerks in general because the clerks have their own group that meet and talk about these types of things. So, it is a concern.

I understand that CNS may say that concern is a chimera. It is imaginary. There's no evidence of it.

I would suggest, Your Honor, that being -- you know, being aware of how the world operates in 2022, it would be hard to argue that there aren't people who, if you give them the opportunity to warehouse data and to use it, that -- that they're not going to do it. They are going to do it. We know they're going to do it. We know some of the biggest companies do it.

And, you know, you can get into, as Ms. McNeill talked about, whether or not that -- that data warehouse and mining and dissemination is neutral or good or evil, or engage in these moral questions. What you do know is that this is how the world operates, generally speaking. If you give people access to information, they are going to try and use it as best they can. As CNS is arguably

for laudable purposes, but they want access to information because it's part of their business model. There are other business models other than CNS, and I think experience indicates that.

THE COURT: And you don't think there's any mechanism that would be effective and efficient that you can screen the individuals to make sure they that have the bona fides that Courthouse News has?

MR. ALTMILLER: So there's actually two problems there. So one problem is you have to screen them. So obviously you have to dedicate resources to screening them. So that's one issue.

The second -- and you have to decide what the criteria would be. You have to undertake it. The moment, of course, you decide that you are going to give some members of the public access but not others, now we're back in the courthouse arguing that, right? And it is -- so that's one issue.

But the other issue is how do you track the person that seemed like they were a good bet not to do this? How do you track whether or not they're doing it? And I think it's virtually -- well, I don't want to say -- I shouldn't talk about the difficulty or impossibility of it. The point is you have to engage at the very least in more resources to police the people that you just spent

resources on vetting, in addition to the resources you're spending on those people if you challenge legally about whether or not you shouldn't have denied them access because your criteria is constitutionally infirm.

And it's a legitimate decision, and it's a legitimate choice to use this regime instead of that regime, I would argue to the Court.

THE COURT: Okay.

MR. ALTMILLER: If there's no more questions, I think I'm done.

THE COURT: Thank you, sir. I appreciate your comments.

MR. ALTMILLER: Thank you, Your Honor.

THE COURT: All right, Mr. Ginsberg.

MR. GINSBERG: Yes. Thank you, Judge. I'll take my mask off first.

And I will try and be brief and not repeat many of the arguments that have been made here today, but there's few things I'd like to clear up and mention, the first of which is what this case is about. The -- we contend that the defendants cannot impose restrictions on who may access publically available court records because it cannot impose restrictions how that information can be used unless those restrictions comply with the First Amendment.

And defendants have the burden of showing that their restrictions comply, and they have not come forward with any evidence. The Commonwealth, in its papers, only cites to law review articles except for this congressional report which we've heard reference to today. But that report, as we explain in our papers, clearly has anything to do with court records at all.

And the clerk, for her part, points -- points to no evidence. There's no evidence cited in their papers to justify the concern here or that the restrictions are narrowly tailored. Or there's certainly no evidence to demonstrate that data brokers are mining court filings available remotely. And Mr. Altmiller's testimony about -- or argument here today about what he has heard has happened at the Fairfax court, that simply doesn't carry the day.

Now, instead of focusing on this constitutional question, this case has been somewhat sidetracked, I would say, to have been morphed into this debate about good and evil over the Internet. And the Commonwealth says that online access is vulnerable to a security risk. And those fears, however, are based on the fact that OCRA would be wide-open to the public if Your Honor rules in our favor. But that's not what we're asking for. Rather, we're asking for access to a permission-based system that is

behind the pay wall and vetted by the clerk.

And Mr. Bodis, in his reply declaration, is not suggesting that all of the tools he lists that can be used to manage bot activity, that all of those things must be implemented. Rather, he's just giving examples as to things that are out there to manage their concern that we have discussed at length today, such as a pay wall. And Mr. Bodis, contrary to what was suggested by Mr. McEntee, he does admit that there are -- that the ways to protect against bots are not necessarily effective.

Instead, he is saying -- what he is saying is that they are reasonably effective. That's a quote from his declaration. But that's not an admission that they may not work. In fact, they are effective, and that's demonstrated by all of the courts in 38 states that grant remote access to civil filings, as well as all federal district courts, including this court. This court's own filings are available to the public on a remote basis, and there is no evidence of the parade of horribles that have been alluded to today. And PACER, just like OCRA, requires a user to register and it requires a user to pay for access to the documents.

Now, I would like to make one more point on time, place and manner scrutiny which has been discussed at length today. And I would point the Court to the

*Planet* case which, yes, observed that access restrictions to civil filings, they may resemble time, place and manner restrictions. But courts still apply what are called a rigorous standard. Not a relaxed standard, as Mr. Altmiller has suggested should be the case. A rigorous standard of applying constitutional scrutiny.

And with respect to the idea that, you know, Courthouse News should have gone or should go to the General Assembly, again, there is no reason to expect that there would be a different result as there was, you know, a few years ago. And in connection with that attempt, which was made by Senator Obenshain, OES had convened a working -- a working group of individuals which consisted of clerks, and they issued a report advocating against remote access for nonconfidential civil filings. So why would the result be any different this time around?

THE COURT: Of course you have got a different composition of the General Assembly in certain areas.

MR. GINSBERG: There may be a different composition in certain areas, but there's no reason to believe that OES, or the clerks, would issue a similar report or fight against the access that we're seeking here, as they're doing in this case. Instead, this Court should walk through the analysis required by the First Amendment, which requires a finding, we contend, that the

restrictions imposed are unconstitutional.

And the one other -- the one other aspect of defendants' argument that I want to address, and this was raised by Mr. Altmiller, about the time and cost burden that would be required. And I believe Mr. Altmiller based that idea on the fact that OCRA may be taken off line if we get the -- if Courthouse News gets the access it seeks in this case, and then resources would have to be devoted to in-person attorney record requests. There's no record evidence about that at all in this case.

And this idea that the clerks would have to devote a substantial amount of resources to vet subscribers, there's also no record evidence about that in this case. In fact, what the evidence does demonstrate is that they're already doing that for attorneys who -- the clerk is already doing that for attorneys who subscribe to OCRA.

And I think I'll finish with pointing to a quote from a recent decision from the Northern District of Florida, which states if budget implications of any amount justify the suppression of constitutional rights, the last two centuries of constitutional jurisprudence would be eviscerated.

Thank you, Judge. Unless the Court has any other questions --

THE COURT: I don't. Thank you very much. I appreciate your argument today.

MR. GINSBERG: Thank you very much.

THE COURT: All right.

Mr. McEntee, do you have a rejoinder?

MR. McENTEE: Yes, sir. Very briefly.

I just have two very discrete points, Your Honor, and I'll get out of your hair.

Mr. Ginsberg continually cites to lack of record evidence that data brokers access court records and mine them for information. This is outlined in the Data Broker report which is by Congress. I think there was an admission made by one of the data brokers - I believe it was Acxiom - specifically using PACER as a source of data to mine.

And I want to talk a little bit about Mr. Bodis' declaration and these security techniques a little bit as it relates to the efficacy requirement. And we're -- we're trying to imagine a world where OCRA does not have the attorney only access restriction. I think that's what the standard of review requires this year.

So CNSs continued assertion is that we would have to implement more security techniques, and that these would be equally effective. We can redact. We can simply seal the records. But once the genie is out of the

bottle, there's no putting the genie back in. We're not worried about CNS in particular. We're worried about intermediaries now becoming the brokers of all this information which would basically put themselves in the place of the clerks. I think that alone subverts the fair and orderly administration of justice.

And as a recent example, I believe Alex Jones -- there was a very high profile lawsuit where Alex Jones used personal information of the Sandy Hook parents. And that led to a very serious lawsuit which was in the press recently.

Unless the Court has any other questions --

THE COURT: No. No, sir.

MR. McENTEE: All right. Thank you, sir.

THE COURT: Mr. Altmiller, do you have any rejoinder?

MR. ALTMILLER: Your Honor, my primarily response to Mr. Ginsberg would be that, as I've cited previously, the test is whether or not it promotes a substantial government interest that would be achieved less effectively absent the regulation. That's the test.

And in this case, we know we have substantial government interests. I think we've demonstrated that if we -- if we allow everyone access, it will affect -- because there's really two choices, Your Honor, right?

And I think people -- I don't think anyone said this directly, but I'll say it. There's two choices, effectively. CNS says if you give attorneys access you must give us, and everybody else, access.

Or, alternatively, you can deny attorneys access and then you're fine. Then we're not entitled to anything. So there's two possibilities that are alternatives. One, we deny attorneys access. That will effect judicial economy. It's apparent. It's self-evident.

So without this rule that gives them access -- because there's two parts of the statute, right? There's the part that says you can't put this stuff on the Internet. And there's a part of the statute that says attorneys are exempted. They have a problem presumptively with both of them.

While the first part -- or, if you will, the second part that says attorneys have access, that -- if you didn't have that, you would have a less efficient judiciary. A less efficient court system.

If you were to take out the part of the statute that said you can't put this information on the Internet, it would compromise the privacy of citizens of the Commonwealth. To what degree? It might be a matter of debate. How much danger are they in might be a matter of

debate. That danger might be different in 2022 than it is in 2025.

But, again, that risk is self-evident. There is case law to establish that both of these are substantial government interests, and the test then becomes would it be less effectively done if we took these out? Clearly, it would. That is the test. Not whether or not you can come up with another version of this that accomplishes the privacy or the efficiency goals, but does it just in a different way.

I do want to thank the Court for listening so intently to the argument in this case. And if the Court doesn't have any other questions, I again thank the Court.

THE COURT: I really don't at this point.

During the course of our preparation of the opinion, if I find an issue that I think needs more flushing out, we'll let you know and I will allow you to have very short briefing. Short briefing.

MR. ALTMILLER: I like that kind of briefing, Your Honor.

THE COURT: Not as much as I do, sir.

MR. ALTMILLER: Thank you, Your Honor.

THE COURT: All right.

Very nice job on the part of everyone. This is an extremely important issue, and I want to make sure that

we do it right and that there is an ample explanation for the direction we go in. It may take me a while. I've got some other trials coming up. It may take me a while to write this opinion. I'm not going to do something quick. I'm going to do it very, very carefully crafted.

It may very well be that we have to move the September 29th trial date strictly because I've got some other trials coming up that are going to be occupying my time and my staff. If in fact we have to do that, Ms. Belcher, my assistant, will contact you and we'll set a trial date definitely by the end of the year, if not sooner.

Any other issues this afternoon, ladies and gentlemen?

MR. GINSBERG: No, I don't believe so, Your Honor. Thank you very much for your time.

THE COURT: Well, thank you. Y'all did a very nice job.

MR. ALTMILLER: Thank you, Your Honor.

THE COURT: Court will stand in recess.

(The proceeding concluded at 12:38 p.m.)

REPORTER'S CERTIFICATE

I, Krista Liscio Harding, OCR, RMR, Notary Public in and for the Commonwealth of Virginia at large, and whose commission expires March 31, 2024, Notary Registration Number 149462,

do hereby certify that the pages contained herein accurately reflect the notes taken by me, to the best of my ability, in the above-styled action.

Given under my hand this 7th day of September, 2022.

/s/
Krista Liscio Harding, RMR
Official Court Reporter

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| COURTHOUSE NEWS SERVICE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:21-cv-460–HEH |
| | ) | |
| KARL R. HADE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION</u>**
**(Resolving Cross-Motions for Summary Judgment)**

This case involves a dispute between a nationwide news service, Courthouse News Service ("CNS" or "Plaintiff"), and Jacqueline C. Smith ("Defendant Smith") in her official capacity as Clerk of the Circuit Court for Prince William County, Virginia, and Intervenor Commonwealth of Virginia (the "State") (collectively, "Defendants"). At issue is whether a web of Virginia statutes governing access to civil court records violates the First Amendment of the United States Constitution.[1] (Compl. ¶ 1–5, ECF No. 1.)[2] Specifically, Plaintiff argues that the enforcement of two Virginia Statutes—Va. Code §§

[1] Plaintiff also sought to have Virginia's regulatory scheme declared unconstitutional under the Fourteenth Amendment of the United States Constitution, but the Court previously granted Defendants' motion to dismiss that claim. (Order, ECF 49.)

[2] Plaintiff filed its Complaint on July 15, 2021 (ECF No. 1), then subsequently filed an Amended Complaint on September 14, 2021 (ECF No. 21).

17.1-293(E)(7)[3] and 17.1-293(H)[4]—violate the First Amendment. (*Id.*) Virginia Code § 17.1-293(E)(7) gives the public unfettered access to nonconfidential civil court records while physically at the courthouse but denies non-Virginia-barred attorneys *remote* access to the same records. Virginia Code § 17.1-293(H) prevents individuals who have remote access to these records from selling, posting, or redistributing data obtained from these records to third parties.

The case is presently before the Court on cross-motions for summary judgment.[5] (ECF Nos. 66, 70, 74.) Both Plaintiff and Defendants have submitted detailed memoranda supporting their respective positions, and the Court heard evidence and oral argument on August 18, 2022. While many of the principles governing public access to

---

[3] The full text of Va. Code § 17.1-293(E)(7) reads:

> [A clerk may provide] secure remote access to nonconfidential court records, subject to any fees charged by the clerk, to members in good standing with the Virginia State Bar and their authorized agents, pro hac vice attorneys authorized by the court for purposes of the practice of law, and such governmental agencies as authorized by the clerk.

[4] The full text of Va. Code § 17.1-293(H) reads:

> Nothing in this section shall be construed to permit any data accessed by secure remote access to be sold or posted on any other website or in any way redistributed to any third party, and the clerk, in his discretion, may deny secure remote access to ensure compliance with these provisions. However, the data accessed by secure remote access may be included in products or services provided to a third party of the subscriber provided that (i) such data is not made available to the general public and (ii) the subscriber maintains administrative, technical, and security safeguards to protect the confidentiality, integrity, and limited availability of the data.

[5] The State filed its Motion for Summary Judgment on July 9, 2022. (Def.'s Mot. Summ. J., ECF No. 66.) Plaintiff filed its Cross-Motion for Summary Judgment on July 11, 2022. (Pl.'s Mot. Summ. J., ECF No. 70.) Defendant Smith filed her Motion for Summary Judgment on July 14, 2022. (Def.'s Mot. Summ. J., ECF No. 74.)

civil court records have been well-developed in courts of the United States, their application to a regulatory scheme that allows the public to freely access such records while physically at the courthouse, yet limits remote access to state-barred attorneys, is a venture into a new frontier. Judicial authority applying the First Amendment to the right to access civil court records is finite, and no federal court has had occasion to decide whether the public has a fundamental First Amendment right to remotely access civil court records where barred attorneys may access such records and such records are already accessible at the courthouse. As Defendants aptly pointed out, this case presents First Amendment issues in a unique context.

For the reasons detailed below, on Plaintiff's First Amendment claim against Defendants' enforcement of the non-attorney access restriction, Va. Code § 17.1-293(E)(7) (Count I), the Court will grant Defendants' Motion for Summary Judgment. On Plaintiff's First Amendment claim against Defendants' enforcement of the dissemination restriction, Va. Code § 17.1-293(H) (Count II), the Court will grant Defendants' Motion for Summary Judgment. The Court will deny Plaintiff's Motion for Summary Judgment in its entirety.

## I. BACKGROUND

In reviewing cross-motions for summary judgment, the Court must consider each motion separately on its own merits to determine if either party deserves judgment as a matter of law. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citations omitted). In considering each motion, the Court will resolve any factual disputes and "competing, rational inferences" in the light most favorable to the opposing party. *Id.*

(internal quotation marks and citation omitted). The following narrative represents the undisputed facts for the purpose of resolving the cross-motions for summary judgment.[6]

In Virginia, the clerk of the circuit court for each county "shall have custody of and shall keep all court records . . . in their offices or at such location otherwise designated by the clerk." Va. Code § 17.1-242. In all Virginia circuit courts, clerks provide the public with access to these court records at the physical courthouse.[7] (Joint Stipulation of Facts (hereinafter, "JSF") ¶ 24.) Beyond access at the courthouse, some circuit courts provide access to civil court records remotely, via the internet, on a system called "Virginia Officer of the Court Remote Access" ("OCRA"). (*Id.* ¶ 27.) It is *optional* for each circuit court clerk to have their records accessible via OCRA, and approximately 104 circuit courts provide that access. Va. Code § 17.1-293(E)(7); (*Id.*).

OCRA provides online access to the same civil court records that are accessible at physical courthouses. (Am. Compl. ¶ 49.) However, OCRA is subject to two important statutory limitations. First, OCRA is only accessible to Virginia-licensed attorneys, their staff, and related government officials (the "non-attorney access restriction"). Va. Code

[6] Plaintiff objected to the State's usage of various secondary sources throughout its Motion for Summary Judgment, arguing that such sources are hearsay, which the Court cannot consider at this posture. (Pl.'s Mem. in Opp'n at 2–3, 24–25, ECF No. 82.) The State, on the other hand, asserted that Plaintiff failed to show how such facts create a genuine issue necessary to be litigated. (Def.'s Reply at 3–8, ECF No. 86.) The Court did not consider nor rely upon the contested, secondary sources in reaching its decision. Aside from the objection to the admissibility of those secondary sources, Plaintiff has stated that it "does not believe that any issues of fact raised by either of Defendants' motions are material to the determination of the parties' respective summary judgment motions." (Pl.'s Mem. in Opp'n at 5 n.2.)

[7] Those filing civil court records must redact all but the last four digits of social security numbers, driver's license numbers, and other identification numbers. Va. Code § 8.01-420.8(A).

§ 17.1-293(E)(7). Second, OCRA users may not sell, post, or redistribute to a third party any data accessed on OCRA unless the data is included in a product or service created by the OCRA user and the data is not made available to the general public (the "dissemination restriction"). *Id.* § 17.1-293(H).

For circuit courts that use OCRA, the clerk, or someone designated by the clerk, serves as the court's OCRA Administrator and this person is responsible for screening, approving, adding, and removing subscribers. (JSF ¶ 41.) The court's OCRA Administrator is responsible for providing subscribers with login information and addressing subscribers' questions about subscriber access. (*Id.*) The Office of the Executive of the Supreme Court of Virginia ("OES") does not in any way evaluate or screen subscribers once the clerk determines they are authorized users—this responsibility falls on the clerk. (*Id.*) The clerk must pay the OES for maintenance and technical support based on the number of private subscribers. (*Id.* ¶ 38.) The Prince William County Clerk currently has 269 private subscribers to OCRA and pays OES an annual maintenance charge of $9,500. (*Id.* ¶ 39.) The clerk charges OCRA subscribers a fee to use the secure remote access system pursuant to the subscriber agreement and applicable Virginia law. (*Id.* ¶ 40.)

Circuit court clerks may provide the public with remote online access to civil court records via their own case management system outside of OCRA. Va. Code § 17.1-225. Although this option is available, the Amended Complaint does not mention any circuit

court that has created such a system.[8]

CNS is a nationwide news service that reports on civil cases in all 50 states, including Virginia. (*Id.* ¶ 1.) CNS reporters have traditionally traveled to Virginia circuit courts in each county to access the civil court records provided in physical courthouses. (*Id.* ¶ 44.) In an effort to save money and travel time, CNS asked many circuit court clerks for access to OCRA even though its staff members are not licensed attorneys. (*Id.* ¶ 53.) Every circuit court clerk denied CNS such access. (*Id.*)

Despite the statutory prohibition, the Clerk of the Circuit Court for Prince William County, Defendant Smith, offered to give CNS access to OCRA for a higher price than Virginia attorneys. (*Id.* ¶¶ 54–59.) At the hearing on January 10, 2022, however, counsel for Defendant Smith made clear that she no longer offers CNS access to OCRA and, in her opinion, the Virginia law bars her from doing so. (*Id.* ¶ 59.)

As CNS was seeking access to OCRA through individual circuit court clerks, it also sought access through OES. (*Id.* ¶ 58.) Defendant Hade is the Executive Secretary of OES. (*Id.* at 1.) While circuit court clerks upload court records to the system and control those records, OES "operates and maintains" the servers and websites that OCRA exists on. Va. Code § 17.1-502(A); (*Id.* ¶¶ 35–36.)

---

[8] The information a circuit court clerk may provide via a public remote access system is more limited than the information available on OCRA. OCRA may contain documents with actual signatures, dates of birth, maiden names, and the names of minor children, while public online remote systems may not. *See* Va. Code §§ 17.1-293(B), (E)(7). Of course, records in OCRA, or an additional system created by a circuit court clerk, would also have confidential information redacted according to Va. Code § 8.01-420.8(A); *see id.* § 17.1-293(A) (requiring full redaction in a non-OCRA online system).

When CNS asked OES for access to OCRA, OES stated that it was not legally authorized to provide access because OCRA is limited to "members in good standing with the Virginia State Bar" and all court documents are "under the custody and control of the circuit court clerks." (Am. Compl. ¶ 59.) Moreover, OCRA's website, which OES controls, states that OCRA "is intended solely for the use of authorized Officer of the Court personnel . . . and [a]ll other use is expressly prohibited." (*Id.* ¶ 40.)

Defendants state various governmental interests for limiting *electronic* access to civil court records to only Virginia-barred attorneys, and preventing the selling, posting, and redistributing of such records accessed *electronically* to third parties. First, Defendants assert that they have an interest in promoting critical privacy and security interests of Virginia litigants by sharply reducing the amount of private, sensitive information let out into the world and limiting the potential for widespread data harvesting which is often done by bots.[9] (Def.'s Mem. in Supp. at 13–18, ECF No. 67; Def.'s Mem. in Supp. at 13–16, ECF No. 75.) The one central concern is that this data

---

[9] While the Court could not identify a case in which the United States Court of Appeals for the Fourth Circuit defined the term "bot," the Court notes that the State's definition of the term coincides with definitions used by other courts. Specifically, the State explains that:

> a 'bot' is a computer program that operates as an agent for a user or other program. Bots are used to automate tasks and therefore can operate without specific input from a human user once activated. Bots can replace a repetitive task a human would otherwise have to perform and are often faster at performing those tasks than a human user would be. One common task for a bot program is to gather information from websites.

(Def.'s Mem. in Supp. at 7 n.18, ECF No. 67.) The United States District Court for the Central District of California likewise said that a bot is "a program that runs on a computer 24/7, automating mundane tasks for the owner, even if the owner is not logged in." *United States v. Krug*, No. 09-1148-GHK, 2013 WL 12205704, at *12 n.11 (C.D. Cal. Aug. 8, 2013).

may be later resold or disseminated. Second, Defendants claim that the regulations promote the fair, orderly, and efficient administration of justice. According to Defendants, the regulations aid attorneys in executing their duties as officers of the court while reducing the burden placed upon the clerk's office to provide filings directly to those attorneys physically at the courthouse. (Def.'s Mem. in Supp. at 24–25, ECF No. 67; Def.'s Mem. in Supp. at 16–18, ECF No. 75.)

The State's Declaration of Joby Knuth, the Deputy Director and Application Manager of the Department of Judicial Information Technology at OES, and Plaintiff's Declaration of Andras Bodis, acting Technology Director for CNS and partner in a software development firm, further inform this matter.[10] (Knuth Decl., ECF No. 67-1; Bodis Decl., ECF No. 85-1.) From reading both Declarations, it is clear that (1) Virginia's publicly available court databases have been mined by bots for Personally Identifiable Information ("PII"); (2) remote access to information, including "secure remote access," poses unique privacy concerns in contrast to information available only in person because the amount of data that can be pulled from a physical courthouse is limited, whereas one can download every available nonconfidential court record containing PII instantaneously and without any limitations; (3) bot management tactics,

[10] The admissibility of these Declarations is undisputed by the parties. CNS stated that it "does not believe that the Knuth Declaration raises any factual issues that are material to the determination of the parties' respective summary judgment motion[s] [sic]. CNS has agreed to waive its objection to the late disclosure of Mr. Knuth as a witness in exchange for the opportunity to submit the Bodis Declaration." (Pl.'s Reply at 10 n.7, ECF No. 85.) The Court considered the Knuth and Bodis Declarations in reaching its decision.

which allow website operators to reasonably prevent against abusive data mining, has not been successful in the Virginia management systems; and (4) there are many documented bot management tactics that could theoretically be used to guard against data mining.

## II. STANDARD OF REVIEW

The standard of review for cross-motions for summary judgment is well-settled in the United States Court of Appeals for the Fourth Circuit:

> On cross-motions for summary judgment, a district court should "rule upon each party's motion separately and determine whether summary judgment is appropriate as to each under the [Federal Rule of Civil Procedure] 56 standard." Summary judgment is appropriate only if the record shows "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."

*Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 156 (4th Cir. 2010) (alteration in original) (first quoting *Monumental Paving & Excavating, Inc. v. Pennsylvania Mfrs' Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999), and then quoting Fed. R. Civ. P. 56(c)).

The relevant inquiry in the summary judgment analysis is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at

247–48 (emphasis in original). A material fact is one that might affect the outcome of a party's case. *Id.* at 248; *JKC Holding Co. LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). A genuine issue concerning a material fact only arises when the evidence, viewed in the light most favorable to the non-moving party, is sufficient to allow a reasonable trier of fact to return a verdict in that party's favor. *Id.*

To defeat an otherwise properly supported motion for summary judgment, the non-moving party must rely on more than conclusory allegations, "mere speculation or the building of one inference upon another," or "the mere existence of a scintilla of evidence" concerning a material fact. *Stone v. Liberty Mut. Ins. Co.*, 105 F.3d 188, 191 (4th Cir. 1997) (first quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.1985), and then quoting *Anderson*, 477 U.S. at 252). Accordingly, to deny a motion for summary judgment, "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate." *Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995) (citing *Anderson*, 477 U.S. at 252). "Thus, if the evidence is 'merely colorable' or 'not sufficiently probative,' it may not be adequate to oppose entry of summary judgment." *Id.* (citing *Anderson*, 477 U.S. at 249–50). The Court cannot weigh the evidence or make credibility determinations in its summary judgment analysis. *See Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004).

## III. DISCUSSION

### A. Enforcement of the Non-Attorney Access Restriction (Count I)

In Count I, Plaintiff asserts that Defendants' enforcement of OCRA's non-attorney access restriction, Va. Code § 17.1-293(E)(7), violates the First Amendment because it allows only Virginia-barred attorneys—not the public or press—access to electronic civil court records at the Prince William Circuit Court. Defendants, on the other hand, assert that the restriction passes constitutional muster because it resembles a time, place, and manner restriction and is content-neutral, narrowly tailored, and preserves significant government interests. (Def.'s Mem. in Supp. at 3, ECF No. 67.) Such interests include "protect[ing] the private information contained in nonconfidential court filings while preserving the fair, orderly and efficient administration of justice." (*Id.*)

In relevant part, the First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. This prohibition is made applicable to the States by the Fourteenth Amendment. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 245 n.10 (4th Cir. 1999). It is well-settled that the press and public have a right of access to most, if not all, civil court records. *See Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 328 (4th Cir. 2021) (finding a right to reasonable contemporaneous access to civil complaints); *Rushford v. New Yorker Mag., Inc.*, 846 F.2d 249, 253 (4th Cir. 1988) (finding a right to access summary judgment documents). Federal courts and most state courts allow the public to access these civil records via an online remote system, however, no court has held that there is a fundamental First Amendment right to access such civil records over the internet. (Pl.'s Mem. in Opp'n at

23–24.) Thus, Plaintiff is not alleging that the public has a fundamental right to remotely access civil court records guaranteed by the First Amendment.[11] Rather, Plaintiff argues that *if* Defendants provide Virginia attorneys remote access to civil court records, *then* the First Amendment also requires them to provide the public with remote access. In effect, Plaintiff argues that Defendants are limiting an already established fundamental right—the right to access civil court records—in an unconstitutional manner by giving one group, Virginia lawyers, remote access while denying it to others.[12] The precise question presented by Plaintiff is whether the First Amendment provides Plaintiff, as a member of the public, a right of electronic access to civil court records that are already physically accessible at the courthouse.

Strict scrutiny ordinarily applies to an alleged violation of the First Amendment. *Schaefer*, 2 F.4th at 328; *Globe Newspaper Co. v. Superior Ct. for Norfolk Cty.*, 457 U.S. 596, 606 (1982). But when a limitation on a right of access resembles a "time, place, and

[11] If that were Plaintiff's contention, the experience and logic test would guide this Court's analysis. *Press-Enter. Co. v. Superior Ct.*, 478 U.S. 1, 8–10 (1986); *Schaefer*, 2 F.4th at 326. While parties discuss the experience and logic test at length in their briefs, the Court need not do so here because, applying the test, the Fourth Circuit has already held that the public has the right to "reasonably contemporaneous access to civil complaints." *Schaefer*, 2 F.4th at 328.

[12] The Court rejects Plaintiff's assertion that its First Amendment rights are violated under *Schaefer* because Plaintiff cannot access civil court records at exactly the same rate as Virginia-barred attorneys, who have electronic access. 2 F.4th at 328. Plaintiff does not assert that access to civil court records at the Prince William Circuit Court are not "reasonably contemporaneous." *Id.* In fact, "[o]nce a new civil filing is scanned into CIS, it can be viewed by the press and public via public access terminals at [the] courthouse[] . . . almost immediately." (JSF ¶ 47.) Plaintiff claims that because there is a faster way to access such records—*i.e.*, electronic access without having to drive to the courthouse—its First Amendment rights are violated. (Pl's. Mem. in Opp'n at 12.) This reading of *Schaefer* contorts its holding. Indeed, civil court records are accessible more rapidly at the courthouse than they are electronically. (JSF ¶ 47.)

manner" restriction, the Court should apply more relaxed scrutiny. *Schaefer*, 2 F.4th at 328; *Globe Newspaper*, 457 U.S. at 607 n.17. The non-attorney access restriction challenged here does not stop Plaintiff from accessing civil court records altogether—Plaintiff can freely access the records at the courthouse. Instead, the access restriction merely controls how and when Plaintiff can access such records. Thus, the restriction resembles a time, place, and manner restriction and relaxed scrutiny applies.

Relaxed scrutiny requires the limitation to be "content-neutral, narrowly tailored and necessary" to preserve a significant governmental interest. *Schaefer*, 2 F.4th at 328 (quoting *Courthouse News Serv. v. Planet*, 947 F.3d 581, 585 (4th Cir. 2020)). "A regulation is narrowly tailored under this standard if it 'promotes a substantial government interest that would be achieved less effectively absent the regulation' and does not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Ross v. Early*, 746 F.3d 546, 552–53 (4th Cir. 2014) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1981)).

The Court turns first to whether the non-attorney access restriction is a content-neutral regulation. Plaintiff contends that the Virginia non-attorney access restriction is not content-neutral because it is "expressly supported by concerns *over content, i.e.*, that civil filings might contain certain personal identifiers," are "based on content Defendants believe would otherwise result in exploitation of litigants' personal information," and "provid[e] remote access only to a special class" of people—Virginia-barred attorneys. (Pl.'s Mem. in Opp'n at 14.) Defendants, on the other hand, assert that the regulations are content-neutral because the regulations "apply equally to all court records" and "do

not turn upon the communicative contents of the court records." (Def.'s Mem. in Supp. at 11, ECF No. 67.)

"The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward*, 491 U.S. at 791 (citing *Clark v. Community for Creative Non-violence*, 468 U.S. 288, 293 (1984)). The government's purpose behind the regulation "is the controlling consideration." *Id.* "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.* (citing *Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 47–48 (1986)); *see also Wag More Dogs, Ltd. Liability Corp. v. Cozart*, 680 F.3d 359, 638 (4th Cir. 2012). "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642–43 (1994).

Virginia Code § 17.1-293(E)(7) permits a Virginia court clerk to provide remote access to nonconfidential court records "to members in good standing with the Virginia State Bar and their authorized agents[.]" The purpose of the regulation is to promote effective advocacy with the need for protecting litigants' private information by generally limiting access to personal information online except to Virginia-barred attorneys, who are self-regulated officers of the court and held to a higher standard than the public.

Plaintiff relies on one out-of-context line from the United States Supreme Court case, *McCullen v. Coakley*, to support its argument that the regulation is content-based.

(Pl.'s Mem. in Opp'n at 14); 573 U.S. 464, 480 (2014) (stating that a restriction is content-neutral only if it is "justified without reference to the content of the regulated speech.") However, a closer reading shows that the case supports the conclusion that the regulation at issue is content-neutral. *McCullen*, as in this case, involves a state regulation which implicates the First Amendment and treats a class of individuals differently than the general public. 573 U.S. at 482. Specifically, *McCullen* considered the constitutionality of a state regulation that prohibited leafletting, sign displaying, engaging in oral protest, and counseling, within an 18-foot radius around the entrances of reproductive health care facilities. *See id.* The regulation exempted certain classes of people—individuals entering or leaving such facility, employees of such facility, law enforcement, or persons walking through the area to reach another destination. *See id.* Petitioners in *McCullen* asserted that the regulation was content-based because it allowed certain individuals to remain in the buffer zones but not the general public. *See id.* The Court rejected this argument because "[t]here is nothing inherently suspect about providing some kind of exemption to allow individuals who work at the clinics to enter or remain within the buffer zones" and the "qualification simply ensures that the exemption is limited to its purpose of allowing the employees to do their jobs." *Id.* at 465, 483.

The line of text upon which Plaintiff relies—a restriction is content-neutral only if it is "justified without reference to the content of the regulated speech"—does not transform Virginia's restriction to a content-based one. *Id.* at 480. Indeed, Virginia's restriction applies to all nonconfidential civil court records in the same fashion and does not treat civil court records about a certain subject or topic differently than others.

Furthermore, as in *McCullen*, "[t]here is nothing inherently suspect about providing some kind of exemption to allow individuals who" are Virginia-barred attorneys to access electronic civil court records so such attorneys can "do their jobs." 573 U.S. at 483. The regulation does not center around disagreement with the message it conveys, turn upon the communicative contents of the court records, nor change based on viewpoint or subject matter. Rather, it applies to all civil court records in the same fashion, and merely controls *how* individuals—attorneys, who have ethical obligations as court officers and need such access to do their jobs—may access these same records electronically. As such, the Court finds that the non-attorney access restriction is content-neutral.

The Court must next determine whether Virginia's non-attorney access restriction is "'narrowly tailored to serve a significant government interest.'" *Ross*, 746 F.3d at 552 (quoting *Ward*, 497 U.S. at 791). This standard is met if the regulation "'promotes a substantial government interest that would be achieved less effectively absent the regulation' and does not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Id.* at 552–53 (quoting *Ward*, 491 U.S. at 799). The Court considers each of these elements in turn.

In order to meet its burden under the first prong of the narrow tailoring requirement, the State must demonstrate that the regulation "'promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Id.* at 555 (quoting *Ward*, 491 U.S. at 799). The State's express purpose in creating the regulation is two-fold. One purpose of the regulation is that it protects citizens' privacy and security and prevents widespread disclosure of litigants' private information, such as

signatures, residential addresses, dates of birth identified with a particular person, maiden names, financial account numbers, and names of minor children. (Def.'s Mem. in Supp. at 14, ECF No. 67.) According to the State, while the same records are available at the courthouse, the facilitation of complete and instantaneous access to all records electronically heightens the potential for abuse of the information contained within those records. (*Id.* at 15.) The State asserts that if such information is available electronically, it would be subject to mass data harvesting that could be sold or used for criminal and quasi-criminal purposes.[13] (*Id.*) This purpose is still served by allowing attorneys to access such data because lawyers are held to a higher standard than the public and face losing their livelihoods should they fail to meet those standards.

The second stated purpose of the regulation is that it ensures the orderly and efficient administration of the State's justice system. (Def.'s Mem. in Supp. at 16–18, ECF No. 75.) Forcing the court clerk to make all nonconfidential civil court records available online would require resource-intensive and costly processing before the documents are uploaded, as well as resource-intensive policing and monitoring of such documents once they are available electronically. (*Id.*) Furthermore, because barred attorneys can immediately access civil court records necessary to do their job, they are able to do their job more efficiently and clerks are freed up from having to respond to attorneys' requests at the courthouse. (*Id.* at 18.) Specifically, the clerk's office no

[13] The State cites to various secondary sources in an attempt to demonstrate the pervasiveness and impact of data harvesting, however, the Court did not rely upon this evidence in reaching its decision.

longer must dedicate staff to handle in-person requests to retrieve and copy files. (*Id.*)

Our jurisprudence makes clear that a state has an interest in policing sensitive information. *See Ostergren v. Cuccinelli*, 615 F.3d 263, 275 (4th Cir. 2010) (citing *The Florida Star v. B.J.F.*, 491 U.S. 524 (1989)). Indeed, the United States Court of Appeals for the Fourth Circuit explained that "'[t]o the extent sensitive information is in the government's custody, it has even greater power to forestall or mitigate the injury caused by its release. The government may classify information, establish and enforce procedures ensuring its redacted release[.]'" *Id.* (quoting *The Florida Star*, 491 U.S. at 534). On this strength of authority, the Court has little trouble concluding the State's asserted interest in protecting citizens' privacy qualifies as "substantial."

Moreover, federal appellate courts have recognized the State's interest in ensuring the orderly and efficient administration of justice. In fact, this interest was recognized in two recent decisions involving CNS. In one case, the Fourth Circuit recognized "the court's important interest in the fair and orderly administration of justice." *Schaefer*, 2 F.4th at 328. In another case, the United States Court of Appeals for the Ninth Circuit recognized governmental entities' "legitimate administrative concerns about privacy and confidentiality, accounting protocols, quality control and accuracy, [and] efficient court administration." *Planet*, 947 F.3d at 597 (holding a county's policy of no public access prior to processing violated the First Amendment but that its policy of scanning new civil complaints and making scans available at the courthouse complied with the First Amendment). Based on this authority, the Court also concludes the State's interest in ensuring the orderly and efficient administration of justice qualifies as "substantial."

This conclusion does not end the Court's inquiry, however, "as it is not enough for the State to identify interests that are significant in the abstract." *Ross*, 746 F.3d at 556 (citing *Turner Broad. Sys., Inc.*, 512 U.S. at 622 ("That the Government's asserted interests are important in the abstract does not mean, however, that the [challenged law] will in fact advance those interests.")). Rather, the State "must demonstrate that the [regulation] 'materially advances an important or substantial interest by redressing past harms or preventing future ones.'" *Id.* (quoting *Satellite Broad. & Commc'ns Ass'n v. FCC*, 275 F.3d 337, 356 (4th Cir. 2001)). While courts "do not require the government to present a panoply of empirical evidence in order to satisfy this standard . . . it must nonetheless make some evidentiary showing that the recited harms are 'real, not merely conjectural,' and that the [regulation] 'alleviate[s] these harms in a direct and material way.'" *Id.* (quoting *Satellite Broad. & Commc'ns Ass'n*, 275 F.3d at 356).

With these principles in mind, the Court is satisfied the State has adequately demonstrated that the electronic publication of litigants' personal data is a plausible threat to citizens' privacy and the fair and orderly administration of justice. In reaching this conclusion, the Court "emphasize[s] that the [State] is 'entitled to advance its interests by arguments based on appeals to common sense and logic.'" *Id.* (quoting *Multimedia Publ'g Co. of S. Carolina, Inc. v. Greenville-Spartanburg Airport*, 991 F.2d 154, 160 (4th Cir. 1993)). This is particularly true where, as here, the burden on speech is relatively small—civil court records are already accessible at the courthouse. *See Ross*, 746 at 556 (quoting *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 14 (1st Cir. 2004) ("[H]eavier burdens on speech must . . . be justified by more cogent evidentiary predicates.")).

The undisputed evidence reveals that the regulation materially advances an important interest by preventing future harms. Knuth explained that he "found an inordinate amount of traffic coming from IP addresses identified as 'bots' through log analysis" on two related record filing systems for civil court documents even where such systems complied with Virginia laws governing the use of technology as applied to court records. (Knuth Decl. ¶¶ 9–10, ECF No. 67-1.) While it is true that such systems did not require a Subscriber Agreement or paywall, as pointed out by Plaintiff, a Subscriber Agreement and paywall does not eviscerate the risks the State intends to prevent. Furthermore, while bots may not be inherently bad, the Court is convinced that there is enough evidence to show that the regulation currently prevents the mass collection of PII by bots and need not analyze this further. A quick review of CNS's website shows that in addition to publishing news articles, it markets a case search engine—"CasePortal"—to anyone who subscribes to CNS.[14] (JSF ¶ 7; Ex. A, ECF 88-1.) If CNS, or any other third party, were given access to the civil court records, there would be nothing stopping such entities from downloading all content from the clerk's software, only paying one fee, and then posting such information on their own website for profit, exploitation, or to sell such information to third parties. If, on the other hand, the State would stop allowing all electronic access to civil court records, Virginia-barred attorneys would then be required

[14] CASEPORTAL BY COURTHOUSE NEWS SERVICE, https://cnscaseportal.com (last visited Sept. 13, 2022) ("Quit bouncing between multiple services while you're trying to research. When you use CasePortal, you can find cases and opinions from federal and state courts all across the nation . . . With CasePortal, case summaries display in the search results, making it easier and faster to research past reports and filter out irrelevant matches . . . You can even search the text of filed documents and opinions!").

to drive to courthouses—here, the Prince William Circuit Court—whenever they need to access any document filed with the court, thus impeding on the efficiency of the judicial system. By limiting electronic access of civil court records to Virginia-barred attorneys—who are officers of the court—the regulation materially reduces the risk the State intends to prevent by controlling who has unlimited access to electronic civil court records and how such individuals may access them. The regulation thus "promotes the [State's] significant interest in a manner 'that would be achieved less effectively absent the regulation.'" *Ross*, 746 F.3d at 556 (quoting *Ward*, 491 U.S. at 799).

Next, we must ask whether the regulation "'burden[s] substantially more speech than is necessary to further the government's legitimate interests.'" *Id.* (quoting *Ward*, 491 U.S. at 799). "To satisfy this standard, the State need not regulate using 'the least restrictive or least intrusive means' available to achieve its goals." *Id.* at 557 (quoting *Ward*, 491 U.S. at 799). In other words, "'[s]o long as the means chosen are not substantially broader than necessary to achieve the government's interest . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative.'" *Id.* (quoting *Ward*, 491 U.S. at 800).

The challenged regulation allows a clerk to provide secure remote access to nonconfidential civil court records to Virginia-barred attorneys. Va. Code § 17.1-293(E)(7). The regulation is limited in scope because it allows the public and press access to all nonconfidential civil court records physically at the courthouse. The provision of the statute restricting the posting of PII on the internet is specifically targeted

to prevent data mining and keep such information out of the hands of third parties who could engage in criminal conduct or otherwise misuse that information. However, it does not restrict access to that information entirely. Instead, it simply makes that information unavailable to the public *over the internet*, where it would be much easier to access significant amounts of data from anywhere in the world with an internet connection and quickly republish it or download it for illegitimate or improper purposes.

The provision of the statute exempting attorneys from the restrictions on clerks posting certain information on the internet is also narrowly tailored to promote the significant governmental interest in the orderly and efficient administration of the justice system. The exemption is narrow and applies only to attorneys and their staff. Attorneys are an essential part of the justice system and their access to this information is necessary for them to perform their professional obligations. Such attorneys are officers of the court—they stand on entirely different footing than members of the general public. In sum, the regulation "does no more than 'target[] and eliminate[] . . . the exact source of 'evil' it seeks to remedy.'" *Ross*, 746 F.3d at 557 (quoting *Frisby v. Schultz*, 487 U.S. 474, 485 (1988)).

Although Plaintiff does not dispute the fact that all nonconfidential civil court records are physically available at the courthouse, Plaintiff nonetheless contends the regulation is not narrowly tailored because Defendants shield these same records—in electronic format—from non-attorneys. (Pl.'s Mem. in Opp'n at 14.) This contention confuses the applicable standard and misses the mark. The purpose of the regulation is to control *how* the public utilizes records that often contain litigants' personal information—

such as their signatures, residential addresses, dates of birth identified with a particular person, maiden names, financial account numbers, and names of minor children—not *what* the public utilizes. Public access to civil court records while physically at the courthouse is far different from public access to such records on the internet because when such records are accessible online, there is a real threat that third parties will access such information who may engage in identity theft, data mining, and other crimes.

If OCRA were available to the global community, the State would have to pass a host of legislative measures to protect the widespread distribution of PII and it is unclear to the Court whether the State's interests would be adequately served with these new policies. Additionally, the State and clerks would be forced to expend substantial resources to police OCRA user activity to limit exploitation of personal information. This kind of significant policy change is not one that this Court should mandate upon the State. Rather, the state courts are best positioned to craft an informed and proper balance between its legitimate institutional needs and the public's interest in electronic access to civil court records. Even though the State's interests could be served by some less-speech-restrictive alternative, the State's means chosen to achieve its goals are not substantially broader than necessary. *See Ross*, 746 F.3d at 556.

Plaintiff further asserts that the regulation is not narrowly tailored because less-restrictive alternatives such as redaction, subscriber agreements, and combinations of bot management tactics could achieve Defendants' interests. (Pl.'s Mem. in Supp. at 18–26, ECF No. 71.) This contention similarly confuses the applicable standard and fails to consider the burden it entails. As it currently stands, the redaction mandates of Va. Code

§ 8.01-420.8 place requirements on attorneys and litigants. This section requires redaction of "all but the last four digits of the identification number" of social security numbers, driver's license numbers, and credit card, debit card, bank account, or other numbers associated with electronic billing and payment systems. The Code explicitly waives civil liability "against the party or lawyer who filed the document or any court personnel, the clerk, or any employees of the clerk's office who received it for filing." Va. Code § 8.01-420.8(C). Thus, the redaction regulations do not meet the requirements for such materials to be posted online pursuant to Va. Code § 17.1-293(A)-(B). This means that in order for the public to access the records online, a new host of information would need to be redacted on all documents including signatures, residential addresses, dates of birth identified with a particular person, maiden names, financial account numbers, and names of minor children.

Currently, this PII is accessible on the internet only to attorneys, a self-policing, pre-vetted group subject to codified Rules of Professional Conduct and serious professional sanctions for violating those Rules. Even if redaction of such information was possible, it is unclear whether such redactions would be enough to protect PII. Subscriber agreements likewise do not adequately achieve Defendants' interests because such agreements are easily ignored or circumvented. While applicants agree not to abuse the system, some users may nevertheless violate the terms and conditions. For example, a user agreement would not stop an entity from accessing and downloading the civil court records and uploading such documents on their own portal—*e.g.*, CasePortal—for profit. Moreover, while a combination of bot safeguards *could* potentially alleviate the State's

concerns over data mining, employing such programs would mean that the State would have to purchase, implement, and monitor such programs. This would be a dramatic policy change for the State, riddled with labor- and resource-intensive repercussions, and it would be less effective than the State's current regulation. The Court is not positioned to mandate this change in policy upon the State, nor is that the legal standard at issue in this case. Rather, the State's current regulation promotes its significant interest in a manner that would be achieved less effectively absent the regulation, and the State is not required to use the least restrictive means possible to achieve its goals. *See Ross*, 746 F.3d at 553.

Lastly, Plaintiff contends that Defendants' regulation is not narrowly tailored because other courts provide electronic access to civil court records. (Pl.'s Mem. in Opp'n at 29–30.) Again, Plaintiff confuses the applicable standard. Plaintiff has not drawn the Court's attention to other states that have adopted specific policy goals of preventing remote data harvesting of information contained in court records while maintaining order and efficiency in the judicial system, nor that other such courts have successfully achieved these goals. Plaintiff merely shows that some courts in some states provide remote access to civil records without further explanation of the effectiveness of protective measures. Plaintiff fails to engage in the analysis required under time, place, and manner scrutiny. That analysis looks to whether a regulation would achieve its significant interest less effectively absent the challenged regulation. *Ross*, 746 F.3d at 556 (quoting *Ward*, 491 U.S. at 799). Without information relevant to either prong of the analysis, comparison to the practices of other states is irrelevant. Plaintiff's argument

amounts to advocating for Virginia to change its public policy—not a valid First Amendment violation claim—and the place for this argument is the Virginia General Assembly, not the federal judiciary.

For all these reasons, the Court concludes that the regulation's grant of authority to clerks to provide secure remote access to nonconfidential civil court records to Virginia-barred attorneys is narrowly tailored to address the threats to citizens' privacy and security and the fair and orderly administration of justice.

**B. Enforcement of the Dissemination Restriction (Count II)**

In Count II, Plaintiff alleges that Defendants' enforcement of OCRA's dissemination restriction, Va. Code § 17.1-293(H), violates the First Amendment because it "impermissibly burdens the fundamental First Amendment rights of CNS, its subscribers, and other readers of its news reports." (Am. Compl. ¶ 91.) Defendants counter that the regulation passes constitutional muster because it resembles a time, place, and manner restriction and is content-neutral, narrowly tailored, and preserves significant governmental interests. (Def.'s Mem. in Supp. at 10–11, ECF No. 67.)

Virginia Code § 17.1-293(H) states that it shall not be "construed to permit any data *accessed by secure remote access* to be sold or posted on any other website or in any way redistributed to any third party, and the clerk, in [her] discretion, may deny secure remote access to ensure compliance with these provisions." § 17.1-293(H) (emphasis added). Because only Virginia-barred attorneys may electronically access civil court records, this regulation only prevents those attorneys with electronic access to such records from selling, posting, or redistributing data obtained in the records to third

parties. The regulation *does not* prevent Plaintiff from selling, posting, or redistributing data obtained from records located at the courthouse to third parties.

It is widely accepted that "state action to punish the publication of truthful information seldom can satisfy constitutional standards." *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 102 (1979) (striking down a statute which made it a crime for a newspaper to publish truthful and legally obtained information); *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) (finding the First Amendment protects speech that discloses the contents of an illegally intercepted communication). However, Plaintiff does not allege that the regulation punishes the press or public from publishing legally obtained, truthful information. Rather, Plaintiff argues that even though it may sell, post, and redistribute information from civil court records obtained physically at the courthouse, Plaintiff's First Amendment rights are violated because it may not do the same with civil court records obtained *electronically*. The precise question presented by Plaintiff is whether the First Amendment provides Plaintiff, as a member of the public, a right to sell, post, and redistribute information obtained from *electronic* civil court records while it may already sell, post, and redistribute information obtained *physically* from the courthouse.

As with Count I, when a limitation on a right of access resembles a "time, place, and manner" restriction, the Court should apply more relaxed scrutiny. *Schaefer*, 2 F.4th at 328; *Globe Newspaper*, 457 U.S. at 607 n.17. The dissemination restriction challenged here does not stop Plaintiff from selling, posting, or redistributing information obtained from civil court records—Plaintiff can freely sell, post, or redistribute information from such records obtained at the courthouse. Instead, the access restriction merely prevents

information from such records *obtained electronically* from being sold, posted, or distributed to third parties. Thus, the restriction resembles a time, place, and manner restriction and relaxed scrutiny applies. Relaxed scrutiny requires the limitation to be "'content-neutral, narrowly tailored and necessary'" to preserve a "'significant governmental interest.'" *Schaefer*, 2 F.4th at 328 (quoting *Planet*, 947 F.3d at 585).

The Court turns first to whether the dissemination restriction is a content-neutral regulation. Plaintiff raises the same argument regarding content-neutrality for Count II as it did for Count I. Specifically, Plaintiff claims that the dissemination restriction is not content-neutral because the statute is supported by concerns over content. (Pl.'s Mem. in Opp'n at 14.) Defendants, on the other hand, contend that the regulation is content-neutral because it "appl[ies] to all non-confidential filings equally" and "do[es] not turn upon the communicative contents of the court records." (Def.'s Mem. in Supp. at 11, ECF No. 67.)

The dissemination restriction is content-neutral for the same reason the attorney-access restriction is content-neutral. That is, the State did not adopt the regulation "because of disagreement with the message it conveys." *Ward*, 491 U.S. at 791 (citing *Clark*, 468 U.S. at 293). Rather, the government's purposes behind the regulation, which "is the controlling consideration," are to promote the fair and orderly administration of justice by protecting citizens' privacy and security and ensure the orderly and efficient administration of its justice system. *Id.* The dissemination requirement does not, "by [its] terms[,] distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." *Turner Broad. Sys., Inc.*, 512 U.S. at 642–43.

Instead, it treats all electronically accessed civil court records the same.

The Court must next determine whether Virginia's dissemination restriction is "'narrowly tailored to serve a significant government interest.'" *Ross*, 746 F.3d at 552 (quoting *Ward*, 491 U.S. at 791.) As stated above, a regulation is narrowly tailored if it "'promotes a substantial government interest that would be achieved less effectively absent the regulation' and does not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Ross*, 746 F.3d at 552–53 (quoting *Ward*, 491 U.S. at 799). The Court will consider each of these elements in turn.

To meet its burden under the first prong of the narrow tailoring requirement, the State must demonstrate that the regulation "'promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Id.* at 555 (quoting *Ward*, 491 U.S. at 799). The State's express purposes in creating this regulation are the same justifying the attorney-access restriction—to promote the fair and orderly administration of justice by protecting citizens' privacy and security and ensure the orderly and efficient administration of its justice system. For the reasons stated in Count I, such purposes justifying the regulation qualify as "substantial." But "the [State] must demonstrate that the [dissemination restriction] 'materially advances an important or substantial interest by redressing past harms or preventing future ones.'" *Id.* at 556 (quoting *Satellite Broad. & Comm'cns Ass'n*, 275 F.3d at 356). Although the State is not required to "present a panoply of empirical evidence in order to satisfy this standard . . . it must nonetheless make some evidentiary showing that the recited harms are 'real, not merely conjectural,' and that the regulation 'alleviate[s] these harms in a direct and material way.'" *Id.*

(quoting *Satellite Broad. & Comm'cns Ass'n*, 275 F.3d at 356).

With these principles in mind, the Court is satisfied that the State has adequately demonstrated that allowing individuals with electronic access to civil court records to sell, post, or redistribute such data to third parties would present a plausible threat to citizens' privacy and security and potentially undermine the orderly and efficient administration of the justice system. In reaching this conclusion, the Court again "emphasize[s] that the [State] is 'entitled to advance its interests by arguments based on appeals to common sense and logic.'" *Id.* (quoting *Greenville-Spartanburg Airport*, 991 F.2d at 160). This is particularly true here, "where the burden on speech is relatively small." *Id.* (citing *Bl(a)ck Tea Soc'y*, 378 F.3d at 14).

Common sense and logic support the notion that if any individual with electronic access to all nonconfidential civil court records could freely sell, post, or redistribute such data to third parties, it could jeopardize citizens' privacy and security as well as the orderly and efficient administration of its justice system. While attorneys and litigants currently redact some confidential information from records (*i.e.*, all but the last four digits of the identification number of social security numbers, driver's license numbers, and numbers associated with electronic billing and payment systems), the redaction requirements do not cover the entirety of the sensitive information described in Va. Code § 17.1-293(A)-(B). The Court agrees with the State that "public access to records at a physical courthouse serves as a bulwark against widespread dissemination of this private information," and is convinced that without the dissemination restriction, any entity could sell, post, or redistribute the information and write an algorithm to harvest such private

information from the records and use that information to the detriment of Virginia litigants. The regulation thus promotes the State's significant interest in a manner "'that would be achieved less effectively absent the regulation.'" *Ross*, 746 F.3d at 556 (quoting *Ward*, 491 U.S. at 799).

Next, the Court must ask whether the regulation "'burden[s] substantially more speech than is necessary to further the government's legitimate interests.'" *Id.* at 557 (quoting *Ward*, 491 U.S. at 799). For this standard, the State "need not regulate using 'the least restrictive or least intrusive means' available to achieve its goals." *Id.* (quoting *Ward*, 491 U.S. at 800). "'So long as the means chosen are not substantially broader than necessary to achieve the government's interest . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative.'" *Id.* (quoting *Ward*, 491 U.S. at 800).

The regulation prevents Virginia-barred attorneys from selling, posting, or redistributing data from civil court records that were obtained electronically to third parties. The policy is limited in scope because it only applies to individuals who have access to the civil court records *electronically* (*i.e.*, Virginia-barred attorneys) and only prevents data obtained electronically from being sold, posted, or redistributed. The regulation leaves ample channels for Plaintiff to post about any civil court record that is obtained physically from the courthouse. On its face, as with the regulation in Count I, this regulation does no more than prevent the mass publication of Virginians' private information from being posted online and the likely data mining that would result, which is "'the exact source of 'evil' it seeks to remedy.'" *Ross*, 746 F.3d at 557 (quoting

*Frisby*, 487 U.S. at 485).

Plaintiff asserts the same arguments as discussed above regarding a lack of narrow tailoring for both regulations, the attorney-access restriction, and the dissemination restriction. Specifically, Plaintiff claims that the dissemination restriction is not narrowly tailored because redactions and subscriber agreements are plausible alternatives that would burden less speech. Yet, for the same reasons as addressed in Count I, "'even if such alternatives are plausible, they do not alter [the Court's] conclusion that the [regulation] does not burden *substantially* more speech than necessary.'" *Ross*, 746 F.3d at 557 (quoting *Ward*, 491 U.S. at 797).

## IV. CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment as to both Count I and Count II and deny Plaintiff's Motion for Summary Judgment as to both Count I and Count II.

An appropriate Order will accompany this Memorandum Opinion.

/s/
Henry E. Hudson
Senior United States District Judge

Date: Sept. 27, 2022
Richmond, Virginia

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| COURTHOUSE NEWS SERVICE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:21-cv-460–HEH |
| | ) | |
| KARL R. HADE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**
**(Resolving Cross-Motions for Summary Judgment)**

THIS MATTER is before the Court on Cross-Motions for Summary Judgment filed by Intervenor Commonwealth of Virginia (the "State") and Defendant Jacqueline C. Smith ("Defendant Smith") in her official capacity as Clerk of the Circuit Court for Prince William County, Virginia (collectively, "Defendants") (ECF Nos. 66, 74, respectively), and Courthouse News Service ("CNS" or "Plaintiff") (ECF No. 70). For the reasons fully stated in the accompanying Memorandum Opinion, Defendants' Motions for Summary Judgment (ECF Nos. 66, 74) are GRANTED and Plaintiff's Motion for Summary Judgment (ECF No. 70) is DENIED. The Clerk is directed to send a copy of the Memorandum Opinion and Order to all counsel of record.

This case is CLOSED.

It is so ORDERED.

/s/
Henry E. Hudson
Senior United States District Judge

Date: Sept. 27, 2022
Richmond, Virginia

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>Plaintiff,<br>v.<br><br>KARL R. HADE, *et al*.,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) | Civil Action No. 3:21-cv-00460-HEH |

**NOTICE OF APPEAL**

NOTICE IS HEREBY GIVEN that plaintiff Courthouse News Service ("Plaintiff"), through its counsel, appeals to the United States Court of Appeals for the Fourth Circuit from: (i) the District Court's Memorandum Opinion (Dkt. No. 91) and Order (Dkt. No. 92), each entered in this action on September 27, 2022, resolving cross-motions for summary judgment, and (ii) those portions of the District Court's Memorandum Opinion (Dkt. No. 48) and Order (Dkt. No. 49), each entered in this action on January 14, 2022, that dismissed Count Three of Plaintiff's Amended Complaint.

Dated: October 25, 2022

Respectfully submitted,

*/s/ Dabney J. Carr*

Dabney J. Carr, IV (VSB No. 28679)
**TROUTMAN PEPPER**
**HAMILTON SANDERS LLP**
P.O. Box 1122
Richmond, Virginia 23218
Tel: (804) 697-1238
Fax: (804) 697-1339
dabney.carr@troutman.com

Jonathan E. Ginsberg (admitted *pro hac vice)*
**BRYAN CAVE**
**LEIGHTON PAISNER LLP**
1290 Avenue of the Americas
New York, New York 10104
Tel: (212) 541-2000
Fax: (212) 541-4630
jon.ginsberg@bclplaw.com

*Counsel for Plaintiff Courthouse News Service*