# 22-2110

# United States Court of Appeals
### *for the*
## Fourth Circuit

---

COURTHOUSE NEWS SERVICE,

*Plaintiff/Appellant,*

– v. –

JACQUELINE C. SMITH, in her official capacity as Clerk
of the Circuit Court for Prince William County, Virginia,

*Defendant/Appellee,*

and

COMMONWEALTH OF VIRGINIA,

*Intervenor/Defendant – Appellee.*

-------------------------------

THE REPORTERS COMMITTEE FOR FREEDOM OF
THE PRESS AND 38 MEDIA ORGANIZATIONS,

*Amicus Supporting Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT RICHMOND

# REPLY BRIEF OF APPELLANT

DABNEY J. CARR, IV
TROUTMAN PEPPER
HAMILTON SANDERS LLP
Post Office Box 1122
Richmond, Virginia 23218
(804) 697-1238

JONATHAN E. GINSBERG
BRYAN CAVE
LEIGHTON PAISNER LLP
1290 Avenue of the Americas
36th Floor
New York, New York 10104
(212) 541-2000

ROGER MYERS
RACHEL MATTEO-BOEHM
BRYAN CAVE
LEIGHTON PAISNER LLP
Three Embarcadero Center
7th Floor
San Francisco, California 94111
(415) 675 3400

*Counsel for Appellant*

*Counsel for Appellant*

*Counsel for Appellant*

## <u>TABLE OF CONTENTS</u>

**Page(s)**

INTRODUCTION ............................................................................................. 1

I. APPELLEES CANNOT AVOID REVERSAL BY OBSCURING THE
NATURE OF CNS' CLAIMS, THE RELIEF IT SEEKS, OR THE TRUE
NATURE OF WHAT APPELLEES CALL A "PRIVACY" ISSUE ............... 3

II. APPELLEES' DEFENSE OF LESSER SCRUTINY FAILS BECAUSE IT
RESTS ON REFUSING TO ACKNOWLEDGE CNS' FIRST
AMENDMENT RIGHTS TO ACCESS AND REPORT ON CIVIL
COURT RECORDS ...................................................................................... 7

    A. APPELLEES CANNOT AVOID STRICT SCRUTINY OF
CNS' EQUAL PROTECTION CLAIM BY USING
TECHNOLOGY TO DENY EQUAL CONTEMPORANEOUS
ACCESS ...............................................................................9

    B. APPELLEES' ARGUMENT FOR APPLYING TPM
SCRUTINY TO THEIR ACCESS RESTRICTION
OVERLOOKS THEIR ADMISSIONS AND CIRCUIT
PRECEDENT ....................................................................... 11

        1. The Record Confirms The Non-Attorney Access
Restriction Is Not Content Neutral ........................................... 12

        2. Appellees Overlook That This Court Has Held Even "A
Minimal Delay" In Access Must Survive *Press-
Enterprise II* Scrutiny ............................................................. 15

    C. APPELLEES IGNORE CASES ESTABLISHING THE
DISSEMINATION RESTRICTION IS A CONTENT-BASED
PRIOR RESTRAINT SUBJECT TO STRICT SCRUTINY ............. 18

III. APPELLEES DO NOT EVEN TRY TO SHOW HOW STRICT OR
*PRESS-ENTERPRISE II* SCRUTINY COULD BE SATISFIED, AND DO
NOT COME CLOSE TO SATISFYING TPM SCRUTINY .......................... 22

    A. THE DISSEMINATION RESTRICTION ....................................... 23

B.     THE NON-ATTORNEY ACCESS RESTRICTION ........................24

1.     Appellees' Stated Interests Are Not Sufficiently Compelling Or Important To Override The First Amendment ....................................................................24

2.     Appellees Fail To Show They Satisfied Their Burden To Prove The Purported Harms Are "Not Merely Conjectural" And The Restrictions Alleviate Them "In A Direct And Material Way" ..................................................27

3.     The Record Evidence Is Insufficient To Show The Restrictions Are Narrowly Tailored ........................................32

a.     Appellees Did Not Satisfy Their Evidentiary Burden To Show Less Restrictive Alternatives Would Not Work..............................................................................32

b.     The Restrictions Prevent Speech On Matters Of Clear Public Concern For No Clear Benefit............................37

4.     TPM's Alternative Channels Requirement Is Not Satisfied Either ......................................................................38

CONCLUSION .........................................................................................39

CERTIFICATE OF COMPLIANCE.......................................................40

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*360 Virtual Drone Servs. v. Ritter*,
    2023 WL 2759032 (E.D.N.C. March 31, 2023) ...............................................10

*44 Liquormart v. Rhode Island*,
    517 U.S. 484 (1996)........................................................................................25

*Associated Press v. U.S. Dist. Ct.*,
    705 F.2d 1143 (9th Cir. 1983) ......................................................................16

*In re Associated Press*,
    172 F. App'x 1 (4th Cir. 2006).......................................................................16

*Billups v. City of Charleston*,
    961 F.3d 673 (4th Cir. 2020)...................................................................*passim*

*Boone v. City of Suffolk*,
    79 F. Supp. 2d 603 (E.D. Va. 1999)..............................................................10

*CBS Inc. v. Young*,
    522 F.2d 234 (6th Cir. 1975)........................................................................20

*In re Charlotte Observer*,
    882 F.2d 850 (4th Cir. 1989)..............................................................15-17, 27

*Citizens United v. FEC*,
    558 U.S. 310 (2010).......................................................................12, 15, 38

*CNS v. Planet*,
    750 F.3d 776 (9th Cir. 2014)....................................................................4, 10

*CNS v. Planet*,
    947 F.3d 581 (9th Cir. 2020)......................................................1, 15, 17, 32

*CNS v. Schaefer*,
    2 F.4th 318 (4th Cir. 2021)....................................................................*passim*

*CNS v. Tingling*,
    2016 WL 8739010 (S.D.N.Y. Dec. 16, 2016) ................................................35

*Cox Broad. Corp. v. Cohn*,
   420 U.S. 469 (1975)............................................................11

*Ctr. for Investigative Reporting v. Se. Pa. Transp. Auth.*,
   975 F.3d 300 (3d Cir. 2020)..............................................22

*Dahlstrom v. Sun-Times Media*,
   777 F.3d 947 (7th Cir. 2015)..............................................25

*Doe v. Public Citizen*,
   749 F.3d 246 (4th Cir. 2014)......................................8, 10, 26, 27

*Evans v. Evans*,
   76 Cal. Rptr. 3d 859 (Cal. App. 2008) ...............................20

*Florida Bar v. Went For It, Inc.*,
   515 U.S. 618 (1995)............................................................25

*Florida Star v. B.J.F.*,
   491 U.S. 524 (1989)............................................................11

*Fusaro v. Cogan*,
   930 F.3d 241 (4th Cir. 2019)..............................................14

*Gentile v. State Bar of Nevada*,
   501 U.S. 1030 (1991)..........................................................20

*Globe Newspaper Co. v. Superior Ct.*,
   457 U.S. 596 (1982)............................................................16

*Harman v. City of New York*,
   945 F. Supp. 750 (S.D.N.Y. 1996) ....................................24

*Harman v. City of New York*,
   140 F.3d 111 (2d Cir. 1998)...............................................24

*Humphreys & Partners Architects v. Lessard Design, Inc.*,
   790 F.3d 532 (4th Cir. 2015)..............................................30

*Hurvitz v. Hoefflin*,
   101 Cal. Rptr. 2d 558 (Cal. App. 2000)..............................21

*Index Newspapers LLC v. U.S. Marshals Serv.*,
   977 F.3d 817 (9th Cir. 2020).......................................................3, 11

*Lanphere & Urbaniak v. Colorado*,
   21 F.3d 1508 (10th Cir. 1994)...........................................................25

*Legi-Tech, Inc. v. Keiper*,
   766 F.2d 728 (2d Cir. 1985)........................................... 8, 9, 10, 27

*Lexington Herald Leader Co. v. Tackett*,
   601 S.W.2d 905 (Ky. 1980) ................................................................8

*Lowery v. Jefferson Cnty. Bd. Of Educ.*,
   586 F.3d 427 (6th Cir. 2009).............................................................13

*McCullen v. Coakley*,
   573 U.S. 464 (2014).................................................................*passim*

*McMellon v. U.S.*,
   387 F.3d 329 (4th Cir. 2004) (en banc) ...........................................17

*In re Morrissey*,
   168 F.3d 134 (4th Cir. 1999).............................................................20

*In re Murphy-Brown, LLC*,
   907 F.3d 788 (4th Cir. 2018).....................................................*passim*

*Nat'l Fed. of the Blind v. FTC*,
   420 F.3d 331 (4th Cir. 2005).............................................................25

*Nat'l Press Photogs. Ass'n v. McCraw*,
   594 F. Supp. 3d 789 (W.D. Tex. 2022) ............................................10

*Near v. Minnesota ex rel. Olson*,
   283 U.S. 697 (1931) ..........................................................................19

*In re NBC, Inc.*,
   635 F.2d 945 (2d Cir. 1980)..............................................................17

*Nebraska Press Ass'n v. Stuart*,
   427 U.S. 539 (1976).........................................................19, 20, 23

v

*News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*,
   612 F.3d 301 (4th Cir. 2010) ............................................................26

*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*,
   556 F.3d 177 (4th Cir. 2009) ............................................................30

*Orsi v. Kirkwood*,
   999 F.2d 86 (4th Cir. 1993) ..............................................................30

*Payne v. Taslimi*,
   998 F.3d 648 (4th Cir. 2021) ............................................................17

*PETA, Inc. v. N.C. Farm Bureau*,
   60 F.4th 815 (4th Cir. 2023) ........................................ 12, 22, 33, 38

*Press-Enterprise Co. v. Superior Court*,
   478 U.S. 1 (1986) ....................................................................*passim*

*In re Providence Journal Co.*,
   293 F.3d 1 (1st Cir. 2002) ................................................................16

*In re Providence Journal Co.*,
   820 F.2d 1342 (1st Cir. 1986) ..........................................................21

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015) ........................................................................12

*Reynolds v. Middleton*,
   779 F.3d 222 (4th Cir. 2015) ....................................................*passim*

*Richmond Newspapers, Inc. v. Virginia*,
   448 U.S. 555 (1980) ........................................................................16

*Ross v. Early*,
   746 F.3d 546 (4th Cir. 2014) ......................................................27, 28

*In re Russell*,
   726 F.2d 1007 (4th Cir. 1984) ..........................................................20

*Seattle Times Co. v. Reinhart*,
   467 U.S. 20 (1984) ..........................................................................25

*Smith v. Daily Mail Pub. Co.*,
    443 U.S. 97 (1979)...................................................................................23

*Soderberg v. Carrion*,
    999 F.3d 962 (4th Cir. 2021)............................................... 18, 21, 22

*Sons of Confederate Veterans, Inc. v. Comm'r of Va. DMV*,
    288 F.3d 610 (4th Cir. 2002) ...................................................5

*Sorrell v. IMS Health, Inc.*,
    564 U.S. 552 (2011)........................................................ 12, 13, 14

*Thomasson v. Perry*,
    80 F.3d 915 (4th Cir. 1996)....................................................9

*Thompson v. W. States Med. Ctr.*,
    535 U.S. 357 (2002)...............................................................26

*Turner Broad. Sys. v. FCC*,
    512 U.S. 622 (1994)....................................................... 12, 27, 28

*U.S. DOJ v. Reporters Comm. for Freedom of the Press*,
    489 U.S. 749 (1989)...............................................................25

*U.S. v. Blankenship*,
    79 F. Supp. 3d 613 (S.D. W. Va. 2015).........................................19

*U.S. v. Buster*,
    26 F.4th 627 (4th Cir. 2022)....................................................17

*U.S. v. Crawley*,
    837 F.2d 291 (7th Cir. 1988)............................................... 17-18

*U.S. v. Miller*,
    982 F.3d 412 (6th Cir. 2020).....................................................1

*U.S. v. Playboy Entm't Group*,
    529 U.S. 803 (2000)...............................................................32

*U.S. v. Sampson*,
    297 F. Supp. 2d 342 (D. Mass. 2003)...........................................17

*W. Va. Coal Workers' Pneumoconiosis Fund v. Bell*,
   781 F. App'x 214 (4th Cir. 2019)......................................................22

*In re Wall St. Journal*,
   601 F. App'x 215 (4th Cir. 2015) (per curiam) ............................8, 19

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989) ......................................................................37

*In re Wash. Post Co.*,
   807 F.2d 383 (4th Cir. 1986)........................................................16

**Statutes**

5 U.S.C. § 552a.............................................................................25

42 U.S.C. § 1320d-6 ......................................................................25

42 U.S.C. § 2721............................................................................25

Va. Code § 17.1-225 ........................................................................6

Va. Code § 17.1-203(H)..................................................................18

Va. Code § 17.1-293(B)........................................................5, 29, 36

Va. Code § 17.1-293(E)(7)..........................................................5, 36

Va. Code § 17.1-293(H)..............................................................8, 19

**Other Authorities**

David S. Ardia & Anne Klinefelter, *Privacy and Court Records: An
   Empirical Study*, 30 Berkeley Tech. L.J. 1807 (2015) .....................31

David S. Ardia, *Privacy and Court Records: Online Access and the
   Loss of Practical Obscurity*, 2017 U. Ill. L. Rev. 1385 (2017) .........31

Federal Trade Commission, *Big Data: A Tool for Inclusion or
   Exclusion?*, available at
   https://www.ftc.gov/system/files/documents/reports/big-data-tool-
   inclusion-or-exclusion-understanding-issues/160106big-data-
   rpt.pdf ......................................................................................30

Federal Trade Commission, *What to Know About Identity Theft*,
available at https://consumer.ftc.gov/articles/what-know-about-
identity-theft ...................................................................................30

Geoffrey Xiao, *Bad Bots: Regulating the Scraping of Public Personal
Information*, 34 Harv. J. L. & Tech 701 (2021)................................30

House Judiciary Committee, Subcommittee on Courts, Intellectual
Property and the Internet, *Testimony of Thomas R. Bruce* (Feb. 14,
2017) ("House Judiciary Hearing Testimony"), available at
https://judiciary.house.gov/sites/evo-subsites/republicans-
judiciary.house.gov/files/legacy_files/wp-
content/uploads/2017/02/Bruce-Testimony.pdf ...............................30

Office of the Attorney General of the State of Vermont, *Department
of Financial Regulation, Report to the General Assembly of the
Data Broker Working Group* (Dec. 15, 2017) ("Vt. Att'y Gen.
Report"), available at https://ago.vermont.gov/sites/ago/files/wp-
content/uploads/2018/02/2017-12-15-Data-Broker-Working-
Group-Report.pdf ............................................................................30

Oversight and Investigations Majority Staff, *A Review of the Data
Broker Industry: Collection, Use, and Sale of Consumer Data for
Marketing Purposes* (Dec. 18, 2013), available at
https://www.commerce.senate.gov/services/files/0d2b3642-6221-
4888-a631-08f2f255b577..................................................................30

## **INTRODUCTION**

Appellees' briefs are remarkable for the facts and law they do ***not*** address.

*First*, they never confront settled law establishing it is the category of court records that triggers First Amendment rights, not the means by which access is available or the nature of the access restriction. "Courts often must apply the legal rules arising from fixed constitutional rights to new technologies in an evolving world." *U.S. v. Miller*, 982 F.3d 412, 417 (6th Cir. 2020).

*Second*, Appellees shut their eyes to their own contentions proving the Non-Attorney Access Restriction[1] is not content-neutral, which requires it to survive strict scrutiny or at least the "rigorous" scrutiny used in the seminal case of *CNS v. Planet*, 947 F.3d 581 (9th Cir. 2020) ("*Planet III*") (applying *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986)) ("*Press-Enterprise II*").

*Third*, Appellees do not mention *In re Murphy-Brown, LLC*, 907 F.3d 788 (4th Cir. 2018), and other cases confirming the Dissemination Restriction is a prior restraint, and content-based, requiring strict scrutiny for either reason.

*Fourth*, Appellees do not attempt to show how the evidentiary record here – more accurately, the lack thereof – satisfies their burden under strict or *Press-*

---

[1] Abbreviations follow CNS' Opening Brief, while CNS' Opening Brief is "AOB," the Commonwealth's Response Brief is "CRB" and Smith's Response Brief is "SRB." Unless otherwise noted, citations to internal quotations are omitted, bold and italic emphases are added, italic-only emphases are in the original, and statutory references are to the Virginia Code.

*Enterprise II* scrutiny. Even if intermediate TPM scrutiny applied, Appellees ignore controlling TPM precedent, including *Reynolds v. Middleton*, 779 F.3d 222 (4th Cir. 2015), and *Billups v. City of Charleston*, 961 F.3d 673 (4th Cir. 2020), which require evidence of real shortcomings with secure remote access to civil court records and that Appellees tried or seriously considered less restrictive alternatives. Although Appellees do their best to obscure it, this evidence does not exist. Nor have Appellees, on this record, satisfied TPM's other requirements.

Perhaps because neither law nor evidence support them, Appellees distort the true nature of the access choice before this Court and the relief requested. At bottom, Appellees appear to hope that if they offer facially plausible arguments, this Court will defer to their choice to create a highly unusual and unconstitutional two-tier system of access that would have the additional effect of maintaining a monopoly over access to public court records. This Court should reject that invitation.

Affirming the district court would run contrary to settled Circuit and Supreme Court precedent. Moreover, Appellees' theory that it is inherently dangerous to allow secure remote access to anyone but government employees and attorneys is incompatible with, and abhorrent to, the First Amendment right of access. It is also contrary to many other courts, including all federal courts, which provide secure remote access on an equal basis.

In our country, the courthouse door is open to all who wish to learn what is happening inside. That court proceedings and records are increasingly observed remotely rather than in person – as is true of many aspects of modern life – cannot change that principle. In *CNS v. Schaefer*, 2 F.4th 318, 326 n.5 (4th Cir. 2021), this Court "agree[d] with plaintiff[] that the press is entitled to a right of access at least coextensive with the right enjoyed by [other segments of] the public." *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 830 (9th Cir. 2020)). It should again because "the press is certainly not disfavored." *Id.*

## I.

### APPELLEES CANNOT AVOID REVERSAL BY OBSCURING THE NATURE OF CNS' CLAIMS, THE RELIEF IT SEEKS, OR THE TRUE NATURE OF WHAT APPELLEES CALL A "PRIVACY" ISSUE

Appellees' briefs sow several areas of potential confusion. To ensure they do not distract from the facts and law requiring reversal, CNS addresses them first.

**The First Amendment right –** This case is not about whether the First Amendment guarantees a per se right of remote access, despite Appellees' attempts to characterize it as such. Rather, CNS contends Virginia's preference system, which provides remote access to lawyers and government employees while withholding it from the press and public, violates the First Amendment. It is this atypical and discriminatory choice that cannot withstand constitutional scrutiny.

**This case is not about data brokers** – CNS does not access court records to harvest and sell personal data. "The purpose of CNS's efforts to timely access … civil complaints is to report on whatever newsworthy content they contain." *CNS v. Planet*, 750 F.3d 776, 787-88 (9th Cir. 2014) ("*Planet I*"); AOB 18 n.11.

**The access sought is *secure* remote access** – CNS is not "contend[ing] that if court records are made remotely accessible to anyone, then the First Amendment requires that they also be made remotely accessible to the general public," CRB 21, at least not in the way suggested. Appellees imply CNS asks this Court to choose between two extremes: the existing discriminatory system, or unrestricted access online to all. In reality, what CNS seeks – access to the same account and paywall-protected system that lawyers and the government use – is the same middle ground the federal courts use for PACER.[2]

This distinction matters. To remotely access Virginia's 105 OCRA courts, someone would need to "separately subscribe" to each court, each with its own user agreement,[3] and pay a "separate subscription fee for each" court. CRB 6; AOB 10-11. This would hardly provide "unfettered public access." CRB 27.

---

[2] It is also the middle ground chosen by the Alexandria Circuit Court in Virginia. AOB 7 (citing JA80); *see also* JA150, JA159-162.

[3] Prince William County's user agreement must be notarized and requires detailed data about the subscriber. AOB 10-11. Every OCRA clerk could do the same.

**The remedy does not require legislation or redaction** – This distinction also explains why there is no merit to Appellees' arguments that the relief sought requires legislation or clerks to redact filings.  Virginia requires filers to redact social security and financial account numbers, § 8.01-420.8, and the record contains no evidence they fail to do so.  Filers need not redact other identifiers because "secure remote access to nonconfidential court records," § 17.1-293(E)(7), is an *exception* to § 17.1-293(B), which bars posting records with those identifiers "on the Internet."

Applying Virginia's "presumption of severability," *Sons of Confederate Veterans, Inc. v. Comm'r of Va. DMV*, 288 F.3d 610, 627 (4th Cir. 2002); *see* § 1-243, the attorney preference in § 17.1-293(E)(7) can be held unconstitutional while leaving the "secure remote access" requirement intact:

> (B) Beginning January 1, 2004, no court clerk shall post on the Internet any document that contains the following information: (a) an actual signature, (ii) a social security number, (iii) a date of birth identified on with a particular person, (iv) the maiden name of a person's parent so as to be identified with a particular person, (v) any financial account number or numbers, or (vi) the name and age of any minor child.
>
> ****
>
> (E) This section shall not apply to the following:
>
> ****
>
> > (7) Providing secure remote access to nonconfidential court records, subject to any fees charged by the clerk, ~~to members in good standing with the Virginia State Bar and their authorized agents, pro hac vice attorneys authorized by the court for purposes of the practice of law, and such governmental agencies~~ as authorized by the clerk.

The distinction between "secure remote access" and unrestricted online access is consistent with § 17-1.225, which permits clerks to provide "remote online access, including Internet access, to all nonconfidential court records," without restricting it to lawyers, provided the clerk implements "proper security measures."

**Repeated references to "privacy" are misnomers** – Appellees' insistence that "the protection of Private Information" is at stake, SRB 22, must also be corrected. ***Court records on OCRA are not private***. Records on OCRA are the same as those available for public review at courts for those with the time and resources to make the trip. While Appellees' briefs do their best to obscure it, the record reveals neither fraud nor identity theft are the main reason for their discriminatory access regime. Rather, the main reason for the restrictions is that data brokers and others may use ***information parties are not required to redact*** for constitutionally protected speech Virginia does not approve of.

**The OCRA restrictions damage news reporting** – Appellees argue OCRA's restrictions do not hurt reporting because OCRA records can be seen at courthouses. This ignores reality, JA142-143, JA150 & JA382; CNS RJN Reqs. 2-3, and the amici brief of the Reporters Committee for Freedom of the Press ("RCFP") and 38 media entities, including *The Washington Post*, *New York Times*, *Virginia-Pilot* and *Daily Press*. As amici explained, the "demise of … news outlets has contributed to the existence of 1,800 so-called 'news deserts' across the country."

6

RCFP Br. 13-14.    This means fewer outlets covering the courts, and "the impracticalities of traveling to the more than 100 courthouses around the Commonwealth to view – and report on – court records mean that these publications must inevitably limit their coverage to a small number of courts."  *Id.* at 14.

## II.

### APPELLEES' DEFENSE OF LESSER SCRUTINY FAILS BECAUSE IT RESTS ON REFUSING TO ACKNOWLEDGE CNS' FIRST AMENDMENT <u>RIGHTS TO ACCESS AND REPORT ON CIVIL COURT RECORDS</u>

The district court's dismissal of CNS' claims rested on its refusal to apply the appropriate scrutiny.  Appellees' primary defense of that decision is to deny the First Amendment even applies on the theory that "[t]he challenged provisions do not impede the public's access to court records and therefore do not implicate CNS's First Amendment rights."  CRB 23; SRB 13.

But the provisions do impede CNS since it does not have contemporaneous access "'"co-extensive with"'" other "'members of the public.'"  CRB 24 (quoting *Schaefer*, 2 F.4th at 326 n.5).  Attorneys or government employees in Norfolk can access a complaint filed after noon in Roanoke remotely within minutes, but CNS' reporter in Norfolk cannot see or inform the public about it until one to three or four days later after driving 4-5 hours and 250 miles.  AOB 33-34.

Appellees' impeding of "'the public's interest in monitoring the functioning of the courts'" – "especially through the press's reporting" – does not end there.

7

*Schaefer*, 2 F.4th at 327 (quoting *Doe v. Public Citizen*, 749 F.3d 246, 253 (4th Cir. 2014)).  CNS' reporter cannot obtain details about the complaint in Roanoke from those who can access it remotely because § 17.1-293(H) bans attorneys and public employees from distributing it.  This "content based" restraint "target[s] speech relating to pending litigation," *Murphy-Brown*, 907 F.3d at 797, "directly impair[s]" the reporter's "right under the First Amendment to gather news," *In re Wall St. Journal*, 601 F. App'x 215, 218 (4th Cir. 2015) (per curiam), and precludes her from informing the public on a "reasonably contemporaneous basis" about "the parties involved …, the facts alleged, the issues for trial, and the relief sought," making it "impossible for the public to perform [its] role" of "'participat[ing] in and serv[ing] as a check upon the judicial process.'"  *Schaefer*, 2 F.4th at 327-28.

Appellees dismiss these impediments by asserting CNS has no right to "convenient" remote access.  CRB 1.  But it has long been clear Appellees may "not close [their] courtroom to the entire press when any members of the public are to be admitted." *Lexington Herald Leader Co. v. Tackett*, 601 S.W.2d 905, 907 (Ky. 1980); *Schaefer*, 2 F.4th at 326 n.5.  Appellees cannot use "technology" to circumvent this rule by "granting … preferential access" to a virtual courthouse records bin while asserting CNS is "merely claiming a right to greater convenience." *Legi-Tech, Inc. v. Keiper*, 766 F.2d 728, 731-34 (2d Cir. 1985); AOB 28-29.

8

**A.**    **Appellees Cannot Avoid Strict Scrutiny Of CNS' Equal Protection Claim By Using Technology To Deny Equal Contemporaneous Access**

As shown, OCRA's restrictions severely and self-evidently burden CNS' fundamental First Amendment rights, which requires applying strict scrutiny to its Equal Protection claim. *Thomasson v. Perry*, 80 F.3d 915, 927-28 (4th Cir. 1996) (strict scrutiny applies "where the statute classifies along inherently suspect lines ***or burdens the exercise of a fundamental constitutional right***"). To defend the dismissal below under a rational basis standard, Appellees attempt a bit of legal legerdemain, in which CNS' acknowledgement that the First Amendment does not require a "per se" right of remote access means its claim "does not implicate a fundamental First Amendment right" at all. CRB 64; SRB 13-14.[4]

The threshold problem with this theory is that the district court recognized CNS asserts that Appellees "are limiting an already established fundamental right, the right to access civil court records, in an unconstitutional manner." JA70.[5] As this Court has held, "the press and public enjoy a First Amendment right of access to newly filed civil complaints," *Schaefer*, 2 F.4th at 328, and other "judicial

---

[4] A claim for a per se right of remote access exists where a court provides no such access and plaintiff contends "such [access] was constitutionally required." *Legi-Tech*, 766 F.2d at 734. This Court "face[s] a different issue, however, for [OCRA] denies [CNS] the very access to information offered to [others]." *Id.*

[5] This is hardly an "incomplete citation," SRB 14, to show the district court recognized the right of access to complaints is "fundamental." AOB 32.

documents and records filed in civil … proceedings." *Doe*, 749 F.3d at 265. Because "the right to access is grounded in the First Amendment, the burden, which falls on the one seeking confidentiality, is as rigorous as the burden for overcoming any other fundamental right." *Boone v. City of Suffolk*, 79 F. Supp. 2d 603, 606 (E.D. Va. 1999); *accord, e.g., Planet I*, 750 F.3d at 787.

The First Amendment right of access does not magically disappear because the "unconstitutional manner" used to deny CNS "reasonably contemporaneous access," *Schaefer*, 2 F.4th at 328, is to allow only a subset of the public – thousands of government employees and attorneys – to register for remote access.

"'[C]ontemporaneous in this context'" means "'as expeditiously as possible,'" *id.* (quoting *Doe*, 749 F.3d at 272), which only those allowed to register for remote access receive, and the fact OCRA access is provided electronically does not excuse violation of the right. "Applying the Constitution's protections to new technological contexts is far from a novel exercise." *Nat'l Press Photogs. Ass'n v. McCraw*, 594 F. Supp. 3d 789, 804 (W.D. Tex. 2022); *Legi-Tech*, 766 F.2d at 732; *360 Virtual Drone Servs. v. Ritter*, 2023 WL 2759032, *9 (E.D.N.C. March 31, 2023) ("The court sees no reason for distinguishing under the First Amendment between images captured by earlier technology and those captured remotely by drone.").

The Commonwealth argues none of this matters because TPM scrutiny applies to CNS' First Amendment access claim, barring application of strict scrutiny

to CNS' Equal Protection claim.  CRB 64.  But as shown in the AOB and explained further below, TPM scrutiny does not apply because the access restriction is not content-neutral and the compelling or overriding interest test in *Press-Enterprise II* applies even to content-neutral denials of contemporaneous access.

### B.    Appellees' Argument For Applying TPM Scrutiny To Their Access Restriction Overlooks Their Admissions And Circuit Precedent

Appellees' primary defense of the dismissal of CNS' First Amendment access claim boils down to a contention that "the First Amendment does not require the government to provide unfettered public access to documents merely because it provides [such] access to anyone."  CRB 27; *see* SRB 11-13.  But secure remote access is hardly unfettered, and the First Amendment ***does*** require the press be granted access ""co-extensive"" with a significant subset of the public.  CRB 24 (quoting *Schaefer*, 2 F.4th at 326 n.5); *see Index Newspapers*, 977 F.3d at 830.[6]

Appellees' fallback position – that denying co-extensive access need only survive TPM scrutiny – ignores Appellees' admissions about the content-based reasons for the distinction and precedent requiring *Press-Enterprise II* scrutiny.

---

[6] The Supreme Court decisions the Commonwealth cites condemn exactly what it is doing here: making information available in public records, then restricting its use to protect purported privacy interests.  *Florida Star v. B.J.F.*, 491 U.S. 524 (1989); *Cox Broad. Corp. v. Cohn*, 420 U.S. 469 (1975).

### 1.    The Record Confirms The Non-Attorney Access Restriction Is Not Content Neutral

Smith contends that because the Non-Attorney Access Restriction is content-neutral on its face and extends to all court records, it is content neutral.  SRB 20-21.  But as at least the Commonwealth recognizes, that does not end the inquiry.

Even if the restriction is facially neutral, strict scrutiny applies if its "purpose and justification … are content based."  *Reed v. Town of Gilbert*, 576 U.S. 155, 166 (2015).  "'[L]aws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference.'"  *Id*. at 170 (quoting *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 658 (1994)).  As this Court recognized, "'restrictions distinguishing among different speakers, allowing speech by some but not others, are as repugnant to the First Amendment as are restrictions distinguishing among viewpoints.'"  *PETA, Inc. v. N.C. Farm Bureau*, 60 F.4th 815, 831 (4th Cir. 2023) (quoting *Citizens United v. FEC*, 558 U.S. 310, 340 (2010)).

The Commonwealth contends "protecting sensitive personal information to prevent fraud has nothing to do with suppressing a disfavored message," CRB 40, and claims CNS did not cite anything in the record "tending to show" the OCRA restrictions were intended "'to target [particular] speakers and their messages for disfavored treatment,' or that it 'imposes burdens based on the content of speech.'"  *Id*. at 41 (quoting *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 565 (2011)).

Not so.  CNS cited the Commonwealth's MSJ opposition, which argued OCRA's restrictions were necessary to prevent public court records from being "misused" for "'direct marketing offers' it disfavors."  AOB 40 (quoting JA331-332).  That record shows fraud or identity theft are not the primary reason for the restrictions.  Rather, the "misuse" Appellees seek to prevent is primarily justified by an aversion to the content of speech about court records by "disfavored speakers," *Sorrell*, 564 U.S. at 564,[7] including commercial and political actors, and media it disfavors or misunderstands like CNS.  JA331-333; *see* JA463-469.[8]

The First Amendment, however, protects that speech even if the government wants to discourage it.  AOB 40.  Not only is "the creation and dissemination of information … speech within the meaning of the First Amendment," *Sorrell*, 564 U.S. at 570, but as *Sorrell* recognized, and the Commonwealth acknowledged below, its value is "in the eye of the beholder."  JA461.  Clarifying what it meant by

---

[7] "Lawmakers may no more silence unwanted speech by burdening its utterance than by censoring its content."  *Sorrell*, 564 U.S. at 566.  But that is exactly what Appellees are doing.  OCRA's restrictions burden public and press speech about court records, while judicial insiders – lawyers and government employees – can register for remote access because their speech about court records is the "right" kind.  Nor does *McCullen* "support[] the conclusion that the regulation at issue is content-neutral," as the district court believed.  JA547-548.  Unlike the exemption there allowing abortion clinic employees to be in buffer zones, the reason for this exemption is not **where** attorneys speak, but the preferred **content** of their speech.

[8] At the least, the record creates a jury issue on content neutrality that precluded summary judgment unless Appellees satisfy strict scrutiny, which they did not try to meet.  *See Lowery v. Jefferson Cnty. Bd. Of Educ.*, 586 F.3d 427, 435 (6th Cir. 2009).

"exploited or misused," *id.*, the Commonwealth explained:

> I guess it depends on how … you view marketing efforts, like marketing payday loans to people that have filed for bankruptcy. Is that a laudable purpose or not? Is that marketing a service to people who might need it, or is it preying on the financially vulnerable? …
>
> ***
>
> The fact is that it exists. And Virginia has taken the position that we want to make it harder for people to engage in that mass data harvesting of data which then allows you to repackage and resell it. …

JA463; JA462 (categorizing "data brokers" as including entities "laudable, like

LexisNexis," or "neutral like Google"), JA461 (describing CNS as "data broker").

Appellees' "reluctance to embrace [their] own … rationale" for the

restrictions by pretending this record does not exist "reflects the vulnerability of

[their] position." *Sorrell*, 564 U.S. at 577. "Those who seek to censor or burden

free expression often assert that disfavored speech has adverse effects. But the 'fear

that people would make bad decisions if given truthful information' cannot justify

content-based burdens on speech." *Id.*

The Commonwealth below argued the restrictions also seek to prevent

"harvesting" and "data mining" of online court records for the purpose of spreading

"election disinformation intended to sow chaos or dissuade voter participation."

JA332-333. This justification is at least "closely tied to political speech, which

generally receives the strongest First Amendment protection." *Fusaro v. Cogan*,

930 F.3d 241, 250 (4th Cir. 2019). Moreover, designating preferred speakers in this

14

context may constitute its own "constitutional wrong."  AOB 38; *see Fusaro*, 930 F.3d at 253 (*Citizens United* "reject[ed the] argument that, 'in the context of political speech, the Government may impose restrictions on certain disfavored speakers'").

### 2. Appellees Overlook That This Court Has Held Even "A Minimal Delay" In Access Must Survive *Press-Enterprise II* Scrutiny

Even a content-neutral restriction on access must still pass *Press-Enterprise II*'s "rigorous" test.  *Planet III*, 947 F.3d at 595-96 & n.9.  The Commonwealth suggests *Planet III* said TPM applies to delayed access, CRB 33, but Smith recognizes that is not true: "Instead of applying TPM scrutiny … *Planet III* held that a court administrator must 'demonstrate … a "substantial probability" that its interest … would be impaired by immediate access, and second, that no reasonable alternatives exist to 'adequately protect' that government interest.'"  SRB 28 (quoting *Planet III*, 947 F.3d at 596) (applying *Press-Enterprise II*, 478 U.S. at 14).

Smith argues *Planet III* erred in applying *Press-Enterprise II* scrutiny because the latter "involved complete closure" – denial of access to a hearing and a transcript of that hearing[9] – not the timing or manner of access.  SRB 29-30.  But the delay in access resulting from Appellees' two-tiered access regime ***does*** work a complete denial of contemporaneous access, which is why this Court held "a 'minimal delay' in access" must survive *Press-Enterprise II* scrutiny.  *In re Charlotte Observer*, 882

---

[9] In fact, the lower court did belatedly "release[] the transcript," which the Supreme Court held did not moot the case.  *Press-Enterprise II*, 478 U.S. at 5-6.

F.2d 850, 856 (4th Cir. 1989) (rejecting view similar to Smith's because it "unduly minimizes, if it does not entirely overlook, the value of 'openness' itself, a value which is threatened whenever immediate access to ongoing proceedings is denied, whatever provision is made for later public disclosure"); *In re Associated Press*, 172 F. App'x 1, 4-5 (4th Cir. 2006) (applying *Press-Enterprise II* to hold delaying access to exhibits until after trial violates "contemporaneous access").[10]

That is consistent with how the Supreme Court said TPM rules apply in this context. The footnote Appellees cited in *Globe Newspaper Co. v. Superior Ct.*, 457 U.S. 596, 607 n.17 (1982), did not discuss how TPM rules apply here, but cited *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980), which did: "'The question in a particular case is whether that control is exerted so as not to deny or unwarrantedly abridge … the opportunities for the communication of thought and the discussion of public questions.'" *Id.* at 581 n.18. Requiring attendees to be "quiet and orderly" is a valid TPM rule that neither denies nor abridges that right, but restrictions that prevent "media representatives" from serving as "surrogates for the public" are not. *Id.* at 573, 581 n.18; *accord id.* at 600 n.3 ("In such situations, representatives of the press must be assured access.") (Stewart, J., concurring).

---

[10] *See In re Wash. Post Co.*, 807 F.2d 383 (4th Cir. 1986) (*Press-Enterprise II* violated where access to hearings denied but transcripts released); *In re Providence Journal Co.*, 293 F.3d 1, 14 (1st Cir. 2002) (upholding delay that met *Press-Enterprise II* test, distinguishing case vacating 48-hour delay that did not) (citing *Associated Press v. U.S. Dist. Ct.*, 705 F.2d 1143, 1147 (9th Cir. 1983)).

It follows that "only the most compelling circumstance should prevent contemporaneous public access" to judicial records. *In re NBC, Inc.*, 635 F.2d 945, 952 (2d Cir. 1980). That means a "compelling interest" must support denying access the day an exhibit is "'introduc[ed] into evidence,'" *U.S. v. Sampson*, 297 F. Supp. 2d 342, 346 (D. Mass. 2003) (quoting *NBC*, 635 F.2d at 952), or a complaint is filed. *Planet III*, 947 F.3d at 594.

The Commonwealth claims the Court should ignore this principle because *Schaefer* applied TPM review and "*Schaefer* controls." CRB 31. But "this Court has directly – and recently – disclaimed the notion 'that everything said in a panel opinion binds future panels.'" *U.S. v. Buster*, 26 F.4th 627, 633 (4th Cir. 2022) (quoting *Payne v. Taslimi*, 998 F.3d 648, 654 (4th Cir. 2021)). As CNS explained, *Schaefer* is such a case; because the district court there misread *Planet III* and applied both *Press-Enterprise II* and TPM scrutiny, the short passage applying TPM was "not necessary to the outcome" as appellants lost either way. *Payne*, 998 F.3d at 655; AOB 42-43. Consequently, the distinction between the two types of review "'may not have received the full and careful consideration of the court,'" and this Court is "not bound" to follow it.[11] *Payne*, 998 F.3d 654-55 (quoting *U.S. v.*

---

[11] If *Schaefer* had decided TPM applies to denials of contemporaneous access, it would conflict with *Charlotte Observer*, which – as "the earliest opinion" – "controls." *McMellon v. U.S.*, 387 F.3d 329, 333 (4th Cir. 2004) (en banc).

*Crawley*, 837 F.2d 291, 292 (7th Cir. 1988) (Posner, J.)).[12]

### C.     Appellees Ignore Cases Establishing The Dissemination Restriction Is A Content-Based Prior Restraint Subject To Strict Scrutiny

Appellees barely attempt to defend the district court's refusal to apply the "most rigorous form of review" to the Dissemination Restriction, which this Court has held must apply to "all" restrictions that "'forbid speech activities.'" *Murphy-Brown*, 907 F.3d at 796-97 (quoting *Alexander v. U.S.*, 509 U.S. 544, 550 (1993)).

Smith does not even address this issue, while the Commonwealth ignores *Murphy-Brown* and does not directly defend the district court's rationale. No doubt that is because this Court has rejected the district court's conclusion that the Dissemination Restriction was not a prior restraint because it banned dissemination of "information obtained from *electronic* civil court records" but not information available "*physically* from the courthouse." JA559; *see Soderberg v. Carrion*, 999 F.3d 962, 966-70 (4th Cir. 2021) (reversing ruling that broadcast ban was not prior restraint, but rather a TPM regulation subject to intermediate scrutiny, because "it does not limit other means of disseminating the same information").

---

[12] *Crawley* involved a similar scenario:  "Since the evidence that a condition of probation had been violated was strong enough to satisfy the preponderance-of-the-evidence standard, the court had no occasion to consider whether, if it had been only strong enough to satisfy the reasonably-satisfied standard, the defendant's probation should not have been revoked."  837 F.2d at 293.

Instead, the Commonwealth contends § 17.1-293(H) "is not a prior restraint because it does not enjoin CNS from publishing any lawfully obtained information" on the apparent theory that a prior restraint only exists where the restriction expressly and absolutely bars the press – a "'newspaper or periodical'" – from publishing. CRB 34-35 (quoting *Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931)).

But the Commonwealth overlooks settled precedent CNS cited rejecting this argument. In *Wall Street Journal*, the district court relied on ***the same argument as the Commonwealth*** to deny a media challenge to a gag order on attorneys and trial participants on the ground it was not "'a prior restraint'" subject to strict scrutiny because it "does not prohibit the press from publishing news articles about the case," which that court, like the Commonwealth, thought "a crucial distinction." *U.S. v. Blankenship*, 79 F. Supp. 3d 613, 617-19 (S.D. W. Va.), *vacated sub nom. In re Wall St. Journal*, 601 F. App'x 215 (4th Cir. 2015) (per curiam).

Rejecting the narrow view of the district court there and the Commonwealth here, this Court vacated the gag order because it was "constrained to conclude that [it] … cannot be sustained" under cases such as *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 562 (1976). *Wall St. Journal*, 601 F. App'x at 218-19. That shows the Commonwealth's error in contending *Nebraska Press* does not apply outside a "'prior restraint … upon the communication of news and commentary on current

events'" by the press.  CRB 37 (quoting 427 U.S. at 559).[13]

That conclusion is also supported by numerous other cases.  For example, in *CBS Inc. v. Young*, 522 F.2d 234 (6th Cir. 1975), the court invalidated a gag order in a civil case on a challenge by the media as a "prior direct restraint[] by government upon First Amendment freedoms of expression and speech" that failed to survive "the closest scrutiny."  *Id.* at 238.  Similarly, *Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991), also treated a state rule against attorneys making certain statements as a "restraint on speech."  *Id.* at 1076.[14]

As for the contention that preventing publication of "sensitive personal information" has "never been treated as 'prior restraints' subject to strict scrutiny," CRB 37, precedent is to the contrary.  "A prohibition against disclosing confidential information constitutes a prior restraint."  *Evans v. Evans*, 76 Cal. Rptr. 3d 859, 869

---

[13] The Commonwealth also overlooks that if the Non-Attorney Access Restriction violates Equal Protection and/or the First Amendment, the Dissemination Restriction will directly "enjoin[] CNS from publishing any information" it would have a constitutional right to access remotely.  CRB 35 (mistakenly claiming Dissemination Restriction "'only'" restricts "members of the Virginia bar").

[14] *Gentile* held that rules restraining "the speech of lawyers ***representing clients in pending cases*** may be regulated under a less demanding standard" than *Nebraska Press*.  501 U.S. at 1074-76.  *Wall Street Journal* cited *Nebraska Press* and cases applying a standard "consistent" with *Gentile* to uphold restraints on attorneys and witnesses in their cases.  *In re Morrissey*, 168 F.3d 134 (4th Cir. 1999); *In re Russell*, 726 F.2d 1007 (4th Cir. 1984).  *Wall Street Journal* thus recognized one level of scrutiny applied to restraints on counsel and participants ***in their pending criminal cases*** and the stricter standard in *Nebraska Press* applied to broader restraints like the Dissemination Restriction.  *Accord Murphy-Brown*, 907 F.3d at 797-98.

(Cal. App. 2008); *In re Providence Journal Co.*, 820 F.2d 1342, 1350 (1st Cir. 1986) ("privacy rights … an insufficient basis for issuing a prior restraint") (citing *Org. for a Better Austin v. Keefe,* 402 U.S. 415, 419-20 (1971) ("[d]esignating the conduct as an invasion of privacy … is not sufficient" to overcome "'heavy presumption' against [the] constitutional validity" of "[a]ny prior restraint")).[15]

Apparently "aware of *no case in any jurisdiction* in which a prior restraint has been imposed to prevent an intrusion into privacy," *Hurvitz v. Hoefflin*, 101 Cal. Rptr. 2d 558, 567 (Cal. App. 2000), the Commonwealth misquotes *Soderberg* in a way illustrating the error in the district court's ruling that the Dissemination Restriction is not a prior restraint "because it does not prohibit CNS from reporting on the exact same court records available … at the courthouse." CRB 37-38; JA559.

The Commonwealth says "when 'there are privacy interests to be protected in judicial proceedings, the States must respond by means which avoid … exposure of private information.'" CRB 36 (quoting *Soderberg*, 999 F.3d at 968) (quoting *Cox Broad.*, 420 U.S. at 496). But the ellipses hide a passage fatal to that argument and the ruling below: "'the States must respond by means which avoid *public documentation or other* exposure of private information.'" The Commonwealth's cases thus hold that what it does here – making the information available in records "'open to public inspection'" at the courthouse – *does* expose that information to the

---

[15] Modified on denial of rehearing, 820 F.2d 1354 (1st Cir. 1987) (en banc).

public, and any attempt to restrain its further dissemination must survive "strict scrutiny." *Soderberg*, 999 F.3d at 966-69 & n.3 (quoting same).

In failing to address *Murphy-Brown*, Appellees also do not dispute strict scrutiny must apply to the Dissemination Restriction for the separate reason that it is a "content-based restriction" that "targets speech relating to pending litigation." 907 F.3d at 797; *accord, e.g., Ctr. for Investigative Reporting v. Se. Pa. Transp. Auth.*, 975 F.3d 300, 314 n.4 (3d Cir. 2020) (gag orders are content-based).

## III.

### APPELLEES DO NOT EVEN TRY TO SHOW HOW STRICT OR *PRESS-ENTERPRISE II* SCRUTINY COULD BE SATISFIED, AND DO NOT COME CLOSE TO SATISFYING TPM SCRUTINY

Appellees never argue OCRA's restrictions could satisfy strict or *Press-Enterprise II* scrutiny.[16]  Even if TPM scrutiny did apply, Appellees fail to show how they met their "evidentiary obligations" under "this Circuit's precedent," *PETA*, 60 F.4th at 831-32, including *Billups* and *Reynolds*, which together articulate the rules for TPM scrutiny after *McCullen v. Coakley*, 573 U.S. 464 (2014).  Appellees do not address these cases cited by CNS, AOB 51-52, and ignore key evidentiary steps those cases require.  This Court should not grant Appellees the constitutional

---

[16] "[A]n appellee who simply ignores arguments in the appellant's brief has forfeited his response," which "'ordinarily result[s] in waiver'" and suggests Appellees "ha[ve] voluntarily chosen to concede" the OCRA restrictions cannot meet strict or rigorous scrutiny.  *W. Va. Coal Workers' Pneumoconiosis Fund v. Bell*, 781 F. App'x 214, 226-27 (4th Cir. 2019).

hall pass they seek. The law and absence of requisite evidence require reversal.

## A.  **The Dissemination Restriction**

CNS starts with the Dissemination Restriction because controlling law and Appellees' own contentions make application of both strict and TPM scrutiny straightforward, and either compels reversal.

The Commonwealth makes available at the court the purportedly "personal information" it seeks to protect. Regardless of the Dissemination Restriction, "any entity could sell, post, or redistribute the information and write an algorithm to harvest such private information from the records'" at the courthouse. CRB 37 (quoting JA562-563). Consequently, "even assuming" the Dissemination Restriction "served a state interest of the highest order" – and as discussed *infra*, that cannot be assumed – "it does not accomplish its stated purpose," and for that reason alone is unconstitutional. *Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 105 (1979); *Murphy-Brown*, 907 F.3d at 796-97 ("gag order must actually 'operate to prevent the threatened danger'") (quoting *Nebraska Press*, 427 U.S. at 562).

Even if it was not possible to gather such data from records at the courthouse – and Appellees presented no evidence showing it is not – the Dissemination Restriction is not "narrowly tailored" to protect against data harvesting or publishing private information, as required by strict scrutiny, *Murphy-Brown*, 907 F.3d at 799, and TPM scrutiny.  *Billups*, 961 F.3d at 686; *Reynolds*, 779 F.3d at 230-32.  A

"sweeping prior restraint mechanism" that bars dissemination of "*all* information" from court records accessed remotely, to protect against disclosure of any "private" information that **might** appear in a fraction of those records, is egregiously "overinclusive" to protect any truly "confidential" information, even under TPM-type scrutiny. *Harman v. City of New York*, 945 F. Supp. 750, 767 (S.D.N.Y. 1996) (enjoining restraint on discussing "any information" about agency policies absent approval as overly broad to protect confidentiality of minors and families identified in "reports of child abuse" or "in foster care"), *aff'd*, 140 F.3d 111 (2d Cir. 1998).

## B.    The Non-Attorney Access Restriction

Controlling law, Appellees' own contentions and the evidentiary record – or, more precisely, the lack thereof – mandate the same result for this restriction.

### 1.    Appellees' Stated Interests Are Not Sufficiently Compelling Or Important To Override The First Amendment

All courts may "'share an interest in preventing harm caused by misuse of personal identifiers.'" CRB 42 (quoting AOB 53). But that does not mean CNS "does not dispute that the governmental interests at stake here are 'significant' and 'important.'" *Id.* As the AOB explains, not all the interests asserted are constitutionally "compelling," "overriding" or even "important."

Merely asserting a "privacy" interest does not make it such. AOB 29-30. It is one thing to say there is an interest in preventing access to identifiers filers are

required to redact.[17]  But that is not true for information parties are not required to redact.  Appellees' reliance on *U.S. DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749 (1989), to contend there is an interest in the "practical obscurity" of public information that may be personal in nature, CRB 46; SRB 23, is inapposite. That case involved a FOIA request for law enforcement criminal history summaries, which are "generally treated … as confidential," 489 U.S. at 753, and to which the First Amendment access right does ***not*** apply.  Appellees cite ***no case*** following *Reporters Committee* where the First Amendment ***does*** apply.[18]

Similarly, there is no cognizable interest in "regulations that seek to keep people in the dark for what the government perceives to be their own good," *44 Liquormart  v. Rhode Island*, 517 U.S. 484, 503 (1996), like preventing information

---

[17] Appellees contend filing parties do not always redact these identifiers.  CRB 14, 61.  This assertion does not satisfy other TPM requirements – there is, for example, no evidence showing it actually happens – but at least it invokes a privacy interest recognized as "important" in other First Amendment access cases.

[18] Other "privacy" authorities the Commonwealth cites, CRB 41-43, also do not involve public court records to which a First Amendment right of access applies. *Seattle Times Co. v. Reinhart*, 467 U.S. 20, 33 (1984) ("pretrial depositions and interrogatories" which are "not public components of a civil trial"); *Lanphere & Urbaniak v. Colorado*, 21 F.3d 1508, 1512 (10th Cir. 1994) (criminal justice records to which "there is no general First Amendment right," not court records); *Florida Bar v. Went For It, Inc.*, 515 U.S. 618 (1995) (direct mail solicitations); *Nat'l Fed. of the Blind v. FTC*, 420 F.3d 331 (4th Cir. 2005) (telemarking); *Dahlstrom v. Sun-Times Media*, 777 F.3d 937 (7th Cir. 2015) and 18 U.S.C. § 2721 (confidential motor vehicle records) (miscited as title 42); 5 U.S.C. § 552a (confidential agency records); 42 U.S.C. § 1320d-6 (health information).

in OCRA records from being used for communications to so-called "vulnerable" groups.   JA331-333; AOB 39-40.  The Supreme Court "rejected the notion that the Government has an interest in preventing the dissemination of truthful commercial information in order to prevent members of the public from making bad decisions with the information." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 374 (2002).

It is also doubtful whether an "interest" in giving attorneys remote access to court records ***outside*** their own cases – what Appellees call an interest in the "efficient administration of justice" – is "sufficiently compelling," *Doe*, 749 F.3d at 269, to justify a discriminatory two-tier system of access for strict scrutiny, or "important" for TPM purposes.   AOB 38-39; *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 612 F.3d 301, 304 (4th Cir. 2010) (Wilkinson, J. concurring) ("it is blackletter law that free speech is not to be wholly subordinated to administrative convenience").   Indeed, the restrictions undermine the efficient administration of justice by denying the press the contemporaneous access critical to proper "functioning of the judicial process." *Schaefer*, 2 F.4th at 327.

Finally, as a matter of law, there cannot be a constitutionally cognizable interest in restricting the ***constitutional*** right of access to preserve government monopoly profits on that access, AOB 57-58 (citing JA470-472, JA552, JA556) – or to protect a choice not to charge for printouts on OCRA, which the Commonwealth repeatedly cites as a reason to maintain its system.   CRB 6-7, 14-

15, 49. "The evils inherent in allowing government to create a monopoly over the dissemination of public information in any form seem too obvious to require extended discussion. Government … may not attempt to control or reduce competition from other speakers." *Legi-Tech*, 766 F.2d at 733.

> **2.** **Appellees Fail To Show They Satisfied Their Burden To Prove The Purported Harms Are "Not Merely Conjectural" And The Restrictions Alleviate Them "In A Direct And Material Way"**

Identifying an interest sufficiently important to override the First Amendment is only the first step. A court "'may not simply assume that the [regulation] will always advance the asserted state interests sufficiently to justify its abridgement of expressive activity.'" *Turner*, 512 U.S. at 664. "When the Government defends a regulation on speech …, it must do more than simply 'posit the existence of the disease sought to be cured.'" *Id.*

Even under TPM scrutiny, then, Appellees must prove: (1) "the recited harms are "'real, not merely conjectural,"'" and (2) the restriction ""'"alleviate[s] these harms in a direct and material way."'" *Ross v. Early*, 746 F.3d 546, 556 (4th Cir. 2014). The same holds true under higher scrutiny. *Doe*, 749 F.3d at 270 ("unsubstantiated or speculative claims of harm" insufficient to support sealing court records); *Charlotte Observer*, 882 F.2d at 855 (court hearing could not be closed where it would be "wholly inefficacious to prevent a perceived harm").

27

The Commonwealth quotes the first part of *Ross* three times. But it never acknowledges the second. CRB 52, 53, 57. Smith does, but fails to show how record evidence satisfies it. SRB 32.[19] Instead, Appellees minimize their burden of proof. CRB 52. But where, as here, it is not "obvious" that a speech restriction materially addresses a problem, "common sense" and "anecdote" are insufficient; the requirement is ***evidentiary***. *Reynolds*, 779 F.3d at 228 & n.4; *Billups*, 961 F.3d at 685 & n.6; AOB 51. This rule has special force where, as here, "the burden on speech" is not "small." *Ross*, 746 F.3d at 556 ("'[H]eavier burdens on speech must, in general, be justified by more cogent evidentiary predicates.'"). While government "need not wait for the harms to occur" and "a panoply of empirical evidence" is unnecessary, CRB 52; SRB 32, it must make an "evidentiary showing that the recited harms are 'real, not merely conjectural.'" *Ross*, 746 F.3d at 556; *accord Turner*, 512 U.S. at 664. This Court may not assume a problem exists simply because Appellees – or a law review commentator – say it does.

Virginia filers already redact social security and financial account numbers. § 8.01-420.8. The Commonwealth says "[s]ome filers … 'fail[] to protect the information within documents that are filed with the clerk,'" CRB 14 (citing JA226), but offered no evidence of how often this occurs, if at all. Rather, the Work Group Report merely references "disclosures that ***may*** result from a party's failure to

---

[19] She also ***ignores*** the narrowly tailored and less restrictive alternative requirements.

28

protect the information," JA226, and the record contains no evidence that filers fail to properly redact personal identifiers in civil records or otherwise.

As for the personal information listed in § 17.1-293(B) that filers are *__not__* required to redact – DOB, maiden and minors' names, and minors' ages – even setting aside they are publicly available, Appellees do not point to any evidence showing how frequently they appear in nonconfidential civil filings.[20]   Smith appears to acknowledge these identifiers are "uncommon among civil filings," SRB 23-24 n.6, and she admitted she could not provide this information.  AOB 55 (citing JA245-247).  As CNS explained, Virginia already provides for sealing where maiden and minor names are likely to be found (child custody proceedings, name change applications, divorce proceedings).  AOB 59.

Nor is there any evidence to show personal identifiers in civil records have resulted in fraud, identity theft or another legally cognizable "misuse" apart from the legal speech the Commonwealth seeks to discourage.  Even setting aside the problems with the Commonwealth's reliance on *__its interpretation__* of law reviews and reports from other governments as "evidence," most of its secondary sources do

---

[20] The list of personal identifiers in § 17.1-293(B) also contains "actual signatures," but, as CNS noted, no other court requires their redaction.  AOB 9 (citing JA162). Only four states require redaction of maiden names.  JA162.

not discuss civil court records.[21]   Instead, they mainly discuss telemarketers, advertisers, credit reporting agencies, financial lenders and others collecting personal data available online from various sources as a result of everyday Internet use.[22]   The House Judiciary Hearing testimony the Commonwealth relies on for its conclusory assertion that the "PACER system has also suffered from data mining," CRB 11, 54, focuses on information – *i.e.*, "identities of crime victims" and "helpful

---

[21] The Commonwealth relies on *Humphreys & Partners Architects v. Lessard Design, Inc.*, 790 F.3d 532, 538 (4th Cir. 2015), to say these secondary sources are admissible because "the information could be put forward in admissible form at trial."  CRB 55.  Not so.  "[U]nsworn, unauthenticated documents," such as these, "cannot be considered on a motion for summary judgment."  *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993); *cf. Humphreys & Partners*, 790 F.3d at 539 (affirming consideration of expert reports accompanied by "declarations made under penalty of perjury from the experts attesting that they would testify to the matters set forth in [the] reports").  Moreover, while a court can judicially notice government reports, it may not judicially notice Appellees' "***interpretation*** of the[ir] content" where, as here, CNS contests the meaning the Commonwealth ascribes to them.  *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 216 (4th Cir. 2009).

[22] *See* CRB 10-13, 54 (citing Office of Oversight and Investigations Majority Staff, *A Review of the Data Broker Industry: Collection, Use, and Sale of Consumer Data for Marketing Purposes* 1 (Dec. 18, 2013) ("focus[ing] specifically on the collection and sale of consumer information for the purpose of marketing"); Vt. Att'y Gen. Report 3-6 (discussing collection and sale of personal data "about individual consumers" from companies like Equifax); FTC, *What to Know About Identity Theft*, (discussing identify theft generally); FTC, *Big Data: A Tool for Inclusion or Exclusion?* i & 1 ("address[ing] only the commercial use of big data consisting of consumer information" collected "when consumers engage digitally – whether by shopping, visiting websites, paying bills, connecting with family and friends through social media, using mobile applications, or using connected devices"); Geoffrey Xiao, *Bad Bots: Regulating the Scraping of Public Personal Information*, 34 Harv. J. L. & Tech 701, 732 (2021) (noting "concerns with … unfettered access to the information hosted on [social media] public websites")).

informants" – collected from criminal, **not civil**, court records, which are not at issue.

The secondary sources that do discuss civil court records do not aid Appellees. *See* CRB 11-12, 54. The North Dakota articles emphasize the State "temporarily suspended remote online access to court records **by anonymous users ... who have not been assigned a secure public access account**." And Professor Ardia confirms that if "a court does provide online access to some or all of its court records … it cannot impose restrictions on who may access those records or how the information can be used unless those restrictions comply with the First Amendment." David S. Ardia, *Privacy and Court Records: Online Access and the Loss of Practical Obscurity*, 2017 U. Ill. L. Rev. 1385, 1442 (2017); *id.* at 1453 (restricting online access to protect privacy, "while superficially appealing, is contrary to established First Amendment doctrines that mandate a presumption of public access").[23]

The Knuth Declaration does not fill this evidentiary gap. The Declaration's only non-speculative, admissible evidence is the assertion that online systems that are **not** behind a paywall have been electronically searched. As the Bodis Declaration explained, JA409-413, and the RCFP brief confirms, this by itself does

---

[23] The other Ardia article cited by the Commonwealth, CRB 56, is inapposite. It analyzed appellate briefs, not trial court records, in North Carolina's Supreme Court, and concluded 75% of the "sensitive information" – including nonconfidential personal information regarding employment, location and health – "appeared in documents filed in criminal cases." David S. Ardia & Anne Klinefelter, *Privacy and Court Records: An Empirical Study*, 30 Berkeley Tech. L.J. 1807, 1868 (2016).

not demonstrate a problem in need of a speech-restricting solution. "Bots are ubiquitous and, contrary to their image in the overheated imagination of some observers as nothing but malicious, a significant number serve to enable the internet's basic architecture to function." RCFP Br. 22.

### 3. The Record Evidence Is Insufficient To Show The Restrictions Are Narrowly Tailored

Even if Appellees met the threshold requirements of constitutional scrutiny, they failed to prove OCRA's restrictions are narrowly tailored, requiring reversal.

### a. Appellees Did Not Satisfy Their Evidentiary Burden To Show Less Restrictive Alternatives Would Not Work

"If a statute regulates speech based on its content, it must be narrowly tailored to promote a compelling Government interest. … If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative. … To do otherwise would be to restrict speech without an adequate justification, a course the First Amendment does not permit." *U.S. v. Playboy Entm't Group*, 529 U.S. 803, 813 (2000). Under *Press-Enterprise II*, narrow tailoring demands that the evidence show "no reasonable alternatives … 'adequately protect' [the] government interest." *Planet III*, 947 F.3d at 596 (quoting 478 U.S. at 14); AOB 50.

Under TPM review, while the restriction need not "be the least restrictive means available, … 'the government still may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance

32

its goals.'" *Reynolds*, 779 F.3d at 230. The government is required to provide evidence "'demonstrating that it ***seriously undertook to utilize'* … *or 'attempted to use less intrusive tools*** readily available'" to "achieve the proffered aims," which "***this Circuit's precedent requires***." *PETA*, 60 F.4th at 831-32 (citing and quoting *Billups*, 961 F.3d at 689-90, and *McCullen*, 573 U.S. at 496). It is "***a nonnegotiable requirement*** in this Circuit" that there be "'***actual evidence***' … that ***lesser restrictions will not do***." *Id.* at 831 (quoting *Reynolds*, 779 F.3d at 229).

CNS cited at least three less restrictive alternatives: (1) expanding the categories of personal identifiers filing parties are required to redact; (2) restricting remote access in certain case types to parties and attorneys; and (3) common bot management practices, particularly effective in the context of paid, secure remote access accounts. AOB 59-61.

Federal courts use these alternatives for their PACER account-based remote access system. So do state courts. AOB 7, 29, 58-59; JA142, JA149; JA382-383. Like the district court, the Commonwealth discounts this – which, at the summary judgment stage, should have raised an inference in CNS' favor – on the ground that "'CNS presented no evidence of how those systems functioned, and no 'explanation of the effectiveness of protective measures.'" CRB 54 n.6 (quoting JA557). But it is ***Appellees' burden*** to show why less restrictive alternatives would not serve their interests as effectively as the challenged restrictions, not the other way around.

33

*Reynolds*, 779 F.3d at 230 ("The ***County presented no evidence*** demonstrating why these alternatives would not serve its safety interest as effectively as the Amended Ordinance."); *McCullen*, 573 U.S. at 495 ("To meet the requirement of narrow tailoring, the ***government must demonstrate*** that alternative measures that burden substantially less speech would fail to achieve the government's interests").

If these alternatives were ineffective in protecting truly private personal identifiers, federal courts would not offer co-extensive remote access to court records, as they do, nor would other state courts. JA79; JA382-383; *see* JA149. Yet Appellees do not show they attempted or seriously considered ***any*** alternatives.[24] Their "post-hoc justifications" are thus insufficient, *Billups*, 961 F.3d at 689, and the Non-Attorney Access Restriction fails TPM scrutiny. *See* AOB 61 & n.23.

At its heart, the Commonwealth's main argument is that alternatives would not work because "the system CNS proposes is not OCRA" and "[t]he access and dissemination regulations ***are*** the privacy safeguards the Commonwealth has reasonably chosen." CRB 1-2, 22, 58-60. But government systems restricting

---

[24] The Commonwealth claims "Virginia tried several methods to deter data mining" of other databases, CRB 52 – two of which did not require an account while the third is not behind a paywall, JA374 – but even setting aside the differences between those accounts and OCRA's paid secure remote access, this court "cannot accept" such a conclusory contention. *McCullen*, 573 U.S. at 494 ("identif[ying] not a single prosecution brought under those laws within at least the last 17 years … the Commonwealth has not shown that it seriously undertook to address the problem with less intrusive tools available to it").

speech are not immunized from constitutional challenge because that is the way the government set things up and avoiding change is "the path of least resistance." *McCullen*, 573 U.S. at 486. "To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures … would fail to achieve the government's interests, not simply that the chosen route is easier." *Id.* at 495.

The Commonwealth makes sweeping and conclusory claims that alternatives to Virginia's discriminatory access system would require clerks to expend "substantial resources to police OCRA user activity, necessitate an "overhaul of Virginia's court-record system," and require "a host of legislative measures to protect the widespread distribution of" personal identifiers." CRB 59. But as shown above, if the unconstitutional portions of § 17.1-293 were invalidated, clerks could offer OCRA accounts to the media and public without any legislative action or additional clerical redaction. The General Assembly could, *if it wished*, require filers to redact additional categories of information, but it is not a prerequisite.[25]

The Commonwealth contends the "bot-management and other security tactics CNS proposes are … resource intensive," CRB 60, but the Ferguson declaration does not address the costs of bot management at all. JA138. And its claim that "redaction

---

[25] Although the General Assembly has long had the opportunity to add redaction categories, injunctive relief could provide limited time to do this before an injunction becomes effective. *CNS v. Tingling*, 2016 WL 8739010 (S.D.N.Y. Dec. 16, 2016) (giving clerk a month to plan for providing timely access via court's online system).

costs would quadruple," CRB 60, assumes access "to the public at large," JA138, under § 17.1-293(B) (which requires additional redactions), not the exception for "secure remote access" in § 17.1-293(E)(7) (which does not). The Riggs Declaration does not show "[t]he current system costs local court clerks $1.2 million annually." CRB 60 (citing JA134). That declaration actually says "OES bills out approximately $1.2 million to Virginia Circuit Court clerks annually," JA134, but as CNS explained, clerks also ***collect*** subscriber fees: Appellee Smith collects $54,800 annually, despite paying an annual maintenance fee of only $9,500. AOB 8 (citing JA84, ¶¶ 38-39, JA209). There is no evidence to show an order invalidating Virginia's unconstitutional system of access would cost clerks or OES a single cent. To the contrary, clerks would ***profit*** by registering more users for paid accounts.

Finally, Appellees offered no evidence to show simple policing of OCRA user agreements would not effectively address Appellees' cognizable interests. The Knuth declaration's claim that those banned from Virginia's ***non-paywall protected*** systems cannot be prevented from reapplying, CRB 10 (citing JA130-131), is too conclusory to be credited, *McCullen*, 573 U.S. at 494 ("respondents … identify not a single prosecution"), and directed at VDBC, which does not require a paid account to access. JA374. There is thus nothing to show the Commonwealth "seriously undertook," *McCullen*, 573 U.S. at 494, to consider whether this or other bot management practices would be effective in the context of a paywall-protected,

account-based system like OCRA.

### b. The Restrictions Prevent Speech On Matters Of Clear Public Concern For No Clear Benefit

To satisfy TPM's narrow-tailoring requirement, Appellees must prove not only that they tried or seriously considered less restrictive alternatives. They also must "prove that the law in dispute does not 'regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.'" *Billups*, 961 F.3d at 688 n.9 (quoting *Ward v. Rock Against Racism*, 491 U.S 781, 799 (1989)).

The Commonwealth claims its choice to be the only state in the nation to defend an unequal system of remote access to court records is a "reasonable balance." CRB 45. But it bars anyone not a lawyer or government employee from OCRA based on the ***possibility*** some records ***might*** contain some sort of personal information and some account holders ***might*** "misuse" that information.

That is hardly "reasonable." Commenting on "'matters of public concern'" – like civil complaints, which set forth the claims and allegations in new litigation, and other developments in civil cases that can only be understood by reading the record – "'lie[s] at the heart of the First Amendment.' … When the government makes it more difficult to engage in these modes of communication, it imposes an especially significant First Amendment burden." *McCullen*, 573 U.S. at 489-90 (regulations making anti-abortion speech "less frequent and far less successful … effectively

stifled petitioners' message").  Virginia's "categorical ban[]" is "asymmetrical to preventing" the harm it claims to prevent, *Citizens United*, 558 U.S. at 361, and "chill[s] an alarming amount of speech without any 'actual evidence' in the … record that lesser restrictions will not do." *PETA*, 60 F.4th at 831.

### 4.    TPM's Alternative Channels Requirement Is Not Satisfied Either

Like the district court, Smith never addresses the final TPM requirement, that the restriction on speech must "leave open ample alternative channels of communication." *Reynolds*, 779 F.3d at 225-26.  The Commonwealth does, but – to repeat a common theme – distorts CNS' position and ignores controlling law.  CNS did not suggest this requirement was "not relevant."  *Compare* CRB 50 *with* AOB 65.  Nor is it true that any alternative channel suffices.  To quote again from *Reynolds*: "the alternatives must be adequate," and, at the least, the record here "raises a question of fact," 779 F.3d at 232 n.5, about whether traveling hundreds of miles from court to court to see complaints and other civil records is an "adequate" alternative to the secure remote access Virginia already provides, albeit only to favored groups.  JA143, JA149-151, JA382; *see* CNS RJN Reqs. 2 & 3.  Contrary to the Commonwealth's suggestion, it is neither feasible nor adequate to hire "couriers" in 105 circuit courts "to obtain the desired records," CRB 26, because CNS needs to "review the filings to determines which ones are newsworthy," JA145-146, as do other media.  RCFP Br. 7, 12-14, 17.

## **<u>CONCLUSION</u>**

A nation of two-tier access to the courts, in which attorneys and the government can use a secure Internet fast lane for access but the media and public cannot, is not just contrary to Circuit and Supreme Court law. It is wholly inconsistent with the open court system on which our nation was founded. If Virginia's system is allowed to stand, there will be nothing to stop other courts from following it. The orders below must be reversed.

Dated: June 15, 2023

BRYAN CAVE
LEIGHTON PAISNER LLP

By:   */s/ Roger Myers*
Roger Myers
Rachel Matteo-Boehm
3 Embarcadero Center, 7th Floor
San Francisco, California 94111
Tel: (415) 675-3400
roger.myers@bclplaw.com
rachel.matteo-boehm@bclplaw.com

By:  */s/ Jonathan E. Ginsberg*
Jonathan E. Ginsberg
1290 Avenue of the Americas
New York, New York 10104
Tel: (212) 541-2000
jon.ginsberg@bclplaw.com

*Counsel for Appellant Courthouse News Service*

TROUTMAN PEPPER
HAMILTON SANDERS LLP

By:   */s/ Dabney J. Carr IV*
Dabney J. Carr IV
P.O. Box 1122
Richmond, Virginia 23218
Tel: (804) 697-1238
dabney.carr@troutman.com

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify:

1.      The attached complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(ii), as modified by this Court's order of May 3, 2023, granting Appellant Courthouse News Service leave to file a reply brief not in excess of 9,750 words.  The attached contains 9,743 words (according to the Microsoft Word 2016 count function), excluding those parts exempted by Rule 32(f) of the Federal Rules of Appellate Procedure.

2.      The attached complies with the typeface and typestyle requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6). The attached has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type style.

*/s/ Jonathan E. Ginsberg*