

October 15, 2024

Roger R. Myers
Partner
Direct:  +1 415 268 1955
Fax:  +1 415 430 4355
roger.myers@bclplaw.com

BRYAN CAVE LEIGHTON PAISNER LLP
Three Embarcadero Center
7th Floor
San Francisco  CA 94111 4070
T: +1 415 675 3400
F: +1 415 675 3434
bclplaw.com

**VIA ECF**

Nwamaka Anowi, Clerk
United States Court of Appeals for the Fourth Circuit
Lewis F. Powell, Jr. United States Courthouse Annex
1100 East Main Street, Suite 501
Richmond, Virginia 23219

**Re:    Courthouse News Service (CNS) v. Jacqueline Smith, No. 22-2110
        Argued December 7, 2023, Before Judges Gregory, Wynn & Rushing**

Dear Ms. Anowi:

We represent Appellant and write under FRAP 28(j) to inform the panel of *CNS v. Omundson*, 2024 WL 4349112 (D. Idaho Sept. 30, 2024) and *Hines v. Pardue*, -- F.4th --, 2024 WL 4297014 (5th Cir. Sept. 26, 2024) (Exhs. 1-2).

*Omundson* "find[s] CNS has a right to access newly-filed civil complaints **the moment they are uploaded** to the [online] system."  Exh. 1 at *11.  Even "minimal" delay must satisfy "'rigorous scrutiny,'" under which defendants "must demonstrate" a "''"substantial probability'''" their "'interest … would be impaired by immediate access'" and "'no reasonable alternatives exist to "adequately protect" [it].'"  Exh. 1 at *3, 11 (quoting *CNS v. Planet*, 947 F.3d 581, 596 (9th Cir. 2020) (quoting *Press-Enterprise v. Superior Court*, 478 U.S. 1, 14 (1986)).

The *Omundson* defendant could not carry her burden to show delay was required to "ensure no confidential or personal information ends up in" what are, "by nature, non-confidential" court records, because Idaho – like Virginia – makes it "the filer's duty to make sure any protected information is redacted."  *Id.;* AOB 55.  She failed to show it would be too expensive and "difficult" to change because "neither can justify an unconstitutional policy" and "other states use alternative measures with good success."  *Id.* at *13-14.

The *Hines* Court found it unnecessary to decide what level of scrutiny applied because – as CNS argues (oral argument recording 6:00 & 11:13) – the speech restriction "cannot withstand even *intermediate* [time, place and manner] scrutiny."  Exh. 2 at *7.



Despite presenting "evidence" that included "literature review, expert testimony, [and] anecdotal evidence," Texas – like Appellees here – failed to carry its "burden to prove real harm" or that its restriction "'alleviate[s] these harms in a direct and material way.'" *Id.* at *9-11.  Nor was it narrowly tailored.

*Hines* reversed summary judgment for defendant and remanded with instructions to enter judgment for plaintiff.  *Omundson* issued an order that did "not tell[] [the clerk] *how* she has to change her system ….  It simply f[ound] that the *current* method is untenable," *id.* at *15, and gave her 90 days to comply.

This Court should do the same.

Respectfully submitted,

        /s/

Roger Myers

Attachment


cc:     All Counsel of Record (via ECF)

# EXHIBIT 1

2024 WL 4349112
Only the Westlaw citation is currently available.
United States District Court, D. Idaho.

COURTHOUSE NEWS SERVICE, Plaintiff,
v.
SARA OMUNDSON, in her official capacity as
Administrative Director of Idaho Courts,
Defendant.

Case No. 1:21-cv-00305-DCN
|
Filed 09/30/2024

**MEMORANDUM DECISION AND ORDER**

David C. Nye Chief U.S. District Court Judge

## I. INTRODUCTION

**\*1** Before the Court are the parties' cross-motions for summary judgment. Dkts. 60, 61. Defendant Sara Omundson also filed a Motion to Seal (Dkt. 58), and, as part of the briefing on that motion, Plaintiff Courthouse News Service ("CNS") filed a Motion for Leave to File Sur-Reply (Dkt. 77).

The Court held oral argument on July 10, 2023, and took the matters under advisement. Upon review, and for the reasons outlined below, the Court GRANTS the Motion for Leave to File Sur-Reply (Dkt. 77), GRANTS in PART and DENIES in PART the Motion to Seal (Dkt. 58), DENIES Omundson's Motion for Summary Judgment (Dkt. 60) and GRANTS CNS's Motion for Summary Judgment (Dkt. 61.)

## II. OVERVIEW

While this is a difficult case, the issues boil down to two basic questions. First, under the First Amendment, at what point in time can CNS expect access to newly-filed civil complaints in Idaho state court? And second, does the review process Omundson currently uses inhibit CNS's right of access?

The Court has researched the issues involved in this case extensively. Notably, CNS has pursued—and is currently pursuing—claims like those at issue here throughout the United States. And generally speaking, CNS has found success in its pursuit.

Many district courts have ruled in CNS's favor. *See, e.g., Courthouse News Serv. v. Forman,*[1] 606 F. Supp. 3d 1200 (N.D. Fla. 2022), (ruling in CNS's favor because defendant's "filing system frustrates the press and public's right to monitor their local judiciary" and infringes CNS's First Amendment rights) *appeal dismissed sub nom. Courthouse News Serv. v. Broward Cnty. Clerk,* 2022 WL 9643634 (11th Cir. Sept. 6, 2022); *Courthouse News Serv. v. Gabel,* 2021 WL 5416650, at \*18 (D. Vt. Nov. 19, 2021) (enjoining the state of Vermont from "delaying public access to electronically filed civil complaints until the [ ] Courts' pre-access review process is complete"); *Courthouse News Serv. v. Jackson,* 2009 WL 2163609, at \*5 (S.D. Tex. July 20, 2009) (granting CNS's motion for injunctive relief).

Some of those cases have been affirmed on appeal. *See, e.g., Courthouse News Serv. v. Schaefer,* 2 F.4th 318, 329 (4th Cir. 2021) (affirming the district court's finding that CNS's First Amendment rights had been violated when the defendants did not make newly-filed complaints available "contemporaneously"—defined loosely as the same day as filing). But others have not. *See, e.g., Courthouse News Serv. v. New Mexico Admin. Off. of Cts.,* 53 F.4th 1245, 1273 (10th Cir. 2022) (holding the district court erred in granting CNS's motion for preliminary injunction and imposing a bright-line, five-business-hour rule for when complaints needed to be made public).

Some courts have ruled in CNS's favor, but on more limited grounds. *See, e.g., Courthouse News Serv. v. Planet,* 947 F.3d 581, 594 (9th Cir. 2020) (finding some procedures unconstitutional and others constitutional).

**\*2** Still other courts have decided the question is fact driven and must proceed to trial. *Courthouse News Serv. v. Cozine,* 2023 WL 6891322, at \*6 (D. Or. Oct. 19, 2023) ("Because the Court finds that Defendant has shown genuine issues of fact for both parts of the *Planet III*

balancing test, summary judgment in Plaintiff's favor is not appropriate. Plaintiff's First Amendment claim will proceed to trial.").[2]

Finally, some courts have stayed similar CNS cases in the hopes of settlement. 🚩 *Courthouse News Serv. v. Harris*, No. CV ELH-22-0548, Dkt. 109 (D. Md. May 21, 2024) (granting joint motion to stay so parties could pursue settlement negotiations).

The varying outcomes of these cases is not surprising considering that each turns on the specific state statutes, filing rules, and court procedures at issue and whether each is constitutionally sufficient under the First Amendment. Nevertheless, the underlying analysis in each of those decisions relates to principles at play in this case and has caused the Court great consternation. There is a difficult balance here. On the one hand, nobody disputes (not even Omundson) that CNS should have access—and quick access at that—to newly filed civil lawsuits for news reporting purposes. On the other hand, everyone agrees (even CNS) that some type of review is necessary for organizational and clerical purposes. Ultimately then, the problem is timing. When does CNS's right to this information attach? And when does Omundson get to undertake her review?

CNS has a right under the First Amendment to access the information it seeks. It candidly recognizes this right is not "immediate." But it also counters the right cannot be "delayed" either. Omundson's process includes some "delay"—at least by common parlance. Thus, the Court must resolve whether the delays stemming from Omundson's review process infringe CNS's constitutional rights. Under the circumstances, the Court finds Omundson's process does infringe CNS's rights. Accordingly, summary judgment is entered in favor of CNS and against Omundson.

## III. BACKGROUND

### A. Factual Background

CNS is a nationwide news service founded more than thirty years ago to provide coverage of civil lawsuits. It offers a variety of publications to thousands of subscribers across the United States. The publication covering Idaho courts is *The Big Sky Report*, written by Boise-based reporter Cathy Valenti. *The Big Sky Report* includes news about civil complaints filed in Idaho, Montana, and

Wyoming, with its primary focus on actions involving businesses and public entities.

Omundson is the Administrative Director of Idaho Courts and, in her official capacity, is responsible for the administration of Idaho's e-filing and public access system—Odyssey or "iCourts"—that is used statewide by courthouses in each of Idaho's 44 counties.

As noted, the crux of this lawsuit centers on the timeliness of CNS's access to newly filed civil complaints in Idaho state court. As it currently stands, when a civil complaint is filed in Idaho, there is a short review county clerks undertake before the case is accessible to the public. This review includes checking for the following: (1) the required case information sheet has been submitted; (2) a certification of service was completed and is included; (3) the caption contains party names; (4) filing fees are paid and paid in the correct amount; (5) the document includes required signatures; and (6) the proper Magistrate division of the District Court has been selected (if applicable). *See* Dkt. 20-14, at 3.

**\*3** The parties agree the aforementioned process takes roughly five minutes. The bigger problem is the time it takes staff to get to the review process in the first place.

CNS argues Omundson and her staff take too long, and the resulting delay infringes on its First Amendment right of access. Omundson asserts any delay is minimal and does not infringe any Constitutional rights.

### B. Procedural Background

At the outset of this litigation, Omundson filed a Motion to Dismiss. Dkt. 7. Therein, Omundson argued that CNS had not stated a claim upon which relief could be granted and, alternatively, that the Court should decline to exercise jurisdiction over this case based upon principles of abstention. CNS opposed Omundson's Motion to Dismiss and filed a Motion for Preliminary Injunction alleging the Court should enjoin Omundson from continuing to delay its access to newly filed civil complaints. Dkt. 14.

Ultimately, the Court denied both motions. Dkt. 40; *Courthouse News Serv. v. Omundson*, 598 F. Supp. 3d 929 (D. Idaho 2022). The Court summarized its decision as follows:

> Omundson's Motion to Dismiss is DENIED. She is incorrect in her assertion that *Planet III* forecloses this

case outright. Additionally, the Court joins other district courts—in conformity with the Ninth Circuit's holding—and finds abstention is inapplicable here. For these reasons, dismissal in inappropriate.

The Court cannot, however, grant CNS's Motion for a Preliminary Injunction at this time either. The outcome of *Press Enterprise II*'s critical second question—regarding the constitutionality of any delay—cannot be determined at this early stage, even preliminarily. The Court has provided some initial rulings and guidance, but discovery is necessary to bring this fully before the Court for resolution. What's more, the remaining *Winter* factors are roughly even. Ultimately, the Court finds a preliminary injunction is not warranted.

*Id.* at 946. As alluded to, a two-prong test is at issue in this case. The Court previously found that CNS had meet the first prong of the test, but that discovery was necessary to flesh out the issues relative to the second prong. Discovery has come to an end, the parties have filed cross-motions for summary judgment on the remaining issue, and the Court held oral argument on the same.[3] The matter is ripe for adjudication.

## IV. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (cleaned up). Importantly, the Court does not make credibility determinations at this stage of the litigation. Such determinations are reserved for the trier of fact. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992).

**\*4** In considering a motion for summary judgment, the Court must "view[ ] the facts in the non-moving party's favor." *Zetwick*, 850 F.3d at 441. To defeat a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in [his or her] favor." *Id.* (cleaned up). Accordingly, the Court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and

on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The respondent cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary judgment; rather the respondent must set forth the "specific facts," supported by evidence, with "reasonable particularity" that preclude summary judgment. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

The standard applicable to motions for summary judgment does not generally change if the parties file cross motions. *See, e.g.*, *Cady v. Hartford Life & Accidental Ins.*, 930 F. Supp. 2d 1216, 1223 (D. Idaho 2013). However, the Court must evaluate each party's motion on its own merits. *Fair Housing Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

## V. DISCUSSION

Before diving into the substance of the Parties' competing Motions for Summary Judgment, the Court must address some procedural issues.

### A. Motion to Seal and Motion to File Sur-Reply (Dkts. 58, 77)

On December 15, 2022, the parties filed their Motions for Summary Judgment. Dkts. 60, 61. In conjunction with her Motion for Summary Judgment, Omundson filed a Motion to Seal. Dkt. 58. Therein, she asked the Court to allow her to file certain documents in support of her Motion for Summary Judgment under seal. *Id.* Those documents include the Declaration of Terry Derrick,[4] the Declaration of Sara Omundson, the Declaration of Jennifer Dvorak, Volume I of the transcript of the deposition of Terry Derrick (Exhibit G to the Declaration of Keely Duke), and Volume II of the deposition of Terry Derrick (Exhibit F to the Declaration of Keely Duke).

In response to Omundson's Motion to Seal, CNS argued Omundson had not met her burden establishing why the documents needed to be filed under seal but averred it would work with her to resolve the issues to avoid further motion practice. Dkt. 68.

In reply to her own motion, Omundson affirmed the

parties were able to reach agreement on two of the documents—the Declaration of Dvorak and the Declaration of Omundson—and that, as a result, she would file redacted versions of those documents for the public record. Dkt. 73. She then noted the parties remained at odds on whether the items related to Derrick should be sealed. *Id*.

CNS then filed a Motion for Leave to File Sur-reply to clarify Omundson's representations about the parties' negotiations. Dkt. 77. It explained that, despite the parties' agreement, Omundson never filed redacted versions of the two documents as promised. *Id*. It also maintained anything related to Derrick need not be filed under seal.

Omundson opposed CNS's request to file a sur-reply, contending there is no such mechanism in federal court. Dkt. 81.[5] She further stated that the redacted documents *were* filed under seal as Dkts. 75-12 and 75-13. *Id*. The parties later clarified at oral argument that the documents in question are actually filed at Dkts. 78-1 and 78-2. Regardless, the parties agree the redacted versions are now in the public record and there is no evidentiary dispute as to the Declaration of Dvorak and the Declaration of Omundson. The sealed and redacted copies in the record as to those documents shall stand.

**\*5** The bigger issue is what to do with the documents related to Terry Derrick—third--party Tyler Technologies' 30(b)(6) deponent. CNS argues Omundson has not met her burden of establishing exactly why these documents should be filed under seal. Omundson explains her argument is short because the argument is simple. According to Omundson, Tyler Technologies had expressed *its* understanding that Derrick's testimony and declaration were subject to the protective order in this case because both documents contained confidential and proprietary information. As a result, *Tyler Technologies' counsel* asked that the documents be filed under seal as part of the summary judgment proceedings. Omundson explained at oral argument that she was simply trying to honor Tyler Technologies' concerns.

Notably, Tyler Technologies did not designate any portions of Derrick's deposition testimony as confidential. Additionally, an *unredacted* version of Derrick's testimony is already in the record. *See* Dkt. 67-1, at 62–122. Thus, while the Court appreciates that some of the information is confidential and/or related to Tyler Technologies' business practices, the fact that it did not actually designate anything specific as confidential and/or move to redact or seal the deposition already publicly available in the record renders the issue essentially moot.

Accordingly, Dkts. 59-2, 59-5, and 59-6 shall be unsealed.

A final procedural matter: as part of summary judgment, and pursuant to local rule, Omundson filed a 27-page Statement of Undisputed Facts. Dkt. 60-1.[6] CNS filed a 23-page response to Omundson's Statement of Undisputed Facts. Dkt. 76. As part of its Response to Omundson's Motion for Summary Judgment, CNS also filed a 58-page "Appendix" outlining its "objections to evidence submitted by [Omundson] in support of her motion for summary judgment." Dkt. 74-3. Omundson then filed a 7-page response to CNS's Appendix. Dkt, 79-1.

Local Rule 7.1(c)(2) outlines that "... the responding party must also file a separate statement, not to exceed ten (10) pages, of all material facts which the responding party contends are in dispute." Because CNS's response to Omundson's Statement of Undisputed Facts exceeds the local rule's limit by 13 pages, Omundson asked the Court to either strike the document or require CNS to refile a shorter document in conformity with local rule. If the latter, Omundson asked for leave to file a short sur-reply. Furthermore, while acknowledging that CNS can file whatever it likes (such as an appendix of objections), Omundson argues this extra document is really a ruse to get around the 10-page limit on statements of disputed facts (even though CNS already exceeded it by 13 pages) and that the appendix should be stricken as well.[7]

The Court discussed this matter with counsel at the hearing. As it indicated at that time, the Court will allow all documents to stand. It appears there was some confusion regarding a stipulation between the parties and how it applied to page lengths. There were also some procedural anomalies as to how these documents came before the Court. Regardless, the important thing is all arguments are squarely before the Court for adjudication.

Finally, CNS's appendix of objections and Omundson's request to strike the same requires more attention and analysis.

The commentary in Rule 56 of the Federal Rules of Civil Procedure makes clear that, while a party can object to "material cited to support or dispute a fact," because it "cannot be presented in a form that would be admissible,", there is "no need to make a separate motion to strike." Fed. R. Civ. P. 56(c)(2) advisory committee's note to 2010 amendment. Instead, the party should file an objection and then "the burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." *Id*.

**\*6** Despite this direction, the Court constantly reviews motions to strike where the parties strive to do just that: strike material offered in support of, or against, summary judgment. Thus, because motions to strike are disfavored, the Court has outlined that any objections should be raised as part of briefing itself or in a separate appendix. *See* https://id.uscourts.gov/district/judges/nye/Motion_Practic e.cfm. Candidly, this is the first time a party has utilized the Court's "appendix" suggestion. And the Court is not implying CNS's appendix was improperly filed; it is simply long. At 58 pages—and containing 45 separate objections—it is actually longer than most of the underlying briefs. Additionally, CNS has included arguments in its appendix. Again, there is nothing inherently wrong with doing so, as the Court would expect CNS to explain its objection(s). But the Court's point is that the purpose of the appendix—to avoid prolonging the case as often occurs when motions to strike are filed—did not really occur here because Omundson responded (as she would have if a motion to strike had been filed) and it took the court substantial time to review the materials (again as it would have with a motion to strike). So, while CNS's methodology here was procedurally proper, it did not save the Court or counsel time as compared to a Motion to Strike.

That said, many of the objections boil down to a repeating single objection, but associated with different people.[8] Thus, for organizational purposes, the Court will group similar objections together while also addressing others individually.

CNS's first objection relates to Omundson's statements regarding certain functionalities of the Odyssey filing system. Dkt. 59-7, at 8–9. CNS alleges Omundson is not an expert on that system and that her opinion lacks foundation. Dkt. 74-3, at 1–3. In response, Omundson agrees she is not an expert, but contends she is not providing an expert opinion, but rather her own observations of how the system operates. The Court agrees that Omundson's personal observations and opinions are not expert opinions. To be sure, Omundson oversees Idaho's e-filing system, but just because she shares her personal knowledge and opinion on a matter does not render those opinions "expert" opinions. *See Richbourg v. Jimerson*, 2013 WL 3336167 (D. Ariz. 2013) (rejecting argument that affidavit testimony from employees was improper expert testimony under Rule 702). The Court will not strike this testimony.

CNS's second objection relates to Omundson's opinion that public confidence could "erode" if a Press Review Queue[9] is utilized. Dkt. 59-7, at 9. Multiple other individuals expressed this same sentiment—*see, e.g.,* Dkts. 60-26, at 5; 60-28, at 12; 60-30, at 5—and it serves as the basis for objections 2, 8, 9, 13, 17, 20, 32, 37, and 45 in CNS's appendix. CNS alleges this statement is speculative and lacks foundation. While it is speculative whether the public's confidence could erode if certain things happen within the Odyssey system, these individuals are just expressing their opinion that this erosion would occur. As a result, this is a question of weight, not admissibility, and is better dealt with at trial. *See Strong v. Valdez Fine Foods*, 724 F.3d 1042, 1046 (9th Cir. 2013) (explaining that challenges to lay witness testimony and opinion go to the weight of the evidence and are "an issue for trial, not summary judgment."). Moreover, while this testimony does not specifically go to the heart of the matters at hand, even if it did, such would still likely be allowed. *See U.S. v. Christensen*, 2016 WL 1158893, at \*2 (D. Ariz. Mar. 24, 2016) (noting that "lay opinion testimony is not inadmissible solely because it addresses the ultimate issue in the case"). Regardless, the Court will not strike these statements.

CNS's third and fourth objections concern two news articles Omundson submitted in support of her Motion for Summary Judgment. Dkts. 60-11, 60-12. These news articles detail a data breach in the Odyssey system that occurred in California and resulted in the inadvertent publication of confidential material. CNS claims these documents are hearsay and lack authentication. Dkt. 74-3, at 3–6. To begin, news articles such as those at issue are self-authenticating. *See Jarritos, Inc. v. Reyes*, 345 F. App'x 215, 218 (9th Cir. 2009) (explaining that "printed materials purporting to be newspapers or periodicals" are self-authenticating and holding it was erroneous for trial court to exclude magazine article for lack of authentication and foundation). Second, these documents are not hearsay. They are not being cited for the proposition that a data breach occurred, but simply to illustrate that the Odyssey system has potential flaws. The Court will not strike this testimony.

**\*7** The next group of objections relates to multiple declarants' statements that "judicial action would be required to address improperly submitted documents ...." *See, e.g.,* Dkt. 60-26, at 3; Dkt. 60-31, at 23, Dkt. 60-34, at 2. CNS contends—in objections 5, 10, 11, 14, 15, 18, 19, 21, 22, 25, 28, 29, 30, 35, 36, 38, 40, 41, 43, and 44—that these statements are "unsupported opinions" and should not be considered. As with the Court's above observations about opinion statements, at this stage of the case, the Court will allow these opinion statements to stand. Each statement is simply the declarant's opinion based upon his or her experience with the state of Idaho's

judicial system. Rule 701(a)'s personal knowledge requirement is met here because these individuals necessarily drew on his or her own understanding and experience with the state of Idaho's judicial system and how Odyssey is utilized. *See United States v. Gadson*, 763 F.3d 1189, 1208 (9th Cir. 2014). Thus, there is requisite knowledge—but not impermissible expert knowledge—and support behind these statements and the Court will allow them to stand.

The final group of objections is similar to the above and relates to statements that certain Odyssey features would "increase the workload" of judges and staff in Idaho's courthouses. *See, e.g.,* Dkt. 60-31, at 3; Dkt. 60-32, at 3; Dkt. 60-34, at 2. CNS again objects—in objections 6, 7, 12, 16, 23, 26, 27, 31, 33, 34, 39, and 42—on the basis that such opinions are speculative. To repeat, like all the opinion statements CNS to which objects, the objection is noted, but overruled because the issue is one of weight and not admissibility.

In sum, Omundson's Motion to Seal is GRANTED in PART and DENIED in PART, as outlined above. The documents already under seal (with redacted versions) shall remain under seal *except* Dkts. 59-2, 59-5, and 59-6 shall be unsealed. CNS's Motion for leave to File Sur-Reply is GRANTED. The objections in CNS's appendix are OVERRULED as outlined above.

### B. Motions for Summary Judgment (Dkts. 60, 61)

As previously discussed at length in the Court's prior decision, the heart of this case takes its lead from a line of cases out of California and the Ninth Circuit referred to as the "*Planet* trilogy." *See Omundson*, 598 F. Supp. 3d at 935–38. The Court will not recount that story, and lengthy legal history, here. Nevertheless, the Ninth Circuit's decision in *Courthouse News Service v. Planet* ("*Planet III*") provides the applicable standard for evaluating whether a court's administrative procedures violate the media's "right of timely access to newly filed nonconfidential complaints." 947 F.3d 581, 585 (9th Cir. 2020).

Based on the leading Supreme Court authority on court record access, *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986) ("*Press-Enterprise II*"), the Ninth Circuit in *Planet III* established a two-step framework for evaluating claims such as those brought by CNS in this case.

Under the first step, a reviewing court must determine whether "the qualified First Amendment right of access" exists as to the judicial records in question and "relatedly, at what point in time that right attaches." *Planet III,* 947 F.3d at 590. In making this determination, a court considers various factors including, "(1) whether that proceeding or record 'ha[s] historically been open to the press and general public' and (2) 'whether public access plays a significant positive role in the functioning of the particular [governmental] process in question.' " *Id.* (quoting *Press-Enterprise II, 478 U.S. at 8*). If both factors are evident, a qualified First Amendment right of access attaches to the implicated judicial records.

Under the second prong, the reviewing court then considers whether any restrictions on that right are "essential to preserve higher values" and "narrowly tailored to serve those interests." *Id.* at 595 (quoting *Press-Enterprise II, 478 U.S. at 13–14*).

The Court will address each factor in turn.

#### A. Judicial Records

As noted, the Court already determined the first question from *Press-Enterprise II.* Or so it thought.

**\*8** In its decision on the parties' prior motions, the Court noted that, "like the parties in *Planet III*, the parties in this case do not dispute the materials in question have historically been available to the public in Idaho and both agree that public access to these types of documents is important." *See Omundson*, 598 F. Supp. 3d at 937–38. The Court went on to note the main dispute, therefore, was "*when* this right attaches and whether any delays in 'processing' are acceptable." *Id.* at 938 (emphasis added).

Omundson now asks the Court to reconsider its prior position on this first question. Simply put, Omundson now claims the public *has not* had historic access to the documents CNS is trying to access. Or at least, it has not had access within the timeframe everyone originally thought.

This, unfortunately, throws the Court back into the murky waters of when a document is "filed" in Idaho state court.

From the outset of this case, Omundson has taken the position that, because there are administrative rules discussing when a civil complaint is "accepted," the First Amendment right of access does not attach in Idaho until

after a county clerk "processes" and "accepts" a civil complaint for filing. For its part, CNS has followed the language of *Planet III*'s holding "the right to timely access attaches at the moment of filing, i.e., when the complaint is received by the court." 947 F.3d at 588. "[W]e conclude, as did the district court, that the qualified right of access to nonconfidential civil complaints arises when they are filed with the court ...." *Id.* at 594.[10]

The Court previously waded into this issue and, after analyzing various state court filing rules, determined that: " 'filed' is best understood to mean when the complaint is submitted to the respective e-filing system, *not* to mean once the documents are reviewed/accepted/processed by a clerk." *Omundson*, 598 F. Supp. 3d at 944.

Omundson contends that the Court's reasoning is flawed because discovery revealed that reporters *historically* did not have access to complaints the minute they were filed—as originally claimed by CNS. Rather, reporters only had access once the civil complaints had been "accepted" by the clerk, file-stamped, and entered into the computer system. Omundson claims that until this process is complete, the documents are not judicial documents, and nobody has any type of First Amendment right to them.

CNS counters that Omundson's view is not only contradictory to the Court's prior ruling, but it contradicts other Court rulings as well. For example, since the Court's prior ruling in this case, the Tenth Circuit has had an opportunity to address this issue. It too found that "the First Amendment right of access attaches to complaints when the court *receives* them, regardless of the technical terms and clerical processes used by the court." *Courthouse News Serv. v. New Mexico Admin. Off. of Cts.*, 53 F.4th 1245, 1262 (10th Cir. 2022).

**\*9** Never dissuaded, Omundson counters that county clerks in Idaho are not officially "receiving" anything until they have reviewed and processed the filings and so their processes still conform with the "receiving" language of the Tenth Circuit.

The Court sees Omundson's point. This is a difficult question. But, respectfully, Omundson has a retort for everything. Omundson initially took the position that lawsuits are not "filed" until court staff reviews and "processes" the documents. But in its prior decision, the Court found "filed" means "submitted." Omundson's response then turned slightly and focused on the idea that documents are not "submitted" until they are "accepted" by court staff. And then when faced with the Tenth Circuit's analysis that "receipt" is essentially acceptance,

Omundson pivoted again, now asserting documents are not really "received" until they are "processed" or "reviewed."

The Court does not fault Omundson for seeking to relitigate this issue. First, as the Court already noted, this question turns on "unclear language," and different—sometimes incongruent—uses of the word "filed" in various Idaho court rules. *Omundson*, 598 F. Supp. 3d at 944. Second, if Omundson prevails on this prong, then CNS's case crumbles. Said another way, if the Court were to agree that the First Amendment right of access does not attach until lawsuits are filed, and "filed" does not occur until after all the processing and review steps have happened (per Omundson's definition), then access is basically instantaneous when cases are filed, there is no delay, and CNS has no complaint.

The Court, however, cannot accept Omundson's position (and will not revise its prior finding) for the following reasons.

First, Omundson's argument creatively puts any delay in the process *before* filing. Said differently, if filing isn't defined until the very end of the process, then a case could be uploaded to the Odyssey system and sit for an undetermined period of time while various processes and procedures are completed before it is actually "filed," and any right of access has actually been created. This stands in contrast to the spirit of the First Amendment's right to access.

Second, and more importantly, Omundson's interpretation is contradictory to Idaho's Rules for Electronic Filing and Service ("IFERS"). As the Court previously analyzed at length, Rule 12 mandates that the current date and time when a document is *submitted* is affixed and will serve as the date and time for statute of limitations purposes *even if additional processing is necessary. See* IFERS (12)(1). Thus, it appears clear that the filing or submission occurs at the outset (i.e. the moment the sender hits send and the document lands in Odyssey). Now, as the Court also already lamented, the next section of IFERS goes on to explain that if the document is then "accepted for filing"—seeming to indicate filing is *not* complete upon submission—the prior date and time will stand. *Id.* But IFERS goes on to explain that when corrections are needed, a filer has "3 business days" from the date it received notice of the error in which to correct the mistake. IFERS 13(b). And, as part of any corrective filing, that party may "request ... that the date of *filing* of the resubmitted document relate back to the date of *submission* of the original document to meet *filing* requirements." IFERS 13(c) (emphasis added). Again, the

overlapping usage of terms such as "submit," and "file" leave much to be desired.

**\*10** The Court appreciates the gravity of the situation. But it does not think mental gymnastics or creative arguments about semantics are necessary. The "traditional" definition of "filed" suffices. As the Tenth Circuit noted, no Court has yet to hold that "the right of access attaches at the point of acceptance" as opposed to the point of "submission." 🚩 *Courthouse News Serv. v. New Mexico Admin. Off. of Cts.,* 53 F.4th 1245, 1266 (10th Cir. 2022).[11]

In sum, the Court will not revisit its prior ruling. " '[F]iled' is best understood to mean when the complaint is submitted to the respective e-filing system, *not* to mean once the documents are reviewed/accepted/processed by a clerk. *Omundson,* 598 F. Supp. at 944.

That said, the Court must briefly touch on the "experience and logic" test set forth by *Press-Enterprise II* for determining whether CNS has a historical right to these types of materials in general. *See* 🚩 478 U.S. at 9.

Omundson argues that the "historical" question hinges on the *timing* of CNS's historical access. The Court disagrees because doing so focuses on a singular aspect of access—timing. The relevant inquiry is broader and looks to the whole "place and process" of the access and whether such materials were "historically [ ] open to the press and general public." 🚩 *Id.* at 8. Thus, while timing plays a role in the overall question, the primary issue is whether this type of information was historically accessible to the press and public in the first place and whether that access served an important governmental function. The answers to both questions are undoubtedly yes.

There has always been a right to access newly filed civil and criminal complaints. Indeed, every circuit to consider the issue has uniformly concluded that the right applies to both civil and criminal proceedings. *See Dhiab v. Trump,* 852 F.3d 1087, 1099 (D.C. Cir. 2017) (Rogers, J., concurring in part and concurring in the judgment) (collecting cases). Nor can Omundson argue public access is unimportant. Afterall, press coverage of judicial proceedings is a "cornerstone[ ] of American democracy." Rachel Luberda, *The Fourth Branch of the Government: Evaluating the Media's Role in Overseeing the Independent Judiciary,* 22 Notre Dame J. L. Ethics & Pub. Pol'y 507, 513 (2008).

As many courts have explained, complaints "instantaneously invoke[ ] a court's jurisdiction," trigger legal obligations, and impact parties' "substantive legal rights and duties." 🚩 *Schaefer,* 2 F.4th at 328. "The press and public thus have an important interest in reasonably contemporaneous access to civil complaints." *Id.*; *cf.* 🚩 *Planet III,* 947 F.3d at 592 ("Public access to civil complaints before judicial action ... buttresses the institutional integrity of the judiciary."). Because public access upon filing facilitates public scrutiny of the court system, it plays a significant positive role in the function of civil court proceedings and governance.

Omundson's efforts to obscure this rather simple truth through definitional disagreements and a myopic focus on timing is ineffective. *See* 🚩 *NAACP v. Button,* 371 U.S. 415, 429 (1963) ("[A] State cannot foreclose the exercise of constitutional rights by mere labels."). CNS had access to civil lawsuits in the past and that access served an important function.

**\*11** Thus, in answering the question of whether CNS has had "historical" access to these documents, the Court finds that it has. Now, depending on how one views the definition of certain words, could CNS's previous access look different—from a timing standpoint—than its current access under Odyssey? Maybe. Similarly, if Omundson were to use different variations of the Odyssey software suite or another service provider (or no provider altogether) could that affect this definition? Potentially. But such esoteric questions miss the mark. The Court's finding today is that "filed" is defined as the moment a complaint is sent or uploaded to the Court's system. And for today's purposes, the Court finds that CNS has had that type of historical access sufficient to meet the first prong of the *Press-Enterprise II* test.

### B. Restrictions

Consistent with its conclusion above regarding history and the definition of "filing," the Court finds CNS has a right to access newly-filed civil complaints the moment they are uploaded to the Odyssey system. CNS does not currently have that access based on Omundson's restrictions. Thus, the Court turns to the second step of the *Press-Enterprise II* framework: whether any restriction on CNS's right of access are "essential to preserve higher values" and "narrowly tailored to serve that interest." 🚩 478 U.S. at 13–14. The parties previously placed these arguments before the Court as part of their Motion to Dismiss / Motion for Preliminary Injunction briefs. The Court determined, however, that it could not rule on that question at that time since the inquiry is very "fact

driven" and not "appropriate at the motion to dismiss stage." *Omundson*, 598 F. Supp. 3d at 938. The Court and Counsel now have the benefit of extensive discovery and can proceed with resolving this critical second question.

As part of its prior order, the Court noted that it "would like more briefing from both parties on the level of scrutiny to apply as part of its second-prong inquiry and whether Idaho's procedures constitute time, place, and manner restrictions." *Omundson*, 598 F. Supp. 3d at 939. In its briefing on summary judgment, CNS says the Court's question is "a bit of a red herring." Dkt. 61-1 at 16 n.3. It goes on to argue that *Planet III* clarified the strict scrutiny standard was not relevant because the "time, place, manner" analysis applicable to speech in public forums is not applicable in these types of press-access cases. *Id.* (citing 🔖 *Planet III*, 947 F.3d at 596 n.9).

Respectfully, the Court did not pose a "red herring" issue for counsel. It was not trying to confuse or mislead anyone; it was simply asking a question to which it did not know the answer. CNS has now provided an answer—which the Court appreciates. That was the Court's point in asking. For its part, Omundson agrees that the Court in *Planet III* said it was not going to use a strict scrutiny test, but then argues it essentially did just that. While Omundson urges the Court not to follow suit, there is little reason to assess the "confusing" analysis from *Planet III* (*see* Dkt. 85, at 13) further when the parties agree on the applicable standard. That standard is known—at least in the Ninth Circuit—as "rigorous scrutiny." 🔖 *Planet III*, 947 F.3d at 596.

In order to prevail on the second step of *Press-Enterprise II*, Omundson "must demonstrate first that there is a 'substantial probability' that [her asserted] interest ... would be impaired by immediate access, and second, that no reasonable alternatives exist to 'adequately protect' that [ ] interest." *Id.* (quoting 🔖 *Press-Enterprise II*, 478 U.S. at 14). Omundson bears the burden of satisfying this "fact-intensive" test, 🔖 *Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012), which requires more than generalized assertions or speculation. 🔖 *New York Civil Liberties Union v. New York City Transit Auth.*, 684 F.3d 286, 303 (2d Cir. 2012) ("[W]e do not believe speculation should form the basis for a restriction of the public's First Amendment rights.") (cleaned up); 🔖 *Press-Enter. Co. v. Superior Ct.*, 464 U.S. 501, 510 (1984) ("*Press-Enterprise I*") ("The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.").

**\*12** Omundson begins by discussing the time accompanying her ministerial review and explains that even if there is some delay from when a civil complaint is filed to when it is available to the press and public, it is minimal at best. According to the data compiled by the parties, nearly 85% of complaints[12] were available within eight business hours of filing (e.g. from the point of original submission), with over 70% of those complaints ready in under four hours, and 65% in less than three hours. Dkt. 60-2, at 21. As a reminder, the actual review process only takes about five minutes. But the delays that occur—and that CNS is worried about—come from the delays of life. That is to say, what takes time is not the individual review itself, but the county clerk finding time in their busy day to get the review done: going to their computer, getting logged into the system, accessing the documents, *and then* performing their five-minute review. The hours-long timeframes mentioned above are, therefore, the time from when a person files their documents to when the clerk allows those documents formally into the system. And this is why understanding the numbers is important. While Omundson correctly claims that it only took eight, four, or three hours from the time of filing to complete the five-minute review process, those are *business* hours. In other words, if a complaint was filed at 3:00pm on a Friday and reviewed by 9:00am the following Monday, that would only count as three business hours even though two and a half calendar days had elapsed. So, while Omundson's numbers may not stand out as overly long, when days are used (as CNS illustrates) the difference appears more dire: 42% of new complaints were not released until the day after filing, with 15% delayed two calendar days or longer. Dkt. 61-4, at 14.

The Court digresses momentarily to discuss the numbers in this case. The parties spent a great deal of time in discovery gathering data. That data was, quite literally, terabytes in volume and had to be submitted to the Court on an external hard drive. The parties had various individuals review, analyze, compile, and summarize these numbers. The problem with statistics, however, is they can be arranged and discussed in ways that benefit each side. The Court is not implying the parties misled the Court in any way; simply that the numbers need to be looked at very closely. For example, during the timeframe the parties reviewed, the total number of cases filed in Idaho was 2,961,279. Dkt. 60-18, at 2–4. Of those, 177,677 were rejected, which is a 6% rejection rate. *Id.* But that was ALL cases (civil and criminal). As far as civil cases go, apparently 403,246 were filed in Idaho during the applicable timeframe the parties decided to use and 44,357 were rejected. *Id.* That is an 11% rejection

rate. *Id.* But even then, the cases CNS wants access to are just the A.A. category cases. Omundson claims there were 8,645 A.A. category cases filed in all of Idaho during this time. *Id.* She does not list a rejection rate. CNS claims there were actually 9,497 such cases filed and 1,624 were rejected which is about a 17% rejection rate. Dkt. 61-4, at 5. A few additional comments about the data.

The Court thoroughly appreciates the parties' efforts here. It has reviewed the data (and the testimony analyzing the data). As noted, numbers can be used, and viewed, from different vantage points. And that is fine. What concerns the Court more is two inter-related issues.

First, Omundson claims that if the Court were to allow CNS to have access to complaints right out of the gate, it would wreak havoc on the system because judges would need to get involved to remedy the errors in those 177,677 rejected cases when they could have been resolved during the clerk review. This concern appears to be premised upon an Idaho rule relating to the handling of records and files once a case is officially open. To wit, Omundson claims a clerk cannot change things in the case without a judge's permission once it has become an official court file. Dkt. 66, at 49. But Omundson readily admits that the Idaho Supreme Court could amend that rule to provide the clerk with more flexibility. *Id.* at 50. It is not clear to the Court why a judge, as opposed to a clerk, would need to fix the errors simply because the case was "officially on file" instead of in the "pre-processing" phase. The task is the same either way. So, if a rule appears to be dictating *who* can edit materials based on where the file is, it might make more sense to simply change the rule.

**\*13** Second and relatedly, the 177,677 cases that were rejected appear large in scale. But again, that is ALL cases (both criminal and civil) over an almost 18-month period. When the data is broken down into just the AA civil cases, the number of rejections per day is minimal (e.g. four or five per day *in the entire state*).[13] Thus, whether it is a judge or clerk that needs to address these cases, such could hardly be called burdensome. Omundson's point seems to be that if the Court finds its procedure is unconstitutional as to the A.A. category of cases, it will have to revamp the *entire* system. Thus, it won't just be those 1,624 rejections the Court has to deal with, but the 177,677 cases with errors. The Court is not so sure. CNS has narrowed its challenge to the A.A. category of cases. Thus, if the Court finds Omundson's procedures unconstitutional as to those cases, Omundson must change its procedure to remedy that discrete issue. The Court can only adjudicate the issue before it. The Court is not ignorant of the fact that the A.A. cases are just one component within a larger system. And the Court

understands it might be difficult to break those cases out with a separate filing procedure, e.g. it might be easier to change the *whole* system as opposed to just the A.A. cases. However, as will be discussed later, such is possible.

In summary, while the data is important—after all, the Court is to undertake a "fact-intensive" inquire—the Court is more concerned with the real-world application of that data. With those thoughts, the Court returns to Omundson's arguments.

More important than her contention that the delay in review is minimal, is Omundson's claim that there are compelling justifications under *Press-Enterprise II* for the delays themselves. Some of these justifications include: 1) catching errors in submissions, 2) protecting confidential information, and 3) maintaining public trust in the judiciary if documents are filed but not opened.

CNS avers none of these justifications rise to the level sufficient to overcome the presumption of access. Under the circumstances, the Court agrees.

For example, Omundson avers clerical errors may need to be corrected and this is an important interest that is worthy of protection. CNS does not dispute that correcting errors is important but points out that Omundson has not explained why those errors have to be corrected *before* the case is publicly available. The Court agrees with CNS that it does not undermine the process if simple errors are corrected after the documents become public rather than before. Other Courts share in these feelings. *See* Courthouse News Serv. v. Gabel, 2021 WL 5416650, at \*15 (D. Vt. Nov. 19, 2021). ("Defendant[ ] offer[s] no evidence that staff review of signatures, filing fees, and filing codes is necessary to protect the orderly administration of justice."); Planet, 947 F.3d at 597 (finding no evidence that immediate access resulted in "accounting issues[,]" "compromised the quality and accuracy of information logged into the [case management system,]" "created efficiency problems[,]" or "resulted in loss, destruction, or mutilation of, or otherwise compromised the 'integrity' of, case files"); Courthouse News Serv. v. Jackson, 2009 WL 2163609, at \*4 (S.D. Tex. July 20, 2009) (finding twenty-four to seventy-two hour delays to verify correct case number, proper court, accurate title, and proper filing category were not narrowly tailored).

Omundson next argues she must ensure no confidential or personal information ends up in new filings. There should not be any confidential information in these types of filings to begin with as they are, by nature,

nonconfidential civil cases. Second, even if a mistake is made and some personal information is included, is not Omundson's fault. Per IRERS 15(a), it is the filer's duty to ensure protected information is redacted from publicly submitted documents.[14] And to reiterate, this is not to say the information cannot ever be corrected. It can—just after it first becomes available to the public. While it may seem counter-intuitive to correct something once it becomes publicly available, the Court sees this happen quite frequently in federal court. The entire process does not crumble because edits have to be made to documents—even documents that are publicly available.

**\*14** Omundson also claims that the public's trust in the judiciary could be compromised if it were inadvertently publishing information and data that was not supposed to be publicly available. But the opposite is also true: public trust could deteriorate if cases are delayed by the Court and news becomes stale. For its part, CNS contends that public trust actually increases when errors are corrected because that provides assurances the system is working. Moreover, the fact that some cases get rejected could be newsworthy. *See* 🔖 *Courthouse News Serv. v. New Mexico Admin. Off. of Cts.*, 53 F.4th at 1268-69 (noting that Defendants' argument that "providing access to complaints that may be rejected or withdrawn only invites confusion as to what is happening in a state's courts ... overlooks the fact that the withdrawal or rejection of a complaint might itself be a matter of public interest that the press deems newsworthy"). Omundson cites to an example of a filing that included "nasty things" about the other party that was "caught and [not] allowed to be filed" claiming its review "saved" that from becoming public. Dkt. 85, at 31. By all accounts that was a singular instance, but more importantly, that filing in itself, could likely have been newsworthy.

In sum, the Court finds Omundson has not "demonstrate[d] ... a 'substantial probability' that [her] interest in the fair and orderly administration of justice would be impaired by immediate access ...." 🔖 *Planet III*, 947 F.3d at 596. Are Omundson's concerns irrelevant or imagined? Not at all. They are important concerns. But there is no evidence that giving CNS more timely access would hinder her ability to address those concerns. It would change the timing and order of operations to some degree, but it would not materially alter what Omundson is doing or the end result.

The Court moves to the next question—are there any alternatives to "adequately protect" Omundson's interest. *See id.* Although this second step is largely irrelevant considering the Court's finding that Omundson has not shown granting CNS immediate access would impair the administration of justice, the Court will assess it briefly because it bolsters the Court's findings above (and provides Omundson guidance for how to move forward).

Omundson has argued there are no reasonable alternatives to the system Idaho currently uses. She outlines why a press-review queue will not work and why other options are cost-prohibitive and/or have failings of their own. CNS rejects all of these arguments, noting it really isn't up to the Court to decide which option is best, but whether the current option is constitutional. The Court agrees in part. The Court's duty is to determine whether the current schema is constitutional. But as noted, that inquiry includes analyzing whether any alternatives exist.

The problem for Omundson, quite frankly, is there does appear to be alternatives to the current system. And candidly, those alternatives seem reasonable. Other states use alternative methods with good success. Most federal courts, including Idaho, although not using the Odyssey system or Tyler Technologies, have alternative systems that do not have the same review process as Idaho state court, and they use those with success as well. *See* Dkt. 64, at 15.

Omundson's two primary concerns appear to be finances and a reluctance to change because the task would be arduous. The parties put forth competing fee amounts each believes would be necessary to make some of the changes which have been discussed. Those numbers range from \$12,500 to \$108,000. Omundson also implies it would take substantial effort—including changing Idaho filing rules, training staff, training attorneys—to revamp its procedures. The Court is sensitive to these apprehensions. But neither can justify an unconstitutional policy. *See Courthouse News Serv. v. Tingling*, 2016 WL 8739010 (S.D.N.Y. Dec. 16, 2016), ("As in *Planet* and *Jackson,* this Court finds that the clerk has failed to meet its burden of demonstrating that its policy of refusing to provide the public and press access to newly filed complaints until after they are reviewed and logged is either essential to preserve higher values or is narrowly tailored to serve that interest.").

**\*15** Critically, the Court is not telling Omundson *how* she has to change her system as part of today's decision. It is simply finding that the *current* method is untenable. Omundson could revamp the entire system. Or she could just carve out A.A. complaints. She could use the press-review queue offered by Tyler Technologies. Or Idaho could develop its own program.[15] Whatever option she chooses, however, must allow CNS un-delayed access. Otherwise, the policy will continue to be unconstitutional under the First Amendment,

*Press-Enterprise II*, and *Planet III*.

## VI. CONCLUSION

The Ninth Circuit said in *Planet III* that a party does not have a First Amendment right to "immediate, pre-processing access to newly filed complaints." 947 F.3d at 594. Omundson claims that is basically what CNS gets, however, if the Court concludes she cannot meet her burden today. The Court agrees the balance between "CNS doesn't get immediate access" and "Omundson can't unreasonably delay access" puts the Court in a bit of a quandary. But the law is clear—a policy cannot withstand "rigorous scrutiny" unless there is a justification for the policy and there are no reasonable alternatives. *Id.* at 596. Ultimately, the Court finds Omundson has not met her burden to establish either factor.

First, CNS's right to access attaches when the complaint is filed. And filed is given its ordinary meaning: when a document is uploaded to the Court's e-filing system.[16] CNS has historically had access to newly-filed civil complaints and this access is an important public function. Thus, CNS has satisfied the first step of the *Press Enterprise II* test.

Second, while Omundson has valid reasons for undertaking a ministerial review of newly-filed complaints, there is no indication that granting CNS (and others) access prior to that review would impair or undermine her process. What's more, there are reasonable alternatives available that Omundson could utilize to make the process work for both sides. The Court will not dictate *what* Omundson must do moving forward, but under the second step of the *Press Enterprise II* test, she must do something because her current system impermissibly delays CNS's First Amendment access.

For all of these reasons, CNS's Motion for Summary Judgment is GRANTED and Omundson's Motion for Summary Judgment is DENIED.

## VII. ORDER

1. Omundson's Motion to Seal (Dkt. 58) is GRANTED in PART and DENIED in PART as outlined above. The documents already under seal shall remain as such except the Docketing Clerk is directed to unseal Dkts. 59-2, 59-5, and 59-6. Redacted versions already filed shall remain on file.

2. CNS's Motion for Leave to File Sur-Reply (Dkt. 77) is GRANTED.

3. Omundson's Motion for Summary Judgment (Dkt. 60) is DENIED.

4. CNS's Motion for Summary Judgment (Dkt. 61) is GRANTED.

5. The Court herby enters a declaratory judgment that Omundson's policy is unconstitutional. She is preliminarily and permanently enjoined from continuing any process that denies CNS timely access to new non-confidential civil complaints. Omundson has 90 days to bring her policies and procedures into substantial compliance with the Court's ruling today.

**\*16** 6. The Court will enter a separate judgment in accordance with Fed. R. Civ. P. 58.

**All Citations**

Slip Copy, 2024 WL 4349112

---

### Footnotes

1    Because the case names of these suits are similar—e.g., Courthouse News v. [Defendant]—and to avoid confusion, the Court will typically use the full citations even when a "short cite" would be permissible.

2    The day before trial was set to begin on September 12, 2024, the parties settled. *Courthouse News Serv. v. Cozine*, Case No. 3:21-cv-00680-SI, Dkt. 158.

[3]     As part of her Motion for Summary Judgment, Omundson asks the Court to revisit its ruling on the first issue arguing information obtained during discovery shows the Court's analysis is incorrect. This aside, the primary focus of the parties' discovery and briefing relates to the second prong of the test.

[4]     Terry Derrick is Tyler Technologies' 30(b)(6) deponent. Tyler Technologies developed the Odyssey software suite Idaho utilizes for case filing.

[5]     Omundson is generally correct. However, the Court has allowed sur-replies in the past. As the Court has explained, "[w]hile the Federal Rules of Civil Procedure do not expressly permit the filing of a sur-reply, this Court has recognized that a reply brief may justify a sur-reply in appropriate circumstances." *Ocampo v. Corizon*, LLC, 2019 WL 1495251, at *3 (D. Idaho Apr. 4, 2019). Leave to file a sur-reply is discretionary but should be granted "where a valid reason for such additional briefing exists," such as when the movant raises new arguments in its reply brief. *Hill v. England*, 2005 WL 3031136, at *1 (E.D. Cal. Nov. 8, 2005). Here, it does appear CNS was responding to arguments first raised in Omundson's reply. While those arguments were more procedural (about the parties' communications) as opposed to substantive, the Court will accept the sur-reply and give it the weight it deems appropriate in sorting out this matter.

[6]     CNS filed a 17-page statement of undisputed facts in conjunction with its Motion for Summary Judgment. Dkt. 61-2.

[7]     This argument notwithstanding, as noted, Omundson also filed a formal response to CNS's appendix. Dkt. 79-1.

[8]     By way of explanation, Omundson filed almost twenty declarations from Idaho state judges and court staff in support of her Motion for Summary Judgment. While the documents are not identical, they are very similar in nature and contain similar wording. Thus, the statements that CNS objected to are, more or less, uniform amongst all the declarants.

[9]     A "press review queue," is a feature Tyler Technologies offers which allows the press to view submitted documents *prior* to administrative or clerical review.

[10]    The underlying facts surrounding this argument come from CNS's complaint where it states reporters previously (before e-filing) would go to courthouses in Idaho and could view newly-filed cases in a "media box, bucket, or cart" and that they could access these documents "regardless of whether the complaints had been docketed [ ] or processed ...." Dkt. 1, at 11. In discovery, however, it became clear that the documents in the "box, bucket, or cart" had been file-stamped—meaning the "basic, ministerial review had been done" even though the case hadn't been placed into the "physical file yet." Dkt. 85, at 16. Omundson claims the language from CNS's complaint is, therefore, false, and that this clarification from discovery and testimony bolsters its argument that the access CNS has now is the same as it has always had—that of complaints *after* an administrative review has taken place.

[11]    The Tenth Circuit also noted that an unwieldy focus on terminology could lead to court administrators "adopting administrative rules that define a document as 'filed' much later in the judicial review process ..." in an attempt to circumventing the media's First Amendment right of access. 🚩 *Courthouse News Serv. v. New Mexico Admin. Off. of Cts.,* 53 F.4th 1245, 1267 (10th Cir. 2022) (cleaned up).

[12]    The data is restricted to Complaints in the "A.A. filing fee category." Cases in this category are civil cases where the amount in controversy exceeds $10,000. These are the only cases to which CNS seeks access.

[13]    Those four or five per day would be spread out over 44 Counties.

[14]    The evidence shows that, during the two-and-a-half-year period the parties reviewed, there was a *single* instance in which a party submitted a motion to seal with the complaint asking that the information be sealed from public access.

[15]    In fact, is appears Omundson already began exploring whether Idaho could build its own portal or contract with another company to do so at a lower rate than Tyler was offering. Dkt. 66, at 35.

[16]    And, as explained above, "submitted" is given its ordinary meaning as well. The bottom line is the right attaches prior to any ministerial review when the document is uploaded to the system by a filer.

**End of Document**                                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 2

2024 WL 4297014
Only the Westlaw citation is currently available.
United States Court of Appeals, Fifth Circuit.

Ronald S. HINES, Doctor of Veterinary Medicine,
Plaintiff—Appellant,

v.

Keith PARDUE, in his official capacity as Vice
President of the Texas State Board of Veterinary
Medical Examiners; Sandra "Lynn" Criner, Doctor
of Veterinary Medicine, in her official capacity as
Secretary of the Texas State Board of Veterinary
Medical Examiners; Michael White, Doctor of
Veterinary Medicine, in his official capacity as a
Member of the Texas State Board of Veterinary
Medical Examiners; Samantha Mixon, Doctor of
Veterinary Medicine, in her official capacity as a
Member of the Texas State Board of Veterinary
Medical Examiners; Randall Skaggs, Doctor of
Veterinary Medicine, in his official capacity as a
Member of the Texas State Board of Veterinary
Medical Examiners; Raquel Oliver, in her official
capacity as a Member of the Texas State Board of
Veterinary Medical Examiners; Sue Allen,
Licensed Veterinary Technician, in her official
capacity as a Member of the Texas State Board of
Veterinary Medical Examiners; Victoria
Whitehead, in her official capacity as a Member of
the Texas State Board of Veterinary Medical
Examiners; Steven Golla, Doctor of Veterinary
Medicine, in his official capacity as President of
the Texas State Board of Veterinary Medical
Examiners, Defendants—Appellees.

No. 23-40483
|
FILED September 26, 2024

**Synopsis**
**Background:** Veterinarian who provided online pet-care
advice brought action alleging that Texas's physical
examination requirement for practicing veterinary
medicine violated First Amendment as applied to him.
The United States District Court for the Southern District
of Texas, Fernando Rodriguez, Jr., J., 395 F.Supp.3d
857, adopted in part and rejected in part report and
recommendation of Ronald G. Morgan, United States
Magistrate Judge, 2019 WL 13036103, and dismissed
action. Veterinarian appealed. The Court of Appeals, 982
F.3d 266, affirmed in part, reversed in part, and
remanded. On remand, the District Court, Fernando

Rodriguez, Jr., J., 688 F.Supp.3d 522, adopted in part
and rejected in part report and recommendation of Ronald
G. Morgan, United States Magistrate Judge, 2022 WL
19072562, and entered summary judgment in state's
favor, and veterinarian appealed.

**Holdings:** The Court of Appeals, Willett, Circuit Judge,
held that:

[1] physical examination requirement primarily regulated
speech, and

[2] physical examination requirement violated First
Amendment as applied to veterinarian.

Reversed and remanded.

Irma C. Ramirez, Circuit Judge, concurred and filed
opinion.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment.

West Headnotes (10)

[1]     **Federal Courts**⬤—Summary judgment

        Court of Appeals reviews summary judgment de
        novo. Fed. R. Civ. P. 56(a).

[2]     **Federal Courts**⬤—Summary judgment
        **Federal Courts**⬤—Summary judgment

        When parties file cross-motions for summary
        judgment, court reviews each party's motion
        independently, viewing evidence and inferences
        in light most favorable to nonmoving party. Fed.
        R. Civ. P. 56(a).

**[3]**    **Constitutional Law**⟜Health care professions
**Health**⟜Veterinarians

State's physical examination requirement for practice of veterinary medicine primarily regulated speech of veterinarian who provided online pet-care advice, for First Amendment purposes, despite state's contention that requirement was primarily conduct regulation. U.S. Const. Amend. 1; 🚩Tex. Occ. Code Ann. § 801.351.

**[4]**    **Constitutional Law**⟜Narrow tailoring

To survive intermediate scrutiny under First Amendment, restriction on speech or expression must be narrowly tailored to serve significant governmental interest. U.S. Const. Amend. 1.

**[5]**    **Constitutional Law**⟜Narrow tailoring
requirement;  relationship to governmental
interest

Content-neutral regulation will satisfy intermediate scrutiny under First Amendment if it furthers important governmental interest; if governmental interest is unrelated to suppression of free expression; and if incidental restriction on alleged First Amendment freedoms is no greater than is essential to furtherance of that interest. U.S. Const. Amend. 1.

**[6]**    **Constitutional Law**⟜Freedom of speech,
expression, and press
**Constitutional Law**⟜Narrow tailoring
requirement;  relationship to governmental
interest

For a content-neutral regulation to survive

intermediate scrutiny under First Amendment, burden of justification for restriction on speech is demanding and it rests entirely on state. U.S. Const. Amend. 1.

**[7]**    **Constitutional Law**⟜Health care professions
**Health**⟜Veterinarians

State's physical examination requirement for practice of veterinary medicine violated First Amendment Free Speech Clause as applied to veterinarian who provided online pet-care advice, notwithstanding state's significant interests in protecting animal welfare, promoting public confidence in professional licensure, maintaining minimum standards of care, and preventing spread of zoonotic disease; state failed to show that alleged harms to animal welfare in context of physical examination requirement were real, that requirement alleviated alleged harms in direct and material way, or that instructing veterinarians not to give veterinary advice without physical exam if, in speaker's professional judgment, he or she could not provide useful help would not alleviate state's concerns. U.S. Const. Amend. 1; 🚩Tex. Occ. Code Ann. § 801.351(a)(2), 🚩(b).

**[8]**    **Constitutional Law**⟜Exercise of police power;
relationship to governmental interest or public
welfare

When government defends regulation on speech as means to redress past harms or prevent anticipated harms, to comply with First Amendment it must do more than simply posit existence of disease sought to be cured; rather, it must demonstrate that recited harms are real, not merely conjectural, and that regulation will in fact alleviate these harms in direct and material way. U.S. Const. Amend. 1.

**[9]** **Constitutional Law**⬥Narrow tailoring requirement; relationship to governmental interest

When evaluating whether content-neutral speech restriction violates First Amendment under intermediate level of scrutiny, court must consider availability and efficacy of constitutionally acceptable less restrictive means of achieving state's asserted interests, while keeping in mind that regulation does not have to be the least restrictive means of advancing state's interest. U.S. Const. Amend. 1.

**[10]** **Constitutional Law**⬥Narrow tailoring requirement; relationship to governmental interest

Although content-neutral law does not have to be the least restrictive means to pass intermediate scrutiny under First Amendment, it must still be close fit, and state must show that it does not regulate expression in such manner that substantial portion of burden on speech does not serve to advance its goals. U.S. Const. Amend. 1.

**West Codenotes**

**Unconstitutional as Applied**

🚩 Tex. Occ. Code Ann. § 801.351(a)(2), 🚩 (b)

Appeal from the United States District Court for the Southern District of Texas, USDC No. 1:18-CV-155, Fernando Rodriguez, Jr., U.S. District Judge

**Attorneys and Law Firms**

Jeff Rowes, Staff Attorney, Institute for Justice, Texas Chapter, Austin, TX, Andrew Heller Ward (argued), Institute for Justice, Arlington, VA, for Plaintiff—Appellant.

Evan Scott Greene (argued), Assistant Solicitor General, Office of the Texas Attorney General, Office of the Solicitor General, Austin, TX, William D. Wassdorf, Office of the Attorney General, General Litigation Division, Austin, TX, for Defendants—Appellees.

Philip S. Goldberg, Christopher Edward Appel, Esq., Shook, Hardy & Bacon, L.L.P., Washington, DC, for Amici Curiae American Veterinary Medical Association, Texas Veterinary Medical Association.

Before Willett, Wilson, and Ramirez, Circuit Judges.

**Opinion**

Don R. Willett, Circuit Judge:

**\*1** Dr. Ronald S. Hines is a retired, physically disabled, Texas-licensed veterinarian who enjoys spending his golden years giving online pet-care advice to animal lovers around the world—often for free. Dr. Hines does not physically examine animals, perform surgeries, apply casts, splints, or bandages, administer vaccinations, or prescribe prescription medication. He merely sends emails. This would be no problem if the patients were people instead of pets. For humans, Texas law allows telemedicine without first requiring a face-to-face examination to establish a physician-patient relationship. Not so with animals, which require an in-person visit. Exam-free telehealth, turns out, is fine for your Uncle Bernard, but not for your Saint Bernard.

No one ever complained about Dr. Hines's online pet-care advice or alleged that it harmed a single animal. However, because Dr. Hines does not physically examine animals before sharing his expertise, the State of Texas considered some of his emails criminal offenses, going so far as penalizing him with a year of probation, fining him $500, and forcing him to retake the jurisprudence section of the veterinary licensing exam. In 2013, Dr. Hines challenged the physical-examination requirement on First Amendment grounds. Over the last decade, his case has been before our court twice—and now, a *third* time.[1] After we remanded this case nearly four years ago, the district court granted summary judgment for the State.[2] Dr. Hines appealed.

Today, we uphold Dr. Hines's First Amendment rights. We specifically conclude that the State of Texas is directly regulating Dr. Hines's speech and that this regulation fails to survive even intermediate scrutiny. We accordingly REVERSE and REMAND with instructions to enter judgment for Dr. Hines.

I

A

Dr. Hines is a veterinarian licensed by the State of Texas. He also holds a Ph.D. in microbiology. After obtaining his veterinary license in 1966, Dr. Hines worked in various roles across the country and around the world researching and working with animals. He worked as a veterinarian for almost four decades, including time spent on animal research.

In 1977, Dr. Hines suffered a fall that injured his spine, rendering him totally disabled according to the Department of Veterans Affairs. In 2002, Dr. Hines retired from his full-time practice of veterinary medicine because the rigors of daily practice had become too cumbersome. Around that time, he launched a website to share articles about veterinary care. Readers began emailing Dr. Hines, seeking advice about their pets or animals they found. Dr. Hines responded to readers' questions from his home in Brownsville, Texas. About half of these emails came from readers outside the United States and most came from outside Texas. At some point, Dr. Hines started charging a flat fee to cover expenses and to screen trivial inquiries, but he helped correspondents for free if they could not pay and refunded fees when he could not help. Dr. Hines requested that readers submit an electronic form with information about their animal and submit "photographs and lab work" for his review. In answering questions, he "always required complete medical records from the owner's local veterinarian," and if none existed, he referred owners to a local veterinarian and urged them to have their pet physically examined.

**\*2** In 2012, the Texas State Board of Veterinary Medical Examiners informed Dr. Hines that his wholly electronic veterinary practice violated Texas law. The law at issue requires veterinarians to establish a veterinarian-client-patient relationship (VCPR) before engaging in the practice of veterinary medicine.[3] Under the statute, a VCPR exists if, as relevant here, "the veterinarian ... possesses sufficient knowledge of the animal to initiate at least a general or preliminary diagnosis of the animal's medical condition."[4] A veterinarian can establish the sufficient-knowledge requirement in two ways: "(1) examining the animal; or (2) making medically appropriate and timely visits to the premises on which the animal is kept."[5] The VCPR "may

not be established solely by telephone or electronic means."[6]

The State concluded that because Dr. Hines's advice constituted the practice of veterinary medicine, and because Dr. Hines never physically examined the animals that were the subject of his advice—facts that Dr. Hines concedes—he had not established a VCPR and thus violated the law. In response, Dr. Hines put a disclaimer on his website, informing readers that he could not "engage[ ] in the 'practice' of veterinary medicine as defined by Texas law," meaning that he could not offer "specific diagnosis [or] treatment," among other things.

But this did not satisfy the State. So, in 2013, Dr. Hines and the State entered into an agreed order, "formally reprimanding [Dr. Hines], imposing a year of probation, fining him $500, and forcing him to retake the jurisprudence section of the veterinary licensing exam."

About two weeks later, Dr. Hines sued the State, alleging that the physical-examination requirement violated his First Amendment rights.

B

Over the last decade, this lawsuit has braved an extensive procedural journey. We recount here the relevant portions related to Dr. Hines's First Amendment claim.

The State moved to dismiss the First Amendment claim under Federal Rule of Civil Procedure 12(b)(6), arguing that the physical-examination requirement did not implicate the First Amendment. The district court denied the motion and granted the State's unopposed motion to certify the question to our court for interlocutory appeal.

We reversed.[7] The panel concluded that the physical-examination requirement did not "regulate the content of any speech, require veterinarians to deliver any particular message, or restrict what can be said once a [VCPR] is established."[8] So it decided that the physical-examination requirement fell "squarely within [the State's] long-established authority" to regulate professional conduct and thus did not offend the First Amendment.[9] On remand, the district court entered final judgment for the State.

Three years later, after the Supreme Court held in National Institute of Family & Life Advocates v. Becerra (NIFLA)[10] that professional speech—like all

other speech—is subject to traditional First Amendment scrutiny, Dr. Hines renewed his suit against the State. The district court again dismissed Dr. Hines's claim, concluding that 🚩 *NIFLA* did not abrogate 🚩 *Hines I*, which "require[d] dismissal."[11]

**\*3** But while Dr. Hines's appeal was pending before our court, we issued an opinion in *Vizaline, L.L.C. v. Tracy*, which held that 🚩 *Hines I*'s "reasoning does not survive 🚩 *NIFLA*."[12] And we clarified that the "relevant question" was whether "[the State]'s licensing requirements regulate only speech, restrict speech only incidentally to their regulation of non-expressive professional conduct, or regulate only non-expressive conduct."[13] So "[b]ound by *Vizaline*" and "no longer bound by 🚩 *Hines I*," we concluded that Dr. Hines's First Amendment claim "may be entitled to greater judicial scrutiny than 🚩 *Hines I* allowed."[14] We reversed and remanded for the district court to make the initial evaluation of whether Dr. Hines's "conduct or speech [wa]s being regulated."[15]

On remand, the parties cross-moved for summary judgment.[16] The district court granted the State's motion and denied Dr. Hines's. It made three key determinations that are before us on appeal: The law (1) regulates Dr. Hines's speech, rather than his conduct; (2) does so in a content-neutral way, warranting intermediate scrutiny; and (3) survives intermediate scrutiny because it was "narrowly tailored to the [State's] substantial interests, which [were] unrelated to the suppression of speech."[17]

## II

[1] [2]We review summary judgment de novo.[18] Summary judgment is warranted if "no genuine dispute as to any material fact" exists and "the movant is entitled to judgment as a matter of law."[19] When parties file cross-motions for summary judgment, we review "each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party."[20]

## III

At the threshold, we face two thorny First Amendment questions. First, does the State's physical-examination requirement regulate Dr. Hines's speech directly, as Dr. Hines argues, or only incidentally to the law's general regulation of his conduct, as the State counters? Second, if it regulates his speech, does it do so in a content-based way, as Dr. Hines contends? The answers to these questions dictate, in turn, the applicable level of scrutiny.[21] Our precedents mandate that we apply intermediate scrutiny only if the law regulates his speech in a content-neutral way.[22] But if the law is a content-based regulation of Dr. Hines's speech, we apply strict scrutiny.[23]

## IV

**\*4** First things first, we must determine what the physical-examination requirement primarily regulates. The State does not dispute that Dr. Hines's speech is implicated. It contends that the physical-examination requirement restricts Dr. Hines's speech incidentally to the general regulation of conduct. So, we consider whether the requirement regulates Dr. Hines's speech directly or only incidentally to the regulation of his conduct. On the one hand, all Dr. Hines does is send emails—pure speech. But on the other, the law regulates his speech as part of the practice of veterinary medicine.[24]

## A

The First Amendment prohibits laws "abridging the freedom of speech."[25] In the Supreme Court's jurisprudence since the adoption of that Amendment in 1791, however, the Court has held that the First Amendment does not protect *all* forms of speech and *does* protect some expressive conduct.[26] Still, neither the Supreme Court—nor our court—has suggested heightened protection for speech regulated only incidentally to a generally applicable regulation of conduct.[27]

As noted above, circuit courts have, until recently, applied the so-called professional-speech doctrine to licensing regulations like this one. These courts, including our own,[28] treated laws regulating professionals' speech as a separate category from non-professional speech, entitling them to less protection and exempting them from traditional First Amendment scrutiny.[29] The Supreme Court, however, rejected this doctrine in 🚩 *NIFLA*,[30] and instructed courts to apply the "traditional conduct-versus-speech dichotomy."[31] But "[a]s it stands today, the relevant First Amendment doctrine is a

mind-numbing morass of tangled precedents developed in contexts very different from professional licensing."[32]

The "notoriously foggy"[33] speech–conduct dichotomy makes "finding the line between speech and conduct ... not as simple as asking whether the prohibition is literally one against verbal or written 'speech,' on the one hand, or one against 'conduct' (i.e., nonverbal action) on the other."[34] In as-applied challenges[35]—especially those involving "generally applicable regulation[s] of conduct," such as the regulation here—a particular act constitutes protected speech, rather than unprotected conduct, if that act "consists of communicating a message."[36]

**\*5** For example, a generally applicable regulation proscribing breaching the peace regulated speech, rather than conduct, when an individual was arrested and convicted for wearing a jacket that said "F\*\*\* the Draft" inside a courthouse.[37] The Supreme Court found the conviction to "clearly rest[ ] upon the asserted offensiveness of the words [the plaintiff ] used to convey his message to the public."[38] Because "[t]he only 'conduct' which [California] sought to punish [wa]s *the fact of communication*," the Supreme Court applied First Amendment scrutiny and reversed the conviction.[39]

In another (and more apt) example, a law proscribing support for "the humanitarian and political activities of" two designated terrorist organizations, which "generally function[ed] as a regulation of conduct," regulated speech because as "applied to [the] plaintiffs[,] the conduct triggering coverage under the statute consist[ed] of *communicating a message*"—individualized legal advice.[40] As the court recognized, whether the plaintiffs could speak with designated terrorist organizations"depend[ed] on what they [said]" because the regulation barred certain forms of speech—including "speech to those groups [that] impart[ed] a 'specific skill' or communicate[d] advice derived from 'specialized knowledge.' "[41]

Our goal then is to determine whether the physical-examination requirement *primarily* affects Dr. Hines's speech ("communication of a message") or his conduct by looking at what "trigger[s] coverage under the statute."[42]

### B

[3]As explained below, the physical-examination requirement primarily regulates Dr. Hines's speech—and not merely incidentally to his conduct.

The State contends that the law is primarily a conduct regulation because the definition of practicing veterinary medicine applies to a "set of skilled actions"—that is, conduct. But calling an act "speech" or "conduct" (or "actions") does not make it speech or conduct for First Amendment analysis.[43] Indeed, the Supreme Court has been clear: "State labels cannot be dispositive of [the] degree of First Amendment Protection."[44] It is a court's duty to consider a "restriction's effect, as applied, in a very practical sense"[45]—not to follow whatever label a state professes. If courts were required to accept a governmental actor's speech-or-conduct designation, we would be compelled to forgo our solemn duty to "assess[ ] the First Amendment interest at stake and weigh[ ] it against the public interest allegedly served by the regulation."[46] This means we must determine from the evidence, rather than the parties' labels, whether Dr. Hines's course of action involved speech.[47]

**\*6** The State identified Dr. Hines's provision of "individually tailored diagnostic services and veterinary medical advice for specific animals" as practicing veterinary medicine.[48] Dr. Hines was penalized specifically for engaging in the practice of veterinary medicine without first establishing VCPRs in person.[49] But in detailing the specific acts that constituted the practice of veterinary medicine in violation of the physical-examination requirement, the State pointed to Dr. Hines's email exchanges in which he communicated individualized diagnoses and treatment plans with various animal owners.

For example, Dr. Hines was contacted by an owner whose bird had managed to remove a splint on its leg only a week after its placement by a local veterinarian. The bird owner, who was concerned that the bird's legs were crossing and that this might inhibit its mobility, attached a video of the bird to the email she sent Dr. Hines. Dr. Hines wrote back and informed the owner that a splint was necessary to ensure the bird's full recovery, and he instructed the owner on how to make a splint and how to apply and adjust it. The State concluded, based on the conclusions of its investigator and experts, that Dr. Hines had engaged in the practice of veterinary medicine without establishing a VCPR by communicating (via email) an individualized diagnosis and treatment plan to the bird owner.

Critically, not *all* of Dr. Hines's conduct was barred. Indeed, the State did not find Dr. Hines's review of the owner's email or video or the substance of his diagnosis and treatment plan violative of the physical-examination requirement; the State did not penalize Dr. Hines for

viewing charts or considering different medical reports. And the State did not penalize him for applying a splint or administering medicine—nor could they. Instead, the State only penalized him for his *communication* with the owner about her bird in which he gave a diagnosis and treatment plan. In effect, the regulation *only* kicked in when Dr. Hines began to share his opinion with his patient's owner—as is the case with all of Dr. Hines's alleged violations of the physical-examination requirement.[50] Because the act in which Dr. Hines engaged that "trigger[ed] coverage" under the physical-examination requirement was the communication of a message, the State primarily regulated Dr. Hines's speech.[51]

## V

**\*7** Regrettably, the Supreme Court's content-neutrality jurisprudence is not much clearer than its speech-conduct jurisprudence.[52] And here, "content neutrality is far from clear."[53] Indeed, we are divided on the issue,[54] "and the parties vigorously dispute the point."[55]

These questions do not need a definitive answer today,[56] however, because the law cannot withstand even *intermediate* scrutiny—the lowest tier of scrutiny available for our analysis based on the facts in this case.[57] Accordingly, we assume without deciding that the law regulates Dr. Hines's speech in a content-neutral manner, meaning we apply intermediate rather than strict scrutiny.

## A

**[4] [5] [6]**"[T]o survive intermediate scrutiny, a restriction on speech or expression must be 'narrowly tailored to serve a significant governmental interest.' "[58] A content-neutral regulation will satisfy this test "if it furthers an important governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.' "[59] While not as exacting as strict scrutiny, intermediate scrutiny is no gimme for the government: "[I]ntermediate scrutiny is still tough scrutiny, not a judicial rubber stamp."[60] "[T]he burden of justification is demanding and it rests *entirely* on the State."[61]

## B

**\*8** We first address the State's asserted interests.

**[7]**While we assume that the State's interests are significant in the abstract, we conclude that the State has failed to show that the harms it seeks to address with the physical-examination requirement are real. And even assuming the State could make this showing, the physical-examination requirement doesn't alleviate those harms in a "direct and material way."[62]

The State asserts four interests: "protecting animal welfare, promoting public confidence in professional licensure, maintaining minimum standards of care, and preventing the spread of zoonotic disease." Dr. Hines conceded before the district court that these interests are significant—at least in the abstract—and he does not argue that the interests relate to the suppression of speech. So we assume that the State's interests are significant.

**[8]**But that does not end the inquiry. We must still examine whether the physical-examination requirement "will in fact advance those interests."[63] "When the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply 'posit the existence of the disease sought to be cured.' "[64] Rather, "[i]t must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way."[65]

The State's defense of the physical-examination requirement focuses exclusively on its interest in animal welfare.[66] So we consider whether the alleged harms to animal welfare are real, and if so, whether the statute alleviates those alleged harms.

### 1

First, the State has failed to show that the alleged harms to animal welfare in the context of the physical-examination requirement are real.

The State alleges that the physical-examination requirement protects animal welfare by reducing the risk that veterinarians will misdiagnose—and thereby harm—animals. In other words, the harm the State seeks to address is misdiagnosis by veterinarians who conduct telemedicine without first performing a physical exam.

To meet its burden to show that the harm it alleges is real,

the State may rely on empirical data, anecdotal evidence, and studies.[67] "The evidence on which it relies need not 'exist pre-enactment.' It may also 'pertain[ ] to different locales altogether.' This requirement may also be satisfied with 'history, consensus, and simple common sense.' "[68] But it cannot rely on "mere speculation or conjecture."[69]

**\*9** As evidence of harm, the State presented a literature review, expert testimony, anecdotal evidence, and expert analysis of Dr. Hines's conduct. Dr. Hines argues that this evidence is little more than conjecture. Although we acknowledge that, in some cases, states may enact prospective regulations,[70] and we acknowledge that the State's concerns for animal welfare are legitimate, we agree with Dr. Hines that the State has failed to show sufficiently "real" harm as required by our precedents.

We address each category of the State's evidence in turn.

First consider the State's expert testimony. The State's first expert, Dr. Carly Patterson, testified to the general benefits of a physical exam. She explained that "[t]he physical exam is the cornerstone of all veterinary care" because "[w]ithout it, veterinarians are left to aimlessly pursue diagnostics that might be needless and in the worst case scenario, completely circumvent the actual problem at hand, resulting in the death of the patient."[71] Because, in her view, the physical exam "is what helps [veterinarians] localize the actual nature of the problem," she testified that "[i]n the absence of a physical exam," a veterinarian "cannot proceed forward with a logical and defensible plan for [a] veterinary patient." She also testified that in-person exams are "critical" because "pet owners can't speak for the pet themselves," and "even diligent pet owners may miss the subtle clues that only a physical exam can provide."

To support her opinion, she testified about two studies. The first was a study of "one hundred apparently healthy dogs," in which a physical exam revealed "anomalies warranting additional assessment." The study's authors "concluded that physical exam abnormalities are common in apparently healthy older dogs, and the veterinarian is instrumental in health screening by way of the history and physical exam." The second study was similar. It looked at "one hundred apparently healthy cats ages 6 years and older[, and] found that less than half of the cats had an ideal body condition, a majority of the cats had gingivitis, and 11% of the cats had a heart murmur auscultated." The study's authors again "emphasized the need for regular health checks in apparently healthy older cats due to the physical exam abnormalities and additional focused diagnostic tests."

Dr. Patterson also provided anecdotal evidence. She pointed to five cases from her own practice, which according to the State, "illustrate the importance of the physical exam—and particularly, how telemedicine alone would have been insufficient to treat these patients." In each case, Dr. Patterson testified that the animal presented with certain symptoms that might have suggested one diagnosis, but the physical exam revealed problems that she opined could not be discovered without a physical exam. Thus, in her opinion, based on these anecdotes, while telemedicine may have "certain distinct advantages for monitoring patients or fielding specific follow-up questions after a diagnosis is made," "it [cannot] substitute for [a patient] history and physical exam."

The State's second witness, Dr. Lori Teller, testified about her and Dr. Patterson's joint assessment of Dr. Hines's conduct. They reviewed "representative examples of [Dr.] Hines's telemedicine practice and assessed it for potential harm." Their review revealed "at least five instances where [Dr.] Hines was practicing veterinary medicine and thus subject to the" physical-examination requirement. They agreed that in these five instances, his correspondence did not meet "the accepted standard of care." Dr. Teller testified that Dr. Hines "most likely" or "potentially" left these animals in a "worse position."

**\*10** The State's expert testimony at least establishes that a physical exam *can* detect conditions that may not have otherwise been discovered. But neither expert identified any evidence of actual harm caused by telemedicine without a prior physical examination.

Before the district court, the State relied on a literature review conducted by Dr. Teller. The State does not press this evidence before us now, likely because the review didn't find *any* evidence of actual harm. It found "no published reports of veterinarians providing inadequate or substandard care via virtual care." And it found no "studies comparing in clinic visits with telehealth visits to determine if there is concordance between the findings of those exams." Although it mentions "risks of missed diagnoses" as a "concern[ ]," a hypothetical concern—even if seemingly significant—is insufficient to identify a "real harm."

Dr. Patterson's anecdotes fare no better. We agree with Dr. Hines that these anecdotes are "*guesses* about what would have happened after telemedicine that never occurred" rather than evidence of real harm. Like Dr. Patterson's testimony about the benefits of the physical exam, the anecdotes at most establish that a physical exam can help veterinarians detect ailments that they *may* have missed over a telemedicine appointment. A *missed*

diagnosis does not actively harm the animal; a *misdiagnosis*, on the other hand, might (neither of which Dr. Hines has done, according to the record).

The expert testimony about Dr. Hines's conduct is the least compelling. Dr. Hines has been answering emails for nearly *twenty* years. And yet, Dr. Teller could not provide a *single* instance where Dr. Hines's emails harmed an animal. Indeed, she testified that Dr. Hines only "potentially" or " 'likely' harmed animals," and she admitted multiple times that "it is unknown if Dr. Hines'[s] actions caused harm." This testimony cannot be characterized as anything more than conjecture and speculation.

The State has effectively proven that veterinarians believe that a physical exam is helpful[72] and that telemedicine should be used only as a follow up to the in-person exam. Indeed, a physical exam seems to be a plus factor to a veterinarian's analysis—a check for physical ailments or physical manifestations of ailments that may not be readily apparent to a pet's owner. These are risks that an individual knowingly chooses to forego by choosing a telemedicine appointment for their animal.

But proving that a physical examination is helpful is not enough. The State has failed to meet its burden of proving that misdiagnoses from telemedicine are a real harm in this case. The State emphasizes that the physical exam reduces the *risk* of misdiagnosis from telemedicine without an exam and argues that it can enact prophylactic rules before the harm occurs. Both are true, and the State's interest in reducing misdiagnoses is legitimate. But the State cannot meet its burden of proving real harm by pointing to "risks" of harm—or hypothetical concerns—that, according to the evidence, have never materialized.[73]

**\*11** The district court faulted Dr. Hines for failing to provide "any controverting evidence," so it concluded "no genuine issue exists on the matter." But it is the *State's* burden to prove real harm,[74] and it has failed to do so here.

### 2

Even if the harms alleged by the State were real, as the State contends, the law suffers from a fatal defect: The State fails to prove that the law "alleviate[s] these harms in a direct and material way."[75]

The first problem with the State's chosen means is apparent on the face of the statute itself. There are two ways a vet can establish the VCPR, and one of them doesn't require a physical exam *at all.* To recap, a veterinarian must first establish a VCPR before practicing veterinary medicine.[76] The VCPR exists "if the veterinarian: ... possesses sufficient knowledge of the animal."[77] And "[a] veterinarian possesses sufficient knowledge of the animal ... if the veterinarian has recently seen, or is personally acquainted with, the keeping and care of the animal by: (1) examining the animal; *or* (2) making medically appropriate and timely visits to the premises on which the animal is kept."[78] But the VCPR cannot "be established solely by telephone or electronic means."[79]

The State does not explain how the law alleviates the harm of misdiagnoses from telemedicine without a physical exam when the VCPR can also be established by a visit to the premises *without* a physical exam. Although the State's experts testified that the premises-visit option is *typically* used for herd animals, she conceded it is not so limited, testifying that the "premises" visited "could be the premises on which a dog is kept." Nor does the plain text provide this limitation.[80] And furthermore, the State fails to explain why a "recent[ ]" physical examination—which has no definition—is sufficient to establish a VCPR. For example, why would a "recent" physical examination in the last year or two provide any better insight into an animal's condition than a real-time telehealth appointment without a preceding physical examination?[81]

If that weren't enough, the State's looser approach to *human* welfare undercuts the State's insistence on a physical exam to advance animal welfare. After all, the State of Texas allows exam-free telemedicine for babies and noncommunicative adults—those who, like animals, cannot communicate with their physicians. How can the State insist a hands-on exam is necessary to protect animals while conceding a hands-on exam is unnecessary to protect humans?[82] Put differently, why does Texas mandate tougher telehealth rules for veterinarians treating animals than for physicians treating people?[83] The State does not say.

### C

**\*12** The law suffers from one final defect: It is not narrowly tailored.

[9]In making this determination, we consider whether the physical-examination requirement "burden[s] substantially more speech than is necessary to further the

government's legitimate interests."[84] At this stage, we consider "the availability and efficacy of 'constitutionally acceptable less restrictive means' of achieving the [state's] asserted interests," while keeping in mind that the regulation does not have to be the least restrictive means of advancing the State's interest.[85]

Dr. Hines proposed a number of less restrictive alternatives. But the district court failed to address any of them. And the State contends that it did not have to reject alternatives *at all* because "the Board was obligated to enforce the Physical Examination Requirement adopted by the Legislature." It cites no authority for this proposition. The burden rests with the State to prove that "it seriously undertook to address the problem with less intrusive tools readily available to it,"[86] and that burden often falls on the State officials that are sued.[87] In the alternative, the State contends that its experts rejected Dr. Hines's less-restrictive alternatives. But its argument—and the expert testimony on which it relies—is unpersuasive.

Take one example. Dr. Hines proposed that the State could "instruct veterinarians not to give veterinary advice without a physical exam if, in the speaker's professional judgment, he or she cannot provide useful help." Dr. Hines alleges that he already does this. The State provided no answer to why this alternative wouldn't work other than reasserting that the requirement is in the statute, and the Board "[has] to enforce the statute." But, in fact, based on Dr. Teller's testimony, veterinarians already do this when performing telemedicine. When asked about her practices for conducting telemedicine, Dr. Teller responded that after she establishes a VCPR by a physical exam or a visit to the premises, "[she] would determine if [she could] provide follow-up care via telemedicine or if [she] needed to see that patient, do a physical[,] or make a visit to the premises," "based on what [she] already knew about the client and about the patient." And as Dr. Hines suggests, veterinarians are required to use their professional judgment in many contexts. The State does not explain why this rule wouldn't work the same way for establishing a VCPR in the first instance, as Dr. Hines suggests. Nor did the State have any answer to Dr. Hines's similar proposal that the State could require "a trip to the veterinarian only when reasonable under the circumstances," or require consent from owners before performing telemedicine without a physical exam.

**\*13** The State's contention that "at present, there is *no alternative* to the physical exam that outweighs the risks of causing animal harm or death from an improper diagnosis and treatment plan" rings hollow because as explained above, the statute itself provides an alternative.

The VCPR can be *established*—and not just *maintained*—by a visit to the premises without a physical exam. And the veterinarian need never lay eyes on the animal during the visit.

**[10]**Although the law does not have to be the *least* restrictive means to pass intermediate scrutiny, it must still be a close fit, and the State must show that it doesn't "regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals."[88] If Dr. Hines has never actually harmed any animal—and the State provides zero evidence that he has—then the heavy burden on his speech doesn't advance the State's interest in animal welfare.[89]

A physical-examination requirement may be an efficient and effective way to protect animal welfare by reducing the risk of missed diagnoses, and "[w]here certain speech is associated with particular speech problems, silencing the speech is sometimes the path of least resistance. But by demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacrific[ing] speech for efficiency.' "[90] The State has failed to carry its burden of showing the necessary narrow tailoring here.


## VI

The State of Texas has failed to meet its burden under intermediate scrutiny. Accordingly, we REVERSE the district court's judgment and REMAND with instructions to enter judgment for Dr. Hines.


Irma Carrillo Ramirez, Circuit Judge, concurring:

While I agree that the case should be reversed and remanded with instructions to enter judgment in favor of Dr. Hines, I write separately because the physical examination requirement, as applied to him, is a content-based speech restriction that does not survive strict scrutiny.


## I

Deciding whether a restriction is content neutral or content based is no simple task, as "not all content-based regulations are alike." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 429, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (Stevens, J., concurring in the judgment). In this third iteration of the case, the district court first found that the PER, "[a]s applied to [Dr.] Hines, ... regulate[d] speech" in a "content-based" manner, *Hines v. Quillivan*, No. 1:18-CV-155, 2021 WL 6618658, at *10 (S.D. Tex. July 29, 2021), *report and recommendation adopted*, 2021 WL 5833886 (S.D. Tex. Dec. 9, 2021), then later concluded that it represented a content-neutral regulation of speech. *Hines v. Pardue*, 688 F. Supp. 3d 522, 550–52 (S.D. Tex. 2023). "Th[is] determination dictates the level of scrutiny the challenged restriction must meet in order to pass muster"—if content based, then strict scrutiny applies; if content neutral, then intermediate scrutiny applies. *Tex. Ent. Ass'n, Inc. v. Hegar*, 10 F.4th 495, 509 (5th Cir. 2021); *see also SDJ, Inc. v. City of Houston*, 837 F.2d 1268, 1274 (5th Cir. 1988) ("Our task in setting the level of review is to strike for that point of equilibrium that vindicates [F]irst [A]mendment values at the least cost to a state's decisional arrangements.").

## A

**\*14** "Regulations which permit the Government to discriminate on the basis of the content of [a] message cannot be tolerated under the First Amendment." *Regan v. Time, Inc.*, 468 U.S. 641, 648–49, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984). If a speech regulation "require[s] 'enforcement authorities' to 'examine the content of the message that is conveyed to determine whether' a violation has occurred," then it is content based. *McCullen v. Coakley*, 573 U.S. 464, 479, 134 S.Ct. 2518, 189 L.Ed.2d 502 (2014) (quoting *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 383, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984)). Put differently, when someone wishes to speak and their ability to do so "depends on what they say," the applicable speech regulation is content based. *Holder v. Humanitarian L. Project (HLP)*, 561 U.S. 1, 27, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010); *see also Hill v. Colorado*, 530 U.S. 703, 738, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (Souter, J., concurring) ("The effect of speech is a product of ideas and circumstances .... The question is simply whether the ostensible reason for regulating the circumstances is really something about the ideas."). As long as the enforcing authority need not examine what the speech expresses to determine whether a violation has occurred, then the regulation is content neutral. *McCullen*, 573 U.S. at 479, 134 S.Ct. 2518.

*McCullen* concerned a law that stated:

> No person shall knowingly enter or remain on a public way or sidewalk adjacent to a reproductive health care facility within a radius of 35 feet of any portion of an entrance, exit or driveway of a reproductive health care facility or within the area within a rectangle created by extending the outside boundaries of any entrance, exit or driveway of a reproductive health care facility in straight lines to the point where such lines intersect the side-line of the street in front of such entrance, exit or driveway.

MASS. GEN. LAWS. ANN. CH. 266, § 120E½(b) (West 2013). Because the law only applied to "reproductive health care facilit[ies]," *i.e.*, "place[s], other than within or upon the grounds of a hospital, where abortions are offered or performed," *id.* § 120E½(a), the plaintiffs contended it was content based as applied[1] because "virtually all speech affected by the [law] [wa]s speech concerning abortion, *McCullen*, 573 U.S. at 479, 134 S.Ct. 2518. But the Court disagreed, stating that the law was content neutral because whether the plaintiffs violated it " 'depend[ed]' not 'on what they sa[id],' but simply on where they sa[id] it." *Id.* (citation omitted) (quoting *HLP*, 561 U.S. at 27, 130 S.Ct. 2705). The plaintiffs could violate the law, the Court found, "merely by standing in a buffer zone, without displaying a sign or uttering a word." *Id.* at 480, 134 S.Ct. 2518. Therefore, the law was content neutral.

Here, it is the interaction between the PER and the statutory definition of practicing veterinary medicine as applied to Dr. Hines that he challenges as a content-based restriction on his speech. To determine whether Dr. Hines engaged in the practice of veterinary medicine, the State examined his words. Where Dr. Hines's communications

conveyed general information regarding veterinary care that was not tailored to a specific animal, the State found that Dr. Hines had not engaged in the practice of veterinary medicine. Where he had communicated veterinary-care information tailored to a specific animal, however, the State drew the opposite conclusion. Whether the PER regulated Dr. Hines's speech required the State to inspect his specific writings, so as applied, the PER is a content-based speech regulation. *See* McCullen, 573 U.S. at 479, 134 S.Ct. 2518.

For example, a pigeon's owner contacted Dr. Hines about advice he had received for applying a wrap to the pigeon's wounded wing. Dr. Hines wrote back with advice about the pigeon's wing and how to assess the wrap. Because Dr. Hines communicated veterinary advice specific to this pigeon, the State determined that he had practiced veterinary medicine. By contrast, when a dog owner wrote to Dr. Hines about the dog's persistent itching and barking, Dr. Hines responded with several differential diagnoses and generally referred the dog owner to recommendations for various anti-flea and anti-tick products. Because Dr. Hines had only communicated general information not tailored to the owner's dog, the State determined that Dr. Hines had not practiced veterinary medicine.

**\*15** Because the determination of whether Dr. Hines violated Texas law "depend[ed] on what [he] sa[id]"—that is, whether his communications constituted personalized advice—the PER is a content-based speech restriction. *See* HLP, 561 U.S. at 27, 130 S.Ct. 2705.

B

The State contends the PER is content neutral under *City of Austin v. Reagan National Advertising of Austin, LLC* and *Ward v. Rock Against Racism*. Both concerned *facial* challenges, however. *See* City of Austin v. Reagan Nat'l Advert. of Austin, LLC, 596 U.S. 61, 76, 142 S.Ct. 1464, 212 L.Ed.2d 418 (2022) ("[T]he City's ordinance is facially content neutral."); *Ward v. Rock Against Racism*, 491 U.S. 781, 790, 803, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (finding the "content-neutral" ordinance "valid on its face"). Here, Dr. Hines brings an *as-applied* challenge. This distinction matters because the analyses in *City of Austin* and

*Ward* generally center on the text and enactment history, respectively, of the regulation being challenged. *See* City of Austin, 596 U.S. at 69, 142 S.Ct. 1464; Ward, 491 U.S. at 791, 109 S.Ct. 2746. By contrast, the analysis in McCullen centers on the *implementation* of the regulation by the enforcing authority, which is more apt for the fact-specific nature of as-applied challenges such as Dr. Hines's.[2] *See* United States v. Marcavage, 609 F.3d 264, 273 (3d Cir. 2010) ("A facial attack tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case. An as-applied attack, in contrast, does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." (citation omitted)).

But even assuming *arguendo* that the PER is content neutral under City of Austin and Ward, it may nevertheless be content based under McCullen.[3] A law may be facially content neutral yet content based in application. *See, e.g.,* Ness v. City of Bloomington, 11 F.4th 914, 923–24 (8th Cir. 2021) (finding a speech restriction content based as applied even when assuming its facial content neutrality *arguendo*); *see also* Eugene Volokh, *Speech as Conduct: Generally Applicable Laws, Illegal Courses of Conduct, "Situation-Altering Utterances," and the Uncharted Zones,* 90 CORNELL L. REV. 1277, 1286–94 (2005) (discussing "content-based as applied" laws).

**\*16** Here, the PER, on its face, is a generally applicable conduct regulation. This does not mean the PER is automatically content neutral as applied to Dr. Hines, however. *See, e.g.,* HLP, 561 U.S. at 26–27, 130 S.Ct. 2705 (finding that even though a law's prohibition "most often does not take the form of speech at all," it may still be a content-based speech restriction as applied). Irrespective of the PER's facial nature, the PER has been enforced against Dr. Hines in a content-based manner.

The State also contends that the PER is content neutral because it need not decide on whether it agrees with the contents of Dr. Hines's advice. But content-based and viewpoint-based discrimination are not the same.[4] While viewpoint discrimination is "a particularly 'egregious form of content discrimination,' " *Vidal v. Elster*, 602 U.S. 286, 293, 144 S.Ct. 1507, 219 L.Ed.2d 56 (2024) (quoting Rosenberger, 515 U.S. at 829, 115 S.Ct. 2510), not all content discrimination is viewpoint discrimination, Reed v. Town of Gilbert, 576 U.S. 155,

168–69, 135 S.Ct. 2218, 192 L.Ed.2d 236 (2015). *See also, e.g.,* *Iancu v. Brunetti*, 588 U.S. 388, 420, 139 S.Ct. 2294, 204 L.Ed.2d 714 (2019) (Sotomayor, J., concurring in part and dissenting in part) (describing the breach-of-the-peace statute in *Cohen v. California* as "viewpoint-neutral content discrimination"). Because the PER, operating in conjunction with the definition of practicing veterinary medicine, "singles out specific subject matter"—*i.e.*, veterinary advice specifically concerning the animals of Dr. Hines's clients—"for differential treatment," the PER is a content-based speech restriction even though "it does not target viewpoints within that subject matter." *Reed*, 576 U.S. at 169, 135 S.Ct. 2218.

## II

Strict scrutiny requires the State to show that the PER is " 'narrowly tailored' to 'further compelling governmental interests.' " *McDonald v. Longley*, 4 F.4th 229, 246 (5th Cir. 2021) (quoting *Johnson v. California*, 543 U.S. 499, 505, 125 S.Ct. 1141, 160 L.Ed.2d 949 (2005)).

Since "[s]trict scrutiny is 'the most demanding test known to constitutional law,' " *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1050 (6th Cir. 2015) (quoting *City of*

*Boerne v. Flores*, 521 U.S. 507, 534, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)), the showing the State must make is sizable. *See* *R.A.V.*, 505 U.S. at 382, 112 S.Ct. 2538 ("Content-based regulations are presumptively invalid."). The State attempts to satisfy its burden with a single sentence: "[I]f the Court determines that strict scrutiny applies, the [PER] would meet it for the same reasons that it satisfies intermediate scrutiny." This conclusory assertion does not suffice to show that the PER is narrowly tailored to the compelling governmental interests asserted by the State. *See* *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799–800, 131 S.Ct. 2729, 180 L.Ed.2d 708 (2011). Considering strict scrutiny's "heavy thumb on the scale in favor of the individual right in question," *Heller v. District of Columbia*, 670 F.3d 1244, 1282 (D.C. Cir. 2011) (Kavanaugh, J., dissenting), the State has not met its burden.

\* \* \*

Because the PER requires the State to examine the content of the messages Dr. Hines communicated to determine whether a violation has occurred, the PER is a content-based restriction of Dr. Hines's speech, and strict scrutiny applies. The State failed to satisfy strict scrutiny.

**All Citations**

--- F.4th ----, 2024 WL 4297014

---

**Footnotes**

1    *Hines v. Alldredge* (*Hines I*), 783 F.3d 197 (5th Cir. 2015); *Hines v. Quillivan* (*Hines II*), 982 F.3d 266 (5th Cir. 2020).

2    In 2023, the enforcement authority for the laws at issue changed to the Texas Department of Licensing and Regulation. Act of June 18, 2023, 88th Leg., R.S., ch. 1103, § 2 (codified at TEX. OCC. CODE § 801.022(a)). The commissioners of the Texas Department of Licensing and Regulation are therefore "automatically substituted" for the members of the Texas State Board of Veterinary Medical Examiners. FED. R. APP. P. 43(c)(2).

3    The statute defines "practice of veterinary medicine" as "the diagnosis, treatment, correction, change, manipulation, relief, or prevention of animal disease, deformity, defect, injury, or other physical condition, including the prescription or administration of a drug, biologic, anesthetic, apparatus, or other therapeutic or diagnostic substance or technique." TEX. OCC. CODE § 801.002(5)(A).

4    *Id.* § 801.351(a)(2).

5    *Id.* § 801.351(b).

6    *Id.* § 801.351(c).

7     *Hines I*, 783 F.3d at 203.

8    *Id.* at 201.

9    *Id.*; *see also* *id.* at 202 n.20 (describing the physical-examination requirement as a "content-neutral conduct regulation").

10    585 U.S. 755, 766–68, 138 S.Ct. 2361, 201 L.Ed.2d 835 (2018).

11    *Hines v. Quillivan*, 395 F. Supp. 3d 857, 864 (S.D. Tex. 2019).

12    949 F.3d 927, 928 n.1 (5th Cir. 2020).

13    *Hines II*, 982 F.3d at 272 (citing *Vizaline*, 949 F.3d at 931).

14    *Id.*

15    *Id.* (citation omitted).

16    At the Rule 12(b)(6) stage, the district court concluded that the law was a content-based restriction on Dr. Hines's speech, requiring discovery to develop the record for strict-scrutiny analysis. *See Hines v. Quillivan*, No. 1:18-CV-155, 2021 WL 6618658, at *10 (S.D. Tex. July 29, 2021), *report and recommendation adopted*, 2021 WL 5833886 (S.D. Tex. Dec. 9, 2021).

17    *Hines v. Pardue*, 688 F. Supp. 3d 522, 546–57 (S.D. Tex. 2023).

18    *Catalyst Strategic Advisors, L.L.C. v. Three Diamond Cap. SBC, L.L.C.*, 93 F.4th 870, 874 (5th Cir. 2024).

19    FED. R. CIV. P. 56(a).

20    *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001).

21    *See* *Tex. Ent. Ass'n v. Hegar*, 10 F.4th 495, 509 (5th Cir. 2021) (noting that the content-neutrality "determination dictates the level of scrutiny the challenged restriction must meet in order to pass muster").

22    *See* *NIFLA*, 585 U.S. at 768, 138 S.Ct. 2361 ("States may regulate professional conduct, even though that conduct incidentally involves speech."); *Vizaline*, 949 F.3d at 933 (citing *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 567, 131 S.Ct. 2653, 180 L.Ed.2d 544 (2011) (explaining that "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech")); *Tex. Ent. Ass'n*, 10 F.4th at 509 ("[C]ontent neutral restrictions are generally subject only to intermediate scrutiny."). We acknowledge that the Fourth Circuit, on the other hand, has held that intermediate scrutiny applies even when regulations only incidentally impact speech. *See* *Cap. Associated Indus., Inc. v. Stein*, 922 F.3d 198, 208 (4th Cir. 2019) ("We think the correct reading of Supreme Court precedent, however, is that intermediate scrutiny should apply to regulations of conduct that incidentally impact speech."). But because our precedent—and that of the Supreme Court—suggests otherwise, we apply intermediate scrutiny only if the law regulates speech directly (and in a content-neutral way), not merely incidentally.

23    *See, e.g.,* *Tex. Ent. Ass'n*, 10 F.4th at 509 ("Content based restrictions on protected First Amendment expression are presumptively unconstitutional and subject to strict scrutiny.").

24    We are mindful that under "[Supreme Court] precedents, [s]tates may regulate professional conduct, even though that conduct incidentally involves speech." *NIFLA*, 585 U.S. at 768, 138 S.Ct. 2361.

25    U.S. CONST. amend. I. The First Amendment applies to the states via incorporation into the Fourteenth Amendment. *See* *Stromberg v. California*, 283 U.S. 359, 368, 51 S.Ct. 532, 75 L.Ed. 1117 (1931).

26  *See, e.g.,* 🚩 *Counterman v. Colorado,* 600 U.S. 66, 73–74, 143 S.Ct. 2106, 216 L.Ed.2d 775 (2023) (finding no protection for true threats); 🚩 *Brandenburg v. Ohio,* 395 U.S. 444, 447–49, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (per curiam) (finding no protection for incitement); 🚩 *Chaplinsky v. New Hampshire,* 315 U.S. 568, 573, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) (finding no protection for fighting words); 🚩 *Texas v. Johnson,* 491 U.S. 397, 406, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (protecting flag burning); 🚩 *Police Dep't of Chi. v. Mosley,* 408 U.S. 92, 99, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) (protecting picketing); 🚩 *W. Va. State Bd. of Educ. v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (protecting refusal to salute the flag).

27  *See supra* note 22.

28  🚩 *Hines I,* 783 F.3d at 202 (adopting the professional-speech doctrine).

29  *See* 🚩 *NIFLA,* 585 U.S. at 768, 138 S.Ct. 2361 (collecting cases).

30  *See* 🚩 *id.* ("Speech is not unprotected merely because it is uttered by 'professionals.' ").

31  *Vizaline,* 949 F.3d at 932 (citing 🚩 *NIFLA,* 585 U.S. at 771–75, 138 S.Ct. 2361).

32  *Tex. Dep't of Ins. v. Stonewater Roofing, Ltd. Co.,* —— S.W.3d ——, —— – ——, No. 22-0427, 2024 WL 2869414, at *16–17 (Tex. June 7, 2024) (YOUNG, J., concurring).

33  🚩 *Jenevein v. Willing,* 493 F.3d 551, 562 (5th Cir. 2007).

34  🚩 *360 Virtual Drone Servs. LLC v. Ritter,* 102 F.4th 263, 274 (4th Cir. 2024).

35  Dr. Hines's complaint states both as-applied and facial challenges to the physical-examination requirement. On appeal, Dr. Hines disclaimed his facial challenge. Accordingly, we evaluate only his as-applied challenge. *See* 🚩 *United States v. Perez,* 43 F.4th 437, 443 (5th Cir. 2022) (recognizing that "circuit practice" requires us to address an as-applied challenge before a facial challenge).

36  🚩 *Holder v. Humanitarian L. Project (HLP),* 561 U.S. 1, 27–28, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010) (concluding

that a law barring communications to certain groups when it "imparts a 'specific skill' or communicates advice derived from 'specialized knowledge' " functioned as a regulation of speech, not conduct); *see* *R.A.V. v. City of St. Paul*, 505 U.S. 377, 389, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) ("[W]ords can in some circumstances violate laws directed not against speech but against conduct."). Admittedly, in *Giboney v. Empire Storage & Ice Co.*, the Court rejected the idea that free speech protection extends "to speech or writing used as an integral part of conduct in violation of a valid criminal statute," 336 U.S. 490, 498, 69 S.Ct. 684, 93 L.Ed. 834 (1949), and emphasized that "[i]t has never been deemed an abridgement of freedom of speech ... to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed," *id.* at 502, 69 S.Ct. 684. But there, the case involved expressive conduct that violated *criminal* law, not speech that violated occupational regulations, as occurred here.

[37] *Cohen v. California*, 403 U.S. 15, 16, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (asterisks substituted).

[38] *Id.* at 18, 91 S.Ct. 1780.

[39] *Id.* (emphasis added).

[40] *HLP*, 561 U.S. at 10, 26–28, 130 S.Ct. 2705; *id.* at 61, 130 S.Ct. 2705 (Breyer, J., dissenting) ("[T]he majority properly rejects ... that the plaintiffs' speech-related activities amount to 'conduct' and should be reviewed as such.").

[41] *Id.* at 27, 130 S.Ct. 2705.

[42] *See* *id.* at 28, 130 S.Ct. 2705; *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 47, 137 S.Ct. 1144, 197 L.Ed.2d 442 (2017).

[43] *See* *Tex. Dep't of Ins.*, ––– S.W.3d at –––, 2024 WL 2869414, at *17 (YOUNG, J., concurring) ("[C]onduct and speech are not hermetically sealed categories.").

[44] *NIFLA*, 585 U.S. at 773, 138 S.Ct. 2361 (original alteration omitted) (quoting *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988)); *see also* *id.* ("States cannot choose the protection that speech receives under the First Amendment, as that would give them a powerful tool to impose invidious discrimination of disfavored subjects." (internal quotation marks and citation omitted)).

45   *Thomas v. Collins*, 323 U.S. 516, 536, 65 S.Ct. 315, 89 L.Ed. 430 (1945).

46   *Bigelow v. Virginia*, 421 U.S. 809, 826, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975).

47   *See Freedom Path, Inc. v. IRS*, 913 F.3d 503, 508 (5th Cir. 2019) (stating that an as applied challenge considers the "application" of a statute "to the particular circumstances of an individual" (citation omitted)).

48   TEX. OCC. CODE § 801.002(5).

49   *Id.* §§ 801.351, .401, .402(4).

50   *Cf. Chiles v. Salazar*, —— F.4th ——, No. 12-1445, 2024 WL 4157902 (10th Cir. Sept. 12, 2024) (holding that a Colorado law banning "conversion therapy" for minors regulated conduct and only incidentally burdened a therapist's speech). Given our analysis in today's case, we are hesitant to embrace *Chiles*'s threshold conclusion that conduct, and not speech, was the target of the Colorado law. Regardless, even if correct, *Chiles* is inapposite. Colorado's conversion-therapy law, unlike Texas's pet-telehealth law, regulates the *substance* of the medical care, not the *form* or *manner* of the care. Moreover, the "conversion therapy" law aims to restrict any counselors engaged in providing such therapy, regardless of how they provided that care; Dr. Hines's speech, by contrast, is the *only* part of his practice that is regulated.

51   *See Cohen*, 403 U.S. at 18, 91 S.Ct. 1780; *HLP*, 561 U.S. at 28, 130 S.Ct. 2705. We previously characterized the physical-examination requirement as a conduct regulation in *Hines I*, and the State contends this characterization controls. *See* 783 F.3d at 201–202, 202 n.20. But *Hines I* merely described the physical-examination requirement in general terms. Here, Dr. Hines brings an as-applied challenge, which tests the "particular application" of the physical-examination requirement to Dr. Hines. *City of Los Angeles v. Patel*, 576 U.S. 409, 415, 135 S.Ct. 2443, 192 L.Ed.2d 435 (2015). The Supreme Court "has often held that a valid statute was unconstitutionally applied in particular circumstances because it interfered with an individual's exercise of [free speech] rights." *Boddie v. Connecticut*, 401 U.S. 371, 379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). The physical-examination requirement's general nature does not demonstrate whether the requirement regulates Dr. Hines's speech or conduct here.

52   The Court itself has often been divided over this question. *See, e.g., McCullen v. Coakley*, 573 U.S. 464, 499, 134 S.Ct. 2518, 189 L.Ed.2d 502 (2014) (Scalia, J., concurring in the judgment) (noting that "the Court is divided 5–to–4" on the issue of content neutrality); *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 86–106, 142 S.Ct. 1464, 212 L.Ed.2d 418 (2022) (THOMAS, GORSUCH, and BARRETT, JJ., dissenting on the content-neutrality

issue).

53      *McCullen*, 573 U.S. at 499, 134 S.Ct. 2518 (SCALIA, J., concurring in the judgment).

54      *See post*, at —— (RAMIREZ, J., concurring).

55      *McCullen*, 573 U.S. at 499, 134 S.Ct. 2518 (SCALIA, J., concurring in the judgment).

56      *Id.* (collecting cases); *see also* *Sorrell*, 564 U.S. at 571, 131 S.Ct. 2653. The concurrence would decide this issue today, deeming the physical-exam requirement a content-based regulation of Dr. Hines's speech that is subject to strict scrutiny. *Post*, at ——. But since Texas's requirement fails even intermediate scrutiny, *post*, at ——we need go no further.

57      *McCullen*, 573 U.S. at 498, 134 S.Ct. 2518 (2014) (SCALIA, J., concurring in the judgment) ("[W]here a statute challenged on First Amendment grounds 'fail[s] even under the [less demanding] test,' " we need not "parse the differences between ... two [available] standards." (quoting *McCutcheon v. FEC*, 572 U.S. 185, 199, 134 S.Ct. 1434, 188 L.Ed.2d 468 (2014) (plurality opinion))); *see also* *Recht v. Morrisey*, 32 F.4th 398, 410 (4th Cir. 2022) ("After all, if you can't ski a blue run successfully, you obviously can't tackle a double black diamond.").

58      *City of Austin*, 596 U.S. at 76, 142 S.Ct. 1464 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)).

59      *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 793 (5th Cir. 2024) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994)).

60      *Cablevision Sys. Corp. v. F.C.C.*, 597 F.3d 1306, 1323 (D.C. Cir. 2010) (KAVANAUGH, J., dissenting).

61      *United States v. Virginia*, 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (emphasis added).

62      *See* *Turner Broad. Sys.*, 512 U.S. at 664, 114 S.Ct. 2445.

63  *Id.*

64  *Id.* (internal quotation marks and citation omitted).

65  *Id.*

66  Although the State mentions its other three interests in passing, it provides no argument on the means-end fit. Because the burden of justifying the law rests solely with the State, it has at the very least failed to meet its burden under the other three interests if it has not forfeited the argument.

67  *Edenfield v. Fane*, 507 U.S. 761, 771, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993).

68  *Pub. Citizen Inc. v. La. Att'y Disciplinary Bd.*, 632 F.3d 212, 221 (5th Cir. 2011) (citations omitted).

69  *Edenfield*, 507 U.S. at 770, 113 S.Ct. 1792.

70  *See* *Turner Broad. Sys.*, 512 U.S. at 664, 114 S.Ct. 2445 (finding states may pass legislation to "prevent anticipated harms").

71  Although, notably, the State doesn't point to *any* deaths that have occurred from a telemedicine misdiagnosis.

72  The literature review also pointed to a survey of Portuguese veterinarians, in which "most participants acknowledged that the service provided by teleconsultations is complementary to that of physical consultations but stressed the need for having a face-to-face interaction before resorting to telematic means." Again, this doesn't say anything about whether using telemedicine without a physical exam would cause *harm*. *See* *Pub. Citizen Inc.*, 632 F.3d at 222 (noting that survey responses the State relied on "fail[ed] to point to any specific harms or to how they will be alleviated by [the challenged regulation]").

73  *See, e.g., Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109, 1117 (9th Cir. 2023) ("To start with the obvious, a state may not restrict protected speech to prevent something that does not appear to occur .... And if the state cannot cite a single case of a minor in California unlawfully buying a gun, then an advertisement about firearms logically could not have contributed to such a sale."); *McCraw v. City of Oklahoma City*, 973 F.3d 1057, 1071–72 (10th Cir. 2020) ("Critically, this record is devoid of evidence that accidents involving vehicles and pedestrians on medians in Oklahoma City is an actual issue, as opposed to a hypothetical concern."); *IMS Health Inc. v. Sorrell*, 630 F.3d 263, 276 (2d Cir. 2010), *aff'd*, 564 U.S. 552, 131 S.Ct. 2653, 180 L.Ed.2d 544 (2011) ("Vermont's own expert was unaware of any instance in which a detailing interaction caused a doctor to prescribe an inappropriate

medication.").

74    *See* 🏴 *Virginia*, 518 U.S. at 533, 116 S.Ct. 2264.

75    *See* 🏴 *Turner Broad. Sys.*, 512 U.S. at 664, 114 S.Ct. 2445.

76    🚩 TEX. OCC. CODE § 801.351(a).

77    🚩 *Id.* § 801.351(a)(2).

78    *Id.* § 801.351(b) (emphasis added).

79    *Id.* § 801.351(c).

80    *See id.* § 801.351(b).

81    *See id.* § 801.351(b).

82    "If a pediatrician can use telemedicine to treat a three-month old infant—based upon medical records, the parent's description of external symptoms and a visual examination of the child—the Court cannot adduce why a veterinarian cannot do the same for a dog, cat, or hamster." *Hines II*, 982 F.3d at 279 (ELROD, J., concurring in part and dissenting in part) (quoting 🚩 *Hines v. Quillivan*, No. CV B-18-155, 2019 WL 13036103, at *15 (S.D. Tex. Feb. 19, 2019), *report and recommendation adopted in part, rejected in part*, 🚩 395 F. Supp. 3d 857 (S.D. Tex. 2019), *aff'd in part, rev'd in part and remanded*, 982 F.3d 266 (5th Cir. 2020)).

83    *See Hines II*, 982 F.3d at 280 (ELROD, J., concurring in part and dissenting in part) ("Babies and other non-communicative adults were intentional beneficiaries of Texas's expansion of telemedicine, not the subjects of unwitting overinclusion. Texas has never shown a preference for animals over humans that would support requiring higher standards for animals' medical treatment. *Cf. Strickland v. Medlen*, 397 S.W.3d 184, 185 (Tex. 2013) (WILLETT, J.) (holding that dog owners could not recover non-economic damages for loss of companionship under Texas tort law because '[p]ets are property in the eyes of the law.').").

84    *Turner Broad. Sys.*, 512 U.S. at 662, 114 S.Ct. 2445 (quoting *Ward*, 491 U.S. at 799, 109 S.Ct. 2746).

85    *Id.* (citation omitted).

86    *McCullen*, 573 U.S. at 494, 134 S.Ct. 2518.

87    *See, e.g.,* *Nat'l Press Photographers Ass'n*, 90 F.4th at 793–94 (suit against McCraw in his official capacity as the Director of the Texas Department of Public Safety). And here, the Board is represented by the Texas Attorney General, the State's chief legal officer.

88    *Ward*, 491 U.S. at 799, 109 S.Ct. 2746.

89    *See also* *McCullen*, 573 U.S. at 493–94, 134 S.Ct. 2518 ("The point is not that Massachusetts must enact all or even any of the proposed measures discussed above. The point is instead that the Commonwealth has available to it a variety of approaches that appear capable of serving its interests, without excluding individuals from areas historically open for speech and debate.").

90    *Id.*

1     By the time *McCullen* reached the Supreme Court, only as-applied challenges remained. *See* *id. at 475, 134 S.Ct. 2518.*

2     While the test from *McCullen* does not apply exclusively to as-applied challenges, *see, e.g.,* *League of Women Voters*, 468 U.S. at 383, 104 S.Ct. 3106, its contextual utility appears greater since as-applied challenges examine the "implementation" of the law while facial challenges examine the "text" of that law, *see* *Whole Woman's Health All. v. Hill*, 937 F.3d 864, 875 (7th Cir. 2019). As *McCullen* demonstrates, whether a law is content based or content neutral *as applied* may turn on whether the content of the speech must be examined to determine if that law has been violated. *See* 573 U.S. at 464, 134 S.Ct. 2518. Without a framework to analyze whether a regulation has been implemented in a content-based way, broad yet facially neutral regulations could be enacted and then enforced based on content, only to have those regulations face relaxed scrutiny in as-applied challenges. *See* *Hoye v. City of Oakland*, 653 F.3d 835, 854 (9th Cir. 2011) ("Courts must be willing to entertain the possibility that content-neutral enactments are enforced in a content-discriminatory manner. If they were not, the First Amendment's guarantees would risk becoming an empty formality, as government could enact regulations on speech written in a content-neutral manner so as to withstand judicial scrutiny, but then proceed to ignore the regulations' content-neutral terms by adopting a content-discriminatory enforcement policy.").

[3] The State does not cite, and we cannot find, authority holding that 🚩*City of Austin* and 🚩*Ward* are the exclusive tests for determining content neutrality.

[4] "Viewpoint discrimination exists 'when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.' " 🚩*Heaney v. Roberts*, 846 F.3d 795, 802 (5th Cir. 2017) (quoting 🚩*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995)). Because it is "uniquely harmful to a free and democratic society," 🚩*Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187, 144 S.Ct. 1316, 218 L.Ed.2d 642 (2024), viewpoint discrimination is "presumptively unconstitutional," 🚩*Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 284 (5th Cir. 2003).

© 2024 Thomson Reuters. No claim to original U.S. Government Works.