**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 22-2110

COURTHOUSE NEWS SERVICE,

Plaintiff – Appellant,

v.

JACQUELINE C. SMITH, in her official capacity as Clerk of the Circuit Court for
Prince William County, Virginia,

Defendant – Appellee,

and

COMMONWEALTH OF VIRGINIA,

Intervenor/Defendant – Appellee.

------------------------------

THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND 38
MEDIA ORGANIZATIONS,

Amicus Supporting Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at
Richmond.  Henry E. Hudson, Senior District Judge.  (3:21-cv-00460-HEH)

Argued:  December 7, 2023                    Decided:  January 22, 2025

Before GREGORY, WYNN, and RUSHING, Circuit Judges.

Affirmed in part, vacated in part, and remanded by published opinion. Judge Rushing wrote the opinion, in which Judge Wynn joined. Judge Gregory wrote a dissenting opinion.

––––––––––––––

**ARGUED:** Roger Myers, BRYAN CAVE LEIGHTON PAISNER, LLP, San Francisco, California, for Appellant. Erika L. Maley, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia; John Connell Altmiller, Jr., PESNER ALTMILLER MELNICK DEMERS & STEELE PLLC, Tysons, Virginia, for Appellees. **ON BRIEF:** Dabney J. Carr, IV, TROUTMAN PEPPER HAMILTON SANDERS LLP, Richmond, Virginia; Jonathan E. Ginsberg, New York, New York, Rachel Matteo-Boehm, BRYAN CAVE LEIGHTON PAISNER LLP, San Francisco, California, for Appellant. Jason S. Miyares, Attorney General, Steven G. Popps, Deputy Attorney General, Robert B. McEntee, III, Assistant Attorney General, Erin R. McNeill, Assistant Attorney General, Andrew N. Ferguson, Solicitor General, Graham K. Bryant, Deputy Solicitor General, M. Jordan Minot, Assistant Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee Commonwealth of Virginia. Heather R. Steele, PESNER ALTMILLER MELNICK DEMERS & STEELE PLLC, Tysons, Virginia, for Appellee Jacqueline C. Smith. Bruce D. Brown, Katie Townsend, Shannon A. Jankowski, Tyler Takemoto, REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, Washington, D.C., for Amici Curiae.

––––––––––––––

RUSHING, Circuit Judge:

The Circuit Court for Prince William County, Virginia, makes civil court records available to the public at the courthouse. Courthouse News Service would like to skip the trip to the courthouse and view civil court records remotely on the internet, like Virginia attorneys can. But Virginia law prohibits the clerk of court from granting Courthouse News the same remote access given to attorneys. So Courthouse News sued, alleging that the Virginia law violates its First Amendment and Equal Protection rights. The district court ruled in favor of the Commonwealth. We agree with that conclusion.

## I.

All Virginia circuit courts offer public access to nonconfidential civil court filings and other court records at the courthouse during business hours. The Prince William County Circuit Court does so through public access terminals. When a litigant files a document with that court, the clerk enters relevant data into the case management program and scans the document into the casefile imaging system. "[A]lmost immediately" upon scanning, the document is available to view for free at public access terminals in the Prince William County Courthouse. J.A. 87. Anyone can print the document upon paying the nominal cost of making a paper copy. These terminals are open to the public Monday through Friday, 8:30 a.m. to 5:00 p.m.

Virginia law leaves to the clerks of each circuit court, who are elected officials, whether to provide access to court records over the internet. *See* Va. Code Ann. § 17.1-225. Clerks who provide online access must ensure they do not "post on the Internet any document that contains . . . (i) an actual signature, (ii) a social security number, (iii) a date

of birth identified with a particular person, (iv) the maiden name of a person's parent so as to be identified with a particular person, (v) any financial account number or numbers, or (vi) the name and age of any minor child."[1]  *Id.* § 17.1-293(B).

This prohibition on posting personal information does not apply to a system that provides "secure remote access to nonconfidential court records . . . to members in good standing with the Virginia State Bar and their authorized agents, pro hac vice attorneys authorized by the court for purposes of the practice of law, and such governmental agencies as authorized by the clerk."  *Id.* § 17.1-293(E)(7).  The Executive Secretary of the Supreme Court of Virginia has created such a system—the Officer of the Court Online Remote Access System, or OCRA.  In each jurisdiction that uses OCRA, an authorized user pays a subscription fee to access the court records that jurisdiction makes available online.[2]  The records are available to the subscriber over the internet anytime, anywhere.  But Virginia law forbids "any data accessed by secure remote access to be sold or posted on any other website or in any way redistributed to any third party."[3]  *Id.* § 17.1-293(H).

---

[1] Litigants must "make reasonable efforts to redact all but the last four digits" of social security numbers, driver's license numbers, and certain financial account numbers included in documents they file.  Va. Code Ann. § 8.01-420.8(A).

[2] For example, the annual subscription fee for OCRA access in Prince William County Circuit Court is $200 for one attorney and one employee.

[3] Such data, however, "may be included in products or services provided to a third party of the subscriber," provided it is "not made available to the general public" and "the subscriber maintains administrative, technical, and security safeguards to protect the confidentiality, integrity, and limited availability of the data."  Va. Code Ann. § 17.1-293(H).

The clerk of the Circuit Court of Prince William County has elected to participate in OCRA.[4]  The circuit court records available to authorized subscribers via OCRA are the same records available to the public via access terminals at the courthouse.  After the clerk scans a nonconfidential civil filing into the casefile imaging system, it becomes available for authorized subscribers to view on OCRA "usually within five minutes."  J.A. 87.  Every civil court record made available remotely on OCRA has already been made publicly available through the access terminals at the courthouse.  The Prince William County Circuit Court's OCRA system has approximately 274 private (non-governmental) subscribers and approximately 551 subscribers total.

Courthouse News Service is a nationwide news organization that specializes in reporting on civil litigation in state and federal courts across the country, including courts in Virginia.  One Courthouse News employee is based in Prince William County and visits the courthouse daily to review new civil case filings.  Like the public, the reporter also can view dockets online for cases filed in Prince William County Circuit Court.

In May 2021, Courthouse News requested OCRA access from the clerk of the Circuit Court for Prince William County.  Pursuant to her policy of offering online access to civil court records only to Virginia-barred attorneys and their staff, the clerk denied the request because Courthouse News did not include a Virginia bar license number and a copy of a Virginia bar card with its application.

---

[4] The circuit court clerks of 105 of Virginia's 120 counties have chosen to use OCRA.

Courthouse News sued the clerk, and the Commonwealth of Virginia intervened as a defendant. In its amended complaint, Courthouse News alleged that Virginia Code § 17.1-293 violates the First and Fourteenth Amendments to the United States Constitution. Specifically, it claimed Virginia Code § 17.1-293(E)(7)—which limits OCRA access to attorneys and their staff (the Access Restriction)—unconstitutionally deprives Courthouse News of "the First Amendment right of equal access to certain civil, nonconfidential, public court filings and other public court records," including "newly-filed civil complaints." J.A. 32–33. Courthouse News similarly alleged that Virginia Code § 17.1-293(H)—which prohibits selling, posting, or redistributing data obtained from OCRA (the Dissemination Restriction)—violates its First Amendment rights. And finally, Courthouse News asserted that Virginia Code § 17.1-293 impermissibly discriminates between attorneys and non-attorneys in violation of the Equal Protection Clause.

The district court dismissed Courthouse News's Equal Protection claim because it did not implicate a suspect class or a fundamental right. As for the two First Amendment claims, the court granted summary judgment in favor of the defendants, upholding the Access Restriction and Dissemination Restriction as content-neutral time, place, and manner regulations that were justified by the Commonwealth's interests in the orderly and efficient administration of justice and protection of sensitive personal information contained in court filings. Courthouse News appeals all three rulings. Our review is de novo. *See Fusaro v. Howard*, 19 F.4th 357, 366 (4th Cir. 2021); *Soderberg v. Carrion*, 999 F.3d 962, 967 (4th Cir. 2021).

II.

We begin with Courthouse News's First Amendment challenge to the Access Restriction.

A.

At the outset, we must decide the applicable level of scrutiny, because "not every interference with [First Amendment rights] triggers the same degree of scrutiny." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 637 (1994). It is helpful first to identify the nature of the right allegedly infringed. Speaking generally, Courthouse News claims that, by denying it OCRA access, the circuit court clerk has unconstitutionally impaired its right to access court records. But upon closer inspection, the asserted right is more narrowly defined.

Our Court has recognized a First Amendment right to access certain civil court records that are available via OCRA.[5] Specifically, we have held that the press and the public have a First Amendment right of access to particular judicial records and documents in civil cases. Those include "newly filed civil complaints," *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 328 (4th Cir. 2021), summary judgment motions and "documents filed in connection with" those motions, *Rushford v. New Yorker Mag., Inc.*, 846 F.2d 249, 253 (4th Cir. 1988), judicial opinions ruling on summary judgment motions, *Doe v. Pub. Citizen*, 749 F.3d 246, 267 (4th Cir. 2014), and docket sheets, *id.* at 268. Courthouse News has access to all these nonconfidential civil court records at the Prince William County

---

[5] The First Amendment, which forbids laws "abridging the freedom of speech, or of the press," applies to Virginia through the Fourteenth Amendment. U.S. Const. amend. I.

Courthouse, as well as online access to dockets sheets, just like the general public. *Cf. In re Greensboro News Co.*, 727 F.2d 1320, 1322 (4th Cir. 1984) ("[T]he rights of the news media . . . are co-extensive with and do not exceed those rights of members of the public in general.").

Our Court has further held that this right of the public and the press generally requires "contemporaneous" access to applicable court records—that is, access "the same day on which the [document] is filed, insofar as is practicable[,] and when not practicable, on the next court date." *Schaefer*, 2 F.4th at 328 (internal quotation marks omitted). Courthouse News, like the general public, has contemporaneous access to the civil court records it seeks through the public access terminals at the courthouse. Newly filed documents do not appear more quickly on OCRA than they do at the public access terminals, and Courthouse News does not claim any unconstitutional time lag or delay. Nor does Courthouse News allege that any new filings become available on OCRA outside courthouse business hours.[6] In fact, the parties agree that when the clerk scans new civil filings, they are available to the public "almost immediately" at the courthouse, while OCRA availability occurs "shortly thereafter, usually within five minutes." J.A. 87.

What Courthouse News does not have is remote online access to the same civil court records it may contemporaneously view at the courthouse. Importantly, however,

---

[6] We therefore reject Courthouse News's argument that OCRA access creates a "virtual courthouse" that is "always open" to attorneys but "closed to the press and general public except during business hours." Opening Br. 28. There is no evidence that any court business occurs outside of business hours.

8

Courthouse News does not claim a freestanding First Amendment right of online access to court records.[7]   Instead, Courthouse News contends that *if* the clerk offers Virginia attorneys online access to nonconfidential civil court records, *then* she must offer the press and the public the same access—"24/7/365, via OCRA."  Opening Br. 28.

Having identified the asserted right, we can see that the Access Restriction, and the clerk's application of it, resembles a time, place, and manner regulation.  Courthouse News undisputedly has access to all the civil court records it seeks, including the records the First Amendment entitles it to view.  The clerk's rejection of its OCRA application does not deny Courthouse News access to those documents.  Rather, the denial of OCRA access limits when, where, and how Courthouse News may access those court records: during business hours at the courthouse using public access terminals instead of all hours of every day, remotely, using a personal computer with internet access.  *Cf. Schaefer*, 2 F.4th at 328 (reasoning that clerks' practices of delaying public access to newly filed civil complaints for days after filing "resemble[d] time, place, and manner restrictions").

The strict scrutiny with which we ordinarily examine the asserted infringement of a First Amendment right of access does not apply to "limitations on the right of access that resemble 'time, place, and manner' restrictions on protected speech."  *Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596, 607 n.17 (1982) (quoting *Young v. Am. Mini Theaters, Inc.*, 427 U.S. 50, 63 n.18 (1976)); *cf. Richmond Newspapers, Inc. v.*

---

[7] Accordingly, no party has offered arguments under the "experience and logic" test we use to determine whether the First Amendment provides a right of access to a particular judicial proceeding or record.  *See Schaefer*, 2 F.4th at 326 (internal quotation marks omitted).

*Virginia*, 448 U.S. 555, 581 n.18 (1980) (plurality); *id.* at 600 (Stewart, J., concurring).  To those limitations "we apply more relaxed scrutiny."  *Schaefer*, 2 F.4th at 328.  Under this standard, the challenged practice must be "content-neutral, narrowly tailored and necessary to preserve the court's important interest[s]."  *Id.* (internal quotation marks omitted); *cf. Young*, 427 U.S. at 63 n.18 ("Reasonable regulations of the time, place, and manner of protected speech, where those regulations are necessary to further significant governmental interests, are permitted by the First Amendment."); *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) ("[T]he government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." (internal quotation marks omitted)).  That is the standard we must apply here.[8]

---

[8] Courthouse News urges us to reconsider the relaxed standard our Court articulated in *Schaefer* and instead apply a purportedly more stringent standard employed by the Ninth Circuit in *Courthouse News Service v. Planet*, 947 F.3d 581 (9th Cir. 2020).  We are not at liberty to ignore this Court's directly applicable precedent.  Moreover, *Schaefer* cited *Planet* but notably did not adopt the rigorous scrutiny Courthouse News claims the Ninth Circuit applied there.  *Compare*, *e.g.*, *Schaefer*, 2 F.4th at 328 (rejecting the strict scrutiny of *Globe Newspaper*, 457 U.S. at 606–607), *with Planet*, 947 F.3d at 596 (applying a test based on *Press-Enterprise Co. v. Superior Ct. of Cal.*, 478 U.S. 1, 13–14 (1986), and *Press-Enterprise Co. v. Superior Ct. of Cal.*, 464 U.S. 501, 509–510 (1984), which came from *Globe Newspaper*, 457 U.S. at 606–607).  Nor does *Schaefer* conflict with this Court's decision in *In re Charlotte Observer*, 882 F.2d 850, 852 (4th Cir. 1989), which, like the *Press-Enterprise* decisions, addressed courtroom closure and sealing orders in a criminal case.

B.

We turn now to assessing whether the Access Restriction satisfies the "relaxed scrutiny" applicable to time, place, and manner limitations on the right of access. *Schaefer*, 2 F.4th at 328. We first consider whether the Access Restriction is "content-neutral" and then whether it is "narrowly tailored and necessary to preserve the [government's] important interest[s]." *Id.* (internal quotation marks omitted).

1.

Laws that burden the right to access court records "without reference to the ideas or views expressed" therein and that are "justified without reference to the content" of the records are content-neutral. *Turner Broad. Sys.*, 512 U.S. at 643; *Ward*, 491 U.S. at 791. By contrast, a government regulation is content-based if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

The Access Restriction is content-neutral. As the district court correctly observed, the Access Restriction "applies to all nonconfidential civil court records in the same fashion and does not treat civil court records about a certain subject or topic differently than others."[9] *Courthouse News Serv. v. Hade*, 631 F. Supp. 3d 349, 362 (E.D. Va. 2022). It "does not center around disagreement with the message [a record] conveys, turn upon the communicative contents of the court records, nor change based on viewpoint or subject matter." *Id.*

---

[9] The Access Restriction refers to "nonconfidential court records." Va. Code Ann. § 17.1-293(E)(7). Courthouse News does not claim a right to access confidential records.

11

Courthouse News does not dispute that the Access Restriction is facially content-neutral but argues that it is akin to an impermissible speaker-based restriction and motivated by government disapproval of certain speech. Because speech restrictions "based on the identity of the speaker" can be "a means to control content," laws "favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference." *Reed*, 576 U.S. at 170 (internal quotation marks omitted). Accepting for argument the parties' adaptation of this principle to the right of access, it does not apply here, where there is no reason to think that providing Virginia attorneys, but not the general public, with online access to court records has any relation to the content of the records each group accesses. Courthouse News and the public have access to the exact same content at the courthouse as OCRA subscribers have via online access. The Access Restriction therefore does not reflect a preference about *what* records non-attorneys may access but *how* non-attorneys may access those records.

As for the law's justification, the Commonwealth defends the restriction as targeting dangers particular to online access—primarily, mass data harvesting of electronic documents. This justification has nothing to do with the content of any given court record or disagreement with Courthouse News accessing that content, and everything to do with the method of access. Indeed, nothing about the Access Restriction suggests the General Assembly adopted it because of "disagreement with the message" conveyed by any court records or disapproval of the ideas or viewpoints expressed by those who access court records. *Id.* at 164 (internal quotation marks omitted). This is demonstrated most vividly

12

by the fact that all court records accessible to Virginia attorneys via OCRA are available for public inspection and copying at the courthouse.

2.

Turning next to the "governmental interest[s]" asserted to justify the Access Restriction, we have no doubt they are "significant." *Ward*, 491 U.S. at 791 (internal quotation marks omitted); *see also Schaefer*, 2 F.4th at 328. The Commonwealth identifies two interests served by the Access Restriction: protecting sensitive personal information contained in court records and furthering the orderly and efficient administration of justice. Courthouse News does not seriously dispute the significance of these interests and waived any arguments to the contrary by waiting until its reply brief to raise them. *See*, *e.g.*, Opening Br. 53 ("All courts share an interest in preventing harm caused by misuse of personal identifiers, and ensuring the efficient administration of justice."); Reply Br. 25 n.17 (acknowledging that the Commonwealth "invokes a privacy interest recognized as 'important' in other First Amendment access cases"); *see also Clendening v. United States*, 19 F.4th 421, 430 n.7 (4th Cir. 2021) ("A party waives an argument by raising it for the first time in its reply brief." (internal quotation marks and brackets omitted)).

In any event, both interests suffice. First, as this Court has previously recognized, the Commonwealth has an "important interest" in the efficient and "orderly administration of justice." *Schaefer*, 2 F.4th at 328; *see also Sharpe v. Winterville Police Dep't*, 59 F.4th 674, 681 (4th Cir. 2023) ("Defendants may point to common sense and caselaw to establish that the [government] has a valid interest . . . ."); *Reynolds v. Middleton*, 779 F.3d 222, 228

13

(4th Cir. 2015) ("[T]he existence of a governmental interest may be established by reference to case law.").

Second, safeguarding sensitive personal information in court records is an important governmental interest. Civil litigation can "implicate privacy interests of litigants and third parties" by requiring them to disclose to one another and the court personal identifying information that is susceptible to misuse. *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 35 (1984). For example, the court records available through OCRA include signatures, birthdates, maiden names, and the names and ages of minor children, along with partial social security numbers, driver's license numbers, and financial account numbers. Va. Code Ann. § 17.1-293(B), (E)(7); *see id.* § 8.01-420.8. As the custodian of that electronic compilation of records, the circuit court clerk has an important interest in protecting privacy and "'forestall[ing] . . . the injury'" caused by dissemination and misuse of that personal information, including identity theft, fraud, and exploitation. *Ostergren v. Cuccinelli*, 615 F.3d 263, 275 (4th Cir. 2010) (quoting *The Fla. Star v. B.J.F.*, 491 U.S. 524, 534 (1989)); *see also Seattle Times*, 467 U.S. at 35 (reasoning "[t]he government clearly has a substantial interest in preventing" the "public[] release[]" of information obtained during discovery that "could be damaging to [the] reputation and privacy" of litigants and third parties); *Nat'l Federation of the Blind v. FTC*, 420 F.3d 331, 339 (4th Cir. 2005) (recognizing the "substantial" governmental interest in protecting the public from fraud); *Lamphere & Urbaniak v. Colorado*, 21 F.3d 1508, 1515 (10th Cir. 1994) (observing "[t]he State's interest in protecting privacy" in court records); *cf. U.S. Dep't of Just. v. Reps. Comm. For Freedom of Press*, 489 U.S. 749, 752, 763–764 (1989)

14

(acknowledging privacy interest in "rap sheet," which compiled information such as "date of birth and physical characteristics" as well as criminal history, and noting the "vast difference" between "scattered disclosure of [] bits of information" and "a single clearinghouse of [that same] information").

3.

Our ultimate inquiry is whether the Access Restriction is narrowly tailored to serve these important interests. In this context, "[a] regulation is narrowly tailored if it . . . 'promotes a substantial government interest that would be achieved less effectively absent the regulation,' and . . . does not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Ross v. Early*, 746 F.3d 546, 555 (4th Cir. 2014) (quoting *Ward*, 491 U.S. at 799).

According to the Commonwealth, civil court records available through remote online access are uniquely susceptible to a practice known as "data mining" or "data harvesting," which facilitates easy identification, collection, and misuse of sensitive personal information. Commw. Br. 9. As the Commonwealth's declarant[10] explains, "[a]nyone with rudimentary programming knowledge" can download and convert imaged documents "to searchable text, aggregate the data in a database, and subsequently search through the data for" personally identifiable information. J.A. 128. This practice is

---

[10] This particular declarant is the "Deputy Director – Application Development Manager" of the Department of Judicial Information Technology within the Office of the Executive Secretary of the Supreme Court of Virginia. J.A. 127. In a passing footnote, Courthouse News asserts that his declaration lacks foundation because it does not establish the declarant's personal knowledge about facts predating his employment. We do not find that contention persuasive.

15

typically done by "internet robots," or "bots," computer programs that can operate without input from a human user once they are activated. J.A. 129. "Data mining typically requires easy access to large volumes of data, which bots programmed to seek personal information can quickly search." Commw. Br. 45. Mined personally identifiable information can then be used to enable identity theft and other types of fraud and exploitation.

The Commonwealth presents evidence that publicly available online records systems operated by the Executive Secretary of the Supreme Court of Virginia have been "subjected to manual and/or automated data mining from around the world." J.A. 129. For example, bots have mined the Online Case Information Systems (OCIS) for Virginia general district courts and circuit courts, which systems allow users to obtain docket information about cases in participating courts. "[I]nstead of searching for a few cases or names within a single session, the bots would enter searches for every single possible case number within the database, sequentially," far faster than what a human is capable of entering. J.A. 129. Another example concerns the Virginia Date of Birth Confirmation System (VDBC), which allows registered organizations to search OCIS to confirm if an individual is "associated with . . . criminal and traffic cases." J.A. 129. The VDBC system allows for searches based on name, date of birth, driver's license information, and the last four digits of a social security number. VDBC has been mined for data by users and bots that "perform[] multiple searches based on guessed, partial data" in order to "piece together the [personal identifying information] underlying the VDBC which is not shown." J.A. 130. For instance, "to discover the full date of birth, users and/or bots will enter a number, pick a starting year," and then search sequentially until data appears, allowing them to

"discover[] the full birth date by process of elimination," despite the fact that the database does not display it.  J.A. 130.

Notably, these problems have persisted despite various preventive measures the Commonwealth has imposed.  For example, to gain electronic access to VDBC, a potential user must assent to a registration agreement which forbids "any form or automated scripting against the system," "access[ing] or attempt[ing] to access the system in an excessive manner," and "misus[ing] search criteria or conduct[ing] searches in a manner that may be construed as attempting to gather information for purposes other than that for which the system was designed."  J.A. 130 (internal quotation marks omitted).  Despite these terms and the Commonwealth's efforts to ban violators, "VDBC has been mined for data."  J.A. 130.  The Executive Secretary also uses various "anti-scripting tactics" but has found they "can be anticipated and circumvented by determined data miners."  J.A. 130.  For example, defensive "algorithms can detect bot activity by determining that any session that makes over a given number of searches in a given time resembles bot activity."  J.A. 130.  But a bot can quickly "adapt and search just under [the] algorithm's limit" to avoid getting banned.  J.A. 130.  And after being banned, "a determined data harvester" can successfully "reapply for access" to VDBC because "there is no real way to vet registrants."  J.A. 130–131.

Like OCIS and VDBC, OCRA provides online access to court records that contain sensitive personal information in an electronic format that is susceptible to mass data harvesting.  The Commonwealth contends that the Access Restriction promotes its interest in safeguarding this information in two primary ways.

17

First, restricting the public to accessing civil court records at the courthouse eliminates the possibility that a member of the public will engage in data mining. At the courthouse, a person "cannot digitally download court records," much less "download [and search] every available nonconfidential court record containing personally identifiable information" like a remote online user could. J.A. 128. Further, at the courthouse a person must request and print documents individually, making it impracticable to obtain the large volume of data necessary for mining or to search the public access terminal using bots.

Second, limiting OCRA access to attorneys protects against data mining and misuse of sensitive personal information by confining remote online access to "a self-policing, pre-vetted group subject to codified Rules of Professional Conduct and serious professional sanctions for violating those Rules," including the possibility of losing their livelihood. *Courthouse News Serv.*, 631 F. Supp. 3d at 366. At the same time, the Commonwealth urges, granting Virginia attorneys and their staff online access to court records furthers its important interest in the orderly and efficient administration of justice by ensuring that participants essential to the justice system have ready access to the information necessary to perform their professional obligations. As the Commonwealth explains, online access to civil court records makes it easier for attorneys "to serve their clients effectively and cost-efficiently," thereby fostering access to justice and its efficient and orderly administration. Commw. Br. 47.

We are satisfied the Commonwealth has demonstrated that the threat of data mining for records available in OCRA is "real, not merely conjectural," and that the Access Restriction "alleviates [that] harm[] in a direct and material way" while also fostering

18

attorneys' access to information necessary for performing their obligations as officers of the court. *Ross*, 746 F.3d at 556 (internal quotation marks omitted). Evidence that data mining has occurred in other publicly available online databases, despite preventive measures to mitigate that harm, amply demonstrates the real risk to sensitive personal information in court records. It also demonstrates that the Access Restriction, by preventing public remote access, furthers the Commonwealth's interest in protecting that information.[11] As a matter of "common sense and logic," giving Virginia attorneys and their staff remote online access to Virginia court records promotes effective legal representation and efficient court administration. *Ross*, 746 F.3d at 556 (internal quotation marks omitted); *see also Sharpe*, 59 F.4th at 681 ("Defendants . . . can rely on any obvious connection between the asserted interest and the challenged regulation to show that their policy was appropriately tailored . . . ." (internal quotation marks omitted)); *Reynolds*, 779 F.3d at 228 & n.4 (instructing that "objective evidence is not always required to show that a speech restriction furthers the government's interests," especially where the relationship is "obvious"). By limiting online access to this relatively small, vetted group of individuals who are strongly incentivized to follow OCRA's rules and who can be effectively disciplined for misconduct, the Access Restriction furthers the Commonwealth's interest in safeguarding sensitive personal information in court records. Absent the Access

---

[11] Because this evidence and common sense demonstrate a relationship between the Commonwealth's important interests and the Access Restriction, we, like the district court, do not address the secondary sources the Commonwealth cites as additional evidence.

Restriction, the Commonwealth's significant interests "'would be achieved less effectively.'" *Ross*, 746 F.3d at 556 (quoting *Ward*, 491 U.S. at 799).

To avoid this conclusion, Courthouse News attempts to poke holes in the evidence. It argues that data mining in OCIS and VDBC is insufficient to demonstrate that sensitive personal information is genuinely at risk in OCRA because the Commonwealth hasn't proven that the data mining was for a nefarious purpose. And Courthouse News faults the Commonwealth for failing to quantify how frequently sensitive personal information actually appears in civil court records.

These contentions insist on a level of exactitude not required by the applicable legal standard. The Commonwealth has demonstrated that online access to civil court records presents a "plausible threat" to the privacy and security of sensitive personal information in those records. *Ross*, 746 F.3d at 556. State court civil records cover a wide range of matters, including such traditional state concerns as family and property law. It is no stretch to accept that those records include sensitive personal information that OCRA does not require to be redacted, including "an actual signature," "a date of birth identified with a particular person," "the maiden name of a person's parent so as to be identified with a particular person," "the name and age of any minor child," and partial social security numbers, driver's license numbers, and financial account numbers. Va. Code Ann. § 17.1-293(B); *see id.* § 17.1-293(E) (authorizing clerks to provide attorneys and their staff with "secure remote access" to court records containing this information); *id.* § 8.01-420.8(A) (requiring litigants to redact "all but the last four digits" of any social security number,

20

driver's license number, or "electronic billing and payment system" number).[12]   Data harvesting undermines the privacy and security of that personal information, even if bots are not inherently bad.   The Commonwealth's evidence suffices to show that the Access Restriction protects against the mass collection of personal identifying information, which is a "real, not merely conjectural," risk associated with online access to state civil court records.

We are also satisfied that the Access Restriction is not "'substantially broader than necessary to achieve the government's'" legitimate interests.   *Ross*, 746 F.3d at 557 (quoting *Ward*, 491 U.S. at 800).   Under this standard, a regulation "need not be the least restrictive or least intrusive means" of achieving the government's desired end.   *Ward*, 491 U.S. at 798.   Rather, "[t]he government has considerable latitude" to "employ the means of its choosing" to promote its interests.   *Satellite Broad.*, 275 F.3d at 364 (internal quotation marks omitted).   "So long as the means chosen are not substantially broader than necessary to achieve the government's interest, . . . the regulation will not be invalid simply because . . . the government's interest could be adequately served by some less[]restrictive alternative."   *Ward*, 491 U.S. at 800.

---

[12] Courthouse News suggests that other statutory provisions shield some of this sensitive personal information from public view.   One of the problems with that premise is that many of the statutes Courthouse News cites do not categorically seal or redact information.   *See, e.g.*, Va. Code Ann. § 8.01-217(G) (providing that the court "may order" name change records to be sealed if there is "a serious threat to the health or safety of the applicant or his immediate family"); *id.* § 20-124 ("Upon motion of a party . . . the court may order" divorce records or agreements to be sealed.); *id.* § 20-146.20(E) (sealing identifying information in child custody records if the "health, safety, or liberty of a party or child would be jeopardized by disclosure of" that information).

The Access Restriction does not burden substantially more access to court records than necessary to further the government's interests in protecting sensitive personal information and facilitating the orderly and efficient administration of justice. Instead, the Access Restriction is limited in scope and tailored to the online danger it is intended to address. The public and the press can access all nonconfidential civil court records at the courthouse; the regulation does not shield any court records from public view. The restriction burdens only remote access to those same records over the internet—the medium uniquely vulnerable to data mining and subsequent misuse of sensitive personal information. Where that concern does not exist, the Access Restriction imposes no burden. In this respect, the regulation achieves "the essence of narrow tailoring": it "focuses on the source of the evils the [Commonwealth] seeks to eliminate" while leaving untouched other forms of access that "do[] not create the same evils." *Id.* at 799 n.7; *see also Ross*, 746 F.3d at 557 (finding policy narrowly tailored where it "does no more than 'target[] and eliminate[] . . . the exact source of the evil it seeks to remedy'" (quoting *Frisby v. Schultz*, 487 U.S. 474, 485 (1988)).

Likewise, offering remote online access only to Virginia attorneys and their staff, as the circuit court clerk does, is narrowly tailored to promote the significant governmental interest in the orderly and efficient administration of justice. As previously discussed, attorneys and their staff do not pose the same threat to sensitive personal information as the public at large. By granting these individuals online access, the Commonwealth does not jeopardize its interest in safeguarding sensitive personal information in court records.

22

Moreover, attorneys are officers of the court and play an essential role in the legal system, which online access to court records facilitates.

Courthouse News counters that the Access Restriction is not narrowly tailored because "readily available less-speech-restrictive alternatives" exist. Opening Br. 61. Specifically, Courthouse News pitches (1) more redaction, (2) "restricting online access for all except the parties and their counsel in case types where identifiers commonly appear," and (3) "commonly-used bot management, mitigation and protection practices." Opening Br. 58–59, 60. As an initial matter, we reiterate that a time, place, or manner regulation is not invalid "'simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative.'" *Ross*, 746 F.3d at 557 (quoting *Ward*, 491 U.S. at 800); *see also Ward*, 491 U.S. at 798 n.6 ("[L]east-restrictive-alternative analysis is wholly out of place" in assessing time, place, or manner regulations.). And the Commonwealth's evidence shows it has "actually tried or considered" less restrictive alternatives and found them "inadequate to serve [its] interest." *Billups v. City of Charleston*, 961 F.3d 673, 688 (4th Cir. 2020).

Beginning with redaction, the Commonwealth has produced evidence that expanding the clerk's current redaction review process to include all sensitive personal information that Virginia law prohibits a clerk to post on the internet, *see* Va. Code Ann. § 17.1-293(B), would "cost substantial additional funds" and time, J.A. 138. One court clerk explained that redaction introduces delays into the process of posting court filings for public view and estimated that, if court filings were made available to the public on the internet, his redaction costs would more than quadruple. He also predicted, reasonably,

23

that attorneys would likely make in-person requests for the unredacted documents. Burdensome redaction procedures and increased demands on court clerks undermine the government's interest in the orderly and efficient administration of justice.

Regarding Courthouse News's passing suggestion to seal online records for certain case types, it is not apparent that alternative is actually less restrictive or would adequately protect personal information. Courthouse News cites existing laws that permit sealing in individual cases for good cause, but the Commonwealth's interest in protecting sensitive personal information online extends far beyond those individualized circumstances. *See*, *e.g.*, Va. Code Ann. § 20-146.20(E) (sealing child custody records if the "health, safety, or liberty of a party or a child would be jeopardized by disclosure of identifying information"); *id.* § 8.01-217(G) (permitting court to seal name change records if there is "a serious threat to the health or safety of the applicant or his immediate family"). Moreover, sealing all cases of a certain type would *reduce* attorney access to court records.

As for bot management and other security measures, the Commonwealth's actual experience with those tactics in other online court records systems supports its assertion that they are less effective than the Access Restriction at protecting sensitive personal information. *See Reynolds*, 779 F.3d at 232 (requiring the government to show it "tried to *use* the available alternatives to address its safety concerns"). Bots and "determined data miners" have proven sufficiently sophisticated to anticipate, circumvent, and evade the courts' "anti-scripting tactics." J.A. 130. A mandatory subscription agreement has failed to deter data mining in the VDBC, even though the agreement specifically prohibits "automated scripting against the system" and is enforced by banning violators. J.A. 130

24

(internal quotation marks omitted).  Given the Commonwealth's experience with these methods in other online databases, it need not pursue these flawed alternatives for OCRA and then, only after exposing the sensitive personal information of its citizens to malicious actors, turn to the more effective method of restricting OCRA access to attorneys and their staff.

Finally, Courthouse News makes much of the fact that various other jurisdictions offer the public online access to court records.  We agree with the district court that, without evidence about how other courts' online access systems work and whether they are effective at safeguarding the sensitive personal data that concerns the Commonwealth, the existence of remote online access systems in other jurisdictions "does not alter our conclusion that the [Access Restriction] does not burden *substantially* more [access to court records] than necessary" to achieve the Commonwealth's important interests.  *Ross*, 746 F.3d at 557.  It is tailored to address the threat presented by remote online access to civil court records, while leaving untouched the public's full access to the same records at the courthouse.

### 4.

An additional consideration in the narrow tailoring analysis, at least for restrictions on speech, is whether the challenged regulation "leave[s] open ample alternative channels of communication."  *Ward*, 491 U.S. at 802.  Our Court in *Schaefer* did not mention this requirement when articulating the standard for evaluating time, place, and manner restrictions on the right to access court records.  *See* 2 F.4th at 328.  The parties here

nevertheless assume the alternative-channels requirement would be imported into this context, so we address it for the sake of argument.

The Access Restriction unquestionably leaves open an alternative avenue for accessing Prince William County Circuit Court records, namely, the public access terminals at the courthouse where the press and the public can view and print all the same records that are available on OCRA. Courthouse News acknowledges this alternative but argues it is inadequate because of "the travel time and expense" required to visit multiple courthouses throughout the Commonwealth. Opening Br. 65. Even if that were true, and even if we were to consider the choices made by court clerks in other counties, "the First Amendment affords no special protection to a [plaintiff's] favored or most cost-effective mode" of exercising his rights. *Ross*, 746 F.3d at 559 (internal quotation marks omitted). Of course, for many individuals, viewing court records for free at the courthouse and paying only for in-person printing costs would be less expensive than purchasing OCRA access. In any event, "the available alternatives need not be the speaker's first or best choice" to pass constitutional muster. *Id.* (internal quotation marks omitted). The courthouse public access terminals are an adequate alternative avenue for accessing civil court records.

*        *        *

In sum, the Access Restriction does not contravene the First Amendment right to access court records because it is a content-neutral time, place, and manner regulation that is narrowly tailored to further the Commonwealth's important interests in protecting

sensitive personal information and promoting the orderly and efficient administration of justice.

## III.

We turn next to Courthouse News's First Amendment challenge to the Dissemination Restriction, which forbids "any data accessed by secure remote access to be sold or posted on any other website or in any way redistributed to any third party." Va. Code Ann. § 17.1-293(H). In view of our ruling that Courthouse News is not entitled to OCRA access, we conclude it lacks standing to challenge this provision. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998) ("[E]very federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review, even though the parties are prepared to concede it." (internal quotation marks omitted)).

The Dissemination Restriction does not impose any restraint on Courthouse News's speech, because it applies only to individuals with remote online access to court records. Courthouse News does not currently have such access, and we have determined it is not constitutionally entitled to receive that access. The circuit court clerk has made clear she will not provide OCRA access to anyone but Virginia-barred attorneys and their staff, and nothing suggests Courthouse News will be offered any type of remote online access to Prince William County Circuit Court records in the near future. Because the Dissemination Restriction does not apply to Courthouse News's speech, it lacks standing to challenge that provision. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (requiring a "personal and individual" injury in fact to establish standing to sue (internal quotation marks omitted)).

27

Courthouse News suggests that the Dissemination Restriction indirectly injures it by hindering its ability to acquire electronic court records from attorneys with OCRA access. "But to have standing to assert a right to receive speech, a plaintiff must show that there exists a speaker willing to convey the information to her." *Stephens v. Cnty. of Albemarle*, 524 F.3d 485, 492 (4th Cir. 2008). Courthouse News has not identified anyone who would redistribute data from OCRA to Courthouse News absent the Dissemination Restriction, nor has it offered any evidence from which the existence of such a person can be inferred. *See id.* We therefore conclude that Courthouse News's assertion of derivative injury is "too speculative to support standing." *Id.* at 491.

Accordingly, we vacate the district court's summary judgment ruling on Courthouse News's First Amendment challenge to the Dissemination Restriction and remand for the district court to dismiss this claim without prejudice. *See S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 185 (4th Cir. 2013) ("A dismissal for lack of standing . . . must be one without prejudice, because a court that lacks jurisdiction has no power to adjudicate and dispose of a claim on the merits.").

IV.

Lastly, we address Courthouse News's claim that the Access Restriction violates the Equal Protection Clause of the Fourteenth Amendment. According to Courthouse News, the Access Restriction's differential treatment of individuals seeking online access to court records violates the Equal Protection Clause for the same reasons it violates the First Amendment. Having rejected the argument that the Access Restriction violates the

First Amendment by limiting OCRA access to attorneys, we also conclude that it is consonant with equal protection.

"'[W]here the state shows a satisfactory rationale for a content-neutral time, place, and manner regulation, that regulation necessarily' survives scrutiny under the Equal Protection Clause." *Brown v. City of Pittsburgh*, 586 F.3d 263, 283 (3d Cir. 2009) (quoting *McGuire v. Reilly*, 260 F.3d 36, 49–50 (1st Cir. 2001)). So it is here: the Access Restriction "passes muster under the Equal Protection Clause for the same reasons that it passes muster under the First Amendment." *McGuire*, 260 F.3d at 50; *see also Williams v. City of Columbia*, 906 F.2d 994, 999 (4th Cir. 1990) (rejecting equal protection claim based on fundamental right of free speech because the ordinance in question "is a content-neutral time, place and manner restriction").

Courthouse News protests that, under the Equal Protection Clause, legislative actions that impinge upon a fundamental right are subject to strict scrutiny. We agree with our sister circuits that "this standard does not apply to content-neutral time, place, and manner restrictions valid under *Ward*'s First Amendment test." *Brown*, 586 F.3d at 283 n.22. As the Third Circuit explains, "[i]f every time, place, and manner regulation were subject to strict scrutiny under the Equal Protection Clause simply because it burdened constitutionally protected speech, *Ward*'s intermediate-scrutiny test would be rendered obsolete." *Id.* Instead, consistent with Supreme Court precedent, "it is only content-based time, place, and manner regulations that call for strict scrutiny—whether viewed through the lens of First Amendment or Equal Protection doctrine." *Id.*; *see McGuire*, 260 F.3d at 49 ("[T]he equal protection interests involved in the differential treatment of speech are

inextricably intertwined with First Amendment concerns . . . ."); *cf.*, *e.g.*, *Carey v. Brown*, 447 U.S. 455 (1980) (holding that content-based picketing restriction violated the Equal Protection Clause); *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 101 (1972) (same, explaining that the ordinance "describe[d] impermissible picketing not in terms of time, place, and manner, but in terms of subject matter").  Because we have already determined that the Access Restriction is content-neutral, strict scrutiny does not apply.

## V.

To conclude, the Access Restriction does not violate the First Amendment but permissibly and in a content-neutral fashion regulates the time, place, and manner in which Courthouse News may access the nonconfidential civil court records of the Prince William County Circuit Court.  Having survived First Amendment scrutiny, the Access Restriction also does not run afoul of the Equal Protection Clause.  We therefore affirm the district court's judgment rejecting both of those claims.  As for the Dissemination Restriction, Courthouse News lacks standing to challenge it; therefore, we vacate the district court's ruling on that claim and remand for the court to dismiss that claim without prejudice.

*AFFIRMED IN PART, VACATED IN PART, AND REMANDED*

GREGORY, Circuit Judge, dissenting:

I respectfully dissent from the majority opinion. As the United States Court of Appeals for the Ninth Circuit observed, "[t]he free press is the guardian of the public interest, and the independent judiciary is the guardian of the free press." *Courthouse News Serv. v. Planet*, 947 F.3d 581, 589–90 (9th Cir. 2020) (citation omitted). In this case, the press invokes our promise of protection and, I fear, the majority has failed to provide it.

I would find that both the Access and Dissemination Restrictions are subject to First Amendment strict scrutiny. And, because this case could be resolved on purely First Amendment grounds, I would decline to consider Courthouse News' equal protection challenge. I would, therefore, reverse the district court's grant of summary judgment to the government and remand for reconsideration of both restrictions under the strict scrutiny standard.

## I.

The First Amendment provides that:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const. amend. I. "[A]nd it is no longer open to doubt that the liberty of the press and of speech, is within the liberty safeguarded by the due process clause of the Fourteenth Amendment from invasion by state action." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 556 (1976) (citation and quotation marks omitted). Thus, the First Amendment applies with equal force to state action, like that implicated here.

31

II.

I would remand to the district court to determine if the Access Restriction can survive strict scrutiny. To begin, the majority and I differ on the proper level of scrutiny. While the majority considers the Access Restriction a permissible time, place, and manner regulation, *supra* at 9 (majority opinion), I would find that the Access Restriction constitutes "listener-based discrimination." Though this doctrine has been lurking in our jurisprudence, it has yet to be christened or fully defined. Today, I endeavor to do both. Because this listener-based discrimination relates to judicial records, I would subject the Access Restriction to strict scrutiny. Therefore, I would remand to the district court for a consideration of whether the Access Restriction satisfies strict scrutiny.

A.

Though not neatly falling into either framework, the Access Restriction sits at the confluence of two lines of First Amendment jurisprudence: the First Amendment's guarantee of access to judicial documents and its prohibition on content discrimination. Together, these ensure a right to be free from "listener-based discrimination." And, under this doctrine, I would hold that the Access Restriction is a form of listener-based discrimination.

First, it is well-established that the First Amendment guarantees access to judicial documents. It is true that this right does not appear in the text of the First Amendment itself but, as the Supreme Court observed, "[t]he First Amendment is [ ] broad enough to encompass those rights that, while not unambiguously enumerated in the very terms of the Amendment, are nonetheless necessary to the enjoyment of other First Amendment rights."

32

*Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596, 604 (1982). This includes the "freedom to listen," *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576 (1980) (plurality opinion); *see also Willis v. Town of Marshall*, 426 F.3d 251, 259–60 (4th Cir. 2005) (gathering cases), and a qualified public right to access judicial documents, *Press-Enterprise Co. v. Superior Ct. of Cal. for Riverside Cty.*, 478 U.S. 1, 11 (1986); *see also Cal. First Amend. Coal. v. Woodford*, 299 F.3d 868, 873 (9th Cir. 2002) ("It is well-settled that the First Amendment guarantees the public—and the press—a qualified right of access to governmental proceedings."). At its heart, this right of public access "protects the public against the government's 'arbitrary interference with access to important information.'" *N.Y.C.L. Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 298 (2d Cir. 2012) (quoting *Richmond Newspapers, Inc.*, 448 U.S. at 583 (Stevens, J., concurring)). After all, "[a] free press cannot be made to rely solely upon the sufferance of government to supply it with information." *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 104 (1979). Without news, the news has nothing to say.

Second, it is axiomatic that the First Amendment "prohibits a restriction on speech that is predicated on its message, its ideas, its subject matter, or its content." *Fusaro v. Cogan*, 930 F.3d 241, 252 (4th Cir. 2019) (quoting *Am. Ass'n of Pol. Consultants, Inc. v. Fed. Commc'ns Comm'n*, 923 F.3d 159, 163 (4th Cir. 2019)). "Content-based laws" are "those that target speech based on its communicative content," and "[g]overnment regulation of speech is content[-]based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Content discrimination can take several forms, including "defining regulated

speech by its function or purpose," and regulating speech based on the speaker's identity (so-called speaker discrimination). *Id.* at 163, 169–70. As for speaker discrimination, the Supreme Court has recognized, "because speech restrictions based on the identity of the speaker are all too often simply a means to control content, . . . we have insisted that laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference." *Id.* at 170 (cleaned up); *see also Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) ("the Government may commit a constitutional wrong when by law it identifies certain preferred speakers."). Regardless of their exact nature, content-based regulations "are subject to strict scrutiny." *Reed*, 576 U.S. at 163–64.

I believe that this case falls at the juncture of these two lines of jurisprudence. First, it directly implicates the First Amendment right to access judicial documents: Courthouse News seeks access to non-sealed Virginia civil court records. *See* Op. Br. at 6.[1] While the Supreme Court's jurisprudence is limited to the right to access in criminal proceedings, this Court, like all of our sister circuits to address the question, has extended the First Amendment right of access to certain non-sealed civil court documents.[2] *United States ex*

---

[1] Here, I pause to note that nothing in this opinion should be read to implicate our long-standing jurisprudence regarding the sealing of civil court documents. *See e.g. United States ex rel. Oberg v. Nelnet, Inc*., 105 F.4th 161, 171 (4th Cir. 2024).

[2] It is true that the First Amendment right to access does not attach to each and every document implicated in a suit. The right to access judicial records derives from two sources: the common law and the First Amendment. And, "[b]ecause there are two sources, the right protected by each varies." *Oberg*, 105 F.4th at 171. While the press and the public enjoy a common-law right of access to all "documents filed with the court . . .

*rel. Oberg v. Nelnet, Inc*., 105 F.4th 161, 172 (4th Cir. 2024); *Courthouse News Serv. v. Planet*, 947 F.3d 581, 590 (9th Cir. 2020) (noting "every circuit to consider the issue has uniformly concluded that the right applies to both civil and criminal proceedings"). Caselaw is clear that "we apply strict scrutiny to examine an asserted infringement of a First Amendment right of access." *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 328 (4th Cir. 2021).

As for the second doctrine, it is true that the Access Restriction cannot be deemed pure speaker discrimination. Virginia is not telling Courthouse News it cannot speak while it allows lawyers to speak. And Virginia *is* providing Courthouse News with access to judicial documents, although not through OCRA.

However, Virginia is limiting access to its records based on the identity of the requester (the would be "listener") as a means of controlling the content of the listener's resulting speech. This is what I call "listener-based discrimination." And, as we have recognized, "when the government has decided to make certain information available, there

---

[that] play a role in the adjudicative process or adjudicate substantive rights," the First Amendment right of access only "attaches to any judicial proceeding or record (1) that has historically been open to the press and general public; and (2) where public access plays a significant positive role in the functioning of the particular process in question." *Id*. (cleaned up). Here, like the majority, I assume that the documents Courthouse News seeks are those covered by the First Amendment and limit my discussion to those documents. *Supra* at 8–9 (majority opinion). Our jurisprudence supports this generous assumption and has found the First Amendment extends to a wide range of civil documents. *See e.g., Oberg*, 105 F.4th at 171 (holding there is a First Amendment right of access to a motion for summary judgment and its accompanying exhibits); *Schaefer*, 2 F.4th at 328 (holding there is a right to access newly filed civil complaints). To the extent that Courthouse News may demand access to documents only covered by the common-law right of access, I would leave that unasked question unanswered.

35

are 'limits to its freedom to decide how that benefit will be distributed.'" *Fusaro*, 930 F.3d at 255 (quoting *L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 43 (1999) (Ginsburg, J., concurring)); *see also Richmond Newspapers, Inc.*, 448 U.S. at 576 (plurality opinion) (noting that the First Amendment protects the "freedom to listen").

Virginia limits OCRA access based on the listeners' identity. Virginia only allows three groups of people to access OCRA: "[1] members in good standing with the Virginia State Bar and their authorized agents, [2] pro hac vice attorneys authorized by the court for purposes of the practice of law, and [3] such governmental agencies as authorized by the clerk." Va. Code § 17.1–293(E)(7). It denies access to all others. The reason that Courthouse News cannot access OCRA is clear and uncontested: Courthouse News is a news service. *See supra* at 5 (majority opinion); J.A. 82.

By limiting access based on the listener's profession, i.e. whether the listener is a lawyer as opposed to a journalist, Virginia evinces a preference for certain types of speech. Lawyers can use the information obtained from OCRA to assist in performing their professional duties, such as writing briefs and making legal arguments. But news services cannot use OCRA to perform their professional duties: to report on the news. The press relies on information—the press can only report if it has something to report. Without access to information, the press is silenced; it cannot speak. *Cf. Branzburg v. Hayes*, 408 U.S. 665, 681 (1972) ("without some protection for seeking out the news, freedom of the press could be eviscerated"). Virginia is, therefore, regulating OCRA access based on "what the [listener] proposes to say." *Gresham v. Swanson*, 866 F.3d 853, 856 (8th Cir. 2017). A form of content discrimination, the Access Restriction is "swapping an obvious

subject-matter restriction" (no media reporting) for a listener-based "proxy that achieves the same result." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 74 (2022). And this I would refer to as "listener-based discrimination."

The majority argues that the Access Restriction is content-neutral because it "applies to all nonconfidential civil court records in the same fashion and does not treat civil court records about a certain subject or topic differently than others." *Supra* at 11 (majority opinion) (citation omitted). But, in my view, the determination of content neutrality does not always depend on the information being sought; it can depend on the listener seeking it. *See, e.g.*, *Fusaro*, 930 F.3d at 252. Here, Virginia is regulating access based on the listener's identity. This constitutes listener-based discrimination.

B.

Like all rights, "even when a [First Amendment] right . . . attaches, it is not absolute," and the government may nevertheless justify their restriction before the courts. *Press-Enterprise Co.*, 478 U.S. at 9; *see also Oberg*, 105 F.4th at 171 n.8 ("[t]hough the First Amendment poses a high bar . . . it is not insurmountable."). Having established that Virginia is engaging in listener-based discrimination, the question remains: What is the proper standard of review? In a previous opinion, this Court has acknowledged that laws that "restrict[] access to and use of [certain government information] based on the identity of the speaker requesting [it] and the content of the speaker's message" "can trigger strict scrutiny." *Fusaro*, 930 F.3d at 252. Because this case involved judicial documents, I would impose strict scrutiny.

In determining that strict scrutiny is appropriate to listener-based discrimination, looking to our public forum analysis is instructive.  When it comes to government property, "the nature of the government property (or 'forum') determines the permissible scope of government control."  *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 196 (4th Cir. 2022).  Caselaw divides government property into at least three categories:  traditional, designated, and nonpublic forums.[3]  When determining which category a forum falls within, we look to whether a forum is "historically associated with the free exercise of expressive activities."  *Id.*

For "traditional" or "designated public forums," "governments have limited leeway to restrict speech."  *Id.*  While "the government may impose reasonable time, place, and manner restrictions on private speech, [ ] restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited."  *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018).  But when it comes to nonpublic forums, the standard of review is lower, as the government "may draw distinctions based upon . . . speaker identity."  *Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*, 470 F.3d 1062, 1067 (4th Cir. 2006); *see also Minn. Voters All.*, 585 U.S. at 12 ("our decisions have long recognized that

---

[3] Traditional public forums are "'public places' historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks."  *White Coat Waste Project*, 35 F.4th at 196.  Designated public forums are areas "lacking" traditional public forums' "historical association with free expression" but that the government has designated as a public forum.  *Id.*  Nonpublic forums, on the other hand, are "[p]ublic property which is not by tradition or designation a forum for public communication."  *Id.*  There is considerable debate about whether there are three or four types of free-speech forums.  As my discussion of public forums is simply to illustrate my belief that strict scrutiny should apply to listener-based discrimination, I have only identified three here but otherwise follow this Court's lead of declining to "wade into this morass."  *Id.* at 196 n. 13.

the government may impose some content-based restrictions on speech in nonpublic forums"); *see also White Coat Waste Project*, 35 F.4th at 196 (governments have "wider latitude to limit speech" in nonpublic forums).

As with our public forum analysis, I would hold that listener-based restrictions on government information likewise depend on the "nature" of the documents (or proceedings) that the listeners seek to access. When the listener seeks access to documents which are "historically associated with free exercise of expressive activities," *id.*, strict scrutiny should apply. But when a listener attempts to access documents that are not "by tradition or designation" ripe for public view, *id.*, the government may exercise greater leeway in limiting speech based on the identity of the listener, *cf. Fusaro*, 930 F.3d at 252, 262 (holding that, because the government was "not compelled" to provide voter registration lists, limitations on the right to access were subject to intermediate scrutiny).

Applying that framework here, I would hold that judicial records are "historically associated with free exercise of expressive activities." *White Coat Waste Project*, 35 F.4th at 196. "For many centuries, both civil and criminal trials have traditionally been open to the public." *Gannett Co. v. DePasquale*, 443 U.S. 368, 386 n.15 (1979); *see also Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1067–70 (3d Cir. 1984) (gathering historical evidence). As the Supreme Court has long observed, "'A trial is a public event. What transpires in the court room is public property.'" *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 492 (1975) (quoting *Craig v. Harney*, 331 U.S. 367, 374 (1947)).

This tradition of openness is intertwined with the press' freedom—indeed, obligation—to report on the judicial process. As the Supreme Court observed, "[a]

responsible press has always been regarded as the handmaiden of effective judicial administration." *Neb. Press Ass'n*, 427 U.S. at 559–60. This is because the press bears the "[g]reat responsibility" of "report[ing] fully and accurately the proceedings of government," and "judicial proceedings . . . are without question events of legitimate concern to the public and consequently fall within the responsibility of the press to report." *Cox Broadcasting Corp.*, 420 U.S. at 491–92. As for criminal trials specifically, the Supreme Court observed that access by the public and the press "enhances the quality and safeguards the integrity of the factfinding process, with benefits to both the defendant and to society as a whole." *Globe Newspaper Co.*, 457 U.S. at 606. The right of access allows the public to "participate in and serve as a check upon the judicial process — an essential component in our structure of self-government." *Id*.

Considering this long history, I would hold that listener-based restrictions on access to judicial records must be subject to strict scrutiny.

## C.

The majority rests its analysis on the fact that there is no "freestanding First Amendment right of online access to court records." *Supra* at 8–9 (majority opinion). It then argues that this is a time, place, and manner restriction because "the denial of OCRA access limits when, where, and how Courthouse News may access those court records: during business hours at the courthouse using public access terminals instead of all hours of every day, remotely, using a personal computer with internet access." *Supra* at 9 (majority opinion).

40

As to the majority's first point, I agree—there is no *freestanding* right to online access. This Court has found that the public has a reasonably contemporaneous right to civil complaints, and that the government must take steps to ensure the prompt processing and availability of newly filed complaints. *See Schaefer*, 2 F.4th at 328. Therefore, not only does the public have a right to accessing these civil judicial documents, but the government also has an affirmative duty to ensure such access. *Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1255 (3d Cir. 1992) ("Our review of the Supreme Court's decisions confirms that the First Amendment does not merely prohibit the government from enacting laws that censor information, but additionally encompasses the positive right of public access to information and ideas."). However, we have noted that courts have "flexibility" and "leeway" in ensuring that the public has contemporaneous access to civil complaints. *Schaefer*, 2 F.4th at 328. Accordingly, the government could shut down OCRA in its entirety without implicating the First Amendment.[4]

It is with the majority's second point that I respectfully disagree. The majority reasons that this case is just about one organization's access to civil court documents. But this case is not about accessing the court records themselves; it is about the government's discriminatory limitation on OCRA access. The government has made OCRA available, but only to some. It has imposed a blanket fiat banning Courthouse News from OCRA.

---

[4] I stress here that I do not believe that states are constitutionally obligated to create an online system similar to OCRA. Our jurisprudence on the right of public access governs what is necessary in that regard. My discussion here instead considers how the government may regulate access to a database containing judicial records, like OCRA, if it chooses to create one.

Courthouse News is *never* allowed to access OCRA at any time, in any place, or in any manner. The Access Restriction simply is not a time, place, or manner restriction, as the majority argues. Rather, as explained above, I would hold that it should be subject to strict scrutiny.

### D.

Simply because the Access Restriction should be subject to strict scrutiny does not mean that it is necessarily unconstitutional. Consistent with our jurisprudence, strict scrutiny is satisfied when the regulation is "necessitated by a compelling government interest and the denial of access is narrowly tailored to serve that interest." *Oberg*, 105 F.4th at 171 (citation and quotation marks omitted). Because the district court did not have occasion to consider this case under the strict scrutiny standard, *see* J.A. 545 (the district court holding that the Access Restriction "resembles a time, place, and manner restriction and relaxed scrutiny applies"), I would remand for further consideration.

### III.

Turning to Virginia's Dissemination Restriction, I again respectfully dissent. I would hold that the Dissemination Restriction is a prior restraint on speech and is, therefore, subject to strict scrutiny. Like with the Access Restriction, I would remand to the district court to apply strict scrutiny.

In my view, the Dissemination Restriction is a classic form of prior restraint, regardless of whether Courthouse News has an independent First Amendment right to access OCRA or whether it must depend on a third party to download OCRA's content.

In contrast to regulations penalizing past speech, "[t]he term prior restraint is used to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (citation and quotation marks omitted) (emphasis in original). Prior restraints are a particularly odious threat to the rights enshrined in the First Amendment. As the Supreme Court explained, "[i]f it can be said that a threat of criminal or civil sanctions after publication 'chills' speech, prior restraint 'freezes' it." *Neb. Press Ass'n*, 427 U.S. at 559. As a result, "[p]rior restraints have been accorded the most exacting scrutiny." *Smith*, 443 U.S. at 102; *see also Neb. Press Ass'n*, 427 U.S. at 558 ("Any prior restraint on expression comes to this Court with a heavy presumption against its constitutional validity.") (cleaned up).

This is particularly true when it comes to reports of judicial proceedings. "[T]he First and Fourteenth Amendments command nothing less than that the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection." *Cox Broadcasting Corp.*, 420 U.S. at 495. "Once true information is disclosed in public court documents open to public inspection, the press cannot be sanctioned for publishing it." *Id*. at 496.

Here, as the parties acknowledge, "[t]here is no difference in the content" between the records available at the courthouse and available on OCRA, as "they are the same records." J.A. 87 (joint stipulation). Therefore, these "official court records" are "open to public inspection." Yet the Dissemination Restriction flatly prohibits Courthouse News or

anyone else from "in any way redistribut[ing] to any third party" any data accessed via OCRA. Va. Code § 17.1–293(H). This is a blatant form of prior restraint.

Virginia implies that because Courthouse News could get this same information a different way and then disseminate it, the Dissemination Restriction is not a form of prior restraint. Virginia Response Br. at 50. But we have already considered and rejected a similar argument.

In *Soderberg v. Carrion*, we found that strict scrutiny applied to Maryland's prohibition on broadcasting official court recordings of criminal proceedings. 999 F.3d 962 (4th Cir. 2021). We rejected Maryland's argument that because there was not an "absolute prohibition[] on the publication of information in any form" and there were "other means of disseminating the same information," the broadcasting ban only constituted a time, place, and manner restriction. *Id.* at 966, 969. Drawing on Supreme Court precedent, we explained: "[i]f a newspaper lawfully obtains truthful information about a matter of public significance[,] then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." *Id.* at 968 (quoting *Smith*, 443 U.S. at 103).

The same is true here. The fact that Courthouse News can obtain and then disseminate the information by going into the courthouse does not render the Dissemination Restriction a time, place, and manner restriction. Because Courthouse News can lawfully obtain information contained in non-sealed civil courts records, I would hold that the Dissemination Restriction is a form of prior restraint and must be subject to strict scrutiny.

Like with the Access Restriction, the district court did not conduct a strict scrutiny analysis of the Dissemination Restriction.  *See* J.A. 561.  I would, therefore, remand for reconsideration.

*       *       *

For these reasons, I respectfully dissent.